# SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

## *MAJOR ACCIDENT INVESTIGATION TEAM*

## *ACCIDENT INVESTIGATION REPORT*

***City of Occurrence***

**Fontana**

***Supervisor***

Sgt. B. Motley

***Investigator***

Deputy Darrell Holland
Deputy Garrett Wolff
Deputy Henry Reyes

***Case Number***

192400847

***Date/Time/Location***

02/03/2024, 2244 hours, at Valley Boulevard and Cypress Avenue, Fontana, CA

***Subpoenas for investigating personnel should be directed to:***
***San Bernardino County Sheriff's Department:***
***Civil Liabilities Division***

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH REPORT

CHP 555 Page 1 (Rev. 3-20) OPI 060

Page 1 of

| SPECIAL CONDITIONS | NUMBER INJURED | HIT & RUN FELONY | CITY | JUDICIAL DISTRICT | LOCAL REPORT NUMBER | |
|---|---|---|---|---|---|---|
| Fatal | 3 | ☐ | Fontana | Rancho Superior | 192400847 | |
| | NUMBER KILLED | HIT & RUN MISDEMEANOR | COUNTY | REPORTING DISTRICT / BEAT | DAY OF WEEK | TOW AWAY |
| On-Duty Emergency Vehicle | 3 | ☐ | San Bernardino | H26G1 / Fon1 | Saturday | ☒ YES ☐ NO |

## LOCATION

| CRASH OCCURRED ON | MO. DAY YEAR | TIME (2400) | NCIC # | OFFICER ID |
|---|---|---|---|---|
| Valley Boulevard | 02/03/2024 | 2244 | 3600 | B9547 |

MILEPOST INFORMATION: ☐ FEET ☐ MILES OF

GPS COORDINATES: LATITUDE LONGITUDE

PHOTOGRAPHS BY: ☐ NONE — H. Reyes, C9389

☐ AT INTERSECTION WITH

☒ OR: 418 ☒ FEET ☐ MILES East OF Cypress Avenue

STATE HWY REL: ☐ YES ☒ NO

## PARTY 1 — ☒ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| None | CA | U | L | H | 2022 | Nissan/Sentra/White | 8ZZG454 | CA |

NAME (FIRST, MIDDLE, LAST): Giovanni, NMN, Bonilla

STREET ADDRESS: 4605 N. Acapulco Street

CITY/STATE/ZIP: San Bernardino/CA/92407

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo. Day Year | RACE |
|---|---|---|---|---|---|---|
| M | Brn | Brn | 511 | 120 | 03/30/2007 | H |

HOME PHONE: (951) 384-5898 BUSINESS PHONE: ( )

INSURANCE CARRIER: None POLICY NUMBER:

| DIR OF TRAVEL | ON STREET OR HIGHWAY | LANE | THRU LANES | TOTAL LANES | SPEED LIMIT |
|---|---|---|---|---|---|
| E | Valley Boulevard | Lt Trn | 2 | 3 | 45 |

OWNER'S NAME: ☐ SAME AS DRIVER — Carlos Arandacortez

OWNER'S ADDRESS: ☐ SAME AS DRIVER — 1650 N Sierra Way, San Bernardino, CA 92405

DISPOSITION OF VEHICLE ON ORDERS OF: ☒ OFFICER ☐ DRIVER ☐ OTHER — Armada Towing, (909) 428-1115

PRIOR MECHANICAL DEFECTS: ☒ NONE APPARENT ☐ REFER TO NARRATIVE

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE: 01

DESCRIBE VEHICLE DAMAGE: ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☒ MAJOR ☐ ROLL-OVER

SHADE IN DAMAGED AREA

CA ____ DOT ____ CAL-T ____ TCP/PSC ____ MC/MX ____

## PARTY 2 — ☒ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| F5431708 | CA | C | L | H | 2020 | Ford/Explorer/Black | 1603691 | CA |

NAME (FIRST, MIDDLE, LAST): Jesus, Mauricio, Garcia (On-Duty Emergency Vehicle)

STREET ADDRESS: 17005 Upland Avenue

CITY/STATE/ZIP: Fontana/CA/92335

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo. Day Year | RACE |
|---|---|---|---|---|---|---|
| M | Brn | Brn | 600 | 225 | 04/27/1995 | H |

HOME PHONE: (909) 350-7740 BUSINESS PHONE: ( )

INSURANCE CARRIER: City of Fontana POLICY NUMBER: Self

| DIR OF TRAVEL | ON STREET OR HIGHWAY | LANE | THRU LANES | TOTAL LANES | SPEED LIMIT |
|---|---|---|---|---|---|
| N | Valley Boulevard | Lt Trn | 2 | 3 | 45 |

OWNER'S NAME: ☐ SAME AS DRIVER — City of Fontana

OWNER'S ADDRESS: ☐ SAME AS DRIVER — 8353 Sierra Avenue, Fontana, CA 92335

DISPOSITION OF VEHICLE ON ORDERS OF: ☒ OFFICER ☐ DRIVER ☐ OTHER — Armada Towing, (909) 428-1115

PRIOR MECHANICAL DEFECTS: ☒ NONE APPARENT ☐ REFER TO NARRATIVE

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE: 48

DESCRIBE VEHICLE DAMAGE: ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☒ MAJOR ☐ ROLL-OVER

SHADE IN DAMAGED AREA

CA ____ DOT ____ CAL-T ____ TCP/PSC ____ MC/MX ____

## PARTY 3 — ☐ DRIVER ☐ PEDESTRIAN ☒ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| | | | P | P | 2018 | Toyota/Corolla/Silver | 8MQB233 | CA |

NAME (FIRST, MIDDLE, LAST):

STREET ADDRESS:

CITY/STATE/ZIP:

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo. Day Year | RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

HOME PHONE: ( ) BUSINESS PHONE:

INSURANCE CARRIER: N/A POLICY NUMBER: N/A

| DIR OF TRAVEL | ON STREET OR HIGHWAY | LANE | THRU LANES | TOTAL LANES | SPEED LIMIT |
|---|---|---|---|---|---|
| W | Valley Boulevard | 2 | 2 | 3 | 45 |

OWNER'S NAME: ☐ SAME AS DRIVER — Alyssa Gutierrez

OWNER'S ADDRESS: ☐ SAME AS DRIVER — 4406 N Aspan Avenue, Covina, CA 91722

DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☒ OTHER — Released to owner

PRIOR MECHANICAL DEFECTS: ☒ NONE APPARENT ☐ REFER TO NARRATIVE

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE: 01

DESCRIBE VEHICLE DAMAGE: ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☒ MAJOR ☐ ROLL-OVER

SHADE IN DAMAGED AREA

CA ____ DOT ____ CAL-T ____ TCP/PSC ____ MC/MX ____

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| Darrell Holland | ☒ YES ☐ NO ☐ N/A | B. [signature] | 5/23/24 |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH REPORT

CHP 555 Page 1 (Rev. 3-20) OPI 060

Page 2 of

| Field | Value |
|---|---|
| SPECIAL CONDITIONS | Fatal; On-Duty Emergency Vehicle |
| NUMBER INJURED | 3 |
| NUMBER KILLED | 3 |
| HIT & RUN FELONY | ☐ |
| HIT & RUN MISDEMEANOR | ☐ |
| CITY | Fontana |
| JUDICIAL DISTRICT | Rancho Superior |
| LOCAL REPORT NUMBER | 192400847 |
| COUNTY | San Bernardino |
| REPORTING DISTRICT | H26G1 |
| BEAT | Fon1 |
| DAY OF WEEK | Saturday |
| TOW AWAY | ☒ YES ☐ NO |

**LOCATION**

| Field | Value |
|---|---|
| CRASH OCCURRED ON | Valley Boulevard |
| MO. DAY YEAR | 02/03/2024 |
| TIME (2400) | 2244 |
| NCIC # | 3600 |
| OFFICER ID | B9547 |
| MILEPOST INFORMATION | ☐ FEET ☐ MILES OF |
| GPS COORDINATES | LATITUDE / LONGITUDE |
| PHOTOGRAPHS BY | ☐ NONE — H. Reyes, C9389 |
| ☐ AT INTERSECTION WITH | |
| ☒ OR: | 418 ☒ FEET ☐ MILES East OF Cypress Avenue |
| STATE HWY REL | ☐ YES ☒ NO |

## PARTY 4

☐ DRIVER ☐ PEDESTRIAN ☒ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| Field | Value |
|---|---|
| DRIVER'S LICENSE NUMBER | |
| STATE | |
| CLASS | |
| AIR BAG | P |
| SAFETY EQUIP. | P |
| VEH. YEAR | 2022 |
| MAKE/MODEL/COLOR | Chevrolet/Silverado/Black |
| LICENSE NUMBER | 91589L3 |
| STATE | CA |
| NAME (FIRST, MIDDLE, LAST) | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE (Mo. Day Year) / RACE | |
| HOME PHONE | ( ) |
| BUSINESS PHONE | ( ) |
| INSURANCE CARRIER | N/A |
| POLICY NUMBER | N/A |
| DIR OF TRAVEL | W |
| ON STREET OR HIGHWAY | Valley Boulevard |
| LANE | 2 |
| THRU LANES | 3 |
| TOTAL LANES | 3 |
| SPEED LIMIT | 45 |
| OWNER'S NAME | ☐ SAME AS DRIVER — Odon Licea |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER — 10050 Juniper Avenue #98, Fontana, CA 92335 |
| DISPOSITION OF VEHICLE ON ORDERS OF | ☐ OFFICER ☐ DRIVER ☒ OTHER — Released to owner |
| PRIOR MECHANICAL DEFECTS | ☒ NONE APPARENT ☐ REFER TO NARRATIVE |
| VEHICLE IDENTIFICATION NUMBER | |
| VEHICLE TYPE | 22 |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☒ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

## PARTY 5

☐ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| Field | Value |
|---|---|
| DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP. | |
| VEH. YEAR / MAKE/MODEL/COLOR / LICENSE NUMBER / STATE | |
| NAME (FIRST, MIDDLE, LAST) | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE (Mo. Day Year) / RACE | |
| HOME PHONE | ( ) |
| BUSINESS PHONE | ( ) |
| INSURANCE CARRIER / POLICY NUMBER | |
| DIR OF TRAVEL / ON STREET OR HIGHWAY / LANE / THRU LANES / TOTAL LANES / SPEED LIMIT | |
| OWNER'S NAME | ☐ SAME AS DRIVER |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER |
| DISPOSITION OF VEHICLE ON ORDERS OF | ☐ OFFICER ☐ DRIVER ☐ OTHER |
| PRIOR MECHANICAL DEFECTS | ☐ NONE APPARENT ☐ REFER TO NARRATIVE |
| VEHICLE IDENTIFICATION NUMBER | |
| VEHICLE TYPE | |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

## PARTY 6

☐ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| Field | Value |
|---|---|
| DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP. | |
| VEH. YEAR / MAKE/MODEL/COLOR / LICENSE NUMBER / STATE | |
| NAME (FIRST, MIDDLE, LAST) | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE (Mo. Day Year) / RACE | |
| HOME PHONE | ( ) |
| BUSINESS PHONE | |
| INSURANCE CARRIER / POLICY NUMBER | |
| DIR OF TRAVEL / ON STREET OR HIGHWAY / LANE / THRU LANES / TOTAL LANES / SPEED LIMIT | |
| OWNER'S NAME | ☐ SAME AS DRIVER |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER |
| DISPOSITION OF VEHICLE ON ORDERS OF | ☐ OFFICER ☐ DRIVER ☐ OTHER |
| PRIOR MECHANICAL DEFECTS | ☐ NONE APPARENT ☐ REFER TO NARRATIVE |
| VEHICLE IDENTIFICATION NUMBER | |
| VEHICLE TYPE | |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| Darrell Holland | ☒ YES ☐ NO ☐ N/A | [signature] | |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH CODING

CHP 555 Page 2 (Rev. 9-19) OPI 060



| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| PROPERTY DAMAGE | OWNER'S NAME | OWNER'S ADDRESS |
|---|---|---|
| | Southern California Edison | 7951 Redwood Avenue, Fontana, CA, 92336 |

| PERSON NOTIFIED | ☐ SAME AS OWNER | TELEPHONE NUMBER | METHOD OF NOTIFICATION (MARK ALL THAT APPLY) | LOG / INCIDENT NUMBER |
|---|---|---|---|---|
| | | (909) 357-6116 | ☐ IN PERSON ☐ PHONE ☒ DISPATCH ☐ CHP 422 | |

DESCRIPTION OF DAMAGE
Damaged conical electrical box.

## SEATING POSITION

1 TO 9 - STANDARD SEATING POSITION
10 - REAR OCC. TRK, VAN, STATION WAGON, ETC.*
11 - POSITION UNKNOWN*
0 - OTHER*

(Diagram: 1 2 3 / 4 5 6 / 7 8 9 / 10)

## SAFETY EQUIPMENT

**OCCUPANTS**
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP / SHOULDER HARNESS USED
H - LAP / SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED
P - NOT REQUIRED

**CHILD RESTRAINT**
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

**MC / BICYCLE HELMET**
DRIVER: V - NO, W - YES
PASSENGER: X - NO, Y - YES

## AIR BAG

B - UNKNOWN
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

## EJECTED FROM VEHICLE

0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

## INATTENTION CODES

A - CELL PHONE HANDHELD
B - CELL PHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
I - PERSONAL HYGIENE
J - READING
K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

### PRIMARY CRASH FACTOR — LIST NUMBER (#) OF PARTY AT FAULT

| # | Item |
|---|---|
| 1 | A CVC SECTION VIOLATED: CVC 22350 — CITED ☐ YES ☒ NO |
| | B OTHER IMPROPER DRIVING*: |
| | C OTHER THAN DRIVER* |
| | D UNKNOWN* |

### WEATHER (MARK 1 TO 2 ITEMS)

| Mark | Item |
|---|---|
| | A CLEAR |
| X | B CLOUDY |
| | C RAINING |
| | D SNOWING |
| | E FOG / VISIBILITY FT. |
| | F OTHER*: |
| | G WIND |

### LIGHTING

| Mark | Item |
|---|---|
| | A DAYLIGHT |
| | B DUSK - DAWN |
| X | C DARK - STREET LIGHTS |
| | D DARK - NO STREET LIGHTS |
| | E DARK - STREET LIGHTS NOT FUNCTIONING* |

### ROADWAY SURFACE

| Mark | Item |
|---|---|
| | A DRY |
| X | B WET |
| | C SNOWY - ICY |
| | D SLIPPERY (MUDDY, OILY, ETC.) |

### ROADWAY CONDITIONS (MARK 1 TO 2 ITEMS)

| Mark | Item |
|---|---|
| | A HOLES, DEEP RUT* |
| | B LOOSE MATERIAL ON ROADWAY* |
| | C OBSTRUCTION ON ROADWAY* |
| | D CONSTRUCTION - REPAIR ZONE |
| | E REDUCED ROADWAY WIDTH |
| | F FLOODED* |
| | G OTHER*: |
| X | H NO UNUSUAL CONDITIONS |

### TRAFFIC CONTROL DEVICES

| Mark | Item |
|---|---|
| | A CONTROLS FUNCTIONING |
| | B CONTROLS NOT FUNCTIONING* |
| | C CONTROLS OBSCURED |
| X | D NO CONTROLS PRESENT / FACTOR* |

### TYPE OF CRASH

| Mark | Item |
|---|---|
| | A HEAD - ON |
| | B SIDE SWIPE |
| | C REAR END |
| X | D BROADSIDE |
| | E HIT OBJECT |
| | F OVERTURNED |
| | G VEHICLE / PEDESTRIAN |
| | H OTHER*: |

### MOTOR VEHICLE INVOLVED WITH (MARK 1 TO 2 ITEMS)

| Mark | Item |
|---|---|
| | A NONCOLLISION |
| | B PEDESTRIAN |
| X | C OTHER MOTOR VEHICLE |
| | D MOTOR VEHICLE ON OTHER ROADWAY |
| X | E PARKED MOTOR VEHICLE |
| | F TRAIN |
| | G BICYCLE |
| | H ANIMAL: |
| | I FIXED OBJECT: |
| | J OTHER OBJECT: |
| | K ADDITIONAL OBJECT(S) STRUCK |

### PEDESTRIAN'S ACTIONS

| Mark | Item |
|---|---|
| X | A NO PEDESTRIANS INVOLVED |
| | B CROSSING IN CROSSWALK - AT INTERSECTION |
| | C CROSSING IN CROSSWALK - NOT AT INTERSECTION |
| | D CROSSING - NOT IN CROSSWALK |
| | E IN ROAD - INCLUDES SHOULDER |
| | F NOT IN ROAD |
| | G APPROACHING / LEAVING SCHOOL BUS |

### VEHICLE AUTOMATION LEVEL

| 1 | 2 | 3 | Item |
|---|---|---|---|
| X | X | | A SAE LEVEL - 0 |
| | | | B SAE LEVEL - 1 |
| | | | C SAE LEVEL - 2 |
| | | | D SAE LEVEL - 3 |
| | | | E SAE LEVEL - 4 |
| | | | F SAE LEVEL - 5 |
| | | | G UNKNOWN* |

### VEHICLE AUTOMATION ENGAGED

| 1 | 2 | 3 | Item |
|---|---|---|---|
| X | X | | A NO AUTOMATION |
| | | | B DRIVER ASSISTANCE |
| | | | C PARTIAL AUTOMATION |
| | | | D CONDITIONAL AUTOMATION |
| | | | E HIGH AUTOMATION |
| | | | F FULL AUTOMATION |
| | | | G UNKNOWN* |

### OTHER ASSOCIATED FACTOR(S) (MARK 1 TO 2 ITEMS)

| 1 | 2 | 3 | Item |
|---|---|---|---|
| X | | | A CVC SECTION VIOLATION: CVC 22107 — CITED ☐ YES ☒ NO |
| | | | B CVC SECTION VIOLATION: — CITED ☐ YES ☐ NO |
| | | | C CVC SECTION VIOLATION: — CITED ☐ YES ☐ NO |
| | | | D |
| | | | E VISION OBSCUREMENT: |
| | | | F INATTENTION*: |
| | | | G STOP & GO TRAFFIC |
| | | | H ENTERING / LEAVING RAMP |
| | | | I PREVIOUS CRASH |
| | | | J UNFAMILIAR WITH ROAD |
| X | | | K DEFECTIVE VEH. EQUIP.: Tire deficiency — CITED ☐ YES ☒ NO |
| | | | L UNINVOLVED VEHICLE |
| | | | M OTHER*: |
| | X | | N NONE APPARENT |
| | | | O RUNAWAY VEHICLE |

### MOVEMENT PRECEDING CRASH

| 1 | 2 | 3 | Item |
|---|---|---|---|
| | | | A STOPPED |
| | | | B PROCEEDING STRAIGHT |
| | | | C RAN OFF ROAD |
| | | | D MAKING RIGHT TURN |
| | X | | E MAKING LEFT TURN |
| | | | F MAKING U TURN |
| | | | G BACKING |
| | | | H SLOWING / STOPPING |
| | | | I PASSING OTHER VEHICLE |
| | | | J CHANGING LANES |
| | | | K PARKING MANEUVER |
| | | | L ENTERING TRAFFIC |
| X | | | M OTHER UNSAFE TURNING |
| | | | N XING INTO OPPOSING LANE |
| | | X | O PARKED |
| | | | P MERGING |
| | | | Q TRAVELING WRONG WAY |
| | | | R OTHER*: |
| | | | S LANE SPLITTING |

### SOBRIETY - DRUG - PHYSICAL (MARK ALL THAT APPLY)

| 1 | 2 | 3 | Item |
|---|---|---|---|
| X | X | | A HAD NOT BEEN DRINKING |
| | | | B HBD - UNDER THE INFLUENCE |
| | | | C HBD - NOT UNDER INFLUENCE* |
| | | | D HBD - IMPAIRMENT UNKNOWN* |
| | | | E UNDER DRUG INFLUENCE* |
| | | | DRE EXAM. CONDUCTED |
| | | | STIMULANT |
| | | | HALLUCINOGEN |
| | | | DISSOCIATIVE ANESTHETICS |
| | | | NARCOTIC ANALGESIC |
| | | | INHALANT |
| | | | CANNABIS |
| | | | DEPRESSANT |
| | | | F IMPAIRMENT - PHYSICAL* |
| | | | G IMPAIRMENT NOT KNOWN |
| | | X | H NOT APPLICABLE |
| | | | I SLEEPY / FATIGUED* |

### SKETCH

INDICATE NORTH

### MISCELLANEOUS

Please see the attached factual diagram and sketch.

### SPECIAL INFORMATION

| 1 | 2 | 3 | Item |
|---|---|---|---|
| | | | A HAZARDOUS MATERIAL |
| | | | B CELL PHONE HANDHELD IN USE |
| | | | C CELL PHONE HANDSFREE IN USE |
| | | | D CELL PHONE NOT IN USE |
| X | X | X | E CELL PHONE USE UNKNOWN |
| | | | F SCHOOL BUS RELATED |

### BIKEWAY FACILITY

| 1 | 2 | 3 | Item |
|---|---|---|---|
| | | | A SHARED ROADWAY |
| | | | B CLASS I - BIKE PATH* |
| | | | C CLASS II - BIKE LANE* |
| | | | D CLASS III - BIKE ROUTE* |
| | | | E CLASS IV - SEPARATED BIKEWAY* |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH CODING

CHP 555 Page 2 (Rev. 9-19) OPI 060



| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

**PROPERTY DAMAGE**

OWNER'S NAME: Southern California Edison
OWNER'S ADDRESS: 7951 Redwood Avenue, Fontana, CA, 92336

PERSON NOTIFIED: ☐ SAME AS OWNER
TELEPHONE NUMBER: (909) 357-6116
METHOD OF NOTIFICATION (MARK ALL THAT APPLY): ☐ IN PERSON ☐ PHONE ☒ DISPATCH ☐ CHP 422
LOG / INCIDENT NUMBER:

DESCRIPTION OF DAMAGE
Damaged conical electrical box.

## SEATING POSITION

1 2 3 / 4 5 6 / 7 8 9 / 10

- 1 TO 9 - STANDARD SEATING POSITION
- 10 - REAR OCC. TRK, VAN, STATION WAGON, ETC.*
- 11 - POSITION UNKNOWN*
- 0 - OTHER*

## SAFETY EQUIPMENT

**OCCUPANTS**
- A - NONE IN VEHICLE
- B - UNKNOWN
- C - LAP BELT USED
- D - LAP BELT NOT USED
- E - SHOULDER HARNESS USED
- F - SHOULDER HARNESS NOT USED
- G - LAP / SHOULDER HARNESS USED
- H - LAP / SHOULDER HARNESS NOT USED
- J - PASSIVE RESTRAINT USED
- K - PASSIVE RESTRAINT NOT USED
- P - NOT REQUIRED

**CHILD RESTRAINT**
- Q - IN VEHICLE USED
- R - IN VEHICLE NOT USED
- S - IN VEHICLE USE UNKNOWN
- T - IN VEHICLE IMPROPER USE
- U - NONE IN VEHICLE

**MC / BICYCLE HELMET**
- DRIVER: V - NO, W - YES
- PASSENGER: X - NO, Y - YES

## AIR BAG
- B - UNKNOWN
- L - AIR BAG DEPLOYED
- M - AIR BAG NOT DEPLOYED
- N - OTHER
- P - NOT REQUIRED

## EJECTED FROM VEHICLE
- 0 - NOT EJECTED
- 1 - FULLY EJECTED
- 2 - PARTIALLY EJECTED
- 3 - UNKNOWN

## INATTENTION CODES
- A - CELL PHONE HANDHELD
- B - CELL PHONE HANDSFREE
- C - ELECTRONIC EQUIPMENT
- D - RADIO / CD
- E - SMOKING
- F - EATING
- G - CHILDREN
- H - ANIMALS
- I - PERSONAL HYGIENE
- J - READING
- K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

### PRIMARY CRASH FACTOR — LIST NUMBER (#) OF PARTY AT FAULT
- 1 — A CVC SECTION VIOLATED: CVC 22350 — CITED ☐ YES ☒ NO
- B OTHER IMPROPER DRIVING*:
- C OTHER THAN DRIVER*
- D UNKNOWN*

### WEATHER (MARK 1 TO 2 ITEMS)
- A CLEAR
- X B CLOUDY
- C RAINING
- D SNOWING
- E FOG / VISIBILITY FT.
- F OTHER*:
- G WIND

### LIGHTING
- A DAYLIGHT
- B DUSK - DAWN
- X C DARK - STREET LIGHTS
- D DARK - NO STREET LIGHTS
- E DARK - STREET LIGHTS NOT FUNCTIONING*

### ROADWAY SURFACE
- A DRY
- X B WET
- C SNOWY - ICY
- D SLIPPERY (MUDDY, OILY, ETC.)

### ROADWAY CONDITIONS (MARK 1 TO 2 ITEMS)
- A HOLES, DEEP RUT*
- B LOOSE MATERIAL ON ROADWAY*
- C OBSTRUCTION ON ROADWAY*
- D CONSTRUCTION - REPAIR ZONE
- E REDUCED ROADWAY WIDTH
- F FLOODED*
- G OTHER*:
- X H NO UNUSUAL CONDITIONS

### TRAFFIC CONTROL DEVICES
- A CONTROLS FUNCTIONING
- B CONTROLS NOT FUNCTIONING*
- C CONTROLS OBSCURED
- X D NO CONTROLS PRESENT / FACTOR*

### TYPE OF CRASH
- A HEAD - ON
- B SIDE SWIPE
- C REAR END
- X D BROADSIDE
- E HIT OBJECT
- F OVERTURNED
- G VEHICLE / PEDESTRIAN
- H OTHER*:

### MOTOR VEHICLE INVOLVED WITH (MARK 1 TO 2 ITEMS)
- A NONCOLLISION
- B PEDESTRIAN
- X C OTHER MOTOR VEHICLE
- D MOTOR VEHICLE ON OTHER ROADWAY
- X E PARKED MOTOR VEHICLE
- F TRAIN
- G BICYCLE
- H ANIMAL:
- I FIXED OBJECT:
- J OTHER OBJECT:
- K ADDITIONAL OBJECT(S) STRUCK

### PEDESTRIAN'S ACTIONS
- X A NO PEDESTRIANS INVOLVED
- B CROSSING IN CROSSWALK - AT INTERSECTION
- C CROSSING IN CROSSWALK - NOT AT INTERSECTION
- D CROSSING - NOT IN CROSSWALK
- E IN ROAD - INCLUDES SHOULDER
- F NOT IN ROAD
- G APPROACHING / LEAVING SCHOOL BUS

### VEHICLE AUTOMATION LEVEL (4 5 6)
- A SAE LEVEL - 0
- B SAE LEVEL - 1
- C SAE LEVEL - 2
- D SAE LEVEL - 3
- E SAE LEVEL - 4
- F SAE LEVEL - 5
- G UNKNOWN*

### VEHICLE AUTOMATION ENGAGED (4 5 6)
- A NO AUTOMATION
- B DRIVER ASSISTANCE
- C PARTIAL AUTOMATION
- D CONDITIONAL AUTOMATION
- E HIGH AUTOMATION
- F FULL AUTOMATION
- G UNKNOWN*

### OTHER ASSOCIATED FACTOR(S) (MARK 1 TO 2 ITEMS) (4 5 6)
- A CVC SECTION VIOLATION — CITED ☐ YES ☐ NO
- B CVC SECTION VIOLATION — CITED ☐ YES ☐ NO
- C CVC SECTION VIOLATION — CITED ☐ YES ☐ NO
- D
- E VISION OBSCUREMENT:
- F INATTENTION*:
- G STOP & GO TRAFFIC
- H ENTERING / LEAVING RAMP
- I PREVIOUS CRASH
- J UNFAMILIAR WITH ROAD
- K DEFECTIVE VEH. EQUIP.: — CITED ☐ YES ☐ NO
- L UNINVOLVED VEHICLE
- M OTHER*:
- N NONE APPARENT — X (4)
- O RUNAWAY VEHICLE

### MOVEMENT PRECEDING CRASH (4 5 6)
- A STOPPED
- B PROCEEDING STRAIGHT
- C RAN OFF ROAD
- D MAKING RIGHT TURN
- E MAKING LEFT TURN
- F MAKING U TURN
- G BACKING
- H SLOWING / STOPPING
- I PASSING OTHER VEHICLE
- J CHANGING LANES
- K PARKING MANEUVER
- L ENTERING TRAFFIC
- M OTHER UNSAFE TURNING
- N XING INTO OPPOSING LANE
- O PARKED — X (4)
- P MERGING
- Q TRAVELING WRONG WAY
- R OTHER*:
- S LANE SPLITTING

### SOBRIETY - DRUG - PHYSICAL (MARK ALL THAT APPLY) (4 5 6)
- A HAD NOT BEEN DRINKING
- B HBD - UNDER THE INFLUENCE
- C HBD - NOT UNDER INFLUENCE*
- D HBD - IMPAIRMENT UNKNOWN*
- E UNDER DRUG INFLUENCE*
  - DRE EXAM. CONDUCTED
  - STIMULANT
  - HALLUCINOGEN
  - DISSOCIATIVE ANESTHETICS
  - NARCOTIC ANALGESIC
  - INHALANT
  - CANNABIS
  - DEPRESSANT
- F IMPAIRMENT - PHYSICAL*
- G IMPAIRMENT NOT KNOWN
- H NOT APPLICABLE — X (4)
- I SLEEPY / FATIGUED*

### SKETCH

INDICATE NORTH

### MISCELLANEOUS

Please see the attached factual diagram and sketch.

### SPECIAL INFORMATION (4 5 6)
- A HAZARDOUS MATERIAL
- B CELL PHONE HANDHELD IN USE
- C CELL PHONE HANDSFREE IN USE
- D CELL PHONE NOT IN USE
- E CELL PHONE USE UNKNOWN — X (4)
- F SCHOOL BUS RELATED

### BIKEWAY FACILITY (4 5 6)
- A SHARED ROADWAY
- B CLASS I - BIKE PATH*
- C CLASS II - BIKE LANE*
- D CLASS III - BIKE ROUTE*
- E CLASS IV - SEPARATED BIKEWAY*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# INJURED / WITNESS / PASSENGERS

CHP 555 Page 3 (Rev. 9-19) OPI 060



| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ("X" ONE): FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | INJURED WAS ("X" ONE): DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 37 | M | ☐ | ☒ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 2 | 3 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Bradley Aaron Terwilliger / 01-23-1987 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Arrowhead Regional Medical Center
DESCRIBE INJURIES: Broken left femur, top of head laceration, concussion, back pain, right elbow pain, abdominal hernia.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 28 | M | ☐ | ☒ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | 2 | 1 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Party #2 / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Arrowhead Regional Medical Center
DESCRIBE INJURIES: Back pain, concussion.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 16 | M | ☐ | ☒ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | 1 | 1 | L | H | 1 |

NAME / D.O.B. / ADDRESS: Party #1 / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Arrowhead Regional Medical Center
DESCRIBE INJURIES: Broken right femur, broken ribs, brain bleeding.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 15 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 1 | 3 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Robert Rias / 11-16-2008 / 2257 N. Spruce Ave, Rialto, CA 92377
TELEPHONE: (208) 917-0519
(INJURED ONLY) TRANSPORTED BY: San Bernardino County Coroner
EMS RUN NUMBER:
TAKEN TO: San Bernardino County Coroner
DESCRIBE INJURIES: Left leg shin laceration, left thigh bruise, bruising to abdomen, puncture to upper right thigh, compound broken right tibia, right side rib fractures, skull fractures, pelvis fracture, aortic tear. TOD pronounced by San Bernardino County Fire on 02/03/24 at 2311 hours.

TOD pronounced by San Bernardino County Fire on 02/03/24 at 2311 hours.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 15 | M | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 1 | 4 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Omari Pitts / 11-01-2008 / 937 W. Clover Ave, Rialto, CA 92376
TELEPHONE: (323) 943-7093
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Loma Linda University
DESCRIBE INJURIES: Hematoma to the head, subdural hematoma on right side of head, transection of celiac artery and a laceration to the right lung.

TOD pronounced by Loma Linda University Medical Center on 02/03/24 at 0735 hours.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 14 | M | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 1 | 6 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Domonic Adams / 04-28-2009 / 1700 Red Trail Lane, Fontana, CA 92336
TELEPHONE: (951) 539-8375
(INJURED ONLY) TRANSPORTED BY: San Bernardino County Coroner
EMS RUN NUMBER:
TAKEN TO: San Bernardino County Coroner
DESCRIBE INJURIES: Right pubic fracture, skull separation from spine, transection of spine, fractured sternum, fractured right ribs, brain hemorrhage, brain/brainstem separation, pulpified right lung, pulpified liver, transection of aorta, laceration above right eye, laceration to right cheek, missing teeth, laceration to inner left thigh, laceration to left foot, deformed left thigh. TOD pronounced by San Bernardino County Fire on 02/03/24 at 2311 hours.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| Darrell Holland | B9547 | 02/03/2024 | (signature) | |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# INJURED / WITNESS / PASSENGERS

CHP 555 Page 3 (Rev. 9-19) OPI 060



| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ("X" ONE): FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | INJURED WAS ("X" ONE): DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ # 1 | ☐ | 23 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: Brian Zozaya / 04-26-2000 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ # 2 | ☐ | 23 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: Daniel Precie / 03-27-2000 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ # 3 | ☐ | 30 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: Edward Bautista / 02-19-1994 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| Darrell Holland | B9547 | 02/03/2024 | B. [signature] | |



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000017


Sketch
DR# 192400847
H. Reyes
0'
50
100
N
Valley Blvd
AOI # 1
AOI # 2
AOI # 3
Vehicle #1
Vehicle #2
Edison Pole #4845670E




CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER




CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

COF 000020




COF 000021
CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER




COF 000022

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| Legend | | Case Name | Courtesy |
|---|---|---|---|
| | | Case Number | 192400847 |
| Drawn By | H Reyes | Incident Date | 02-03-2024 |
| Drawn Date | H. Reyes | Location | Valley Blvd / Cypress Ave |

| # | X | Y | Z | Description |
|---|---|---|---|---|
| 1 | 0.00 | 0.00 | 0.00 | Edison Pole # 4845670E |
| 2 | 9.26 | 63.37 | 0.00 | Patrol unit light bar |
| 3 | 33.94 | 47.27 | 0.00 | Debris Field |
| 4 | 55.02 | 63.97 | 0.00 | Vehicle 2 at rest |
| 5 | 62.25 | 111.84 | 0.00 | Vehicle 3 at rest |
| 6 | 79.21 | 110.42 | 0.00 | Vehicle 1's rear right passenger door |
| 7 | 100.98 | 108.72 | 0.00 | Vehicle 1 at rest |
| 8 | 117.37 | 107.02 | 0.00 | Vehicle 4 at rest |
| 9 | 109.40 | 99.37 | 0.00 | tire to vehicle 1 |
| 10 | 133.06 | 99.12 | 0.00 | Vehicle 1 plastic bumper |




COF 000024

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**FACTS:**

**NOTIFICATION:**

On 02/03/2024, I was assigned to the San Bernardino County Sheriff's Department M.A.I.T. team. At approximately 2320 hours, I was dispatched to assist with a unit involved fatal injury traffic collision in the City of Fontana. Responding from Main Street and Ninth Avenue in the city of Hesperia, I arrived on scene on 02/04/2024 at 0143 hours. All times, speeds, and measurements found in this report are approximate. All measurements were made with the FARO scan system.

**INITIAL OBSERVATIONS:**

When I arrived on scene, I observed a white sedan (Vehicle #1 – V-1) on all four wheels facing southwest along the north curb of Valley Boulevard, east of the intersection with Cypress Avenue. The vehicle had heavy damage throughout the exterior, and it appeared the roof of the vehicle was removed by fire personnel for extrication of subjects inside V-1. V-1 came to rest against the north curb of Valley Boulevard and a black pickup truck (Vehicle #4 – V-4) that was parked along the north roadway curb line of Valley Boulevard. There were two deceased subjects located inside V-1 in the #3 (Robert Rias) and #6 (Domonic Adams) seats. There were numerous pieces of plastic, metal and glass debris around V-1.

I observed a black and white Fontana Police patrol vehicle (SUV) with extensive damage to the front of the vehicle, facing northeast. The vehicle came to rest in the center turn lane of Valley Boulevard, east of the intersection with Cypress Avenue. There were numerous pieces of plastic, metal and glass debris around V-2. The light bar of V-2 came to rest in the center turn lane on the west side of V-2.

I observed a silver sedan with major damage to the driver side along the north curb of Valley Boulevard. The vehicle came to rest facing southwest and appeared to be a parked vehicle along the north curb line of Valley Boulevard that was struck by V-1 during the collision.

