ARBIO ACCIDENT RECONSTRUCTION & BIOMECHANICS

**SoCal office: 4201 Jamboree Rd. #342, Newport Beach, CA 92660**
**NorCal office: 16346 Valley View Rd, Truckee, CA 93420**
**Phone: 800-587-4858, Email: office@arbio.expert**

July 24, 2026

Kayleigh Andersen
Manning Kass
801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017

Re: Galburth, et al v City of Fontana, et al

**Initial Expert Report**

Dear Ms. Anderson:

My assignment in this case is to perform a forensic biomechanical analysis and accident reconstruction. This report pertains to the decedents, the three passengers in the Nissan Sentra (Domonic Adams-14 years old, Omari Pitts-15 years old, and Robert Rias-15 years old).

To date, I have reviewed the following information:

- Inspection and CDR for 2020 Ford Explorer
- Inspection and CDR for 2022 Nissan Sentra
- Body Worn Camera
- Coroner Records:
    - Dominic Adams
    - Omari Pitts
    - Robert Rias
- Deposition Transcripts:
    - Dominic Adams Sr.
    - Giovanni Bonilla Ramirez
    - Ta-Tanisha Galburth
    - Brittany Mason
    - Brian Zozaya
    - Bradley Terwilliger
    - Jesus Garcia
    - Daniel Precie

    - Garrett Wolff
- Audio of Radio Transmissions
- Complaint
- Discovery Responses for Maria Ramirez
- Medical Records for Maria Ramirez-Arrowhead Regional Medical Center
- CHP Supplemental Investigation
- CHP Supplemental Report
- Initial Incident Report by Officer Brian Zozaya
- Photos of Scene
- Scene inspection
- Surveillance Videos
- Transcripts of BWC and 911 audio
- Vehicle inspections of Ford and Nissan
- BWC photos
- MAIT Report
- Discovery Responses

**Scientific Method**

The scientific method is a method of procedure that has characterized natural science since the 17th century, consisting of systematic observation, measurement, and experiment, and the formulation, testing, and modification of hypotheses.

**Background**

For background purposes, the deposition of Officer Jesus Garcia (June 3, 2026) is summarized below. Officer Garcia was driving the Ford Explorer at the time of the incident.

**4** Officer Garcia testified he had previously given one deposition involving a traffic collision while working as a law enforcement officer.
**5** The previous lawsuit involved a collision at an intersection that was unrelated to this case.
**6** Testified he was the driver in the prior collision, was transported to the hospital, and stated it involved two vehicles at an intersection.
**9** Garcia had hearing issues, back pain, and memory loss following the subject collision, stating his memory problems began after the accident.
**10** His memory loss resulted from the February 2024 collision and described difficulty recalling events and maintaining his train of thought.
**11** The collision occurred in February 2024 at night near the intersection of Cypress and Valley, at approximately 10:44 p.m.
**12** Reviewed documents, videos, audio recordings, photographs, police reports, and the pursuit policy in preparation for the deposition. Did not prepare the police report for the incident but believed he reviewed Officer Zozaya's report.
**13** Reviewed several reports and videos related to the incident, including body-worn camera footage, street camera footage, and other recordings concerning the pursuit and crash. Recalled reviewing video showing events before the collision.

**14** Did not recall seeing a clear video showing the collision itself. Believed many of the videos depicted events after the collision. Reviewed radio traffic audio and the Fontana Police Department pursuit policy (Policy 314, to the best of his recollection).
**15** Reviewed photographs showing his patrol vehicle and several other involved vehicles. Recalled being interviewed by investigators several days to one or two months after the incident. Believed the interview was conducted by the Sheriff's Department but could not remember who conducted it or how long it lasted.
**16** Believed the investigative interview was audio recorded. Spoke with attorneys before the interview, and they represented him during the interview. Did not recall a Fontana Police Department representative being present and did not remember whether he reviewed reports or videos before that interview.
**17** Garcia has driven past the collision location since the incident but had not conducted a walk-through. Did not recall attending a tactical debrief. Did not recall receiving any discipline related to the incident.
**18** Did not recall undergoing retraining because of the incident. Was unaware of any finding that his own actions violated department policy.
**19** Was not aware of any policy violations by other officers. Identified Sergeant Janusz as his immediate supervisor to the best of his recollection. His partner was the senior officer/FTO. At the time of the deposition, he was employed by the San Bernardino County District Attorney's Office as a victim advocate.
**20** Duties as a victim advocate included assisting crime victims with resources, working with deputy district attorneys, guiding victims through court proceedings, and helping with restitution forms. Had held that position for approximately one year. Could not recall exactly how long he remained employed by the Fontana Police Department after the incident.
**21** Remained employed by the Fontana Police Department for several months after the collision. Was on industrial injury leave ("4850") following the incident and medically retired from the department. Was hired by the Fontana Police Department in approximately May 2020.
**22** Entered the police academy shortly after being hired and graduated later that year. Was assigned to patrol and was no longer an FTO trainee at the time of the collision. Had been a fully certified officer for less than four years before the incident.
**23** Had no previous law enforcement or military experience before joining the Fontana Police Department. Had not previously met or interacted with any occupants of the white sedan involved in the collision. Confirmed the other vehicle involved in the collision with his patrol vehicle was a white sedan.
**24** Had no information regarding the occupants' histories or intentions. Had not received information that the occupants had physically injured or threatened anyone before the collision. Knew only that they were fleeing from law enforcement based on radio traffic and did not know where they had originally come from.
**25** Recalled hearing over the radio that the pursuit involved Vehicle Code violations but did not know the specific violations. Did not recall witnessing or hearing of any other collisions involving the white sedan before his own collision with it.
**26** Garcia did not remember whether air support had been requested or was airborne that night, although Fontana Police Department had a helicopter available. Did not specifically recall hearing requests for backup during the pursuit.
**27** Officers normally respond to assist vehicle pursuits within policy limits, and his intention was to respond to assist. Did not recall hearing radio traffic that the fleeing vehicle had run red lights.

The roadway was wet or damp due to light rain. Confirmed he was driving a Fontana Police Department Ford Explorer patrol SUV.
**28** Did not know what modifications had been made to the patrol vehicle before it was placed into service. Testimony continued regarding the equipment installed on the patrol vehicle.
**29** Patrol vehicle was equipped with a push bumper (grill guard) on the front. Did not know its specifications, weight, manufacturer, or whether it affected vehicle performance.
**30** Did not know whether the push bumper changed the vehicle's crashworthiness or handling characteristics. Was not involved in selecting or installing the equipment on the patrol vehicle.
**31** Patrol vehicle contained standard police equipment, including emergency lighting, radio equipment, and other issued gear. Did not know the total weight of the equipment or vehicle.
**32** Did not know the curb weight or gross vehicle weight of the patrol vehicle. Had not performed calculations regarding the vehicle's weight with occupants and equipment.
**33** Recalled being parked while completing a police report before hearing radio traffic regarding the pursuit. Responded after hearing the radio call.
**34** Garcia was familiar with the general area where the collision occurred. Began driving toward the pursuit after receiving the radio broadcast.
**35** Garcia did not recall his exact route, speed, or specific radio transmissions while responding to the pursuit.
**36** Could not recall the exact distance between his patrol vehicle and the pursued vehicle before the collision. Memory of the sequence of events remained limited because of injuries sustained in the collision.
**37** Did not recall specific details regarding emergency equipment activation while responding. Could not remember exactly when lights or siren were activated.
**38** Garcia could not recall specific vehicle speeds or distances immediately before the collision. Recalled only the general sequence of responding to assist the pursuit before the impact.
**39** Could not recall the precise movements of the white sedan immediately before impact because of limited memory of the collision sequence.
**40** Could not recall the exact point of impact or the final moments immediately preceding the collision.
**56** Based on his review of the video, believed the patrol vehicle headlights were not on. Explained patrol vehicles are "blacked out" while parked for officer safety. Believed lights and sirens are required when actively engaged in a pursuit but was unsure of the exact policy language.
**57** Reviewed the pursuit policy the day before the deposition. Agreed headlights are generally used while driving at night for visibility and to make the patrol vehicle more visible to other motorists.
**58** Blacking out patrol vehicles makes them less visible to the public. Stated there are circumstances in police work when officers may drive without headlights but could not identify the specific policy exceptions.
**59** Stated driving without headlights may be appropriate for tactical or safety reasons to remain inconspicuous. Did not remember whether there was a tactical reason to keep his headlights off during this incident. Estimated participating in approximately 30 prior vehicle pursuits, including several at night.
**60** Garcia could not estimate how many prior pursuits were conducted without lights and sirens because circumstances vary. While writing his report before responding, he was attempting to remain inconspicuous.

