# Diana Rias et al. v. City of Fontana et al.

## United States District Court – Central District of California
## Consolidated Case No. 5:25-cv-207-JGB-SHK

## Expert Witness Report of Jeffrey A. Martin, J.D., M.S., C.F.V.T.

### IDENTIFICATION AND QUALIFICATIONS

My full name is Jeffrey Alan Martin. I am a retired police sergeant from the San Jose, California, Police Department. I currently divide my time between consulting, expert witness services, and teaching. I am a former labor relations attorney whose practice focuses on representing public safety personnel in administrative matters. I also authored "Daily Training Bulletins" on various police practices, including use of force, for Lexipol, L.L.C. In that capacity, I regularly applied policy, legal, and other police practices concepts to fact patterns to determine whether the presented conduct would likely be deemed within policy.

I began my full-time law enforcement career as an officer with the San Francisco Bay Area Rapid Transit District (BART) Police Department, serving from October 1981 to December 1984. While there, I worked on uniformed and plainclothes patrol assignments and served as a collateral-duty baton instructor. After starting my tenure at the San Jose Police Department, I was promoted to sergeant in 1995. I worked in the Patrol Division, the Administrative Unit of the Bureau of Field Operations as the Training Coordinator, the Airport Division, and as a supervisor in the Training Division. As an officer and supervisor, I have responded to many in-progress incidents that required rapid task identification and prioritization, personnel deployment, and securing additional resources. I have also responded to and investigated several non-deadly use-of-force incidents as a patrol supervisor.

As an officer, my assignments included the Patrol Division, the Parks Enforcement Unit, the Field Training Officer Program, and, as an investigator, the Narcotics/Covert Investigations (NCI) Unit.

The opinions or non-opinion information in this report are based on the identification of issues related to the human factors commonly at play in officer-involved shootings. Generally, "human factors" refers to the application of the widely accepted science of human capabilities and limitations in interaction with the environment.[1] Human factors is categorized as "cognitive ergonomics," which studies and applies human information processing, including perception, memory, response time, and attention.[2] "physical ergonomics," which studies and applies how people physically interact with their tools and their environments;[3] and "macro-ergonomics,"

[1] "What is Human Factors and Ergonomics?" n.d. https://www.hfes.org/About/What-Is-Human-Factors-and-Ergonomics.
[2] APA Dictionary of Psychology. n.d. https://dictionary.apa.org/cognitive-ergonomics.
[3] "The Difference Between Physical Ergonomics, Cognitive Ergonomics, and Macroergonomics | Center for Occupational and Environmental Health." n.d. https://www.coeh.berkeley.edu/news/difference-between-physical-ergonomics-cognitive-ergonomics-and-macroergonomics#:~:text=Physical%20ergonomics%20Escortes%20on%20injury,reduce%20quality%20issues%20and%20error.

which studies and applies how people interact with one another in teams and within organizations, with "crew resource management" as an example.[4] Forensic human factors addresses "the application of human factors knowledge and techniques to 'standards of care' and accountability established within the legislative, regulatory, and judicial systems."[5]

It should be noted that, because this incident occurred in an open (uncontrolled) environment, it was not practical to obtain precise measurements of distances or replication of lines of sight. Additionally, the subjective experiences of the involved officers during the event cannot be recreated.

The principles applied are grounded in peer-reviewed research and widely accepted in the field. However, the retrospective application of such principles to a specific individual's perception necessarily involves some degree of uncertainty. It does not provide a determination of what the involved officers actually perceived or how they processed the event.

My qualifications to develop and present opinions, or to provide informational framework testimony regarding **human factors**, include:

**<u>Formal education in Human Factors:</u>**

- Master of Science in Psychology with an Emphasis on Human Factors Psychology – Grand Canyon University (2023). Graduate-level program specializing in human factors psychology, including social and cultural psychology, research methods, and statistics (continuation from graduate certificate).
- Graduate Certificate in Human Factors Psychology – Grand Canyon University (2017). Graduate-level program specializing in human factors psychology, including sensation and perception, cognition, and general human factors theories and principles.
- Human Factors and Ergonomics – San Jose State University (2015). Graduate-level survey course in human factors and ergonomics.
- Bachelor of Arts in Psychology – California State University at Hayward (now "East Bay") (1981). Undergraduate study in general psychology.

**<u>Professional Associations and Participation/Presentations</u>:**

- Member of the Human Factors and Ergonomics Society (HFES) and active membership in the Forensic Professionals Technical Group (FPTG).
- Presented at four of the annual meetings (2016, 2018, 2020, and 2023), accompanied by peer-reviewed proceedings papers, with three on the topics of how officers interacted with their firearms during critical incidents.

---

[4] "What Is Ergonomics (HFE)? | International Ergonomics Association." n.d. https://iea.cc/about/what-is-ergonomics/.

[5] https://www.hfes.org/Groups-Communities/Technical-Groups

- Served as the FPTG Program Chair for the 2023 and 2024 annual meetings, recruiting the reviewers for submissions, managing the submission, review, and approval process, and facilitating the FPTG presentations.
- Annual Reserve Peace Officers Conference (2025). "Case Studies in Applied Human Factors." Four-hour presentation of four case studies where human factors analysis was critical in exonerating peace officers in criminal and administrative matters.
- Served as a proposal & proceedings paper peer reviewer for the 2024, 2025, and 2026 annual meetings.
- Various conference and special presentations, including "A Potential Case of Change Blindness in an Officer-Involved Moving-Vehicle Shooting" (PORAC LDF Symposium, 2023, Force Science Conference, 2022; "Eyewitness Dynamics for Events," San Diego County Office of County Counsel, 2021; San Diego County District Attorney's Office, 2019; "Human Factors for the Crime Scene Investigator," Santa Clara County Crime Laboratory, 2016; "Human Factors" and "Eyewitness Dynamics," California Highway Patrol – Critical Incident Investigations Team, 2015).

**Publications:** I have 8 peer-reviewed publications, 7 of which address human factors issues, and some of my work has been cited by other authors. All my publications are listed in my attached CV.

**Ongoing Teaching in Human Factors:**

- California Commission on Peace Officer Standards and Training – Robert Presley Institute for Criminal Investigation: "Officer-Involved Shooting Investigations." Recruited in 2012 to design and deliver a three-to-four-hour block of instruction on fundamental human factors commonly at issue in Patrolman-involved shootings. I have presented the block of instruction approximately 75 times throughout the State of California.
- International Homicide Investigators Association – "Officer-Involved Critical Incident Investigations." Designed and delivered a four-hour block of instruction on fundamental human factors commonly at issue in officer-involved shootings and other incidents. I have presented this course five times since 2024.

**Prior Testimony:** I have testified on human factors in 12 state criminal court trials or hearings and once in federal court. All testimony given over the past four years is listed at the back of my attached CV.

My qualifications to **forensically prepare, examine, and interpret video evidence** consist of over 200 hours of training and include:

**Formal Training in Forensic Video Analysis:**

- "Level 1: Forensic Video Analysis & the Law" (2021), provided by the Law Enforcement & Emergency Services Video Association, International (LEVA).
- "Level 2: Digital Multimedia Evidence Processing" (2021), provided by LEVA, completion of which awarded certification as a "Certified Forensic Video Technician."
- Several other forensic video training courses, including the identification of firearm dischargers in audio and video evidence, are listed in my CV.

**Professional Associations and Participation/Presentations:**

- Member of LEVA.
- "Video in Litigation," presented at the 2025 Annual Conference for the Institute for the Prevention of In-Custody Deaths.
- "Forensic Video and Its Role in the I.A. Investigation," presented at the 2024 Advanced Public Safety/Significant Events Internal Investigations and Discipline Seminar by Americans for Effective Law Enforcement.
- "Video Evidence: What Did I Just See," presented in 2024 for the San Bernardino Police Department Homicide Division.
- "Pros and Cons of Relying on In-house Subject-Matter Experts/What does it mean to 'watch' BWC video?" (2023). Presented at the 29th Annual Training Symposium of the International Association of Homicide Investigators - Leadership/Management Breakout.
- "Video Evidence: What Did I Just See?" (2022). Presented at the 28th Annual Training Symposium of the International Association of Homicide Investigators.
- "Things Can Be Deceiving, Especially on Video." (2022) Co-presented at the PORAC LDF Member Conference.

**Publication:**

- "Assumed Realism": What is it and what does it mean for law enforcement? (2019) *CalibrePress.com*. https://calibrepress.com/2019/09/assumed-realism/

**Ongoing Teaching in Forensic Video Analysis:**

- International Homicide Investigators Association – "Officer-Involved Critical Incident Investigations." Designed and delivered a four-hour block of instruction on the fundamentals of forensic video evidence, including bandwidth factors and illusory effects. I have presented this course five times since 2024.

**Prior Testimony:**

- I have testified regarding digital video analysis and demonstrative video exhibits that I prepared in 11 California Superior Court hearings and trials, 1 Georgia Superior Court hearing, and 1 federal court trial.

My qualifications to evaluate **police vehicle pursuits include:**

**Practical Experience:**

- I have engaged in or participated in pursuits while driving marked patrol cars, marked sport utility vehicles, and unmarked cars, some of which have resulted in the use of high-risk vehicle stop tactics.
- I have supervised and documented police pursuits, some of which have involved the application of high-risk vehicle tactics.
- While working as the Bureau of Field Operations Training Coordinator, I reviewed and evaluated pursuits for policy compliance on behalf of the deputy chief.
- I have consulted with other supervisors and command officers regarding pursuits in evaluating policy compliance.

**Specialized Training:**

- I am a California P.O.S.T.-certified LEDS instructor.
- I am a California P.O.S.T.-certified "Emergency Vehicle Operations Course" (EVOC) instructor.
- I am a California P.O.S.T.-certified "Driver Awareness" instructor.
- Completed an eight-hour Pursuit Intervention Technique course provided by the Oakland Police Department

**Research and Publication:**

- I have conducted limited research regarding supervisory response times and the driving behavior of violators after pursuits have been terminated;
- I have authored three articles on pursuit decision-making and pursuit termination, two of which have been cited by other authors and researchers.[6]

**Pursuit-Policy & Decision-Making Instruction:**

---

[6] "Pursuit Termination: A Lifesaver?" was cited by Schultz, Hudak & Alpert (March 2010) in "Evidence-Based Decisions on Police Pursuits: The Officer's Perspective," in *FBI Law Enforcement Bulletin* and in the COPS/USDOJ-PERF Publication, Vehicular Pursuits: A Guide for Law Enforcement Executives on Managing the Associated Risks, (2003). "3QFC Pursuit Decision Making Model" was cited by Hoffman (2003) in Queensland Crime and Misconduct Commission Publication, *Police Pursuits: A Law Enforcement and Public Safety Issue for Queensland,* in the COPS/USDOJ-PERF publication listed *supra,* and by Uribe (2009), *EVOC Training for Police Officers,* a master's thesis.

- I researched and developed an eight-hour course on "Pursuit Decision Making" and delivered it in eight states.
- My pursuit decision-making course was also offered in a computer-based format by The Backup, Inc.
- I was a featured subject-matter expert (SME) in the training video "Police Pursuit Driving," published by Performance Dimensions.
- I have delivered EVOC instruction to members of the San Jose Police Department.
- I rewrote the pursuit policy of the San Jose Police Department in 2007;
- I designed the updated pursuit policy training, trained other instructors, and delivered it to the bulk of the sworn members of the San Jose Police Department.
- During my work for Lexipol, I drafted approximately 200 "Daily-Training Bulletins" that presented real-world or hypothetical situations to determine whether peace officer conduct would comply with various policies, including the pursuit policy, from 2009 through 2013.
- I have taught high-risk vehicle tactics to active peace officers in California.

**<u>Professional Contributions</u>:**

- I was a subject-matter-expert member of the *California Law Enforcement Vehicle Pursuit Guidelines* revision committees in both 2007 and 2020 (to comply with S.B. 719).
- I was a featured SME in the P.O.S.T. Telecourse "California Law Enforcement Vehicle Pursuit."
- I was a member of the Vehicle Operations Training Committee, a subcommittee of the California P.O.S.T. SAFE Driving Campaign.

**<u>Prior Testimony</u>:** I have testified on pursuit-related matters one time in a state criminal court trial. All testimony given over the past four years is listed at the back of my attached CV.

My qualifications regarding **the use of force by peace officers** include:

**<u>Practical Experience</u>:**

- During my 28-year career, I employed various tools and techniques to control subjects in field situations, including batons, chemical agents (CS and OC sprays), the TASER®, extended-range impact munitions, maximum restraints, and non-lethal measures such as control holds, takedowns, neck restraints, and deescalation approaches.
- As a supervisor, I have responded to, investigated, and documented

several use-of-force incidents.

**Specialized Training:**

- I have had specialized instructor-level training in firearms, TASERs, batons, defensive tactics, OC spray, and deescalation methods, as fully listed in my CV.
- I have attended specialized training on investigating officer-involved shootings and use of force incidents, as fully listed in my CV.

**Instruction:**

- I am currently an instructor in the California Commission on Peace Officer Standards and Training (POST) Institute for Criminal Investigations (ICI) course, "Officer-Involved Shooting and Death Investigations" (OISI), where I teach "Lawful Force."
- I teach the Officer-Involved Critical Investigations course for the International Homicide Investigators Association. I developed and delivered the sections on use-of-force law.
- I taught use-of-force investigation and documentation in the POST Supervisor School for the South Bay Regional Public Safety Training Consortium and the San Jose Police Department Night Detective Academy.
- As a supervisor in the Training Division at the San Jose Police Department (2005-2009), I oversaw the POST-FOS program, implemented in 1999 to meet POST "perishable skills" requirements. In this program, my staff and I delivered this training to sworn members of the San Jose Police Department and other peace officers in Santa Clara County. Additionally, our facility was designated as a "regional skills training center." We provided instructor training to others throughout California.
- I served as a defensive tactics and arrest-and-control instructor at the Basic Academy of the South Bay Regional Public Safety Training Consortium.
- I served as the firearms instructor for the NCI Unit during my tenure there.
- While in the training unit, I supervised and taught classes in defensive tactics, TASER, and tactics.

**Professional Associations:**

- I am an active member of the California Force Instructors Association and the International Association of Chiefs of Police – Legal Officers Section.

**Publications:**

- I have approximately 16 articles published in law enforcement

magazines and newsletters.

- Five of my peer-reviewed publications involve use-of-force issues.

**<u>Prior Testimony</u>:** I have testified regarding the use of force in 15 state criminal court trials and hearings and four federal court trials.

My qualifications to develop and present opinions, or to provide informational framework testimony regarding **municipal liability and how and when law enforcement agencies initiate internal/administrative investigations and address and remedy less-than-optimal performance or misconduct**, include:

**<u>Practical Experience</u>:**

- I spent the last 15 years of my career as a first-line supervisor and had occasions to take corrective action for performance failures or deficiencies of the personnel I supervised. This included reporting and investigating misconduct and providing informal counseling and coaching, depending upon the nature of the performance issues.
- I also spent one year as a labor representative. I represented SJPD members in internal affairs interviews and reviewed investigative and disciplinary packages, including those addressed by the SJPD Disciplinary Review Panel.
- I spent approximately five years as a labor-relations attorney for public safety personnel, representing peace officers at all stages of the disciplinary process, including the investigative, pre-disciplinary, and post-disciplinary stages, and becoming familiar with the approaches taken by different agencies and executives in addressing suspected or confirmed performance issues or misconduct.
- I continue to review and analyze internal investigations and disciplinary processes in California and other states in my current role as expert witness and consultant. I have also reviewed and addressed disciplinary actions in Nebraska, Nevada, and Louisiana.

**<u>Specialized Training</u>:**

- I have received specialized training in supervision, including the California POST 80-hour Supervisors Course as well as the Supervisors In-House Academy, provided by the San Jose Police Department. Both courses addressed the disciplinary process, as well as counseling and coaching personnel.
- As a supervisor in the Training Unit, I was responsible for overseeing and planning remedial training for personnel regarding driving performance issues.

**Professional Associations:**

- I am an active member of the International Association of Chiefs of Police – Legal Officers Section.

My curriculum vitae is attached as Appendix D.

The facts, data, and widely accepted principles reflected in this report are based upon the following:

1. My education, personal experiences, and training.

2. The scope of my expertise encompasses how these areas relate to peace officers' interactions with perceptions typically perceived as threatening, attention, and decision-making in light of their training and experience, as well as forensic video analysis.

3. My analysis is similar to that of other experts in the field, i.e., based on the widely accepted human factors principles.

4. My understanding of the facts of this case.

5. I recognize that there may be factors or evidence that either support, do not support, or neutralize my opinions or informational framework.

6. I may have drawn conclusions based on certain assumptions.

## COMPENSATION

I am charging $375.00 per hour for work and $475.00 per hour for testimony either at deposition or at trial. My full fee agreement is attached as Appendix E.

## METHODOLOGY, DATA, AND OTHER INFORMATION CONSIDERED WHEN FORMING OPINIONS

The methodological approach in forming my opinions and conclusions or informational framework information in this case, includes (1) self-debiasing; (2) using the available and relevant data to reconstruct and understand the facts of the incident to the extent possible; (3) conducting reviews of the relevant peer-reviewed and non-peer-reviewed literature; (4) applying my training, education, and experience, and (5) applying the widely accepted scientific principles regarding human factors and forensic video analysis. This includes the deductive application of peer-reviewed and widely accepted principles to the facts. This can involve breaking down the incident into cognitive and physical tasks, identifying the variables, including environmental and

physiological constraints, mapping or connecting the variables to established, peer-reviewed principles of human performance, and evaluating the officers' reported perceptions and actions with the predictable limits of human performance defined in the scientific literature. I also apply my training and experience as a police officer and psychomotor skills trainer.

The literature reviewed may include materials specific to the law enforcement profession, forensic video, and human factors. I have also drawn on the totality of the materials I have read, studied, and examined, as well as the experiences and instruction I have had and provided to law enforcement personnel throughout my career. I also rely on the personal experiences obtained during my law enforcement career. The materials listed herein are the type, quality, and quantity upon which I and others in my profession rely in examining the events surrounding a police practice and forming opinions and conclusions regarding the matters addressed herein. The peer-reviewed literature cited in this report primarily establishes definitions of accepted principles in human factors and cognitive psychology.

Any opinions expressed herein are based on my application of the principles and analytical methodology described above—which includes human factors research on how peace officer perception and decision-making operate during critical incidents—to the fact pattern of this incident. However, they do not purport to establish, by importing specific empirical research findings or principles, what the officers involved actually perceived at the time in question.

Some information presented may not take the form of opinions or even answer hypotheticals; it may only provide general scientific findings and widely accepted principles about the human factors typically at play in this type of incident. Because these principles apply beyond this matter, their reliability is for the Court to determine. The information is intended to help the trier of fact understand the context of the incident. It does not include a case-specific diagnostic assessment or claim to know or state what the involved officers actually perceived. Instead, it seeks to identify widely accepted basic and framework scientific principles (akin to issue-spotting) so that factfinders may perform their respective roles in determining case-specific matters and weighing the evidence.[7] All cited references are for definitional/conceptual purposes and are not intended to serve as a scientific study directly applicable to the facts in this case, unless otherwise stated.

LIMITATIONS: The opinions or basic/framework scientific principles applied in this report do not purport to determine or replicate the states of mind of the officers or others involved. This includes whether the officers saw or did not see objects or events. Framework information, for example, the factors that make it more or less likely a similarly situated person would see something, without a conclusive opinion, may be included or existing opinions modified as such.

I reserve the option to modify, amend, and change any opinion expressed in this document should additional information be provided affecting my understanding of the fact pattern in this case. I also reserve the right to illustrate the points made in this report with demonstrations, demonstrative exhibits, and audio-visual aids. All statements and opinions herein are based on a more-probable-than-not basis or probabilistic inferences based on widely accepted, population-

[7] David L. Faigman, Christopher Slobogin, and John Monahan, "Gatekeeping Science: Using the Structure of Scientific Research to Distinguish Between Admissibility and Weight in Expert Testimony," *Northwestern University Law Review* 110, no. 4 (2016: 859-904).

based human factors, law enforcement principles, or forensic video principles. All times, time intervals, measurements, frame numbers, and line references are approximations. Nothing in this report makes legal conclusions or credibility assessments.

The specific case materials I have reviewed to date are listed in Appendix A.

## WHY EXPERT TESTIMONY IS REQUIRED TO ASSIST FACTFINDERS TO UNDERSTAND THE LIMITATIONS AND POTENTIAL ILLUSORY EFFECTS OF DIGITAL VIDEO EVIDENCE

California peace officers are trained in constitutional legal standards governing their use of force. Those standards dictate, "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[8] Therefore, the technical limitations of digital video evidence must be acknowledged. This is because digital video evidence does not necessarily reflect a reasonable officer's perspective, especially regarding how officers processed the actual event in real time and how that compares to what is or is not depicted in a video file. As I have written before, ***"cameras record; people process."***

When compared to how humans detect and perceive visual information, it is essential to remember the following limitations of video evidence:

1. Even when a camera is mounted on an officer's head, it does not perfectly represent the officer's visual perspective.

2. The video perspective is limited to the field of view recorded in each frame.

3. The viewer of a video usually knows the outcome of the event. In contrast, an officer experiencing it in real time does not, thereby failing to accurately reflect the fears, emotions, and stressors that might affect an officer's reasonable perceptions and decision-making.