All other subjects were transported by American Medical Response (AMR) to local hospitals for treatment of injuries. Prior to my arrival, and directly following the collision, Fontana Police officers

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

located Party #1 (P-1, Bonilla) on the north sidewalk of Valley Boulevard, outside the #3 passenger door, where he was ejected from V-1. P-1 sustained serious injuries and was transported by medical personnel to Arrowhead Regional Medical Center. Pitts was located by Fontana Police officers in the #4 passenger seat of V-1 and was later extricated by fire personnel and transported to Loma Linda University Medical Center for treatment of injuries.

**STATEMENTS:**

*STATEMENTS ARE NOT VERBATIM AND WERE WRITTEN IN SUMMARY FORM.*

**Witness #1 (Zozaya)** On 03/18/2024, at approximately 1510 hours, I spoke with Zozaya in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Zozaya was assigned to patrol with Fontana Police and was in his patrol vehicle conducting routine patrol in the area of Valley Boulevard and Catawba Avenue. Zozaya was the driver of the patrol vehicle and was assisted by his partner (Precie), who sat in the #3 seat. Zozaya traveled east on Valley Boulevard and observed a white sedan (V-1) in front of his patrol vehicle in the #1 lane on Valley Boulevard. It appeared a passenger in the #6 seat of V-1 was leaning out the window, not wearing a seatbelt, holding a cell phone. V-1 made a lane change from the #1 to the #2 lane, failing to signal the lane change. Based on the two vehicle code violations observed, Zozaya conducted a traffic enforcement stop on V-1 by activating his overhead solid red light and siren. V-1 accelerated through a green light at the intersection with Catawba Avenue, and made an unsafe lane change back into the #1 lane, cutting off another vehicle that occupied the #1 lane. V-1 accelerated quickly, east on Valley Boulevard from Catawba Avenue. Zozaya broadcast the failure to yield to Fontana dispatch center.

V-1 continued accelerating from 60 to approximately 80 mph in the #1 eastbound lane of Valley Boulevard through the intersection with Citrus Avenue, failing to yield to the light and siren displayed by Zozaya. Traffic was moderate in the intersection, with wet roadways due to continuous rain conditions. Zozaya broadcast the pursuit to Fontana dispatch as V-1 continued at approximately 80 mph on Valley Boulevard through the intersection with Cypress Avenue. As Zozaya got close to Cypress Avenue, he observed a Fontana patrol vehicle with overhead lights on, facing west on Valley Boulevard. Zozaya then observed a second patrol vehicle travel west on Valley Boulevard toward his

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

vehicle. V-1 merged from the eastbound #1 lane of Valley Boulevard into opposing lanes and collided with a Fontana patrol vehicle at an estimated speed of 80-90 mph. Zozaya broadcast the collision to Fontana dispatch and requested medical personnel to the scene.

Zozaya observed V-1 come to rest along the north curb of Valley Boulevard, facing west. Zozaya exited his patrol vehicle and ran to V-1 to assist with medical attention for any involved parties. As Zozaya approached the driver door of V-1, he observed there was nobody in the #1 driver seat. Zozaya ran around to the sidewalk near the passenger side of V-1 and observed a subject laying on the sidewalk (later identified as P-1). Zozaya observed passengers in the #3 and #6 seats of V-1 and began rendering aid to all subjects he observed in and outside the vehicle. Zozaya did not want to move any subjects until medical personnel arrived, due to the potential for spinal injuries. Shortly after broadcasting all related information, medical personnel, along with Fontana Police supervisors, arrived and secured the scene.

**Witness #2 (Precie)** On 03/18/2024, at approximately 1514 hours, I spoke with Precie in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Precie was assigned to patrol with Fontana Police, and was in his patrol vehicle, along with Officer Zozaya, conducting routine patrol in the area of Valley Boulevard and Catawba Avenue. Precie observed V-1 in front of his patrol vehicle with a passenger hanging out of the #6 seat window, holding a cell phone. Precie observed the rear passenger was not wearing a seatbelt. V-1 made an unsafe lane change from the #2 to the #1 lane on Valley Boulevard. V-1 cut off another vehicle in the #1 lane, while failing to signal the lane change. Zozaya activated his overhead solid red light and siren, and attempted an enforcement stop on V-1. V-1 fled the location at approximately 80 mph, east on Valley Boulevard. V-1 continued for approximately 20 seconds to elude Precie's patrol vehicle through several intersections, eastbound on Valley Boulevard. As V-1 cleared the intersection with Cypress Avenue, an assisting patrol vehicle exited a business parking lot on the south side of Valley Boulevard by turning left to travel west on Valley Boulevard. As the patrol vehicle exited onto Valley Boulevard, V-1 veered from the #1 eastbound lane into the center median of Valley Boulevard and collided with the patrol vehicle. Precie estimated V-1's speed at approximately 80-90 mph in wet drizzling conditions at the time of the collision. During the pursuit, V-1 ran a minimum of one red light on Valley Boulevard through an unknown intersection. Precie did not recall seeing brake lights illuminated on V-1 prior to impact.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**Witness #3 (Bautista)** On 03/18/2024, at approximately 1523 hours, I spoke with Bautista in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Bautista was assigned to Fontana Police patrol as a K-9 handler. Bautista was in his patrol vehicle, stationary on the southeast corner of the intersection of Valley Boulevard and Cypress Avenue, in the parking lot of a business (Deseret Industries). Bautista heard Zozaya broadcast a pursuit, so Bautista exited the parking lot by driving north onto Valley Boulevard. Bautista turned left and traveled west in the #1 lane of Valley Boulevard. Bautista could see the pursuing patrol vehicle's overhead lights from a distance (minimum of 1500 feet), plenty of distance to pull out onto Valley Boulevard, and ascertained the suspect vehicle was in front of the pursuing patrol vehicle. Bautista was in the #1 westbound lane of Valley Boulevard traveling slow for several seconds when he observed V-1 go past his patrol vehicle at a high rate of speed (approximately 80-90 mph). As V-1 passed Bautista's location, he observed sparks in his driver's side view mirror. Bautista did not see brake lights or driver steering input from V-1 prior to the collision.

**V-1 Passenger (Terwilliger)** On 03/18/2024, at approximately 1532 hours, I spoke with Terwilliger in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Terwilliger was assigned to patrol with Fontana Police and was in his patrol vehicle with his partner Garcia, stationary on the southwest corner of Valley Boulevard and Cypress Avenue in a parking lot. Terwilliger heard one of his partners broadcast they were in pursuit of a vehicle, eastbound on Valley Boulevard from Citrus Avenue. Garcia was the driver of their patrol vehicle, and exited the parking lot by driving north onto Valley Boulevard. As Garcia drove towards the driveway of the parking lot that exited north onto Valley Boulevard, Terwilliger heard the pursuing unit broadcast that V-1 was eastbound Valley Boulevard through Oleander Avenue at speeds exceeding 100 mph. As Garcia was near Valley Boulevard, Terwilliger looked left (out the driver's window) and saw V-1 coming at them (approximately 20-30 feet away) with no headlights on. Terwilliger could not recall any other details regarding the collision and could not recall where Garcia was when the collision occurred.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**Party #2 (P-2, Garcia)** On 03/18/2024, at approximately 1546 hours, I spoke with Garcia in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Garcia was assigned to patrol with Fontana Police and was in his patrol vehicle with his partner Terwilliger, stationary on the southwest corner of Valley Boulevard and Cypress Avenue in a parking lot. Garcia was parked in the parking lot of Deseret Industries when he heard one of his partners broadcast they were in pursuit of a vehicle. Garcia drove north out of the parking lot towards Valley Boulevard. Garcia looked left and right and saw no vehicles coming, so he made a left turn to travel west on Valley Boulevard. Garcia completed his turn in the #1 westbound lane of Valley Boulevard when he observed V-1 coming at him (eastbound on Valley Boulevard). Garcia did not recall the collision, but remembered the conditions on the road were wet and slippery.

**Party #1 (P-1, Bonilla)** On 02/06/24, at approximately 1030 hours, I attempted to set up an interview with P-1. I was advised by P-1's mother (Maria Ramirez), the family retained an attorney and P-1 would set up a time at a later date to provide a statement. P-1, his family or an attorney representing the family never returned my call for an interview to set up a time. On 04/22/24, I placed a follow-up call to Maria to determine if P-1 would be providing a statement with an attorney. Maria could not provide an answer if P-1 would be providing a statement at a future time.

**OPINIONS AND CONCLUSIONS:**

**SUMMARY:**

P-1 traveled east in the #1 lane of Valley Boulevard through the intersection with Cypress Avenue at a minimum average speed of 105 mph. P-2 traveled north and made a left turn from the private parking lot of Deseret Industries Thrift Store at 16593 Valley Boulevard, which was located on the south side of Valley Boulevard. P-1 traveled at 105 mph, turned V-1 to the left, and lost control of V-1. The rear of V-1 slid to the right, causing the passenger side of V-1 to collide with the front of V-2 in a broadside collision. The momentum of the collision caused V-1 to continue north where the rear of V-1 collided with the driver side of V-3, which was parked along the north curb of Valley Boulevard. The remaining momentum from the second collision caused V-1 to roll backwards, where the rear of V-1 collided with the front of V-4, which was parked along the north curb of Valley Boulevard.

**CAUSE:**

**Primary Collision Factor**

P-1 caused this collision by being in violation of the following vehicle code section: CVC 22350 –"No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property."

**Associated Collision Factor**

P-1 was in violation of the following vehicle code section: CVC 22107 – "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

P-1 was found to have operated the vehicle with defective equipment (right rear and left rear tire). At the time of the collision, the spare tire was being operated on the right rear axle of V-1. The left rear tire was mounted improperly with the tread direction reversed. The reversed tread direction contributed to the tire's inability channel water property, thus reducing traction with the roadway surface. The width of the right rear tire (spare) was less than the standard tire width. The narrow width of the right rear tire provided less contact with the roadway surface, thus reducing traction.

**Electronic Data Recovery**

The Airbag Control Modules (ACM) for V-1 and V-2 were obtained during the vehicle inspection of both vehicles. Data recovery was performed, and speeds were obtained for both vehicles prior to impact at the time of the collision.

Using vehicle data acquired from the event data recorder (EDR), Detective LaFond performed mathematical calculations to determine the distance range V-1 was from V-2 when V-2 entered onto Valley Boulevard. LaFond calculated V-1 traveled with a wheel speed range of 83.3 to 108.7 mph and was approximately 537 to 609 feet west of V-2 when V-2 entered Valley Boulevard, near the area of impact.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

Based on the distance between V-1 and V-2, wet roadway conditions, video footage, vehicle data and the average speed of V-1, I determined V-1 was in violation of the above listed vehicle codes for Primary and Associated Collision factors. P-2 entered Valley Boulevard with the expectation that V-1 was far enough away (537-609 feet) that P-2 would be able to complete his turn and enter the roadway, without obstructing the right of way of P-1.

The above violations are based on the statements of the parties involved, witnesses, location of the vehicles upon my arrival on scene, the physical evidence of the scene (including damage to all vehicles), data recovery for involved vehicles and the weather conditions at the time of the collision.

**INJURIES:**

**P-1** sustained a broken right femur, broken ribs and brain bleeding. All injuries were sustained as a result of the collision.
**P-2** sustained back pain and a concussion. All injuries were sustained as a result of the collision.
**Terwilliger (Passenger, V-2, seat #3)** sustained a broken left femur, top of head laceration, concussion, back pain, right elbow pain and an abdominal hernia. All injuries were sustained as a result of the collision.
**Rias (Passenger, V-1, seat #3)** sustained internal/external fatal injuries that included left leg shin laceration, left thigh bruise, bruising to abdomen, puncture to upper right thigh and compound broken right tibia, right side rib fractures, internal skull fractures, right side pelvis fracture and aortic tear. All injuries were sustained as a result of the collision.
**Pitts (Passenger, V-1, seat #4)** sustained internal fatal injuries that included hematoma to the head, subdural hematoma on right side of head, transection of celiac artery and a laceration to the right lung. All injuries were sustained as a result of the collision.
**Adams (Passenger, V-1, seat #6)** sustained internal/external fatal injuries that included right pubic fracture, skull separation from spine, transection of spine and spinal cord, fractured sternum, fractured ribs, brain hemorrhage, brain separation from brainstem, pulpified right lung, pulpified liver and transection of aorta, laceration to skin above right eye, laceration to right cheek, teeth dislodged from gums, laceration to inner left thigh, laceration to inner left foot and deformity to left thigh. All injuries were sustained as a result of the collision.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**INTOXICATION:**

A search warrant was authorized for the medical records of P-1, which contained toxicology screening results upon his admittance to Arrowhead Regional Medical Center. The toxicology results did not appear to show significant levels of drugs or alcohol in P-1's blood near the time of the collision.

**CORONER'S REPORT:**

For details on the Coroner's report please refer to the attached San Bernardino County Coroner's reports #702401067 (Rias), #702401068 (Adams), and #702401073 (Pitts).

**RECOMMENDATIONS:**

I recommend a copy of this report be forwarded to Fontana Police Department for prosecution of P-1 (Bonilla).

**EVIDENCE:**

Photographs of the scene and vehicle inspection were taken, and later uploaded to Motorola Command Central Vault at the Hesperia Police station.

A copy of the medical record for P-1 was placed into evidence at the Hesperia Police station.

DNA swabs were taken throughout the driver compartment of V-1 during the vehicle inspection. The swabs were placed into evidence at the Hesperia Police station.

Fontana Police obtained video surveillance from intersection cameras at Valley Boulevard/Citrus Avenue and Valley Boulevard/Cypress Avenue. The videos were uploaded to Motorola Command Central Vault at the Hesperia Police station.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

Body Worn Camera (BWC) footage was obtained from all Fontana Police officers involved at the scene. The videos were uploaded to Motorola Command Central Vault at the Hesperia Police station.

Cell phones located at the scene and during the vehicle inspection were placed into evidence initially at the Victorville Police station, but later transferred to the Hesperia Police station. The cell phones were later transferred to the Fontana Police station for additional processing related to the collision.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |

**FACTS:**

**NOTIFICATION:**

On 02/03/2024, I was assigned to San Bernardino County Sheriff's Department Major Accident Investigation Team (M.A.I.T). At 2330 hours, I was notified from Fontana police Lieutenant Dill in reference to a fatal collision that occurred near Valley Boulevard and Cypress Avenue. I arrived to the scene at 0120 hours and my call sign was 14W1. As I arrived to the scene, I contacted Sergeant Motley and later contacted Deputies Holland and Wolff. I was tasked with conducting the scene investigation and processing the scene.

The scene measurements were obtained using the following:

- a FARO Laser Scanner S/N LLS081811621.
- Google maps website
- Lidar laser

**SCENE:**

The scene was near the intersection of Valley Boulevard and Cypress Avenue. The collision occurred on Valley Boulevard, east of Cypress Avenue. Valley Boulevard is an asphalt-paved, traveled roadway, with two lanes traveling east, two lanes traveling west, with a center turn lane. Cypress Avenue is an asphalt-paved, traveled roadway, with one lane traveling north, and two lanes traveling south, with right and left turn lanes.



STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |




The collision occurred approximately 455 feet east of east Cypress Avenue curb line, on Valley Boulevard, just north of the north exterior driveway to the business of 16593 Valley Boulevard, Fontana.

To measure the scene with the FARO, I used Edison light pole (ELP) # 4845670E as a reference point. The ELP was located on the south sidewalk of Valley Boulevard, approximately 422 feet east of the east curb line prolongation of Cypress Avenue.

There was a driveway on the south side of Valley Boulevard, approximately 28 feet east of the ELP.

**OFFICER OBSERVATIONS:**

As I arrived on scene, Vehicle 2 (Ford) was at rest, facing east in the center turn lane of Valley Boulevard. Vehicle 1 (Nissan) was at rest, on the north curb of Valley Boulevard. Vehicle 3 (Toyota) was at rest on the north curb of Valley Boulevard. Vehicle 4 (Chevy) was at rest, parked facing west near the north curb of Valley Boulevard.

STATE OF CALIFORNIA

## MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL

CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |



Vehicle 1(Nissan) had extensive damage to the front and right side. The roof was removed and rested in front of the vehicle. Passengers #3 and #6 were pronounced deceased prior to my arrival. A yellow-colored blanket was placed on the passengers by medical personnel. There was a black pop-up canopy tent placed over Vehicle 1 by Fontana police personnel.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |




Vehicle 2 (Ford) had extensive front-end damage to the front end. The driver and passenger airbags were deployed and both doors were damaged.

STATE OF CALIFORNIA

**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**

CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |



Vehicle 3 (Toyota) was an unoccupied parked vehicle. The vehicle was at rest on the north curb of Valley Blvd.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |



Vehicle 4 (Chevy) was an unoccupied vehicle parked near the north curb of Valley Blvd. Vehicle 1 was at rest in front of vehicle 4.

**WEATHER CONDITIONS:**

While at the scene the weather was raining and wet.
I attached the weather conditions for this day from https://www.wunderground.com/ to this report.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |

**ROADWAY CONDITIONS:**

The roads were wet and it was raining at the time of the collision. After I arrived on scene, it stopped raining and the roads were wet. There were no unusual conditions or construction on the roadway. Valley Boulevard was closed off by Fontana police department personnel. They closed Valley Boulevard at the intersections of Cypress Avenue and Juniper Avenue.

**POSTED SPEED LIMIT:**

The posted speed limit on Valley Boulevard was 45 MPH.

**PHYSICAL EVIDENCE:**

I walked around the scene to look for any vehicle tire marks or gouges on the roadway related to the vehicles involved. Due to the collision occurring while it was raining, and the road was wet, there was no visible tire marks or gouges.

**OPINIONS AND CONCLUSIONS:**

**AREA OF IMPACT:**

Deputy Wolff and I measured the areas of impact using a Lidar laser. Area of impact #1 was estimated using plastic pieces of debris seen west of vehicle 2 at rest.

- Area of impact #1 (V-1 vs. V-2) was 67 feet north of ELP #4845670E and 2 feet west of ELP.
- Area of impact #2 (V-1 vs. V-3) was 101 feet north of ELP and 63 feet east of ELP.
- Area of impact #3 (V-1 vs. V-4) was 108 north of ELP and 110 feet east of ELP.

Please see the attached diagram for more information.

**PHOTOGRAPHS:**

I took digital photographs of the scene, and they were uploaded into the Vault system at the Yucaipa station.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |

**EVIDENCE:**

I placed the scene photographs, and FARO Raw Data on a Blu-ray disc. I packaged the disc and placed it in evidence at the Yucaipa Police Station.

**FACTUAL DIAGRAM:**

I documented the scene using a FARO Laser Scanner, Serial#LLS081811621. I completed 29 scans of the scene and processed them using the FARO SCENE software.

I used the Edison light pole (ELP) #4845670E as a reference point to measure the scene.

I prepared the following diagrams using FARO Reality Diagraming Software:

- Factual Diagram
- Roadway Details
- Evidence with Legend
- Area of impact
- Sketch

Please see the attached factual diagram.

Our Apps (/download)

About Us (/about/our-company)

Contact (/about/contact-us)

Careers (https://www.weathercompany.com/careers)

PWS Network (/pws/overview)

WunderMap (/wundermap)

Feedback & Support (https://www.wunderground.com/feedback)

Terms of Use (/company/legal)

Privacy Policy (/company/privacy-policy)

Accessibility Statement (/accessibility-statement)

Data Vendors (/data-vendors)

(https://www.essentialaccessibility.com/the-weather-channel?utm_source=theweatherchannelhomepage&utm_medium=iconlarge&utm_term=eachannelpage&utm_content=header&utm_

We recognize our responsibility to use data and technology for good. We may use or share your data with our data vendors. Take control of your data.

**Review All Privacy and Ad Settings (/privacy-settings)** | **Do Not Sell or Share My Personal Information** You opted in **(/privacy-settings#do-not-sell)** | **Data Rights (/data-rights)**

© Copyright TWC Product and Technology LLC 2014, 2024

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## AUTOPSY REPORT:

### ASSIGNMENT:

| | | |
|---|---|---|
| Date / Time: | February 6, 2024, 1138 Hours | |
| Coroner Case #: | 702401073 | |
| Autopsy #: | A0301-24 | |
| Toe tag #: | 03808 | |
| Body bag lock #: | 7690323 | Lock broken @ 1147 Hours |

### PERSONNEL PRESENT:

| | |
|---|---|
| Doctor: | Scott Luzi, Coroner's Division |
| Autopsy Assistant: | Josie Rivera, Coroner's Division |
| Deputy: | Garrett Wolff, Major Accident Investigation Team |
| Deputy: | Darrell Holland, Major Accident Investigation Team |

### VICTIM:

| | |
|---|---|
| Name: | Omari Pitts |
| Race: | Black |
| Age: | 15 |
| Date of Birth: | 11/01/2008 |
| Date of Death: | 02/04/2024 |
| Height: | 70 |
| Weight: | 120 |
| Hair: | Black |
| Eyes: | Brown |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**EXTERNAL EXAMINATION:**

On Tuesday, February 6, 2024, at about 1138 hours, an autopsy was conducted on the body of Omari Pitts at the San Bernardino County Coroner's Office. The body laid on a coroner's gurney inside a yellow body bag.

At about 1147 hours, I saw Autopsy Assistant Josie Rivera cut the bag lock. The body bag was opened by Rivera to reveal a second, white body bag, containing the body of Pitts. Rivera opened the white bag to reveal Pitts, who laid in a supine position. Pitt's arms laid down by his sides and his hands rested in front of his lower abdomen. Pitts was a black male juvenile with black hair and brown eyes. Toe Tag #03808 was attached to his right great toe.

A medical device was affixed to Pitt's left thigh and appeared to penetrate his skin. A bandage was affixed to the right side of his upper torso below the nipple line. Beneath the bandage was a cut, which was closed with surgical staples. A cut extended down the center of Pitt's abdomen, which was closed with surgical staples. There was also a cut on the top right side of Pitt's head, which was closed with surgical staples.

**TATTOOS:**

Pitt's right arm was tattooed with the text, "Tatanesha."

**EXTERNAL INJURIES:**

I did not observe any external injuries, beside the aforementioned areas which were surgically stapled and appeared to be associated with a medical procedure conducted at Loma Linda University Medical Center.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**INTERNAL EXAMINATION:**

Doctor Scott Luzi located and determined the following internal injuries were a result of the traffic crash.

- Hematoma to right head
- Subdural hematoma on the right side of the head
- Transection of celiac artery
- Laceration to right lung

**CAUSE OF DEATH:**

Doctor Scott Luzi said the cause of death was blunt force traumatic injuries and death was within minutes.

The manner of death was accident.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## AUTOPSY REPORT:

### ASSIGNMENT:

Date / Time: February 6, 2024, 1025 Hours
Coroner Case #: 702401068
Autopsy #: A0298-24
Toe tag #: 09878
Body bag lock #: 7689622 Lock broken @ 1027 Hours

### PERSONNEL PRESENT:

Doctor: Scott Luzi, Coroner's Division
Autopsy Assistant: Josie Rivera, Coroner's Division
Deputy: Garrett Wolff, Major Accident Investigation Team
Deputy: Darrell Holland, Major Accident Investigation Team

### VICTIM:

Name: Domonic Adams
Race: Black
Age: 14
Date of Birth: 04/28/2009
Date of Death: 02/03/2024
Height: 61"
Weight: 123 pounds
Hair: Black
Eyes: Brown

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**EXTERNAL EXAMINATION:**

On Tuesday, February 6, 2024, at about 1025 hours, an autopsy was conducted on the body of Domonic Adams at the San Bernardino County Coroner's Office. The body laid on a coroner's gurney inside a yellow body bag.

At about 1027 hours, I saw Autopsy Assistant Josie Rivera cut the bag lock. The body bag was opened by Rivera to reveal Adams lying supine, inside the bag. Adam's arms laid down by his sides and his hands rested in front of his lower abdomen. Adams wore green and brown camouflage boxer briefs. A gray sweater, socks, shoes, and other clothing laid in the bag around Adams' legs. Adams was a black male juvenile with black hair and brown eyes. Toe Tag #09878 was attached to his right great toe. Two EKG pads were affixed to Adams' body; one to his left abdomen and one to his right chest.

**EXTERNAL INJURIES:**

I observed the following external injuries on Adams' body.

- Laceration/trauma to the skin above his right eye
- Laceration to right cheek
- Teeth visibly dislodged from gums and held in place by dental braces.
- Laceration to inner left thigh
- Laceration to inner left foot
- Visible deformity to left thigh

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**INTERNAL EXAMINATION:**

Doctor Scott Luzi located and determined the following internal injuries were a result of the traffic crash.

- Right pubic fracture
- Skull internally separated from spine
- Transection of spine and spinal cord at vertebra T4
- Fractured sternum
- Fractured right ribs three, four, and five
- Hemorrhage in brain
- Brain separated from brainstem
- Pulpified right lung
- Pulpified liver
- Transection of aorta

**CAUSE OF DEATH:**

Doctor Scott Luzi said the cause of death was blunt force traumatic injury and death was instantaneous.

The manner of death was accident.

# San Bernardino County Sheriff - Coroner Division

***Report Of Death Worksheet***

| | | | | |
|---|---|---|---|---|
| 1 | MODE **Traffic** | CASE # **702401067** | **Master File** | |
| | STATUS **Post** | DECEDENT **Robert Rias** | | |

## CASE INFO

| REPORTED BY | AGENCY | DATE | TIME | Call Back Phone |
|---|---|---|---|---|
| Deputy G. Wolff | San Bernardino Co. Sheriff's Dept. (SBCSD) | 02/04/2024 | 0403 | (760) 947-1500 |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | # OF PHOTOS | MEDIUM | SPECIAL CIRCUMSTANCES |
|---|---|---|---|---|---|
| Yes | Yes | Yes | | | Officer Involved |

## DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| **Robert** | **Andrew** | **Rias** |

| AKA | DOE TYPE/NUMBER | PHONE |
|---|---|---|
| | | |

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 2257 N. Spruce Ave. | Rialto | CA | 92377 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | Hispanic | 11/16/2008 | 15 yrs | Yes |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 7689664 | 09879 | 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 | 67.0 in | 128.0 lbs | Black | Brown |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED |
|---|---|---|
| | | Circumstantial ID approved (M. Leyva) |

## LEGAL NEXT OF KIN

| NAME | RELATIONSHIP | DOB/AGE | DATE/TIME NOTIFIED | NOTIFIED BY |
|---|---|---|---|---|
| Diana Rias | Mother | 03/13/1986 37 yrs | 02/04/2024 0703 | DCI A. Acevedo |

| ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 303 W. Pennwood St. APT B103 | Meridian | ID | 83642 |

| PHONE | ALTERNATE PHONE # |
|---|---|
| (208) 917-0519(Cell) | |

## PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|
| 02/04/2024 | 2311 | Sunday | San Bernardino County Fire Department Paramedic A. Anderson pronounced. |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Roadway | | Other |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| Valley Blvd. approximately 525 feet east of Cypress Avenue | Fontana |

## INVESTIGATIVE SUMMARY

ADDITIONAL NARRATIVE ATTACHED [X] YES [ ] NO

On Sunday, 02/04/2024 at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 15-year-old Robert Rias who was involved in a traffic collision near Valley Blvd. and Cypress Ave. in Fontana. According to Deputy Wolff, the Fontana Police Department attempted to initiate a traffic stop with a white Nissan Sentra west of Valley Blvd. The vehicle failed to yield and at 2244 hours Officers wi Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high-rated speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there was a total of 4 juveniles inside of the vehicle. The driver and passenger on the rear driver's side were transported to Arrowhead Regional Medical Center and Loma Linda University Medical Center. The passenger (Robert Rias) and the individual in the rear passenger (John Doe 27-24) were pronounced at the scene. According to Officers with Fontana PD they stated that before the collision occurred two juveniles were hanging out the back windows of the vehicle and were unrestrained.
There was no alcohol, tobacco, or illicit drugs located inside the vehicle.

*NOTE TO PATHOLOGY*

Officer involved pursuit. MAIT team wants to attend autopsy they are going vehicular homicide.

# San Bernardino County Sheriff - Coroner Division

**Report Of Death Worksheet**

**2**

MODE **Traffic** CASE # **702401067** **Master File**

STATUS **Post** DECEDENT **Robert Rias**

## MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | M/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| N/A | N/A | | | No | | Not Available |

## CAUSE OF DEATH

| 107 CAUSE | TIME INTERVAL | |
|---|---|---|
| (A) MULTIPLE BLUNT FORCE INJURIES | Seconds | 109 BIOPSY PERFORMED? ☐ YES ☒ NO |
| DUE TO (B) | | 110 AUTOPSY PERFORMED? ☒ YES ☐ NO |
| (C) | | AUTOPSY # A0300-24 SL EXAM # |
| (D) | | INDIGENT # |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107

NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF "YES" LIST TYPE OF OPERATION & DATE.

No

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| N/A | | | Scott Luzi |
| 115 PHYSICIAN TO SIGN D.C. Coroner | ADDRESS | PHONE | DATE 02/06/2024 TIME 0000 |

## INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Accident | Roadway | No | 02/03/2024 | 22:45 |

125 LOCATION (include Zip Code)

Valley Blvd. approximately 525 feet east of Cypress Ave. Fontana 91764

DESCRIBE HOW INJURY OCCURRED

Head on vehicle collision, airbags deployed, passenger not ejected, not seat belted.

## PROPERTY

| PROPERTY? | PROP RLS'D? |
|---|---|
| ☐ YES ☒ NO | ☐ YES ☒ NO |

## LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| San Bernardino Co. Sheriff's Dept. (SBCSD) | Deputy Sheriff G. Wolff | 192400847 |

## AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| AA | 02/04/2024 | 02-06-2024 | 03/08/2024 | Dep. Darrell Holland (MAIT team) (760) 881-9780 |

## DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY |
|---|---|---|
| RELEASE | | N/A |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| 92M | Ana Acevedo | 02/04/2024 | 0446 | 0525 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| Family Funeral Chapel & Cremation | (909) 875-9000 |

6 REVIEWED BY Leyva

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 3 | *MODE* **Traffic** | *CASE #* | **702401067** | **Master File** | |
| | *STATUS* **Post** | *DECEDENT* | **Robert Rias** | | |

# Coroner Investigation

**02/05/2024**

## ASSIGNMENT:

On Sunday, 02/04/2024, at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 15-year-old Robert Rias, who was involved in a traffic collision near Valley Boulevard and Cypress Avenue in Fontana. I was assigned incident number CO240350005 at 0430 hours.

## INTERVIEW - DEPUTY SHERIFF G. WOLFF (SBCSD):

At 0437 hours I spoke with Deputy G. Wolff via telephone. The following is a summary of that statement.

According to Deputy Wolff, the Fontana Police Department (FPD) attempted to initiate a traffic stop on a white Nissan Sentra west of Valley Boulevard. The vehicle failed to yield and at 2244 hours, officers with Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high rate of speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there were a total of four juveniles inside the vehicle. The driver and the passenger on the rear driver's side were transported to Arrowhead Regional Medical Center (ARMC) and Loma Linda University Medical Center (LLUMC). The passenger Robert Rias and the individual in the rear passenger Domonic Adams were pronounced at the scene. The area of impact was 67.4 feet north, 2.0 feet west of the Edison pole.

According to officers with the Fontana PD, they stated that before the collision occurred, two juveniles were hanging out of the back windows of the vehicle and were unrestrained.

## REVIEW OF PARAMEDIC RUN SHEET:

At 2245 hours, the San Bernardino County Sheriff's Department received a call for service. ME 77 arrived at the scene at 2252 hours. When fire personnel arrived at the scene, they found a two-car traffic collision with major damage to both vehicles. Vehicle 1 was a Fontana Police Department patrol vehicle with two occupants. The second vehicle was a white four-door sedan with four individuals with major damage to the vehicle including the roof collapsed onto the passenger space compartment. The first individual was found on the passenger side of the vehicle. The second individual was found near the rear window entrapped by the roof at the neckline. John Doe #1 was the front right-seat passenger of the white sedan. Fire personnel were unable to access the individual initially due to the damage to the roof of the car. The male was visibly apneic. The upper torso was located between the front two seats with the head towards the driver-side rear door while the lower body remained in the front passenger seat. The male was repositioned to make access to the other viable males inside the passenger space compartment. Fire personnel made contact with the male and found him pulseless, apneic, and asystole. The death was pronounced at 2311 hours by Paramedic A. Anderson.

## RESPONSE TO SCENE:

At 0454 hours, I responded from the City of Ontario to the scene located on Cypress Avenue and Valley Boulevard in Fontana and arrived at 0509 hours.

## SCENE ASSESSMENT:

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | |
|---|---|---|---|---|
| **4** | *MODE* **Traffic** | *CASE #* **702401067** | **Master File** | |
| | *STATUS* **Post** | *DECEDENT* **Robert Rias** | | |

At 0542 hours I began the scene assessment.

The location was on Valley Blvd. approximately 525 feet east of Cypress Avenue in Fontana. Valley Blvd. was designated as an east-and-west roadway with two lanes of traffic going east and west. There were two left turn lanes located on the westbound lanes of traffic. The east and westbound lanes were separated by a solid yellow line. On the north side of the westbound lanes of traffic was an apartment complex with the address 10050 Juniper Ave. in Fontana. On the south side of the eastbound lanes of traffic was an empty lot/field. A patrol unit was located near the middle of the roadway on the left turn lane with major damage to the front end of the vehicle facing northeast. A white Nissan Sentra with License plate number 8ZZ6454 came to rest at GPS coordinates 37.07053 N, and -117.44253 W with the back of the vehicle slightly up a curb in between two parked vehicles. A gray Toyota Corolla with damage to the left driver-side door was located in front of the Nissan Sentra and A Black Chevrolet Silverado was found in the back of the Nissan Sentra. The roof of the Nissan Sentra was missing. Glass, debris, and various car parts were located along the east and westbound lanes of traffic. The windshields were shattered from both vehicles. The airbags were deployed. There were two bodies located inside the white Nissan Sentra. Rias was located on the front passenger seat and Adams was located on the rear passenger seat. The two individuals were not seat belted. The weather was cool, and the ambient temperature was approximately 50 degrees Fahrenheit.

**BODY EXAMINATION:**

At 0553 hours I began the body examination at the scene.

The body was that of a juvenile male, approximately 15 years of age. The complexion was medium. The hair on the head was brown and medium in length. The eyes were brown. There were natural teeth located on the upper and lower gums. The body was approximately 5 feet 5 inches tall and weighed approximately 150 pounds.

Body Position:

The body was found seated in the passenger seat with the head tilted to the left. The feet were resting on the floorboard. The arms were extended by the torso with the hands resting on the lap.

Clothing:

The body was clothed in a black sweatshirt with blue and silver rhinestones, tan T-shirt, purple underwear, black socks, and black sweatpants.

Therapeutic Devices:

There were electrocardiogram pads located on the anterior lower right forearm and lower right and left abdomen.

Observations:

The sclerae were clear. The pupils were fixed and dilated. There was blood exuding from the nose. There was shattered glass present on the upper and lower extremities. There was blood present in the mouth. Blood was present on the right and left hands.

Trauma:

The following trauma was observed on the body:

· A broken tooth in the lower front gums

· Dicing injuries on the right side of the face

· Contusions on the right temporal area

· Contusions on the lower abdomen

· Abrasions on the upper anterior right leg

· Contusions and abrasions along the inner left leg

· An open compound fracture with bone exposed to the lower right leg

· An abrasion on the lower anterior right leg

· An abrasion on the outer left leg near the knee

· A puncture wound on the lower inner left leg.

Tattoos:

There were no tattoos observed on the body.

Postmortem Changes:

I palpated the chest, abdomen, upper and lower back, and all extremities and they felt cool to the touch consistent with the ambient temperature. Blanching lividity was present on the posterior side of the body consistent with the seated position in the vehicle. Rigor mortis was present on the extremities and was manipulated with ease.

Conclusion:

At 0649 hours I concluded the body examination. I took 61 digital photographs of the body and scene. 92M Transportation team affixed toe tag number 09879 to the big right toe, placed the body in a yellow body bag, and secured it with pouch lock 7690396. The body was transported by the 92M Transportation team to the San Bernardino County Sheriff's Coroner Morgue at my request.

**PROPERTY:**

Two red bracelets, a yellow metal chain, a white metal chain, a white rubber bracelet, and two clear stone earrings were given to Don Rias with the authorization of the legal next of kin, Diana Rias.

**NEXT OF KIN NOTIFICATION:**

At 0703 hours I spoke with Diana Rias via telephone. The following is a summary of that statement.

Rias was 15 years of age, making Diana Rias the legal next of kin. Rias was staying with his grandma due to her living in Idaho and according to Rias' mother, Rias went out with friends the night the collision occurred.

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 6 | *MODE* | **Traffic** | *CASE #* | **702401067** | **Master File** |
| | *STATUS* | **Post** | *DECEDENT* | **Robert Rias** | |

Diana provided me with a description of Rias' clothing the last time he was seen and confirmed that Robert Rias was her son with the date of birth of 11/16/2008.