**61** Did not recall attempting to remain inconspicuous after beginning his response to the pursuit. Explained his vehicle was already blacked out while writing the report for tactical and officer safety reasons immediately before receiving the pursuit call.
**62** Estimated only a few seconds elapsed between beginning his response and the collision. Did not recall using his turn signal when turning onto Valley. Did not remember the exact roadway markings but believed there was a center turn lane separating eastbound and westbound traffic.
**63** Could not recall the exact lane configuration or pavement markings. Agreed that a center turn lane is generally located between two sets of yellow lines but was not certain that was the configuration at this location.
**64** Understood that turning across a double-yellow line could result in a Vehicle Code citation, although he could not identify the specific code section.
**65** Was unfamiliar with the law enforcement term "double double" regarding double-yellow lines. Stated traffic was not his specialty. The patrol radio was on during his response to receive pursuit transmissions. Did not recall any other distractions such as music.
**66** Did not recall receiving any updates on the MDC (Mobile Data Computer) between responding and the collision. Officers are required to review and test on pursuit policy and maintain a general knowledge of department policy. Believed certification or testing was required before operating a patrol vehicle. Memory of the collision itself remained incomplete.
**67** Believed certification or training was required before operating a patrol vehicle. Agreed officers are expected to have a general knowledge of the department's pursuit policy rather than know it verbatim.
**68** Confirmed he had completed department training related to vehicle operations and pursuit policy. Could not recall the specific details of the certification process.
**69** Acknowledged officers receive ongoing policy training but did not remember the specific frequency or timing of the training before this incident.
**70** Described his understanding that pursuit decisions depend on changing circumstances and officer judgment consistent with department policy.
**71** Could not specifically recall additional details regarding his actions immediately before the collision because of memory loss following the crash.
**72** Continued to explain that his recollection of the final moments before impact was limited and relied primarily on what he remembered rather than later review of evidence.
**73** Confirmed his memory remained incomplete regarding the sequence of events immediately preceding the collision.
**74** Could not provide additional details about vehicle positioning or movements beyond what he had already described earlier in the deposition.
**76** Agreed that failing to follow safe and defensive driving rules can lead to a collision. Agreed collisions can result in serious bodily injury or death. Believed the Fontana Police Department had a seatbelt policy requiring officers to wear safety restraints when practical, although he could not recall the exact wording.
**77** Garcia did not know whether department policy required the driver to ensure passengers were wearing seatbelts. Believed the pursuit policy he reviewed was likely the same one in effect at the time of the incident. Believed the policy likely required officers to use lights and sirens during pursuits and believed there may also be a Vehicle Code requiring their use.
**78** Confirmed department training included driving with due regard and caution. Recalled the training generally emphasized driving with due regard for public safety whenever practical. Was aware there is a Vehicle Code addressing due regard but could not recall its language. Did not

remember whether anyone requested additional units or whether he requested assistance in the pursuit.
**79** Did not recall the defensive driving term "space cushion." Agreed officers should generally maintain a safe distance from surrounding vehicles. Recalled the concept of maintaining a "high visual horizon," meaning looking farther down the roadway rather than only immediately ahead.
**80** Believed the pursuit policy includes vehicle intervention techniques. Believed PIT maneuvers are covered by department policy and believed supervisor approval is generally required before using intervention techniques when practical.
**81** Believed pursuit intervention techniques may constitute a use of force and, depending on the circumstances, could constitute deadly force. Agreed officers generally should not use deadly force solely because a vehicle is fleeing. Believed blocking is one of the intervention techniques identified in department policy.
**82** Believed officers receive training regarding blocking techniques but did not recall scenario-based training. Believed ramming is another pursuit intervention technique but could not recall when department policy authorizes its use. Audio of the radio communications was marked as Exhibit 1.
**83** Recognized Officer Zozaya's voice on the radio recording. Heard the broadcast that the white sedan was traveling eastbound on Valley at Catawba and that Officer Zozaya was attempting to obtain the vehicle's license plate.
**84** Understood Officer Zozaya announced he was in pursuit. Explained that "starting mileage 89.7" referred to the patrol vehicle's odometer reading rather than its speed. Heard the broadcast that the pursuit was eastbound on Valley passing Oleander.
**85** Confirmed he had reviewed the same radio recording before the deposition. Heard Officer Zozaya report that the pursuit was at a high speed and that traffic was light. Agreed those broadcasts inform responding officers about pursuit conditions and traffic levels.
**86** After replaying the recording, heard Officer Zozaya report "coming up to Cypress." Understood "Eagle 1 launching" meant the police helicopter was launching to assist the pursuit.
**87** Explained that "TC" means traffic collision. Heard Officer Zozaya report that he had collided with another unit. Surveillance video from Valley Boulevard and Cypress Avenue was marked as Exhibit 2.
**88** Believed the surveillance video was one he had previously reviewed. Observed a white vehicle turning left and another vehicle stopped with headlights visible. Agreed several vehicles were traveling through the area before the collision.
**89** Identified what appeared to be Officer Bautista's patrol vehicle near the Deseret Industries driveway. Agreed the video showed Officer Bautista turning westbound onto Valley Boulevard. Identified another patrol vehicle that appeared to be his own.
**90** Could not remember whether he paused at the driveway apron before entering the roadway. Stated the poor video quality made it difficult to determine exactly what his vehicle was doing. Reviewed the video frame by frame.
**91** Agreed his vehicle appeared to be generally in the area of the driveway apron. Believed Officer Bautista was on Valley Boulevard but could not determine the specific lane. Agreed the white sedan appeared to be entering the intersection.
**92** Described the white sedan as a blurry white vehicle within the intersection. Could not remember whether he had already begun his turn. Identified another patrol vehicle with emergency lights activated.

**93** Believed the patrol vehicle shown had its overhead emergency lights activated. Could not determine the exact position of the white sedan because of the poor video quality and explained he was uncertain of the camera orientation.
**94** Believed the white sedan may have been in the Number 1 eastbound lane. Could not identify the double-yellow lines because of the poor video quality. Could not distinguish the vehicles beyond seeing a patrol vehicle with emergency lights activated.
**95** Continued reviewing the surveillance video frame by frame. Repeatedly stated the image quality prevented him from determining his vehicle's exact movements or position.
**96** Reviewed Exhibit 3, consisting of three photographs. Did not specifically remember seeing the first photograph before but believed it depicted the collision scene. Thought the damaged patrol vehicle shown was likely his. Acknowledged the photograph showed two sets of double-yellow lines but could not say whether the area between them constituted a painted median or identify the exact roadway designation.
**97** Agreed the damaged patrol vehicle in the photograph appeared to be his. Recognized the double-yellow lines in the roadway. Could not determine whether the area between them was considered a painted median under police terminology.
**98** Observed debris scattered across the roadway. Based on his recollection, photographs, and review materials, believed his patrol vehicle was in the Number 1 westbound lane at the time of impact. Could not state whether his vehicle was north or south of the double-yellow lines when the collision occurred.
**99** Believed the second and third photographs depicted his patrol vehicle and the white sedan after the collision. Recalled the white sedan came to rest on the north side of the roadway. Had reviewed several scene photographs the night before the deposition. Exhibit 4, a Google Maps aerial photograph, was introduced.
**100** Identified the Google Maps image as depicting the collision location. Identified the driveway he used to exit toward Valley Boulevard. Clarified he believed he had actually been parked in the roadway between the dirt lot and the paved parking lot rather than inside the main parking lot itself.
**101** Indicated he and Officer Bautista were parked generally in the driveway area before responding. Identified the double-yellow lines that converged into the westbound left-turn lane but could not fully describe the roadway markings or their significance.
**102** Could not determine his vehicle's exact position on the aerial photograph at the moment of impact. Plaintiff's counsel concluded his examination. A recess was taken before questioning by counsel for Mr. Bonilla.
**103** Examination by Mr. Cesena began. Confirmed he reviewed reports, videos, and other materials before the deposition, including the MAIT report. Believed the report contained statements from himself and Officer Zozaya, photographs of the vehicles, and an overhead view of the collision scene.
**104** Confirmed he had reviewed the surveillance video showing the Nissan traveling through the intersection. Could not determine whether spray was visible behind the vehicle because of the poor video quality but recalled the roadway was wet due to rain that night.
**105** Could not recall notifying dispatch or Officer Zozaya before leaving to respond to the pursuit. Was generally familiar with Pursuit Policy 314 but could not recall its specific provisions concerning secondary unit responsibilities.