4. A video records a series of still images at either a constant or a variable frame rate, with some frames alternating in presentation duration.[9] Most people are accustomed to watching videos that are recorded and played back at 29.97 FPS. The faster the frame rate, the smoother the motion will appear.[10] Video recorded at significantly slower frame rates or with irregular frame presentation durations tends to miss much of the action or give the impression that movements or actions were faster and more forceful than they were, thereby making the video less accurate and

---

[8] California Commission on Peace Officer Standards and Training, *Learning Domain 20: Use of Force/Deescalation,* v. 5.4 (April 2021), p. 1-4.

[9] *Scientific Working Group on Digital Evidence (SWGDE), Core Technical Concepts for Time-Based Analysis of Digital Video Files, Version 1.0*, 9/7/2020. https://www.swgde.org/documents/published-complete-listing/19-v-002-swgde-core-technical-concepts-for-time-based-analysis-of-digital-video-files/

[10] *S.W.G.D.E. Technical Overview of Digital Video Files,* Version 1.3, 8/5/2024. https://www.swgde.org/17-v-001/

reliable in depicting the events. While removing frames from action sequences is intentionally done in some theatrical film/video productions,[11] the same illusory effect sometimes occurs organically.

5. Even though metadata readers might indicate that a video file is played back at a particular frame rate, that rate often represents an average, and it cannot be assumed that each frame accurately reflects the time interval between frames. This is because frames might be encoded or displayed at various time intervals and/or for different durations.[12]

6. Humans usually perceive their visual world in three dimensions; video is two-dimensional and can have a "flattening" effect that distorts depth, space, and distance perception.

7. Most body-worn cameras (BWCs) used by law enforcement agencies have a relatively wide field of view, i.e., they use wide-angle lenses that introduce inherent distortion, making it even more difficult to gauge depth and distance accurately. This makes the spaces depicted appear larger than they actually were, and objects and people farther away from the officer than they actually were.

8. During fast-paced events, actions that video evidence shows officers perceived and responded to may not be stored in an officer's long-term memory if the time and/or effort to reflect on them is disrupted.[13]

9. Most humans see in clear detail, while recordings recorded and/or stored at low resolution can obscure that detail.

10. The quality and accuracy of video evidence can be significantly affected by "spatial" and "temporal" compression.[14] Temporal compression occurs when "predictive framing" algorithms are used to encode the data for most of the frames and can fail to record movement that occurred, produce movement that did not occur, or cause the same object to appear in two different locations within the same frame. Spatial compression occurs within individual frames whereby redundant or less important color aspects are removed and can result in the loss of detail – making the images visually distorted.

11. Video data can be further degraded or altered through compression during processing, even if that processing includes emailing a video directly from a cell phone, uploading to a social media platform, or on-screen recording, any of which

---

[11] Inouye, Kevin. 2020. *The Screen Combat Handbook: A Practical Guide for Filmmakers*. Routledge.
[12] *S.W.G.D.E. Core Technical Concepts for Time-Based Analysis of Digital Video Files*
[13] Schwartz, Bennett L. *Memory: Foundations and Applications*. Thousand Oaks, CA: SAGE, 2018.
[14] *Supra* at Note 8.

can also result in the loss of entire frames.

12. While inferences may be drawn about what viewers believe video images depict, there are also qualitative factors, such as resolution, frame rate, compression, distance, motion, perspective, and lighting, that constitute the "bandwidth."[15] The video's bandwidth determines whether it can be considered authentic, i.e., whether it is sufficient to represent what it is being offered to prove, given how it was originally generated. In other words, what is the question the evidence is believed to answer? Therefore, when video evidence has low bandwidth, it must always be considered that it might be insufficient to answer specific questions conclusively, such as "Did the kick land on the arm or the head?" Another consideration is whether one or more cameras recorded the same event from a closer position, at a higher frame rate, or from a better perspective; different interpretations might result.

13. It is inappropriate and unempirical to make determinations about what people perceive or intend solely based on video evidence.

14. Before alleging or suspecting that officers are being dishonest when their accounts are different from what veridical video evidence depicts, it is important to consider how stress physiology alters human memory processing.[16,17]

15. The video must be viewed with a player that supports single-frame forward and reverse, so that the content and context can be interpreted more accurately. I recommend Switch®, as it supports most exhibits on Windows and Mac operating systems and allows single-frame advance and reverse.

These technical realities make it crucial to understand the processing history of video files and to ensure that **anyone** using video evidence in investigations or evaluations of peace officer conduct is aware of the recognized best practices in the technical preparation, examination, and interpretation of digital video evidence.[18]

It is also important to note that when using video evidence in investigating or evaluating police conduct, the same perceptual dynamics that influence how people perceive real-time experiences also apply; their previously held beliefs and biases can influence what they see and

---

[15] Chen, Jessie Y., and Jennifer E. Thropp. "Review of Low Frame Rate Effects on Human Performance." *IEEE Transactions on Systems, Man, and Cybernetics - Part A: Systems and Humans* 37, no. 6 (2007): 1063–76. https://doi.org/10.1109/tsmca.2007.904779.

[16] Di Nota, Paula M., Bryce E. Stoliker, Adam D. Vaughan, Judith P. Andersen, and Gregory S. Anderson. "Stress and Memory: A Systematic State-of-the-Art Review with Evidence-Gathering Recommendations for Police." *Policing: An International Journal* 44, Number 1 (2021): 1–17. https://doi.org/10.1108/PIJPSM-06-2020-0093.

[17] U.S. Department of Justice. *The Report of the Department of Justice Pursuant to Section 13(c) of Executive Order 14074: Officer Review of Body-worn Camera Recordings After an Incident Involving the Use of Force.* May 2024. Archived content, U.S. Department of Justice. https://www.justice.gov/archives/media/1384336/dl

[18] Scientific Working Group on Digital Evidence, *S.W.G.D.E. Best Practices for Digital Forensic Video Analysis*, Version 2.0, 12/10/2025. https://www.swgde.org/documents/published-complete-listing/18-v-001-2-0/

how they interpret video images, including a false sense that the video comprises the same experiences as the participants.[19] This dynamic also applies to human performance limitations, such as limited visual acuity, which can lead viewers to focus on only one aspect of the video event—what the officer appears to be doing—rather than what a resisting suspect or another officer is doing contemporaneously.

## FORENSIC VIDEO/AUDIO WORKFLOW

I received several BWC video and surveillance video files. I used Amped FIVE (Build Date 6/3/2026 – Revision 40823) to confirm which files contained the time periods and areas of interest. Upon importing two of the files, COF 000477 and COF 000485, into Amped FIVE, it notified me of a frame-count mismatch within the .AVI and .MOV containers (1 and 28 frames, respectively), which could result in dropping frames when viewed. Therefore, I used the DVR function to copy the streams into MKV containers and used those versions for further forensic work within Amped FIVE.[20] This process does not change the original codec/actual video and audio stream content; it only places it into the other container (i.e., .mkv rather than .mov or .avi).[21]

I also used Amped FIVE and Hash Calculator v2.11 to generate SHA-256 hashes for the video files as received and for any stream-copied files. Next, I interrogated them using the built-in MediaInfo and the other tools to generate frame information reports and GOP analyses. Combined with cursory viewings of each, I obtained the following metadata and concluded that they were camera originals. I also confirmed that each contained areas and time periods of interest.

I used Amped FIVE to create the demonstrative exhibits from the original files as listed below. Each process is explained, and the resulting demonstrative exhibit(s) are listed under each original file. None of the processes changed the content or meaning of the images, and all technical notes are available upon request for reproducibility. All demonstrative exhibits resulting from these processes are listed in Appendix B, which also includes a partial list of free video players for both Windows and macOS that play MKV files.

### 402. BWC of Ofc. Daniel Precie Inspecting Collision. 020324. 5 min. 41 sec. [COF 000465].mp4

SHA 256: 0c282cb36143be4219d35db9620d669a8e27f696040af8c7b968714fb43161dc
Format: AVC/H264
Size: 109 KB
Duration: 5 minutes 50 seconds
Encoded Date and Time: 2/4/2024 at 06:50:37 UTC
Resolution: 1280x720
Display Aspect Ratio: 16:9
Frame Rate: 19.470

---

[19] Granot, Yael, Emily Balcetis, Neal Feigenson, and Tom Tyler. "In the eyes of the law: Perception versus reality in appraisals of video evidence." *Psychology, Public Policy, and Law* 24, no. 1 (2018): 93.

[20] .mpg and .mkv stand for "mpeg" and "Matroska" container formats, respectively. Matroska containers are more modern and considered more reliable at displaying all images in an H.264 video stream (See SWGDE at Note 9 and https://blog.ampedsoftware.com/2024/11/08/video-codecs-and-formats).

[21] *Supra* at Note 16.

Frame Rate Mode: Variable
Minimum Frame Rate: 15.831 FPS
Maximum Frame Rate: 83.256 FPS
GOP: 30 Fixed
Audio: AAC LC
Channels: 1
Sampling Rate: 44.1 kHz

Text overlays:

- "402 Precie BWC COF 465" at the bottom center
- Original frame number (OFN) at the bottom left corner
- Frame rate on top of the OFN
- Timer in the lower right-bottom corner, and
- Frame type (I, P, or B) on top of that.

I next rendered it as a "visually lossless" H264 file and saved it as:

**402. Precie BWC [COF 000465] Marked.mkv**

I next trimmed the portion of the video that was recorded after the collision, rendered it as above, and saved it as:

**402. Precie BWC [COF 000465] Trim & Mark.mkv**

**<u>411. Surveillance. Intersection Camera of Pursuit on Valley and Cypress.001. 16 min. 12 sec. [COF 000474].avi</u>**

SHA 256: 49bdf1d60dcfd4d73f0089913daab7118cf2fb3c88a8737cde3d224ca4b0e37c
Format: AVC/H264
Size: 260 MB
Duration: 16 minutes 12 seconds
Encoded Date and Time: Not displayed
Resolution: 1280x720
Display Aspect Ratio: 16:9
Frame Rate:  19.983 FPS per Frame Rate overlay filter
Frame Rate Mode: Variable
Minimum Frame Rate: Not read
Maximum Frame Rate: Not read
GOP: 49.82 Not fixed
Audio: None

Text overlays:

- "City Cam Valley & Cypress COF 474" in the upper right corner
- Timer in the lower right corner

- OFN on top of that
- Frame rate on top of that, and
- Frame type on top of that

I rendered it as above and saved it as:

**411 City Cam 1 [COF 000474] Trim & Mark.mkv**

**<u>412. Surveillance. Intersection Camera of Pursuit on Citrus and Valley.002. 1 min. 15 sec. [COF 000475].avi</u>**

SHA 256: 49b9e2df0b4d09517fb274ae0567fc17522568d6b0305b8f951c3c3630ddb262
Format: AVC/H264
Size: 29.4 MB
Duration: 1 minute 15 seconds
Encoded Date and Time: Not displayed
Resolution: 1280x720
Display Aspect Ratio: 16:9
Frame Rate: 20 FPS per Frame Rate overlay filter
Frame Rate Mode: Variable per frame information report (FIR)
Minimum Frame Rate: Not read
Maximum Frame Rate: Not read
GOP: 49.82 Not fixed
Audio: None

Text overlays:

- "City Cam COF 475" at the top center
- OFN at the top left
- Timer at the top right
- Frame rate at bottom left
- Frame type on top of that

I also trimmed the portion of the file that was recorded after the vehicles passed the view of the camera, rendered it as above, and saved it as:

**412 City Cam 2 [COF 000475].mkv**

**<u>413. Surveillance. 76 Gas Station on Citrus and Valley.020324. 2 min. 59 sec. [COF 000476].mp4</u>**

SHA 256: 45491d705f36403a6359325f1f3fb003996c58b349997d3d09226f725aab00bb
Format: AVC/H264
Size: 104 MB
Duration: 3 minutes 0 seconds
Encoded Date and Time: Not displayed
Resolution: 2688x1520

Display Aspect Ratio: 16:9
Frame Rate: 20 FPS
Frame Rate Mode: Constant
Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 50 Fixed
Audio: None

Text overlays:

- "76 Station Citrus & Valley COF 476" at the bottom center
- OFN at the bottom left
- Frame rate on top of that
- Frame type on top of that
- Timer at the lower right

I also trimmed the portions of the video before and after the vehicles passed the camera view, rendered it as above, and saved it as:

**413 76 Gas Station [COF 000476].mkv**

**414. Surveillance. 711 on Citrus and Valley.020324. 3 min. 2 sec. [COF 000477].avi**
SHA 256: 2a2ac0ab1957a6237b65cb9a28acf2c2051c4943b737f44a7d83443a47ab8c05
Format: AVC/H264
Size: 90.8 MB
Duration: 3 minutes 2 seconds
Encoded Date and Time: Not displayed
Resolution: 2560x1440
Display Aspect Ratio: 16:9
Frame Rate: 30.610 FPS per frame rate overly/~ 32 per OSD
Frame Rate Mode: Variable
Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 60.66 Not fixed
Audio: None
Text overlays:

- "414 7-11 Citrus & Valley COF 477" at the bottom center
- OFN at the bottom left
- Frame rate on top of that
- Frame type on top of that
- Timer at the lower right

I also trimmed the portions of the video before and after the vehicles passed the camera view,

rendered it as above, and saved it as:

**414 711 on Citrus and Valley [COF 000477] Trim & Mark.mkv**

**416. Surveillance. Calzona Truck Sales on Poplar and Valley.020324. 37 sec. [COF 000479].mp4**

SHA 256: bd1e038dab26c1de1db22e80d0f3065b45ecb61aa144a8a92bd578adaa2841be
Format: HEVC
Size: 23 MB
Duration: 2 minutes 18 seconds
Encoded Date and Time: Not displayed
Resolution: 1020x1080
Display Aspect Ratio: 16:9
Frame Rate: ~ 28 FPS per OSD
Frame Rate Mode: Constant
Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 50 Fixed
Audio: None

Text overlays:

- "416 Calzona Truck Sales COF 479" at the bottom center
- OFN at the bottom left
- Frame rate on top of that
- Frame type on top of that
- Timer at the lower right

I also trimmed the portions of the video before and after the vehicles passed the camera view, rendered it as above, and saved it as:

**416. Calzona Truck Sales [COF 000479] Trim & Mark.mkv**

**417. Surveillance. Chevron Gas Station on Cherry and Valley.001.020324. 1 min. 34 sec. [COF 000480].mp4**

SHA 256: 35159e39c1801bd365466e0c144e5d1d202fdb471df2ffdb4424182b2840ad6e
Format: HEVC
Size: 18.2 MB
Duration: 1 minute 34 seconds
Encoded Date and Time: Not correctly displayed (11/27/2013)
Resolution: 3840x2160
Display Aspect Ratio: 16:9
Frame Rate: 20 FPS
Frame Rate Mode: Constant

Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 40 Fixed
Audio: None

Text overlays:

- File name at the bottom
- OFN at left middle
- Frame rate at the top right
- Timer at the right middle

I rendered it as above and saved it as:

**417 Chevron [COF000480] Marked.mkv**

**418. Surveillance. Chevron Gas Station on Cherry and Valley.002.020324. 8 min. 22 sec. [COF 000481].mp4**
SHA 256: c8803f7cbe271b473128b9a773d15b1e3d89d33f500cbacd8ecd1bf5e715d84b
Format: HEVC
Size: 100 MB
Duration: 8 minutes 22 seconds
Encoded Date and Time: Not correctly displayed (11/27/2013)
Resolution: 3840x2160
Display Aspect Ratio: 16:9
Frame Rate: 20 FPS
Frame Rate Mode: Constant
Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 40 Fixed
Audio: None

Text overlays:

- File name at the bottom
- OFN at left middle
- Frame rate at the top right
- Timer at the right middle

I rendered it as above and saved it as:

**418 Chevron [COF000481] Marked.mkv**

**419. Surveillance. Fontana Motors Direct Catawba and Valley.001.020324. 2 min. 17 sec. [COF 000482].mp4**

SHA 256: 34570c21f2ec679aecf9441d88540dbef939a2596c644f01af8fc49a4ea87310
Format: HEVC
Size: 30.8 MB
Duration: 37.383 seconds
Encoded Date and Time: Not displayed
Resolution: 2592x1944
Display Aspect Ratio: 4:3
Frame Rate: 30 FPS
Frame Rate Mode: Constant
Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 50 Fixed
Audio: None

Not used due to a better perspective with the next video.

**420. Surveillance. Fontana Motors Direct Catawba and Valley.002.020324. 2 min. 38 sec. [COF 000483].mp4**
SHA 256: 27f0d940458b6fd0b50d151d4420fbce737f6b81aac11f752d11635c1d38ba71
Format: HEVC
Size: 30.3 MB
Duration: 2 minutes 38 seconds
Encoded Date and Time: Not displayed
Resolution: 1920x1080
Display Aspect Ratio: 16:9
Frame Rate: 30 FPS
Frame Rate Mode: Constant
Minimum Frame Rate: N/A
Maximum Frame Rate: N/A
GOP: 50 Fixed
Audio: None

Text overlays:

- “420 Fontana Motors COF 483” at the bottom center
- OFN at the bottom left
- Frame rate on top of that
- Frame type on top of that
- Timer at the lower right

I also trimmed the portions of the video before and after the vehicles passed the camera view, rendered it as above, and saved it as:

**420 Fontana Motors Direct Catawba and Valley [COF 000483] Trim & Mark.mkv**

I next cropped the upper-left portion of the video, resized (enlarged) it, and added the following text overlays:

- "420 Fontana Motors COF 483" at the bottom center
- OFN at the bottom left
- Timer at the bottom right

I rendered the video as above and saved it as:

**420 Fontana Motors Direct Catawba and Valley [COF 000483] Crop.mkv**

**<u>422. Surveillance. Yervan Truck Sales on Catawba and Valley.020324. 11 sec. [COF 000485].mov</u>**
SHA 256: (Pre-stream copy) d6f8d4ca97fd50b638e2bc38c02751090c19f97d6559c9ebe64b26695369481b & (Post-stream copy) b4110fa86a5062e39ac994fa6125a8161ed7c0a60de6c08bdba5b17d6f621f5e
Format: AAC/H264
Size: 13 MB
Duration: 11 seconds
Encoded Date and Time: 2/5/2024 at 22:57:01 UTC
Resolution: 750x1334 (Rotated)
Display Aspect Ratio: 16:9
Frame Rate: 23.942 FPS
Frame Rate Mode: Variable
Minimum Frame Rate: 2.817
Maximum Frame Rate: 60.00
GOP: 60 Not fixed
Audio: AAC LC
Channels: 2
Sampling Rate: 44.1 kHz

Because this file displayed vertically, I applied the "rotate" filter to rotate it 90 degrees rightward, and applied the following text overlays:

- "Yerevan Truck Sales" at the bottom center
- Timer on top of that
- OFN at the bottom right
- Frame rate at the bottom left, on top of the on-screen display (OSD) information
- Frame type at the upper right.

I then rendered it as above and saved it as:

**422 Yerevan Truck Sales [COF 000485] Marked.mkv** (Originally saved as "Yervan," but file manually renamed to reflect the accurate spelling).

**<u>423. Surveillance.Sunrise Ford on Citrus and Valley.020324. 1 min. [COF 000486].exe</u>**

**SHA 256: b763a2372f232d1a25d8bd03a2ec1c5b0806b9d74cfe9cef79ae3e72675fcc98**

Note: This was a proprietary executable file and provided the following two files after the streams were copied and rewrapped into MKV containers. They appeared to be from the same camera, with the most salient differences being resolution, frame rate, and duration, as shown below:

**Filename:** ../423. Surveillance.Sunrise Ford on Citrus and Valley.020324. 1 min. [COF 000486].exe-15-2560-sc-converted.mkv
SHA 256 :052844e3a143a991e214bf7bdf36514c4e6018e8ba415c1325ce709afa131c66
Format: AAC/H264
Size: 17.925 MB
Duration: 1 minute 3 seconds
Encoded Date and Time: Not noted
Resolution: 2560x1440
Display Aspect Ratio: 16:9
Frame Rate: 10.35 FPS
Frame Rate Mode: Variable
Minimum Frame Rate: Unknown
Maximum Frame Rate: Unknown
GOP:
Audio: None

- "423 Sunrise Ford COF 486" at the bottom center
- OFN at the bottom left
- Frame rate on top of that
- Frame type on top of that
- Timer at the lower right

I trimmed the portion of the video after the vehicles passed the camera view, rendered it as above, and saved it as:

**423A Sunrise Ford [COF 000486] Trim & Mark.mkv**

**Filename:** ../423. Surveillance.Sunrise Ford on Citrus and Valley.020324. 1 min. [COF 000486].exe-15-640-sc-converted.mkv
SHA 256: b5d3e144a4f58ec74955b9a70ca1be3f3b3d96b446938f9a72655cf0888238c2
Format: AAC/H264
Size: 17.925 MB
Duration: 1 minute 6 seconds

Encoded Date and Time: Not noted
Resolution: 640x360
Display Aspect Ratio: 16:9
Frame Rate: 14.8675 FPS
Frame Rate Mode: Variable
Minimum Frame Rate: Unknown
Maximum Frame Rate: Unknown
GOP:
Audio: None

I did not perform any additional tasks on this file.