**IDENTIFICATION:**

At 0730 hours I responded to 2257 Spruce Avenue in Rialto and presented Don Rias (uncle) with a photo of Robert Rias who confirmed the identification of Robert Rias with the date of birth of 11/16/2008. A coroner identification form was filled out and signed by Don Rias and provided me a copy of his California Driver License.

**INTERVIEW WITH LUPE RIAS (GRANDMOTHER):**

At 0740 hours I spoke with Lupe Rias at her residence. The following is a summary of that interview. Rias was out with friends on 02/03/2024 at approximately 1900 hours. Lupe stated to Rias that he needed to return home by 2200 hours. She continuously checked his location and observed that he was first at the Dave and Busters located in Ontario Mills, then rechecked his location and found him near Cherry Avenue and Valley Boulevard in Fontana. She continuously tried to reach him via text message and was not able to get a hold of him. Lupe received a call from Diana Rias (mother) stating that an investigator had gotten hold of Rias' telephone, stating that he was possibly a decedent involved in a traffic collision.

**DISPOSITION:**

The case was referred to Pathology for autopsy.

**Created by Ana Acevedo. Approved by**

# San Bernardino County Sheriff - Coroner Division

## *Report Of Death Worksheet*

**1**

| | | | |
|---|---|---|---|
| MODE | **Traffic** | CASE # | **702401068** |
| STATUS | **Post** | DECEDENT | **Domonic Adams** |

**Sub File To**
**702401067**

## CASE INFO

| REPORTED BY | AGENCY | DATE | TIME | Call Back Phone |
|---|---|---|---|---|
| Deputy G. Wolff | San Bernardino Co. Sheriff's Dept. (SBCSD) | 02/04/2024 | 0403 | (760) 947-1500 |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | # OF PHOTOS | MEDIUM | SPECIAL CIRCUMSTANCES |
|---|---|---|---|---|---|
| Yes | Yes | Yes | | | Officer Involved |

## DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| **Domonic** | **Odell** | **Adams Jr** |

| AKA | DOE TYPE/NUMBER | PHONE |
|---|---|---|
| John Doe 27-24 | John 27-24 | |

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 1700 Red Tail Lane | Fontana | CA | 92336 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | Black | 04/28/2009 | 14 yrs | Yes |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 7689665 | 09878 | | 61.0 in | 123.0 lbs | Black | Brown |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED |
|---|---|---|
| | | Circumstantial ID approved (M. Leyva) |

## LEGAL NEXT OF KIN

| NAME | RELATIONSHIP | DOB/AGE | DATE/TIME NOTIFIED | NOTIFIED BY |
|---|---|---|---|---|
| Brittany Mason | Mother | 11/01/1985 38 yrs | 02/04/2024 1545 | A. Valentin |

| ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 1700 Red tail Ln | Fontana | CA | 923636 |

| PHONE | ALTERNATE PHONE # |
|---|---|
| (909) 261-8830(Cell) | |

## PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|
| 02/03/2024 | 2311 | Saturday | San Bernardino County Fire Department Paramedic A. Anderson pronounced |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Roadway | | Other |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| Valley Blvd. approximately 525 feet east of Cypress Avenue | Fontana |

## INVESTIGATIVE SUMMARY

ADDITIONAL NARRATIVE ATTACHED [x] YES [ ] NO

On Sunday, 02/04/2024 at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentifiec black male appearing to be 15-16 years of age who was involved in a traffic collision near Valley Blvd. and Cypress Ave. in Fontana. According to Deputy Wolff, the Fontana Police Department attempted to initiate a traffic stop with a white Nissan Sentra west of Valley Blvd. The vehicle failed to yield and at 2244 hours Officers wi Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high-rated speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there was a total of 4 juveniles inside of the vehicle. The driver and passenger on the rear driver's side were transported to Arrowhead Regional Medical Center and Loma Linda University Medical Center. The passenger (Robert Rias) and the individual in the rear passenger (John Doe 27-24) were pronounced at the scene. According to Officers with Fontana PD they stated that befor the collision occurred two juveniles were hanging out the back windows of the vehicle and were unrestrained. There was no alcohol, tobacco, or illicit drugs located in the vehicle.

The unidentified male was wearing white American Eagle Jeans size 28x32, white, red and navy-blue Jordan shoes size 10.5, a white t shirt size with an image of a buddha in the front, a gray hoodie with the phrase "Diggin Detroit" on the front of the upper left side of the sweater and on the back.

## *NOTE TO PATHOLOGY*

Officer involved pursuit. MAIT team wants to attend autopsy they are going vehicular homicide.

# San Bernardino County Sheriff - Coroner Division

**Report Of Death Worksheet**

**2**

MODE **Traffic** CASE # **702401068** **Sub File To 702401067**

STATUS **Post** DECEDENT **Domonic Adams**

## MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | M/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| N/A | N/A | | | No | | Not Available |

## CAUSE OF DEATH

| 107 CAUSE | TIME INTERVAL | |
|---|---|---|
| (A) MULTIPLE BLUNT FORCE INJURIES | Immediate | 109 BIOPSY PERFORMED? [ ] YES [x] NO |
| DUE TO (B) | | 110 AUTOPSY PERFORMED? [x] YES [ ] NO |
| (C) | | AUTOPSY # A0298-24 SL EXAM # |
| (D) | | INDIGENT # |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107

NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF "YES" LIST TYPE OF OPERATION & DATE.

No

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| N/A | | | Scott Luzi |
| 115 PHYSICIAN TO SIGN D.C. Coroner | ADDRESS | PHONE | DATE 02/06/2024 TIME 1145 |

## INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Accident | Roadway | No | 02/03/2024 | 22:45 |

125 LOCATION (Include Zip Code)

Valley Blvd. approximately 525 feet east of Cypress Ave. Fontana 92335

DESCRIBE HOW INJURY OCCURRED

Head on vehicle collision, airbags deployed, passenger not ejected, not seat belted.

## PROPERTY

| PROPERTY? | PROP RLS'D? |
|---|---|
| [ ] YES [x] NO | [ ] YES [x] NO |

## LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| San Bernardino Co. Sheriff's Dept. (SBCSD) | Deputy G. Wolff | 192400849 |

## AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| AA | 02/04/2024 | 02-06-2024 | 03/08/2024 | Dep. Darrell Holland (MAIT team) (760) 881-9780 |

## DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY |
|---|---|---|
| RELEASE | | |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| 92M | Ana Acevedo | 02/04/2024 | 0446 | 0525 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| McKays Family Mortuary Fontana | (909)-822-9595 |

[5] REVIEWED BY Leyva

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| **3** | *MODE* **Traffic** | *CASE #* | **702401068** | **Sub File To** 702401067 | |
| | *STATUS* **Post** | *DECEDENT* | **Domonic Adams** | | |

## Coroner Investigation

**02/06/2024**

**ASSIGNMENT:**

On Sunday, 02/04/2024, at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 14-year-old Domonic Adams, who was involved in a traffic collision near Valley Boulevard and Cypress Avenue in Fontana. I was assigned incident number CO240350005 at 0430 hours.

**INTERVIEW - DEPUTY SHERIFF G. WOLFF (SBCSD):**

At 0437 hours I spoke with Deputy G. Wolff via telephone. The following is a summary of that statement.

According to Deputy Wolff, the Fontana Police Department (FPD) attempted to initiate a traffic stop on a white Nissan Sentra west of Valley Boulevard. The vehicle failed to yield and at 2244 hours, officers with Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high rate of speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there were a total of four juveniles inside the vehicle. The driver and the passenger on the rear driver's side were transported to Arrowhead Regional Medical Center (ARMC) and Loma Linda University Medical Center (LLUMC). The passenger Robert Rias and the individual in the rear passenger Domonic Adams were pronounced at the scene. According to officers with the Fontana PD, they stated that before the collision occurred, two juveniles were hanging out of the back windows of the vehicle and were unrestrained.

**REVIEW OF PARAMEDIC RUNS HEET:**

At 2245 hours, the San Bernardino County Fire Department received a call for service. ME 77 arrived at the scene at 2252 hours. When fire personnel arrived at the scene, they observed a male located in the rear right seat passenger of a white sedan with fire personnel unable to access the male due to damage to the roof of the car. The male was seated upright in the rear right seat with significant facial trauma to his right orbital area. Access was made to the male after extraction of the roof and the male appeared to be pulseless, apneic, and asystole. The death was pronounced at 2311 hours by Paramedic A. Anderson.

**RESPONSE TO SCENE:**

At 0454 hours, I responded from the City of Ontario to the scene located on Cypress Avenue and Valley Boulevard in Fontana and arrived at 0509 hours.

**SCENE ASSESSMENT:**

At 0542 hours I began the scene assessment.

The location was on Valley Blvd. approximately 525 feet east of Cypress Avenue in Fontana. Valley Blvd. was designated as an east-and-west roadway with two lanes of traffic going east and west. There were two left turn lanes located on the westbound lanes of traffic. The east and westbound lanes were separated by a solid yellow line. On the north side of the westbound lanes of traffic was an apartment complex with the address 10050 Juniper Ave. in Fontana. On the south side of the eastbound lanes of

lane with major damage to the front end of the vehicle facing northeast. A white Nissan Sentra with License plate number 8ZZ6454 came to rest at GPS coordinates 37.07053 N, and -117.44253 W with the back of the vehicle slightly up a curb in between two parked vehicles. A gray Toyota Corolla with damage to the left driver-side door was located in front of the Nissan Sentra and A Black Chevrolet Silverado was found in the back of the Nissan Sentra. The roof of the Nissan Sentra was missing. Glass, debris, and various car parts were located along the east and westbound lanes of traffic. The windshields were shattered from both vehicles. The airbags were deployed. There were two bodies located inside the white Nissan Sentra. Rias was located in the front passenger seat and Adams was located in the rear passenger seat. The two individuals were not seat belted. The weather was cool, and the ambient temperature was approximately 50 degrees Fahrenheit.

**BODY EXAMINATION:**

At 0622 hours I began the body examination at the scene.

Physical Characteristics:

The body was that of a juvenile male approximately 14 years of age. The complexion was dark. The hair on the head was black and medium in length. The eyes were brown. There were braces present in the mouth and natural teeth present on the upper and lower gums. The body was approximately 5 feet 10 inches tall and weighed approximately 160 pounds.

Body Position:

The body was found seated on the rear passenger seat with the feet resting on the floorboard. The arms were resting beside the torso and the head was tilted to the right.

Clothing:

The body was clothed in white jeans, a pair of Jordan shoes, a white T-shirt, a gray sweater, and a black ski mask.

Therapeutic Devices:

There were no therapeutic devices observed on the body.

Observations:

The sclerae were clear. The pupils were fixed and dilated. There was shattered glass located on the upper and lower extremities. There was blood exuding from the nose. There was blood present in the mouth and on the face.

Tattoos:

There were no tattoos observed on the body.

Trauma:

The following trauma was observed on the body.

- A laceration on the upper right orbital area exposed the skull

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | |
|---|---|---|---|---|
| **5** | *MODE* **Traffic** | *CASE #* **702401068** | **Sub File To** **702401067** | |
| | *STATUS* **Post** | *DECEDENT* **Domonic Adams** | | |

· The teeth were broken.

· Abrasion on the right side of the face

· Dicing injuries on the chin

· An abrasion on the left cheek

· Neck and rib fractures palpated.

· I palpated fractures on the sternum.

· I palpated fractures on the upper left leg.

· An abrasion on upper inner left leg

· I palpated a fracture on the tailbone.

· An abrasion near the tailbone.

Postmortem Changes:

I palpated the chest, abdomen, upper and lower back, and all extremities and felt cold to the touch. Blanching lividity was present on the posterior side of the body consistent with the seated position in the rear passenger seat. Rigor mortis was present on the extremities that was manipulated with ease.

Conclusion:

At 0649 hours, I concluded the body examination. I took 64 digital photographs of the body and scene. 92M Transportation team affixed toe tag number 09878 to the big right toe, placed the body into a yellow body bag and secured it with pouch number 7691366. The body was transported by the 92M Transportation team to the San Bernardino County Sheriff's Coroner Morgue on my request.

**PROPERTY:**

There was no property collected from the body or scene.

**IDENTIFICATION:**

See supplemental report provided by DCI A. Valentin.

**NEXT OF KIN NOTIFICATION:**

See supplemental report provided by DCI A. Valentin.

**DISPOSITION:**

The case was referred to Pathology for autopsy.

**Created by Ana Acevedo. Approved by**

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 6 | *MODE* | Traffic | *CASE #* | 702401068 | Sub File To 702401067 |
| | *STATUS* | Post | *DECEDENT* | Domonic Adams | |

## Coroner Supplement Report

**02/06/2024**

DEPUTY CORONER INVESTIGATOR A. VALENTIN

CIRCUMSTANIAL IDENTIFICATION:

On February 4, 2024, at 1545 hours, Brittany Mason and Domonic Adams, Domonic's parents, came to the coroner's lobby to conduct a visual ID from a photo.

I spoke with them in the lobby and showed them a photo and they identified it as their son Domonic Adams Jr.

Brittany filled out and signed the coroner's identification form which I witnessed. I uploaded this form into CCMS images.

DISPOSITION:

Attach to original report.

**Created by Alondra Valentin. Approved by**

# San Bernardino County Sheriff - Coroner Division

## *Report Of Death Worksheet*

| | | | | | |
|---|---|---|---|---|---|
| **1** | *MODE* | **Traffic** | *CASE #* | **702401073** | **Sub File To** 702401067 |
| | *STATUS* | **Post** | *DECEDENT* | **Omari Pitts** | |

## CASE INFO

| REPORTED BY | AGENCY | DATE | TIME | Call Back Phone |
|---|---|---|---|---|
| Unit Coordinator A. Alnajjar | Loma Linda University Children's Hospital | 02/04/2024 | 0755 | |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | # OF PHOTOS | MEDIUM | SPECIAL CIRCUMSTANCES |
|---|---|---|---|---|---|
| Yes | No | Yes | 33 | Digital | Officer Involved |

## DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| **Omari** | **Malik** | **Pitts** |

| AKA | DOE TYPE/NUMBER | PHONE |
|---|---|---|
| John Doe 28-24, Doe Sugarland | John 28-24 | |

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 937 W. Clover Ave. | Rialto | CA | 92376 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | Black | 11/01/2008 | 15 yrs | Yes |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 7689666 | 03808 | | 70.0 in | 120.0 lbs | Black | Brown |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED |
|---|---|---|
| | | Circumstantial ID approved. Biological mother, Tatanesha Galburth identified her son as Omari Pitts, DOB 11/01/2008 via tattoo and digital photograph. DM |

## LEGAL NEXT OF KIN

| NAME | RELATIONSHIP | DOB/AGE | DATE/TIME NOTIFIED | NOTIFIED BY |
|---|---|---|---|---|
| Tatanesha Galburth | Mother | | 02/04/2024 1430 | DCI A. Valentin |

| ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 937 W. Clover Ave. | Rialto | CA | 92376 |

| PHONE | ALTERNATE PHONE # |
|---|---|
| (323) 943-7093(Cell) | |

## PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|
| 02/04/2024 | 0735 | Sunday | Dr. Sonea Qureshi |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Loma Linda University Children's Hospital | In Patient | |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| 11234 Anderson Street | Loma Linda |

## INVESTIGATIVE SUMMARY

*ADDITIONAL NARRATIVE ATTACHED* [x] YES [ ] NO

On 02/04/2024, John Doe 28-24 was a passenger of a White Honda Civic who collided with a Fontana Police Department vehicle. John Doe 28-24 was transported via American Medical Response ambulance to Loma Linda University Medical Center- Children's Hospital for medical care.

John Doe 28-24 was taken to surgery for exploratory laparotomy. He had internal damage to his organ.

John Doe 28-24 was a juvenile black male approximately 15-17 years old. He was approximately 5'7-6' tall and weighed approximately 169 pounds. He had a tattoo "TATANESHA" with a crown on the right forearm. He had two eyebrow slits on the left eyebrow.

He had no clothing at the time of body examination. LLUMC tossed the clothing. Per AMR the male had an unknown colored/brand jacket and a pair of white shoes tha was given to RN Joelle at arrival. Per LLUMC he was wearing a black puff jacket, Unk pants and black Nike Airforce 1 shoes.

Mother Tatanesha called in asking for information on the Doe. She circumstantially identified Omari Pitts as John Doe 28 via the tattoo on the left arm and the jacket description.

## *NOTE TO PATHOLOGY*

Officer involved pursuit. MAIT team wants to attend autopsy they are going vehicular homicide.

# San Bernardino County Sheriff - Coroner Division

***Report Of Death Worksheet***

**2**

| | | | |
|---|---|---|---|
| MODE | **Traffic** | CASE # | **702401073** |
| STATUS | **Post** | DECEDENT | **Omari Pitts** |

**Sub File To**
**702401067**

## MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | M/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| Fontana | LLUMC | 02/04/2024 | 1527 | No | 9900679 | |

## CAUSE OF DEATH

| 107 CAUSE | TIME INTERVAL | |
|---|---|---|
| (A) MULTIPLE BLUNT FORCE INJURIES | hours | 109 BIOPSY PERFORMED? ☐ YES ☒ NO |
| DUE TO (B) | | 110 AUTOPSY PERFORMED? ☒ YES ☐ NO |
| (C) | | AUTOPSY # A0301-24 SL; EXAM # |
| (D) | | INDIGENT # |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107

NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF "YES" LIST TYPE OF OPERATION & DATE.

No

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| Dr. Sonea Qureshi | (909) 558-4000 | 02/04/2024 | Scott Luzi |

| 115 PHYSICIAN TO SIGN D.C. | ADDRESS | PHONE | |
|---|---|---|---|
| Coroner Cert | | | DATE 02/06/2024 TIME 1313 |

## INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Accident | City Street | No | 02/03/2024 | 22:45 |

125 LOCATION (include Zip Code)

34.07053 N, -117.44253 W Fontana 92335

DESCRIBE HOW INJURY OCCURRED

Head on vehicle collision, airbags deployed, (Pending seat belt info and where he was in vehicle)

## PROPERTY

| PROPERTY? | PROP RLS'D? |
|---|---|
| ☐ YES ☒ NO | ☐ YES ☒ NO |

## LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| San Bernardino Co. Sheriff's Dept. (SBCSD) | Deputy Sheriff G. Wolff | 192400847 |

## AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| | | 02-06-2024 | 03/28/2024 | Dep. Darrell Holland (MAIT team) (760) 881-9780 |

## DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY |
|---|---|---|
| RELEASE | | N/A |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| 92M | Ana Acevedo | 02/05/2024 | 1204 | 1258 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| Funeral Preciado | (909)-383-1108 |

5 REVIEWED BY Leyva

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | |
|---|---|---|---|---|
| **3** | *MODE* **Traffic** | *CASE #* **702401073** | **Sub File To** 702401067 | |
| | *STATUS* **Post** | *DECEDENT* **Omari Pitts** | | |

# Coroner Investigation

**02/05/2024**

## ASSIGNMENT:

OnSunday, 02/04/2024 at 0755 hours, Unit Secretary Ammar Alnajjar called to report the death of a juvenile male John Doe #28-24, later identified as 15-year-old Omari Pitts, who was involved in a traffic collision in the city of Fontana on 02/03/2024. At 0805 hours, I was assigned Coroner Call #CO240350012.

## STATEMENT- REGISTERED NURSE M. ZARATE (LLUMC):

At 0810 hours, I spoke with Registered Nurse M. Zarate via telephone. The following is a summary of her statement.

The john doe was a black juvenile male appearing to be between 14-16 years old. He arrived at the hospital via ambulance at 2327 hours on 02/03/2024. The juvenile male was involved in a traffic collision. He was not awake or oriented.

The male arrived at the hospital and was taken to the operating room. Doctors performed an exploratory laparotomy. The male had internal trauma.

From the operating room, he was taken to the pediatric intensive care unit due to not oxygenating after the surgery.

The male became unresponsive. Medical staff began advance cardiac life support. He was pronounced deceased at 0737 hours by Dr. Sonea Qureshi.

Registered Nurse Zarate advised she had started her shift and did not know further information about clothing or other trauma. She refused to provide medical records at hospital response.

It was unknown where the clothing was located.

## HOSPITAL RESPONSE:

At 0829 hours, I responded from the San Bernardino Coroner Division and arrived at the hospital at 0838 hours.

## BODY DESCRIPTION:

At 0847 hours, I began the body examination.

### Physical Description:

The body was that of a black juvenile male appearing to be the age of 15-17 years old. The complexion was dark. There was short hair on the head. The eyes were brown. There was no facial hair. The body was approximately between 5 feet 10 inches to 6 feet tall and weighed approximately 169 pounds.

### Body Position:

The body was supine on a hospital gurney. Both arms and legs were extended out straight parallel to

each other.

Clothing:

There was no clothing on the body. There was no clothing in the room. Hospital staff did not know where the clothing was that he was wearing when he arrived at the hospital.

Therapeutic Devices:

The following therapeutic devices were on the body:

· Intracranial Sophysa Bolt

· An endotracheal tube

· Neck brace

· Intraosseous line on the left shoulder

· Surgical bandage on the abdomen

· Intravenous line on the left arm

· Intraosseous line on the left thigh

· Pelvis brace

· Leg brace on the left leg

Observations:

Both eyes were clear. Top and bottom frenulum are intact. Fingernails were intact. There were no defensive wounds on the hands or arms. Natural teeth were present on the upper and lower gums.

Tattoo(s):

The following tattoos were most identifiable:

"Tatanesha" with a crown on top of it on the right arm

Trauma:

The following trauma was observed and palpated on the body:

- Left leg fracture

Postmortem Changes:

I palpated the chest, abdomen, and all extremities felt warm. Rigor mortis was not present. Lividity was not present.

Conclusion:

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| 5 | *MODE* Traffic | *CASE #* 702401073 | Sub File To 702401067 |
|---|---|---|---|
| | *STATUS* Post | *DECEDENT* Omari Pitts | |

The body was released to the hospital morgue. I confirmed with Senio Deputy Coroner Investigator D. McCarthy that the body was releasable to the morgue.

## NEXT OF KIN NOTIFICATION:

At 1418 hours, Carnaisa Galloway called San Bernardino County Coroner's office looking for her brother, Omari Pitts. At 1430 hours, I spoke to Carnaisa and their mother, Tatanesha Galburth over the phone.

## INTERVIEW - TATANESHA GALBURTH (MOTHER) AND CARNAISA GALLOWAY (SISTER):

I spoke with Tatanesha and Carnaisa via telephone. The following was a summary of their interview.

Omari was out with his friends on Friday 02/03/2024. He was with two Hispanic juvenile males and his friend Domonic Adams. Omari and Domonic had not arrived home that night of.

Tatanesha and Domonic's parents were looking for them. They saw on the news about a traffic collision that occurred in Fontana.

Omari was wearing a black jacket and blue jeans. He had a tattoo on the right lower arm with the name "Tatanesha."

## IDENTIFICATION

They circumstantially identified the body as Omari Pitts, based on the tattoo on the right forearm with the name of "Tatanesha" by his mother Tatanesha Galburth.

See Deputy Coroner Investigator S. Morgan report for further.

## MEDICAL RECORDS:

Medical records were requested from LLUMC.

## SCENE RESPONSE/ DESCRIPTION

See Deputy Coroner Investigator A. Acevedo report.

## STATEMENTS

See Deputy Coroner Investigator A. Acevedo report.

## DISPOSITION:

This case was submitted to pathology for review.

**Created by Alondra Valentin. Approved by**

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| **6** | *MODE* **Traffic** | *CASE #* **702401073** | **Sub File To** **702401067** |
| | *STATUS* **Post** | *DECEDENT* **Omari Pitts** | |

# Coroner Supplement Report

**02/05/2024**

**Investigator: S. Morgan**

## CIRCUMSTANIAL IDENTIFICATION:

On February 5, 2024, at 1139 hours, Tatanesha Galburth came to the coroner's lobby to conduct a visual ID from a photo. At 1151 hours, I spoke with Tatanesha Galburth in the lobby and showed her a photo and she identified it as her son Omari Pitts.

She filled out and signed the coroner's identification form which I witnessed. I uploaded this form into CCMS images.

## DISPOSITION:

Attach to original report.

**Created by Shawn Morgan. Approved by**

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 7 | *MODE* | **Traffic** | *CASE #* | **702401073** | **Sub File To** **702401067** |
| | *STATUS* | **Post** | *DECEDENT* | **Omari Pitts** | |

# Coroner Supplement Report

**02/06/2024**

**INVESTIGATOR A.ACEVEDO**

## ASSIGNMENT:

On Sunday, 02/04/2024, at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 15-year-old Robert Rias, who was involved in a traffic collision near Valley Boulevard and Cypress Avenue in Fontana. I was assigned incident number CO240350005 at 0430 hours.

## INTERVIEW - DEPUTY SHERIFF G. WOLFF (SBCSD):

At 0437 hours I spoke with Deputy G. Wolff via telephone. The following is a summary of that statement.

According to Deputy Wolff, the Fontana Police Department (FPD) attempted to initiate a traffic stop on a white Nissan Sentra west of Valley Boulevard. The vehicle failed to yield and at 2244 hours, officers with Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high rate of speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there were a total of four juveniles inside the vehicle. The driver and the passenger on the rear driver's side were transported to Arrowhead Regional Medical Center (ARMC) and Loma Linda University Medical Center (LLUMC). The passenger Robert Rias and the individual in the rear passenger Domonic Adams were pronounced at the scene. According to officers with the Fontana PD, they stated that before the collision occurred, two juveniles were hanging out of the back windows of the vehicle and were unrestrained.

## RESPONSE TO SCENE:

At 0454 hours, I responded from the City of Ontario to the scene located on Cypress Avenue and Valley Boulevard in Fontana and arrived at 0509 hours.

## SCENE ASSESSMENT:

At 0542 hours I began the scene assessment.

The location was on Valley Blvd. approximately 525 feet east of Cypress Avenue in Fontana. Valley Blvd. was designated as an east-and-west roadway with two lanes of traffic going east and west. There were two left turn lanes located on the westbound lanes of traffic. The east and westbound lanes were separated by a solid yellow line. On the north side of the westbound lanes of traffic was an apartment complex with the address 10050 Juniper Ave. in Fontana. On the south side of the eastbound lanes of traffic was an empty lot/field. A patrol unit was located near the middle of the roadway on the left turn lane with major damage to the front end of the vehicle facing northeast. A white Nissan Sentra with License plate number 8ZZ6454 came to rest at GPS coordinates 37.07053 N, and -117.44253 W with the back of the vehicle slightly up a curb in between two parked vehicles. A gray Toyota Corolla with damage to the left driver-side door was located in front of the Nissan Sentra and A Black Chevrolet Silverado was found in the back of the Nissan Sentra. The roof of the Nissan Sentra was missing. Glass, debris, and various car parts were located along the east and westbound lanes of traffic. The windshields were

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| 8 | *MODE* Traffic | *CASE #* 702401073 | **Sub File To** 702401067 |
|---|---|---|---|
| | *STATUS* **Post** | *DECEDENT* **Omari Pitts** | |

Nissan Sentra. Rias was located on the front passenger seat and Adams was located on the rear passenger seat. The two individuals were not seat belted. The weather was cool, and the ambient temperature was approximately 50 degrees Fahrenheit.

**DISPOSITION:**

Refer to the original report.

**Created by Ana Acevedo. Approved by**

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

The following supplemental investigation was conducted by the San Bernardino County Sheriff's Department.

Personnel involved:

Deputy D. Holland, Hesperia Station
Deputy G. Wolff, Victorville Station
San Bernardino County Deputy District Attorney Rodney Tamparong

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**VEHICLE #1:**

**TIRES AND WHEELS:**

This vehicle was equipped with three different size tires of four different makes and models. The tires were mounted on three different types of wheels. Notably, the right rear tire was a spare tire, designated for temporary use.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Left Front** tire was a Delinte DH2 all season passenger tire. The tire size was 205/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on a 16" diameter Nissan alloy wheel.

The DOT number on the tire was TBPVAP5C2121. The tire was inflated to 36.1 PSI at the time of examination. The maximum PSI rating was 44 PSI.

The tread depths were as follows:

Inner tread: 3/32"
Center tread: 6/32"
Outer tread: 3/32"

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Right Front** tire was a Kumho Ecsta 4X II all season passenger tire. The tire size was 205/60 R16. The tire was recovered on scene, dismounted from the wheel, after the wheel suffered catastrophic failure during the crash. Debris from the wheel was located inside the tire. A portion of the wheel remained bolted to the right front wheel hub. The sidewalls of the tires were punctured in multiple locations. The tire size and physical evidence indicated it was mounted on a 16" diameter Nissan alloy wheel.

The DOT number on the tire was 1Y0TPYC9W1621. The tire pressure was 0 PSI at the time of examination. The maximum PSI rating was 50 PSI.

The tread depths were as follows:

Inner tread: 6/32"
Center tread: 6/32"
Outer tread: 5/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

### TIRES AND WHEELS:

The **Left Rear** tire was an Achilles ATR Sport DH2 performance tire. The tire size was 215/45 R18. The tire had no abnormal signatures. The tire tread was unidirectional and installed backwards, with the intended direction for forward rotation directed rearward. Mounted in such fashion, the tread pattern was reversed and would draw water to the center of the tire, rather than draw it out as designed, compromising hydroplaning resistance. The tire was mounted on an 18" diameter Nissan alloy wheel.

The DOT number on the tire was 5KQSWA. The tire was inflated to 20.2 PSI at the time of examination. The maximum PSI rating was 50 PSI.

The tread depths were as follows:

Inner tread: 7/32"
Center tread: 8/32"
Outer tread: 7/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**TIRES AND WHEELS:**

The **Right Rear** tire was a Maxxis compact spare tire. The tire size was 125/70 R16. The tire had no abnormal signatures. The tire was mounted on a 16" diameter Nissan steel wheel. The wheel displayed indentations to the outer edge and abrasion to the front face.

The DOT number on the tire was 77FXQM002. The tire was inflated to 24.7 PSI at the time of examination. The maximum PSI rating was 60 PSI.

The exterior surface of the tire read, "TEMPORARY USE ONLY," "SPARE TIRE," and, "inflate to 420KpA (60 PSI)."

A warning label was affixed to the wheel, which read the following:

WARNING
1. SPARE TIRE FOR TEMPORARY EMERGENCY USE ONLY
2. REPLACE WITH REGULAR TIRE AS SOON AS POSSIBLE, TO AVOID POSSIBLE ACCIDENT AND SERIOUS [*Illegible due to damage*]
3. DO NOT EXCEED 50 MPH (80KM/H)
4. SEE OWNERS MANUAL BEFORE USING SPARE TIRE.

The tread depths were as follows:

Inner tread: 2/32"
Outer tread: 3/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**STEERING SYSTEM:**

This vehicle was equipped with a dual pinion rack electric power steering system. Unless otherwise indicated, all components were intact, secure and properly mounted with no indication of impairment.

The steering wheel contained a mounted Supplemental Restraint System (SRS) air bag module which was deployed. The steering column was still attached to its dashboard and bulkhead mounts. The steering shaft extended downward from within the adjustable steering column and extended through the bulkhead. The steering shaft was joined to the steering gear input shaft.

The steering assembly consisted of an electronically controlled dual pinion and rack; tie rod ends and steering knuckles. A threaded adjustable shaft and tie rod ends were attached to each end of the steering rack, and the other end of the tie rod ends were attached to the steering knuckle. The passenger side tie rod shaft was broken between the threads and the rack. The driver side tie rod was connected and appeared in working order.

Ball and socket joints were used to join the articulating steering components between the steering gear and steering knuckles. The joints were secured by locking nuts. The ball and socket joints were equipped with rubber dust boots that remained complete and intact. When tested, there was no discernible lateral movement within the ball and socket joints.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #1

### THROTTLE SYSTEM:

The vehicle was equipped with an electronic fuel injected, 2.0 liter inline-4 cylinder gasoline engine with 149 horsepower. Unless otherwise indicated, all component parts were intact, securely and properly mounted, with no indication of impairment.

The engine throttle was operated by an electronic system commonly referred to as a "Throttle-By-Wire" system. This system employs sensors and electronic components to gain input from the accelerator pedal and apply the positioning to the throttle plate. The accelerator pedal was mounted to the driver side bulkhead.

The throttle body was clean. The throttle body operated smoothly and recoiled to a closed position when released. Upon inspection, a piece of loose black plastic was found on the outside of the butterfly valve. The plastic appeared to have broken off the intake assembly and fell into the throttle body during the crash. The valve prevented the plastic from falling further into the intake manifold which indicated the valve was closed when the debris entered the throttle body. There were no observed irregularities or nonfunctional components in the throttle system.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

The vehicle was equipped with a power-assisted, 4 wheel disc Anti-lock Brake System. Unless otherwise indicated, all component parts were intact, securely, and properly mounted with no indication of impairment. All measurements within this section are approximate.

The brake pedal was suspended from the underside of the driver dashboard. The rubber brake pedal cover was properly positioned on the brake pedal.

The brake system used a power-brake booster to provide assistance during braking. The booster was mounted on the forward side of the bulkhead and connected directly to the brake pedal by a push rod. The diaphragm vacuum booster was self-contained and utilized engine intake manifold vacuum and atmospheric pressure for its power.

The master cylinder was mounted to the front of the power-brake booster. The reservoir no longer mounted on the master cylinder, and fluid leaked from the top. The loose plastic reservoir was located in the engine compartment below the master cylinder.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry, with no indication of fluid loss or contamination. Brake lines to each assembly showed no indication of damage or fluid loss.

The brake pads were composed of a bonded semi-metallic friction material. The Federal Vehicle in Use Inspection Standard is 1/32 inch of friction material, or 0.79 millimeters. All of the pads on the front axle far exceeded this standard. The friction surfaces on the brake pads showed wear but were otherwise normal.

The brake pad measurements were as follows:

Left Front Inner: 5.0 mm
Left Front Outer: 3.5 mm
Right Front Inner: 5.0 mm
Right Front Outer 3.5 mm

The rotor measurements were as follows:

Left Front Rotor: 23.5 mm
Right Front Rotor: 24.0 mm

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The swept areas (friction surface) on the ventilated brake rotors appeared normal. The wheel bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

**VEHICLE #1**

**BRAKE SYSTEM:**

**REAR AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry, with no indication of fluid loss or contamination. Brake lines to each assembly showed no indication of damage or fluid loss. Emergency brake cables to the rear brake assemblies appeared functional and were not damaged.

The brake pad measurements were as follows:

Left Rear Inner: 5.0 mm
Left Rear Outer: 4.5 mm
Right Rear Inner: 6.0 mm
Right Rear Outer 5.0 mm

The rotor measurements were as follows:

Left Rear Rotor: 7.5 mm
Right Rear Rotor: 7.5 mm

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**REAR AXLE:**

The swept areas (friction surface) on the brake rotors appeared normal. The wheel bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly.

**EMERGENCY / PARKING BRAKE:**

The parking brake assembly on this vehicle consisted of a foot pedal located on the driver side footwell.

The parking brake pedal was in the up position, indicating it was not active, during the time of the examination. A test of the parking brake was conducted and appeared to be working correctly.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #1

### NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION:

On February 6, 2024, I contacted the National Highway Traffic Safety Administration (NHTSA), Office of Defects Investigation, Recall and Service Bulletins Database, via their World Wide Web site on the internet. The purpose of the contact was to inquire if there were, or had been, any NHTSA defect investigation, recalls and/or technical service bulletins for the 2022 Nissan Sentra. There were two recalls for the 2022 Nissan Sentra shown on the website, one of which was applicable and reportedly unrepaired this vehicle. The recalls were printed and attached to this report.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## ANALYSIS AND OPINION

## MECHANICAL EXAMINATION

### VEHICLE #1

The mechanical examination of the tires and wheels revealed the improper installation of the unidirectional left rear tire. When installed correctly, the angled tread pattern of unidirectional tires provides more efficient water channeling for improved traction in wet conditions and increased hydroplaning resistance. Installed backwards, the tread would tend to channel water inward and compromise the tire's engineered ability to resist hydroplaning. The tire was inflated to 20.2 PSI at the time of inspection. According to the vehicle's tire and loading information sticker, the recommended tire pressure was 33 PSI. The improper installation of the tire and underinflation could have contributed to the crash. The right rear tire was a spare tire, with a recommended pressure of 60 PSI. The tire pressure at time of inspection was 24.7 PSI. The tire was rated for 50 miles per hour. The improper usage of the tire and underinflation could have contributed to the crash.