**106** Acknowledged Policy 314 may require officers entering a pursuit to notify dispatch. Reiterated he did not recall notifying anyone because he did not consider himself to have entered the pursuit. Denied attempting any pursuit intervention technique.
**107** Confirmed he was not attempting blocking, boxing-in, PIT, ramming, roadblocks, tire deflation, or any other pursuit intervention tactic. Explained he was simply responding to assist officers involved in the pursuit.
**108** Explained his purpose was to respond to assist for officer safety because only one patrol unit was involved. Confirmed he had not been specifically requested to respond and had not notified dispatch, but stated officers commonly respond to assist under those circumstances.
**109** Stated that when he attempted to clear the driveway before entering Valley Boulevard he did not recall seeing any vehicles immediately approaching. Acknowledged the surveillance video showed the Nissan approaching the intersection but emphasized the poor quality of the recording and his limited recollection.
**110** Recalled hearing radio broadcasts indicating the pursuit was at high speed and passed Oleander but could not remember the precise sequence or wording of the broadcasts.
**111** Believed the Nissan had traveled eastbound through Oleander before reaching Cypress but could not estimate the distance between the intersections. Reiterated he did not recall seeing any vehicle immediately before beginning his left turn. Agreed public safety is an important consideration while driving.
**112** Discussed photographs showing his patrol vehicle after the collision. Believed the photographs depicted his vehicle but noted he had not previously seen those specific images. Could not definitively identify the exact location of his vehicle within the roadway from the photographs.
**113** Stated the photographs he had previously reviewed showed his patrol vehicle at final rest between the Number 1 westbound lane and the turning lane. Could not remember whether anyone informed him of the precise point of impact. Explained his purpose in responding was to assist fellow officers involved in the pursuit.
**114** Explained he was responding solely to assist his partner for officer safety. Recalled hearing only that the pursuit involved Vehicle Code violations. Did not recall hearing about weapons or any actions directed toward people, vehicles, or structures before the collision.
**115** Did not recall receiving information that the Nissan had been swerving or otherwise driving erratically beyond fleeing from officers. All counsel stated they had no further questions, and the deposition concluded at 12:16 p.m.
**115 End.**

**Accident Reconstruction**

The traffic collision/MAIT report summarizes the incident as follows and describes the collision factors involved.

**Summary**

> P-1 (Giovanni Bonilla, DOB: 3/30/07) traveled east in the #1 lane of Valley Boulevard through the intersection with Cypress Avenue at a minimum average speed of 105 mph. P-2 (Officer Jesus Garcia) traveled north and made a left turn from the private parking lot of Deseret Industries Thrift Store at 16593 Valley Boulevard, which was located on the

south side of Valley Boulevard. P-1 traveled at 105 mph, turned V-1 (2022 Nissan Sentra) to the left, and lost control of V-1. The rear of V-1 slid to the right, causing the passenger side of V-1 to collide with the front of V-2 (2020 Ford Explorer) in a broadside collision. The momentum of the collision caused V-1 to continue north where the rear of V-1 collided with the driver side of V-3 (2018 Toyota Corolla), which was parked along the north curb of Valley Boulevard. The remaining momentum from the second collision caused V-1 to roll backwards, where the rear of V-1 collided with the front of V-4 (2022 Chevrolet Silverado), which was parked along the north curb of Valley Boulevard.

**Primary Collision Factor**

P-1 caused this collision by being in violation of the following vehicle code section: CVC 22350-"No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility-, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property."

**Associated Collision Factor**

P-1 was in violation of the following vehicle code section: eve 22107- "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement"

P-1 was found to have operated the vehicle with defective equipment (right rear and left rear tire). At the time of the collision, the spare tire was being operated on the right rear axle of V-1. The left rear tire was mounted improperly with the tread direction reversed. The reversed tread direction contributed to the tire's inability channel water property, thus reducing traction with the roadway surface. The width of the right rear tire (spare) was less than the standard tire width. The narrow width of the right rear tire provided less contact with the roadway surface, thus reducing traction.

**CDR data – 2022 Nissan Sentra**

The Crash Data Retrieval data was recovered from the Sentra (see Table 1) and showed that the vehicle was traveling 105.0 mph, 5 seconds before the subject collision, and was traveling 83.3 mph, at the time of the collision. The speed limit on Valley Blvd., in the City of Fontana, where the collision occurred, is 45 mph.

BOSCH

CDR CRASH DATA RETRIEVAL

**Pre-Crash Data -5 to 0 Sec (Event Record 2) - Table 1 of 2**

| Time (sec) | Speed, Vehicle Indicated (MPH [km/h]) | Accelerator Pedal, % Full (%) | Engine RPM (rpm) | Motor RPM (rpm) | Motor RPM2 (rpm) | Service Brake, On/Off | Steering Input (deg) | ABS regulation status |
|---|---|---|---|---|---|---|---|---|
| -5.0 | 105.0 [169] | 79 | 5,200 | 5,200 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -4.5 | 105.6 [170] | 77 | 5,200 | 5,200 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -4.0 | 106.3 [171] | 75 | 5,300 | 5,300 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -3.5 | 106.3 [171] | 70 | 5,300 | 5,300 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -3.0 | 106.3 [171] | 84 | 4,800 | 4,800 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -2.5 | 106.9 [172] | 82 | 5,100 | 5,100 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -2.0 | 107.5 [173] | 70 | 5,100 | 5,100 | N/A | "OFF" (Brake not activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -1.5 | 108.7 [175] | 0 | 5,100 | 5,100 | N/A | "ON" (Brake activated) | 250.0 (clp) | "OFF" (no ABS regulation) |
| -1.0 | 96.3 [155] | 0 | 3,700 | 3,500 | N/A | "ON" (Brake activated) | 250.0 (clp) | "ON" (ABS in regulation) |
| -0.5 | 83.3 [134] | 0 | 2,600 | 2,700 | N/A | "ON" (Brake activated) | 242.5 | "ON" (ABS in regulation) |
| 0.0 | 83.3 [134] | 0 | 2,500 | 2,700 | N/A | "ON" (Brake activated) | 245.0 | "ON" (ABS in regulation) |

**Table 1, CDR data recovered from the Nissan Sentra**

The "system status at event" showed that the driver of the Nissan was unrestrained at the time of the incident (Table 2 below). The Nissan sustained a maximum longitudinal Delta-V of -38.5 mph and a maximum lateral Delta-V of -45.4 mph, **which equates to an overall Delta-V of 59.5 mph**.

**System Status at Event (Event Record 2)**

| | |
|---|---|
| Ignition Cycle, Download | 5,296 |
| Multi-Event, Number of Events (1,2) | Single event or 1st event of multi-event |
| Time from Event 1 to 2 (sec) | 0.0 |
| Complete File Recorded (Yes, No) | Yes (Complete) |
| Complete File Recorded all (Yes, No) | Yes (Complete) |
| Ignition Cycle, Crash | 5,295 |
| Safety Belt Status, Driver | OFF "Unfastened" |
| Frontal air bag warning lamp, on/off | "Off" |
| Frontal air bag suppression switch status, right front passenger (on, off, or auto) | Off (AS airbag deploy) |
| Maximum delta-V, longitudinal (MPH [km/h]) | -38.5 [-62] |
| Time, Maximum Delta-V, Longitudinal (msec) | 250.0 |
| Maximum delta-V, lateral (MPH [km/h]) | -45.4 [-73] |
| Time maximum delta-V, lateral (msec) | 175.0 |
| Maximum acceleration, Longitudinal (g) | -60.0 (clp) |
| Time, Maximum acceleration, Longitudinal (msec) | 40.0 |
| Maximum acceleration, Lateral (g) | -60.0 (clp) |
| Time, Maximum acceleration, Lateral (msec) | 25.0 |
| Life Time Counter (sec) | 7,752,874 |
| Occupant Size Classification, Right Front Passenger, Child (Yes/No) | No |
| Seat track position switch, foremost, status driver | N/A |
| ABS Warning lamp, on/off | OFF |
| AEB/FCW switch status ON/OFF (from ADAS) | AEB ON / FCW ON |
| AEB Warning lamp (from ADAS) | Permanent Failure Display |

**Table 2, System status at event showing the maximum Delta-Vs**

**CDR data – 2020 Ford Explorer**

The Crash Data Retrieval data was recovered from the Explorer (see Table 3) and showed that the vehicle was traveling 15.9 mph, 5 seconds before the subject collision, and was traveling 19.4 mph, at the time of the collision. The speed limit on Valley Blvd., in the City of Fontana, where the collision occurred, is 45 mph.