**310. FPD TC Radio Transmission.041.020304. 10 min. 23 sec. [COF 000460].wav**
SHA 256: 39297ed580b9e248239170574d04e5f99a9bb388875022eb17da7ed84167cfd4
(Hash Calculator v2.11)
Format: ADPCM/WaveFormatEx
Size: 9.51 MB
Duration: 2 minutes 35 seconds
Channels: 2
Sampling Rate: 8,000 Hz

I imported this file into Adobe Audition 2026, Build 26.0.0.56, and opened it in the spectral view. I then used the marker feature to mark the beginning and ending of the transmissions (excluding the second transmission by the channel operator acknowledging the Eagle 1 launch) to approximate the length of time from when Officers Zozaya and Precie first broadcast that the vehicle was "taking off on [them]" until Officer Zozaya broadcast that the collision had occurred. I took a screenshot of the Audition window with the markers in place, then exported the data to a .csv file, opened it, saved it as a Numbers file, and saved a PDF version of that. That information is in Appendix C.

## RECONSTRUCTION

On 2/3/2024 (Saturday) at approximately 2244 hours, Fontana Police Officers Brian Zozaya and Daniel Precie were on duty and working as patrol officers in full uniform and in a fully marked patrol vehicle (Zozaya driving). At about that time, they were driving east on Valley Boulevard, approaching Catawba Avenue, when they saw a white 2022 Nissan Sentra, License #8ZZG454, traveling in the same direction and in the Number 1 lane.[22] The driver of the Sentra was subsequently identified as 16-year-old Giovanni Bonilla. (Holland CHP 555, p. 1, COF 000012) They also saw one of the passengers extending their upper torso out of the right-rear

[22] The surveillance video from Fontana Motors Direct depicts the officers' emergency lights coming on while behind the Sentra in COF 000483. In his report, Officer Zozaya stated that they were approaching Catawba when they first noticed the violations and that the Sentra stopped for the red signal at Catawba. However, this video depicts both the Sentra and the patrol SUV crossing Catawba Avenue with the green signal (see OFNs XX-XX).

passenger window, holding a cell phone and not wearing a seat belt, and then changing lanes in front of a third-party vehicle without signaling. (Zozaya ORIG Confidential Incident Report, COF 000001; CHP 558D Narrative/Supplemental by D. Holland, pp. 1-3, COF 000025-27; Zozaya Deposition, 14:21-17:12)

The sequence of events unfolded as follows:

- The officers followed the Sentra as it approached Poplar Avenue and passed Calzona Truck Sales, located at 15689 Valley Boulevard on the southwest corner; (416 Calzona Truck Sales [COF 000479] Trim & Mark.mkv)
- They continued following the Sentra, and they both traveled through the intersection at Poplar Avenue with the green traffic signal there; (420 Fontana Motors Direct Catawba and Valley [COF 000483] Crop.mkv)
- As they passed Fontana Motors, located at 15836 Valley Boulevard, on the north side of Valley Avenue just west of Catawba Avenue, Officer Zozaya activated the emergency lights and siren to signal the Sentra to pull over and stop to address the noted violations: (420 Fontana Motors Direct Catawba and Valley [COF 000483] Crop).mkv, OFNs 3466 through 4661; Zozaya ORIG Confidential Incident Report, COF 000001; Zozaya Deposition, 13:1-18; 25:23-28:25; Holland, pp. 2-3, COF 00026-27)
- The Sentra continued east with Officers Zozaya and Precie following it with the lights and siren on and crossed Catawba Avenue and past Yerevan Truck Sales, located at 15908 Valley Boulevard on the northeast corner, and Officer Zozaya radioed that they had a "white sedan taking off on [them], eastbound Valley at Catawba. Trying to get you a plate."[23] (422 Yerevan Truck Sales [COF 000485] Marked.mkv; 310. FPD TC Radio…[COF 000460].wav; Zozaya Deposition, 25:23-28:25)
- Both Mr. Bonilla and Officer Zozaya crossed Catawba Avenue against the red signal for their direction; (422 Yerevan Truck Sales [COF 000485] Marked.mkv)
- They continued east and past Sunrise Ford, located at 16005 Valley Boulevard, located on the south side of Valley Boulevard, between Catawba and Citrus Avenues;[24] (423A Sunrise Ford [COF 000486] Trim & Mark.mkv; Zozaya Deposition, 12:7-17, 13:1-18; Zozaya ORIG Confidential Incident Report, COF 000002)
- Officer Precie activated his BWC just before they crossed Citrus Avenue;[25] (402. Precie BWC [COF 000465] Trim & Mark.mkv, OFNs 1 through 20; Zozaya Deposition, 11:3-12:2)

---

[23] In his report, Officer Zozaya recalled that they had stopped behind the Sentra at the red signal at Catawba Avenue. However, the video from Fontana Motors Direct, located at 15836 Valley Boulevard, depicts the signal light at Poplar Avenue being green at the time they approached and crossed the intersection (see 420 Fontana Motors Direct Catawba and Valley [COF 000483] Crop.mkv).

[24] During his deposition, Officer Zozaya recalled that he initiated the pursuit of the Sentra shortly after [they crossed] Citrus Avenue (12:7-17).

[25] During his deposition, Officer Zozaya could not recall hearing Officer Precie's BWC activate as he was trying to broadcast the pursuit information and recalled that this occurred before crossing Catawba (10:13-11:24).

- They continued past the 76 Station located on the southwest corner at Citrus Avenue, and the 7-Eleven on the southeast corner, with the green signal; (413 76 Gas Station [COF 000476].mkv; 414 711 on Citrus and Valley [COF 000477] Trim & Mark.mkv)
- Officer Zozaya radioed, "Ok. We're going to be in pursuit. Starting mileage 89.7; still don't have a plate. Eastbound valley, passing Oleander. High speed, traffic is light. Coming up to Cypress."[26] (310. FPD TC Radio…[COF 000460].wav at 13.468; Zozaya Deposition, 12:7-13:18; Zozaya ORIG Confidential Incident Report, COF 000002)
- The on-duty helicopter crew broadcast, "Eagle 1, launching"; (FPD TC Radio…[COF 000460].wav at 29.676)
- At about this time, Officer Edward Bautista, who was in a fully marked patrol SUV, drove north from the parking lot at 16593 Valley Avenue, briefly stopped at Valley Boulevard, then proceeded across and then west and into the eastbound No. 2 turn lane of Valley Avenue, and slowed;[27] (City Cam Valley & Cypress COF 474, OFNs 388 through 750; Holland CHP 558D, p. 4, COF 000028)
- As the Sentra crossed the intersection traveling east in the Number 1 lane, Officer Bautista turned on his overhead emergency lights. During this time, Officers Garcia and Terwilliger were on the Deseret Industries driveway at Valley Avenue and driving north;[28] (City Cam Valley & Cypress COF 474, OFN 750; Garcia Deposition, 46:25-49:22; Holland CHP 558D, p. 5, COF 000029).
- At about the time Mr. Bonilla passed the west crosswalk at Cypress Avenue at high speed, Officers Garcia and Terwilliger were driving north across the southern lanes and marked barrier of Valley Boulevard and then west onto Valley Boulevard on or along the north side of the painted barrier and the number 1 westbound lane;[29,30,31] (Scene Stills, City Cam COF 474 Cropped, OFNs 770, 785, 798, 800, 805; CHP 558D Supplement by Holland, pp. 2-5, COF 000026-29; Garcia Deposition, 98:13-99:1)

---

[26] Just after Officer Zozaya radioed that they were approaching Cypress Avenue, the air support unit, "Eagle 1," radioed that they were "launching" (310. FPD Radio…[COF 000460].wav).

[27] When Officer Bautista drove north across Valley Boulevard and turned west, he drove over the marked, divided roadway.

[28] Based on demonstrative exhibit 411 City Cam 1 [COF 000474] Trim & Mark.mkv, Officer Garcia had not turned on the headlights to his patrol SUV (OFNs 676 through 804). Neither Officers Garcia nor Terwilliger could remember whether the headlights had been turned on during their depositions (55:23-57:25 and 30:4-11, respectively).

[29] Officer Garcia recalled that he had driven north across Valley Boulevard from the parking lot and turned west into the No. 1 westbound lane of Valley Boulevard, after having looked left and right and not seeing any vehicles coming. He did not recall the collision (CHP 558D by Holland, p. 5, COF 000029; Garcia Deposition, 25-30:2, 52:5-53:17).

[30] During his deposition, Officer Garcia recalled being in the No. 1 westbound lane of Valley Boulevard for only a second or a "couple of seconds" just before the collision and "maybe" traveling at "20 to 25 mph." Additionally, he remembered seeing the headlights of the Sentra just before the collision. He could not provide any further information about the Sentra, its occupants, or its speed (30:16-32:13, 32:18-34:25). He also recalled having looked to the west. He did not see any vehicles approaching from that direction before entering Valley Boulevard (52:5-53:17).

[31] Officer Garcia also drove across the marked, divided roadway.

- Mr. Bonilla's Sentra moved from the number 1 eastbound lane of Valley Boulevard in a northeastern direction in such a manner that the right side of the Sentra presented eastward, and collided with the front of Officers Garcia and Terwilliger's patrol vehicle (Area of Impact #1);[32] and (Holland, p. 1, COF 000012; Reyes CHP 558D Supplemental, pp. 4-7, COF 000037-40; Reyes Sketch, COF 000018)
- The Sentra continued in a northeastern direction and collided with an unoccupied vehicle parked along the north curb of Valley Boulevard, which then collided with another unoccupied parked vehicle parked to the east of it; and (Holland CHP 558D, p. 5, COF 000029; Area of Impact Sketch by Reyes, COF 000018)
- Next, Officer Zozaya radioed that they were trying to catch up to the vehicle – in pursuit, Officer Zozaya radioed, "TC'd into another unit. TC'd into another unit."[33] (FPD TC Radio…[COF 000460].wav at 33.988; Zozaya Confidential; Zozaya ORIG Confidential Incident Report, COF 000002)

Robert Rias (age 15), Omari Pitts (age 15), and Dominic Adams (age 14) were found to be the other occupants of the Sentra and had been seated in the right front (3), left rear (4), and right rear (6) positions, respectively. All three were killed. (Holland CHP 555, pp. 1-6, COF 000012-17; SBCS Coroner Division, Report of Death Worksheets for Robert Rias, Omari Pitts, and Dominic Adams, COF 000059, 65, and 71) The driver of the Sentra was found to be Giovanni Bonilla (age 16), who sustained serious injuries but survived. (Holland CHP 555, pp. 1-5, COF 000012-16; Bonilla Deposition)

## OPINIONS AND SUPPORTING ANALYSES

**Opinion One: Officers Zozaya and Precie's actions—during the approximately 34 seconds starting from their first broadcast about the white sedan taking off on them until the collision—complied with the FPD pursuit-policy (Balance Test).**

**Policy**

The FPD, at the time of the incident, subscribed to Lexipol®. Lexipol provides standardized policy manuals based on state-specific laws to several law enforcement agencies across the United States and throughout California. As a part of its subscription service, Lexipol publishes semi-annual "releases" to ensure that subscribing agencies' policies reflect legislative changes. The two release versions of the pursuit policies I received were dated 7/19/2023 and 1/2/2024 (COF 001513 and 1525, respectively). There are no substantive differences between the two.

The applicable sections to the facts include the following definitions from § 314.1.1:

[32] According to calculations performed by SBCSO Detective LaFond using the data from the event data recorder from the Sentra, the Sentra was approximately 537 to 609 feet west of the Garcia/Terwilliger patrol vehicle at a speed ranging from 83.3 to 108.7 mph, when the Garcia/Terwilliger patrol vehicle entered Valley Boulevard (Holland CHP 558D Supplemental, pp. 6-7, COF 000030-31).

[33] During his deposition, Officer Garcia recalled that he did not actually see the collision, just "the aftermath" (40:8-42:4)

Vehicle Pursuit: An event involving one or more law enforcement officers attempting to apprehend a suspect, who is attempting to avoid arrest while operating a motor vehicle by using high-speed driving or other evasive tactics, such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop.

Blocking: A low-speed tactic where one or more authorized police department emergency vehicles intentionally restrict the movement of a suspect vehicle, with the goal of containment or preventing a pursuit. Blocking is not boxing in or a roadblock.

Pursuit Intervention Technique (PIT): A low-speed tactic intentionally applied to cause the suspect vehicle to spin out and terminate the pursuit.

Ramming: The deliberate act of impacting a suspect's vehicle with another vehicle to functionally damage or otherwise force the suspect's vehicle to stop.

In policy § 314.2.1 (Officer Responsibilities), FPD members "are authorized to initiate a pursuit when the officer reasonably believes that a suspect, who has been given appropriate signal to stop by a law enforcement officer, is attempting to evade arrest or detention by fleeing in a vehicle." While the policy list "factors that should be considered in deciding whether to initiate a pursuit," the overarching principle/rule is that FPD members should balance the known or reasonably suspected offense, the apparent need for immediate capture against the risks to peace officers, innocent motorists, and others to protect the public" (Balance Test),[34] which is listed under subsection (b):

> The importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to officers, innocent motorists, and others. (COF 0001514/1526)

In addition to the other 10 factors (not quoted here for brevity), Policy§ 314.2.3 (Speed Limits) pays specific attention to the factor of the speed of pursuits and how that factor fits into the Balance Test. That section provides:

> The speed of a pursuit is a factor that should be evaluated on a continuing basis by the officer and supervisor. Evaluation of vehicle speeds should take into consideration public safety, officer safety, and the safety of the occupants of the fleeing vehicle.

[34] California Commission on Peace Officers Standards and Training, *California Law Enforcement Vehicle Pursuit Guidelines,* (2022), pp. 9-10, 17, 38. "…an ongoing decision-making process to analyze the risk of initiating, continuing, and/or terminating a pursuit."

> Should high vehicle speeds be reached during a pursuit, officers and supervisors should also consider these factors when determining the reasonableness of the speed of the pursuit:
>
> (a) Pursuit speeds have become unreasonably unsafe for the surrounding conditions.
> (b) Pursuit speeds have exceeded the driving ability of the officer.
> (c) Pursuit speeds are beyond the capabilities of the pursuit vehicle thus making its operation unsafe. (COF 001515)

Policy § 314.2.2 provides guidance on "when to terminate a pursuit," which restates the Balance Test, i.e., the factors for initiating the pursuit are the same for terminating a pursuit, with an additional eight factors. Only the following two factors apply to the facts of this incident:

> (f) The danger that the continued pursuit poses to the public, the officers, or the suspect, balanced against the risk of allowing the suspect to remain at large (Balance Test), and
> (h) Extended pursuits of violators for misdemeanors not involving violence, risk of serious harm, or weapons (independent of the pursuit) are generally discouraged. (COF 001515)

**<u>Rationale for the Balance Test</u>**

The rationale for the balance test is that a fleeing violator who drives without due regard for the safety of others is more likely to drive with due regard once the pursuing officers either do not pursue or cease pursuing them.[35,36] Both practical experience and the <u>very limited research literature</u> have significant limitations. For example, surveys of offenders who have fled in vehicles from police have indicated that about 75 percent said they would resume safer driving behavior "when they felt safe" and that they would no longer perceive the police as attempting to stop them.[37] The same survey data revealed that suspects said they would have to perceive the police were no longer chasing them "for approximately two blocks in town…and 2.5 miles on a freeway." Surveys of law-enforcement air support crews found that fleeing violators took an average of 90 seconds to resume safer driving.[38] National Institute of Justice-funded testing of the StarChase system, which tags and tracks fleeing violator vehicles via GPS, found that, on average, a tagged fleeing suspect slowed to within 10 mph of the posted speed limit in less than two minutes.[39]

---

[35] *Ibid.*
[36] U.S. Department of Justice – Community Oriented Policing Services and the Police Executive Research Forum, Vehicular Pursuits: A Guide for Law Enforcement Executives on Managing the Associated Risks, 2023.
[37] Schultz, David P, and Geoffrey Alpert. "Evidence-Based Decisions on Police Pursuits: The Officer's Perspective." *FBI L. Enforcement Bull.* 79 (2010): 1.
[38] *Ibid.*, citing Martin, Jeff. "Pursuit Termination: A Lifesaver?" *Law and Order* 49 (2001), 30–33.
[39] Trevor A. Fischbach, Keo Hadsdy, and Amanda McCall, *Pursuit Management: Fleeing Vehicle Tagging and Tracking Technology*, Document No. 249156 (Washington, DC: National Criminal Justice Reference Service, Office of Justice Programs, U.S. Department of Justice, 2015). Award No. 2010-IJ-CX-K022.

However, there is no way for pursuing officers to know or predict if and ***when*** fleeing violators will resume safe driving behavior.[40]

It should be noted that the literature cited, especially my article, has significant limitations on external validity. Still, there is not much research literature that has attempted to obtain a generalizable average. However, the limited literature supports the general standard of care of aborting pursuits when the risks they pose to the public outweigh the benefits of immediate apprehension.

**Pursuit Phases**

Police vehicular pursuits have been identified as having the following four phases:

- Prepursuit Phase: the time between the officer's decision to stop a vehicle and the officer's recognition of the vehicle's attempt to flee;
- Communication Phase: the period between the start of the pursuit and the arrival of assisting officers or resources;
- Resources Phase: the period during the arrival of assisting officers and/or resources and an attempt to terminate an in-progress pursuit; and
- Postpursuit Phase: the period encompassing any actions that occur after the suspect's vehicle has stopped fleeing and eluded capture.[41]

**Task Demands**

It is generally accepted that civilians who are driving under normal circumstances have to perform the tasks of (1) lane keeping, (2) speed control, and (3) watching for other vehicles, pedestrians, and traffic controls.[42,43] Peace officers engaged in pursuits generally have the additional task demands, such as (1) watching the violator vehicle, (2) tracking location, speed, and direction, (3) communicating this information, (4) potentially increased stress due to the use of the lights and siren, and the fear of bad outcomes.[44,45] Additionally, officers and supervisors are subject to human performance limitations regarding how quickly they can process information, select responses, and physically make those responses.[46,47]

---

[40] *Supra* at Note 38.

[41] United States Department of Justice – Office of Justice Programs – National Institute of Justice, "Pursuit Management Task Force: A summary of the Pursuit Management Task Force's Report on Police Pursuit Practices and the Role of Technology." *National Institute of Justice Research Preview*, August 1998. https://nij.ojp.gov/library/publications/pursuit-management-task-force

[42] Green, Marc. *Roadway Human Factors: From Science to Application*. Tucson, AZ: Lawyers & Judges Publishing Company, 2018.

[43] California Commission on Peace Officer Standards and Training, *Learning Domain 19: Vehicle Operations*, v6.3.

[44] Hsiao, Hongwei, Joonho Chang, and Peter Simeonov. "Preventing Emergency Vehicle Crashes: Status and Challenges of Human Factors Issues." *Human Factors*, 60, no. 7 (2018): 1048-72.

[45] *Learning Domain 19.*

[46] Green, Marc. "How Long Does it Take to Stop? Methodological Analysis of Driver Perception-Brake Times." *Transportation Human Factors,* 2, no. 3 (2000): 195-216.

[47] *Learning Domain 19.*

**Scientific Consensus on the Effect of Multiple Task Demands on Reaction Time**

The peer-reviewed literature on dual-task interference – including foundational bottleneck theory, independent systematic reviews, and studies of communication tasks performed during driving – indicates that individuals actively engaged in multiple concurrent tasks requiring cognitive processing, such as driving a police vehicle, tracking a fleeing suspect vehicle, and radio communication, generally exhibit slower reacting times and delayed recognition of new critical information compared to individuals who are not simultaneously performing those additional tasks. [48,49,50,51,52] It has been demonstrated that the effect in delayed response times can be reduced through training and experience, but is still subject to degradation under high stress conditions.[53,54]

**Facts and Data**

As applied to the facts, during the time Officer Zozaya radioed that they were in pursuit of the Sentra, he and Officer Precie were facing the following circumstances:

- The initial probable cause to stop the Sentra was based on the officers' observations of the right-rear passenger positioned in the window and not wearing a seatbelt and failing to signal during a lane change, in violation of California Vehicle Code §§ 27315 and 22108, respectively; (Zozaya Incident Report, COF 000001; Zozaya Deposition, 14:21-17:12, 17:17-20:12; Precie Deposition, 17:10-19:1, 23:1-4)
- They had followed the Sentra through the green signal at Poplar Avenue; (420 Fontana Motors Direct Catawba and Valley [COF 000483] Crop.mkv, OFNs 3630 through 4657)
- Officer Zozaya had turned on the overhead emergency lights and siren while passing Fontana Motors as it approached Catawba Avenue; (420 Fontana Motors Direct Catawba and Valley [COF 000483] Crop.mkv, OFNs 4658 through 4693; Zozaya Deposition, 12:7-13:18)
- Both Mr. Bonilla and Officer Zozaya crossed Catawba Avenue against the red signal for their direction, and the two cars moving from southbound Yerevan

---

[48] Pashler, H. (1994). Dual-task interference in simple tasks: Data and theory. *Psychological Bulletin*, 116(2), 220–244. https://doi.org/10.1037/0033-2909.116.2.220

[49] Levy, Jonathan, Harold Pashler, and Erwin Boer. "Central Interference in Driving: Is There Any Stopping the Psychological Refractory Period?" *Psychological Science* 17, no. 3 (2006): 228–35. https://doi.org/10.1111/j.1467-9280.2006.01690.x.