The mechanical examination of the steering system revealed a broken tie rod between the rack and right front steering knuckle. NHTSA records indicated an outstanding recall on the vehicle for tie rods. The following are excerpt from NHTSA Safety Recall Report 23V-581:

*Description of the Defect: On affected vehicles, the left and/or right side tie rod's strength may be insufficient under certain operating conditions. If the tie rod experiences a high input force (such as a curb impact) it may deform.*

*Description of the Safety Risk: A bent tie rod may impair the driver's ability to steer the vehicle. Additionally, the steering wheel may be off-center and/or experience vibration. In the worst-case scenario, if the tie rod breaks, it can lead to a partial loss of steering control which may increase the risk of a crash.*

Nissan's Voluntary Recall Campaign Document (Campaign ID R23B3) described the recall service procedure. The service procedure required the technician to examine the tie rods for bending. If bending was observed, an identical replacement part was to be ordered and installed. The document contained photographs which indicated the area of bending and failure were the same point of failure identified on the Nissan's right front tie rod during inspection. NHTSA Safety Recall Report 23V-581 and Nissan's Voluntary Recall Campaign Document were attached to this report.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #1

The condition of the front right tie rod prior to the crash was unknown. There were no indications or reports from NHTSA documents of sudden catastrophic tie rod failure. Additional damage was noted to the right front of the vehicle, including a broken stabilizer linkage and shattered wheel, which indicated the tie rod failure was likely the result of the crash, and did not cause or contribute to the traffic collision.

If additional evidence were discovered indicating the tie rod was damaged prior to the incident, it may have contributed to the crash.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #1

The mechanical examination of the throttle system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the brake system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision. The surfaces on the brake pads and brake rotors were indicative of normal wear.

The mechanical examination of the parking brake did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

**MECHANICAL EXAMINATION VEHICLE #1 END.**

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

VEHICLE #2

INTRODUCTION:

The following information was associated with this examination:

| | |
|---|---|
| DATE OF EXAMINATION | February 7, 2024 |
| REQUESTED BY | San Bernardino County Sheriff's Department |
| EXAMINATION LOCATION | Armada Towing<br>8623 Carob Street<br>Fontana, CA 92335 |
| MANUFACTURED BY | FORD MOTOR COMPANY |
| MAKE | Ford |
| MODEL | Explorer |
| MODEL YEAR | 2020 |
| VIN | 1FM5K8AB4LGC13863 |
| CALIFORNIA VEHICLE LICENSE | 1603691 |
| TYPE OF VEHICLE | Multipurpose Passenger Vehicle |
| COLOR | White/Black |
| EXTENT OF EXAMINATION | Steering, Throttle, Brakes, Tires and Wheels |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

**VEHICLE #2:**

**TIRES AND WHEELS:**

This vehicle was equipped with two types of tires that were mounted on the factory equipped wheels. The vehicle was found to be equipped with two Goodyear Eagle Enforcer all weather passenger tires and two Firestone Firehawk all season performance passenger tires. All four tires were size 255/60 R18.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Left Front** tire was a Goodyear Eagle Enforcer all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel. The outer edge of the steel wheel was indented in two places.

The DOT number on the tire was 1MGW4JJ1R2323. The tire was inflated to 42.1 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 8/32"
Center tread: 8/32"
Outer tread: 9/32"

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**TIRES AND WHEELS:**

The **Right Front** tire was a Firestone Firehawk Pursuit all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel. The outer edge of the steel wheel was indented such that the seal between the wheel and tire was broken. The tire was deflated.

The DOT number on the tire was 1W2W4FKPT5023. The tire was inflated to 0 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 8/32"
Center tread: 8/32"
Outer tread: 8/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Left Rear** tire was a Firestone Firehawk Pursuit all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel.

The DOT number on the tire was 1W2W4FKPT4623. The tire was inflated to 43.1 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 7/32"
Center tread: 7/32"
Outer tread: 7/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

### TIRES AND WHEELS:

The **Right Rear** tire was a Goodyear Eagle Enforcer all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel.

The DOT number on the tire was 1MGW4JJ1R1823. The tire was inflated to 42.4 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 7/32"
Center tread: 7/32"
Outer tread: 7/32"

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**STEERING SYSTEM:**

This vehicle was equipped with a pinion rack electric power steering system. Unless otherwise indicated, all components were intact, secure and properly mounted with no indication of impairment.

The adjustable tilt steering column was in the lowest position. The lever controlling position appeared broken and the steering column tilted up and down freely. The steering wheel mounted Supplemental Restraint System (SRS) air bag module was deployed. The steering column was still attached to its dashboard and bulkhead mounts. The steering shaft extended downward from within the adjustable steering column and extended through the bulkhead. Within the engine compartment, the steering shaft bent and disconnected from steering gear input shaft. The steering gear input shaft and steering assembly were displaced forward and left, along with the engine and transmission.

The steering assembly consisted of a rack; tie rod ends and steering knuckles. A threaded adjustable shaft and tie rod ends were attached to each end of the steering rack, and the other end of the tie rod ends were attached to the steering knuckle. The left tie rod was broken in the threads between the adjustable nut and the rack. The right tie rod was intact, the portion of the right steering knuckle where the tie rod was fastened, along with the lower control arms was fractured off. A portion of the steering knuckle remained mounted to the hub and right strut.

Ball and socket joints were used to join the articulating steering components between the steering gear and steering knuckles. The joints were secured by locking nuts. The ball and socket joints were equipped with rubber dust boots that remained complete and intact. When tested, there was no discernible lateral movement within the ball and socket joints.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**THROTTLE SYSTEM:**

The vehicle was equipped with an electronic fuel injected, 3.3-liter six cylinder gasoline engine with 285 horsepower. Unless otherwise indicated, all component parts were intact, securely and properly mounted, with no indication of impairment.

The engine throttle was operated by an electronic system commonly referred as a "Throttle-By-Wire" system. This system employs sensors and electronic components to gain input from the accelerator pedal and apply the positioning to the throttle plate. The accelerator pedal was mounted to the driver side bulkhead.

The air intake assembly, throttle body, and a portion of the intake plenum were broken off from the engine. I was unable to locate the throttle body or connected components loose within the engine compartment. There we no observed irregularities or nonfunctional components in the throttle system.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

The vehicle was equipped with a power-assisted, 4 wheel disc Anti-lock Brake System. Unless otherwise indicated, all component parts were intact, securely and properly mounted with no indication of impairment. All measurements within this section are approximate.

The brake pedal was suspended from the underside of the driver dashboard. The rubber brake pedal cover was properly positioned on the brake pedal.

The brake system used a power-brake booster to provide assistance during braking. The brake booster, master cylinder, and fluid reservoir sustained catastrophic damage as the result of the crash and were displaced from their factory mounted position.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry with no indication of fluid loss or contamination.

The brake pads were composed of a bonded semi-metallic friction material. The Federal Vehicle in Use Inspection Standard is 1/32 inch of friction material. All of the pads on the front axle far exceeded this standard. The friction surfaces on the brake pads were glazed and worn.

The brake pad measurements were as follows:

| | |
|---|---|
| Left Front Inner: | 10.0 mm |
| Left Front Outer: | 10.0 mm |
| Right Front Inner: | 10.3 mm |
| Right Front Outer | 10.0 mm |

The rotor measurements were as follows:

| | |
|---|---|
| Left Front Rotor: | 32.5 mm |
| Right Front Rotor: | 32.0 mm |

STATE OF CALIFORNIA

**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**

CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The swept areas (friction surface) on the ventilated brake rotors were normal. The wheels bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly. The brake hoses were dry and had no indication of fluid loss.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #2

### BRAKE SYSTEM:

### REAR AXLE:

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry with no indication of fluid loss or contamination.

The brake pads were composed of a bonded semi-metallic friction material. The Federal Vehicle in Use Inspection Standard is 1/32 inch of friction material. All of the pads on the front axle far exceeded this standard. The friction surfaces on the brake pads were glazed and worn.

The brake pad measurements were as follows:

| | |
|---|---|
| Left Rear Inner: | 8.0 mm |
| Left Rear Outer: | 7.5 mm |
| Right Rear Inner: | 8.0 mm |
| Right Rear Outer | 7.0 mm |

The rotor measurements were as follows:

| | |
|---|---|
| Left Rear Rotor: | 24.9 mm |
| Right Rear Rotor: | 25.1 mm |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**REAR AXLE:**

The swept areas (friction surface) on the ventilated brake rotors were slightly irregular. Both rear rotors displayed a rotor edge lip. Measurements of rotor thickness were taken using a digital micrometer to exclude the edge lip. The wheels bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly. The brake hoses were dry and had no indication of fluid loss.

**EMERGENCY / PARKING BRAKE:**

The parking brake assembly on this vehicle consisted of an electronic switch in the driver compartment.

The vehicle was unpowered and the parking brake was not activated.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION:

On February 8, 2024, I contacted the National Highway Traffic Safety Administration (NHTSA), Office of Defects Investigation, Recall and Service Bulletins Database, via their World Wide Web site on the internet. The purpose of the contact was to inquire if there were, or had been, any NHTSA defect investigation, recalls and/or technical service bulletins for the 2020 Ford Explorer. There were zero unrepaired recalls associated with the vehicle.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## ANALYSIS AND OPINION

## MECHANICAL EXAMINATION

### VEHICLE #2

The mechanical examination of the tires and wheels did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the steering system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the throttle system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the brake system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision. The irregular and abraded friction surfaces on the brake pads and brake rotors were indicative of normal wear.

The mechanical examination of the parking brake did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

## MECHANICAL EXAMINATION VEHICLE #2 END.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000113

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**AIRBAG CONTROL MODULES:**

During the inspection, I removed the Airbag Control Modules (ACMs) from the Nissan Sentra and Ford Explorer for off-site examination. While I continued the inspection, San Bernardino County Deputy District Attorney Rodney Tamparong transported the ACMs to the to the San Bernardino County District Attorney's Office at 303 West 3rd Street in San Bernardino, California, for imaging. Tamparong returned the ACMs to me at the inspection location. Tamparong provided me a USB drive containing the ACM image files. Refer to Tamparong's supplemental report for more information.

I provided the ACMs to Holland for booking into evidence.

County of San Bernardino

Office of the District Attorney

JASON ANDERSON, District Attorney

Bureau of Investigation

Eric Hopley, Chief Investigator

# San Bernardino County District Attorney's Office
# Report #3397

## Supplemental Report

## San Bernardino County Sheriff's Department
## Major Accident Investigation Team
## Case #192400847

SBDA Sr. Investigator Rodney Tamparong

*1-909-382-3686 (Office)*
*E-mail: rtamparong@sbcda.org*

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

## SUPPLEMENTAL REPORT

### Assignment

I am a Senior District Attorney Investigator (Police Officer) for the San Bernardino County District Attorney's Office - Bureau of Investigation. I am assigned to the Office of Traffic Safety - Impaired Driving; Vehicular Manslaughter Unit, working in a plain clothes assignment driving an unmarked police vehicle.

### Prop 115 Certification

I have been a Police Officer for over 23 years, and I am Proposition 115 qualified through a POST Mandated Course.

### Notification

On Tuesday, 2-6-2024, San Bernardino County Sheriff's Department (SBSD) Major Accident Investigation Team (MAIT) Investigator G. Wolff requested my assistance with a fatal traffic collision investigation.

Note: Involved parties' information on this case is noted in the originating agency report, SBSD - MAIT case #192400847. For further information refer to the original report.

### Investigation

On Wednesday, 2-7-2024, I assisted SBSD-MAIT Investigators D. Holland and Investigator G. Wolff with a fatal traffic collision investigation. I was asked to image the Airbag Control Modules (ACM) for two vehicles.

1. 2020 Ford Explorer, VIN 1FM5K8AB4LGC13863
2. 2022 Nissan Sentra, VIN 3N1AB8DV6NY230192

Investigator G. Wolff obtained a search warrant granting access to the vehicles ACM's. The search warrant was signed by the Honorable Judge Cheryl Kersey on, Monday, 2-5-2024, under warrant ID #000135481.

SBSD-MAIT had removed the vehicles ACMs prior to my involvement. I met MAIT Investigator G. Wolff at Armada Towing, located at 8623 Carob Street, Fontana, CA 92335. He then gave me both ACM's.

| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7881 | 2-8-2024 |



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000116

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

CASE NO. 3397

ASSOCIATED CASES
SBSD – MAIT
192400847

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

## 2020 Ford Explorer







## ACM 2020 Ford Explorer






| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

## 2022 Nissan Sentra





## ACM 2022 Nissan Sentra






| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000118

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

**ACM Imaging**

I then drove to the San Bernardino County District Attorney's Office, located at 303 W. Third Street, San Bernardino.

Senior Investigator J. Rodriguez assisted me with the imaging process. I used the Bosch EDR tool along with the proper combination of cords and cables to successfully image both ACMs.

**Note: The additional notes section on the Bosch generated report did not have enough room for the disclaimer. The disclaimer should read:**

> *Disclaimer:*
>
> *I have accessed and retrieved data from CDR Tool accessible system(s) from or in the vehicle identified by the applied VIN in which potential Event Data Recorder (EDR) may be found. The retrieved data may be related to a crash or other physical event. The successful retrieval of the data and production of this report is an indication that the procedure(s) necessary to properly access and retrieve the data have been followed and the data was properly imaged/downloaded.*
>
> *I will have or will provide the appropriate party(s) a copy of the original, raw data file – the underlying CDR System file - for discovery and/or later re-printing as necessary. This file will be named using the vehicle's Vehicle Identification Number (VIN) and identified by the *.CDRx file extension. This file should only be opened and viewed with the latest version of the Bosch Crash Data Retrieval System Software; improper use of a "text viewer" may corrupt the CDRx file which would prevent it from being opened again in the CDR Tool software and generating a data translation report.*
>
> *The raw data as found in the CDRx file might be compared to a photographic negative and it is a direct image or copy of the data stored on/in the module(s) accessed using the CDR Tool. The CDRx file should be preserved in its native format, unedited, and should be shared in that format where it may be viewed at a later date using a licensed copy of the CDR Tool software or using the "free reader" version of the CDR Tool software in the latest production release of that software. Prior to any analytical use of this data or legal proceeding, the original *.CDRx file should be reopened and the raw data translated in the latest production version of the CDR software to ensure the most recent, complete translation of the data is used as described in the "Important Notice" above.*
>
> *I have indicated to the individual(s) receiving the CDRx file that the report includes a Data Limitations section which follows this disclaimer and that portion of this translation report may describe or suggest conditions or characteristics of the data which may be, on the surface, confusing or require a more complete analysis by other means. I have also informed the*

| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

*individual(s) that the data may be affected by conditions or vehicle characteristics described in the Data Limitations section of the report or in other related reference material including, but not limited to, the CDR Tool software Help File. For these reasons and others, a situationally complete analysis of the crash or event under study should be undertaken to fully evaluate the meaning, usefulness and applicability of the recovered data found in this report.*

I later returned the ACMs and provided the Bosch generated reports and files to MAIT Investigator G. Wolff concluding my investigation. For further refer SBSD-MAIT case # 192400847.

**Recommendations**

Forwarded report to MAIT Investigator D. Holland.

| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000120

Warrant
No.

SUPERIOR COURT OF CALIFORNIA
County of San Bernardino

The Great Seal

**SEARCH WARRANT**
Probable Cause Warrant to Search
(Penal Code Section 1524)

Report #: 192400847

**SEARCH WARRANT AND AFFIDAVIT**

**AFFIDAVIT**

I, Deputy Darrell Holland, swear under oath that the facts expressed by me in the attached and incorporated **Statement of Probable Cause** are true and that based therein I have probable cause to believe and do believe that the articles, property, and persons described below may be lawfully seized pursuant to Penal Code Section 1524, as indicated below, and is now located at the location(s) set forth below. Wherefore, I request that this Search Warrant be issued.

______________________, (Signature of Affiant)

**HOBBS SEALING REQUESTED:** ☐ YES ☒ NO
**NIGHT SEARCH REQUESTED:** ☐ YES ☒ NO

**SEARCH WARRANT**

**THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY SHERIFF, POLICEMAN OR PEACE OFFICER IN THE COUNTY OF SAN BERNARDINO:** proof by affidavit, under penalty of perjury, having been made before me by Deputy Darrell Holland that there is probable cause to believe that the property or person described herein may be found at the location(s) set forth herein and that it is lawfully sizeable pursuant to Penal Code Section 1524 et seq., as indicated below by "☒"(s), in that:

☐ it was stolen or embezzled;

☐ it was used as the means of committing a felony;

☐ it is possessed by a person with the intent to use it as means of committing a public offense or is possessed by another to whom he or she may have delivered it for the purpose of concealing it or preventing its discovery;

☒ it tends to show that a felony has been committed or that a particular person has committed a felony;

☐ it tends to show that sexual exploitation of a child, in violation of Penal Code Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Section 311.11, has occurred or is occurring;

☐ an arrest warrant has been issued for ____________N/A____________________________;

☐ a provider of electronic communication service or remote computing service has records of evidence, as specified in Penal Code Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in possession of any person with intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery;

**YOU ARE THEREFORE COMMANDED TO SEARCH:**

Clinical Laboratory Department – 1st level of Arrowhead Regional Medical Center Main Building.

**PREMISES TO BE SEARCHED:**

Arrowhead Regional Medical Center, Clinical Laboratory – 1st Level, 400 N. Pepper Avenue, Colton, CA 92324.

**FOR THE FOLLOWING PROPERTY:**

Any and all blood samples taken for toxicology screening for Giovanni Bonilla, DOB: 03/30/2007, taken at the time of admittance to Arrowhead Regional Medical Center on or after February 3, 2024, for treatment sustained during the traffic collision on February 3, 2024.

**AND TO SEIZE IT IF FOUND** and bring it before me, or this court, at the courthouse of this court. This Search Warrant and incorporated Affidavit was sworn to and subscribed before me this 9th day of Feb, 2024, at 1000 (a.m.)/p.m. Wherefore, I find probable cause for the issuance of this Search Warrant and do issue it.

________________________________, NIGHT SEARCH APPROVED: ☐ YES ☐ NO

*(Signature of Magistrate)*

**Judge of the San Bernardino Superior Court**

## STATEMENT OF PROBABLE CAUSE

### STATEMENT OF FACTS:

On February 3, 2024, at approximately 2355 hours, I was assigned to Region MAIT (Major Accident Investigation Team) with the San Bernardino County Sheriff's Department, and was dispatched to assist Fontant Police Department with an interagency investigation of a fatal traffic collision. I was dispatched to a two-vehicle head-on fatal traffic collision near the intersection of Valley Boulevard and Cypress Avenue in the City of Fontana, that involved a Fontana PD patrol vehicle (Vehicle #2, V-2) and a 2022 white Nissan Sentra (Vehicle #1, V-1).

V-1 traveled east on Valley Boulevard through the interseciton with Citrus Avenue, when a Fontana PD patrol vehicle attempted to conduct a traffic stop on the vehicle for violation of CVC 27315(e) - passenger not wearing a seatbelt. V-1 was observed with two passengers hanging out of the right and left rear passenger windows, making gestures and using cellular phones to record their activity. A traffic stop was initiated by the patrol vehicle (by activating a solid red light and siren), but V-1 failed to yield and fled at a high rate of speed. V-2 was a second assisting Fontana PD patrol vehicle, that was stationary facing westbound in the center turn lane of Valley Boulevard, approximately 3500 feet east of the attempted traffic stop near Valley Boulevard and Citrus Avenue. V-1 fled eastbound in the #1 lane on Valley Boulevard in excess of 90 mph in a 45 mph zone, in raining conditions on a wet roadway surface. V-1 entered the intersection with Cypress Avenue when the driver (Party #1, P-1, GIOVANNI BONILLA) lost control of V-1, causing V-1 to slide sideways in the wet conditions. The passenger side of V-1 collided with the front of V-2, causing P-1 to be ejected from V-1. Momentum from the collision caused V-1 to slide out of control and collide with a parked vehicle (Vehicle #3, V-3) along the north roadway curb of Valley Boulevard. As a result of the collision, the passengers in the right front, right rear, and left rear seats of V-1 died as a result of injuries sustained during the collision. P-1 was transported to Arrowhead Regional Medical Center for treament of serious injuries sustained in the collision.

A toxicology screen conducted at Arrowhead Regional Medical Center at the time P-1 was admitted, showed a presence of narcotics in his blood. It is believed P-1 operated a motor vehicle while under the influence of drugs at the time of the collision, which contributed to the cause of the collision.

**YOUR AFFIANT DECLARES UNDER PENALTY OF PERJURY,** under the laws of the State of California that this Affidavit is true and correct.

[signature]
**Darrell Holland, Deputy Sheriff**

**Date:** 02/09/24

**WARRANT NOTES**

(No Notes)

County of San Bernardino.

The people of the State of California to any peace officer in the County of San Bernardino:

Proof, by affidavit, having been this day made before me by telephone by the officer whose signature is affixed to the affidavit, that there is probable cause for believing that evidence tending to show that a felony (or felonies) has or have been committed, you are therefore commanded to make search on the person and/or property set forth in the description page and/or affidavit, which is incorporated by reference herein; and, in the case of a thing or things or personal property, if you find the same or any part thereof, to bring the thing or things or personal property forthwith before me at the courthouse of this Court.

Given under my hand, and issued at 10:19 on this 9th day of February, 2024

Hobbs Sealing Approved: **NO** Night Service Approved: **NO**



Judge Shahla Sabet

**Warrant ID: 000135947**

**END OF WARRANT**



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000124

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**NOTIFICATION:**

On Tuesday, April 23, 2024, at about 1704 hours, I was assigned to the Hesperia Station as a Detective/Corporal for the Hesperia Station and a supervisor for the San Bernardino County Sheriff's Department Regional Major Accident Investigation Team (M.A.I.T.) Deputy D. Holland, asked me to conduct the Event Data Recorder (EDR) analysis for the 2022 Nissan Sentra (VIN 3N1AB8DV6NY230192) and the 2020 Ford Explorer (VIN 1FM5K8AB4LGC13863) involved in a collision on Saturday, February 3, 2024. The airbag control modules (ACM) from each of the vehicles were removed during the vehicle inspection. On Wednesday, February 7, 2024, the ACM's were imaged by San Bernardino County District Attorney Senior Investigator Rodney Tamparong pursuant to a search warrant.

**EVENT DATA RECORDER:**

An Event Data Recorder (EDR) is a function or device installed in a motor vehicle to record technical vehicle and occupant information for a very brief period before, during, and after a crash solely for the purpose of monitoring and assessing vehicle safety system performance. After a vehicle module's primary functions are complete, and where appropriate thresholds are met, data may be recorded as part of the "Event Data Recorder" (EDR) functionality or capability. An "EDR" is not a standalone device, and the data may not always be recorded.

Event Data Recorders (EDR) and air bag control modules (ACM) are being used synonymously. Each term may be used but refers to the same item. The event data recorder is located inside the vehicle's airbag control module. A common misconception is that they are two different modules or boxes. The EDR Summary data table tells us about the currently recorded events and tells us what else this module has seen over its lifetime.


~~CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000135~~

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EVENT DATA RECORDER:**

EDRs may record:

- information, but only after some physical event like a crash
- vehicle dynamics information and system status for about 5 seconds before a crash
- certain driver inputs for about 5 seconds before a crash
- vehicle crash severity signature
- restraint use and deployment related information
- post-crash data such as the activation of an automatic collision notification (ACN) system

Crash Data Retrieval is a term used by those who use specialized equipment to "retrieve" the vehicle's EDR (event data recorder) data. This EDR data is also referred to as "crash data". CDR technicians and experts connect their EDR tool to an automobile allowing them to communicate with the vehicle and retrieve the EDR data file. Specialized software is then used to translate the EDR data file to a readable format for review and analysis.

CDR is also used in the name of the Bosch CDR Tool and the Bosch CDR Software. These specialized tools are made up of hardware and software which provides the ability to “image”, “download”, or “retrieve” EDR data that may be stored in the control modules. The software component is a single, standalone program designed to run in a Windows environment. The hardware part of the EDR Tool is a collection of components including interface modules (VCI), cables and adapters which, with proper training and minimal difficulty, are used to “retrieve” data from supported vehicles.

In the context of EDR Tool technology, the word “image” is used to describe the process of saving a digital copy of the EDR data / crash data which may be recorded in a supported vehicle to the person’s computer. Think of it being like a photographic image. When you take a picture of a vehicle, you are not physically changing or taking anything away from that vehicle, just getting an “image.” That vehicle is in the same condition as it was before the photograph. The EDR Tools simply retrieve an “image” of the crash data which may be in that vehicle and copies that data – as an “image” – to your computer in a secure digital file.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000136

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS:**

On Sunday, April 28, 2024, I analyzed the data obtained from the ACM of Vehicle #1.

While reading the comments section from the CDR report, I read the recommended tire size for Vehicle #1 was 215/45/R18. Vehicle #1 was front wheel drive The size mounted on the front of Vehicle #1 at the time of the collision was 205/60/R16. With the tire size smaller than the recommended size, the EDR would overestimate the wheel speed from the actual wheel speed unless the speedometer for Vehicle #1 was calibrated for the new size. If the speedometer was not calibrated for the new size, the speed offset would be 95.55% of the stated wheel speed.

The ACM of Vehicle #1 can record up to two events within its memory. An event is vehicle activity sensed by the ACM and recorded on the module. Event data includes both pre-crash and crash data. There are generally two types of events recorded, deployment and non-deployment events are most common. A deployment event refers to the deployment of the vehicles SRS airbags and a non-deployment event refers to an event that the module detects, however, the module does not deploy the SRS system(s). A non-deployment event is recorded if the change in longitudinal or lateral velocity equals or exceeds 8km/h over a 150ms timeframe or another type of non-reversible deployable restraint device other than a front, side, or side curtain airbag (e.g. seatbelt pretensioner) is commanded to deploy. Except as indicated below, non-deployment events are not locked into memory and can be over-written by subsequent non-deployment or deployment events. A deployment event is recorded if front airbag(s), side airbag(s), or side curtain airbag(s) are commanded to deploy. Deployment events are locked into memory and cannot be over-written.

The ACM for Vehicle #1 records two samples of pre-crash data per second for five seconds before Algorithm Enabled (AE). AE can also be described as time zero on the CDR printout. The main data elements are vehicle wheel speed, steering input, accelerator pedal, service brake activation, and engine RPM's. Other pre-crash data recorded one second before AE includes safety belt status, seat track position switch, airbag warning lamp status, occupant size classification and frontal airbag disable indicator.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

Vehicle #1 had two events recorded on the ACM. From the table below, the ACM records the vehicle's ignition cycle at the time of the event. Using the vehicle's ignition cycles at the time of event, you can see event record 2 is the only recorded event involving this collision. The ignition cycle at the time the module was imaged indicated 5,296. The ignition cycle at the time of the event record 1 indicated 4,033. Event record 2 indicated the event recorded at ignition cycle 5,295. Event record 1 was a non-deployment event and event record 2 was a deployment event. There was no maximum value for ignition cycles at the time of the crash listed in the data limitation.

| SYSTEM STATUS AT EVENT (EVENT RECORD 1) | |
|---|---|
| Ignition Cycle, Download | 5,296 |
| Ignition Cycle, Crash | 4,033 |
| | |
| **SYSTEM STATUS AT EVENT (EVENT RECORD 2)** | |
| Ignition Cycle, Download | 5,296 |
| Ignition Cycle, Crash | 5,295 |

The event data recorded showed the driver was not wearing his seat belt by indicating the safety belt status as OFF or "unfastened." The event data did not indicate the safety belt status of the front right passenger. The data indicated the right front passenger was not a "child" and the frontal air bag suppression switch was "off" indicating the airbag was set to deploy. At the time of the crash, the frontal airbag, side airbag and side curtain were all deployed for the driver and right front passenger.

Based on the information obtained during the investigation, Party #1 was driving Vehicle #1 eastbound on Valley Boulevard at a high rate of speed failing to stop for Fontana Police Department emergency personnel. Party #1 turned Vehicle #1 to the left which caused Vehicle #1 to cross over a divided highway sideways and into the front of Vehicle #2 (on-duty emergency vehicle). The impact with Vehicle #2 subsequently killed three occupants inside of Vehicle #1.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

The posted speed limit in this area of Valley Boulevard is 45 miles per hour. This area of Valley Boulevard had multiple lanes in each direction. The prima facie for Valley Boulevard was 65 miles per hour. The EDR captured Vehicle #1's data five seconds prior to the collision.

| PRE-CRASH DATA -5 TO 0 SEC (EVENT RECORD 2) | | | | | |
|---|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) | Accelerator Pedal, % Full (%) | Engine RPM (rpm) | Service Brake, On/Off | Steering Input (deg) |
| -5 | 105 | 79 | 5,200 | OFF (Brake not activated) | 250.0 (clp) |
| -4.5 | 105.6 | 77 | 5,200 | OFF (Brake not activated) | 250.0 (clp) |
| -4 | 106.3 | 75 | 5,300 | OFF (Brake not activated) | 250.0 (clp) |
| -3.5 | 106.3 | 70 | 5,300 | OFF (Brake not activated) | 250.0 (clp) |
| -3 | 106.3 | 84 | 4,800 | OFF (Brake not activated) | 250.0 (clp) |
| -2.5 | 106.9 | 82 | 5,100 | OFF (Brake not activated) | 250.0 (clp) |
| -2 | 107.5 | 70 | 5,100 | OFF (Brake not activated) | 250.0 (clp) |
| -1.5 | 108.7 | 0 | 5,100 | ON (Brake activated) | 250.0 (clp) |
| -1 | 96.3 | 0 | 3,700 | ON (Brake activated) | 250.0 (clp) |
| -0.5 | 83.3 | 0 | 2,600 | ON (Brake activated) | 242.5 |
| 0 | 83.3 | 0 | 2,500 | ON (Brake activated) | 245 |

From the data collected on the EDR, Vehicle #1 had a wheel speed of 83.3 to 108.7 miles per hour within the five seconds prior to the collision. Based on an EDR accuracy of +/- 4% and a speed offset of 95.55%, Vehicle #1 showed a wheel speed range of 99.7 to 113.0 miles per hour 1.5 seconds prior to the collision braking. From the data obtained, I believe it was at this point Vehicle #1 rotated counter clockwise and began to slide sideways which caused the rapid deceleration of wheel speed. The steering input showed 250 degrees which is the maximum steering input in degrees for the data limitations. The steering input possibly exceeded the 250 degrees during these time intervals.

Since this part of the roadway was undivided and one lane of travel in each direction (prima facie of 65 miles per hour), Party #1 was in violation of CVC Section 22349(a): Exceeding 65 miles per hour. See the table below for speed data.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

| PRE-CRASH DATA -5 TO 0 SEC (EVENT RECORD 2) | | | | | |
|---|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) | Speed, Vehicle Indicated (mph) 4% Over EDR | Speed, Vehicle Indicated (mph) 4% Under EDR | Speed, Vehicle Indicated (mph) 95.55% Speed Offset Over EDR | Speed, Vehicle Indicated (mph) 95.55% Speed Offset Under EDR |
| -5 | 105 | 109.2 | 101 | 104.3 | 96.3 |
| -4.5 | 105.6 | 109.8 | 101 | 104.9 | 96.9 |
| -4 | 106.3 | 110.6 | 102 | 105.6 | 97.5 |
| -3.5 | 106.3 | 110.6 | 102 | 105.6 | 97.5 |
| -3 | 106.3 | 110.6 | 102 | 105.6 | 97.5 |
| -2.5 | 106.9 | 111.2 | 103 | 106.2 | 98.1 |
| -2 | 107.5 | 111.8 | 103 | 106.8 | 98.6 |
| -1.5 | 108.7 | 113.0 | 104 | 108.0 | 99.7 |
| -1 | 96.3 | 100.2 | 92 | 95.7 | 88.3 |
| -0.5 | 83.3 | 86.6 | 80 | 82.8 | 76.4 |
| 0 | 83.3 | 86.6 | 80 | 82.8 | 76.4 |

I calculated the distance Vehicle #1 traveled during the five seconds prior to AE. I used the minimum speed and the maximum speed from the table above. The distance Vehicle #1 traveled in the five seconds prior to AE was approximately 750 to 851 feet.

| PRE-CRASH DATA -5 TO 0 SEC (EVENT RECORD 2) | | | | |
|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) Minum | Distance Traveled Minimum (feet) | Speed, Vehicle Indicated (mph) Maximum | Distance Traveled Maximum (feet) |
| -5 | 96.3 | 70.6 | 109.2 | 80.1 |
| -4.5 | 96.9 | 71.1 | 109.8 | 80.5 |
| -4 | 97.5 | 71.5 | 110.6 | 81.1 |
| -3.5 | 97.5 | 71.5 | 110.6 | 81.1 |
| -3 | 97.5 | 71.5 | 110.6 | 81.1 |
| -2.5 | 98.1 | 72.0 | 111.2 | 81.6 |
| -2 | 98.6 | 72.3 | 111.8 | 82.0 |
| -1.5 | 99.7 | 73.1 | 113.0 | 82.9 |
| -1 | 88.3 | 64.8 | 100.2 | 73.5 |
| -0.5 | 76.4 | 56.0 | 86.6 | 63.5 |
| 0 | 76.4 | 56.0 | 86.6 | 63.5 |
| Total | | 750.5 | | 851.0 |

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

The total resultant speed change ($\Delta V_r$) experienced is a factor of the Maximum Delta-V in the Longitudinal direction ($\Delta V_x$) and the Maximum Delta-V in the Lateral direction ($\Delta V_y$). The formula to determine the total speed change of a vehicle is: $\Delta V_r$=Sqrt $\Delta V_x^2 + \Delta V_y^2$

The crash pulse for the longitudinal Delta-V and Acceleration of Vehicle #1 peaked at about 110 msec after the collision at -36.0 miles per hour. The crash pulse for the lateral Delta-V and Acceleration peaked at about 110 msec after the collision at -44.1 miles per hour.

| (EVENT RECORD 2) | | |
|---|---|---|
| Time (msec) | Delta-V, Lateral (mph) | Delta-V, Longitudinal (mph) |
| 0 | 0 | 0 |
| 10 | -3.1 | -1.9 |
| 20 | -9.3 | -5 |
| 30 | -28 | -9.3 |
| 40 | -34.8 | -9.3 |
| 50 | -36 | -18 |
| 60 | -36.7 | -23 |
| 70 | -41 | -28.6 |
| 80 | -41.6 | -32.9 |
| 90 | -42.3 | -35.4 |
| 100 | -43.5 | -35.4 |
| 110 | -44.1 | -36 |

I calculated the combined Delta-V experienced by Party #1 and the occupants to be approximately 56.85 miles per hour (+/- 10%). The Delta-V experienced is consistent with fatal injuries. A copy of the PDF is attached to this report.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000141

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

On Monday, April 29, 2024, I analyzed the data obtained from the ACM of Vehicle #2.

While reading the comments section from the CDR report, I read the recommended tire size for Vehicle #2 was 255/60/R18. Vehicle #2 was equipped with four tires of the recommended size. There would be no speed offset for Vehicle #2 in this case. The indicated wheel speed on the EDR would be correct besides for the margin of error.

The ACM of Vehicle #2 can record up to two events within its memory. An event is vehicle activity sensed by the ACM and recorded on the module. Event data includes both pre-crash and crash data. There are generally two types of events recorded, deployment and non-deployment events are most common. A deployment event refers to the deployment of the vehicles SRS airbags and a non-deployment event refers to an event that the module detects, however, the module does not deploy the SRS system(s). A non-deployment event is recorded if the change in longitudinal or lateral velocity equals or exceeds 8km/h over a 150ms timeframe or another type of non-reversible deployable restraint device other than a front, side, or side curtain airbag (e.g. seatbelt pretensioner) is commanded to deploy. Except as indicated below, non-deployment events are not locked into memory and can be over-written by subsequent non-deployment or deployment events. A deployment event is recorded if front airbag(s), side airbag(s), or side curtain airbag(s) are commanded to deploy. Deployment events are locked into memory and cannot be over-written.

The ACM for Vehicle #2 records five samples of pre-crash data per second for five seconds before Algorithm Enabled (AE). AE can also be described as time zero on the CDR printout. The main data elements are vehicle wheel speed, accelerator pedal, service brake activation, and engine RPM's. Other pre-crash data recorded one second before AE includes safety belt status, seat track position switch, airbag warning lamp status, occupant size classification and frontal airbag disable indicator.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

Vehicle #2 had one event recorded on the ACM. From the table below, the ACM records the vehicle's ignition cycle at the time of the event. Using the vehicle's ignition cycles at the time of event, you can see event record 1 is the only recorded event involving this collision. The ignition cycle at the time the module was imaged indicated 3,118. The ignition cycle at the time of the event record 1 indicated 3,117. There was no maximum value for ignition cycles at the time of the crash listed in the data limitation.

| SYSTEM STATUS AT TIME OF RETRIEVAL | |
|---|---|
| VIN As Programmed into RCM at Factory | 1FM5K8AB4LGC13863 |
| Current VIN (From PCM) | 1FM5K8AB4LGC13863 |
| Ignition Cycle, Download (First Record) | 3,118 |
| Ignition cycle, Crash | 3,117 |

The event data recorded showed the driver was not wearing his seat belt by indicating the safety belt status as "unbelted." The event data indicated the safety belt status of the front right passenger was also "unbelted." The event data indicated the safety belt status of the second row driver, middle and passenger side was "unbelted." At the time of the crash, the frontal airbag, side airbag, side curtain and inflatable knee bolster were all deployed for the driver and right front passenger.