BOSCH

CDR CRASH DATA RETRIEVAL

**Pre-Crash Data -5 to 0 sec [5 samples/sec] (First Record) - Table 1 of 2**

| Time (sec) | Speed, Vehicle Indicated (MPH [km/h]) | Speed, Vehicle Indicated, Quality Factor | Accelerator Pedal, % Full | Accelerator Pedal, % Full, Quality Factor | Service Brake, On/Off | Service brake, on/off Quality Factor | Engine RPM | Brake Pre-Charge Request |
|---|---|---|---|---|---|---|---|---|
| - 5.0 | 15.9 [26] | OK | 0 | OK | ON(Driver_Braking) | OK | 1,420 | No PreCharge Request |
| - 4.8 | 14.2 [23] | OK | 0 | OK | ON(Driver_Braking) | OK | 1,260 | No PreCharge Request |
| - 4.6 | 12.3 [20] | OK | 0 | OK | ON(Driver_Braking) | OK | 1,080 | No PreCharge Request |
| - 4.4 | 9.8 [16] | OK | 0 | OK | ON(Driver_Braking) | OK | 880 | No PreCharge Request |
| - 4.2 | 7.6 [12] | OK | 0 | OK | ON(Driver_Braking) | OK | 666 | No PreCharge Request |
| - 4.0 | 6.1 [10] | OK | 0 | OK | ON(Driver_Braking) | OK | 686 | No PreCharge Request |
| - 3.8 | 5.3 [9] | OK | 0 | OK | OFF(Driver_Not_Braking) | OK | 812 | No PreCharge Request |
| - 3.6 | 5.2 [8] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 1,144 | No PreCharge Request |
| - 3.4 | 5.4 [9] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 1,470 | No PreCharge Request |
| - 3.2 | 6.1 [10] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 1,892 | No PreCharge Request |
| - 3.0 | 7.5 [12] | OK | 99 | OK | OFF(Driver_Not_Braking) | OK | 2,114 | No PreCharge Request |
| - 2.8 | 9.1 [15] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 2,298 | No PreCharge Request |
| - 2.6 | 10.8 [17] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 2,484 | No PreCharge Request |
| - 2.4 | 12.2 [20] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 2,844 | No PreCharge Request |
| - 2.2 | 13.9 [22] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 3,124 | No PreCharge Request |
| - 2.0 | 15.2 [24] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 3,362 | No PreCharge Request |
| - 1.8 | 16.5 [26] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 3,546 | No PreCharge Request |
| - 1.6 | 17.8 [29] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 3,958 | No PreCharge Request |
| - 1.4 | 19.0 [31] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 4,110 | No PreCharge Request |
| - 1.2 | 20.4 [33] | OK | 100 | OK | OFF(Driver_Not_Braking) | OK | 4,396 | No PreCharge Request |

| Time (sec) | Speed, Vehicle Indicated (MPH [km/h]) | Speed, Vehicle Indicated, Quality Factor | Accelerator Pedal, % Full | Accelerator Pedal, % Full, Quality Factor | Service Brake, On/Off | Service brake, on/off Quality Factor | Engine RPM | Brake Pre-Charge Request |
|---|---|---|---|---|---|---|---|---|
| - 1.0 | 21.7 [35] | OK | 43 | OK | OFF(Driver_Not_Braking) | OK | 4,668 | No PreCharge Request |
| - 0.8 | 23.1 [37] | OK | 0 | OK | OFF(Driver_Not_Braking) | OK | 4,752 | No PreCharge Request |
| - 0.6 | 23.8 [38] | OK | 0 | OK | OFF(Driver_Not_Braking) | OK | 4,784 | No PreCharge Request |
| - 0.4 | 23.9 [38] | OK | 0 | OK | ON(Driver_Braking) | OK | 4,788 | No PreCharge Request |
| - 0.2 | 21.9 [35] | OK | 0 | OK | ON(Driver_Braking) | OK | 4,138 | No PreCharge Request |
| 0.0 | 19.4 [31] | OK | 0 | OK | ON(Driver_Braking) | OK | 3,588 | No PreCharge Request |

**Table 3, CDR data recovered from the Ford Explorer**

**Biomechanical Analysis**

Based on the MAIT report, the three decedents were not wearing their restraints (seatbelts) at the time of the incident. The National Highway Traffic Safety Administration (NHTSA) compiled statistics in 2023 regarding Occupant Protection in Passenger Vehicles and these were the key findings (see attached Traffic Safety Facts article):

- Forty-nine percent of passenger vehicle occupants killed in traffic crashes in 2023 were unrestrained (based on known restraint use).

- In traffic crashes in 2023, considering known driver restraint use by passenger vehicle type, 59 percent of pickup drivers killed were unrestrained, compared to SUV drivers (47%), passenger car drivers (47%), and van drivers (41%).

- Sixty-one percent (based on known restraint use) of passenger vehicle occupant fatalities in the 13-to-14 and 25-to-34 age groups in traffic crashes in 2023 were unrestrained—the highest percentage of all age groups.

- In 2023 traffic crashes, among passenger vehicle occupants with known restraint use, 53 percent of male fatalities were unrestrained compared to 41 percent of females.

- In 2023 among passenger vehicle occupant traffic fatalities with known restraint use, 48 percent seated in the front row and 59 percent of those in the second row were unrestrained.

- Among passenger vehicle occupant fatalities in traffic crashes in 2023 with known restraint use, 42 percent were unrestrained during the day compared to 56 percent at night.

**Domonic Adams-14 years old, rear right passenger in Nissan Sentra**

Scott Luzi, MD, Forensic Pathologist (from San Bernardino County Sheriff's Department, Coroner Division), diagnosed Domonic Adams with the following injuries:

1. Multiple blunt force injuries
    - A. Head and neck
        1. Open fracture, right zygoma
        2. Lacerations, right cheek
        3. Laceration, left cheek
        4. Laceration, lower lip
        5. Abrasion, chin
        6. Oral mucosa lacerations
        7. Fracture, maxilla
        8. Fracture-dislocation, atlanto-occipital joint with transection of spinal cord
    - B. Torso
        1. Abrasion, chest
        2. Contusion, abdomen
        3. Abrasion, sacrum
        4. Bilateral hemothoraces
        5. Hemoperitoneum
        6. Multiple right rib fractures
        7. Fracture, sternum
        8. Fracture-dislocation, thoracic spine with transection of underlying spinal cord
        9. Fracture, right pubic bone
        10. Pulpifaction, right lung
        11. Rupture, right hemi-diaphragm
        12. Transection, aorta
        13. Laceration, right renal artery
        14. Pulpifaction, liver
    - C. Extremities
        1. Abrasion, right thigh
        2. Laceration, left thigh
        3. Patterned abrasion, left thigh
        4. Fracture, left femur

II. Other injuries: none

III. Natural disease and pre-existing conditions
- A. Cerebral edema
- B. Mild peripheral atherosclerosis

IV. Toxicology results (femoral blood)
- A. Ethanol: none detected
- B. No other positive findings of toxicological significance

**Omari Pitts-15 years old, rear left passenger in Nissan Sentra**

Scott Luzi, MD, Forensic Pathologist (from San Bernardino County Sheriff's Department, Coroner Division), diagnosed Omari Pitts with the following injuries:

I. Multiple blunt force injuries
- A. Subgaleal hemorrhage
- B. Subdural hemorrhage
- C. Right hemothorax
- D. Laceration, right lung
- E. Laceration, celiac trunk
- F. Fracture, left femur

II. Other injuries: none
Ill. Natural disease and pre-existing conditions
- A. Cerebral edema
- B. Pulmonary congestion and edema
- C. Cardiomegaly with left ventricular hypertrophy
- D. Mild peripheral atherosclerosis

IV. Toxicology results (blood)
- A. Ethanol: none detected
- B. Delta-9 THC: 0.52 *ng/mL*
- C. Fentanyl: 1.9 ng/mL
- D. Nortentanyl: 0.7 ng/m

**Robert Rias-15 years old, front right passenger in Nissan Sentra**

Scott Luzi, MD, Forensic Pathologist (from San Bernardino County Sheriff's Department, Coroner Division), diagnosed Robert Rias with the following injuries:

I. Multiple blunt force injuries
- A. Abrasion, Jeft orbit
- B. Abrasions, right cheek and chin
- C. SubgaleaJ hemorrhage
- D. Basilar skull fracture
- E. Abrasion, chest
- F. Bilateral hemothoraces
- O. Hemoperitoneum
- H. Retroperitoneal hemorrhage
- I. Multiple right rib fractures
- J. Pelvic fractures
- K. Lacerations, lungs
- L. Transection, aorta
- M. Laceration, right renal artery
- N. Lacerations, liver
- O. Abrasions and lacerations, extremities
- P. Open fractures, right tibia and fibula

II. Other injuries: none
Ill. Natural disease and pre-existing conditions
A. Cerebral edema
B. Mild peripheral atherosclerosis
IV. Toxicology results (chest blood)
A. Ethanol: none detected
B. No other positive findings of toxicological significance

The Nissan sustained a maximum longitudinal Delta-V of -38.5 mph and a maximum lateral Delta-V of -45.4 mph, **which equates to an overall Delta-V of 59.5 mph**. In May 2022, NHTSA (National Highway Traffic Safety Administration, United States Department of Transportation) published a study titled "MAIS(05/08) Injury Probability Curves as Functions of Delta V" (see attached study). In this study, they discuss the meaning of "Delta-V" relative to injury outcomes, as follows:

> "Delta-V has been used to predict injury risk outcome (Gabauer, 2006; Viano, 2010). In 2004, the agency developed a set of injury probability curves when it promulgated the Federal Motor Vehicle Safety Standards No. 138, Tire Pressure Monitoring System (TPMS) (NHTSA, 2004). These injury probability curves were established using the 1995-1999 CDS and for MAIS (93/98), which was the injury scale reported in that period of CDS. The data sample was limited to occupants in crashes where at least one passenger vehicle used the brakes. The model fitting was based on the approach described in the Validation Process (Section 3.5) of this report."

> "The analysis relies on data from 2010-2015 CDS (NHTSA's NASS-CDS coding and editing manuals and analytic user's manuals, NHTSA 2011a, 2011b, 2012a, 2012b, 2013a, 2013b, 14a, 2015a, 2015b, 2016)."

The MAIS+(05/08) Injury Probability Curves (Figures 4-1) are included in this report, from NHTSA's scientific study referenced above, showing the injury probability in all crashes studied as well as frontal crashes studied.




*Figure 4-1. MAIS+(05/08) Injury Probability Curves, All Crashes*

Domonic Adams, Omari Pitts, and Robert Rias all sustained fatal injuries because of the subject collision. The subject Delta-V was 59.5 mph, which results in approximately 65% probability of fatality in all crashes (more likely than not to be fatal).

**Opinions**

1) Based on the Delta-V of 59.5 mph, it was more likely than not (approximately 65% probability in all crashes), that Domonic Adams, Omari Pitts, and Robert Rias would have (and did, in fact) sustain fatal injuries.

2) The fact that Domonic Adams, Omari Pitts, and Robert Rias, were all unrestrained at the time of the collision, significantly increased their likelihood of suffering fatal injuries.

3) There is no physical evidence to indicate that Officer Garcia contributed to the subject incident.

4) The fatal injuries incurred by Domonic Adams, Omari Pitts, and Robert Rias, were a direct result of their actions (e.g. being unrestrained), and the actions of the driver of the Nissan Sentra.

I declare under penalty of perjury under the laws of the United States that the foregoing is an accurate statement of my professional opinions. The opinions and comments formulated in this report are based on observations and information available at the time of the investigation. My opinions, as expressed in this report, are based on my education, career, and relevant experience, as well as my inspections, testing, and the material reviewed. The findings presented in this report are made to a reasonable degree of scientific certainty. I reserve the right to supplement this report and to expand or modify these opinions based on the review of additional material as it becomes available through any further work by me or the review of additional work performed by others.]
Sincerely,

Jesse L. Wobrock, Ph.D.
Accident Reconstruction & Biomechanics, Inc.

**My Curriculum Vitae and fee schedule are attached. My compensation is $595 per hour for case analysis and travel time as well as $1,500 per hour for sworn testimony.**

**Jesse L. Wobrock, Ph.D. – Rule 26 list**

**Depositions (previous 4 years):**

Vanadore v Mayhan Electric, 8/5/22
Lim v Moa, 8/9/22
Weissman v Hendlish, 8/16/22
Hart v Redwood City, 8/26/22
Martinez v Smith, 9/6/2022
Del Moral v Chen, 9/14/22
Knoblach v Allstate, 10/12/22
Fisher v Roberts, 10/13/22
Naranjo v Mora, 10/27/2022
Hovsepyan v Kurbanov, 11/9/22
Vieyra v Macias, 11/15/22
Vieyra v Macias, 11/18/22 Volume 2
Silva v USA, 11/21/22
Fuentes v Trencore, 12/12/22
Ponce v Perez, 12/14/22
Rosas v Zinn Packing Co., 2/3/23
Castro v Loomis, 2/8/23

Larsen v County of Los Angeles, 2/13/23
Hurtado v CHP, 2/23/2023
Perez v Almeida, 4/13/2023
Avalos v Michelin, 4/26/23
Najera v Uber, Volume 1, 5/17/2023
Najera v Uber, Volume 2, 6/1/2023
Konstad v Tibon, 6/28/2023
Ponce v County of Los Angeles, 7/19/23
Black v Chantravat, 8/4/23
Emory v Key Risk Insurance, 8/30/2023
Silva v Slater, 8/31/23
Polk v City of Long Beach, 10/3/2023
Thompson v Bug I'd, 12/21/2023
Milum v All-Star, 2/20/24
Lee v Coleman, Volume 2, 2/28/2024
Aguilar v Afsharkhamseh, 3/11/24
Freeman v King of Joy, 4/10/24
Herrera v COLA, 5/16/24
Park v Costco, 5/30/24
Davila v City of Long Beach, 6/3/24
Chacon v Enercom, 6/20/24
Somo v Villanueva, 6/25/24
Peneloza v The Irvine Company, 7/10/24
Perez v Finn, 7/16/24
Dodds v COLA, 7/17/24
Corredor v Taylor, 7/18/24
Garibay v Castro, 7/29/2024
Zapotitla v COLA, 8/1/24
Rosales v Lopez, 8/21/2024
Sanchez v Liang, ARB&B, 8/23/2024
Otero v City of Stockton, 9/20/24
Williams v COLA, 9/30/2024
Mena v Ma, 10/29/2024
Brockmeir v Fuentes, 11/5/24
Terrell v Vizenor, 11/14/2024
Foshee v USA, 11/25/2024
Cornejo v Dallas, 11/26/2024
Madrid v Saucedo, 12/9/24
Wilson v Pine Wild, 12/17/2024
Acosta v Access Services, 1/2/25
Moyer v AJG Group, 1/9/25
Gonzalez v Save Mart, 1/13/25
Estrada v Kohl's, 1/15/24
Wilson v Pine Wild, 1/29/2025
Sanchez v Sy, 2/27/25
Munoz v Meaur, 2/28/25

Vea v Mike Brown Grandstands, 3/21/25, Volume 1
Vea v Mike Brown Grandstands, 3/24/25, Volume 2
Gomez-Rodriguez v Lopez, 4/25/2025
Meintzer v City of Gilroy, 6/3/25
Murray v Whedbee, 6/13/25, Volume 1
Sarabia v CCP Holdings, 6/16/25
Murray v Whedbee, 6/18/25, Volume 2
Thomas v COLA, 6/23/25
Flores v CDS, 6/25/25
Brockmeier v Fuentes, Volume 2, 8/22/25
Bustos v Bonilla, 9/2/25
Baselyos v Stumbaugh, 9/16/25
Chen v COLA, 10/27/25
Monet v Tesla, 12/5/25
Reyna v Phillips, 1/16/26
Rivas v Woodley Sara Apartments, 1/26/26
Sardarian v Smaldino, 2/13/26
Tong v Castro, 2/25/26
Baselyos v Stumbaugh, 3/31/26, Volume 2
Torreslanda v Fox, 4/2/26
Torreslanda v Fox, Volume 2, 4/10/26
Rivera v IC Refrigeration, 5/7/26
Cyre v AG Transport, 5/8/26
Miller v Dopp, 5/22/26
Cabrera v RES, 5/27/26
Miller v Dopp, Volume 2, 5/29/26
Delgado v City of Portland, 6/8/26
Renteria v MDS, 6/17/26
Mayes v Bayard, Volume 1, 6/18/26,
Zhang v Guzman, Volume 1, 6/19/2026
Walters v Yanez, 6/23/2026
Gomez v AAA, 7/13/26
Baker v R & R, 7/17/2026