[50] Strobach, Tilo, Anja Schütz, and Torsten Schubert. "On the Importance of Task 1 and Error Performance Measures in PRP Dual-Task Studies." *Frontiers in Psychology* 6 (April 2015). https://doi.org/10.3389/fpsyg.2015.00403.

[51] Leone, Carmela, Peter Feys, Lousin Moumdjian, Emanuele D'Amico, Mario Zappia, and Francesco Patti. "Cognitive-Motor Dual-Task Interference: A Systematic Review of Neural Correlates." *Neuroscience & Biobehavioral Reviews* 75 (April 2017): 348–60. https://doi.org/10.1016/j.neubiorev.2017.01.010.

[52] Caird, Jeff K., Chelsea R. Willness, Piers Steel, and Chip Scialfa. "A Meta-Analysis of the Effects of Cell Phones on Driver Performance." *Accident Analysis & Prevention* 40, no. 4 (2008): 1282–93. https://doi.org/10.1016/j.aap.2008.01.009.

[53] Hembroff, Chet C., Katherine D. Arbuthnott, and Gregory P. Krätzig. "Emergency Response Driver Training: Dual-Task Decrements of Dispatch Communication." *Transportation Research Part F: Traffic Psychology and Behaviour* 59 (November 2018): 222–35. https://doi.org/10.1016/j.trf.2018.08.019.

[54] Strobach, Tilo, and Torsten Schubert. "Mechanisms of Practice-Related Reductions of Dual-Task Interference with Simple Tasks: Data and Theory." *Advances in Cognitive Psychology* 13, no. 1 (2017): 28–41. https://doi.org/10.5709/acp-0204-7.

Avenue to eastbound Valley Avenue slowed/stopped when the Sentra and Officer Zozaya's vehicle crossed the intersection;[55,56,57,58] (422 Yerevan Truck Sales [COF 000485] Marked.mkv, OFNs 26 through 175; Zozaya Incident Report, COF 000002)

- Neither officer had been able to read the license plate; (Zozaya Deposition, 17:17-20:12; Radio Audio, COF 000460; Precie Deposition, 30:17-20)
- Officer Zozaya spent approximately 14.2 seconds broadcasting that they were in pursuit, did not have a license plate number, passing Oleander Avenue, at "high speed" with "light" traffic, and approaching Cypress Avenue; (Radio Audio, COF 000460; Appendix C)
- The last time Officer Zozaya looked at his speedometer during the pursuit, he noted his speed at 80 mph and increasing; (Zozaya Deposition, 42:5-45:7)
- The traffic signals for eastbound Valley at Citrus, Oleander, and Cypress Avenues were green; (402. Precie BWC [COF 000465] Trim & Mark.mkv)
- Valley Boulevard from Poplar Avenue to Cypress Avenue is a multi-lane, paved roadway, and the road was wet from precipitation;
- Officer Zozaya was giving timely information over the radio, which would allow a supervisor monitoring the pursuit information upon which to make a timely decision;[59] and
- Officers Zozaya and Precie were aware that the FPD airship, Eagle 1, was taking off to respond and assist. (Zozaya Deposition, 30:21-31:2; Precie Deposition, 31:8-12)

**Application to Facts and Data**

It is important to remember that while pursuit situations evolve, the violator and police vehicles are covering distance and time is passing. As applied to the facts, the first transmission by Officer Zozaya, i.e., that they had a white sedan taking off on them, consumed ~6.1 seconds and could be categorized as occurring during the prepursuit phase. When Officer Zozaya started his next broadcast, ~7.4 seconds after the end of his first broadcast, he explicitly stated they were in pursuit, i.e., that the white sedan was fleeing, and he decided to pursue it. It was also during this

---

[55] In his report, Officer Zozaya wrote that he had waited for the red signal at Catawba Avenue to turn green before turning on his overhead emergency lights (COF 000002).

[56] Although 422 Yerevan Truck Sales [COF 000485] Marked.mkv shows that the light was red when they crossed Catawba Avenue, it is unknown whether Officer Zozaya recognized it as such at the time they approached and crossed that intersection. Refer to the section, "Why Expert Testimony…to assist factfinders…" above. Additionally, Officer Zozaya was not asked about Mr. Bonilla's driving related to the traffic controls during his deposition.

[57] During his interview with MAIT Detective Holland, Officer Zozaya recalled that the light at Catawba Avenue was green when they crossed it, before the Sentra moved into the No. 1 lane, cutting off another vehicle (Holland CHP 558D, p. 2, COF 000026).

[58] During his deposition, Officer Precie did not recall whether they had crossed any intersections against red traffic signals (28:22-29:3).

[59] Sergeant David Janusz was the patrol supervisor during the incident, and it is unclear from the materials whether he heard and started monitoring the pursuit before the collision. He attached himself to the event at 22:45:21, immediately after Officer Zozaya broadcast the collision (043. Detailed History for Police Event #240201288, COF 000228, 236).

~14.2-second transmission that Officer Zozaya provided the starting mileage, that they could not provide the plate number, their direction of travel, that the speed was "high," the traffic was light, and they were passing Oleander and approaching Cypress Avenue. Immediately after Officer Zozaya finished his ~14.2-second transmission, the FPD helicopter crew radioed that they were responding from the airport.

This data suggests that Officer Zozaya was in the communication and resources phases of the pursuit during his second ~14.2-second transmission, broadcasting important information for responding officers and a monitoring supervisor to decide whether the pursuit should be continued or aborted. The collision occurred only ~3.5 seconds after Eagle 1 finished broadcasting that they were responding from the airport.

**Potentially Insufficient Time to Reach an Abort-Decision Threshold**

Given the relative task demands, similarly situated officers and a monitoring supervisor could still be in the process of making good-faith efforts to decide whether to continue or abort the pursuit but have that process cut short before a salient conditional threshold was recognized, i.e., one that clearly signaled that the risks of the pursuit outweighed the need to make an immediate apprehension for minor vehicle code violations. Examples of salient thresholds to trigger a decision to abort include a numerical speed report (e.g., 100 mph) or noticing and reporting that the fleeing violator had started violating traffic signals at intersections. Another salient threshold for discontinuing the ground pursuit could be the arrival of the airship so FPD personnel could transition into "tracking mode," as defined in Policy § 314.3.9(a).

Assimilating the incoming information takes time, especially when simultaneously engaged in other tasks. In this case, the collision occurred a very short time after the start of the initial broadcast that they were in pursuit, and Officer Zozaya may not have thought of radioing that information (the "reason for the pursuit" per § 314.3.3(c)) given the overall task demands.[60] Additionally, Sergeant Janusz may not have had sufficient time to process the information provided and ask for the reason for the initial stop before the collision.[61] One reason supervisory control is important during pursuits is that when supervisors are not directly involved in pursuit tasks, they may be in a better position to process information and make more timely decisions because they are engaged in fewer, high-demand tasks than the pursuing officers.[62] In this case, the collision probably occurred before they received and attended to enough information to reach a threshold that would cause them to decide and act on aborting the pursuit.

**Predicting Post-Abort Driving Behavior**

Even if Officers Zozaya and Precie had aborted the pursuit and turned off their lights and siren as they approached Oleander Avenue, there is insufficient data (including the limited research literature or experience) that would allow for a reliable prediction that Mr. Bonilla would have (1)

---

[60] During his deposition, Officer Precie specifically noted that one reason why the reason for the pursuit was not broadcast was that, "…everything happened so quickly, so we didn't have enough reasonable time" (34:1-5).

[61] There is no information in the materials I have reviewed thus far about Sergeant Janusz's awareness of the pursuit and whether he was waiting for additional information or was going to ask Officer Zozaya for the reason for the pursuit. I have no intention of testifying to the information Sergeant Janusz had or what his thought processes were.

[62] Thompson, Justin. "Police Pursuits: Are No-Pursuit Policies the Answer?" [Student paper]. October 21, 2005. https://www.cji.edu/wp-content/uploads/2019/04/police_pursuits.pdf

noticed that he was no longer being pursued and (2) started to drive with due regard for the safety of others before the collision that occurred less than ~6.3 seconds after Officer Zozaya finished broadcasting the last update. The limited research data and experience do not support the generalized assertion that fleeing drivers instantaneously start driving safely upon perceiving they are no longer being pursued.

**Opinion Two: Officers Garcia and Terwilliger never assumed a role in the pursuit before the collision.**

It is a common practice for peace officers to start driving toward the area of vehicle pursuits to position themselves to rapidly respond by (1) taking an active role in the pursuit, i.e., as a primary, secondary, or tertiary unit, or (2) assisting with the apprehension of associated suspects in the event the violator vehicle yields, stops and the occupants flee on foot, or stops due to a collision. The FPD pursuit policy is clear as to what constitutes active participation, i.e., by the primary and secondary units, or "paralleling," under §§ 314.3.3, 314.3.4, and 314.3.8, respectively.

As applied to the facts, Officer Garcia made it clear that he drove north from the parking lot across Valley Boulevard with the intention of assuming an active role in the pursuit. (Garcia Deposition, 36:25-38:23). However, he never positioned his vehicle to assume the role of a secondary unit in the pursuit, which would have necessarily required him to get behind Officers Zozaya and Precie's vehicle and follow them, which would have triggered his duties as a secondary pursuing unit pursuant to the FPD policy.[63]

**Opinion Three: FPD's decision not to conduct a separate administrative investigation is consistent with agency discretion under the circumstances.**

Based on my training and experience as (1) a first-line supervisor responsible for identifying performance issues or misconduct and taking corrective action, (2) as a labor representative and labor-relations attorney, and (3) as an expert witness/consultant, and having reviewed numerous administrative investigations and resulting discipline across multiple agencies in California and other states, I am aware that many law enforcement executives exercise discretion in deciding whether to initiate duplicative administrative investigations following a critical incident that an outside agency has thoroughly investigated.

As applied to the facts, the San Bernardino County Sheriff's Department MAIT conducted a thorough accident investigation and reconstruction, which, along with the video and audio evidence, identified the relevant facts bearing on the performance of the FPD personnel, including Officer Garcia's driving across the divided roadway without turning on his emergency lights and turning on his headlights in violation of FPD policy. In my experience, agencies and their executives sometimes treat a thorough outside investigation of this kind as the basis for their discretionary decisions. Such discretion usually involves addressing the policy violations formally or informally through counseling or coaching, if the violations were identified as errors rather than intentional misconduct.

[63] During his deposition, Deputy Wolff testified that the Garcia patrol vehicle was "facing in a northwesterly direction—somewhere between due north and due west," and that he believed that, due to steering data from the EDR, Garcia intended to continue into the No. 1 westbound lane and drive west (86:6-87:3).

Additionally, due to Officer Garcia's injuries, he was unlikely to return to work and ultimately retired due to the disability. (Garcia Deposition, 21:5-23) Such circumstances are generally considered in deciding whether to impose formal discipline. Nothing in the materials I have reviewed thus far for this opinion reflects a pattern of similar incidents or a documented agency response inconsistent with the practices identified above.

**Opinion Four: The City of Fontana and the FPD trained their personnel to a level that meets the minimum California POST standard for training their personnel in making difficult decisions where, if the wrong decisions are made, would result in violations of constitutional rights.**

First, the driving, pursuit, and use-of-force policies of the FPD are based on clearly established law. (COF 001553, 001513, 001542) Second, Officers Zozaya, Precie, Garcia, Terwilliger, Bautista, and Sergeant Janusz have all met the minimum training requirements regarding all of the relevant subjects. That training was current at the time of this incident. Each of them had graduated from POST-certified basic academies, meaning they satisfied the minimum training requirement on the constitutional limitations on the use of force. (Zozaya POST Profile, COF 001839; Precie POST Profile, COF 0001823; Garcia POST Profile, COF 001952; Terwilliger POST Profile, COF 001978; Bautista POST Profile, COF 001773; Janusz POST Profile, COF 001860)

California POST implemented the "Perishable Skills Program" to ensure that agencies provide a minimum of periodic training on critical topics (e.g., use of force and driving). The standard enacted as of June 15, 2021 requires a total of 18 hours of training every 24 months on high-liability topics such as the lawful use of force and safe vehicle operations.

The materials I have reviewed thus far support that the following FPD personnel have satisfied the POST Perishable Skills Requirements about the constitutional limitations on the use of force by peace officers and safe vehicle operations:

Zozaya:

- Firearms on 1/18/2024
- Driving on 11/7/2023 (COF 001839)
- Use of Force on 11/14/2024

Precie:

- Firearms on 1/10/2024
- Driving on 11/14/2023 (COF 001823)
- Use of Force on 11/14/2024

Garcia:

- Firearms on 1/17/2024
- Driving on 11/8/2023
- Firearms on 3/30/2022
- Use of Force on 3/30/2022
- Driving on 10/26/2021 (COF 001952)

Terwilliger:

- Firearms on 1/17/2024
- Driving on 11/7/2023
- Firearms on 4/1/2022
- Use of Force on 4/1/2022
- Driving on 11/5/2021
- Firearms on 7/22/2020
- Driving on 1/20/2020
- Firearms on 7/10/2018
- Driving on 9/19/2018 (COF 001979)
- Driver Training (EVOC) Update/PIT Maneuver on 8/3/2017
- Firearms on 11/16/2016
- Driving on 9/9/2016
- Firearms on 4/8/2015
- Driving on 1/19/2015
- Firearms on 11/21/2013 (COF 001978)

Bautista:

- Driving on 1/17/2024
- Firearms on 11/7/2023
- Use of Force on 8/10/2022
- Driving on 11/4/2021
- Firearms on 4/8/2015
- Driving on 1/19/2015 (COF 001774)
- Firearms on 7/22/2020
- Driving on 2/7/2020
- Firearms on 7/4/2018
- Driving on 9/20/2018
- Firearms on 11/16/2016
- Driving on 9/8/2016 (COF 001773)

Janusz:

- Firearms on 1/17/2024
- Driving on 11/8/2023
- Firearms on 4/6/2022
- Use of Force on 4/6/2022 (COF 001862)
- Driving on 11/4/2021
- Firearms on 7/6/2018
- Driving on 9/28/2018
- Firearms on 11/15/2016
- Driving on 9/13/2016
- Firearms on 7/30/2014
- Driving on 1/21/2014 and 12/12/2012
- Firearms on 10/5/2011

- Driving on 12/16/2010 (COF 001861)
- Firearms on 6/2/2010
- Firearms on 2/21/2008
- Driving/Force Options Simulator on 1/10/2007
- Driving/Force Options Simulator on 9/15/2004 (COF 001860)

**Opinion Five: Based on the materials I have reviewed, FPD's response is consistent with how agencies address performance issues they do not identify as violations of constitutional rights.**

First, I reiterate my experience as presented under Opinion Seven. Second, nothing in the materials I have reviewed thus far would likely cause an executive to suspect that any of the conduct by his personnel in this matter involved one or more violations of constitutional rights. In my experience, a facially unintentional collision of this nature is not the type of incident that could cause such a conclusion or suspicion. Third, even considering that Officer Garcia drove without his headlights and crossed the divided roadway, there has been no evidence provided by Mr. Bonilla indicating that this caused him to see (assuming he saw) the Garcia patrol vehicle later than he would have had it had its headlights on. It is also unknown if the Sentra's last movements were the result of any steering or braking input by Mr. Bonilla, or if there was a coincidental loss of control due to the unsafe condition of the Sentra (i.e., the improper tire and spare tire arrangement). (Holland CHP 558D, COF 000030; Wolff Deposition, 36:12-21, 49:1-12, 72:2-17, 170:17-172:18) Fourth, even if supervisors recognize an error on the part of one of its personnel, such errors are not always addressed via formal investigations or discipline; sometimes oral counseling and coaching is deemed sufficient. And finally, as mentioned above, if the employee is not anticipated to return to work, executives sometimes decide not to conduct formal investigations or impose discipline.

Respectfully Submitted,

JEFFREY A. MARTIN, J.D., M.S., C.F.V.T.

[signature] Date: July 27, 2026

727 Industrial Road, Suite 102
San Carlos, California 94070

# Diana Rias et al. v. City of Fontana et al.

## United States District Court – Central District of California
## Consolidated Case No. 5:25-cv-207-JGB-SHK

## Rebuttal Expert Witness Report of Jeffrey A. Martin, J.D., M.S., C.F.V.T.

**REBUTTAL TO REPORT BY PLAINTIFFS' EXPERT ROGER CLARK**

**PURPOSE:** This rebuttal is based on sufficient facts and data from the incident, including those in my primary report, peer-reviewed and non-peer-reviewed literature, and professional standards. This rebuttal, like my primary report, applies a deductive "issue-rule-analysis-conclusion" (IRAC) approach that is reliable and reproducible. This report is offered to rebut the expert witness report by Mr. Roger Clark, dated 7/26/2026. My role in this matter, my qualifications, publication history, prior testimony, compensation, and facts and data considered, remain as stated in my primary report dated 7/27/2027.

**BACKGROUND**: On 7/28/2026, I received the expert witness report by Plaintiffs' expert Roger Clark. The recurring pattern in Mr. Clark's analysis, as demonstrated below, includes opinions that (1) do not include the totality of the circumstances each of the FPD personnel faced at the time, i.e., Mr. Clark selectively relied on facts to support his opinions; (2) He interpreted the evidence in such a manner to support his opinions, despite the fact the evidence did not support such interpretations or the evidence could have equally supported alternative interpretations; (3) He did not identify facts and data, such as speeds and the relative timing of the events, leaving gaps between his opinions, the stated bases, and the facts; (4) he failed to apply the generally accepted/consensus information—both professional and scientific—relevant to an analysis of this incident; (5) he identified no methodology for the formation of his opinions that is reproducible; (6) makes multiple state-of-mind determinations, and (7) he identifies facts unknown to the officers until after the conclusion of the incident, although he states he does not do so. This renders many of his opinion statements as *ipse dixit*.[1]

**Rebuttal Point One re Clark Additional Opinion 1: On pages 36-37 of his report, Mr. Clark wrote the following:**

- Officer Zozaya should not have initiated a vehicle pursuit under these conditions and circumstances. When you declare a pursuit, a reasonable officer understands the foreseeable consequences of a pursuit, including a deadly collision, which is why the balancing test is required prior to initiating a pursuit. Even after the pursuit began, Officer Zozaya should have terminated the pursuit under the same balancing test, which considers the high speeds, low visibility/dark, raining/wet road,

[1] Expert opinion becomes ipse dixit when the expert fails to close the analytical gap between the facts and data relied upon and the conclusion reached. See *Gen. Elec. Co. v. Joiner*, 522. U.S. 136, 146 (1997).

unrestrained child in the back seat, and minor traffic violation.[2]

- However, when the Nissan failed to yield and fled, Officer Zozaya was required in the totality of this [sic] circumstances not to declare, or engage in, a vehicle pursuit for such insignificant vehicle code violations.
- Accordingly, in the training, declaring and engaging in a police pursuit for simple vehicle code violations is never justified.

Mr. Clark's statements assume that, once Officer Zozaya first perceived that the Nissan started to drive away after signaling the Nissan driver (Mr. Bonilla) to stop, Officer Zozaya would be able to instantaneously determine that Mr. Bonilla's driving constituted an immediate threat to the public or was going to do so eventually. Mr. Clark did not acknowledge the multiple tasks officers engage in during this type of activity, as reflected in both personal experience and the relevant literature. The statements also imply that Officer Zozaya could (1) immediately predict that Mr. Bonilla would reach ~100 mph, and (2) that a fellow officer would drive across the path of the fleeing Nissan resulting in a collision. Practical experience dictates that violators will sometimes start to flee. Then either yield, come to a stop, and flee from the vehicle on foot, or drive in such a manner that does not constitute an immediate threat to the public.

Mr. Clark also implies that had Officer Zozaya neither (1) initiated the pursuit nor (2) aborted the pursuit before the collision, that would have resulted in an immediate change in Mr. Bonilla's driving behavior that would have prevented the collision with Officers Garcia and Terwilliger's patrol vehicle. Mr. Clark does not provide either an experiential, professional, or scientific basis for this, as I did in my primary report.