Based on the information obtained during the investigation, Party #2 was driving Vehicle #2 was assigned to uniformed patrol with the Fontana Police Station. Vehicle #2 was a marked Fontana Police vehicle equipped with emergency lights and sirens. Party #2 was in a stationary position in a parking lot on the southeast corner of Valley Boulevard and Cypress Avenue. While in the stationary position, there was a broadcast of a pursuit heading towards their location. Party #2 drove Vehicle #2 north through the parking lot to exit onto Valley Boulevard. Party #2 exited the parking lot and turned to head west on Valley Boulevard. After Party #2 completed his left turn, the front of Vehicle #2 was struck by the passenger side of Vehicle #1.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

## EDR ANALYSIS (CONTINUED):

The EDR captured Vehicle #1's data five seconds prior to the collision.

| PRE-CRASH DATA -5 TO 0 SEC [5 SAMPLES/SEC] (FIRST RECORD) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Time (sec) | Stability Control Yaw Rate (deg/sec) | Steering Wheel Angle (deg) | Speed, Vehicle Indicated (mph) | Accelerator Pedal, % Full | Accelerator Pedal, % Full, Quality Factor | Service Brake, On/Off | Engine RPM |
| -5 | 0.51 | 2 | 15.9 | 0 | OK | ON(Driver_Braking) | 1,420 |
| -4.8 | 0.66 | 3 | 14.2 | 0 | OK | ON(Driver_Braking) | 1,260 |
| -4.6 | 0.42 | 5 | 12.3 | 0 | OK | ON(Driver_Braking) | 1,080 |
| -4.4 | 0.42 | 7 | 9.8 | 0 | OK | ON(Driver_Braking) | 880 |
| -4.2 | 0.39 | 7 | 7.6 | 0 | OK | ON(Driver_Braking) | 666 |
| -4 | 0.42 | 13 | 6.1 | 0 | OK | ON(Driver_Braking) | 686 |
| -3.8 | 0.63 | 25 | 5.3 | 0 | OK | OFF(Driver_Not_Braking) | 812 |
| -3.6 | 2.15 | 51 | 5.2 | 100 | OK | OFF(Driver_Not_Braking) | 1,144 |
| -3.4 | 3.85 | 88 | 5.4 | 100 | OK | OFF(Driver_Not_Braking) | 1,470 |
| -3.2 | 8.32 | 132.9 | 6.1 | 100 | OK | OFF(Driver_Not_Braking) | 1,892 |
| -3 | 12.34 | 168 | 7.5 | 99 | OK | OFF(Driver_Not_Braking) | 2,114 |
| -2.8 | 17.76 | 192.9 | 9.1 | 100 | OK | OFF(Driver_Not_Braking) | 2,298 |
| -2.6 | 17.74 | 200 | 10.8 | 100 | OK | OFF(Driver_Not_Braking) | 2,484 |
| -2.4 | 24.27 | 197 | 12.2 | 100 | OK | OFF(Driver_Not_Braking) | 2,844 |
| -2.2 | 20.71 | 184.9 | 13.9 | 100 | OK | OFF(Driver_Not_Braking) | 3,124 |
| -2 | 25.56 | 177.9 | 15.2 | 100 | OK | OFF(Driver_Not_Braking) | 3,362 |
| -1.8 | 25.35 | 174 | 16.5 | 100 | OK | OFF(Driver_Not_Braking) | 3,546 |
| -1.6 | 24.46 | 143 | 17.8 | 100 | OK | OFF(Driver_Not_Braking) | 3,958 |
| -1.4 | 9.2 | 20 | 19 | 100 | OK | OFF(Driver_Not_Braking) | 4,110 |
| -1.2 | -1.38 | -1 | 20.4 | 100 | OK | OFF(Driver_Not_Braking) | 4,396 |
| -1 | 4.23 | 34 | 21.7 | 43 | OK | OFF(Driver_Not_Braking) | 4,668 |
| -0.8 | 5.88 | 22 | 23.1 | 0 | OK | OFF(Driver_Not_Braking) | 4,752 |
| -0.6 | 0.7 | -10 | 23.8 | 0 | OK | OFF(Driver_Not_Braking) | 4,784 |
| -0.4 | 2.55 | 33 | 23.9 | 0 | OK | ON(Driver_Braking) | 4,788 |
| -0.2 | 7.93 | 53.9 | 21.9 | 0 | OK | ON(Driver_Braking) | 4,138 |
| 0 | 8.2 | 64 | 19.4 | 0 | OK | ON(Driver_Braking) | 3,588 |

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

## EDR ANALYSIS (CONTINUED):

I calculated Vehicle #2's wheel speed with the +/- 4% taken into consideration. With the speed calculated, I calculated the distance traveled within the five seconds before AE.

| PRE-CRASH DATA -5 TO 0 SEC [5 SAMPLES/SEC] (FIRST RECORD) | | | | | |
|---|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) | Speed, Vehicle Indicated -4% (mph) | Speed, Vehicle Indicated +4% (mph) | Distance Traveled -4% (feet) | Distance Traveled +4% (feet) |
| -5 | 15.9 | 15.3 | 16.5 | 4.5 | 4.9 |
| -4.8 | 14.2 | 13.6 | 14.8 | 4.0 | 4.3 |
| -4.6 | 12.3 | 11.8 | 12.8 | 3.5 | 3.8 |
| -4.4 | 9.8 | 9.4 | 10.2 | 2.8 | 3.0 |
| -4.2 | 7.6 | 7.3 | 7.9 | 2.1 | 2.3 |
| -4 | 6.1 | 5.9 | 6.3 | 1.7 | 1.9 |
| -3.8 | 5.3 | 5.1 | 5.5 | 1.5 | 1.6 |
| -3.6 | 5.2 | 5.0 | 5.4 | 1.5 | 1.6 |
| -3.4 | 5.4 | 5.2 | 5.6 | 1.5 | 1.6 |
| -3.2 | 6.1 | 5.9 | 6.3 | 1.7 | 1.9 |
| -3 | 7.5 | 7.2 | 7.8 | 2.1 | 2.3 |
| -2.8 | 9.1 | 8.7 | 9.5 | 2.6 | 2.8 |
| -2.6 | 10.8 | 10.4 | 11.2 | 3.0 | 3.3 |
| -2.4 | 12.2 | 11.7 | 12.7 | 3.4 | 3.7 |
| -2.2 | 13.9 | 13.3 | 14.5 | 3.9 | 4.2 |
| -2 | 15.2 | 14.6 | 15.8 | 4.3 | 4.6 |
| -1.8 | 16.5 | 15.8 | 17.2 | 4.6 | 5.0 |
| -1.6 | 17.8 | 17.1 | 18.5 | 5.0 | 5.4 |
| -1.4 | 19 | 18.2 | 19.8 | 5.4 | 5.8 |
| -1.2 | 20.4 | 19.6 | 21.2 | 5.7 | 6.2 |
| -1 | 21.7 | 20.8 | 22.6 | 6.1 | 6.6 |
| -0.8 | 23.1 | 22.2 | 24.0 | 6.5 | 7.0 |
| -0.6 | 23.8 | 22.8 | 24.8 | 6.7 | 7.3 |
| -0.4 | 23.9 | 22.9 | 24.9 | 6.7 | 7.3 |
| -0.2 | 21.9 | 21.0 | 22.8 | 6.2 | 6.7 |
| 0 | 19.4 | 18.6 | 20.2 | 5.5 | 5.9 |
| Total | | | | 102.6 | 111.1 |


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000145

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

From the table, Vehicle #2 had a wheel speed between 22.9 and 24.9 miles per hour. Party #2 was in a stationary position prior to exiting onto Valley Boulevard. From the data collected, it appears that at about four seconds prior to AE, Party #2 released the brake pedal and accelerated to make his turn onto Valley Boulevard. Party #2 completed his turn to westbound Valley Boulevard approximately 2.8 seconds later. Within that time period, Vehicle #2 traveled a distance of approximately 48-52 feet. This put Vehicle #2 entering the divided highway portion of Valley Boulevard. Based on the speed calculations listed above, Vehicle #1 was approximately 537-609 feet away when Vehicle #2 entered onto Valley Boulevard.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000146

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

The total resultant speed change ($\Delta V_r$) experienced is a factor of the Maximum Delta-V in the Longitudinal direction ($\Delta V_x$) and the Maximum Delta-V in the Lateral direction ($\Delta V_y$). The formula to determine the total speed change of a vehicle is: $\Delta V_r$=Sqrt $\Delta V_x^2 + \Delta V_y^2$

The crash pulse for the longitudinal Delta-V and Acceleration of Vehicle #1 peaked at about 120 msec after the collision at -32.03 miles per hour. The crash pulse for the lateral Delta-V and Acceleration peaked at about 80 msec after the collision at 27.38 miles per hour.

| CRASH PULSE (FIRST RECORD) | | |
|---|---|---|
| Time (msec) | Delta-V, longitudinal (MPH) | Delta-V, Lateral (MPH) |
| 0 | -1.8 | -0.04 |
| 10 | -4.7 | 1.43 |
| 20 | -7.31 | 2.83 |
| 30 | -10.9 | 5.68 |
| 40 | -15.73 | 10.95 |
| 50 | -19.63 | 15.43 |
| 60 | -24.36 | 23.8 |
| 70 | -26.33 | 26.63 |
| 80 | -28.09 | 27.38 |
| 90 | -29.63 | 27.21 |
| 100 | -30.77 | 26.62 |
| 110 | -31.17 | 25.68 |
| 120 | -32.03 | 25.72 |

I calculated the combined Delta-V experienced by Party #2 and the occupants to be approximately 42.13 miles per hour (+/- 10%). The Delta-V experienced is consistent with serious to life threatening injuries. A copy of the PDF is attached to this report.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000147

IMPORTANT NOTICE: Robert Bosch LLC and the manufacturers whose vehicles are accessible using the CDR System urge end users to use the latest production release of the Crash Data Retrieval system software when viewing, printing or exporting any retrieved data from within the CDR program. Using the latest version of the CDR software is the best way to ensure that retrieved data has been translated using the most current information provided by the manufacturers of the vehicles supported by this product.

## CDR File Information

| | |
|---|---|
| User Entered VIN | 3N1AB8DV6NY230192 |
| User | Sr. Inv. Rodney Tamparong |
| Case Number | 192400847 |
| EDR Data Imaging Date | 02/07/2024 |
| Crash Date | 02/03/2024 |
| Filename | 3N1AB8DV6NY230192_ACM.CDRX |
| Saved on | Wednesday, February 7 2024 at 16:47:51 |
| Imaged with CDR version | Crash Data Retrieval Tool 23.2 |
| Imaged with Software Licensed to (Company Name) | San Bernardino County District Attorney |
| Reported with CDR version | Crash Data Retrieval Tool 23.2 |
| Reported with Software Licensed to (Company Name) | San Bernardino County District Attorney |
| EDR Device Type | Airbag Control Module |
| Event(s) recovered | Event Record 1,<br>Event Record 2 |

## Comments

VIN: 3N1AB8DV6NY230192, 2022 Nissan Sentra
Inspection location: 303 W. Third Street, SAN BERNARDINO, CA 92415
Individuals present:
Senior Investigator, Rodney Tamparong, San Bernardino County District Attorney's Office. Senior Investigator, Jorge Rodriguez, San Bernardino County District Attorney's Office.
Module was removed by SBSD - MAIT from the vehicle prior to imaging.
Restraint deployment(s): Airbags deployed.
Seatbelts: Unknown.
Imaging conducted pursuant to search warrant (warrant details) (Y/N)? Yes.
Imaging conducted pursuant to owner consent (Y/N)? N/A.
Imaging conducted pursuant to civil discovery (Y/N)? N/A.
Ignition key or fob available and its position at the start of the inspection: No.
Odometer reading/units: Unknown.
Recommended tire size (sticker):
215/45R18 Tire size(s) (actual):
L/F - 205/60R16 - Inflated
L/R - 215/45/R18 - Inflated
R/F - 205-60R16 - Deflated
R/R - 215/45/R18 - Inflated
Other notes: Imaging completed by direct to module benchtop.
Disclaimer: I have accessed and retrieved data from CDR Tool accessible system(s) from or in the vehicle identified by the applied VIN in which potential Event Data Recorder (EDR) may be found. The retrieved data may be related to a crash or other physical event. The successful retrieval of the data and production of this report is an indication that the procedure(s) necessary to properly access and retrieve the data have been followed and the data was properly imaged/downloaded. I will have or will provide the appropriate party(s) a copy of the original, raw data file - the underlying CDR System file - for discovery and/or later re-printing as necessary. This file will be named using the vehicle's Vehicle Identification Number (VIN) and identified by the *.CDRx file extension. This file should only be opened and viewed with the latest version of the Bosch Crash Data Retrieval System Software; improper use of a "text viewer" may corrupt the CDRx file which would prevent it from being opened again in the CDR Tool software and generating a data translation report.The raw data as found in the CDRx file might be compared to a photographic negative and it is a direct image or copy of the data stored on/in the module(s) accessed using the CDR Tool. The CDRx file should be preserved in its native format, unedited, and should be shared in that format where it may be viewed at a later date using a licensed copy of the CDR Tool software or using the "free reader" version of the CDR Tool software in the latest production release of that software. Prior to any analytical use of this data or legal proceeding, the original *.CDRx file should be reopened and the raw data translated in the latest production version of the CDR software to ensure the most recent, complete translation of the data is used as described in the "Important Notice" above. I have indicated to the individual(s) receiving the CDRx file that the report includes a Data Limitations section which follows this disclaimer and that portion of this translation report may describe or suggest conditions or characteristics of the data which ma

## Data Limitations

**General Information:**
Data limitations are intended to assist in reading event data that has been imaged from the vehicle's Air bag Control Unit (ACU). Event data should be considered in conjunction with other available physical evidence from the vehicle and scene.

**Airbag Control Unit (ACU)**
- The Air bag Control Unit (ACU) can store two types of events: Non-Deployment Events and Deployment.

- A Non-Deployment Event is a crash or other physical occurrence which causes the ACU algorithm to be activated, but in which deployment thresholds are not reached.
- A Deployment Event is a crash or other physical occurrence which causes ACU deployment thresholds to be reached or exceeded. Depending on the vehicle model, one or more of the following may be activated during a Deployment Event: front air bags, seat-mounted side airbags, roof-mounted or door-mounted curtain air bags, pretensioners, or pop-up roll bars.

- The ACU can record up to two events. If additional events occur subsequently, the older of the two events already recorded (i.e. the one which occurred first) is overwritten.
  - A Non-Deployment Event can be overwritten by another Non-Deployment event, or by a Deployment Event.
  - A Deployment Event has higher priority than a Non-Deployment Event, and cannot be interrupted or overwritten by another event.
  - The data pertaining to a Deployment Event is locked after being recorded. However, a second event can still be recorded subsequently in the portion of the event memory which is not locked.

- Event data includes both pre-crash data and crash data.
  - If the power supply to the ACU is lost during an event, all or part of the event data may not be recorded.
  - In addition to the recording of event data, the ACU has the ability to perform diagnostics and record Diagnostic Trouble Codes (DTCs).

**Data Element Sign Convention:**
The following table provides an explanation of the sign convention for data elements in the CDR report.

| Data Element Name | Positive Sign Notation Indicates |
|---|---|
| Longitudinal Acceleration | Forward |
| Delta-V, Longitudinal | Forward |
| Maximum Delta-V, Longitudinal | Forward |
| Lateral Acceleration | Left to Right |
| Delta-V, Lateral | Left to Right |
| Maximum Delta-V, Lateral | Left to Right |
| Vehicle Roll Angle | Left to Right Rotation |
| Steering Input | Left Turn |

- "Life Time Counter (sec)" indicates the elapsed time, in seconds, from the vehicle's first ignition activation until the start of the first recorded event. The counter is incremented whenever the vehicle's ignition is on. The counter is reset to 0 if the ACU is replaced.
- "Complete File Recorded" indicates whether a complete EDR data set has been stored after the event. "Yes" indicates that a complete data set has been recorded. "No" indicates that only a portion of the data set has been recorded, for example due to the power to the ACU being lost during the event.
- "Multi-Event, Number of Events (1, 2)" indicates the number of events which are stored during a given ignition cycle. A Multi-Event occurs whenever the time between Event 2 trigger threshold and Event 1 trigger threshold is less than or equal to 5 seconds during the same ignition cycle, and "2" will be recorded in this case. Otherwise, "1" will be recorded.
- "Air Bag Warning Lamp (On, Off)" indicates whether the ACU was in trouble mode or in normal operation mode at the time of the event. "On" indicates that the air bag warning lamp was illuminated at the time of the event, and the ACU was in trouble mode. "Off" indicates that the air bag warning lamp was not illuminated at the time of the event, and the ACU was in normal operation mode.
- "Frontal Air Bag Suppression Switch Status" indicates whether front passenger air bag deployment was suppressed at the time of the event. "On" indicates that the front passenger air bag was suppressed at the time of the event (deployment inhibited). "Off" indicates that the front passenger air bag was not suppressed at the time of the event (deployment enabled). This data will not be available for all vehicles.
- "Delta-V, Longitudinal" indicates the cumulative change in velocity along the longitudinal direction.
- "Acceleration, Longitudinal" indicates the rate of change of velocity with time along the longitudinal direction.
- "Delta-V, Lateral" indicates the cumulative change in velocity along the lateral direction.
- "Acceleration, Lateral" indicates the rate of change of velocity with time along the lateral direction.
- "Engine Throttle, % full" indicates the position of the accelerator pedal as a percentage of the fully depressed position.
- "Service Brake (On, Off)" indicates whether the service brake is activated ("On") or not activated ("Off").
- "Steering Input (deg)" indicates the angular displacement of the steering wheel measured in degrees. -250 deg indicates a 250 degree turn to the right of the steering wheel, 0 deg indicates the straight-ahead steering wheel position, and 250 deg indicates a 250 degree turn to the left of the steering wheel.
- The notation "CLP" indicates that the measurement captured by a sensor exceeded the design range of the sensor.
- "Seat Track Position Switch, Foremost, Status, Driver (Yes/No)" indicates whether the driver's seat is positioned within a designated threshold value of the most forward adjustment position. "Yes" indicates that the driver's seat is positioned within a designated threshold value of the most forward adjustment position. For all other adjustment positions, "No" is displayed. This data will not be available if the seat track position switch is not installed in the vehicle.
- "Occupant Size Classification, Right Front Passenger, Child (Yes/No)" indicates whether or not the right front passenger is classified as a child (as defined in 49 CFR part 572, subpart N or smaller). This data will not be available for all vehicles.
- "e-pedal ON/OFF Status" indicates whether "e-pedal" is activated (ON), or not activated (OFF). This data will not be available for all vehicles.
- "ABS Warning lamp, on/off" indicates whether "Anti-lock Brake System" was in trouble mode or in normal operation mode at the time of the event. This data will not be available for all vehicles.
- "AEB/FCW switch status ON/OFF (from ADAS)" indicates whether the switch of "Automatic Emergency Braking or Forward Collision Warning controlled by ADAS unit" was ON, or OFF at the time of the event. This data will not be available for all vehicles.
- "AEB Warning lamp (from ADAS)" indicates whether "Automatic Emergency Braking controlled by ADAS unit" was in trouble mode or in normal operation mode at the time of the event. This data will not be available for all vehicles.
- "ABS regulation status" indicates whether "Anti-lock Brake System" was activated (ABS in regulation), or not activated (no ABS regulation). This data will not be available for all vehicles.
- "VDC switch status ON/OFF" indicates whether the switch of "Vehicle Dynamic Control" in ON, or OFF. This data will not be available for all vehicles.
- "VDC status/warning" indicates whether "Vehicle Dynamic Control" was in normal operation mode and not activated (No failure and no control), in trouble mode and not activated (Failure), or in normal mode and activated (In active control). This data will not be available for all vehicles.



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000149

- "Adaptive Cruise Control status" indicates whether "Intelligent Cruise Control status" was activated (ACC activated), waiting (ACC waiting), suspended (ACC suspended), or not activated (No display request). This data will not be available for all vehicles.
- "AEB operating capability" indicates whether "Automatic Emergency Braking" was in trouble mode (Impossible to execute request) or in normal operation mode (Braking fully operational). This data will not be available for all vehicles.
- "AEB Brake request (from ADAS)" indicates whether "Automatic Emergency Braking controlled by ADAS unit" was activated (Brake Torque AEB Maximum), or not activated (No Brake Request). This data will not be available for all vehicles.
- "VIN retrieval from other ECU " indicates VIN data retrieval from other ECU when CDR connect to vehicle by using OBD system if available.
- "VIN retrieval from ACU " indicates VIN data retrieval from ACU. It will not be available for all vehicles.
- "Engine RPM (Gearbox Input Shaft) " indicates RPM of motor used for vehicle drive on electric or hybrid vehicles. In case of ICE vehicles, this indicates input shaft revolution that is input to Gearbox. This data will not be available for all vehicles.
- "Engine RPM (Front Electrical Motor) " indicates RPM of motor used for vehicle drive on electric vehicles. This data will not be available for all vehicles.
- "Engine RPM (Rear Electrical Motor)" indicates RPM of motor used for 4WD vehicle drive on electric vehicles. This data will not be available for all vehicles.
- "Engine RPM" indicates RPM of engine used for vehicle drive on electric vehicles. This data will not be available for all vehicles.
- "Airbag Deployment Time" indicates deployment time of each airbag. This data will not be available for all vehicles.
- "Seat Track Position Switch, Foremost, Status, Passenger" indicates whether the passenger's seat is positioned within a designated threshold value of the most forward adjustment position. "Yes" indicates that the passenger's seat is positioned within a designated threshold value of the most forward adjustment position. For all other adjustment positions, "No" is displayed. This data will not be available if the seat track position switch is not installed in the vehicle.

**Hexadecimal Data:**
All data that has been specified for retrieval is shown in the Hexadecimal Data section of this report. However, the Hexadecimal Data section may contain data that is not translated by the CDR tool.

**Data Sources:**
- Crash data is measured internally in the ACU.
- Pre-crash data is not measured internally in the ACU, but is transmitted from other control units through the Controller Area Network (CAN).
- Pre-crash data and crash data are asynchronous.

0701_Nissan001_r011



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000150

## System Status at Time of Retrieval

| | |
|---|---|
| VIN retrieval from ACU | Not Available |
| VIN retrieval from other ECU | Not Available |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,<br><br>Defendants. | No. 5:25-cv-00207-JGB-SHK |

DEPOSITION OF GARRETT WOLFF

PMK for the County of San Bernardino

Taken Remotely Via Zoom Workplace

Thursday, July 2, 2026

Stenographically Reported by:
Monica Schoonover, CSR No. 1022
Job No. 28389

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 5:25-cv-00207-JGB-SHK |
| CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive, | ) | |
| Defendants. | ) | |

REMOTE DEPOSITION OF GARRETT WOLFF, PMK for the County of San Bernardino, taken on behalf of the Defendants, beginning at 9:01 a.m. and ending at 3:06 p.m., on Thursday, July 2, 2026, via Zoom Workplace before Monica Schoonover, Certified Shorthand Reporter No. 10220.

APPEARANCES:

For Plaintiffs:

LAW OFFICES OF DALE K. GALIPO
BY: MARCEL F. SINCICH, ESQ.
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333

SHOJAI LAW FIRM
BY: NEEMA SHOJAI, ESQ.
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
619.777.0383

For Defendants CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA:

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
BY: EUGENE HANRAHAN, ESQ.
eugene.hanrahan@manningkass.com
801 South Figueroa Street, 15th Floor
Los Angeles, California 90017-3012
213.624.6900

For Plaintiff MINOR CHILD "A" (Case No. CIVSB2500920):

LAW OFFICES OF JAMES H. CESENA
BY: JAMES CESENA, ESQ.
jamescesena711@gmail.com
1748 West Katella Avenue, Suite 105
Orange, California 92867
714.744.3333

INDEX TO EXAMINATION

WITNESS: GARRETT WOLFF


| EXAMINATION | PAGE |
|---|---|
| By Mr. Sincich | 6, 186 |
| By Mr. Hanrahan | 123 |

# INDEX TO EXHIBITS


| DESCRIPTION | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of County of San Bernardino Person(s) Most Knowledgeable Regarding the Incident Investigation Pursuant to FRCP 30(b)(6) | 10 |
| Exhibit 2 | MAIT Report | 19 |
| Exhibit 3 | Whiteboard Diagram | 57 |
| Exhibit 4 | Screenshot of Diagram | 63 |
| Exhibit 5 | Screenshot of Diagram | 63 |
| Exhibit 6 | Screenshot of Diagram | 67 |
| Exhibit 7 | Whiteboard Diagram | 67 |
| Exhibit 8 | Photo COF 000497 | 67 |
| Exhibit 9 | Photo COF 000600 | 88 |
| Exhibit A | Photo | 143 |
| Exhibit B | Photo - Bates 607 | 145 |
| Exhibit C | Photo - Bates 614 | 146 |
| Exhibit D | Photo | 159 |
| Exhibit E | Video | 181 |

THURSDAY, JULY 2, 2026; 9:01 A.M.

THE COURT REPORTER: Good morning. My name is Monica Schoonover. I am a California Certified Shorthand Reporter, License No. 10220.

Mr. Wolff, please raise your right hand.

GARRETT WOLFF,

having been first duly sworn remotely by the reporter, was examined and testified as follows:

EXAMINATION BY MR. SINCICH

BY MR. SINCICH:

Q Good morning. Can you please state and spell your name for the record?

A Yes. My name is Garrett Wolff. That's spelled G-a-r-r-e-t-t W-o-l-f-f.

Q Have you had your deposition taken before?

A No.

Q Have you testified in court before?

A Yes.

Q Approximately how many times?

A I would estimate somewhere between 30 and 50 times.

Q Was at least the majority of those related to

law enforcement?
A Yes.
Q Who do you currently work for?
A The San Bernardino County Sheriff's Department.
Q And what's your current rank?
A Deputy sheriff.
Q Okay. Just like in the other times that you testified in court, do you understand that you are under oath to tell the truth today?
A Yes.
Q And although we are sort of in an informal setting of a Zoom deposition, do you understand that your testimony today has the same force and effect as if given in a court of law?
A Yes.
Q The plan is to go about an hour and take a ten-minute break each hour, but if you need a break at any point in time, would you let me know?
A Sure.
Q If you don't understand a question, would you let me know that as well?
A Yes.
Q If there's a technology issue, you might have to, like, wave your hand to get our attention. Okay?
A No problem.

Q Maybe or maybe not, depending on where you testified previously, there might not have been a court reporter, but do you understand that we have a court reporter here today that's typing down everything that's being said?
A Yes.
Q And because of that, and hopefully to make her job easier, it is important for us to only speak one at a time. Okay?
A Understood.
Q And that includes using audible responses to questions. Do you understand what I mean by that?
A Yes. Like, don't nod your head in response to a question.
Q Right. And it also means -- and it might be difficult for her to even put down even in my explanation, but to say the more formal "yes" or "no" if that's the appropriate response instead of the sounds "uh-huh" or "huh-uh." Do you understand that?
A Yes.
Q That way, there's no ambiguity when reading the transcript later.
Is there any reason why you wouldn't be able to give your best testimony today?
A No.

Q Do you understand that you have been designated by the County of San Bernardino as their person most knowledgeable for this deposition?
A I do.
Q And did you receive a notice of deposition?
A I did.
Q Okay. Did you bring anything with you today?
A I did.
Q What did you bring with you?
A I have a printed-out copy of the report prepared by Deputy Holland, the report prepared by myself, the report prepared by Deputy Reyes, and the report prepared by -- he's now -- I think he was at the time Detective LaFond.
Q Okay. Could you spell LaFond for our court reporter?
A Yes. It's L-a-F-o-n-d.
Q Okay. Are these reports contained within the MAIT report?
A Yes. It is -- it is almost the entirety of the MAIT report that I possess in my hands right now.
Q Okay. And the supervisor was Sergeant Motley?
A Yes.
Q That's M-o-t-l-e-y?
A Correct.

Q Did Sergeant Motley draft any reports, to your knowledge?
A Not to my knowledge.
Q Okay. Did you bring anything else?
A No.
MR. SINCICH: Okay. I am going to mark as Exhibit 1 the notice of deposition.
(Exhibit 1 marked for identification.)
BY MR. SINCICH:
Q Do you understand that you are here to testify about the investigation into the February 3rd, 2024, collision that occurred just east of the Cypress and Valley intersection?
A Yes.
Q And if I reference the word "incident," do you understand that I am referring to that collision incident?
A Yes.
Q Which is the subject of your report; right?
A Correct.
Q And also in the notice, it's stated to include information contained in the MAIT report, M-A-I-T, interviews with involved officers and witnesses, conclusions reached, and the basis for those conclusions. Are you prepared to discuss that information as well?

A Yes.
Q Okay. In the notice of deposition, did you also receive a request for documents?
A I did.
Q Did you produce any documents?
A I did not.
Q Do you possess any of the documents requested?
A I possess this hard copy of the report that is in my hands. That was produced to me by our clerk who has access to -- I can't remember. They changed the name of the software. They have a -- there's a document system that contains these reports.
Q Okay. Other than the reports that you brought with you, did you review anything else in preparation for today?
A I think I looked at the call history which I don't believe is contained in this. It's not really -- for me, I don't need to reference it, so the -- I asked -- I told or asked our clerk when I asked her to print this -- I said that I didn't need the -- the EDR download because it's probably 100 pages long, and I didn't need the call history from the case because I didn't think there was any information in there that wouldn't be contained within this report, so -- but I did look at it because I can access it via computer, and it

has, like, the times and stuff that we arrived, but that information is contained within this report, so I didn't think it was necessary to print it out.

Q Other than the call history, did you review anything else?

A No.

Q Okay. Just a little bit about your background. When did you go to the academy?

A I went to the academy in 2019, January of 2019.

Q Okay. From then until now, can you just take me through briefly your assignments?

A Yes. So I completed the academy in June of 2019. I then worked -- I was assigned to West Valley Detention Center from 2019 until 2021 at which point I was assigned to patrol in Victorville. I believe -- I couldn't tell you the exact date that I was assigned to traffic, but I was kind of pushed into traffic pretty early, and I -- if I had to guess, I would say sometime in 2022, near the end of 2022, I started in the traffic division, and I worked there until March of 2024 when I was involved in a crash and I was out medically for several months, and then when I returned, I was very quickly transferred to the gangs/narcotics division which -- on a temporary assignment, and that was approximately June of 2025, and I have been in the

gangs/narcs division since then.

Q Okay. What was your primary assignment at the time of this incident?

A I was assigned to traffic enforcement and accident investigation in the City of Victorville, and I was also assigned to the Sheriff's Department's Regional Major Accident Investigation Team.

Q Approximately how many times have you had to conduct an investigation with the Major Accident Investigation Team?

A With the regional team or with -- because I was -- I also did major accident investigations for Victorville. This was the only major accident investigation I did for the regional team, but I have done at least -- at least two and then assisted with probably three or four or more at the station level because Victorville had its own Major Accident Investigation Team.

Q Okay. Were any of those prior to this incident?

A They were all prior to this incident, I believe. I don't think -- I can't recall investigating any other MAITs between -- between this and then the time that I was involved in a crash, and just to be clear, what we call a MAIT, a major accident investigation, is not -- does not necessarily include all fatals. Most

fatal crashes are not MAITs.  There's a threshold that a crash has to have to become a MAIT which you probably know, and so it is possible that I investigated a fatal crash after this because those happen pretty regularly in Victorville, but I don't believe I investigated any MAITs after this particular case.

Q Okay.  And for the record, please explain, what is the threshold for a MAIT investigation?

A Generally, the decision is kind of beyond my pay grade, but what it usually is is if there is a fatal crash or potentially fatal crash or major injury crash that could become a fatal crash where there is likely going to be prosecution of one of the involved drivers for causing the crash and causing someone to die, or if there is a high probability of the accident being litigated and involving litigation against the government.

So like in the case of Victorville, if it were to include not just the police department but if it were to be a fatal accident that involved a city vehicle, for instance, that could be considered a MAIT, but, again, it's not usually my decision.  It's -- in those cases, the cases where it involved liability against the city, that's generally a decision that's made by a MAIT supervisor.

company.

Q After joining the sheriff's department, did you get any specific training in accident or collision investigations?

A I did.

Q Take me through the training that you received, please.

A I did the -- and I am -- I will have to give my best guess at the length of these courses because it's been a while. I did the basic accident investigation class which I believe is a 40-hour class. I did the intermediate accident investigation class which I believe is an 80-hour class. I did the advanced traffic investigation class which is, I believe, an 80-hour class. And I did the reconstruction class which is an 80-hour class. And I did the vehicle dynamics class which I believe is a 40-hour class.

Q Were all of these courses in-house or did the county send you somewhere?

A They were in-house. Our county hosts those courses at our academy in the advanced officer training area, and it's attended by -- by officers from throughout the region and even Northern California.

Q Okay. Is it only for law enforcement officers?

A To my knowledge, yes. Actually, I think -- I

think some of our nonsworn do take basic, so I don't know that it's a requirement to be a peace officer to attend all of the classes, but because our -- some of our nonsworn take -- investigate noncriminal crashes, I believe they do take some of the lower level traffic investigation courses.

Q Okay. Were any of these courses taken after this incident?

A No.

Q Okay. Did you take these courses in the order that you described them?

A I did.

Q How long prior to this incident did you graduate from the vehicle dynamics course?

A I couldn't -- I wouldn't want to guess because I really don't know. If I pulled up my POST profile --

Q Sure.

A -- I could tell you exactly, but I wouldn't want to guess.

Q Yeah. And I don't want you to guess. Basically, I just want your best estimate, and it could be a range, if it was a few months or it was two years. I am not looking for an exact number there.

A I would say it was probably between six months and a year.

Q Okay.
A And the main reason for that is it would be longer except the vehicle dynamics course was newly offered and I took the first class that -- the very first time that the sheriff's department offered it to my knowledge, I attended that class.
And it may be worth adding I also assisted in the instruction of all of those classes, including vehicle dynamics, after I had taken the classes.
Q Okay. Are you still part of the MAIT team?
A I am not.
Q Are you still with narcotics?
A I am.
Q Okay. All right. I basically want to go through the report. I will mark as Exhibit 2 what I have as the MAIT report. It is 225 pages, and it's Bates-stamped COF 11 through 235.
(Exhibit 2 marked for identification.)
BY MR. SINCICH:
Q I think this one has all of the EDR data and things like that that you have seen before; right?
A If -- if you are trying to show me a document on screen or something, I can't see it so...
Q I will show you. I just wanted to mark that as Exhibit 2 for now. And then when we get to certain

portions, if you don't have it in front of you or maybe if it's easier, I will share my screen with you. Okay?

A Sure.

Q Okay. So how would you describe the purpose of your investigation into this incident?

A I would describe my purpose as to establish the facts of the incident. As a -- as a nonbiased investigator, my job -- and this is one of the reasons that I love accident investigation is the facts are the facts. They are concrete, and you can't, you know, make them up, and so I have appreciated that about traffic, and my job is just to look at the physical evidence and form an opinion about how the crash occurred.

Q Okay. On my document, it's page 34 just for reference to counsel, but it goes to the notification.

A Is this of my specific report --

Q What I will do --

A -- or is this --

Q I want to ask you that because it looks like it's Reyes' report because his name is on the bottom left-hand corner. Is that an indication of who wrote the report?

A Yes.

Q Okay. So at least on this page, it said that Officer Reyes was contacted and reported to the scene,

Q Okay. Now, the officer vehicle, to your knowledge, was it moved at all from the time of the collision to the time of the scan?
A To my knowledge, no.
Q And did you and your team also take photographs of the scene?
A We did.
Q And to your knowledge, had it been moved at any point in time prior to taking that photograph?
A To my knowledge, no.
Q Okay. So the officer vehicle would be oriented but facing when it came to a stop in a -- in a northeast direction approximately 45 degrees; is that fair?
A Yes.
Q And from your observation on the scene of the subject vehicle, which direction was it facing?
A I would -- I would say predominantly west but a little bit southwest, if that makes sense, and if I had to give you a degree on that, I would say the vehicle's heading was about 260 degrees.
Q Okay. So as we are looking, for instance, on this image COF 20, the left side of the vehicle, that would be the front of the vehicle, and the right side would be the trunk?
A Correct.

Q Do you know who was present?
A To my knowledge, Holland.
Q Do you know if any of the interviews were audio- or video-recorded?
A I do not.
Q Is that something as part of a MAIT investigation that you would typically do is conduct interviews?
A Yes.
Q And typically during a MAIT investigation, are the interviews recorded in some way?
A Yes. I believe our department has a policy that prevents us from recording department members in their interviews, so we generally would not record members of our department in an interview. I would have to refer to policy to determine whether or not we are supposed to record other law enforcement officers in these investigations.
So I am not sure if -- if I say "Dusty," by the way, I am referring to Holland because that's his nickname and I keep having to stop myself. I am not aware if Holland recorded them. I don't know if -- I can't remember if our policy requires us to record other department members -- sorry -- members of other law enforcement agencies for interviews, but generally under

almost every circumstance we would record interviews of nonsworn-involved parties.