**Trials (previous 4 years):**

November 1, 2022 – Montalvan v Myers
February 14, 2023 – Vieyra v Macias
April 5, 2023 – Del Morel v Chen
April 11 & 12, 2023 – Vargas v County of Los Angeles
August 29, 2023 –Konstad v Tibon
September 21, 2023 – Martinez v Parker
October 11 & 13, 2023 – Polk v City of Long Beach
March 13, 2024 – Hurtado v CHP
April 11, 2024 – Milum v All Star
April 17, 2024 – Dawson v Sieber

July 1, 2024 – Park v Costco
July 12, 2024 – Davila v City of Long Beach
September 19, 2024 – Dodds v County of Los Angeles
October 22, 2024 - Hurtado v CHP
January 27, 2025 – Cornejo v Dallas
January 28, 2025 – Williams v County of Los Angeles
March 6, 2025 – Wilson v Pine Wild
March 10, 2025 – Munoz v Meaur
March 20, 2025 – Foshee v USA
March 25, 2025 – Moyer v Wang
April 24, 2025 – Lopez v Gonzalez
April 28, 2025 – Madrid v Saucedo, et al
October 7, 2025 – Sarabia v CCP Holding, et al
October 14, 2025 – Bustos v Bonilla
January 27-28, 2026 – Lee v Coleman
March 2, 2026 – Silva v Slater
March 25, 2026 – Brockmeier v Fuentes
March 27, 2026 – Tong v Castro
May 14, 2026 – Cyre v AG Transport
May 20, 2026 – Torreslanda v Fox
June 4, 2026 – Miller v Dopp
June 16, 2026 – Murray v Whedbee

ARBIO ACCIDENT RECONSTRUCTION & BIOMECHANICS

**SoCal office: 4201 Jamboree Rd. #342, Newport Beach, CA 92660**
**NorCal office: 16346 Valley View Rd, Truckee, CA 93420**
**Phone: 800-587-4858, Email: office@arbio.expert**

# CURRICULUM VITAE

**Jesse L. Wobrock, Ph.D**
Forensic Biomedical/Biomechanical Engineer
and Accident Reconstructionist

## FORMAL EDUCATION

UNIVERSITY OF CALIFORNIA, LOS ANGELES
*Doctor of Philosophy (Ph.D.), Biomedical Engineering*
Emphasis in Biomechanics, Biomaterials and Tissue Engineering
Minor field*: Injury Epidemiology*

CALIFORNIA STATE UNIVERSITY, NORTHRIDGE
*Master of Science (M.S.), Kinesiology – Graduated with Distinction*
Emphasis in Biomechanics

CALIFORNIA STATE UNIVERSITY, NORTHRIDGE
*Bachelor of Science (B.S.), Kinesiology – Cum Laude*
Double Major in Health Science and Kinesiology

CALIFORNIA POLYTECHNIC UNIVERSITY, SAN LUIS OBISPO
*Professional Certificate*
Systems Integration Engineering

STANFORD UNIVERSITY
*Graduate Certificate*
Management Science and Engineering (in progress)

**FORENSIC BIOMECHANICS AND ACCIDENT RECONSTRUCTION CONTINUING PROFESSIONAL EDUCATION**

UNIVERSITY OF CALIFORNIA, LOS ANGELES
UCLA Extension – Los Angeles, CA
Psychology coursework

CALIFORNIA POLYTECHNIC STATE UNIVERSITY - San Luis Obispo, CA
*Graduate School Professional Development*
Coursework: Ethics in Mechanical Engineering

TEXAS A&M UNIVERSITY - El Paso, Texas
*Pedestrian and Bicycle Collision Reconstruction*
Coursework: Analysis and reconstruction of pedestrian and bicycle vs. automobile collisions.

TEXAS A&M UNIVERSITY - Houston, Texas
*Analysis of "Low Speed" Collisions*
Coursework: Analysis, accident reconstruction, biomechanics, and injury mechanisms in low speed automobile collisions.

TEXAS A&M UNIVERSITY – Mesquite, Texas
*Collision Trauma Biomechanics*
Coursework: Injury mechanisms in automobile collisions.

UNIVERSITY OF CALIFORNIA, RIVERSIDE – Riverside, CA
*Computer Assisted Traffic Accident Reconstruction using MathCAD*
Coursework: Accident reconstruction techniques using MathCAD mathematical software.

UNIVERSITY OF CALIFORNIA, RIVERSIDE – Riverside, CA
*Occupant Kinematics and Injury Mechanisms During Motor Vehicle Collisions*
Coursework: Automobile collision biomechanics.

SOCIETY OF AUTOMOTIVE ENGINEERS – Davis, CA
*Motor Vehicle Accident Reconstruction*
Coursework: Motor vehicle accident reconstruction and cause analysis.

TNO MADYMO North America – Livonia, MI
*MADYMO 6.1 Introductory Training*
Coursework: Education and training regarding modeling applications using MADYMO 6.1.

TNO MADYMO North America – Livonia, MI
*MADYMO 6.0 Introductory Training*
Coursework: Education and training regarding modeling applications using MADYMO 6.0.

VERICOM TRAINING COURSE – Temecula, CA
*Traffic Crash Investigation*
Coursework: Acceleration and Vericom computer familiarization for traffic accident investigation.

ARAS 360 – Kamloops, BC, Canada
*ARAS HD Upgrade: What's New in HD*
Coursework: Training for ARAS 360 Software HD Upgrade

ARAS 360 – Kamloops, BC, Canada
*ARAS HD for Crash Reconstruction*
Coursework: Training for ARAS 360 Software Crash Reconstruction

ENGINEERING DYNAMICS CORPORATION – Northridge, CA
*EDC Simulation*
Coursework: Application and physics-based education and instruction for computer simulations in accident reconstruction.

ENGINEERING DYNAMICS CORPORATION – Northridge, CA
*EDC Reconstruction*
Coursework: Application and physics-based education and instruction for accident reconstruction.

NORTHWESTERN UNIVERSITY TRAFFIC INSTITUTE – Evanston, IL
*Traffic Accident Investigation*
Coursework: Instruction regarding investigation and evaluation of traffic accidents.

CALIFORNIA ASSOCIATION OF ACCIDENT RECONSTRUCTION SPECIALISTS
*Sixth Annual CA2RS Training Conference*
Coursework: Motorcycle investigation and reconstruction.

CALIFORNIA ASSOCIATION OF ACCIDENT RECONSTRUCTION SPECIALISTS
*2006 Fall Crash Training Conference – Crash Reconstruction, Start to Finish*
Coursework: Accident Reconstruction Training

CALIFORNIA ASSOCIATION OF ACCIDENT RECONSTRUCTION SPECIALISTS
*2010 Investigation and Analysis of Rollover Collisions*
Coursework: Rollover Accident Reconstruction Training

AMERICAN BACK SOCIETY & St. MARY'S MEDICAL CENTER
*Advanced Diagnosis and Treatment for Neck & Back Pain*
Coursework: Medical topics in neck and back treatment and injuries

## CRIME SCENE AND SHOOTING RECONSTRUCTION CONTINUING PROFESSIONAL EDUCATION

WEST VIRGINIA UNIVERSITY – Morgantown, WV
*Shooting Reconstruction*
Coursework: Evaluating, interpreting, and reconstructing a shooting scene

WEST VIRGINIA UNIVERSITY – Morgantown, WV
*Crime Scene Investigation*
Coursework: Assessment, observation, documentation, search, collection, and analysis are all integral parts to a crime scene investigation

WEST VIRGINIA UNIVERSITY – Morgantown, WV
*Introduction to Firearms and Toolmarks*
Coursework: The history of firearm and ammunition development, classification of firearms and ammunition components, test firing, proper methods of evidence collection, laboratory testing, microscopic identification, and much more

WEST VIRGINIA UNIVERSITY – Morgantown, WV
*Introduction to Bloodstain Pattern Analysis*
Coursework: Background information and techniques necessary in performing bloodstain analyses

FORENSIC SCIENCE CONSULTANTS – San Diego, CA
Instructor Michael Haag
*Shooting Scene Reconstruction*
Coursework: Evaluating, interpreting, and reconstructing a shooting scene

ARAS 360 – Kamloops, BC, Canada
*ARAS HD CSI for Crime Scene Reconstruction*
Coursework: Training for ARAS 360 Software for Crime Scene Reconstruction

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| March '05-<br>Present | **Accident Reconstruction & Biomechanics, Inc.**<br>Newport Beach, CA & Truckee, CA<br>**President**<br>Reconstruction and biomechanical analysis of accidents, collisions, and injuries. Case retention examples include but are not limited to wrongful death, product liability, railway matters, maritime accidents, catastrophic injuries, homicide, criminal matters, slip/trip and falls, falls from heights, premises liability, human factors issues, pediatric injuries, industrial accidents, gun shots and trajectory analysis, aviation accidents, law enforcement, fireworks accidents, high and low speed vehicle collisions, pedestrian collisions, tractor-trailer collisions, motorcycle collisions, bicycle collisions, and helmet/protective equipment issues. |

October '20- Dec '22

**Executive Strategy Council, Orange Lutheran High School**
Orange, CA
Focus on:

- Strategic challenges and opportunities, plans
- Financials, long term growth and sustainability
- Long term investments, capital needs
- Special projects, growth opportunities, technology
- Growing OLU's development efforts, endowments

March '10- March '17

**Arroyo Grande Community Hospital Foundation**
Arroyo Grande, CA
**Hospital Foundation Board Member (Volunteer)**
**Our Mission: "**The Promise of healthcare philanthropy is the ability to change lives and the power to saves lives. The Arroyo Grande Community Hospital Foundation Board of Directors develops the resources that help keep and expand that promise to the people by assisting the hospital in fulfilling its mission, adhering to its core values, and providing medical services to all in our community.