Mr. Clark's also asserted that the conditions included (1) "high speeds," (2) "low visibility/dark," and (3) that there was an "unrestrained child in the back seat." Mr. Clark never filled the gap or analyzed the point in time at which Officer Zozaya should have determined that (1) the speeds were too high for the multi-lane thoroughfare given the light traffic and that most of the traffic signals were green; (2) how Officer Zozaya perceived the overall visibility in terms of distance during the pursuit;[3] (3) Officer Precie stated during his deposition that "the visibility was good" and that there were long and clear lines of sight (43:17-24); (4) that the different videos depict the presence of illuminated street lights and lighting from businesses (**10 420** Fontana Motors Direct Catawba and Valley [COF 000483] Crop.mkv; **12 422** Yerevan Truck Sales [COF 000485] Marked.mkv; **13 423A** Sunrise Ford [COF 000486] Trim & Mark.mkv; **5 413** 76 Gas Station [COF 000476].mkv; **6 414** 711 on Citrus and Valley [COF 000477] Trim & Mark.mkv; **4 412** City Cam 2 [COF 000475].mkv; **3 411** City Cam 1 [COF 000474] Trim & Mark.mkv; and **2 402** Precie BWC [COF 000464] Trim & Mark.mkv; and (5) the CHP 555 form clearing indicates that street lights were present. (CHP 555, COF 000014)

Mr. Clark's statement about the "unrestrained child" was not based on what Officer Zozaya knew at the time, since (1) Officer Zozaya didn't recall the passenger continuing to extend out the right-rear window once they attempted to stop the Nissan, and (2) it would be unlikely that Officer

---

[2] It should be noted that Mr. Clark did not mention that the traffic was "light" in his analysis supporting his opinion that Officer Garcia should not have initiated the pursuit. Still, later, in support of his opinion that the Nissan's 100+ mph speeds did not pose an immediate threat to public safety, he then mentioned that traffic was "light" (p. 38).

[3] It does not appear that Officer Zozaya was asked about the visibility in terms of distance during his deposition.

Zozaya could determine whether the right-rear passenger had put on his seatbelt and (3) he made it very clear that he could not determine the age of the right-rear passenger.[4] (Zozaya Deposition, 15: 25-16:4)

**Rebuttal Point Two re Clark Additional Opinion 1: On page 37 of his report, Mr. Clark wrote the following:**

- Accordingly, in the training declaring and engaging in a police pursuit for simple vehicle code violations is never justified.

This misrepresents the balance test, which both Mr. Clark and I document in our respective reports. Under the balance test, officers can still pursue violators for "simple vehicle code violations" so long as the risks the pursuit poses do not outweigh the need to apprehend the violator(s) immediately. As stated above, if a violator fails to yield without violating traffic laws, or if the driver demonstrates due regard for the safety of others and the driving behavior does not present an immediate threat to public safety, officers may initiate and continue pursuits under the Balance Test.

**Rebuttal Point Three re Clark Additional Opinion 1: On page 37 of his report, Mr. Clark wrote the following:**

- Officer Zozaya...cannot be excused or forgiven for his decision to declare and engage in pursuit of the Nissan in this set of facts.
- In this set of facts, Officer Zozaya's decision to do so was foreseeable catastrophic.
- Officer Zozaya's decision set in motion a sequence of events resulting in the...unnecessary death of juveniles and significant injuries inflected [sic] on two police officers who had to retire from service.

First, California peace officers are trained that they can be held accountable for their actions in both criminal and civil court proceedings.[5] Second, these statements are moralized legal conclusions about culpability, which the trier of fact must determine. Third, Mr. Clark identifies no reproducible methodology that supports such statements and lacks any facts or data to support that the collision with Officers Garcia and Terwilliger's vehicle was foreseeable. Fourth, the "set in motion" statement does not include any indication or support for the notion that, had Officer Zozaya not pursued the Nissan, or had aborted the pursuit before the collision, this would have guaranteed that Mr. Bonilla's driving would have changed in such a manner so that the collision would not have happened.

Mr. Clark did not apply any of the facts and data to support his statement, i.e., "there is insufficient data (including the limited research literature or experience) that would allow for a reliable prediction that Mr. Bonilla would have (1) noticed that he was no longer being pursued and (2) started to drive with due regard for the safety of others before the collision that occurred

---

[4] On page 2 of his report, Mr. Clark wrote, "Relevant to my analysis in this matter is what was known to the Defendant Officers at the time of the incident." The ag

[5] California Commission on Peace Officer Standards and Training, Learning Domain 19: Vehicle Operations v6.3, pp. 1-3 and 3-3.

less than ~6.3 seconds after Officer Zozaya finished broadcasting the last update" (Martin primary report, pp. 32-33). This renders Mr. Clark's opinion statements *ipse dixit*.

**Rebuttal Point re Clark Additional Opinion 2: On page 37 of his report, Mr. Clark wrote the following:**

- At the time of the collision, Officer Garcia was not in pursuit of the Nissan and should have remained in the parking lot.
- Under these facts, Officer Zozaya's unit was the primary unit (Unit 1), Officer Bautista could have been the secondary unit (Unit 2), and the Sergeant in response would have been the supervisor (Unit 3).
- Units not involved in the pursuit should not attempt to parallel the pursuit (according to FPD policy) and should remain in their assigned areas unless otherwise directed by a supervisor.

First, as I wrote in my primary report under Opinion Two, and as Officer Garcia clearly stated during his deposition, it is common practice to drive toward the locations of pursuit, especially when a single unit is involved. (Garcia Deposition, 26:24-27:4; 108:4-7) Both Officers make it clear that they were not "in the pursuit," but they were driving toward it to assist. (Garcia Deposition, 37: 10-19, 108:9-19; Terwilliger Deposition, 13:5-21) Officer Terwilliger also noted that, to be in pursuit, they would have needed to turn on their lights and siren, which they did not. (Terwilliger Deposition, 40:14-17) Mr. Clark omitted these facts and data from his analysis.

Second, the FPD pursuit policy clearly defines what constitutes active participation, i.e., by the primary and secondary units, or "paralleling," under §§ 314.3.3, 314.3.4, and 314.3.8, respectively. Regardless, Mr. Clark implied that the officers were paralleling, even though the facts and the definition of paralleling do not support that implication or inference. Again, a huge gap exists between the facts and Mr. Clark's opinion statements. Third, Mr. Clark's statement about the officers "remain[ing] in their assigned areas unless otherwise directed by a supervisor" is completely disconnected from the facts. It is common knowledge that police patrol deployments are frequently determined by geographical subdivisions referred to as "beats." Officer Garcia stated during his deposition that he believed that the parking lot was in his assigned beat on the date of the incident. (Garcia Deposition, 44:7-10).

Nothing in the materials or policy informs FPD personnel that driving out of a parking lot and onto a roadway constitutes leaving an assigned area or beat. Additionally, Mr. Clark did not identify which geographical area or beat that Officers Garcia or Terwilliger were in, and Officer Bautista was a canine unit. Canine units are typically assigned to areas larger than single beats or can patrol citywide. Mr. Clark wrote this without referencing how FPD subdivided the city for patrol deployment purposes and without stating what Officer Garcia's assigned area was.

**Rebuttal Point One re Clark Additional Opinion 3: On page 38 of his report, Mr. Clark wrote the following:**

- There are physical facts, circumstances, and admissions by Officer Garcia that support the finding that Officer Garcia intentionally and/or deliberately used his vehicle to collide with the Nissan.
- Officer Garcia intentionally and/or deliberately used his vehicle to collide with the Nissan.

Mr. Clark then provided the following as data points to support his state-of-mind opinion:

- Officer Garcia knew from the radio traffic that the pursuit was E/B Valley Blvd. at high speeds from Catawba.
- Officer Garcia knew that within seconds the pursuit was passing Oleander and seconds later that the high-speed pursuit was approaching Cypress, which was the closest cross-street to the west of Officer Garcia's location.

While Officer Garcia recalled that he was aware of the eastbound direction of the pursuit and he recalled hearing "Catawba" as a cross street, he specifically testified that he did not recall hearing that the pursuit was traveling at a "high speed." (Garcia Deposition, 48:14-25) Officer Terwilliger recalled hearing that the Nissan was traveling east on Valley Boulevard through Oleander at 100 mph. Still, this information cannot be attributed to Officer Garcia because Officer Terwilliger heard it (while getting the speed report wrong), which does not mean Officer Garcia heard and remembered it just before the collision. (MAIT Report, COF 000028).

There is nothing in Garcia's deposition testimony or in the MAIT summary of Officer Garcia's statement that he knew anything about the timing of the arrival of the Nissan. While Officer Zozaya's update was broadcast, that doesn't mean Officer Garcia heard and remembered it before the collision.

Mr. Clark then offered the following additional datapoints in support of his state-of-mind opinion:

- Officer Garcia was trying to remain inconspicuous by keeping his headlights off.
- At the apron of the driveway, Officer Garcia saw the headlights of the Nissan approaching eastbound on Valley Blvd., approximately one or two seconds prior to the collision.
- Given the speed of the Nissan and distance from the apron, no reasonable officer would believe that it would be safe to turn from the apron onto Valley without risking a collision with the Nissan.
- Based on Officer Terwilliger's testimony, at the apron, Officer Garcia saw the Nissan and said, "Fuck, there they are"
- The EDR data shows that Officer Garcia removed his foot from the brake, depressed the accelerator pedal to 100%, and turned the front of his patrol vehicle directly into the side of the Nissan.

It is important to note that Mr. Clark wrote the following on pages 1 and 2 of his report:

> It is also necessary to state at the at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events shown in the evidence versus that which is proffered by the Defendant Officers and/or others, I do not opine for the trier of fact regarding who are the more believable witnesses. I consider that the resolution of any such conflicts is within the purview of a jury to decide.

Despite this disclaimer, Mr. Clark omitted from his analysis that there is nowhere in the materials where Officer Garcia expressed the intention of colliding with the Nissan. However, Officer Garcia's summarized statement in the MAIT report did not support an express or implicit intention to do so:

- He looked both east and west before proceeding across Valley Boulevard and did not see a vehicle coming;
- After seeing no vehicles coming, he proceeded north and turned west onto Valley Boulevard;
- It was after he completed the westbound turn that he saw the other vehicle coming at him; and
- He did not recall the collision. (COF 000029)

During his deposition, Officer Garcia stated the following:

- He suffered memory loss since the collision and could not recall it;
- He did not recall having any intention of using any pursuit intervention technique; (107:9-16)
  He only recalled that he was responding to the pursuit; and (107:20-108:1)
- He recalled having seen the other vehicle "a couple of seconds or a second" before the crash; (32:18-24)
- That he only remembered seeing headlights just before the crash and was unable to provide any description of the vehicle without looking at the evidentiary videos and photographs; (32:2-13)

The MAIT report and Detective Wolff's deposition testimony directly contradict Mr. Clark's state-of-mind opinions:

- That the Nissan was traveling within a range of 83 to 108 mph and was approximately 537 to 609 feet west of Garcia's vehicle when Garcia entered Valley Boulevard; (COF 00030
- Detective Wolff explained why a driver in Garcia's position would have difficulty estimating the time he had to make the turn in relation to another vehicle approaching at 100 mph at nighttime; (97:7-20; 92:12-24)

- That he agreed with Detective Holland's opinion that the Nissan was traveling so fast that no reasonable person would have believed it was anywhere close enough to constitute a hazard; (95:25-93:7) and
- Detective Wolff testified that a reasonable person in Officer Garcia's position would not knowingly pull out in front of a vehicle he believed he did not have time to clear. If Officer Garcia believed he did not have time to make the turn before the Nissan arrived, "I doubt he would pull out in front of the vehicle as no reasonable person, unless they were suicidal, would do such a thing." (98:3-14)

Felix Lee, in his report, made no inferences as to Officer Garcia's intent based on the data he developed. Specifically, he only found that:

- Officer Garcia negotiated a left turn out of a parking lot into the path of the Nissan;
- Garcia's vehicle was traveling ~5 mph before reaching the driveway apron and then applied full throttle while negotiating a left turn during the 3 seconds leading up to impact;
- Garcia's vehicle left the driveway apron and entered Valley Boulevard ~2 seconds before impact;
- The front left of Garcia's vehicle struck the right front of the Nissan;
- The area of impact was in the left portion of the eastbound No. 1 lane; and
- The Nissan was traveling around 82 to 84 mph during the impact with Garcia's vehicle, which was traveling around 19 to 20 mph at the time. (Lee Report, p. 8)

Officer Terwilliger's summarized statement in the MAIT report stated:

> As Garcia drove towards the driveway of the parking lot that exited north onto Valley Boulevard, Terwilliger heard the pursuit unit broadcast that V-1 was eastbound Valley Boulevard through Oleander Avenue at speeds exceeding 100 mph. As Garcia was near Valley Boulevard, Terwilliger looked left (out the driver's window) and saw V-1 coming at them (approximately 20-30 feet away) with no headlights on. (COF 000028)

During his deposition, Officer Terwilliger stated:

> And I remember pulling up to the driveway or the apron [of] the driveway, and I remember Officer Garcia saying ... 'Fuck, there they are.' And I remember a car coming at – at – driving at the vehicle. And the next thing I know, I'm outside of the car, sitting on the ground with my femur snapped in half. (16:11-17)

Additionally, Officer Terwilliger testified during his deposition that he could not approximate the speed of the Nissan when he first saw it, and that he believed the Nissan had already passed/crossed

the intersection at Cypress Avenue when he first saw it. (22:22-24, 23:17-23) This supports that both officers saw only the Nissan's headlights just before impact, which likely left insufficient time to avoid it.

Mr. Clark puts forth Officer Terwilliger's account as a fact, but it is the same basis Mr. Clark relies upon for the "Fuck, there they are" statement and the times at which they noticed the headlights just before the collision. If Officer Terwilliger's memory is sufficiently reliable for Mr. Clark to use to support his inference of Officer Garcia's intent, then Officer Terwilliger's recollection that the Nissan had already crossed Cypress Avenue when he first saw it must be considered. However, Mr. Clark selectively relied on the portions of the same witness's memory to support his inference about Officer Garcia's intent.

Assuming that Mr. Lee's findings were more accurate than the MAIT team's,[6] Mr. Clark frames his data points to only support the hypothesis that Officer Garcia saw the approaching Nissan with sufficient time to intentionally intercept it at the northern edge of the eastbound No. 1 lane of Valley Boulevard. However, Mr. Lee's does not draw that inference or allow for only that inference. Mr. Lee reported the 100 percent acceleration to start 3.6 seconds before the impact, and Mr. Clark did not apply the alternative hypothesis that Officer Garcia's sudden acceleration might have been an attempt to completely cross the path of the Nissan to avoid a collision. Therefore, Mr. Lee's acceleration data is equally consistent with an unsuccessful evasive maneuver as with an intentional interception. When combined with the totality of the materials and evidence—including the absence of declared intent by Officer Garcia, both officers' consistent accounts of seeing only headlights one to two seconds before the impact, and Detective Wolff's testimony regarding the difficulty of accurately estimating an oncoming vehicle's speed under the circumstances—Mr. Clark's inference of a deliberate collision is unsupported.[7]

Under Rule 702(d), an expert's opinion must reflect a reliable application of the expert's methodology to the facts of the case. Here, Mr. Clark's stated methodology, i.e., the application of POST training standards and the professional standard of care, does not provide for establishing an officer's subjective or actual intent.

**Rebuttal Point Two re Clark Additional Opinion 3: (Assuming arguendo that Officer Garcia intentionally collided with the Nissan) Mr. Clark wrote the following on page 38 of his report:**

- Intentionally striking the Nissan with the Ford Explorer patrol vehicle would be a use of deadly force.
- No reasonable officer would conclude that the Nissan was an immediate threat of death or serious bodily injury to any person at the time.

[6] Mr. Lee found AOI No. 1 to be at the northern edge of the eastbound No. 1 lane of Valley Boulevard, and that the left front of the Explorer impacted the right front of the Nissan. The MAIT team found that Mr. Bonilla had applied its brakes 1.5 seconds prior (1.5 to 2.0 seconds per Mr. Lee) due to the undersized spare tire and the improperly installed tire, and that the Nissan slid in a northeastern direction and presented its right side to and impacting the front of Explorer at the northern edge of the marked median and to the west of Mr. Lee's AOI No. 1.

[7] I'll leave the suicidal nature of a decision to collide with the Nissan as expressed by Detective Wolff during his deposition (and which Mr. Lee put at 105 mph only 5 seconds before the collision), to the province of the Court and the jury.

- In my opinion, considering the officers' testimony and the video evidence, that Officer Garcia could not have reasonably believed that the Nissan was an imminent threat of death or serious bodily injury at the time.
- At the time, Officer Garcia did not know what the primary pursuit vehicle suspected the Nissan to have violated.
- Officer Garcia did not know where the Nissan was fleeing from.
- Officer Garcia did not have any information about the individuals in the subject Nissan.
- Officer Garcia had no information that the occupants of the Nissan had physically injured any person. Officer Garcia had no information that the occupants of the Nissan had verbally threatened any person.
- Officer Garcia had no information that the Nissan had been in any prior collision.
- Further, traffic was light.

California peace officers are trained that, under the Fourth Amendment of the U.S. Constitution, their uses of force will be "judged using the 'objective reasonableness' standard."[8] They are also trained that their uses of force will be evaluated as follows:

> …must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation.

California peace officers are further trained that the major factors in determining whether their actions are objectively reasonable are:

- Whether the suspect posed an immediate threat to the safety of officers or others,
- The severity of the crime at issue,
- Whether the suspect was actively resisting arrest,
- Whether the suspect was attempting to evade arrest by flight, and
- Split-second judgments during circumstances that are tense, uncertain, and rapidly evolving.

California peace officers are further trained:

> The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that deputies are often forced to make split-second decisions about the amount of

[8] California Commission on Peace Officer Standards and Training, *Learning Domain 20: Use of Force/Deescalation*, v5.4, pp. 1-3 and 1-4.

> force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.[9]

California peace officers are also trained about an additional, but not inclusive, list of factors that will be considered, including:

- Whether there was an opportunity to warn about the use of force prior to force being used…
- Availability of other objectively reasonable force options, and
- Environmental factors, including but not limited to lighting, footing, sound conditions, crowds, traffic, and other hazards.[10]

Additionally, California peace officers are trained that the objective reasonableness standard also applies to uses of deadly force. The standard California peace officer training identifies deadly force as a potential response available when an officer perceives an ongoing and immediate threat to public safety of the type presented by Mr. Bonilla, i.e., that force that creates a substantial risk of causing death or serious bodily has been found to be constitutionally permissible to stop fleeing violator vehicles that, due to the nature of their flight, present an immediate threat to public safety.[11,12]

Again, Mr. Clark departs from his stated methodology of applying the POST training standards and the professional standard of care. Although Mr. Clark lists POST *Learning Domain 20: Use of Force Deescalation* on page 6 of his report, he did not list or refer to any of the on-point information about peace officers' constitutional limitations on the use of force listed above. Instead, Mr. Clark quoted peripheral or philosophical language from learning domain, for example, the "tremendous responsibility" the use authority to use deadly force brings, (p. 11), "influencing factors," with his addition of "emotional maturity" (p. 12), and that "fear alone does not justify the use of deadly force" (p. 13), with the latter being derived from state statute, not the constitutionally based language I quoted above.

Additionally, Mr. Clark does not state the facts and data commonly used in this profession to render opinions on peace officer conduct. For example, he did not determine when Officer Garcia first had the opportunity to see the Nissan being driven at ~100 mph, how much time he had to calculate when he would have to accelerate to intercept it, or how rapidly the event was evolving. Instead, Mr. Clark—in addition to selectively presenting the data—provided his state-of-mind opinion by selectively identifying excerpts from Learning Domain 20

Had Mr. Clark consistently applied his stated methodology, he would have included all of the facts and data, including the timing information from the reconstruction reports and the video evidence, including the ~100 mph speed, and inventoried them as the totality of the circumstances

---

[9] *Ibid.*
[10] *Learning Domain 20, p. 1-5.*
[11] *Learning Domain 20,* p. 4-4.
[12] Learning Domain 20 specifically references *Scott v. Harris*, [127 S. Ct. 1759 (2007)], p. 4-10. *Plumhoff v. Rickard,* 572 U.S. 765 (2014) is also a part of the "Lawful Force" curriculum in the POST ICI Officer-involved Shootings and Death Investigations Course.

Officer Garcia (objectively) faced at the time of his purported decision to collide with the Nissan. Such an analysis might read as follows:

> As applied to the facts, a similarly situated peace officer could believe that it would be consistent with his legal training to use his patrol vehicle to stop the movement of a fleeing violator vehicle—force which has a substantial risk of causing serious bodily injury or death to the driver and other occupants—that was traveling at around 100 mph in a commercial area to stop that threat to public safety. These circumstances make attempts to warn or apply deescalation tactics before using that force option unfeasible.
>
> While it is unknown at what point Officer Garcia had the first opportunity to see the Nissan traveling at 105 mph as it approached Cypress Avenue as he drove north on the driveway toward Valley Boulevard (since the visual obstructions were not sequentially identified), and it is unknown precisely when Officer Garcia first saw the Nissan, it is difficult to determine how much time a similarly situated officer would have to select a response, and then physically engage that response.

However, Mr. Clark never mentioned the Nissan's 105-mph speed before the collision, as determined by Mr. Lee, or how that speed endangered the public. Instead, he provided a list of absent circumstances (i.e., what Officer Garcia did not know about the pursuit, that Mr. Bonilla had not threatened anyone, and that Mr. Bonilla had not previously collided with another vehicle). It should also be noted that, in support of his opinion "that no officer would conclude that the Nissan was an immediate threat of death or serious bodily injury to any person at the time," he pointed out that "...traffic was light." Mr. Clark mentions that the traffic was light to support that Mr. Bonilla's operation of the Nissan at ~100 mph was not a threat. Yet, he did not mention this as one of the factors balancing whether the risks the pursuit initiated by Officer Zozaya outweighed the need for immediate apprehension. Traffic conditions are a factor in applying the balance test identified in the FPD pursuit policy (COF 0001514) and the *California Law Enforcement Vehicle Pursuit Guidelines* (p. 10).