Q Okay. For instance, I see from his report, and this is on Bates 29, that Mr. Bonilla was interviewed. Had you ever seen a file during your investigation or in preparation for today that showed any recordings of any interviews?

A I don't recall reading whether or not they were recorded. Obviously, I can -- I can refer to the report which I am doing now to see if he indicated whether or not he recorded, and, yeah, there's no indication whether or not he recorded his attempts to set up an interview so -- and that may be perhaps because he wasn't trying to -- he wasn't trying to directly contact Bonilla. He was trying to get a hold of somebody. Because as I understood it, Bonilla was not capable of providing an interview at that time. So if he -- I would not be surprised if he did not attempt to record his contact with Maria Ramirez as she was not a party involved in the crash, and he was simply communicating with her to attempt to coordinate an interview with Bonilla. There's no indication here that it's recorded, so my guess would be that it was not recorded, but that would be a guess.

Q Okay. Thank you. Do you know if there's any form of long-form notes that are more detailed than the

and so the logical conclusion would be that he passed through the intersection at some point between 5 seconds prior to impact when his speed was 105 and 1.5 seconds prior to impact when the brakes were activated in which case his speed was 108.7, and the vehicle had been either continuing at the same speed or accelerating for the entirety of that time between 5 seconds prior to impact and 1.5 seconds prior to impact, and at all times was the speed greater than 105, and he may have concluded it by that way.

And there's multiple ways to come to that conclusion essentially. I don't know exactly how he came to it, but I would venture to say that, in short, he knows that 5 seconds prior to impact the vehicle had not passed through the intersection and its speed at that time was 105, and 1.5 seconds prior to impact the vehicle was 100 percent -- like, he has absolute confidence that the vehicle was through the intersection 1.5 seconds before impact, and between those two time points at all times the speeds -- the speeds were in excess of 105 miles an hour -- at or greater than 105 miles an hour, and so he was comfortable concluding that the vehicle's minimum average speed as it passed through the intersection was 105 miles an hour.

Q Okay. Thank you. And then just generally

speaking, the officer vehicle traveled north and made a left-hand turn from the private parking lot of the thrift store onto Valley; is that fair?

A Yes.

Q And that thrift store was on the south side of Valley?

A Yes.

Q Then it indicates that the subject vehicle traveled at 105 miles per hour. Is that still an approximate average speed?

A Yes. Everything -- I will just preface this by saying everything is an approximation.

Q Okay. So the subject vehicle traveling 105 miles per hour turned to the left, and then it says that the driver lost control. Do you see that?

A Yeah. The vehicle turned left.

Q So we know the vehicle turned left from the EDR data.

A Okay. I see the -- maybe the point that you are about to make is it says that P-1 turned Vehicle 1 to the left. That appears to be what it's saying is that P-1 traveled 105 miles an hour and turned Vehicle 1 to the left; correct?

Q Right. Let's assume that P-1 intentionally turned the vehicle to the left.

A Well, I am not going to assume that.

Q Okay. Well, we can -- it's fair to say that the EDR data shows that the wheel -- the steering wheel went to the left which moved the tires to the left? Is that fair to say?

A Without looking at the -- without looking at the EDR data -- maybe you have access to that, but the -- I am looking at what LaFond put in and generally -- and this is why I can't assume -- generally, in my experience, a positive number for steering wheel angle indicates a clockwise turn which would be a turn to the right, but every vehicle is different. So I can't -- without that information, without having the EDR data in front of me that will describe its limitations or how to interpret the data, I couldn't conclude whether he was turning right or left, and I am not sure if LaFond defined or provided that information in his report. I didn't notice it anywhere.

Q Okay. Is it fair to say that based off of the diagram that Deputy Reyes put together it would corroborate that the subject vehicle went from the Number 1 lane eastbound and then started to go to the left at some point?

A Yes. I would say from the diagram and in my opinion, the vehicle did -- the vehicle rotated laterally

and moved left. However, I -- without having EDR data, I would not -- I couldn't -- I couldn't say definitively if that was due to a deliberate steering input to the left or if -- or if -- because there's two possibilities. Either there was a steering input to the left that caused the vehicle to go left or the vehicle began an uncontrolled lateral rotation to the left and the driver attempted to countersteer and put a right-hand turn input to try to straighten the vehicle out. So those are two options, and if I had the EDR data which includes that information, then I could form a better opinion about that.

Q Yeah. In a little bit we will go through the EDR data specifically.

So is it fair to say that -- for instance, I have seen the movie Tokyo Drift, right, where they are drifting in the vehicle. Have you seen it?

A Right. I have.

Q So there's instances where the steering wheel and the actual front tires can be turning one direction, but the vehicle because of its momentum is actually turning a different direction --

A Correct.

Q -- because it's drifting? And the EDR data doesn't take into account necessarily what the vehicle

was doing. It's just recording what the steering input was; is that fair?

A Correct.

Q Okay. So what I am wondering here is in this sentence, it's saying that the driver of the subject vehicle lost control of the vehicle. What's the basis for that opinion?

A I would say -- to put it briefly, I would say the totality of the circumstances. The reason that I personally would conclude would be two things. The first is that -- I am getting some echo all of a sudden.

The first would be that based on the physical evidence of the vehicle inspection, we were able to conclusively say that Vehicle 1 was sideways essentially when it impacted the patrol vehicle, and then, two, I would just say that if your vehicle is sideways and -- if your vehicle is not -- if all four wheels have lost traction and your vehicle is in a lateral spin, unless it's something you are deliberately doing, then you have lost control of your vehicle. I would venture to say that if somebody is traveling at this speed and their vehicle is in a lateral spin, then they are not in control of the vehicle unless they are, like, a trained drifter or something.

Q Okay. And what's the second reason?

A Oh, so reason 1 was we concluded that the vehicle was sideways upon impact.

Q Okay.

A And reason 2 is if you are traveling that speed and your vehicle is sideways, then you are not in control of the vehicle.

Q Okay. So when you are determining that the vehicle was sideways at the moment of impact, what are you basing that upon?

A I don't know if you can hop to the pictures because I can show you that in depth, but essentially the --

Q Hop to the what? I am sorry. I couldn't hear you.

A Hop to pictures from the vehicle inspection if you have those, but essentially the driver front tire and wheel which was -- and this is an important detail because the patrol unit had two different tires in the front, two different makes of tire or at least two different models of tire, and the front driver's side of the patrol vehicle's -- that particular tire imprinted into the rear passenger side door of Vehicle 1, and the only way that those two could have possibly met with the amount of force necessary to do that is if Vehicle 1 was sideways upon impact. I know saying "sideways" is kind

wheel and tire of the patrol vehicle.
Q Okay. Thank you for that explanation.
I am saving them as I go so that it's organized, and hopefully that's easier for us later on.
Okay. Based on your review of the angle of the impact, keeping in mind the original direction of the vehicles, subject vehicle going eastbound, officer vehicle turning to the left, would you agree that the subject vehicle appeared to have made some form of evasive maneuver to avoid the impact?
MR. HANRAHAN: Objection. Object to the form. Argumentative. You can answer.
THE WITNESS: Okay. If you don't mind, I will -- let me look at the data from the EDR real quick just so I can kind of more accurately explain my answer which --
MR. SINCICH: Okay.
MR. HANRAHAN: And one more objection. Calls for speculation as to the state of the mind of the driver.
THE WITNESS: Sorry. I am looking for a specific table here in a very large report, and if you wouldn't mind, could you ask your question again just so I can be clear with my answer?
MR. SINCICH: Yes, please. Can I have a

readback?

(Record read.)

THE WITNESS: Can you clarify what you mean by "maneuver"?

BY MR. SINCICH:

Q Does it appear to you based off of your review of the data, physical evidence, forensic evidence, and the EDR data that there's any indication that the subject vehicle intentionally struck the officer's vehicle?

A I do not --

MR. HANRAHAN: Same objection.

THE WITNESS: And I am clear to answer, right, because this is a deposition?

BY MR. SINCICH:

Q Yeah.

A I do not believe that the suspect vehicle intentionally struck the patrol vehicle, or I do not believe that the driver of Vehicle 1 intentionally struck his vehicle into Vehicle 2, if that's what your question was.

Q Correct. Based off of your review of the information, does it appear that from the evidence the driver of Vehicle 1 attempted to avoid the collision by turning hard to the left?

MR. HANRAHAN: Objection. Calls for

speculation. No foundation. You can answer.

THE WITNESS: I -- I would hesitate to make any conclusions about whether his steering input was to avoid the crash. I would say that he made an effort to avoid the collision based on the fact that he took his foot off of the gas and put it on the brake. So I believe that that was an effort to slow the vehicle when -- when essentially they were past the point of no return. There was no avoiding the crash at that point, but I believe that his application of the brake prior to impact was an indication that he was trying to avoid the crash.

As for his steering input, I don't know if the steering input was related to a loss of control of the vehicle or if that was steering input that came as a result of a deliberate input by the driver as a result of seeing -- seeing the patrol vehicle entering the roadway.

BY MR. SINCICH:

Q You referred to "the point of no return" being the moment in time when a driver wouldn't be able to avoid the impact; is that fair?

MR. HANRAHAN: Objection. Calls for speculation. Vague as to the term -- vague as to the terms of -- no foundation. You can answer.

THE WITNESS: I -- I haven't really identified what the point of no return -- like, the actual moment in

time in this particular case that I would consider the point of no return, but in general, yes, when we say "the point of no return," we are referring to the moment at which the circumstances have made it such that no action by either driver could prevent a collision.

BY MR. SINCICH:

Q Because of the direction of movement, is there a scientific term that you are familiar with that essentially shows that the direction of the vehicles after the collision will go into a particular direction because of the direction of the collision? Do you understand what I mean by that?

A Are you referring to, like, approach and departure angles as a result of conservation of momentum? Or I feel like you are looking for a particular topic that you want to talk about and hoping that I am the one that brings it up.

Q No. I think you hit the nail on the head there. Could you describe what conservation of momentum means?

A Yes. And I will try to think of, like, an analogy to make it simple because they tell us that we have got to make it simple for juries and stuff.

So essentially an object in motion stays in motion. So if we were to go into space and I were to throw a golf ball, that golf ball would move and it would

move forever. It would not stop unless another force acted upon it.

Now, if that golf ball were to collide with another golf ball, that would be a force that acts upon -- or let's say the golf ball collides with a tennis ball. When that golf ball collides with a tennis ball, it's going to transfer some of its momentum which is -- momentum is essentially a calculation of how much something weighs and how fast it's moving. It's going to transfer all or some of its momentum to the tennis ball.

Now, depending on the location of that impact between the tennis ball and the golf ball, they will depart the impact in different directions. So the same goes for vehicles. When two vehicles collide -- I can't remember if you asked me conservation of momentum or if you just asked me what momentum is.

Q Conservation.

A Conservation. So there is a total amount of momentum that goes into a crash in a given direction, and after a crash, momentum is conserved. So in this case, a portion -- like in the case of this crash, a portion of the momentum that Vehicle 1 had -- well, so Vehicle 2 had momentum because we know it was moving, and Vehicle 1 had momentum because we know it was moving. They were moving in different directions.

When they collided, Vehicle 1 had significantly more momentum because it was traveling much faster. When Vehicle 1 collided with Vehicle 2, it -- and I don't want to get into vectors, but it completely cancelled out the momentum that Vehicle 2 had in the westerly -- westernly direction and caused Vehicle 2 -- Vehicle 1 and Vehicle 2 both exited that collision traveling in a east or northeasternly direction. Does that make sense?

Q Yes. So is it fair to say that because Vehicle 1 moving faster, its momentum caused Vehicle 2 essentially to move to the east?

A Yes.

Q And because a part of Vehicle 1's movement was also slightly north, would it be fair to say that it also caused Vehicle 2 to move slightly north?

A Yes.

MR. SINCICH: Okay. It's 11:20. Let's take a ten-minute break, and I will see you guys back at 11:30.

THE WITNESS: Okay. Thank you.

(Recess taken.)

MR. SINCICH: Let's go back on the record.

BY MR. SINCICH:

Q In the diagram that Deputy Reyes made, it indicated the area of impact. Do you remember that?

A I do.

Q Do you know how he determined the area of impact?

A I would have to review what he said that he used to come up with that. I don't want to just speculate and say based off the physical evidence, yeah.

Q I understand.

A So I assume I have that in here. Let me see.

Q I am going to share my screen COF 40 as Deputy Reyes' Opinions and Conclusions, and it states "Area of Impact." Can you see my screen there?

A Yes.

Q Okay.

A So he stated that he estimated it using pieces of plastic and -- plastic pieces of debris, and this was one of those that was particularly difficult, I imagine, for him to make this estimation given that we didn't have gouges or skids. So I imagine, kind of like he said, it was an approximation based off of -- based off of the debris field and where the vehicles came to rest with the information that he had and understood at that time that he made that estimation.

Q Would it be fair to say that the area of impact of this primary collision would have been close to that debris field?

A I mean "close" is a vague term. How close?

Q Would it be within a few feet?
A No. In this particular case, I don't think the debris was within a few feet of the vehicles. The area of impact was with -- sorry. I don't believe the area of impact was within a few feet. I think the closest major piece of debris to the area of impact was the light bar, in my opinion.
Q Okay. Let me see. And light bar is Number 2?
A Yes.
Q Okay. So looking at COF 20, the -- and I am going to zoom in. Is it fair to say that the center of the truck is marked -- approximately the center of the truck is marked with a black dot?
A Yes.
Q And is it fair to say that the center of the red circle indicating the area of impact is slightly north of the center of the patrol vehicle?
A Of the frame of the vehicle, yes, I would agree to that, but I will just make a note that the engine and transmission of the vehicle -- I don't know if you can see my cursor -- were up here, so --
Q I don't see your cursor right now.
A Okay. So the engine and transmission of the patrol vehicle were outward. Like, we will have to look at pictures to be exact, but they were more forward

because they were partially ejected from Vehicle 4, and I wouldn't say with 100 percent certainty, but I would say that the majority of the engine and transmission were on or even potentially north of the double yellow lines that run on the north side of Vehicle 2 in this scan.

And the only reason I make that point is if we look at this hunk of metal -- that will be helpful, yeah. Looking at this, treating Vehicle 2 as, you know, one big unit, the engine and transmission represent a significant amount of its mass, and those are more north. So while, yes, the center -- this is, like, the approximate center of the vehicle's, you know, space, and potentially it's near its center of mass when it was a undamaged vehicle. I believe the center of mass of this postcrash vehicle is north of where this dot is, if that make sense, so -- and, again, I am using my cursor and it doesn't show up.

MR. CESENA: I don't see a dot.

THE WITNESS: The dot on Vehicle 2 --

MR. CESENA: Okay.

THE WITNESS: -- that is approximately its center. Like, prior to the crash, that dot is probably relatively close to where its center of mass is. However, in its postcrash state, a large portion of the vehicle's mass, that is, its engine and transmission, were partially ejected north, and so I don't believe that

that dot on Vehicle 2 in its postcrash state are an accurate representation of where its center of mass is. I would say that the center of mass of the vehicle there is probably about as north as the area of impact, if that makes sense.

BY MR. SINCICH:

Q Okay. What data would you use to determine -- data or information would you use to determine that the area of impact is west of the light bar?

A The only -- I believe the only information that I can think of would be two things. One, it would take a significant amount of force to -- or a significant change in velocity for that light bar to shear off the top of the patrol vehicle, and in that process, undoubtedly the light bar would experience -- would most likely -- or would experience acceleration in the easterly direction and would likely have velocity in the eastern direction.

And so, for us, it was -- and I think Reyes agreed, was that the light bar would most likely have ended up east of the area of impact. While it would be possible for it to essentially remain in place, I think that we just kind of concluded based off of our instincts and experience that the force required to do that would be unimaginable and not that the force in this crash wasn't unimaginable, but in our experience, debris from

the vehicles, especially large debris like this, tends to -- tends to depart in the crash in the same direction as the vehicles.

Q So considering that these vehicles were also moving to the north, would it be fair to say that the light bar also traveled slightly north of the impact area?

MR. HANRAHAN: Objection. Calls for speculation.

THE WITNESS: I would -- I couldn't say that with certainty, and the main reason I say that is based off of the damage to Vehicle 2, it seems to me that the -- essentially the front end from the A-pillar forward kind of -- almost stayed in place or -- because you see the vehicle opened; right? From the A-pillar to the rear, from our perspective, experienced a significant, probably, you know, in the area of 90-degree rotation from -- from the northwest direction that we -- you know, the range that we earlier -- that I earlier stated, it was probably facing -- to a postimpact, it's facing northeast.

So from the A-pillar to the rear rotated from the -- from the northwest to the northeast about, you know, 90 degrees, plus or minus 45 probably, right, but the front end of the vehicle, while it remained intact on

the driver's side A-pillar, the vehicle essentially opened up near the passenger side A-pillar, and the engine and transmission experienced a significantly -- significantly less rotation. As the vehicle came to rest, the engine and transmission were essentially predominantly facing the same direction that they were at the impact.

And all that is to say is that the cab of the vehicle experienced rotation upon impact, and depending upon where that light bar was mounted during that -- during that rotation and at what point during that rotation it became detached, I couldn't predict what direction that light bar would travel as far as the north and south go.

Again, I feel that it most likely would -- as far as the east-west vectors go, I would say most likely it would travel in an east direction along with the vehicles, but as far as its north-south movement because of that rotation, it's hard to say, and it truly is hard to say with 100 percent confidence. It's, I would say, probably impossible to say with 100 percent confidence even that it -- we know for sure it moved east after the crash. Just that we know based off of our experience that that's most likely the case.

///

BY MR. SINCICH:

Q Okay. Is it fair to say that it's possible that the area of impact of this collision was slightly south of the light bar?

MR. HANRAHAN: Objection. Calls for speculation. You can answer.

THE WITNESS: I would say that it is -- it is possible, yes. And, again, I will add the caveat of that is a circle, and Reyes' determination was that, you know, if we were to assume that it was -- that the area of impact was within that circle, then that circle does extend south of the light bar. And so if you are suggesting that the center of that circle should be south of the light bar, I don't necessarily agree with that, but I certainly would just reiterate that the circle is an area, it's an approximation, and the border of that circle is not intended to be treated as a concrete definitive line with which the impact occurred inside of. It is designating an area, and that's why we call it an "area" and not a "point."

BY MR. SINCICH:

Q Right. Is there any physical or forensic evidence that you could cite to that would preclude the area of impact circle being such that at 12:00 o'clock it touched the north double yellow lines and at 6:00 o'clock

it touches the bottom double yellow lines?
MR. HANRAHAN: Object to the form.
THE WITNESS: Can you ask that question again? I just have a hard time understanding.
BY MR. SINCICH:
Q And what I will do is I will just draw a circle, for instance. Oops. So there's a circle here just for demonstrative purposes that's sort of in line with this measurement of 67.40 where 12:00 o'clock is about where the double yellow lines on the north is and 6:00 o'clock of the circle is about where the double yellow lines is on the south side.
Is there any information, data that you collected in your investigation that would preclude this area of encompassing the potential estimated area of impact?
MR. HANRAHAN: Calls for speculation. Foundation. You can answer.
THE WITNESS: Let me think to say how to -- so, in other words, you are asking me: Is there any reason why in my opinion the area of impact should not contain the space outlined in your green circle as opposed to the one that was created by Deputy Reyes?
BY MR. SINCICH:
Q That's another way of putting it, yes.

MR. HANRAHAN: Same objection.

BY MR. SINCICH:

Q For instance --

A I will tell you why I don't think that it was -- it's kind of hard for me to just put into words that are digestible because it's not a simple topic, but when you look at the EDR data from the patrol vehicle, particularly the steering input, the driver of the patrol vehicle had stopped turning. They turned the wheel essentially to the maximum of their -- you know, the desired turn radius and then turned the wheel back to center and so -- and, again, because part of this has to do with this -- this circle is supposed to essentially encompass the area where the two vehicles met at impact. It's not meant to encompass the entire area where -- it's not meant to encompass the vehicles; right?

So if you were to say place the vehicles in a proposed direction where they were and what directions they faced at impact, the vehicles would protrude from this area, right, and what -- to me, the way the area of impact works is, you know, there is -- there is clearly a point of impact, and that point of impact should be or to our best estimation within the circle of the area that we define as the area of impact, if that makes sense, or within what he drew here.

You know, there's no defined radius around the point at which is designated the area of impact. Of course, you are given a point and we are saying that's the area, and to my knowledge, there's no definition for the radius of that area.

I don't believe based off of my observations here that the point at which they collided would be -- would be at the southern double yellow lines. Among other things, that would -- that would indicate that the patrol vehicle -- because I strongly believe that the patrol vehicle was faced in a somewhat northwesternly direction, that would indicate that the patrol vehicle essentially was occupying the Number 1 eastbound lane, and I don't believe that to be true, so -- and a portion of my reasoning with that is that the driver of the patrol vehicle had disengaged from the turn.

So the fact that they were disengaged from the turn tells me that they were either entering or about to enter the Number 1 eastbound lane. Whether or not they were faced perfectly -- sorry -- the Number 1 westbound lane. Whether or not they were faced perfectly west, I don't believe they were. I believe their patrol vehicle was perhaps predominantly in the center turn lane. As they disengaged that turn, I believe that it was likely

faced northwest with the intent of continuing into the Number 1 westbound lane and straightening out essentially to a direct western heading.

So that's a lot of words to essentially say I believe that the circle that you have drawn encompasses too much of an area to the south. I believe that the area of impact -- I believe that the front driver's side of that patrol vehicle was most likely in the top half of the center turn lane as we defined earlier, and I believe that because of the fact that the driver had disengaged from turning and then obviously plus the physical locations of the evidence.

Q Do I understand your testimony correctly that based on your review of the information, the majority of the patrol vehicle would have been contained inside the center turn lane?

MR. HANRAHAN: Calls for speculation. No foundation. You can answer.

THE WITNESS: In my opinion, I believe that at least a portion of the patrol vehicle was in the center turn lane, if not the majority of the patrol vehicle.

BY MR. SINCICH:

Q Okay. Based on the data you reviewed, we can preclude, for instance, that the area of impact is in the Number 1 lane going eastbound; is that fair?

A I am sorry. Say that question again.

Q Based on the data that you reviewed in the investigation, is it fair to say that we can preclude the area of impact being in the Number 1 eastbound lane?

A Again, I would struggle to -- I mean, what you are doing is asking me to tighten up the area of impact that's shown here, and, again, just a reminder that the circle is not a -- is not a standardized radius; right?

So this drawing, I don't believe its intent is to indicate that the point at which the two vehicles collided is or is not in the Number 1 eastbound lane. It's simply indicating an approximate area where the vehicles came together.

So you are asking me to say that it wasn't in the area above the double yellow lines, and I don't know -- the problem that I have with that is you are essentially asking me to define a radius for the area of impact from the point at which -- from the point at which our team designated, and I have a hard time doing that because it's an approximation, and it's intended to be an approximation.

I don't -- I don't have any -- it's just -- it's tough for me to say that because there's so many factors, particularly the imposed rotation on the patrol vehicle, the fact that essentially it almost was split into two,

Garrett Wolff

and the two -- you know, the two halves of the vehicle rotated at different -- at different velocities.

If -- if you are asking my -- my opinion about the point of impact because that's essentially what you are narrowing down, I believe that the point of impact was -- in other words, the area where the two vehicles collided is most likely at the very north part of the -- of the center turn lane.

Can I conclusively say that it was -- that's the case? No. I can just say that in my opinion, I believe most likely where the two vehicles came into contact with each other was within those, but I believe it is possible that it was not. Does that make sense?

Q Yes, it does. Thank you.

I am going to mark as Exhibit 9 Bates stamp 600 -- COF 600, and this is a photograph kind of close to sun up, it appears. It's a little bit better quality than the other ones.

(Exhibit 9 marked for identification.)

BY MR. SINCICH:

Q Can you see my screen?

A Yes.

Q Did your team take this photograph?

A Yes, as far as I know. I believe that Reyes took that photograph.

Q And it shows the light bar in the center of the double yellow lines?
A Yes.
Q And the debris field is sort of towards the right-hand side of the screen which would be south?
A Yes.
Q And then obviously the patrol vehicle is in its resting location?
A Yes.
Q Okay. Deputy Holland formed certain opinions about the cause of the collision. Do you recall reviewing those?
A Yeah. I will pull those up. I apologize. These are not in -- it would be nice if I had, like, a book that had a table of contents that I could flip to, you know.
Q I understand. I was doing keyword searches myself to find the stuff.
A Wish they made that for physical paper.
Q I will share my screen here, and it's on page COF 30 from Exhibit 2. Can you see my screen?
A Yes, and I found it right about the same time.
Q Okay. So is it fair to say that essentially what Deputy Holland described as the cause of the collision to be certain Vehicle Code violations?

Q And "AE" is the collision right; right?
A I actually -- I am not sure what he means by AE, but I am concluding that based on the context. It's probably activation event, but I didn't read the part in his report where he explains that.
Algorithm enabled. Okay. So algorithm enabled being what he said was described in this EDR as essentially the activation.
Q Okay. So let me see. We have the vehicle speed here on COF 140 on the top, distance traveled on the bottom, and do you agree with Detective LaFond's calculation for this distance traveled?
A I haven't personally verified it, but, I mean, I can break out a calculator right now and do it. I assume I am not explaining this to you because you don't know how to read it. You know -- you know the calculation he used; correct?
Q Generally, but sometimes it's for the record so that it's easier to explain it to others.
So, I mean, obviously the distance traveled is the sum of the right-hand column from the bottom table; correct?
A The distance there -- the bottom row contains the sum of the -- of each column, yes.
Q Right. And so he has a -- based off of the

different ranges of speed, the distance could be different in each half-second increment; right?

A Yes.

Q Okay. So what calculation is used to determine the distance traveled per half-second increment?

A So what he's doing is he's taking the -- we will focus on the left-hand side first. I am looking at particularly the minus 5 seconds, 96.3 miles per hour. What he did was he converted that into -- well, he could have done it in two orders, but essentially he converted it into feet per second and divided it by 2. That, or he divided it by 2 and then converted it into feet per second. But that essentially says if this was the speed for this -- on or about this particular half second of time, if I know the speed that it was traveling for that half second, then I can tell you how far it traveled in that half second.

Q Okay.

A It's basically approaching -- it's, like, attempting to do calculus if you don't know how to do calculus. He's approaching the derivative, and he's just -- the smallest unit that we can divide it in with the information that we are given is half-second increments.

Q Do you know the distance from the approximate

area of impact to the crosswalk on the east side of the cross street?

A I don't -- I don't recall. I think that was probably something that I had looked at at some point in this, but I don't remember what it was.

Q Is it indicated in any of the reports, to your recollection? You don't have to look for it.

A I know it's been discussed, so I am not 100 percent sure if the distance particularly from the crosswalk to there is mentioned. I don't remember a specific measurement from crosswalk to area of impact. So I am going to say I don't recall seeing that, but I couldn't say with certainty that it's not in the report.

Q Okay. And what we have on -- let me see. Where is the driver input?

Okay. So on COF 139, is this the chart that shows Vehicle 1's speed, brake activation, and steering input?

A Let me see. Yes, this shows Vehicle 1's speed and brake activation and steering input, yes.

Q So, in other words, it says "clp" under steering input. What does that mean, to your knowledge?

A To my knowledge, that's the -- that means that a vehicle is -- the wheel is turned at least 250 degrees. The sensor cannot measure beyond 250 degrees, so the

wheel could, in fact, be much, much further. It could be -- it could be 251 degrees, it could be 250.1 degrees, or it could be, you know, in excess of 360 degrees, but the sensor can only detect up to 250 degrees.

I don't know what "clp" means, but if I had to guess, I would say it means clipped because sometimes in the engineering world signals get clipped if they exceed a range.

Q And can you tell from your review of the report if a positive number in the steering input of Vehicle Number 1 indicates a clockwise or counterclockwise turn?

A I -- I am sure he mentioned it. I don't see mention of it specifically whether it's positive -- positive is clockwise or counterclockwise. So if it's somewhere that you are aware of or if it's in the EDR data --

Q I am not aware of it. In fact, I am trying to -- well, what I am curious about is: How is it possible that there is a 250-plus-degree steering output 5 seconds prior to the collision at all whether it's left or right? You saw the video; right?

A I did, yeah.

Q And the potential steering to the left of Vehicle Number 1 from the video, is it fair to say that it has to be within 2 seconds before the collision?

MR. HANRAHAN: I am going to object. Calls for speculation. Improper hypothetical. No foundation. You can answer.

THE WITNESS: Yeah, I don't believe that the vehicle's wheels were turned at 5 seconds prior to the crash to kind of jump to the point of what you are saying.

BY MR. SINCICH:

Q Right. So is the steering input -- is it just incorrect for Vehicle 1?

A Yeah, I --

MR. HANRAHAN: Same -- hold on. Hold on. Mr. Wolff, if you could give me a pause so I can get my objections in before you answer. Same objections.

THE WITNESS: I apologize. I am sorry. Can you ask the question again?

BY MR. SINCICH:

Q Isn't it fair to say that he couldn't possibly have been turning 250 degrees left or right even 4 seconds prior to the impact based off of your review of the video?

MR. HANRAHAN: Same objections.

THE WITNESS: I would say it is highly unlikely, and I don't see how he could possibly have been -- had the wheels turned at that stage of -- yeah. I don't

believe it's possible, and I would say that a possibility that I do see would either be a severe misalignment -- again, it depends on the location of the sensor that is measuring the steering input on that particular vehicle, but I do not believe that the wheels -- the wheels were turned the way that they would be on a properly -- a properly configured vehicle at 250 degrees. I don't believe that the wheels of Vehicle 1 were turned in accordance with a 250-degree steering input 5 seconds prior to the crash.

BY MR. SINCICH:

Q Okay. I am going to go to Vehicle Number 2, and it looks like Vehicle Number 2 has -- instead of every half-second calculation, it's every two-tenths of a second?

A Yes.

Q Okay. Now, do you know from your review of the data whether or not the steering input positive is clockwise or counterclockwise knowing that he turned left at some point prior to the impact?

A I can tell you --

MR. HANRAHAN: Objection. Hold on. Hold on. Objection. No foundation. Calls for speculation. You can answer.

THE WITNESS: My conclusion would be that a

positive number is indicative of a counterclockwise steering input.

BY MR. SINCICH:

Q Okay. So somewhere around the 3.2 seconds prior to the impact to 1.6 prior to the impact, that's where the steering input is over 100 degrees turning left? Is that fair to say?

A That is how it appears.

Q Is that from reading the data indicating when he was turning left?

A I would clarify that. He begins increasing his left-hand turn much sooner, so what you have highlighted is the peak of the turn essentially.

Q So, I mean, essentially if the throttle is at zero at 3.8 seconds, does that indicate approximately -- somewhere between 3.8 to 4 seconds prior to the collision, is that a good indication of where Officer Garcia was on the apron of the driveway?

MR. HANRAHAN: Objection. Calls for speculation. Foundation.

THE WITNESS: I believe that that in conjunction with his foot being on the brake in conjunction with the video is an indicator of when he was on the apron, yeah.

BY MR. SINCICH:

Q So at approximately 3.8 seconds prior to the

collision, that's generally where Officer Garcia accelerated from the apron and began his left turn steering input; is that fair?

MR. HANRAHAN: Objection. Calls for speculation. Foundation.

THE WITNESS: I would say at some point -- at some point prior to the, you know, T minus 3.8 seconds when his foot was removed from the brake, at some point prior to that is the moment that he in his brain said, okay, I am going to make this -- I am going to exit the driveway and make the turn.

MR. SINCICH: Okay.

MR. HANRAHAN: Objection. Move to strike as speculation just for the record.

BY MR. SINCICH:

Q And then between 1.6 to 1.4 seconds before the collision, there's a drastic turn from 143 degrees left to 20 degrees left. Is that fair to say?

MR. HANRAHAN: Objection. Same objections as before.

THE WITNESS: Steering input does change from 143 to 20 degrees between those two measurements, yes.

BY MR. SINCICH:

Q And that's a straightening of the tire?

A Yes.

Q So the tire would be on its way to turning right?

A It would be returning to center.

Q Correct. And then when it gets to negative 1 at minus 1.2 seconds, that would be pretty much straight; is that fair?

A Pretty much straight, overshot center by a degree.

Q And then at some point -- well, not at some point, but at 1 second prior to the collision, from the EDR data, the steering input begins to turn slightly to the left again; right?

A Right.

Q And then within two-tenths of a second, it appears as though the steering wheel was jerked to the right for two-tenths of a second and then jerked back to the left. Is that what that reads from .8 to .4 seconds?

MR. HANRAHAN: Calls for speculation. Foundation.

THE WITNESS: Yes. The steering input does go from left to right to left.

BY MR. SINCICH:

Q And it appears that the officer at .8 seconds removes his foot from the accelerator?

results of the autopsy; correct?
A Correct.
Q And your role -- and that's of two of decedents in this case; is that true?
A True.
Q And that had really nothing to do with the cause of the crash, correct, what happened in the autopsy; is that true?
A That is true, I believe.
Q And you did the vehicle inspections of both the patrol vehicle and the white Nissan; is that true?
A Yes.
Q And you conducted the vehicle inspections on a cursory level the morning after the crash; is that true?
A I don't remember if it was the exact morning after the crash, so I would have to confirm that. Let me check.
No. We conducted the vehicle inspections on February 7th.
Q Okay. So several days after the crash; is that true?
A Yes.
Q I meant to say, you went out to the scene of the crash the morning after it happened; is that true?
A Yes.

Q So that's what I was getting at. You went out and did -- you, at least, saw the condition of the patrol vehicle and the white Nissan at that time; is that true?
A Yes.
Q And then you did a more thorough inspection at an impound lot of the patrol vehicle and the Nissan; is that true?
A Yes.
Q And at that location, you looked at the damage to the rear passenger side door of the Nissan; true?
A True.
Q And you said you noticed damage that appeared to be inflicted there by the -- one of the front tires of the patrol vehicle; is that true?
A Yes, specifically the driver's side tire.
Q Did you actually take the driver's side front tire and place it alongside the white Nissan?
A Yes.
Q And to you, that was, you know, approximately a match; is that accurate?
A I would say it was -- it was absolutely a match. It was -- there was no other possibility other than the two of those items met during that crash and, again, not just because of the unique tire situation but also because of that visible -- there was a visible substrate

under -- I say "substrate" as a generic term. There was a material that had protruded from it within the door panel of the -- of the Nissan, and it left a mark and some remnants behind on the rim in the exact spot where they collided. So it was the only wheel of the police vehicle which could have left that mark.

Q Okay. So your conclusion was that the patrol vehicle's front left tire hit the passenger side rear door of the Nissan; is that true?

A Yes.

Q And you concluded based on Officer Reyes' analysis and your review of the EDR that the patrol vehicle when it pulled out of the apron of the parking lot that it had completed the left turn heading westbound on Valley; is that true?

MR. SINCICH: Misstates facts. Lacks foundation. Argumentative.

THE WITNESS: I cannot conclusively say that it had completed the turn and was headed directly westbound. In fact, I don't believe that's the case.

BY MR. HANRAHAN:

Q Well, did you testify earlier that the EDR evidence showed that the patrol vehicle had taken a left turn from a motionless position; is that true?

A Yes. I think that's kind of a semantic issue.

So I know that he did turn left and returned the wheel to center, so I believe that he completed the turn in the direction -- or to turn his vehicle to whatever direction he intended to continue.

What I can't conclusively say is that he turned 90 degrees. I would say he had not turned 90 degrees at the time that his wheel returned to center.

Q Okay. Well, let me just do one question at a time and just try to answer just what I am asking, Mr. Wolff.

Did the tires, according to the -- of the patrol vehicle, according to the EDR data, did they return to center -- or sorry. Did the wheels return to center position after making the left turn?

A Yes.

MR. SINCICH: Overbroad.

BY MR. HANRAHAN:

Q Okay. And is there an indication that the wheels turned back to just about -- the steering wheel turned back to neutral after completing the left turn?

MR. SINCICH: Overbroad. Assumes facts.

THE WITNESS: There is a indication that the steering wheel returned to center after turning left.

BY MR. HANRAHAN:

Q And did you testify earlier that the patrol

vehicle -- another way of putting that is it disengaged from its turn to the left?

MR. SINCICH: Vague as to time.

THE WITNESS: Yes. I would say the vehicle -- it initiated a left-hand turn and then disengaged the left-hand turn or terminated the left-hand turn and returned to, even if it was only briefly, a straight path of travel.

BY MR. HANRAHAN:

Q So when the patrol vehicle is turning back to a straight path of travel, that means that the wheels are facing basically straight? They are not canted one angle or the other; is that true?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: Yes.