March '04- Feb '05

**Biomechanics Engineering Accident Reconstruction**
Davis, Sherman Oaks, San Diego, CA
**Associate Biomechanics and Accident Reconstruction Consultant**
Accident reconstruction and biomechanical engineering analysis of injury causing accidents.

Sep '03- Sep '04

**Society of Automotive Engineers**
Detroit, MI
**Scientific Publication Reviewer (Volunteer)**
Volunteer reviewer of scientific research publications pertaining to accident reconstruction and forensic biomechanics.

Jan '03- April '04

**Head Protection Research Laboratory**
Paramount, CA
**Biomechanist/Data Analyst**
Research regarding select biomechanical topics in relation to motorcycle crashes and motorcycle helmets.

Jan '03- Feb '04

**Roger Clark Associates**
Paramount, CA
**Biomechanics and Accident Reconstruction Consultant**
Accident reconstruction and biomechanical engineering analysis of injury causing accidents.

| | |
|---|---|
| Jan '03-<br>April '03 | **University of California, Los Angeles**<br>Los Angeles, CA<br>**Graduate Student Researcher**<br>Researcher in the department of Biomedical Engineering with emphasis on biomechanical topics. |
| Jan '00 –<br>Dec '02 | **Accident Research and Biomechanics**<br>Valencia, CA<br>**Research Associate**<br>Accident reconstruction and biomechanical engineering analysis of injury causing accidents. |
| Jan '01-<br>Dec '01 | **California State University, Northridge**<br>Northridge, CA<br>**Part-time Faculty – Graduate Teaching Assistant**<br>Instructor of biomechanics laboratory, which is an undergraduate upper division course. |
| Aug '98-<br>Jan '00 | **Los Robles Regional Medical Center**<br>Thousand Oaks, CA<br>**Physical Therapy Technician**<br>Application of therapeutic modalities, assisted and observed patient assessments and evaluations, coached patients through exercise programs, wound care, patient education, and patient ambulation assistance. |

## TESTIMONY VENUE EXAMPLES

Qualified and testified as an accident reconstructionist and/or forensic biomechanical engineering expert in civil, criminal, and federal venues.

Approximately 600 trial, arbitration, and deposition testimonies.

- Los Angeles County Superior Court, CA
- Fresno County Superior Court, CA
- Tulare County Superior Court, CA
- San Francisco County Superior Court, CA
- Orange County Superior Court, CA
- Sonoma County Superior Court, CA
- Butte County Superior Court, CA
- Merced County Superior Court, CA
- Solano County Superior Court, CA
- Santa Barbara County Superior Court, CA
- San Luis Obispo County Superior Court, CA
- Stanislaus County Superior Court, CA
- Riverside County Superior Court, CA
- San Bernardino County Superior Court, CA

- Kern County Superior Court, CA
- Alameda County Superior Court, CA
- Santa Clara County Superior Court, CA
- Ventura County Superior Court, CA
- Shasta County Superior Court, CA
- San Diego County Superior Court, CA
- Sacramento County Superior Court, CA
- El Dorado County Superior Court, CA
- Sutter County Superior Court, CA
- San Joaquin County Superior Court, CA
- Multnomah County District Court, OR
- Wake County Superior Court, NC
- Clark County Superior Court, NV
- Washoe County Superior Court, NV
- Douglas County Superior Court, NV
- Maricopa County Superior Court, AZ
- Waukesha County Superior Court, WI
- Cook County Superior Court, Ill
- Darlington County Superior Court, SC
- Broward County Judicial Circuit Court, FL
- Monmouth County Superior Court, NJ
- Ector County 161st Judicial District, TX
- Third Judicial District, Superior Court for the State of Alaska
- Edmund D. Edelman Children's Court, Monterey Park, CA
- United States District Court for the Eastern District of California, Fresno, CA
- United States District Court for the Eastern District of California, Sacramento, CA
- United States District Court for the Central District of California, Los Angeles, CA
- United States District Court for the Central District of California, Riverside, CA
- United States District Court for the District of South Dakota, Pierre, SD
- United States District Court for the District of Oregon, Portland, OR
- Internal Affairs Board of Rights of the City of Los Angeles Police Department (LAPD)
- California DMV Hearings

Previously retained as an expert in California, Alaska, North Carolina, Nevada, Washington, Oregon, Arizona, Florida, Texas, Michigan, Wisconsin, South Carolina, Indiana, Missouri, South Dakota, and British Columbia (Canada), Mexico, among others.

## PROFESSIONAL CERTIFICATIONS (PAST AND PRESENT)

- Accreditation Commission for Traffic Accident Reconstruction (ACTAR #1594)
- CXLT Certification (Excel Tribometers, LLC)

## RECONSTRUCTION SOFTWARE PROGRAM EXPERIENCE

- MADYMO (MAthamatical DYnamic MOdels)
- PC-CRASH
- AutoCAD
- MAYA
- Photomodeler
- HVE (Human, Vehicle, Environment)
- ARAS HD
- ARAS Blitz
- ARAS Genius
- Fotex

## PROFESSIONAL ASSOCIATIONS (PAST AND PRESENT)

- American Mensa
- UCLA Alumni Association
- American Society for Testing and Materials (ASTM)
- Institute of Transportation Engineers (ITE)
- Accreditation Commission for Traffic Accident Reconstruction (ACTAR)
- California Association of Accident Reconstruction Specialists (CAARS)
- American Society of Mechanical Engineers (ASME)
- National Association of Traffic Accident Reconstructionists and Investigators (NATARI)
- Association for the Advancement of Automotive Medicine (AAAM)
- Society of Automotive Engineers (SAE)
- American Society of Biomechanics (ASB)
- International Society of Biomechanics (ISB)
- National Association of Railroad Safety Consultants and Investigators (NARSCI)

## PROFESSIONAL ACTIVITIES AND PRESENTATIONS

Professional and educational (MCLE) presentation to law firms (plaintiff and defense), insurance companies, national organizations, and international organizations.

Colleges of Law
Santa Barbara and Ventura, CA – June 2016
Guest Lecturer re: Expert Witnesses in Accident Reconstruction and Biomechanics

ASME Joint Rail Conference (JRC)
Pueblo, Colorado – March 2011

ASTM International
Meeting on Sports Equipment and Facilities
San Antonio, TX – November 2010

CAARS Quarterly Training Conference
Roseville, CA – May 2010
Speaker - Accident Reconstruction and Biomechanical Analysis of Pedestrian Collisions

CAARS Quarterly Training Conference
Riverside, CA – May 2010
Speaker - Accident Reconstruction and Biomechanical Analysis of Pedestrian Collisions

Crashteams Nation Conference
Las Vegas, NV – March 2010
Speaker – Injury Mechanisms and Injury Severity

American Board of Trial Advocates (ABOTA) – California Coast Chapter
Masters in Cross Examination Seminar – October 2009
Speaker – Accident Reconstruction Expert

27th Annual Injuries in Baseball Course
American Sports Medicine Institute
Houston, Texas – January 2009

American Back Society & St. Mary's Medical Center
Advanced Diagnosis and Treatment for Neck & Back Pain
Speaker – Las Vegas, Nevada – June 2007

2006 International IRCOBI Conference on the Biomechanics of Impact
Sponsored by International Research Council on the Biomechanics of Impact
Speaker-Madrid, Spain – September 2006

31st International Workshop on Human Subjects for Biomechanical Research
Sponsored by NHTSA
San Diego, CA – October 2003