**Rebuttal Point re Clark Additional Opinion 4: Mr. Clark wrote the following on page 39 of his report:**

- If Officer Garcia did not intend to strike the Nissan, his conduct was nevertheless reckless, unsafe, without due regard, inconsistent with basic law enforcement training, and violated basic POST standards and the standard of care pursuant to POST and officer training.
- Whether Officer Garcia was intending to create a blocking position or otherwise imped [sic] the path of the Nissan, or if he was intending to follow Officer Bautista for any reason, under these facts, Officer Garcia's choice to exit the driveway

knowing and seeing a high-speed pursuit moving eastbound on Valley Blvd., without headlights, and without being situationally aware and yielding the right-of-way, was reckless and a gross departure from the nationally accepted and required tactics as well as the basic Rules of the Road required by any driver.

First, the statement that if Officer Garcia did not intend to strike the Nissan, his conduct was "...reckless, unsafe, [and] without due regard" constitutes a legal conclusion. Second, Mr. Clark also makes another determination about Officer Garcia's mental state. California peace officers are trained that the elements for the crime of reckless driving under California Vehicle Code § 23103(a) are:

> Any person who drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property is guilty of reckless driving.[13]

Given the required mental state element, "in willful or wanton disregard for the safety of persons or property..." and Mr. Clark again, draws the inference about Officer Garcia's state of mind bsed on (1) that Officer Clark made the "choice to exit the driveway knowing and seeing a high-speed pursuit moving eastbound on Valley Blvd., (2) without headlights, and (3) without being situationally aware and yielding the right of way.

Again, the problem is that Mr. Clark did not show when Officer Garcia first saw the Nissan traveling east at ~100 mph, or when he actually saw it. He again omitted from his analysis the testimony that Officer Garcia did not recall seeing the car coming at them—and only seeing headlights—until one to two seconds before the impact. Additionally, Mr. Clark did not support this opinion with an analysis of the factors that made it more or less likely that a similarly situated officer would have seen and identified the oncoming Nissan earlier than he reported. This requires a human factors analysis which Mr. Clark does not provide, and it also ignores Detective Wolff's deposition testimony about the difficulty people have in determining speed and distance of speeding vehicles under similar circumstances.

Mr. Clark's additional state-of-mind determination, i.e., that Officer Garcia was "not situationally aware," is also a state of mind opinion that will be further addressed under the rebuttal point to Mr. Clark's Additional Opinion 6.

**Rebuttal Point One to Additional Opinion 5: on page 39 of his report, Mr. Clark writes:**

- The Officers' failed tactics contributed to the collision and death of the three innocent occupants of the Nissan.
- During the pursuit, Officer Zozaya did not get the Nissan's license plate and did not instruct Officer Precie to get the license plate.
- Officer Zozaya and Officer Precie failed to adequately communicate with each other prior to and during the pursuit.

---

[13] California Commission on Peace Officer Standards and Training, *Learning Domain 28: Traffic Enforcement*, v6.4, p. 3-43.

- Officer Garcia should not have attempted to join the pursuit under these facts.
- Officer Garcia stated that he knew what was put out over the radio.
- Officer Garcia did not hear a specific request for backup.
- Officer Garcia should have known that there was already a primary unit in pursuit (Zozaya), a secondary unit en route to assist (Bautista), and a Sergeant en route.

First, the opinion that Officer Garcia's operation of the police vehicle that evening "contributed to the collision and death of three innocent occupants of the Nissan," is a causation opinion, which generally is within the scope of an accident reconstructionist. Mr. Clark did not take into consideration the conditions under which the collision occurred, including the ~100 mph speed, lighting, what influence, if any, Officer Bautista's driving and emergent lights had on Mr. Bonilla's responses, and other factors that a qualified accident reconstructionist would have to provide. Additionally, Mr. Lee did not make any determination about causation, and the MAIT investigation indicated that Mr. Bonilla's driving was the primary collision factor, with no contributing factor assigned to Officer Garcia because of the Nissan's high speed and the difficulties that presented to a similarly situated driver.

Second, the statement that Officer Garcia did not get the Nissan's license plate and did not instruct Officer Precie to get the plate assumes that the plate was visible and legible to each of them. Nothing in the materials suggests the plate number was visible or legible, but Mr. Clark's statement assumes it was. Mr. Clark also did not point out that, during Officer Garcia's initial broadcast about the Nissan taking off on them, he specifically said, "...trying to get you a plate" (310. FPD TC Radio Transmission.041.020304. 10 min. 23 sec. [COF 000460] at 0.00 seconds).

Third, the statement that Officers Garcia and Precie failed to adequately communicate with each other" is without basis, and there is no showing that, whatever communication they had or didn't have, somehow violated a policy or standard of care. Furthermore, there was no showing that, had the two officers communicated differently, the outcome would have been different.

Fourth, the characterization about Officer Garcia "attempting to join the pursuit" has been addressed under **Rebuttal Point to Additional Opinion 2**. It is also a hindsight-based determination.

Fifth, the statement about Officer Garcia not being specifically requested to respond as a backup unit ignores (1) this is how officers generally operate, i.e., they respond to support other officers without being asked to do so, based on my part- and full-time career of 30 years, as well as the review of patrol operations in my current capacity, and (2) Officer Garcia explained this generally operating principle during his deposition. Mr. Clark, conversely, did not demonstrate why this was not the standard practice for patrol operations writ large, or at the FPD.

Sixth, the statement that Officer Garcia should have known that there was already a total of three units in the pursuit is a misrepresentation of the facts and circumstances as also demonstrated under **Rebuttal Point to Additional Opinion 2**, above.

**Rebuttal Point Two to Additional Opinion 5: On page 40, Mr. Clark writes the following (in addition to the repetitive points made):**

- There was a lack of communication between offices within each vehicle and a lack of communication between officer vehicles.

- Officer Garcia did not communicate with a supervisor, did not communicate with Officer Zozaya's vehicle, and did not communicate with dispatch that he was responding to the pursuit.

These statements are completely disconnected from how officers typically operate under the circumstances. First, immediately after Officer Garcia radioed that they had the Nissan taking off on them and that they were trying to get a plate, the channel operator broadcast "I copy. Units, Code 33 on the channel for 45, eastbound Valley at Catawba" (310. FPD TC Radio Transmission.041.020304. 10 min. 23 sec. [COF 000460] at 8.243 through 12.149). This alerts all units to stay off the radio unless they have something of competing importance to communicate. This would apply to officers traveling toward the incident area, as both Officers Bautista and Garcia did. Broadcasting their responses could have impeded Officer Zozaya's ability to radio updates, or the supervisor's ability to ask questions about speeds or other important decision-making factors.

Second, Mr. Clark never mentions how much time was available for such communications, the purpose of those communications, or how additional communications would have changed the outcome. As illustrated on Appendix C of my primary report, the only gaps in radio transmissions were (1) ~2 seconds between Officer Zozaya's initial transmission and the channel operator's response, (2) ~1 to 1.5 seconds between the channel operator's response and Officer Zozaya's next transmission, (3) ~2 seconds between Officer Zozaya's update and Eagle 1's transmission that they were launching, (4) ~2.5 seconds between Eagle 1's transmission and the channel operator's acknowledgement, and (5) ~1 second between the channel operator's acknowledgement and Officer Zozaya's broadcast that the collision had occurred. Mr. Clark never articulated when, during this rapidly evolving situation that lasted ~34 seconds, this extra communication was supposed to occur, or how it would have changed the outcome, making the statements *ipse dixit* because they are disconnected from the facts and data.

**Rebuttal Point to Additional Opinion 6. On page 40 of his report, Mr. Clark writes:**

- In my opinion, the Officers exhibited a gross departure from nationally accepted required tactics to minimize harm and death under these circumstances.
- Trained and experienced officers know that failure to follow them violates professional standards and training.
- Based on my review of the record, the Officers violated FPD training and policies and violated POST standards, which reflects their lack of adequate training, and a direct reflection of FPD's inadequate supervision, and training policies.
- The Officers' use of deadly force and poor tactics demonstrates the Defendant Officers' complete lack of situational awareness, lack of control over their emotions and fears, and their inadequate training and understanding of basic use of force and vehicle pursuit principles.

First, Mr. Clark did not identify the "nationally accepted required tactics to minimize harm and death..." to which he refers. Without articulating them, it's difficult to determine which ones the officers failed to follow, whether they are relevant to the facts and issues, or to which of the

five officers and their respective conduct he's referring. For example, Officers Precie and Terwilliger had relatively passive roles in this incident, so which of the "nationally accepted required tactics" is he accusing them of failing to follow? Second, I am completely unaware of any "nationally accepted required tactics" in law enforcement, and I have actively searched for them with negative results.

Third, Mr. Clark's assertion about inadequate training, FPD's inadequate supervision, and training policies is not supported by any facts or data. For example, he does not reference any of the FPD members' training records (as I did). Sergeant Janusz was never deposed, so Mr. Clark has no information about when or how Sergeant Janusz processed incoming information or his decision-making criteria. Mr. Clark did not state what the training policies were, and how they were inadequate. Inferring agency-wide deficiencies in training, supervision, or training policies based upon a single incident with a tragic outcome, without examining the actual training, supervision, or training policies, does not constitute a reliable methodology. Such statements are *ipse dixit*.

Fourth, Mr. Clark's statement about the officers' "lack of situational awareness," "lack of control over their emotions and fears," and their "understanding of basic use of force and vehicle pursuit principles," is also completely unsupported by any facts or data, is inferential, and constitutes more state-of-mind opinions.

"Situational awareness" is actually referred to as "situation awareness" and is a recognized concept in the field of Human Factors and has a structured definition, to wit: (1) perceiving something in the environment, (2) understanding/comprehending what it is, and (3) projecting the possible ramifications into the future.[14] Mr. Clark never identifies how each officer failed to use, or even attempt to use, situation awareness, or what factors would have made it more likely that each similarly situated officer would have noticed the change in the environmental feature. Officers Zozaya and Precie were in the pursuing vehicle, and nothing indicates they were not actively interacting with their environment and performing relevant tasks. Officer Bautista successfully made the turn from the parking lot into the westbound No. 1 lane of Valley Boulevard and turned on his emergency lights as the oncoming Nissan approached the intersection. Officer Garcia recalled looking both ways before entering Valley Boulevard. However, it has not been established that the Nissan was within a clear line of sight at the time he did so.

Additionally, none of the officers described their emotional states during their depositions. Officer Zozaya's voice and tone were calm and measured on the radio, and Mr. Clark offered no support for the statement about the officers' "lack of control over their emotions and fears." This statement is another improper state-of-mind determination, irrelevant to the issues, and *ipse dixit*.

---

[14] Endsley, M. R. "Toward a theory of situation awareness in dynamic systems." *Human Factors* 37 (1995): 85-104. https://doi.org/10.1518/001872095779049543

Respectfully Submitted,

JEFFREY A. MARTIN, J.D., M.S., C.F.V.T.

Date: August 14, 2026

727 Industrial Road, Suite 102
San Carlos, California 94070

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

DIANA RIAS; TATANISHA PITTS;
DOMINIC ADAMS Sr.; and
BRITTANY MASON,

Plaintiffs,

v. Case No. 5:25-cv-00207-JGB-SHK

CITY OF FONTANA; EDWARD
BAUTISTA; JESUS GARCIA;
DANIEL PRECIE; BRIAN
ZOZAYA; and DOES 1-10, inclusive,

Defendants.
_______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF

BRIAN ZOZAYA

WEDNESDAY, JUNE 10, 2026

Reported Stenographically by:
KIMBERLY D'URSO, CSR 11372, RPR
Job No. 27878

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: MARCEL SINCICH, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
msincich@galipolaw.com

SHOJAI LAW FIRM
BY: NEEMA SHOJAI, ESQ. (Via cell phone)
8880 Rio San Diego Drive, Suite 800
San Diego, California 92108
619.777.0383
neema@shojaifirm.com

FOR THE DEFENDANTS CITY OF FONTANA, EDWARD BAUTISTA, JESUS GARCIA, DANIEL PRECIE, BRIAN ZOZAYA:

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
BY: EUGENE P. RAMIREZ, ESQ.
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
213.624.6900
eugene.ramirez@manningkass.com

FOR MINOR A:

LAW OFFICES OF JAMES H. CESENA
BY: JAMES H. CESENA, ESQ.
1748 W. Katella Av., #105
Orange, CA 92867
714.744.3333
jamescesena711@gmail.com

--oOo--

INDEX OF EXAMINATION

WITNESS: BRIAN ZOZAYA

EXAMINATION BY PAGE

MR. SINCICH..............................4

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

(NONE MARKED.)

--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 10th day of June, 2026, commencing at the hour of 1:01 p.m., thereof, BRIAN ZOZAYA, appeared remotely in Fontana, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

EXAMINATION

BY MR. SINCICH:

Q. Good afternoon, Officer. Could you please state and spell your name for the record?

A. Good afternoon. Brian, B-R-I-A-N; Zozaya, Z-O-Z-A-Y-A.

Q. Have you had your deposition taken before?

A. Yes.

Q. Approximately how many times?

A. Once.

Q. Was that related to your law enforcement activities?

A. Yes.

Q. Were you a named the defendant in that case?
A. No.
Q. Were you a witness to an event?
A. No.
Q. Have you had an opportunity to testify in court before?
A. Yes.
Q. Approximately how many times?
A. Approximately 25.
Q. Do you understand that, like your other testimony, you're under oath to tell the truth today?
A. Yes.
Q. And do you understand that although we're sort of in an informal Zoom conference meeting, that your testimony still has the same force and effect as if given in a court of law?
A. Yes.
Q. I'll probably go about an hour and take a break, but if you need to take a break at any point in time in between that, would you let me know?
A. Yes, sir.
Q. If you don't understand any of my questions, would you let me know?
A. Yes, sir.
Q. And if the technology breaks up or something

like that, if you could pay attention that we might have to wave at each other, for instance, if the sound goes out. Okay?
A. Yes, sir.
Q. Is there any reason why you wouldn't be able to give your best testimony today?
A. No.
Q. Do you understand you're here to talk about the fatal collision incident?
A. Yes.
Q. And that incident occurred February 3rd, 2024; is that right?
A. Yes.
Q. Was it approximately 2:44 p.m.
MR. RAMIREZ: Excuse me. Did you say "2:44 p.m."?
MR. SINCICH: 2244. Sorry.
THE WITNESS: Yes.
BY MR. SINCICH:
Q. And that would be 10:44 at night?
A. Yes.
Q. Was it dark at the time?
A. Yes.
Q. The location of the collision itself was to the east of Valley and Cypress intersection?

A. Yes.
Q. Prior to the collision, were you in a vehicle pursuit with the subject vehicle?
A. Yes.
Q. Were you the driver of the vehicle in pursuit?
A. Yes.
Q. Was your partner Officer Terwilliger?
A. No. The partner in my vehicle was Officer Precie.
Q. Right. I'm sorry. He was the passenger in the vehicle with Officer Garcia; right?
MR. RAMIREZ: You mean "Terwilliger"?
MR. SINCICH: Yes.
THE WITNESS: Yes.
BY MR. SINCICH:
Q. During the vehicle pursuit, in your vehicle, between you and Officer Precie, was there a radio communication being given to dispatch?
A. Yes.
Q. Who was the officer who was giving all the radio communication?
A. I was.
Q. Were you the senior man in the car?
MR. RAMIREZ: Vague and ambiguous as to the term "senior man."

But you may respond, if you understand.
THE WITNESS: Seniority-wise, no. Me and Officer Precie were both -- our title was police officer. The only seniority that would even be considered was just the amount of time on, and that I had more time on than Officer Precie did.
BY MR. SINCICH:
Q. And when you say "time on," had you been a law enforcement officer longer than him?
A. Yes.
Q. Were you a field training officer at the time?
A. No.
Q. You weren't in the capacity of supervision or training to Officer Precie, were you?
A. No.
Q. Did you review any documents in preparation for today?
A. Yes.
Q. What did you review?
A. I reviewed my report that I submitted after the incident. I reviewed the summary report from the San Bernardino County Sheriff's MAIT team. I reviewed body-worn camera footage, surveillance footage, as well as my own pursuit policies.
Q. Which surveillance footage did you review?

A. There was a wide variety of surveillance footage that I reviewed, so just depending on what specific footage you're -- you're asking.
Q. Well, what footage did it depict?
A. The footage depicted the pursuit.
Q. Okay. Was it essentially the surveillance footage showed the white vehicle and your vehicle at various locations?
A. Yes.
Q. Did you write only one report or more than one?
A. I submitted an initial pursuit report, as well as a Allied Agency Pursuit Form.
Q. Okay. Were you interviewed related to this incident?
A. Yes.
Q. Who were you interviewed by?
A. San Bernardino County Sheriff's Major Accident Investigation Team.
Q. Do you recall the rank or title of the individual who conducted the interview?
A. No. I cannot recall that.
Q. Do you recall the name of the individual who conducted the interview?
A. To my knowledge, it was a Deputy Holland; and I couldn't recall the other deputy's name.

Q. Okay. Do you know if your interview was recorded at all?
A. I'm unaware if that interview was recorded.
Q. You read the summary of your interview in the MAIT report?
A. Yes.
Q. Have you ever seen anything else related to your interview?
A. No.
Q. I know you mentioned the pursuit policy. Are there any other policies that you reviewed?
A. No.
Q. Who was your immediate supervisor at the time of this incident?
A. At the time of the incident, it was Sergeant David Janusz.
Q. Could you spell that last name, please?
A. To my knowledge, the way it's spelled is J-A-N-U-S-Z.
Q. Approximately when did you give your statement in relation to the incident?
A. Approximately a month after.
Q. Did you review any documents, including videos or photographs, prior to giving that statement?
A. Just my own body-worn camera video, as well as

Officer Precie's body cam video, and then reviewing my pursuit report.

Q. Did you activate your body-worn camera during the pursuit?

A. No.

Q. Why not?

A. Due to how -- due to how fast the events were occurring, as I was trying -- I was trying to put out the radio traffic that the white sedan was fleeing from to me. Due to how fast they were driving, I was trying to keep up with the vehicle, and at the same time, relay radio communications back to Dispatch.

As soon as that immediately happened, I heard Officer Precie's camera activate and give a verbal activation. So as soon as I heard that, I was just waiting until it was safe to activate my camera at that point. And then once the pursuit terminated, that's when I activated my body-worn camera.

Q. At what point in the pursuit did you hear verbal confirmation that Officer Precie's body-worn camera had been activated?

A. I couldn't give a specific time in seconds, as to how fast it activated, but I knew it was rather -- it was rather quickly as soon as the pursuit started.

Q. Was it around the intersection of Catawba and

Brian Zezaya

Valley?

A. Yes. Yeah.

Q. And you reviewed his body-worn camera video, prior to giving your interview?

A. Yes.

Q. Approximately where -- well, strike that.

Did you initiate the pursuit on Valley Boulevard?

A. Yes.

Q. Approximately where on Valley Boulevard did you initiate the pursuit?

A. Shortly after the vehicle was traveling eastbound Citrus, that's when I initiated -- I broadcasted to Dispatch that I was in pursuit and I initiated a pursuit.

Q. You said "Citrus"?

A. Yes.

(Reporter admonition to slow down.)

BY MR. SINCICH:

Q. Were you to the east or west of the intersection when you initiated the pursuit?

A. I couldn't be specific as to if we were west of or east at the time, but it was somewhere in that -- in that general area.

Q. At some point related to the time frame of

initiating the pursuit, did you go over the radio and communicate that the pursuit was being initiated?

A. Yes.

Q. Was that before or after you turned on your lights and sirens?

A. That was after.

Q. How long after turning on your lights and sirens did you put out over the radio that the pursuit was being initiated?

A. At that time, once we were at Catawba, which is west of Citrus, on Valley, that's when I turned on my lights to conduct a traffic enforcement stop. And at that point, that's when the vehicle failed to yield for my lights and siren, and I just -- my lights were on throughout the continued duration.

So through the failure to yield to Citrus, and then from Citrus onward, to the termination, my lights were on. My lights and sirens were activated.

Q. Okay. Are you currently an officer with the Fontana Police Department?

A. Yes.

Q. How long have you been an officer with Fontana P.D.?

A. Approximately three and a half years.

Q. How many years of experience did you have at

the time of the incident?

A. Approximately a year and two months.

Q. Did you have any prior law enforcement experience?

A. Not in the capacity of a sworn police officer.

Q. In what capacity was it?

A. As a cadet with the City of Fontana.

Q. Any other law enforcement experience?

A. No.

Q. Any military experience?

A. No.

Q. What was your rank at the time of the incident?

A. Police officer.

Q. What's your rank now?

A. Police officer.

Q. Were you on patrol at the time of the incident?

A. Yes.

Q. What is your assignment now?

A. I'm still currently assigned to the patrol division.

Q. Okay. When did you first see the subject vehicle?

A. I first observed the subject vehicle on Valley, west of Catawba.

Q. In what direction was your vehicle moving at

that time?