BY MR. HANRAHAN:

Q And when the steering input has stopped, that means the steering wheel is not turning one way or the other. It's basically just neutral, not turned in either direction; is that true?

A Just to clarify, you said that if -- like, essentially what you are saying is if it shows zero that the wheel is not turning, and I just want to clarify that what it tells us is it shows that the wheel is -- the steering wheel at that particular time is centered, but

it doesn't tell us if the driver is actively turning the wheel, if that makes sense. So do you understand?

Q Well, when the EDR says the steering wheel position is at zero, it means the steering wheel is centered; true?

A Yes.

Q And "centered" means the steering wheel is not turning to the left or the right; true?

A It means that it's not currently turned. I just want to indicate that the wheel could be in the process -- like, it could be -- the wheel could have angular velocity. It could have -- you could be turning a wheel really fast and the moment that the snapshot is taken, it shows zero.

All I am getting at is I don't know if the wheel was stationary or not, but I do know that it was centered. Hopefully, that clarifies it.

Q Okay. All I am trying to say is that when a steering wheel is at zero, it's, okay, centered. I think you answered the question.

And there's no way to tell from your analysis or Deputy Reyes' analysis precisely where the Area of Impact 1 was; is that correct?

A Again, I would just say that precision is hard to define. It's hard to precisely say as in to narrow it

down to a very small area. In this particular case, it's quite difficult.

Q And is that partly because of the high velocity of the Nissan before and during the collision?

A Yes, it is partly because of that.

Q Is that because also the patrol vehicle was moving immediately before the collision?

A Yes. That also makes it more difficult.

Q Would you characterize this as a dynamic crash scene?

MR. CESENA: Objection. Vague.

THE WITNESS: Yeah. I mean, yes, but I kind of feel like that's kind of how most crashes could be described as, like, a dynamic instant, you know. So if you have, like, a more specific question, maybe I could answer it.

BY MR. HANRAHAN:

Q Well, what I am getting at is, because the vehicles were both moving and one vehicle was going extremely fast, does that create a very violent impact when those two vehicles collide?

MR. SINCICH: Argumentative. Overbroad.

THE WITNESS: Yes.

BY MR. HANRAHAN:

Q And the more violent the impact and the higher

rates of speed, is it that much harder in your analysis or in Deputy Reyes' analysis to determine the approximate area of impact?

MR. SINCICH: Overbroad. Calls for speculation. Argumentative.

THE WITNESS: I would say that higher speed crashes can certainly be -- it certainly can be more challenging to ascertain the area of impact. It isn't necessarily always the case, but in this case in particular, there was a very large discrepancy of speed between the two vehicles, and they -- they moved significantly postimpact, and then that, of course, combined with the ground being more slick and having no tire impressions made it extremely difficult.

BY MR. HANRAHAN:

Q Back to your inspection of the vehicles, the front end of the patrol vehicle was almost entirely sheared off; is that correct?

MR. SINCICH: Overbroad. Misstates facts.

THE WITNESS: I would say that it was -- it was -- I don't know about -- I wouldn't use the term "shear" because that is a -- that is a specific thing. I would say that the front portion of the vehicle from the A-pillar forward was almost -- almost completely separated from the A-pillar to the rear.

A Correct.
Q The damage to the patrol vehicle was so extensive, it basically knocked the engine and transmission loose from the vehicle; is that true?
A Yes.
Q And the damage in the patrol vehicle went all the way from the very front of the vehicle all the way to the passenger compartment behind the windshield area; is that true? Or up to the windshield area; is that true?
A Of the patrol vehicle?
Q Yes.
A There was damage beyond that. There was -- there was damage inside of the -- inside of the vehicle, but visibly from the outside, yes, the damage was mostly from the A-pillar forward.
Q Okay. And for the sake of your analysis, that's what you are looking at to determine the cause of this crash and what happened during this crash; correct?
A In particular, the way the vehicle -- the patrol vehicle was damaged and the way that the engine separated I think was important in determining the -- basically the principal direction of force of the Nissan into the patrol vehicle.
Q Okay. Some part of the patrol vehicle had a violent collision with the front passenger door and

passenger compartment of the Nissan as well -- just start with that. Restate it. Let me restate it.

Some part of the patrol vehicle collided violently with the front passenger side door of the Nissan; correct?

A Correct.

Q And caused it to knock the door right off its hinges; correct?

MR. SINCICH: Misstates testimony. Assumes facts. Lacks foundation.

BY MR. HANRAHAN:

Q Correct?

A Can you ask it again? I am sorry.

Q The patrol vehicle collided with the passenger side front door of the Nissan; correct?

A Yes.

Q The front of the patrol vehicle collided with the passenger side door of the Nissan; correct?

A The front, yes.

Q And the front collided so violently with the front passenger side of the Nissan that it killed the right front passenger and ejected the driver onto the sidewalk; correct?

A I think that's outside of my expertise.

Q Okay. Well, you know that -- you believe that

the passenger compartment of -- the front passenger compartment of the Nissan at the front driver's seat -- at the front passenger seat was basically collapsed; is that true?

A Yes.

Q Is that what happened in this crash?

A There was intrusion into the passenger compartment on the passenger side.

Q Okay. And so this was a collision that was as you say -- you were talking about momentum and tennis balls hitting one another. This is -- is this an inelastic collision or elastic collision?

A This is an inelastic collision.

Q And it's an inelastic collision how come?

A Because in an elastic collision, you don't lose momentum to things like, you know, the crushing metal deformation, the sound and heat that come from it. So an inelastic collision is more like two pieces of Play-Doh colliding where they each change shape, and that absorbs some of the energy, and so that's what this crash is, is the damage absorbed some of the energy whereas two tennis balls colliding, they may change shape momentarily but in separation they return to their shape. And so, again, in theory, that would be an elastic collision, but car crashes are not elastic.

Q Okay. Well, in this collision, the Nissan and the patrol vehicle collided, and then the Nissan shot off and hit two other vehicles parked along the curb; correct?

A Correct.

Q And the patrol vehicle bounced back several feet at least; is that true?

A Correct.

Q So this wasn't a case of two pieces of Play-Doh coming together and sticking together. This was a case where there was an impact and each vehicle shot off in different directions like pool balls; is that correct?

A No. Pool balls would be a better example of a near elastic collision.

Q Okay. Well, skip the pool ball simile. This was a case where the patrol vehicle smashed into the side of the Nissan and the Nissan shot off northbound and the patrol vehicle shot back eastbound down Valley; is that true?

MR. CESENA: I would object. That mischaracterizes all of the prior testimony. No one has ever mentioned "shot back."

THE WITNESS: Yeah. I would say the Nissan departed in a northeasternly direction, and the patrol vehicle departed in a predominantly eastern but most

likely a slightly northeastern direction.

BY MR. HANRAHAN:

Q Okay. And the damage to the Nissan, that was caused due to the high rates of speed of the Nissan; true?

MR. SINCICH: Calls for speculation. Lacks foundation. Improper opinion.

THE WITNESS: I would say the speed was a factor.

BY MR. HANRAHAN:

Q Well, in your analysis, is the fact that the Nissan was described as going approximately 105 miles per hour immediately before the crash -- is that a primary factor to this crash?

A Yes.

MR. SINCICH: Calls for speculation.

BY MR. HANRAHAN:

Q Did you also analyze whether there were latent problems with the tires on the Nissan?

A I did.

Q Did you analyze whether there was also latent problems with the steering rack and pinions on the Nissan?

A I am sorry. Could you ask that question one more time?

Q Did you determine that there was also latent damage to the steering of the Nissan?
A Postcrash, correct.
Q Well, did you conclude that there was a broken tie rod on the steering system between the rack and the right front steering knuckle?
A Yes.
Q And did you do some research about whether there was a National Highway Traffic and Safety recall for that defect?
A I did.
Q So were you able to determine whether the broken tie rod on the steering system existed before or after the collision?
A No.
Q Would the car still be drivable if it had this defect between the rack and the right front steering knuckle?
A No.
Q Okay. And was the -- did the recall have to do with that under strain oversteering, for example, that this-- this tie rod might break under stress?
A Yes.
Q And what effect would that have on the ability to steer the vehicle if that were to happen, say, if

someone were driving a vehicle at excess speeds on a wet road surface?

A I would expect most likely a complete loss of control.

Q Now, let's talk about for a minute your analysis of the tires to the vehicle. Did you evaluate -- and the vehicle I am talking about -- and just let me also clarify, the problem with the broken tie rod, was that on the Nissan?

A Yes.

Q And did you also analyze the condition of the tires on the Nissan?

A Yes.

Q On the left front tire, did you analyze whether that was a safe tire with appropriate tire pressure?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: I did.

BY MR. HANRAHAN:

Q What was your conclusion?

A The tire was in good condition but was underinflated.

Q Is it inherently dangerous for a left front tire on a Nissan such as this to be underinflated to 36.1 PSI instead of the max 44 PSI?

MR. SINCICH: Vague.

THE WITNESS: Not necessarily. I would need to -- I don't know if I put that information in here. I need to see what the -- what the vehicle -- what the manufacturer's suggested tire pressure is.

BY MR. HANRAHAN:

Q Okay. For the right front tire in your analysis, you determined that that tire sustained a catastrophic failure as a result of the crash?

A The left front?

Q No. The right front.

A The right front, yes.

Q And now I am going to ask you about the left rear tire. Did you determine whether that was installed in the correct direction?

A I did.

Q What was your determination?

A That it was installed backwards.

Q What does it mean when a tire is installed backwards?

A If it is a directional tire like this particular tire, the channels that are designed to push water out from the center of the tire and to improve traction would, in fact, be channeling water into the tire.

Q What effect would that have when one is driving on wet roads?

MR. SINCICH: Calls for speculation.

THE WITNESS: It could potentially reduce traction to be -- yeah, it would reduce traction. It could reduce traction.

BY MR. HANRAHAN:

Q Is that because instead of channeling the water away from the tire, the tire would channel water underneath the tire?

A That's correct.

Q Would that make the tire more susceptible to hydroplaning and losing control underneath that tire?

MR. SINCICH: Vague.

THE WITNESS: Yes.

BY MR. HANRAHAN:

Q Did you analyze whether that left rear tire on the Nissan was underinflated?

A Yes.

Q Was it inflated to 20.2 PSI?

A Yes.

Q Was the recommended tire pressure on that tire 33 PSI?

A Again, I am looking for where I have -- if I have -- I apologize if I didn't put that in there the recommended tire pressures. It's probably in a photograph of the car. So I can't -- I don't have that

information in front of me, so I can't testify to what the recommended tire pressure was for the tires, but in my experience, just based off my training and experience, 20 is generally far below a typical specification for a vehicle like this.

Q Let me see if I can find -- oh, do you know whether the cell phones were analyzed of the occupants of the vehicle as part of your analysis?

A I do not believe they were.

Q Do you know one way or the other?

A I am near confident that they were not and that they were provided to Fontana Police Department for their investigation.

Q Okay. So, in other words, MAIT didn't analyze them as far as you know?

A Correct.

Q Okay. I will look for -- I am trying to find your -- anyway, I will keep looking for your report, but as to the right rear tire of the Nissan, did you analyze that one when you inspected that vehicle?

A I did.

Q Was that a regular tire or a spare tire?

A That was a spare tire.

Q What's a spare tire?

A I am sorry. What is a spare tire?

Q Yeah. What is a spare tire?
A A spare tire is a -- generally a smaller tire that's intended for temporary use in the event of a flat and is carried usually in the trunk of a vehicle or underneath the vehicle.
Q Is it safe to leave a spare tire on a vehicle and just keep driving with it mile after mile?
MR. SINCICH: Incomplete hypothetical.
THE WITNESS: In my opinion, no.
BY MR. HANRAHAN:
Q Why is that?
A Because they are designed for a temporary use. They are not engineered to be driven on for extended periods of time or at highway speeds, or they are not engineered to provide the same traction and control that a regular street tire would have, and so for those reasons generally you shouldn't drive for extended periods of time on those tires.
Q Do the surface of the tires say printed on its sidewall "Temporary use only, spare tire, and inflate to 60 PSI"?
A Yes.
Q Was that spare tire underinflated to 24.7 PSI instead?
A Yes.

Q Was there another warning label on the spare tire?

A Yes.

Q Did the warning label say, "Warning: Spare tire for temporary emergency use only"?

A Yes.

Q Did the warning also say, "Replace with regular tire as soon as possible to avoid possible accident and serious" and then an illegible word after that because of a smudge?

A Yes.

Q Did the warning also say, "Do not exceed 50" or any miles per hour -- or "50 miles per hour," I believe?

A Yes. It said, "Do not exceed 50 miles per hour," and then it had 80 kilometers an hour.

Q Okay. Did the warning also say, "See owner's manual before using spare tire"?

A Yes.

Q Did you see another car in the white Nissan other than these four we have discussed so far?

MR. SINCICH: You said "car," Counsel.

MR. HANRAHAN: Sorry. What did I say?

MR. SINCICH: You said "car in the car."

MR. HANRAHAN: Oh, sorry. Yeah, it's getting to be 2:30. That's what usually happens. Let me try and

rephrase that.

BY MR. HANRAHAN:

Q Sir, did you see another tire in the Nissan other than the four tires we have talked about so far?

A Yes. Well, I believe it was not in the car at the time that I located it, but there was another wheel and tire at the scene which was a match for one of the -- or at least the style of wheel that the nonspares were for the Nissan, and we have concluded that that -- that that tire was associated with that vehicle because there were no other -- there were no other vehicles that didn't have all of their wheels accounted for, and given its proximity to the Nissan and the fact that appeared to match the wheels on the Nissan and the fact that the Nissan was on a spare, we concluded that that came from the Nissan.

Q Did you do any analysis on that tire that was not actually on the Nissan?

A I don't believe so, no, besides just photographing it.

Q Okay. Did you run an accident or crash report for the Nissan?

A Did I run a crash report?

Q Yes.

A Can you clarify what you mean?

Q You know when you buy a used car, you can get a crash report done by CARFAX and they can tell you that your new car that you thought was really great but actually has been totally retrofitted?

A I see. Like a vehicle history report. No, I did not run --

Q Yes.

A -- a vehicle history report for the Nissan.

Q And in terms of primary causes, Deputy Reyes concluded that -- let me back up a little bit.

Deputy Reyes' job in this case was to serve as the case deputy or case investigator; is that correct?

A Reyes -- I think the term you are looking for that we would use would be case agent.

Q Okay.

A And I believe Holland was designated as the case agent which is why his name is listed first. Typically, the case agents are the ones that will do the summary and cause.

Q Okay. So it was Holland's job to ultimately issue the opinion of the MAIT team as to the cause of this collision; correct?

A Correct.

Q And Deputy Holland's opinions are a collaborative effort of all of the MAIT investigators to

offer an opinion as to what caused this collision; correct?

A Correct.

Q And is there an opportunity for a MAIT investigator to write a dissenting opinion if he or she disagrees with Deputy Holland's conclusions?

A Well, I haven't heard of that. That would certainly be acceptable. It's certainly doable.

Q Okay. Well, you said that you had some disagreement with one of the authors of the report about the -- I call it the black box but the EDR data about whether the speed of the vehicle would be actually 95.55 percent slower than the stated wheel speed. Do you remember that?

A I do.

Q And you disagreed with that. You thought that actually the EDR report would be 100 percent of the stated wheel speed, that the smaller tire would have no impact on the stated wheel speed; is that true?

A I didn't -- LaFond and I didn't have any communication about it, and I didn't review his section of the report prior to the entire thing being submitted with Holland's overall opinion.

So I was -- honestly, I hadn't -- I hadn't noticed that until -- until reading it which I didn't

read it before -- before this was all brought to my attention. So, like, before this deposition came about, I hadn't read his section.

Obviously, I communicated with him, but I believe that communication was essentially limited to, you know, his calculation for the distance, and I don't believe there was any discussion about that 95 percent -- approximately 95 percent speed discrepancy.

Q Okay. Well, all I am really getting at is that in this report, that's the only discrepancy that you can point to is that .45 percent difference as to the wheel speed of the Nissan before the collision; is that true?

A That is true.

Q And -- oh, another thing is that since you can't tell, and correct me if I am wrong, the precise direction that the Nissan was facing immediately before the collision and you can't tell the exact direction that the patrol vehicle was facing immediately before the collision, you can't tell precisely how each of those vehicles was oriented to one another before the collision; is that true?

MR. CESENA: Objection. That's compound.

THE WITNESS: I would actually say no.

BY MR. HANRAHAN:

Q Okay. Well, you say that -- is it clear to you

that the front of the patrol vehicle collided with the side of the -- passenger side of the Nissan?

A Do I have to answer these in yes or no as well or can I just say --

Q Well, if anybody has a follow-up, they can follow up. The point is you don't have to explain everything. You can say yes or no and then we can take your answer or ask for follow-up, but just -- and if you don't know, that's fine, too, but just -- or you don't remember, that's a fine answer too. I am not trying to trick you or anything, but just is what I said accurate or not?

A I just -- I guess the problem that I have being a crash guy is when you say "front," you know, there's a front and there's front side and there's front side and there's back and there's backside. So, like, if we are referring to the portion of the vehicle -- the front of the vehicle as being both the front and the front sides, I just want to distinguish between the front and the front sides, if that makes sense, you know.

Q Okay. Well, I understand. When I say "the front," I mean the bumper area, like the bumper area, headlights, like the front-facing part of the vehicle, not like the whole front hood, tires, engine. Just the front of that part of the vehicle, the front of the

patrol vehicle, you know, the headlights, the bumpers, all that equipment.

A The front front?

Q Yeah, the front front. That struck the Nissan? Is that true, in your opinion?

A Yes.

Q Okay. And the part of the Nissan that that struck was the passenger side; correct?

A Yes.

Q And it struck the passenger side with such violence that it basically collapsed the passenger side compartment on the two passengers who sat in there; correct?

A I believe the intrusion came from the front, mostly from the front side of -- the front driver's side of the vehicle, not so much the front bumper area, but -- so more or less yes, but I just want to clarify.

Q Okay. And in terms of determining the area of impact, in the absence of skid marks or an eyewitness or surveillance videos showing precisely where the impact happened, the analysis of the area of impact is based on circumstantial evidence like the aftermath of the crash; correct?

A Correct.

Q And the aftermath of the crash includes various

items of debris that are scattered around the crash scene; correct?

A Correct.

Q And the location of the vehicles themselves doesn't tell you very much about where the crash occurred; correct?

A Well, that depends.

Q Well, in this situation.

A I would say that the location where the vehicles came to rest tends to indicate an area where the crash happened. It doesn't provide a precise location.

Q Right. And no item that was found at the scene, like plastic, glass, the light bar, can tell you with any precision about what the area of impact is; is that true?

A True.

Q And the EDR data, that can't tell you with any precision about where each vehicle was at the time of impact; is that true?

MR. SINCICH: Outside the scope. Calls for speculation.

THE WITNESS: I think the EDR can provide valuable information that can assist in making that determination, but by itself with no other information, the EDR data would be insufficient to precisely determine an area of impact.

BY MR. HANRAHAN:

Q Well, and the EDR data gives you a variance of, you know, up to 10 miles per hour that the vehicles were traveling, so that could translate into over 20 feet in terms of their location from beginning to end of this incident; is that correct?

A Yes.

MR. SINCICH: Lacks foundation.

BY MR. HANRAHAN:

Q When you are looking at the video of this incident, are you able to tell whether the front tires of the Nissan are heading straight or whether they are turned to one side or the other?

MR. SINCICH: Vague. Ambiguous.

THE WITNESS: From my recollection, I didn't notice whether the wheels were straight or turned, and -- but I would just add that I don't know if the reason I don't recall that is because it's not really visible or if -- if it's because they were straight.

Based off my recollection, nothing stood out to me that the wheels were turned, but I can't recall how -- how visible the wheels were. I would certainly -- I guess unfortunately at no point did I -- when looking at that video did I -- did I notice anything unusual about the wheels and -- oh, well, there you go.

BY MR. HANRAHAN:

Q Okay. I am going to mark as Exhibit E, and you tell me if you can tell from looking at this video whether you can tell whether the front tires of the white Nissan are turned in one direction or another or pointed straight or you can't tell. You just tell me what you can tell from looking at this.

(Exhibit E marked for identification.)

MR. HANRAHAN: And for the record, I am playing it from the beginning.

(Video played.)

BY MR. HANRAHAN:

Q Sorry. I have it on playing slow. Sorry.

A Okay.

Q Let me back up. I am at 39. I am going to back up five seconds so we can get right to.

A You can leave it in slow motion if you want.

Q Well, let's just watch it at real speed and then we can play with it if you want.

A Okay.

(Video played.)

THE WITNESS: Yeah, I wouldn't be able to make any judgment as to wheel position based off of that.

BY MR. HANRAHAN:

Q Okay. Do you want me to -- we will go back, and

do you want me to slow -- do you think slowing it down would have any impact on whether you could change your opinion?

A I think it's unlikely to definitively say anything. Just, I mean, even looking at this here still shot, you can't -- of the police cruiser, you can't really discern. I mean, we can assume that its wheels are facing forward, but I can't -- I can't really visually confirm that. So I don't think slowing it down will have much of an effect, but if you would like to, we can look at it for the sake of being thorough.

Q Unfortunately, it's not what I want that matters around here. It's what you think would make an impact. If you think it would make an impact, then we will do it. If you don't think it would change your opinion, then we don't need to take the time to do it.

A I say let's do it.

Q Okay. Did I hear, "Let's do it"? You were kind of muffled.

A Yes.

Q Okay. So I am going back to 30 seconds and I am going to speed it to half a second or half speed.

(Video played.)

THE WITNESS: No. I can't definitively say if wheels are facing any particular direction.

BY MR. HANRAHAN:

Q So is the only information from which you could determine the direction of the Nissan's tires before the collision would be from the black box or EDR data?

A That's the only -- I would say that's the only tool that we have at our disposal in this particular case to try to estimate the wheel position.

Q Okay. And do you know whether there was any evidence -- any effort to try to download any other electronic data from the Nissan such as its NissanConnect feature?

A To my knowledge, no.

Q Do you know whether that was possible with this vehicle?

A I don't recall being aware of it or researching it. So, no, I didn't -- I was not familiar with the -- it's essentially, what, kind of like an entertainment center or infotainment device, I assume?

Q I can represent that, yes, it is. It's like -- for example, in my car, it's like Apple Access, I think. It will link to your cell phone and link your cell phone to your car.

Do you know whether there was any effort to download that information from the Nissan by any member of your team?

A To my knowledge, no.
Q Do you know whether there was any effort to download any other kind of location information from the Nissan such as GPS data or any kind of mapping data?
A To my knowledge, no.
Q Would this have been something that you were responsible for or someone else who was a member of your team?
A It would have been most likely Rodney because he was kind of the resident expert on -- on doing those downloads, so I imagine that he is probably familiar with that. I can't speak to whether or not he was familiar with it at the time, but that would have been his -- his portion.
Q Could you tell me Rodney's last name?
A Yeah. I will spell it for you. Let me pull up his supplemental here. All right. It is Tampa like Tampa Bay and then r-o-n-g, Tamparong.
Q So in the way that you're the math expert on the team, he's the circuitry software downloading expert at the sheriff's department MAIT unit?
A He works for the -- he was a district attorney investigator.
Q Okay. So he's part of that -- when these regional investigators get together, he comes from the

DA's office, you know, and other officers come from other agencies. That's how it works?

A Right. I believe he's -- like, his whole position is funded by the Office of Traffic Safety, I believe. Don't quote me on that. I guess it's too late; huh? I think that his -- his position is funded by the Office of Traffic Safety, and in a case-by-case basis he will assist with certain investigations.

Q So when I want someone to go back into this vehicle and pull out the Nissan access data, Rodney is the person to talk to?

A Yeah. I would think that he's probably the most qualified.

Q Okay. Let me just go through my notes. I think I am almost done.

One more question. Just backing up about the FARO scans, who took them in this case? Was that --

A Reyes.

Q -- Deputy Reyes? Okay. So Deputy Reyes should be the one. Is he also still in MAIT now?

A I do not know.

Q Do you know, does he work for the sheriff's department?

A As far as I know he does.

MR. HANRAHAN: Okay. All right. I think that's

all I have.

MR. SINCICH: I just have a little bit of follow-up. Do you need a quick break?

MR. CESENA: Yes.

MR. SINCICH: I don't want to be longer than, like, five minutes, ten minutes maybe.

MR. CESENA: Okay. Five minutes.

MR. SINCICH: I will be quick.

MR. CESENA: Five minutes.

MR. SINCICH: I will try to be super quick.

FURTHER EXAMINATION BY MR. SINCICH

BY MR. SINCICH:

Q Deputy Wolff, isn't it also true that the patrol vehicle's tires were underinflated upon examination?

A Again, I don't have the recommended pressures for the vehicles in front of me. So 42, 43, 42.

Q When you report a maximum PSI rating, are you stating maximum as recommended or what does that mean?

A No. The maximum PSI is simply the maximum pressure that the tire is engineered to operate with. The pressure that the tire should have is designated by the vehicle manufacturer.

Q Okay. Given that at the time of testing the inflation of the Nissan tires it was after a serious

collision, is it fair to say we don't know exactly what the pressure was at the time of the collision?

A Yes and no. I do believe it is possible in a crash for tires to -- to -- obviously to catastrophically deflate or deflate entirely. We know that that's possible.

I do believe it is possible that a tire could potentially lose some of its pressure at impact. The likelihood that -- because that would essentially require the bead of the tire to separate from the rim to allow air to escape. The likelihood that that would happen without catastrophic failure, I think, is really low.

Q Okay.

A So in my opinion, most likely if we have an intact tire -- wheel and tire assembly, the pressure that we measure generally I am of the opinion that that's accurate to what the tire was inflated to at the time, but if the tire is obviously completely deflated, then -- generally speaking absent some other circumstances, then I can presume that that's a result of the crash.

Q Okay. Is it possible that the front end bumper of the patrol vehicle came in contact with the right side of the Nissan towards the front door, and then as the Nissan moved forward which would have been east-northeast and as the patrol vehicle rotated clockwise, that during

that movement the front left tire of the patrol vehicle made the imprint into the back right door of the Nissan?

MR. HANRAHAN: Objection. Calls for speculation. Improper hypothetical. You can answer.

THE WITNESS: I personally don't believe that this crash happened that way.

BY MR. SINCICH:

Q Is it possible that's how it occurred?

MR. HANRAHAN: Same objections.

THE WITNESS: In my opinion, no.

BY MR. SINCICH:

Q Okay. Let me just go through this video really quickly here. Can you see my screen?

A It's black right there. There it is. I see it.

Q Okay. This is the surveillance video, and I am using Exhibit 2 which was previously marked during the officers' depositions. I am not going to mark it for today. Just for reference.

Do you see the black truck that's in the Number 1 lane eastbound on Valley?

A I can't tell if that's the Number 1 lane or the Number 2 lane. To me, it looks like the Number 2 lane.

Q Well, we know there's only two lanes on eastbound Valley; right?

A Yes, but I believe, unless my perspective is

wrong here, that that's the Number 2 lane and the lane -- the dividing line to the driver's side of that vehicle on the other side of that line is the Number 1 lane.

Q Let me do it this way. We have already determined that at least after crossing the crosswalk the Nissan was in the Number 1 lane; right?

A Yes, I believe so.

Q Okay. Just going forward to --

A Right.

Q Okay. Let me see. I am going forward to 35 seconds, and this is approximately the time frame that the Nissan crosses the crosswalk on the east side?

A Yes.

Q Okay. I am just going to go frame by frame as we go through it, and we are still at 35 seconds, and I stopped at 37 seconds it now reads at the bottom left. Can you see the black and white patrol vehicle?

A I do.

Q And is that the driver's side of the black and white patrol vehicle?

A I believe so.

Q It's oriented generally north?

A Yes.

Q And as I continue to click, do you see just

below the e-y of Valley at 37 seconds the red taillights of the Nissan?

A I do.

Q So we know generally speaking the Nissan is oriented to the east still?

A Yes.

Q And as I continue to click forward at 38 seconds, we can still see the white part of the driver's side door of the patrol vehicle?

MR. HANRAHAN: Objection. It speaks for itself. Argumentative.

BY MR. SINCICH:

Q You can answer, if you know.

A Yes.

Q And we can still see the rear lights of the Nissan?

A Yes.

Q As I click forward, it's still 38 seconds. Just to the left of the V in Valley, can we still see the rear red lights of the Nissan?

A Yes.

Q And so if we can still see the red lights, is it fair to say that the Nissan is still facing generally eastbound?

A Generally, yeah.

Q And as I click forward, it's still at 38 seconds. Up to the point that the Nissan went out of screen, we could still see the red lights of the Nissan; is that fair?

A I can -- yeah, I can see the lights until they went off screen, yep.

Q Okay. And the impact -- the collision occurred at some point in time after this moment; right?

A Yes.

Q Is it fair to say it was within maybe a second or two after this?

A Yes.

MR. HANRAHAN: Okay. I have no further questions.

MR. SINCICH: I have no further question.

MR. CESENA: I have no questions now. Thank you.

MR. SINCICH: Is there any orders you need to get on the record before we go off?

THE COURT REPORTER: Mr. Cesena, would you like to order a copy of the transcript?

MR. CESENA: Oh, I'm sorry. Yes. I was just looking at something else.

THE COURT REPORTER: No problem. Thank you.

And, Eugene, would you like to order a copy of

the transcript?

MR. HANRAHAN: Yes, please.

(The deposition concluded at 3:06 p.m.)

REPORTER'S CERTIFICATION

I, MONICA SCHOONOVER, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of Certificate No. 10220, which is in full force and effect and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

That the foregoing 192 pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

That prior to the completion of the foregoing deposition, review of the transcript was requested.

I further certify that I am not a relative or

employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 15th day of July, 2026.

MONICA SCHOONOVER, CSR No. 10220

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ____ day of __________________, 2026.

______________________________________
GARRETT WOLFF

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:__________________________

___________________________________________________________

Reason for change:________________________________________

___________________________________________________________

Page No._____Line No._____Change to:__________________________

___________________________________________________________

Reason for change:________________________________________

___________________________________________________________

Page No._____Line No._____Change to:__________________________

___________________________________________________________

Reason for change:________________________________________

___________________________________________________________

Page No._____Line No._____Change to:__________________________

___________________________________________________________

Reason for change:________________________________________

___________________________________________________________

Page No._____Line No._____Change to:__________________________

___________________________________________________________

Reason for change:________________________________________

___________________________________________________________

SIGNATURE______________________________DATE:______________

GARRETT WOLFF

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:_____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:_____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:_____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:_____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

SIGNATURE_____________________________DATE:______________
GARRETT WOLFF

Focus Litigation Solutions
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone (916) 228-4593
Production@FocusLitigationSolutions.com

July 17, 2026

Garrett Wolff
gWolfff@sbcsd.org

Re: Diana Rias v. City of Fontana
Date of Deposition: July 2, 2026

The transcript of your deposition taken in the above-entitled matter has been transcribed. The original transcript will be held for 30 days from the date of this letter before it is sealed and forwarded to the noticing attorney.

You have the right to review, sign and make corrections to your transcript within the 30-day period. Please call the above number, or e-mail to make an appointment for your review. It is our policy not to release the original transcript and complimentary copies are not provided.

If you are represented by an attorney, we advise that you contact your attorney to discuss this matter. If you are an independent witness and have questions, please contact the attorney who requested you to testify or this office for further instructions.

If you wish to waive signature, please sign and date below and return this letter to the above address. In the event you have not read, corrected, and signed your deposition within (30) days of receipt of this letter, it may be used with the full force and effect as though it had been read, corrected, and signed.

Cc: All counsel

______________________ ______________________
DATE Garrett Wolff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

DIANA RIAS; TATANISHA PITTS;
DOMINIC ADAMS Sr.; and
BRITTANY MASON,

Plaintiffs,

v. Case No. 5:25-cv-00207-JGB-SHK

CITY OF FONTANA; EDWARD
BAUTISTA; JESUS GARCIA;
DANIEL PRECIE; BRIAN
ZOZAYA; and DOES 1-10, inclusive,

Defendants.
________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF

JESUS GARCIA

WEDNESDAY, JUNE 3, 2026

Reported Stenographically by:
KIMBERLY D'URSO, CSR 11372, RPR
Job No. 27646

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: MARCEL SINCICH, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
msincich@galipolaw.com

SHOJAI LAW FIRM
BY: NEEMA SHOJAI, ESQ.
8880 Rio San Diego, Suite 800
San Diego, California 92108
619.777.0383
neema@shojaifirm.com

FOR THE DEFENDANTS CITY OF FONTANA, EDWARD BAUTISTA, JESUS GARCIA, DANIEL PRECIE, BRIAN ZOZAYA:

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
BY: EUGENE P. RAMIREZ, ESQ.
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
213.624.6900
eugene.ramirez@manningkass.com

FOR MINOR A:

LAW OFFICES OF JAMES H. CESENA
BY: JAMES H. CESENA, ESQ.
1748 W. Katella Av., #105
Orange, CA 92867
714.744.3333
jamescesena711@gmail.com

--oOo--

INDEX OF EXAMINATION

WITNESS: JESUS GARCIA

EXAMINATION BY PAGE

MR. SINCICH..............................4

MR. CESENA............................102

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

Ex 1 - Clip of radio communication...............82

Ex 2 - 50-second clip of the surveillance video on Valley and Cypress.....................87

Ex 3 - Copies of three photographs...............96

Ex 4 - Copy of Google Maps photo.................99

--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 3rd day of June, 2026, commencing at the hour of 9:13 a.m., thereof, JESUS GARCIA, appeared remotely in Los Angeles, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

EXAMINATION

BY MR. SINCICH:

Q. Good morning, Mr. Garcia. How are you?

A. Good morning, sir. I'm okay. How are you?

Q. All right. Thank you for asking. I'm doing well.

Have you had your deposition taken before?

A. Yes.

Q. How many times?

A. Once.

Q. Was it related to your responsibilities as a

were inside the white sedan?
A. Yes, sir.
Q. Is it fair to say you didn't know what they were thinking at the time?
A. Yes, sir.
Q. Up to the time of the collision, had you received any information that they had physically injured any person?
A. Not that I recall.
Q. Any information that they had verbally threatened any person?
A. Not that I recall.
Q. Prior to your collision, had you received any information as to whether they were fleeing from a particular place?
A. I'm sorry. Could you repeat the question, sir?
Q. Yeah. Do you know if they were fleeing from a particular place?
A. I know that they were fleeing from law enforcement, not a particular place.
Q. Okay. So you didn't know, like, where they were coming from when they first got engaged with law enforcement?
A. No, sir. All I know is what was put out over the radio.

Jesus Garcia

Q. Okay. Did you know why law enforcement began the engagement with that vehicle?
A. I recall having heard -- I'm not sure exactly at what point -- that it was for Vehicle Code violations.
Q. Do you know what Vehicle Code violations they were?
A. No, sir.
Q. As far as you knew at the time, they could have been, like, a minor violation. Is that fair to say?
MR. RAMIREZ: May call for speculation.
But you may respond what you knew.
THE WITNESS: Vehicle Code violations range from minor to a severe. So, yes.
BY MR. SINCICH:
Q. Okay. And prior to the collision between your vehicle and the white car, did you see any collision between the white car and any other vehicle?
A. Not that I recall.
Q. Did you hear anybody state over the radio that there was a, like, different vehicle collision at all, during the pursuit?
A. I'm sorry. Say it again, sir?
Q. Did you hear any information over the radio that there was another collision during the pursuit?

A. I don't --
Q. I'm sorry. Say it again?
A. I don't remember.
Q. Okay. Do you know if anybody requested air support?
A. I don't recall.
Q. To your knowledge, was air support available for things like vehicle pursuits, at the time of the incident?
MR. RAMIREZ: May call for speculation.
But you may respond, if you know.
THE WITNESS: At the time, I don't recall if -- if they were in the air or if we had the -- the helicopter up or not.
Q. Was there a helicopter that was available to Fontana P.D. at the time?
A. We -- we had a helicopter, yes. I'm not sure if they were working that night or not, is what I'm saying.
Q. Okay. Thank you.
Did you hear anyone request backup for the pursuit?
A. Not specifically, no, sir.
Q. What do you mean by, "Not specifically"?
A. Typically, in police work, when a vehicle is

engaged in a pursuit, for officer safety, we -- we -- we try to go assist within our policy's limits.
Q. Okay. And was that what your intention was, was to try to go and assist the pursuit?
A. To respond, yes, sir.
Q. Okay. Did you hear anyone over the radio state that the white car had ran any red lights?
A. I don't recall, sir.
Q. Okay. What were the road conditions like at the time?
A. I remember that night was a -- a mix of light rain to mild rain, so the road would have been wet or -- or damp.
Q. Okay. Now, the vehicle that you were driving, was that a Fontana Police Department patrol vehicle?
A. Yes, sir.
Q. What kind was it?
A. I believe it was a Ford Explorer.
Q. That's an SUV?
A. Yes, sir.
Q. Do you know if that SUV had ballistic panels?
A. I'm not sure, sir.
Q. Okay. Do you know if it was -- any modifications to that vehicle, besides being painted black or white?