47th Stapp Car Crash Conference
Sponsored by the Stapp Organization
San Diego, CA – October 2003

International Whiplash Trauma Congress
Sponsored by Spinal Injury Foundation
Denver, Colorado – October 2003

2003 International IRCOBI Conference on the Biomechanics of Impact
Sponsored by International Research Council on the Biomechanics of Impact
Lisbon, Portugal – September 2003

47th AAAM Annual Scientific Conference
Sponsored by the Association for the Advancement of Automotive Medicine
Speaker - Lisbon, Portugal – September 2003

Southern California Conference on Biomechanics
Sponsored by Pepperdine University
Speaker - Malibu, CA – March 2003

CSUN Student Research and Creative Works Symposium
Sponsored by CSUN
Speaker - Los Angeles, CA – November 2002

Technologies Shaping the Future
Sponsored by UCLA
Los Angeles, CA – October 2002

Southern California Tissue Engineering Symposium
Sponsored by UCLA Biomedical Engineering Society
Los Angeles, CA – September 2002

TRB 81st Annual Meeting
Sponsored by Transportation Research Board
Speaker - Washington, D.C. – January 2002

American Society of Biomechanics Annual Conference
Sponsored by American Society of Biomechanics
San Diego, CA – August 2001

SAE World Congress
Sponsored by Society of Automotive Engineers
Speaker - Detroit, MI – March 2001

Clinical Seminar in Sports Medicine, “New Approaches to Disorders of the Spine”
Sponsored by California State University, Northridge.
Northridge, CA - March 2000

Motorsports Safety – Presented by John Melvin, Ph.D.
Sponsored by the Society of Automotive Engineers
San Luis Obispo, CA – February 2000

SWACSM Annual Conference
Sponsored by Southwest American College of Sports Medicine
San Jose, CA – November 1999

Participant and/or human volunteer in “low speed” rear, lateral, frontal, and underride/override impact crash tests.

Participant in pedestrian dummy and bicycle vs. automobile crash tests.

**AWARDS**

- Young Investigator Award - Association for the Advancement of Automotive Medicine (AAAM) 47th Annual Scientific Conference
- CSUN Student Research and Creative Works Symposium - 1st Place Award for College of Health and Human Development
- American Society of Biomechanics - 2002 Student Travel Award
- Graduate Student Researcher Award - Winter Quarter 2002, UCLA

**PATENTS**

January 9, 2018: Wobrock 9,866,741

February 25, 2020: Wobrock 10,574,873

July 13, 2021: Wobrock 11,064,101

October 3, 2023: Wobrock 11,778,303

March 17, 2026: Wobrock 12,581,180

Patent pending: Application #19/550,825

**PUBLICATIONS**

Many professional and educational (MCLE) presentations to large law firms, insurance companies, national organizations, and international organizations.

UCLA Graduate Quarterly, Spring 2005. *Graduate Student Profile - Jesse Wobrock, Biomedical Engineering.* Written by Jacqueline Tasch.

Motorcycle Consumer News, July 2006. *Dangerous Design? Read this and you'll never look at a motorcycle the same way again.* Written by Wendy Moon.

Wobrock, JL, Mal, A, Kraus, J, and Wu, B (2006). Pelvic Injury Potential and Motorcycle Gas Tanks. 2006 International IRCOBI Conference on the Biomechanics of Impact.

Wobrock, JL (2005). MADYMO Simulation, Reconstruction, and Biomechanical Analysis of Motorcycle Crashes. University of California, Los Angles – Ph.D. Dissertation.

Wobrock, JL (2002). Head Impacts and Injury Potential in Motorcycle Collisions. California State University, Northridge - Master Thesis.

Wobrock, J., Fugger, T., Randles, B. and Vrongistinos, K (2002). Vibrations Experienced by Wheelchair Users While Traversing Decorative Crosswalks. World Congress of Biomechanics, 2002 Annual Conference Proceedings, 2002.

Wobrock, JL, Smith, T, Kasantikul, V, and Whiting, B (2003). Effectiveness of Collision-Involved Motorcycle Helmets in Thailand. 47th Annual Conference Proceedings for Association for the Advancement of Automotive Medicine.

Fugger, TF, Wobrock, JL, Randles, BC, Stein, AC, and Whiting, WC (2001). Driver Characteristics at Signal-Controlled Intersections. Society of Automotive Engineers, Paper No. 2001-01-0045

Fugger, TF, Randles, BC, Wobrock, JL, Welcher, JB, Voss, DP, and Eubanks, JJ (2002). Human Occupant Kinematics in Low Speed Side Impacts. Society of Automotive Engineers, Paper No. 2002-01-0020.

Fugger, TF, Randles, BC, Wobrock, JL, and Eubanks, JJ (2002). Pedestrian Throw Kinematics in Forward Projection Collisions. Society of Automotive Engineers, Paper No. 2002-01-0019.

Fugger, TF, Randles, BC, Wobrock, JL, Stein, AC, and Whiting, WC (2001). Pedestrian Behavior at Signal-Controlled Crosswalks. Society of Automotive Engineers, Paper No. 2001-01-0896.

Fugger, TF, Randles, BC, Wobrock, JL, and Eubanks, JJ (2001). An Analysis of Pedestrian Dummy Throw Characteristics for Forward Projection Pedestrian Collisions (published abstract). International Research Council on the Biomechanics of Impact (IRCOBI).

Fugger, TF, Randles, BC, Wobrock, JL, Stein, AC, Whiting, WC, and Gallagher, B (2001). Analysis of Elderly Pedestrian Gait and Perception/Reaction at Signal-Controlled Crosswalk Intersections. Transportation Research Board Annual Conference Proceedings.

ARBIO ACCIDENT RECONSTRUCTION & BIOMECHANICS

**SoCal office: 4201 Jamboree Rd. #342, Newport Beach, CA 92660**
**NorCal office: 16346 Valley View Rd, Truckee, CA 93420**
**Phone: 800-587-4858, Email: office@arbio.expert**

**Fee Schedule**

| | |
|---|---|
| One-time document handling, organization, case initiation, expert designation/retention fee: | $1,000 |
| Clerical and animation: | $250/hr |
| Draftsman/architect, scaled drawings: | $350/hr |
| **Accident Reconstruction and Biomechanics research and analysis** Including but not limited to document review, deposition summary, calculations, research, travel time, pc-crash analysis, etc.: | $595/hr |
| Testimony time **(recorded or not)**: | |
| Deposition (**Payment must be received the calendar day before remote depositions, i.e., the attorney taking the deposition testimony will tender the expert's deposition fee prior to commencement of the deposition, pursuant to *Code of Civil Procedure*, section 2034.450**…. 1-hr minimum w/cancellation fee if less than 24-hour notice): | $1,500/hr |
| Trial/Arbitration/Mediation (including waiting and meeting time): Half-day is 0 to 4 hours long, Full-day is 4 to 8 hours long | $6,000/half-day $12,000/full-day |
| Retainer (case dependent): | $10,000 minimum |
| Related expenses (e.g. subcontractors, lodging, flight, etc.): | Cost +25% |
| Mileage reimbursement (due to CA fees and taxes): | $2.00 per mile |
| Late fees for invoices not paid within 30 days: | 2.5% monthly |

- **All fees are subject to change without notice.**
- **By accepting this fee schedule and hiring Dr. Wobrock and/or Accident Reconstruction & Biomechanics (ARBIO), you are agreeing to pay for all fees related to your case as outlined above and all fees related to collection of delinquent charges, including but not limited to legal representation and professional time exhausted to collect outstanding debts. Dr. Wobrock and/or Accident Reconstruction & Biomechanics are independent and impartial. Payment of all related fees is not subject to any case outcome, result, and/or award.**
- **Regular business hours are 9 am to 5 pm, Monday through Friday. Formally scheduled events (phone conferences, depositions, inspections, etc.) will be billed at double-time if scheduled after regular business hours, weekends, or holidays.**
- **Travel time is billed from Dr. Wobrock's physical location.**
- **All outstanding invoices must be paid prior to any deposition, arbitration and/or trial testimony by Dr. Wobrock. Additional retainers may be required, depending on the course and scope of the requested work as well as dependent on the client's past payment (or lack thereof) history.**
- **Receipt of case materials, signed retainer agreement, and retainer fees are required prior to expert designation. Expert designation is strictly prohibited without the explicit written permission of Dr. Wobrock and/or ARBIO. If expert is designated without receipt of required case materials, the entire retainer amount is forfeited and becomes non-refundable.**