A. My vehicle was moving eastbound.

Q. In what direction was the subject vehicle going?

A. Eastbound.

Q. Were you behind the subject vehicle?

A. Yes.

Q. How far behind?

A. I would estimate two- to three-car lengths.

Q. Were there any vehicles in between you?

A. No.

Q. What drew your attention to the white vehicle?

A. As I was driving eastbound on Valley, I observed a white vehicle. As I looked at the vehicle, I could see that there was a passenger seated at the back rear number 6 position, with their torso out of the vehicle, extended out, out of the window.

Q. Could you see anything in that individual's hands?

A. No.

Q. Describe the individual that you saw, please.

A. From my recollection, it was -- I could not identify the race or gender of who the person was. All it appeared was they were wearing dark clothing.

Q. Could you tell the approximate age of the

person?

A. No.

Q. Could you tell if it was a boy or a girl?

A. No.

Q. Did you see anything in that person's hands?

A. No, not that I recall.

Q. How far out of the window did you see that person?

A. From what I observed, there -- it almost appeared as if they were seated on the window -- the window was down, and they were seated kind of on the window of the vehicle. And then, this person had their hand in the air, indicative of possibly maybe a cell phone in their hand, but it was too -- it was too dark to tell if there was anything in their hand.

Q. From your recollection, their butt would have been on the area where the window was?

A. Yes.

Q. Was their torso extended outward to the right, or was it upward? How would you describe it?

A. I couldn't recall. All I know is that it was outside of the vehicle, but it was visibly -- they were visibly out of the vehicle.

Q. Did it appear that that individual was looking in a particular direction?

A. No.

Q. Did you form the opinion that the individual saw your police vehicle?

A. Can you rephrase that? I'm sorry.

Q. Were you under the impression that the person that was hanging out of the window was aware that there was a police vehicle behind them?

A. I -- I couldn't speak to what their mindset was or if they saw us or not.

Q. Okay. You didn't see their face looking in your direction, or something like that?

A. No.

Q. Is it safe to assume that if that person was in the back right seat, there's probably somebody driving the vehicle?

A. Yes.

Q. Other than the presumptive driver and the back right passenger, were you aware of any other persons in the vehicle?

A. No, I was not.

Q. Did it have tinted windows, to your knowledge?

A. Not to my knowledge.

Q. Did you utilize your spotlights when you saw that vehicle?

A. No.

Q. Were your headlights activated?
A. Yes.
Q. What kind of vehicle were you driving?
A. I was driving a Ford Police Interceptor, essentially a Ford Explorer.
Q. And what was the reason for initiating the traffic stop?
A. Yes. As we -- as myself and Officer Precie were driving eastbound on Valley, just in front of Catawba, I made my first observation of the vehicle.
MR. RAMIREZ: Slow it down.
THE WITNESS: Sorry.
I made my first observation of the vehicle. That observation was the subject hanging out of the window. As I was behind the vehicle, I observed the sedan make a unsafe turning movement from the Number 2 lane into the 1 lane, and then back into the Number 2 lane.
BY MR. SINCICH:
Q. So when you first saw the subject vehicle, it was in the Number 2 lane?
A. Yes.
Q. And how long was it in the Number 1 lane before it went back to the Number 2 lane?
A. I can't recall that, to my knowledge. It was

just a short period of time.
Q. Was it, for instance, circling around another vehicle?
A. Yes, yes. It made a -- that unsafe turning movement was in front of another vehicle.
Q. Why are you describing it as an "unsafe turning maneuver"?
A. The signal was not activated, and there was not enough space for them to make a safe turning movement into the next lane.
Q. Was there a collision between the subject vehicle and any other vehicle at that time?
A. No.
Q. What do you mean, there was not enough room?
A. As far as not enough warning for the vehicle that was in the Number 1 lane to allow them to yield.
Q. Did you see any of the bystander vehicles slamming on the brakes?
A. Not to my knowledge. I couldn't recall.
Q. Did you see them swerving out of the way?
A. I couldn't recall.
Q. Did you hear any the bystander vehicles honking the horn?
A. No. I couldn't recall if anyone honked their horn.

Q. Did you ever go over the loud speaker and say anything to the subjects?
A. No.
Q. Is it fair to say that you didn't recognize the subjects from any prior encounters?
A. No.
Q. And didn't know anything about them?
A. No.
Q. Were you able to see the license plate of the subject vehicle when you first saw the back right driver hanging out of the window?
A. No. I did not see the license plate.
Q. Did you check out this patrol vehicle?
MR. RAMIREZ: It's vague and ambiguous as to the term "check out."
But you may respond, if you understand.
THE WITNESS: Yeah, could you rephrase that?
BY MR. SINCICH:
Q. Yeah. Was the patrol vehicle assigned to you?
A. Yes.
Q. As part of the assignment of the patrol vehicle, at the beginning of the shift do you inspect the vehicle?
A. Yes.
Q. Is part of the inspection to ensure that it's

working properly?
A. If you could just rephrase "working properly."
Q. That all of its lights and functions are functioning properly, if you needed to use them?
A. Yes.
Q. Did your vehicle have a license plate reader?
A. No.
Q. Are you aware of any other vehicles with Fontana Police Department being equipped with a license plate reader at the time?
A. At the time, not to my knowledge.
Q. Are you aware of any cameras around the city -- I think they're called "Flock" -- that read license plates as vehicles drive by, at the time?
A. At the time of the incident?
Q. Yes.
A. Yes.
Q. Based on your training and experience, if you decided not to initiate the pursuit, would you be confident that because of those license plate readers, you'd be able to identify the license plate of that vehicle?
MR. RAMIREZ: Calls for speculation. Lacks foundation. Assumes facts not in evidence.
But you may respond, if you can.

THE WITNESS: No, not necessarily. Given the area of Valley, which they were, to my knowledge, there might not have been any license plate readers in that area that would have captured that license plate.

BY MR. SINCICH:

Q. Okay. When a vehicle pursuit is initiated and an officer informs Dispatch of that information, are you aware of anyone within the Fontana Police Department, for instance, Dispatch, that would have the capability of viewing the surveillance traffic videos?

MR. RAMIREZ: May call for speculation. Lacks foundation.

But you may respond, if you can.

THE WITNESS: Potentially via some of the city cameras; but given what position the cameras are at and the conditions of -- whatever time at night it might be, it's possible, but not certain.

BY MR. SINCICH:

Q. Who are you aware of, in terms of title, that would have the ability to access the live feed cameras, for instance, during a traffic pursuit at the time?

A. You're still talking about the city cameras?

Q. Yes. Like an intersection camera, for instance?

A. Dispatch.

Q. How did you become aware of Dispatch's ability to view those kind of cameras?
A. While I was on training, we've utilized the city cameras to assist us with investigations. It's just another tool that we have.
Q. You've asked Dispatch, for instance, to look at what's happening in realtime?
A. Yes. Yes. Yep.
Q. And to your knowledge, can Dispatch manipulate the angle of the camera?
A. Yes.
Q. For instance, they can -- they can move the camera to the left or right?
A. Yes.
Q. And can Dispatch also zoom in?
A. Yes. Depending on which camera it is, and like I said, the quality of the camera and the quality of the video, there is an ability to zoom.
Q. Okay. And part of the videos that you reviewed in this incident, did it include the surveillance camera from the intersection of Valley and Cypress?
A. Yes.
Q. That essentially showed the, for instance, two seconds before the collision?
A. Yes.

Q. Did you continue watching the video after the collision?
A. No.
Q. Did you ever see the camera angle move when you watched the video?
A. Yes.
Q. When you saw the camera angle move, did you understand that that was Dispatch controlling it in realtime?
A. Yes.
Q. Were you able -- ever able to get the license plate of the subject vehicle prior to the collision?
A. No.
Q. Did you ever instruct Officer Precie to get the license plate of the vehicle?
A. No.
Q. Did you expect him to attempt to do so as your partner officer?
A. I couldn't really speak to his mindset, as far as, you know, what he was -- what he was thinking.
Q. Did you ever instruct him to do so?
A. No.
Q. Or ask him to do so, for instance?
A. No.
Q. Is there a role division between the driver and

the passenger when you're in a two-man vehicle in Fontana Police Department?

MR. RAMIREZ: May call for speculation. Lacks foundation. Assumes facts not in evidence.

But you may respond.

THE WITNESS: It just kind of depends, as far as what roles we would have. Like, I would need a little bit more specific, if you don't mind?

BY MR. SINCICH:

Q. Yeah. Sometimes, I've heard agencies say that the driver is the vehicle commander, or the passenger is the vehicle commander. Do you have any kind of designation like at Fontana?

A. No.

Q. Some agencies I've heard say that the driver is the contact officer and the passenger is the cover officer, or vice versa. Did you have that understanding in Fontana?

A. Yes. Generally, just based off driver and passenger positioning, we are going to conduct a traffic stop, whoever is closest to the driver's side would be making the contact.

Q. Okay. Approximately how much distance did you travel from when you first saw the subject vehicle to the time that you turned on your lights to initiate the

traffic stop?

A. I couldn't recall, but it wasn't -- it wasn't too much distance.

Q. Was it still on the same block, for instance?

A. Yes. It was still on Valley, just west of Catawba.

Q. After initiating the traffic stop, how long until you realized that there was going to be a failure to yield?

A. Almost immediately. As soon as I activated my overhead lights and siren, the vehicle accelerated quickly away from me.

Q. As part of your training, do you do some sort of assessment to determine whether or not to initiate a vehicle pursuit?

A. Yes.

Q. And what went through your mind during that assessment?

A. In this particular instance, I factored in a wide variety of the totality of all the circumstances that we had. One, the roads were still a little wet, and you had a passenger sticking out of the window, which is unsafe, as well as the lane change violation; so we were going to conduct a traffic enforcement stop on those violations.

And then at that point, the vehicle took off. And as far as our -- I immediately broadcasted what we had. I was driving with due regard for our vehicle. We had observation of the suspect vehicle, so all the criteria we had was met for the pursuit.

Q. And when you say the road was wet, was that because of a recent rain?

A. Yes.

Q. Was it raining at the time?

A. It was a light drizzle.

Q. Had it rained hard that day at all, or was it a light drizzle previously?

A. I couldn't recall.

Q. Did you consider the fact that it was nighttime?

A. Yes.

Q. How long was the passenger outside of the window?

A. From what I can recall, as soon as they were out the window, and then as soon as I activated my lights, my focus shifted away from that passenger and into the vehicle pursuit, so I couldn't recall how long they were out of the window for.

Q. Do you know if that passenger was still out of the window during any portion of the vehicle pursuit?

A. Not to my knowledge.
Q. Is one of the reasons why you wanted to stop the vehicle was for the safety of that passenger?
A. Yes.
Q. Would you agree that if the passenger was hanging out of the window on a high-speed pursuit, it would be a danger to that passenger?
A. Yes.
Q. Is it fair to say that the passengers don't have control over the vehicle's speed of movement or direction of travel?
MR. RAMIREZ: May call for speculation. Lacks foundation. Assumes facts not in evidence.
But if you know.
THE WITNESS: I couldn't recall, like -- yeah, I couldn't testify or speak to their mindset, as far as if they had control or what their relationship with the driver was. That -- those are all factors that can play into that.
BY MR. SINCICH:
Q. Generally speaking, is the person who's sitting in the driver's seat the one who is in control of the steering wheel and the accelerator, for instance?
A. Yeah. They're not -- the passenger wouldn't be.

Q. Did you receive any training that if you cancel or terminate a vehicle pursuit, that there's a chance that the pursuit will slow down, the subject vehicle would slow down?

MR. RAMIREZ: It's vague and ambiguous.

But if you understand, you may respond.

THE WITNESS: Yeah. If you can just rephrase that question, if you don't mind, please.

BY MR. SINCICH:

Q. Yeah. Have you received any training with Fontana Police Department that if you cancel or terminate a vehicle pursuit, that under the training, you can expect the subject vehicle to slow down?

A. We can't -- we can't really speak to what the suspect vehicle is going to do after, once we terminate a pursuit. So we -- it's not something we've trained on.

Q. Typically, in a vehicle pursuit, the subject vehicle is exceeding the speed limit; is that fair?

A. Yes.

Q. And that's generally unsafe; is that fair to say?

A. Yes.

Q. What was the speed limit on Valley?

A. I don't want to assume the facts, but I believe

it was either 50 or 55.
Q. Did you ever receive any training that if a subject in a vehicle pursuit thinks they got away, that they tend to slow down and drive safer, or normally, as opposed to speeding, so that they can be more inconspicuous?
MR. RAMIREZ: Vague and ambiguous. Compound. May call for speculation.
But you may answer about your training.
THE WITNESS: No, that's not our specific training.
BY MR. SINCICH:
Q. Did you receive any training that's similar to that scenario?
A. Yeah. You'd have to rephrase the scenario, if you don't mind.
Q. Okay. Did you receive any training that officers should call for air support, if available, when initiating a vehicle pursuit?
A. Yes.
Q. Did you call for air support in this case?
A. No.
Q. Did air support, nevertheless, get deployed?
A. Yes.
Q. And were you aware that air support was en

route?

A. Yes.

Q. Are you familiar with the vehicle pursuit tactic of "paralleling"?

A. Yes.

Q. What is that, under your training and policy?

A. Not to quote the policy without it being in front of me, but generally, a summary of paralleling would be officers not involved in the pursuit would follow on side streets, without lights and sirens activated, in the event that the pursuit would terminate, and they would need to be there quickly.

Q. Are you familiar with the vehicle pursuit tactic of "surveillance mode"?

A. Yes.

Q. And how would you describe "surveillance mode"?

A. Again, not to quote the policy, but a summary of surveillance mode would be when an airship does arrive, the airship maintains a visual observation, while the officers in pursuit will fall back and allow the airship to broadcast speed, direction, and termination of that pursuit.

Q. And why, under the training and policy, would the pursuing officers fall back, under surveillance mode?

A. Generally, they would fall back to -- in an effort to try to get the vehicle to slow down.

Q. Under the training, if a vehicle -- if the pursuing officers fall back, is the training that the vehicle that you're pursuing might slow down?

A. No. Because like I've said, it's not a guarantee that the vehicle will slow down, it's just a -- that's just an assumption of what will happen.

Q. Didn't you just testify that the surveillance mode policy and training is that officers would fall back, so that the subject vehicle would slow down?

A. Yes.

Q. And is one of the purposes of surveillance mode that the air unit would maintain a visual on the subject vehicle?

A. Yes.

Q. And that then, when it was safe to do so, the officers would reengage with the subject vehicle?

A. Yes.

Q. Is that considered to be a safer way of taking persons into custody than a high-speed pursuit?

MR. RAMIREZ: May call for speculation. Vague and ambiguous as to "safer way of taking persons into custody."

But you may respond.

THE WITNESS: For that surveillance mode to be considered, we have to evaluate a complete totality of circumstances. There's a lot of factors that that would depend on, so it's not just a one -- one -- one-size-fits-all kind of thing.

BY MR. SINCICH:

Q. Does your Fontana Police Department policy, for surveillance mode, have a list factors for officers to consider?

A. I couldn't speak to the facts of the exact policy unless I have it in front of me.

Q. Well, what factors are you aware of in the policy to consider, in determining whether to go into surveillance mode?

A. Again, not to quote the policy, but having an airship available is definitely the primary factor, since that's what's needed to conduct a surveillance. The time of day, the amount of traffic on the freeway, the speeds of the vehicle we're pursuing, the severity of the crime; there's a wide variety of factors.

Q. Based on your training and policy, what is the purpose of surveillance mode?

MR. RAMIREZ: Asked and answered.

But you may respond, again.

THE WITNESS: Yeah. To summarize it, it's to

maintain an observation of the vehicle and see where it concludes or where it goes, and to reengage or take the suspects into custody.

BY MR. SINCICH:

Q. Surveillance mode would alleviate officers from being involved in high speeds on the road?

MR. RAMIREZ: Calls for speculation. Lacks foundation. Assumes facts not in evidence.

But you may respond.

THE WITNESS: No, not necessarily.

BY MR. SINCICH:

Q. Well, doesn't surveillance mode necessarily include the officers stopping their Code 3 pursuit and falling back?

A. That would kind of depend on the speeds of the suspect, how fast the suspect's going. Like I said, there's a wide variety of factors to consider in surveillance mode.

Q. Right. I'm not asking about the subject vehicle, but the officer vehicles. In surveillance mode, wouldn't they necessarily stop a Code 3 pursuit?

A. Yes, they would.

Q. And under Code 3 pursuit, you'd be authorized to exceed the speed limit?

A. No, not necessarily.

Q. When you're in a vehicle pursuit and it's exceeding the speed limit, are officers allowed to exceed the speed limit to continue on that pursuit?

A. If they're in vehicle pursuit?

Q. Yes. If there's a vehicle pursuit, and the subject vehicle is exceeding the speed limit, are officers allowed to exceed the speed limit in order to be on pursuit of that subject vehicle?

A. Yes.

Q. And in order to be on pursuit of a subject vehicle that's exceeding the speed limit, can the officer vehicle exceed the speed limit also, under the policy and training?

A. Yes.

Q. In order to exceed the speed limit under the policy and training for a vehicle pursuit, do officers have to have their lights and sirens on, in other words, Code 3?

A. Again, that all kind of depends on the totality of all the circumstances. If, you know, they still -- even when you're in surveillance mode, you still have to be able to be within a reasonable distance to reengage, or if the vehicle stops and there's a foot bail, there's just a wide variety of circumstances to consider.

Q. Well, my last question wasn't necessarily

drive with due regard for the general public.

Q. Did your vehicle have a dash camera?

A. No.

Q. Do you know if at the time of the incident, any vehicles with the Fontana Police Department had a dash camera?

A. Not to my knowledge.

Q. Are you familiar with the pursuit mode called "tracking mode"?

A. Yes.

Q. What's your understanding of "tracking"?

A. Not -- not quoting directly from policy, but tracking mode is with the availability of an airship, officers will continue Code 3, and simply fall back; but they'll still continue with lights and sirens.

Q. Do you have any documents with you today, or notes?

A. No.

Q. Did you bring your pursuit policy with you?

A. No.

Q. So the tracking mode essentially allows the officers to fall back, but still maintain their lights and sirens?

A. Yes.

Q. Is the difference between tracking mode and

Q. Did you consider this vehicle pursuit dangerous?

A. I would consider it dangerous for the vehicle that we were chasing. As the driver of our pursuing vehicle, I still maintained driving with due regard for the general public, and I didn't outdrive my capabilities or the capabilities of the vehicle.

Q. Other than in the beginning of the traffic stop when the subject vehicle went around another vehicle in the Number 2 lane, did you see the subject vehicle change lanes at all?

A. Not that I could recall. Based on my recollection, the pursuit primarily stayed in the Number 1 lane.

Q. Did you see the collision between Officer Garcia's vehicle and the subject vehicle?

A. I saw the aftermath.

Q. Did you see the collision itself?

A. No.

Q. What were you focused on during the vehicle pursuit, visually?

A. Visually, I was focused on, you know, traffic coming in my direction, through the various intersections. Making sure traffic was clear, to my left, to my right, and trying to get a license plate for

that vehicle.

Q. In the policy for vehicle pursuits that you reviewed in preparation for today, do you recall the section that's titled: "Optional pursuit modes"?

A. Yes. That would be in reference to tracking and surveillance mode.

Q. When you reviewed it, did it say: "The following modes are intended to enhance safety to the public and officers involved in a vehicle pursuit, by encouraging a fleeing suspect to operate his or her vehicle in a safe manner, and/or self terminate the pursuit"?

A. Without having that policy directly in front of me, I won't quote it exactly; but to summarize it, essentially, yes, it would be to slow down the pursuit and minimize the danger.

Q. I'm sorry. I didn't catch the last thing you said?

A. Minimize the danger of the pursuit.

Q. How would it, "Minimize the danger of the pursuit"?

A. Essentially, that referred to the suspect and their driving, as well as our officers who are in pursuit, as well.

Q. With regard to the suspect and their driving,

how does it minimize the danger of the pursuit?
A. Hopefully it acts as a deterrent for them to slow down or terminate the pursuit on their own or come to a stop.
Q. You were considered the primary pursuit vehicle?
A. Yes.
Q. Did you ever call for backup?
A. No.
Q. Did you ever ask for assistance?
A. No.
Q. Did you understand if backup came, even without that request?
A. I'm sorry? Can you re-ask that one more time?
Q. Yeah. Was it your understanding, during the pursuit, at any point in time, that backup was en route?
A. Yes.
Q. And who did you understand was en route?
A. To my knowledge, not anyone specifically. But to my understanding, yes, there was other officers en route. I didn't have any prior knowledge of who they were.
Q. What gave you an indication that there were other officers en route?
A. Generally, it's kind of common practice,

whenever a vehicle pursuit is initiated, that other officers will respond to assist in the pursuit.

Q. Under the policy, do you know how many vehicles are allowed to be in a vehicle pursuit?

A. Yes. Again, it kind of relies on the totality of a lot of circumstances. But in most cases, it is two officers plus a supervisor; and additional can be requested, as well.

Q. And when you say "two officers," are you referring to the number of individuals or the number of vehicles?

A. The number of vehicles.

Q. Was the subject vehicle driving safely prior to initiating the traffic stop, other than when you saw the pedestrian hanging out of the window?

MR. RAMIREZ: May call for speculation. Vague and ambiguous.