MR. RAMIREZ: It's vague and ambiguous.

But you can respond, if you know the modifications.

THE WITNESS: No. I'm sorry. I'm not sure what the -- what's done to the vehicles before we use them.

BY MR. SINCICH:

Q. Okay. Did that vehicle have a grill guard?

A. I'm sorry.

Q. Did your vehicle have a grill guard?

A. "A grill guard"?

Q. A grill guard.

A. We have what's -- what I know of as to be a push bar.

Q. Okay. And I take it it had the overhead lights and sirens?

A. Yes.

Q. Okay. Did your vehicle have a dash camera?

A. Not that I know of.

Q. Do you know of any vehicles in Fontana P.D., did they have dash cameras at the time?

A. Not that I know of.

Q. Okay. Were you wearing a body-worn camera at the time?

A. Yes, sir.

Q. Did you ever activate your body-worn camera?
A. Not that I recall.
Q. Did you inspect the vehicle at the start of the shift?
A. We conduct a basic inspection of the vehicles before the shift, yes.
Q. When you say "we," are you referring to you and your partner?
A. Referring to our department.
Q. Okay. Did you personally inspect the vehicle?
A. Yes.
Q. Did you ensure that the radio was functioning correctly?
A. Not specifically conducting a radio check, but I did confirm that the radio worked.
Q. Okay. Did you confirm that all the lights were functioning correctly?
A. I confirmed that our overhead lights worked and that our siren worked.
Q. Okay. Do you know if the other vehicle -- I believe it was a Nissan Sentra. Is that your recollection?
A. I don't remem- -- I don't recall make and model. I remember it was a white sedan.
Q. Okay. Based on your recollection, did your SUV

hit the sedan, or the did the sedan hit your SUV?
A. I don't remember the collision itself.
Q. Okay. Do you recall seeing damage to your SUV?
A. I recall what I have seen in photos and videos. Again, I don't remember much of the accident itself.
Q. Okay. What's the general location of the damage to your SUV?
A. Again, based off of what I've seen in photos and videos, it looks like the front end.
Q. And do you know where the general damage was to the white sedan?
A. Not specifically. No, sir.
Q. Okay. Did you review photographs of the white sedan at all?
A. Yes, sir.
Q. Okay. Was your SUV moving at the time of the collision?
A. Yes, sir.
Q. How fast were you going?
A. I don't believe it was more than, maybe, 20 to 25 miles an hour.
Q. Do you know if you were braking or accelerating at the time?
A. I don't recall.
Q. Do you recall if you were turning left or right

or going straight at the time of the collision?
A. Again, I don't remember at the time of the collision. Prior to the collision, I remember being in the Number 1 lane of westbound traffic on Valley.
Q. Okay. Do you know what lane you were in at the time of the collision?
A. Again, sir, I don't remember the collision itself.
Q. Okay. After you recall being in the Number 1 lane, do you recall turning at all?
A. Prior to the -- prior to being in the Number 1 lane, I -- I did turn out of a driveway.
Q. Right. What about immediately prior to the collision, did you try to turn at all?
A. I don't recall.
Q. Do you recall if you did anything to try to avoid the collision?
A. Not that I recall.
Q. For instance, did you try to honk your horn?
A. Not that I recall.
Q. Did you try to hit the brakes, or anything like that?
A. Not that I recall, specifically.
Q. Okay. Was the white car moving at the time of the collision?

A. I'm not sure, sir.

Q. Okay. Did you see the white car prior to the collision?

A. I saw headlights. I -- I -- I'm not sure -- to describe a vehicle, I wouldn't be able to tell you that I recall, without having looked at some of the footage and -- and photographs.

Q. Okay. When you say that you "saw headlights," are you referring to the white sedan?

A. Again, sir, I don't -- specifically, based off my memory, leading up to remembering and seeing headlights, I don't know what color the car was or what it looked like. I just remember having seen headlights.

Q. Right. Were those headlights the vehicle that ended up being involved in the collision with your vehicle?

A. After having seen photos, I believe so, yes.

Q. Okay. Approximately how long prior to the collision did you first see the headlights?

A. To give you a specific time frame, I'm not sure, sir.

Q. Could you give me your best estimate, a range, perhaps?

A. Maybe a couple seconds or a second.

Q. Okay. Were you able to judge how fast you

believed that vehicle was going in?
A. No, sir.
Q. Did you see any of the occupants inside the vehicle?
A. Could you specify the question?
Q. Right. So before the collision occurred, did you see any occupants inside the white sedan?
A. Not that I recall.
Q. Did you see any movement inside the white sedan, prior to the collision?
A. Not that I recall.
Q. Did you see the white sedan turning at all, prior to the collision?
A. I don't recall, sir.
Q. Okay. Could you describe your best recollection of what you do recall on how the collision occurred, for instance, the moment of impact?
A. Again, I don't remember the collision itself. And I'm sorry I keep repeating that, but I don't remember the collision itself. And all I recall prior to is turning out from a driveway, being in the Number 1 lane, and then seeing headlights.
Q. And when you saw those headlights, what lane did you believe those headlights were coming from?
A. Based on radio traffic and the general, like,

recollection, and from what I recall, I believe they were coming from -- they were from the -- from the west, coming east, on Valley.

Q. And what lane do you recall them being in when you first saw the headlights?

A. It all happened so fast. I -- I think right in front of us, pretty much, in the Number 1 lane of westbound traffic.

Q. Okay. So from your recollection, the white sedan was coming straight on to your vehicle, going eastbound, but in the Number 1 westbound lane?

A. Again, my -- my memory is a little foggy on that, but I believe so, based off the things that I pieced together from what I can remember.

Q. Okay. And I appreciate that. Thank you.

Did you see the white sedan do any kind of maneuvers to try to avoid the crash, like braking or swerving?

A. I'm not sure, sir.

Q. Did you hear any noise immediately prior to the crash?

A. I don't remember.

Q. Like, for instance, did you hear a horn honking?

A. I don't remember, sir. I'm sorry.

Q. Okay. And sometimes I'll ask the questions because it might jog your memory just by hearing the question. So, that's why -- that's why I continue to ask. I don't mean to bother you with it, because I understand.

MR. RAMIREZ: We don't think you're being argumentative at all, Marcel. We get it.

MR. SINCICH: I appreciate it.

MR. RAMIREZ: I know when you are argumentative, but this isn't it.

MR. SINCICH: Yeah, I don't think this one's it.

BY MR. SINCICH:

Q. If you didn't hear a horn, for instance, did you hear, like, tires squealing or screeching from braking?

A. Again, sir, I apologize, but I don't remember.

Q. Okay. After the incident, did you see any skid marks on the road?

A. I don't recall.

Q. Is it your understanding, as you sit here today, that the white sedan is the vehicle that was subject to the vehicle pursuit?

A. Could you clarify the question?

Q. Yeah. Was the white sedan that you were in a

collision with, that was the subject of the vehicle pursuit; right?

A. To my understanding, yes, sir.

Q. Okay. Do you know how many patrol vehicles were involved in the pursuit?

A. To my recollection, I believe just the one.

Q. And who was that vehicle?

A. I believe -- I believe it would have been Officer Zozaya and Officer Precie in one unit.

Q. And it was Officer Zozaya that was driving?

A. I believe so. Yes, sir.

MR. SINCICH: Okay. And can you spell Precie for our court reporter?

THE WITNESS: I'm not sure of the exact spelling of his name. I'm sorry.

MR. RAMIREZ: I think it's P-R-E-C-I-E. I think that's it.

MR. CESENA: That's correct. That's it.

MR. SINCICH: Okay.

BY MR. SINCICH:

Q. Okay. I think you said earlier that, really, the only information you knew was what was transmitted over the radio. Is that what you said?

A. At the time, yes, sir.

Q. Do you know who was making the radio

transmissions between those two officers?
A. I believe it was Officer Zozaya, but I don't recall exactly.
Q. Okay. And I think you said that you were -- you were responding to the pursuit earlier?
A. Yes, sir.
Q. Can you describe that? What do you mean by that?
A. Specifically, what is it you're asking?
Q. Just to add some clarification to what you mean by you were "responding to the pursuit"?
A. I was trying to go assist my partner in the pursuit for officer safety, so I was leaving the area where I was, to go to respond to the area of either where they were going, or the traffic -- the radio traffic that was being put out.
Q. Okay. So you were intending to join the vehicle pursuit?
A. To assist, yes, sir.
Q. And when you say "assist," that would have meant that you would be part of the vehicles that were following the white sedan until it eventually pulled over?
A. Ideally, yes, sir.
Q. Okay. So when you pulled out of the parking

lot, I think you said that your intent was to join the vehicle pursuit; right?
A. Again, my intent was to respond to assist my partner in the pursuit.
Q. And I think you said that you were trying to go to where the direction they were going in. Something like that. Do you recall that?
A. I was attempting to respond to the pursuit, yes.
Q. Okay. Did you have an understanding that the pursuit was going eastbound on Valley?
A. Yes, sir.
Q. Why did you turn westbound on Valley?
A. I -- again, I was trying to respond to the pursuit, so I would have had to have left the area that I was in, and there's only --
Q. Okay.
A. I'm not sure if there's only one way to leave that parking area, but it was the closest one to me.
Q. Okay. Was it an option to wait in the parking lot to see which direction the pursuit went before leaving the parking lot?
A. Yes, sir.
Q. And I know you described some of your injuries as it relates to the collision. I think you said you

had back pain?
A. Yes, sir.
Q. Were you transported to the hospital after the incident?
A. Yes, sir.
Q. Did you stay in the hospital for some period of time?
A. Yes, sir.
Q. Approximately how long?
A. I don't know exactly. I know that by the next day, I was home.
Q. Okay. Were you transported by ambulance?
A. No, sir.
Q. How did you get to the hospital?
A. I was -- I was transported by one of our units, one of our officers.
Q. How long after the incident did you go to the hospital?
A. I don't recall exactly.
Q. Was it within an hour?
A. All that stuff's kind of a very harsh blur to me, sir. I don't -- I don't remember exactly.
Q. Okay. After the collision, I understand that at some point you were outside of your vehicle; is that fair?

A. Again, I don't recall exactly. I've -- I've seen footage of -- I think it's me outside of my vehicle, yes.
Q. Were you walking around?
A. I don't recall.
Q. What were your injuries on the day of the incident?
A. I don't -- I'm not -- don't remember exactly what they wrote on my medical report, so I -- I -- couldn't tell you exactly.
Q. Could you just describe what your injuries are, then?
A. From what I remember, I had -- I'd hit my head, so I had a cut on my head. I had cuts, bruising, and swelling, and all kinds of stuff all over my arms. I had hit my -- my elbow.
MR. RAMIREZ: Which elbow?
THE WITNESS: My right elbow. I had really bad -- really bad back pain. A really bad headache.
That I can remember, that was -- those are the majority. Again, that entire area is kind of a blur, so I don't remember exactly, but I think that's a good summary.
BY MR. SINCICH:
Q. Okay. Any broken bones?

A. Not that I recall.
Q. Did you drive home from the hospital the next day?
A. No, sir.
Q. How long after the incident did you feel comfortable driving again?
A. I don't remember.
Q. Did you feel like your injuries prevented you from driving?
A. I mean, I think so. Yeah.
Q. Are you driving now?
A. Yes, sir.
Q. When you were discharged from the hospital, were you able to walk?
A. I believe so.
Q. Okay. Do you know if any other officers were injured as a result of the incident?
A. Yes, sir.
Q. Who was that?
A. My partner, Officer Terwilliger.
Q. Can you spell that, please?
A. No, sir, I can't. I'm sorry.
MR. SINCICH: It's T-E-R-W-I-L-L-I-G-E-R, for the court reporter.
MR. RAMIREZ: That sounds about right.

THE WITNESS: I -- I think so.
MR. SINCICH: I hope I'll pronounce it correctly this afternoon.
THE CERTIFIED STENOGRAPHER: Thank you for the spelling.
MR. SINCICH: That's a tough one.
BY MR. SINCICH:
Q. Do you recall what his injuries are or were at the time?
MR. RAMIREZ: May call for speculation. May call for a medical conclusion. May involve HIPAA issues.
But you can answer what you know.
THE WITNESS: I remember he had a cut on his head, and was having trouble walking and getting around. I think he was on the floor at one point, based off, like, video I've seen and stuff. I don't recall exactly what his exact injuries were.
BY MR. SINCICH:
Q. Were you wearing a seatbelt during the incident?
A. I don't recall.
Q. Do you know if Officer Terwilliger was wearing a seatbelt during the incident?
A. I -- I don't remember.
Q. My understanding is that you were parked in a

parking lot on the southeast corner of Cypress and Valley; is that right?
A. I believe so, yes.
Q. And is that a particular business or something?
A. We were parked at the parking lot of Deseret Industries, I belive is the name of it. I'm not sure if that's still the name of the location.
Q. That is like a thrift store?
A. I've never been in there, sir, so I'm not sure what it is.
Q. Okay. And were you there with another patrol vehicle, as well?
A. Yes, sir.
Q. Was that a one-man or two-man unit?
A. That would have been a canine unit, so one man and his canine, I belive. I'm not sure if he had it that night or not.
Q. And which officer was that?
A. Officer Bautista.
MR. SINCICH: And can you spell that for the court reporter, please?
MR. RAMIREZ: I think it's B-A-U-T-I-S-T-A, is my best --
MR. SINCICH: Yeah.
THE WITNESS: Sorry.

MR. RAMIREZ: Best attempt, but I think that's it.

MR. SINCICH: I always try to ask the deponent first, and then we can clear it up afterwards, but we can give it a shot.

BY MR. SINCICH:

Q. So why were you guys in that parking lot?

A. I was assigned, I believe, to that beat area, and it was a good spot for us to park. And I believe I was typing a report at the time; so, yeah.

Q. Okay. So you were kind of just waiting there until you received the next call for service?

A. Yes, sir.

Q. Okay.

MR. SINCICH: All right. I see that it's 10:10. Why don't we take a ten-minute break, since we've been going about an hour, and then we'll come back on.

MR. RAMIREZ: Sounds good. Thank you.

(Break taken.)

BY MR. SINCICH:

Q. Okay. We just left off, Mr. Garcia, talking about how you were in the parking lot. Do you recall that?

A. I believe so. Yes, sir.

Jesus Garcia

Q. Okay. And so at some point in the parking lot, as you were writing the report, you got some information that a vehicle pursuit had occurred?
A. Yes, sir. It was broadcast over the radio.
Q. All right. And what information did you have from that initial broadcast?
A. I don't recall, myself, having heard it, based off my memory, but I remember in the recordings the pursuit was in the area of either Citrus and Valley or Catawba and Valley. That area.
(Reporter clarification.)
MR. SINCICH: I think it's C-A-T-A-W-B-A.
THE WITNESS: Yes, sir.
MR. RAMIREZ: Very good.
MR. SINCICH: I wasn't good in spelling.
BY MR. SINCICH:
Q. From your knowledge of the City of Fontana, which street was further from your location, Citrus or Catawba?
A. I believe Citrus was further --
Q. Okay.
A. -- from my location at the time.
Q. Right. In the parking lot; right?
A. Yes, sir.
Q. And approximately, what is that distance

between the parking lot where you were at and the intersection of Valley and Citrus?
A. I don't -- I don't know of even an approximate distance, but several streets over.
Q. Is it something like miles away? Do you know?
A. I don't think so.
Q. Do you think it's less than a mile?
A. Probably right around a mile, maybe.
Q. And then what is the approximate distance, to your knowledge, from that parking lot you were in to the cross street of Valley and Cypress -- or excuse me -- Valley and Catawba?
A. Could you re-ask the question, please? Sorry.
Q. Yes. What is the approximate distance between the parking lot that you were in and the cross street of Valley and Catawba?
A. So if since Citrus and Valley is right around a mile, it would be less than that.
Q. Would it be half the distance or closer to the one-mile mark?
A. I'm not sure, sir.
Q. Okay. How long after receiving that call did you wrap up what you were doing and begin to move your vehicle?
A. I think as soon as the -- as soon as the radio

traffic came over, we -- both me and Officer Bautista tried to respond to assist.

Q. Okay. Approximately how long after receiving that initial radio call did you begin to move your vehicle?

A. Maybe a few seconds.

Q. Was your -- was your SUV already on?

A. Yes, sir.

Q. What other information did you receive prior to turning on to Valley Boulevard?

A. I don't recall.

Q. Do you recall if the pursuing officer -- is that the "primary vehicle"? Is that what it's called?

A. I'm sorry?

Q. Is it the primary vehicle that was giving the information about the pursuit?

A. Officer Zozaya and Officer Precie would have been the vehicle pursuing, I believe.

Q. Okay. But you're not sure which individual officer was on the radio?

A. Yeah. Again, not that I recall.

Q. Okay. For the sake of clarity, could we call that the "primary pursuing vehicle"?

A. Yes, sir.

Q. Okay. Did you hear communication from the

primary vehicle about the speed of the pursuit?
A. Not that I recall.
Q. Did you hear any updates from the primary pursuing vehicle about the location of the pursuit?
A. Again, sir, I'm sorry. I don't remember.
Q. Okay. Did you hear from the radio the primary vehicle indicating that the pursuit was initiated, passing Catawba?
MR. RAMIREZ: It's vague and ambiguous.
But you may respond, if you understand.
THE WITNESS: Could you repeat or rephrase the question, sir?
BY MR. SINCICH:
Q. Did you hear the primary vehicle broadcast over the radio that the pursuit was initiated passing Catawba?
A. Again, sir, I -- I don't specifically remember exactly, but I believe I do remember having heard the -- the street Catawba at one point.
Q. Okay. And was that before you started to respond?
A. I don't remember, sir. I'm sorry.
Q. Okay. Did you hear the primary vehicle stating that the pursuit was high speed?
A. I don't recall.

Q. Did you hear the primary vehicle broadcast that the pursuit was passing Oleander?
A. I don't recall, sir.
Q. Did you hear the primary vehicle in the pursuit broadcast that the pursuit was approaching Cypress?
A. Not that I remember, sir. I don't remember. Sorry.
Q. Okay. When you left the parking lot, the driveway to leave the parking lot would have been going north; right?
A. Yes, sir.
Q. And then, when you turned to west, you would have turned left?
A. Yes, sir.
Q. And at that time, you knew that the vehicle pursuit was going eastbound on Valley Boulevard?
A. Yes, sir.
Q. When you first got to -- well, strike that.
From my recollection of the video, it would have been Officer Bautista that was in front of you; right?
A. Yes, sir.
Q. Between the time that you first received that radio broadcast about a pursuit, to the time of the collision, did you have any communication with a

A. I'm not sure, sir.

Q. Did you speak with your partner in between that time frame?

A. It's possible. I don't remember.

Q. Okay. When you got to the end of the driveway -- sometimes I've heard it referred to as the "curtain of the driveway." Is that what you've heard it as, as well?

A. I've -- we call it an "apron," I believe.

Q. The "apron." Okay.

When you get to the apron of the driveway, did you stop before turning?

A. I don't recall exactly having stopped. I -- I believe I cleared the intersection.

Q. And what do you mean by "cleared the intersection"?

A. Checked to see if there's any cars immediately preventing me from turning out.

Q. Is there a procedure, for instance, that you went through in clearing the intersection?

A. Not specifically, no.

Q. Did you look to your left, to the west?

A. Yes, sir.

Q. Did you see any vehicles coming in your direction from the west?

A. Not that I could see, sir.
Q. Did you look to your right, to the east?
A. Yes, sir. I -- I believe so.
Q. Did you see any vehicles coming in your direction from the east?
A. Not that I recall.
Q. Did you hear Officer Bautista put out any radio communication?
A. Not that I recall, sir.
Q. Did you see any update on your computer that would inform officers that Officer Bautista was responding to the pursuit?
A. I don't remember.
Q. When you looked to the west, did you see any vehicles near the intersection of Cypress and Valley?
A. I don't remember. To be honest with you, I don't remember.
Q. Okay. Before you turned, were you able to see Officer Bautista's vehicle?
A. Yes.
Q. And where did he go?
A. He made a -- a westbound turn out of the apron.
Q. Okay. And do you recall what lane he was in?
A. Could you rephrase the question?
Q. Do you know what lane Officer Bautista turned

into, on Valley Boulevard?
A. Not exactly. I believe it's Lane 1 of westbound, on Valley. But I wasn't in his car, so I don't specifically remember.
Q. Okay. But he turned left, to the west?
A. Yes, sir.
Q. Okay. Is it your recollection that you had completed your left-hand turn prior to the collision?
A. Yes, sir.
Q. Okay. And what I mean by that is, you weren't still in the process of making the left-hand turn?
A. Yes, sir.
Q. When you made the decision to join the pursuit, why didn't you turn your body-worn camera on?
A. Everything happened so fast that I don't believe I had time, but I don't remember exactly specifically why I made that decision.
Q. How do you turn the body-worn camera on that you had at the time?
A. You -- there's a button you press to activate it.
Q. Was it in the center of your chest?
A. Around the area, yes.
Q. And I mean the camera itself?
A. Around the area of the chest, yes.

Q. And then the button is on the camera?
A. Yes, sir.
Q. Okay. Do you just have to press it once, or is it one that you have to press twice?
A. I don't remember.
Q. Do you know if in your vehicle, it's situated to where if you turned on your sirens, it would also turn on your body-worn camera video?
A. Not that I know of, sir.
Q. Okay. Between getting the call and the collision, did you have your sirens on at all?
A. Not that I recall. I don't remember.
Q. Did your vehicle, in that time frame, have its emergency red and blue lights on at all?
A. Again, sir, I'm sorry, but I don't remember.
Q. Based on your review of the video, could you see if you had your red and blue emergency lights on?
A. Not -- not that I recall, and not based off what I remember seeing in the video.
Q. Okay. The video that you saw of the pursuit, did that have any audio?
A. I don't think so.
Q. Okay. Did you have your headlights turned on when you were turning left on to Valley?
A. I don't remember, sir. I'm sorry.

Q. From your review of the video, were you able to see if the headlights to your vehicle were on at that time?
A. Based off what I remember, having seen of the video, I don't think so.
Q. Do you know why your headlights would have been off?
A. When we park, again, for safety -- I'm sorry -- for safety, we -- we blackout our vehicles.
Q. Okay. When you're joining a pursuit, is there any policy that you're aware of as to whether or not you're supposed to turn on your lights and sirens?
A. I'm not sure what the verbiage on the policy is exactly, sir. It's possible it's in there.
Q. What's your understanding of the policy with regard to lights and sirens, when joining a pursuit?
A. That I recall, I believe when you're actively engaged in the pursuit, you're to have your lights and sirens on.
Q. And what do you mean by "actively engaged"?
A. As in you're involved with the pursuing officer.
Q. Is there any differences in the policy for what you're supposed to do when you're actively engaged in a pursuit, as opposed to responding to the pursuit?

A. Not that I recall. Again, I don't remember the exact verbiage. It's been some time.

Q. You reviewed the pursuit policy in preparation for today, though; right?

A. Yes, sir.

Q. When was the last time you reviewed it?

A. I don't remember the exact time, but it was sometime yesterday.

Q. Okay. And when you're driving at night, generally are you supposed to use your headlights?

A. Yes, sir.

Q. And why is that?

A. Visibility.

Q. What do you mean by that, "Visibility"?

A. Visibility of the road, visibility of other vehicles.

Q. The headlights assist the driver of the vehicle to see other vehicles or obstacles in the road. Is that what you're describing?

A. Potentially, yes, sir.

Q. Do the headlights also make it easier for other drivers to see your vehicle?

MR. RAMIREZ: May call for speculation.

But you can answer.

THE WITNESS: Generally, it could, yes.

Q. Approximately how many of the 30 did you not use lights and sirens?

A. I'm not sure, to give you an exact or even approximate number. Policing is -- and particularly in pursuits, it's rapidly evolving circumstances where I could have turned them on and then turned them off, or just not had them on, and maybe turned them on at one point later in a different pursuit.

I'm not sure if that answers your question. I'm sorry.

Q. Okay. During this incident, were you trying to be inconspicuous at all?

A. While I was typing my report, leading up, yes.

Q. Right. What about between the time of when you started to respond to the pursuit to the time of the collision?

A. What was the question? Sorry.

Q. From the time that you start to respond to the time of the collision, were you attempting to be inconspicuous at all?

A. Again, I was parked inconspicuously, typing my report, and then responded. And that's kind of like a flow of events, if that makes sense?

Q. So were you still kind of in the mode of being inconspicuous?

A. At the time I was typing my report, leading up to when the call came out, yes.

Q. Okay. And what about after the call came out up to the time of the collision, were you trying to be inconspicuous at all?

A. Not that I recall.

Q. Okay. Were there any tactical reasons between receiving the call to the time of the collision, where you wouldn't want to use your headlights?

A. Sorry. Say it again.

Q. Were there any tactical reasons that you considered between receiving the call and the time of the collision, that you considered to not use your headlights?

A. Again, while I was typing, I was trying to be inconspicuous, for safety reasons and tactical reasons. And I received the call maybe a few seconds after. And again, that sequence of events is all kind of connected, to my recollection.

So not specifically for the pursuit, but I was trying to be inconspicuous while typing my report, for tactical reasons, for safety reasons, and the things we've discussed.

Q. Okay. And so that all kind of flowed into the time frame all the way up to the collision?

A. To the best of my recollection, yes, sir.
Q. Approximately how long was it from the time that you first started to respond to the time of the collision?
A. I'm not sure, sir. I don't remember.
Q. Could you give me an approximate time frame?
A. My best guess would be a few seconds, but I'm not sure.
Q. Okay. Do you recall if you used your blinker when turning left on to Valley?
A. I don't remember, sir.
Q. Do you recall, if you had turned into the Number 1 westbound lane, would you have had to pass a double-yellow line?
A. I don't remember the exact layout of the lines on Valley.
Q. Do you know if there was a center lane, or if it was a painted median?
A. And forgive me if the terminology's off, but I believe there is some sort of turning lane in the middle of eastbound and westbound lanes on Valley. I'm not sure what the exact term for that area or that lane is.
Q. Okay. And when you say a "turning lane," what does that look like, in terms of the paintings on the road?

Cypress" on the left-hand corner.
Q. Okay. Now, does this look like a type of video that you reviewed in preparation for today?
A. I believe so.
Q. Okay. I'm going to press play.
(Video being played.)
BY MR. SINCICH:
Q. And I'm stopping at 3 seconds.
Did you see the white car that went from eastbound Valley, turning north on to Cypress?
A. I'm not sure what the orientation of the cameras are. I did see a white car turn left.
Q. And then there appears to be another car that's stopped in the road, on the left-hand side?
A. Yes, sir. I see headlights.
Q. Okay. I'm going to press play.
(Video is being played.)
BY MR. SINCICH:
Q. All right. There's been a few other cars around 19 seconds, that are traveling. Is that fair to say?
A. Yes, sir.
Q. All right. I stopped it at 24 seconds.
If you look at the top left-hand corner of the screen, does it appear to be a patrol vehicle right

above the "Y" of "Valley"?
A. I believe so. I see what looks like a black and white car.
Q. Okay. And is this the parking lot on the top of the screen that was the Deseret Industries Thrift Store?
A. I believe so, yes.
Q. Okay. And from your review of the video and recollection of the incident, would this be Officer Bautista's car that's at the apron of the driveway, right now at 24 seconds?
A. Based off the video and what little I remember, it does seem to be that that would be Officer Bautista.
Q. Okay. I'm going to press play.
(Video being played.)
BY MR. SINCICH:
Q. And I stopped it at 32 seconds.
Is it fair to say that Officer Bautista turned left on to Valley, going westbound?
A. Yes, sir.
Q. And then, on the top left-hand corner of the screen at 32 seconds, just above the "P" and "R" in the word Cypress, did you see another patrol vehicle up there?
A. Yes. It looks like some sort of white vehicle.

Q. Okay. Is that your patrol vehicle?
A. Based off the video and from what I -- from what little I remember, I think so, yes.
Q. Okay. I'm going to press play.
(Video being played.)
BY MR. SINCICH:
Q. All right. I stopped it at 35 seconds.
Is this about the time that you paused for a second the apron of the driveway?
A. I don't remember, sir, exactly what I was doing at that exact time.
Q. Is that what you see in the video, your vehicle pausing for a second on the apron of the driveway?
A. It's very low visibility. I can't tell exactly what's happening. It looks like there's some sort of light there, but I can't tell exactly what it is.
Q. Right. I'm going to back up a little bit to 32 seconds, and I'm able to go frame by frame on this VLC player.
Have you ever used VLC player before?
A. I think so.
Q. Okay. I'm clicking the frame by frame. Do you see your vehicle moving on the top left-hand corner?
A. Yes, sir.
(Video being played.)

BY MR. SINCICH:
Q. And you see how the time is adjusting?
A. Yes, sir.
Q. Okay. And does it appear -- and I'm still at 34 seconds as I click, and I stopped it at 35 seconds.
Does it appear that your vehicle was around the area of the apron of the driveway when I stopped at 35 seconds?
A. Again, sir, it's very low visibility. It looks like that vehicle's in that general area. I can't tell exactly where it's at.
Q. Okay. In the general area of the apron; is that fair?
A. Yes, sir.
Q. And is it Officer Bautista's vehicle that looks like it's in approximately the Number 1 lane, westbound Valley?
MR. RAMIREZ: That may call for speculation.
But you can respond, if you can.
THE WITNESS: It looks like he's on Valley. Yes, sir. I'm not sure exactly what lane.
BY MR. SINCICH:
Q. Okay. And at this time, does it appear that the white sedan is entering the intersection of Valley and Cypress?

line be considered a painted median?
A. I'm not -- I'm not sure what that terminology, if that's accurate.
Q. Is it fair to say that it's not a turning lane?
MR. RAMIREZ: May call for speculation.
But you can respond, if you can.
THE WITNESS: Again, I -- I don't know.
BY MR. SINCICH:
Q. Do you know where, based off of -- well, you see the debris spread out along the road from the vehicles?
A. Yes, sir.
Q. Based on your recollection and reviewing the video and the photographs, do you know where your vehicle was, approximately, at the moment of impact?
A. Based off my recollection and from what I recall having seen and what I've reviewed, I believe in the Number 1 lane.
Q. And when you say "the Number 1 lane," are you talking about where these words that say "Signal ahead" are?
A. Assuming that that's Valley, westbound, near Deseret Industries, yes.
Q. Okay. So you were -- is it your recollection that you were on the south side or the north side of the

(Reporter clarification.)

BY MR. CESENA:

Q. -- entry into a pursuit?

A. It's possible, sir.

Q. However, you indicated you did not recall ever telling anyone that you were entering the pursuit; correct?

A. Not that I recall, but I wasn't in the pursuit.

Q. Well, you were not attempting -- as Mr. Garcia indicated, you were not attempting to do any of the PIT techniques, the pursuit intervention techniques?

MR. RAMIREZ: This is Mr. Garcia.

MR. CESENA: I'm sorry.

BY MR. CESENA:

Q. Mr. Cesena just asked the questions regarding the PIT. Were you attempting to do any of those items that are listed in pursuit policies?

A. I'm sorry. I got confused with the question and the interjectory. Repeat it one more time. Sorry.

Q. Sure. Vehicle Pursuit Policy 314, lists an item called "pursuit intervention techniques." You recall those questions?

A. Do I recall what questions?

Q. Mr. Sincich asked you questions regarding pursuit intervention and pursuit techniques. Do you

recall that?
A. Yes. I remember having answered questions from Mr. --
(Simultaneous speakers.)
(Reporter clarification.)
THE WITNESS: -- Sincich had answered -- had asked. I'm sorry.
BY MR. CESENA:
Q. And in any of these questions that you were asked, you indicated that you were not attempting to -- excuse me -- did you state you were not attempting to conduct a pursuit intervention?
A. I don't remember having said that I was conducting a pursuit intervention technique.
Q. Were you intending to do so?
A. Not that I recall.
Q. You were not intending to do anything -- any other tactic; correct?
A. I'm sorry. I don't understand the question.
Q. Sure. There are several tactics listed that are defined, such as blocking or boxing in, pursuit intervention, the PIT, ramming, road blocks, tire deflation. Were you attempting to do any of those items?
A. Not that I recall, sir. I was just responding

to the pursuit.

Q. And in responding to the pursuit, do you know whether or not you had been requested to do so?

A. It's -- I'm not sure this answers your question, but in general, based of training and experience, whether an officer puts out a pursuit and there's a single unit involved, it's an officer safety thing to respond to the pursuit to assist.

I'm not sure if that answers the question.

Q. Well, isn't it required, under your pursuit policy for the Fontana Police Department, that you are to immediately notify dispatch of your enter into the pursuit?

A. Yes, sir, but I wasn't in the pursuit.

Q. Well, what was your objective of entering the roadway?

A. Again, I'm not sure if this answers the question, sir, but I was responding to assist in the pursuit.

Q. But you were not specifically requested to do so, nor did you notify dispatch?

A. Correct. Again, I'm not sure if this answers your question, sir, but in general, it's an officer safety thing. When there's a single officer involved in a pursuit, it's a safety thing to respond to assist the

Q. Sure. You were asked regarding -- regarding for safety of others on the roadway when you are entering?

A. I don't remember if I was asked that or not. I think so.

Q. Okay. And in reviewing the video that you saw just a few moments ago, showing your car was in the median area; correct?

MR. RAMIREZ: May call for speculation. Vague and ambiguous as to time.

But you may respond.

THE WITNESS: If -- if what you're asking is if in the video I can see myself in that -- what I refer to as the "turning lane" --

BY MR. CESENA:

Q. It was a photograph. I'm sorry. But in the photograph.

A. I'm sorry. Which photograph and what was the question?

Q. You were shown some photographs, a series of photographs, Exhibit 3, with three photos. It shows your vehicle in the median area. That was, in fact, your vehicle; correct?

A. If it's referring to the photos that I hadn't seen before, I -- I believe so.

Q. Have you seen any -- any photo showing your vehicle in any westbound lane on Valley?

A. I'm not sure. I don't think so.

Q. Pardon?

A. I said: I'm not sure exactly. I believe the photos I have seen have shown the vehicle after it's come to rest, and it looks like it's in between the Number 1 lane for westbound and the area that I referred to as a turning lane.

Q. Well, at any point, were you ever informed where the point of impact was?

A. It's possible, sir. I don't remember.

Q. I just may have one or two questions left. Give me a moment.

(Pause.)

BY MR. CESENA:

Q. And when you say you were responding to assist, what were you trying to assist in doing? I understand you were going to join the pursuit, but what specifically were you hoping to accomplish?

MR. RAMIREZ: May call for speculation. Lacks foundation.

But you may respond.

THE WITNESS: Was the question what I was doing when I was responding to the pursuit?

BY MR. CESENA:
Q. What were you hoping to accomplish when you were responding?
A. It was -- it was my attempt at trying to assist my partner for his safety.
Q. Well, earlier you indicated the only thing you were aware of was that there was a Vehicle Code violation; correct?
MR. RAMIREZ: May misstate his testimony.
But you may respond.
THE WITNESS: Repeat the question? Sorry.
BY MR. CESENA:
Q. Sure. Let me rephrase it.
Earlier you testified that what you had heard was there were some Vehicle Code violations; correct?
A. I believe so. Again, my memory is not great for the incident. I -- I thought I remember hearing Vehicle Code violations.
Q. Did you ever hear anything about any weapons involved?
A. Not that I recall.
Q. Did you ever hear about any actions by the white Nissan, directed towards any person, vehicle, or structure?
A. Not that I recall.

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 9th day of June, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

ERRATA SHEET

PAGE/LINE CHANGE REASON

______________________________________________

DECLARATION OF DEPONENT

I, ____________________, say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of ______________, 2026, at ______________________, California.

____________________________

JESUS GARCIA

# Court Access Portal

Superior Court of California, County of San Bernardino

*Registered*

HOME SEARCH CALENDARS CASE PAYMENT FAQ/INSTRUCTIONAL VIDEOS EUGENE HANRAHAN LOGOFF

## 24IN-028155 ☆

The People of the State of California vs. GIOVANNI BONILLA

Print

CASE INFO PARTIES EVENTS HEARINGS CHARGES/DISPO. FINANCIALS

### CHARGES, DISPOSITIONS & PLEAS

| COUNT | RESULT | DATE | DETAILS | Citation# | JURISDICTION |
|---|---|---|---|---|---|
| 001 | CHARGE | 3/10/2024 | Infraction - VC22356(B)-I: Exceeding 70 MPH | 7NH000038 | San Bernardino |
| | DISPOSITION | 4/20/2024 | Traffic School - Ordered | | |
| | DISPOSITION | 6/14/2024 | Traffic School - Completed | | |

‹ Go Back