But you may respond, if you understand.

THE WITNESS: I couldn't recall. But to my knowledge, yes, they were driving safely.

BY MR. SINCICH:

Q. Were they exceeding the speed limit prior to initiating the pullover?

A. I couldn't recall that.

Q. Did you ever mention in your report or in your

statement to investigators if they were exceeding the speed limit prior to initiating the pullover?

A. No.

Q. What was the fastest that the subject vehicle was going, based off of your observations?

A. Based on my observations, while I was in pursuit, I looked down at my speedometer and I saw that my vehicle was 80 miles an hour and increasing speed; and the suspect vehicle was exceeding that, because they started to pull away from us.

Q. What was your estimate as to how fast the subject vehicle was going its top speed?

A. I couldn't specify to a top speed, but above 80 miles an hour.

Q. Could you give me a range above 80?

A. To my knowledge, no. It exceeded 80 miles an hour.

Q. Did the subject vehicle ever exceed 90 miles an hour, based off your observation?

A. It possibly could have.

Q. Did the subject vehicle ever exceed 100 miles per hour, based on your observation?

A. It possibly could have.

Q. Did you ever drive 100 miles per hour during your pursuit?

A. Not to my knowledge.
Q. Did you ever drive up to 90 miles an hour during your pursuit?
A. Possibly could have. But when I looked down at my speedometer, it was 80 miles an hour and increasing. But I couldn't give you a specific number as to how fast I was driving.
Q. Other than your attorneys and the investigators, did you speak to anyone else about this incident?
A. No.
Q. Was there ever a debrief related to this incident?
A. No.
Q. Was there ever some form of message? Sometimes agencies send out an email. Other agencies might have a flyer, for instance, related to an incident. Have you ever seen anything like that?
A. As far as what kind of incident.
Q. Related to this incident?
A. To my knowledge, there was a press release. That was all I knew, to my knowledge.
MR. SINCICH: Okay. Okay. It's 2:01. We can go off the record.
(Break taken.)

BY MR. SINCICH:

Q. Okay. Did you see any other collisions during the pursuit, other than with Officer Garcia's vehicle and the subject vehicle?

A. No.

Q. Earlier you said that the subject vehicle remained in lane 1 for the majority of the pursuit?

A. Yes.

Q. Did you ever see it leave lane 1, eastbound, prior to the collision?

A. Yes.

Q. When did you see it leave lane 1, prior to the collision?

A. Shortly after it passed the intersection with Cypress, going eastbound. It passed another Fontana Police unit, and then went into the westbound lanes.

Q. Okay. Which westbound lane did you see the subject vehicle go into?

A. Towards the Number 1 lane of Valley, just east of Cypress, westbound.

Q. Was it in the left-hand turning lanes, or was it east of the left-hand turning lanes, when you saw it in the westbound traffic?

A. Due to the speeds and how fast they were going, I couldn't recall if it actually went into the turn

lanes or was past it.
Q. What was the approximate distance that it traveled in the westbound turning lane -- excuse me -- in the westbound traffic lanes?
MR. RAMIREZ: It's vague and ambiguous.
But you can respond, if you understand.
THE WITNESS: I couldn't speak to how fast they were -- how much time they were in those lanes.
BY MR. SINCICH:
Q. What was the approximate distance that it traveled?
A. As far as "traveled" where?
Q. In the westbound lanes?
A. Yeah. I couldn't -- I couldn't accurately approximate how -- how much or how far they went in the lanes.
Q. Was it as much as a hundred yards?
A. No.
Q. Was it more or less than 50 yards?
A. Possibly. I couldn't give you an exact approximation. From my recollection, it was a short amount of time, just how fast they were driving, and then when the collision occurred.
Q. And you had mentioned that it had passed another officer vehicle prior to leaving the Number 1

eastbound lane?
A. Yes.
Q. Which officer vehicle did it pass?
A. Officer Bautista's unit.
Q. How far past Officer Bautista's unit did it go before it started into the other lanes?
A. Yeah. Again, due to the speed and how fast they were driving, I couldn't recall how far after. I know it was after it, but I couldn't recall a distance or time.
Q. Did you see it cross a double-yellow line?
A. Yes.
Q. Did you see it cross only one double-yellow line, or was it two sets of double-yellow lines?
A. Based on my recollection, I saw the first line.
Q. Okay. Did you see it swerve at all prior to the impact?
A. No.
Q. Did you see its brake lights?
A. No, Not to my recollection.
Q. Did you see the subject vehicle hydroplane on the water, for instance?
A. No.
Q. Did you see the subject vehicle skid at all, prior to the impact?

A. No.
Q. Did you see it turn sideways, prior to the impact?
A. No.
Q. Did you hear the subject vehicle honk its horn, prior to the impact?
A. No.
Q. Did you hear any officer vehicles honk their horn?
A. No.
Q. Did you see Officer Garcia's vehicle in the road at all prior to the impact?
A. Very briefly, right before the collision.
Q. Where was Officer Garcia's vehicle when you saw it very briefly before the collision?
A. In the westbound lanes of Valley.
Q. Did you see Officer Garcia turning from the parking lot into that lane?
A. No.
Q. When you did see Officer Garcia's vehicle, did you see whether it had its emergency lights on?
A. Not from my recollection, no.
Q. Could you tell if it had its headlights on?
A. I couldn't tell, from my recollection.
Q. Was it hard to see Officer Garcia's vehicle

when you saw it?
MR. RAMIREZ: It's vague and ambiguous as to "hard to see."
But if you understand, you may respond.
THE WITNESS: Yeah. I mean, if you're asking me if I was able to see the vehicle, my focus wasn't really on their vehicle. My focus was more on the vehicle I was trying to pursue, and then clearing the intersection of Cypress in both directions.
BY MR. SINCICH:
Q. When you saw it, did it appear to be fully lit?
A. As far as fully lit --
Q. With lights on?
A. I couldn't recall.
Q. Were you looking beyond the subject vehicle during the pursuit?
MR. RAMIREZ: Vague and ambiguous as to time.
But you may respond.
THE WITNESS: Yeah. Generally, when I'm in pursuit, yeah, I kind of scan different -- depending where we're at, I'm kind of scanning to make sure there's no cars in front or behind, so as far as what specific time you're referring to.
BY MR. SINCICH:
Q. Is it part of the training for vehicle pursuits

for the primary officer, being the closest officer to the subject vehicle, to look past the subject vehicle, to see if there's any oncoming hazards or pedestrians, for instance?

A. Yes.

Q. And so around the time that the subject vehicle was crossing Cypress, did you ever look past the subject vehicle to see if there was anything in front of it?

A. I recall looking past it. I don't recall if I saw anything past it.

Q. What about when the subject vehicle had just passed Cypress, but before it passed Officer Bautista's vehicle, did you see any vehicles pass the subject vehicle?

A. No, because my attention at that time had turned over to Officer Bautista's vehicle, because he had his lights on. But I don't recall seeing anything past it.

Q. Did you see any other vehicles in your peripheral vision, for instance?

A. Yes. I can recall vehicles in my peripheral.

Q. And where were those vehicles that you saw?

A. They were at the intersection of Cypress and Valley. They were uninvolved motorists that were turning away from Valley.

Q. Were any of those other vehicles to the east of the subject vehicle, on Valley?

A. No.

Q. Was it important for you as the primary vehicle to let other officers and Dispatch know pertinent information about the pursuit?

A. Yes.

Q. For instance, the direction the pursuit was going in?

A. Yes. That was broadcasted throughout the duration of the pursuit.

Q. Did you broadcast that the pursuit was on Valley Boulevard?

A. Yes.

Q. And that it was initiated passing Catawba?

A. Yes.

Q. Did you broadcast that it was high speed?

A. Yes.

Q. Did you ever broadcast the speed limit?

A. No.

Q. Did you ever check your odometer at the end of the pursuit?

A. No.

Q. Did you give your odometer reading at the beginning of the pursuit?

A. Yes.
Q. Do you know how long the pursuit was in miles?
A. It was 0.65 miles.
Q. And approximately how long did the pursuit last?
A. Without having, like, my report in front me, the exact -- exact number, it was approximately 23 seconds.
Q. Did you also broadcast that the pursuit was passing Oleander?
A. Yes.
Q. Did you put that information out before or after the Oleander intersection?
A. I put that radio traffic out when the vehicle -- the suspect vehicle passed Oleander.
Q. Did you also put out traffic that the pursuit was approaching Cypress?
A. Yes.
Q. I see in your report you also put 0.65 miles.
(Reporter clarification.)
BY MR. SINCICH:
Q. Did you put in any other report the time frame of the pursuit?
A. As far as the time frame in, like, hours of the day or seconds?

Q. When you referenced 23 seconds, did you ever report that?
A. Yes. That should have been in the California Highway Patrol Allied Pursuit Form.
Q. Okay. During the vehicle pursuit, did you have any verbal communication with Officer Precie?
A. None that I can recall.
Q. Do you recall if Officer Precie said anything to you?
A. I couldn't recall if he did.
Q. Did you have any communication with Officer Bautista?
A. No.
Q. Any communication with Officer Terwilliger?
A. No.
Q. Any communication with Officer Garcia?
A. No.
Q. Any communication with your sergeant?
A. No.
Q. Are officers at Fontana Police Department required to know their training and policy?
A. Yes.
Q. Are you familiar with Vehicle Code Section 21056?
A. Not the exact specifics, without it being in

front of me.
Q. What's your general understanding of that Vehicle Code?
A. I couldn't speculate without having it in front of me.
Q. Are you familiar with Vehicle Code Section 21055?
A. Again, not with- -- not without it in front of me. I don't want to misquote it or misstate a fact.
Q. Based on your understanding, do both of those Vehicle Codes require police officers to drive with due regard?
A. Based on my training with those Vehicle Codes, they do fall into the -- yeah, that officers do have to drive with due regard and caution.
Q. You had mentioned "due regard" earlier in your testimony. Do you remember that?
A. Yes.
Q. What's your understanding of "due regard" under the training and policy?
A. As -- as -- as police officers, if we are in a vehicle pursuit or responding Code 3, regardless of if we're exempt from the Vehicle Code, we still do have to maintain a due regard, and drive in a manner that's safe and not posing a danger to other motorists.

Q. I'm going to show you what was previously marked as Exhibit 4, which is a map of the collision area. Let me know when you can see my screen.
A. Yes.
Q. I'm just going to try to make it bigger for you.
Does this depict the intersection of Valley and Cypress?
A. Yes.
Q. Does it also depict the general area where the vehicle collision occurred?
A. Yes.
Q. Do you see the double-yellow line just to the east of the crosswalk?
A. Yes.
Q. And did you see where the double-yellow line splits into two double-yellow lines?
A. Yes.
Q. Is that called a "painted median," to your knowledge?
A. Yes, median, painted median, yes.
Q. Would it be a Vehicle Code violation to cross a painted median?
A. No.
Q. Is a painted median different than a middle

turning lane?
MR. RAMIREZ: It's vague and ambiguous.
But if you understand, you may respond.
THE WITNESS: As far as what -- what difference?
BY MR. SINCICH:
Q. That's what I'm wondering, if there's a difference under your understanding of the Vehicle Code and the training?
A. No. Unless it's posted, then there's no difference.
Q. Does this row that's on the bottom right-hand corner of the map, is that your understanding of where Officer Garcia's vehicle turned from?
A. Yes. That's my understanding, yes.
Q. And did you see it turn at all from -- for instance, in the area of the apron of that driveway?
A. No.
Q. Did you ever see Officer Garcia's vehicle passing the eastbound Valley lanes?
A. No.
Q. When you first saw Officer Garcia's vehicle, where was it in relation to the map that's displayed as Exhibit 4?
A. As far as before the collision occurred or

after?

Q. When you first saw it.

A. It was very brief when I saw their vehicle, and that was before the collision, and that was kind of where the apron is. Again, I couldn't recall exactly where it was, but it was somewhere near the median to the westbound lanes. Like, in the westbound lanes by the second double yellow.

Q. Did it appear to you that Officer Garcia's vehicle was primarily inside that painted median?

A. From how fast I was driving and our position, I couldn't tell.

Q. Could you tell from looking at this map where, approximately, Officer Garcia's vehicle ended up after the collision?

A. From my recollection, it ended up somewhere inside the median or near the median, closer to the westbound lanes.

Q. What distance would you estimate that it traveled from when you first saw it to the time that you saw it after the collision?

MR. RAMIREZ: May call for speculation. Lacks foundation.

But you may respond, if you can.

THE WITNESS: Yeah. I couldn't approximate how

far it traveled.
BY MR. SINCICH:
Q. Did it travel some distance to the east?
A. Yes.
Q. Could you tell from your observations of seeing that vehicle twice, including your review of the body-worn camera and surveillance videos, as to whether it traveled more or less than 10 feet?
A. Possibly. I couldn't give you an exact distance, but possibly more than 10 feet.
Q. Okay. I'm going to show what was previously marked as Exhibit 7, which is a video from the Chevron gas station on Valley and Cherry.
Are you familiar with the gas stations in that area?
A. Yes.
Q. You've patrolled that area many times?
A. Yes.
Q. Okay. So from your familiarity, the Chevron station is on the south side of Valley?
A. Yes. That would be the southwest corner.
Q. Okay. And just at the very beginning of this video, do you see the white car that is in the front of the line, eastbound on Valley?
MR. RAMIREZ: If you could please move the --

yeah, the gallery there. We're just moving something so we can see the whole video.

MR. SINCICH: Thanks, Gene.

MR. RAMIREZ: Sorry. Thanks.

BY MR. SINCICH:

Q. Do you see that white vehicle?

A. Yes.

Q. Does that appear to be the subject vehicle?

A. Yes.

Q. Did you ever see the subject vehicle around the intersection of Valley and Cherry?

A. No.

Q. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. I stopped it at 12 seconds of Exhibit 7.

Do you see the patrol vehicle that stopped westbound on Valley?

A. Yes.

Q. Is that your patrol vehicle?

A. No. I couldn't recall if that was our patrol vehicle.

Q. Did you ever use your spotlight to shine it on eastbound traffic, while driving westbound on Valley?

A. I mean, at this specific time?

Q. Yes, within minutes of the vehicle pursuit?
A. Not that I can recall.
Q. This is 22:42, on the day of the incident; right?
A. Yes.
Q. I'm going to press play.
(Video being played.)
BY MR. SINCICH:
Q. It appears that approximately five vehicles also passed the officer vehicle going eastbound. Is that fair?
A. Yes.
Q. And then, the officer vehicle made a U-turn, going eastbound on Valley. Did you see that?
A. Yes.
Q. Other than Officer Bautista and Officer Garcia's vehicles, are you aware of any other Fontana Police Department vehicles that were on Valley, in that area, at the time?
A. Not to my knowledge.
Q. Do you know how many vehicles were out on duty at the time?
A. An approximate number of 12 to 14.
Q. Do you know if any of them were patrolling around the area of Valley, in between Cherry and

Cypress?

MR. RAMIREZ: May call for speculation. But he can respond.

THE WITNESS: Not to my knowledge, but it's possible. Valley Boulevard is one of our most major thoroughfares through the city.

BY MR. SINCICH:

Q. Would it be fair to say that that officer vehicle would have passed in the lane directly next to the subject vehicle?

MR. RAMIREZ: May call for speculation. But you can respond.

THE WITNESS: Yeah. I'm sorry. "Passed," as how?

BY MR. SINCICH:

Q. You were in the very next lane. Isn't that fair to say, as the subject vehicle passed going eastbound?

MR. RAMIREZ: Assuming it was you. So vague and ambiguous.

THE WITNESS: Yeah. It's unclear if that -- who that might have been, or where they might have been going.

BY MR. SINCICH:

Q. Are you aware that Officer Precie testified

that that was your patrol vehicle?

MR. RAMIREZ: Assumes facts not in evidence. Misstates testimony.

But you may respond, if you know.

THE WITNESS: Yeah. I'm not sure what he testified as to.

BY MR. SINCICH:

Q. Who would have been in control of the spotlight on a patrol vehicle that's on the driver's side of the vehicle? Would it be the driver or the passenger?

A. The driver.

Q. After the collision, what did you do -- what was the first thing that you did?

A. After the collision occurred, I immediately hit my brakes. Our vehicle ended up further east of the pursuit, just because of our speed and braking and trying to avoid colliding.

I immediately exited the driver's side, and I ran to the white car, to immediately begin checking for any sort of injuries that might have happened.

Q. How many persons did you see inside the white car?

A. At the time, I observed two.

Q. And where were they seated?

A. One was seated in the passenger Number 3

position, and the other was in the back, in the Number 6 position.

Q. Number 3 position is the front position?

A. Yes, sir.

Q. Number 6 position is the rear right passenger?

A. Yes, behind Number 3.

Q. Did you ever go to the driver's side of the vehicle?

A. Yes.

Q. Did you see anyone in the back left, the Number 4 position?

A. Not that I could recall, due to the damage and the airbag being deployed.

Q. Did you see a driver, anyone in that position?

A. No. The driver's seat was empty.

Q. Did you ever see a third individual related to the white vehicle?

A. Yes.

(Simultaneous speakers.)

BY MR. SINCICH:

Q. Sorry.

A. Yes, laying on the sidewalk.

Q. Where was that individual, in relation to the subject vehicle?

A. Immediately next to the rear passenger side

door, on the floor.
Q. Was the driver's door open or closed?
A. Based on my recollection, it was closed.
Q. Did you see Officer Garcia inside of his vehicle at all?
A. No.
Q. Did you see Officer Garcia walking around?
A. Yes.
Q. Did he appear to be injured to you when you saw him?
A. Yes.
Q. What apparent injuries did he have?
MR. RAMIREZ: May call for a medical conclusion.
But you can respond.
THE WITNESS: Based on my observations of his exterior injuries, he had some blood coming from his face, that I can remember.
BY MR. SINCICH:
Q. Did you see Officer Terwilliger inside of the patrol vehicle?
A. No.
Q. Did you see Officer Terwilliger seated on the ground?
A. Yes.

Q. Do you know how Officer Terwilliger got there?
A. No.
Q. Did you provide any medical care to any of the boys in the white vehicle?
A. Based on my initial observations, I attempted. On the driver that was on the ground, I conducted a pulse check, just trying to make sure he was still conscious, because he was still conscious and breathing.
And after that, I turned to the occupants inside the vehicle, and due to the level of trauma and potential risk of further injuries, I just monitored their status until Fire arrived.
Q. Did you see any officers giving medical care to the three boys that were in the vehicle?
A. No.
Q. Did you hear any officers say "They're done"?
A. Not to my knowledge.
Q. Did you hear any officer make reference to the boys being dead?
A. Possibly. I would have to watch the body camera again.
Q. Which officer do you recall making reference to the boys being dead?
A. Out of the couple of us that were there, I couldn't recall.

Q. How many officers were there at the time when you were assessing the subjects from the white vehicle?

A. Approximately four, possibly a fifth.

Q. What were their names?

A. I couldn't recall their exact names, who they were. Yeah, it would have been -- the ones that I can remember, Officer Lopez and Officer Richard. Those are the only two off the top of my head that I can remember.

MR. SINCICH: Okay. Thank you for your time, Officer. I have no further questions at this time.

Is there any follow-up for you, Mr. Ramirez?

MR. RAMIREZ: None for me. Thank you.

MR. SINCICH: Mr. Cesena, do you have anything?

THE CERTIFIED STENOGRAPHER: Mr. Cesena, you're muted. Do you have any questions?

MR. CESENA: I'm looking right now. Sorry about that. No, I have nothing further.

THE CERTIFIED STENOGRAPHER: Mr. Ramirez, are you ordering a copy?

MR. RAMIREZ: Yes, please.

THE CERTIFIED STENOGRAPHER: And Mr. Cesena, are you ordering a copy?

MR. CESENA: Yes.

(2:47 p.m., deposition concluded.)

--oOo--

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 13th day of June, 2026.

Kimberly D'Urso

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

ERRATA SHEET

PAGE/LINE CHANGE REASON

DECLARATION OF DEPONENT

I, ____________________, say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of _____________, 2026, at ______________________, California.

______________________________

BRIAN ZOZAYA

Focus Litigation Solutions
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone (916) 228-4593
Production@FocusLitigationSolutions.com

June 15, 2026

Brian Zozaya
c/o Eugene P. Ramirez, Esq.
eugene.ramirez@manningkass.com

Re: Diana Rias v. City of Fontana
Date of Deposition: June 10, 2026

The transcript of your deposition taken in the above-entitled matter has been transcribed. The original transcript will be held for 30 days from the date of this letter before it is sealed and forwarded to the noticing attorney.

You have the right to review, sign and make corrections to your transcript within the 30-day period. Please call the above number, or e-mail to make an appointment for your review. It is our policy not to release the original transcript and complimentary copies are not provided.

If you are represented by an attorney, we advise that you contact your attorney to discuss this matter. If you are an independent witness and have questions, please contact the attorney who requested you to testify or this office for further instructions.

If you wish to waive signature, please sign and date below and return this letter to the above address. In the event you have not read, corrected, and signed your deposition within (30) days of receipt of this letter, it may be used with the full force and effect as though it had been read, corrected, and signed.

Cc: All counsel

______________________ ______________________
DATE Brian Zozaya