# Exhibit A

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich, Esq. (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

**SHOJAI LAW FIRM**
Neema Shojai, Esq. (SBN 321833)
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
Telephone: (619) 777-0383
Facsimile: (619) 775-1383

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiffs,

v.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

Case No.: 5:25-cv-207

**COMPLAINT FOR DAMAGES**

Pursuant to 42 U.S.C. §1983:
1. Fourth Amendment (Excessive Force)
2. Fourteenth Amendment (Interference with Familial Relationship)
3. Municipal Liability (Ratification)
4. Municipal Liability (Failure to Train)
5. Municipal Liability (Unconstitutional Custom, Practice, or Policy)

Pursuant to State Law:
6. Battery (Survival/Wrongful Death)
7. Negligence (Survival/Wrongful Death)
8. Violation of the Bane Act

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES

COME NOW, Plaintiffs DIANA RIAS, individually and as successor-in-interest to decedent ROBERT RIAS; TATANISHA PITTS, individually and as successor-in-interest to decedent OMARI PITTS; and DOMINIC ADAMS Sr., and BRITTANY MASON both individually and as successors-in-interest to decedent DOMINIC ADAMS Jr. for their Complaint for Damages against Defendants CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive, and hereby alleges as follows:

## INTRODUCTION

1. This civil rights action arises out of the violation of both Federal and State Law including the use of excessive and unreasonable force against ROBERT RIAS, deceased, OMARI PITTS, deceased, and DOMINIC ADAMS Jr., deceased, (together called the "Decedents") by CITY OF FONTANA Police Department officers on February 3, 2024, at approximately 10:44 p.m., at or around Valley Boulevard and Cypress Avenue, in the City of Fontana, State of California.

2. Decedents, ROBERT RIAS, OMARI PITTS, and DOMINIC ADAMS Jr., suffered serious bodily injury and death, as a direct and proximate result of the actions and inactions of the Defendant CITY'S Officers, including Officers EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; and BRIAN ZOZAYA;. Defendant GARCIA and DOE Officers are directly liable for their nonfeasance and malfeasance and for Decedents' and Plaintiffs' injuries, harm, and damages under federal law pursuant to 42 U.S.C. §1983 and under state law pursuant to Cal. Govt. Code §§820, 820.4, 820.8, and 821.8, Cal. Civ. Code §52.1, and Cal. Code. of Civ. Pro. §§377.20, 377.30, 377.34, 377.60, 377.61, and 1021.5. Defendant CITY is directly liable for its conduct pursuant to 42 U.S.C. §1983 pursuant to

*Monell* and vicariously liable for the acts and omissions and for the nonfeasance and malfeasance of FPD Officers, including Defendant DOE Officers, pursuant to Cal. Govt. Code §§820(a), 815.2(a), and 815.6.

3. Upon information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers caused various injuries herein directly, or by integrally participating or failing to intervene in the incident, and by engaging in other acts and/or omissions around the time of the incident. Specifically, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers escalated the situation when they wrongfully used unreasonable tactics and vehicle intervention techniques against Decedents, causing the vehicle Decedents occupied to crash, and causing their death, while Decedents were not an immediate threat of death or serious bodily injury to any person.

4. Defendant CITY and DOE Supervisors also caused various injuries and are liable under federal law and under the principles set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

5. Plaintiffs seeks compensatory damages from Defendants for violating various rights under the United States Constitution in connection with their use of excessive and unreasonable deadly force, negligent and deliberately indifferent conduct. Plaintiffs seek punitive damages from Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers and Supervisors only, and not Defendant CITY.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

7. This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. §1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred within this district.

9. On or around July 31, 2024, Plaintiffs served their comprehensive and timely claim for damages on their own behalf and on behalf of their respective deceased son with the CITY OF FONTANA pursuant to applicable sections of the California Government Code.

10. On September 14, 2024, Defendant CITY rejected Plaintiffs' and Decedents' claims by operation of law by failing to respond.

## PARTIES

11. Decedent ROBERT RIAS ("RIAS") is the 15-year-old child, and Decedent in this action. Decedent RIAS died on March 13, 2022. At all relevant times, Decedent was an individual residing in the County of San Bernardino, California.

12. Decedent OMARI PITTS ("PITTS") is the 15-year-old child, and Decedent in this action. Decedent PITTS died on March 13, 2022. At all relevant times, Decedent was an individual residing in the County of San Bernardino, California.

13. Decedent DOMINIC ADAMS Jr. ("ADAMS") is the 14-year-old child, and Decedent in this action. Decedent ADAMS died on March 13, 2022. At all relevant times, Decedent was an individual residing in the County of San Bernardino, California.

14. At all relevant times, Plaintiff DIANA RIAS is and was an individual residing in the County of San Bernardino, California. Plaintiff DIANA RIAS is the natural mother of Decedent RIAS, which constitutes a special relationship with Decedent, and sues in her individual capacity for wrongful death and survival damages under state and federal law. Plaintiff DIANA RIAS is Decedent's successor-in-interest pursuant to California Code of Civil Procedure §§377.30 and 377.60.

15. At all relevant times, Plaintiff TATANISHA PITTS is and was an individual residing in the County of San Bernardino, California. Plaintiff TATANISHA PITTS is the natural mother of Decedent PITTS, which constitutes a special relationship with Decedent, and sues in her individual capacity for wrongful death and survival damages under state and federal law. Plaintiff TATANISHA PITTS is Decedent's successor-in-interest pursuant to California Code of Civil Procedure §§377.30 and 377.60.

16. At all relevant times, Plaintiff DOMINIC ADAMS Sr. is and was an individual residing in the County of San Bernardino, California. Plaintiff DOMINIC ADAMS Sr. is the natural father of Decedent ADAMS, which constitutes a special relationship with Decedent, and sues in his individual capacity for wrongful death and survival damages under state and federal law. Plaintiff DOMINIC ADAMS Sr. is Decedent's successor-in-interest pursuant to California Code of Civil Procedure §§377.30 and 377.60.

17. At all relevant times, Plaintiff BRITTANY MASON is and was an individual residing in the County of San Bernardino, California. Plaintiff BRITTANY MASON is the natural mother of Decedent ADAMS, which constitutes a special relationship with Decedent, and sues in her individual capacity for wrongful death and survival damages under state and federal law. Plaintiff BRITTANY MASON is Decedent's successor-in-interest pursuant to California Code of Civil Procedure §§377.30 and 377.60.

18. Defendant CITY OF FONTANA ("CITY") is a political subdivision of the State of California that is within this judicial district. Defendant CITY is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the City of Fontana Police Department ("FPD") and its agents and employees. At all relevant times, Defendant CITY was responsible for assuring those actions, omissions, policies, procedures, practices, and customs of the Defendant CITY, FPD, and its employees and agents complied with the laws of the United States and the State of California. At all relevant times, Defendant CITY was the employer of Defendant DOES 1-10.

19. At all relevant times, Defendant EDWARD BAUTISTA ("BAUTISTA") was a duly appointed CITY Officer and/or employee or agent of CITY, subject to the oversight and supervision of CITY'S elected and non-elected officials. At all relevant times, Defendant BAUTISTA acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant CITY, the FPD, and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant BAUTISTA acted within the course and scope of his employment as a CITY police officer. On information and belief, Defendant BAUTISTA is and was at all relevant times a resident of this judicial district.

20. At all relevant times, Defendant JESUS GARCIA ("GARCIA") was a duly appointed CITY Officer and/or employee or agent of CITY, subject to the oversight and supervision of CITY'S elected and non-elected officials. At all relevant times, Defendant GARCIA acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant CITY, the FPD, and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant GARCIA acted within the course and scope of his employment as a CITY

police officer. On information and belief, Defendant GARCIA is and was at all relevant times a resident of this judicial district.

21. At all relevant times, Defendant DANIEL PRECIE ("PRECIE") was a duly appointed CITY Officer and/or employee or agent of CITY, subject to the oversight and supervision of CITY'S elected and non-elected officials. At all relevant times, Defendant PRECIE acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant CITY, the FPD, and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant PRECIE acted within the course and scope of his employment as a CITY police officer. On information and belief, Defendant PRECIE is and was at all relevant times a resident of this judicial district.

22. At all relevant times, Defendant BRIAN ZOZAYA ("ZOZAYA") was a duly appointed CITY Officer and/or employee or agent of CITY, subject to the oversight and supervision of CITY'S elected and non-elected officials. At all relevant times, Defendant ZOZAYA acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant CITY, the FPD, and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant ZOZAYA acted within the course and scope of his employment as a CITY police officer. On information and belief, Defendant ZOZAYA is and was at all relevant times a resident of this judicial district.

23. At all relevant times, Defendant DOES 1-8 ("DOE Officers"), inclusive, were duly appointed FPD Officers, Sergeants, Lieutenants, and employees and agents of Defendant CITY (regardless of rank or title), subject to the oversight and supervision by Defendant CITY'S elected and non-elected officials and acted within the course and scope of their employment and under color of law, to wit, under the color of statutes, ordinances, regulations,

policies, customs, and usage of Defendant CITY, FPD, and under color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE Officers were the agents of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each Defendant. At all relevant times, Defendant DOE Offices acted with the complete authority and ratification of their principal, Defendant CITY.

24. Defendant DOES 9-10 ("DOE Supervisors"), inclusive, are managerial, supervisorial, or policymaking employees of the Defendant CITY who were acting under color of law within the course and scope of their duties as supervisorial officials for the FPD. Defendant DOE Supervisors were acting with the complete authority of their principal, Defendant CITY.

25. Plaintiffs are ignorant of the true names and capacities of Defendant DOES 1-10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend the complaint to allege the true names and capacities of those Defendants when the same has been ascertained. Plaintiffs are informed and believe, and on that basis alleges, that DOES 1-10, inclusive, and each of them, are responsible in some manner for the occurrences alleged herein and proximately caused Plaintiffs' and Decedents' damages.

26. According to information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, were at all relevant times residents of the County of San Bernardino.

27. Plaintiffs are informed and believe, and on that basis alleges, that Defendants acted at all times mentioned herein as the actual and/or ostensible agents, employees, servants, or representatives of each other and, in doing the activities alleged herein, acted within the scope of their authority as agents and employees, and with the permission and consent of each other.

28. Plaintiffs are informed and believe, and on that basis alleges, that at all times mentioned herein all individual Defendants acted under the color of law, statute, ordinance, regulations, customs and usages of the State of California and the Defendant CITY.

29. Pursuant to Cal. Govt. Code §815.2(a), Defendant CITY is vicariously liable for the nonfeasance and malfeasance of the individual Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, as alleged by Plaintiffs' state law claims. ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."). Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, are liable for their nonfeasance and malfeasance pursuant to Cal. Civ. Code §820(a). Defendant CITY is also liable pursuant to Cal. Govt. Code §815.6.

30. All Defendants who are natural persons are sued individually and/or in his/her capacity as officers, supervisors, agents, policy makers, and representatives (regardless of rank or title) of Defendant CITY and the FPD; and punitive damages are only being requested as to these Defendants, and not Defendant CITY.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

31. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 30, inclusive, as if fully set forth herein.

32. On February 3, 2024, at approximately 10:44 p.m., Defendant CITY Officers in patrol vehicles approached and stopped Decedents.

33. Upon information and belief, prior to arrival on scene, Defendant CITY Officers did not have reasonable suspicion to believe Decedents had

committed or were about to commit a serious or violent crime and did not have reasonable suspicion to believe that Decedents were an armed threat to the officers or any other person. Defendant CITY Officers did not have probable cause to arrest Decedents as they had no information that a crime was in progress related to Decedents.

34. Upon information and belief, nevertheless, at or around the area of Valley Boulevard and east of Cypress Avenue, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers escalated the situation when they unreasonably used their patrol vehicles to forcibly strike the vehicle occupied by but not driven by Decedents.

35. At all relevant times based on information and belief, Decedents were not an immediate threat of death or serious bodily injury. No person or officer was in the path of the vehicle at the time of the force. No person or officer was about to be struck, hit, or run over by the vehicle at the time.

36. Upon information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers did not have any information that any person was harmed or about to be harmed by Decedents; had no information that Decedents had verbally threatened any person; had no information that a crime was being or about to be committed by Decedents; and had no information that Decedents were armed with a gun or weapon of any kind.

37. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers either used deadly force in their improper tactics and by vehicle intervention techniques, failed to intervene in the use of force against Decedents, and/or integrally participated in the use of force against Decedents, including by escalating the situation by unreasonably using patrol vehicle intervention techniques.

38. Based on information and belief, the use of deadly force and negligent conduct against Decedents by Defendants BAUTISTA; GARCIA;

PRECIE; ZOZAYA; and DOE Officers was unnecessary, excessive, and unreasonable under the totality of the circumstances, because no verbal warning had been given to Decedents, despite it being feasible to do so; Defendants had less-intrusive options available to them; Defendants failed to attempt using their less-intrusive options, despite it being feasible to do so; Decedents did not pose an immediate threat of death or serious bodily injury to any person or officer at the time of the force; and Defendants used the highest, most intrusive level of force possible.

39. The conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers as alleged herein, including the unreasonable detention and use of excessive and unreasonable force against Decedents, was a cause and substantial factor in causing Decedents fear, anxiety, pain, suffering, serious bodily injury, and death.

40. The conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers as alleged herein, including the unreasonable detention and use of excessive and unreasonable force against Decedents, was a cause and substantial factor in causing Plaintiffs the lifelong loss of their respective sons.

41. Upon information and belief, no officer or official, including Defendants, and no person was harmed other because of Decedents' conduct yet officers, Plaintiffs, and Decedents were harmed by Defendants' conduct as alleged herein.

42. The Defendant FPD Officers violated their own policies and basic officer training when they used force, including deadly force against Decedents, indicating a deficiency in their policies and training for such a serious public issue.

///

## DAMAGES

43. As a direct and proximate result of the intentional conduct, negligent conduct, reckless disregard, deliberate indifference and otherwise wrongful conduct of Defendants, Plaintiffs suffered and continue to suffer the lifelong loss of their respective sons, resulting in Plaintiffs' economic and non-economic damage including for the past and future loss of their Decedents' love, companionship, comfort, care, assistance, attention, protection, affection, society, moral support, instruction, training, advice, guidance, gifts or benefits, funeral and burial expenses, household services, and future financial support in amounts to be proven at the time of trial (hereinafter called "wrongful death damages").

44. As a direct and proximate result of the intentional conduct, negligent conduct, reckless disregard, deliberate indifference and otherwise wrongful conduct of Defendants, Decedents endured severe pre-death pain and suffering, loss of life, and loss of opportunity and enjoyment of life, for which Plaintiffs bring and can recover as the successors in interest to their Decedents (hereinafter called "survival damages").

45. The conduct of the individual Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Plaintiffs and Decedents in that Plaintiffs' and Decedents' constitutional rights were intentionally deprived and violated, and/or there was reckless disregard for the constitutional rights of Plaintiffs and Decedents. As such, their conduct as alleged herein entitles Plaintiffs and Decedents an award of exemplary and punitive damages from the individual Defendants. Plaintiffs bring no action for punitive damages against Defendant CITY.

46. Pursuant to 42 U.S.C. §1988(b), Plaintiffs and Decedents are entitled to recover reasonable attorney fees, costs, and interests incurred herein. Pursuant to Cal. Civ. Code §52.1, Plaintiffs and Decedents are entitled

to recover civil penalty, costs, and reasonable attorney fees including treble damages. Pursuant to Cal. Code of Civ. Pro. §1021.5, Plaintiffs seek reasonable attorneys' fees.

## FIRST CLAIM FOR RELIEF

**Violation of the Fourth Amendment—Unreasonable Search and Seizure—Excessive Force (42 U.S.C. §1983)**

(By Plaintiffs against Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers)

47. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 46, inclusive, as if fully set forth herein.

48. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, acted under the color of state law and within the course and scope of their employment with Defendant CITY.

49. The Fourth Amendment of the United States Constitution, as applied to State Actors by the Fourteenth Amendment, provides the right of every person to be free from the use of excessive force by Officers.

50. At all relevant times, upon information and belief, Decedents did not verbally threaten any officer or person and were not attempting to inflict harm on any officer or person. Defendants were not responding to a serious or violent crime, Defendants had no information that any person was harmed or that Decedents had harmed any person, and Defendants did not see a crime in progress upon arrival. Nevertheless, Defendants used force, including deadly force, against Decedents, including by using their vehicles to cause the vehicle in which Decedents occupied to crash and causing their deaths.

51. Defendants used force, including deadly force against Decedents, while no officer or person was about to be struck or run over by the vehicle, Decedents were not an immediate threat to the safety of others, were not an

immediate threat of death or serious bodily injury, no warning was given that force would be used, and there were several less-intrusive alternatives to the use of deadly force available to the Defendant officers at the time.

52. Upon information and belief, the Defendant officers were equipped with less intrusive options that could have been employed instead of lethal force. Further, the Defendant officers should have given the Decedents time to comply after less intrusive force was used instead of escalating the situation to using deadly force. Defendant officers are trained that they should consider the least intrusive force option, and to only use deadly force when necessary to prevent an immediate threat to the life of a person. The Defendant officers had the time and ability to attempt voluntary compliance without resorting to physical force through de-escalation and tactical communication but failed to do so.

53. Upon information and belief, the Defendant officers had the opportunity to provide a verbal warning to Decedents but failed to do so prior to the use of deadly force against Decedents. Their tactics and force violated FPD officer training and standard law enforcement training, including violating training with respect to the use of deadly force.

54. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, caused various injuries as mentioned herein by integrally participating or failing to intervene in the incident, and by engaging in other acts and/or omissions around the time of the incident. Defendants' acts and omissions deprived Decedents of their right to be secure in their persons against unreasonable searches and seizures as guaranteed to Decedents under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

55. As a direct result of the aforesaid acts and omissions of Defendants, Decedents suffered great physical and mental injury prior to their deaths, loss of life, and loss of enjoyment of life.

56. The conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, alleged above was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedents and warrants the imposition of exemplary and punitive damages in an amount according to proof.

57. Plaintiffs seek survival damages, including but not limited to Decedents' pre-death pain and suffering, loss of life, and loss of enjoyment of life, under this claim. Plaintiffs also seek reasonable attorneys' fees and costs under this claim.

## SECOND CLAIM FOR RELIEF

**Violation of the Fourteenth Amendment—Substantive Due Process—Interference with Familial Relationship (42 U.S.C. §1983)**

(By Plaintiffs against Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers)

58. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 57 of this Complaint with the same force and effect as if fully set forth herein.

59. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive acted under the color of state law and within the course and scope of their employment with Defendant CITY.

60. The Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees all persons the right to be free from unlawful state interference with their familial relations.

61. A parent, such as each Plaintiff, has a fundamental liberty interest in the companionship and society of their child and the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. §1983. *See Lee v. County of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001); *Kelson v. County of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985).

62. Plaintiffs and Decedents had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiffs' relationship with her respective son.

63. By engaging in the conduct alleged herein, Defendants deprived Plaintiffs of their right to a familial relationship with their respective son in such a manner as to shock the conscience, including by unlawfully seizing Decedents, and using excessive force against Decedents as alleged herein, which caused Decedents' death and Plaintiffs' life-long loss. This conduct violated Plaintiffs' and Decedents' rights, privileges, and immunities secured by the Fourteenth Amendment to the United States Constitution.

64. Upon information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, intentionally used force, or failed to intervene in the intentional use of force against Decedents, causing their deaths, when they were not an immediate threat of death or serious bodily injury to any person at the time. Upon information and belief, Defendants failed to give Decedents a verbal warning before they used deadly force against them and took their lives. There were less-intrusive means available to the FPD officer besides the use of deadly force, including de-escalation and tactical communication to attempt voluntary compliance, and upon

information and belief, the FPD officer failed to deploy these less-intrusive techniques and/or failed to allow Decedents the time to comply thereafter.

65. By engaging in the foregoing conduct, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers were integral participants and acted with deliberate indifference to the constitutional rights of Decedents and Plaintiffs, and with the purpose to harm unrelated to any legitimate law enforcement objective. Defendant DOES 1-8 are liable to Plaintiffs and Decedents for interference with their familial relationship.

66. As a result of their misconduct, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers are liable to Plaintiffs, either because they were integral participants in the deliberate indifference to Plaintiffs' rights, or because they failed to intervene to prevent the denial of Plaintiffs' rights.

67. As a direct and proximate result of the wrongful conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, Plaintiffs have been deprived of the lifelong love, companionship, comfort, support, society, care, and sustenance of their Decedents, and will continue to be so deprived for the remainder of their natural life. Further, Decedents suffered pre-death pain and suffering, loss of enjoyment of life, and loss of life.

68. The use of excessive and objectively unreasonable deadly force by Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, as alleged above, shocks the conscience, was in deliberate indifference and reckless disregard for Decedents' and Plaintiffs' rights, and displayed a purpose to harm Decedents unrelated to a legitimate law enforcement objective. In so doing, Defendants' conduct constitutes a violation of Plaintiffs' and Decedents' Fourteenth Amendment Substantive

Due Process right to be free from unlawful state interference with their familial relationship with their respective son and beloved family members.

69. Defendants' conduct was malicious, oppressive and in reckless disregard for the rights and safety of Decedents and Plaintiffs and warrants the imposition of exemplary and punitive damages as to Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers.

70. As a direct result of the death of Decedents, Plaintiffs have suffered the loss of their Decedents' love, care, comfort, society, companionship, assistance, protection, affection, moral support, financial support, and loss of services of their Decedents. Plaintiffs seeks wrongful death damages under this claim.

71. Plaintiffs bring this claim individually and seeks wrongful death damages under this claim for their past and future loss of their Decedents' love, companionship, comfort, care, assistance, attention, protection, affection, society, moral support, instruction, training, advice, guidance, gifts or benefits, funeral and burial expenses, household services, and future financial support, and punitive damages.

72. Plaintiffs also seeks attorneys' fees pursuant to 42 U.S.C. §1988 and costs of suit.

## THIRD CLAIM FOR RELIEF

**Municipal Liability—Unconstitutional Custom, Practice, or Policy (42 U.S.C. §1983)**

(By Plaintiffs against Defendant CITY and DOES 9-10, inclusive)

73. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 72, inclusive, as if fully set forth herein.

74. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive acted under the color of state law and within the course and scope of their employment with Defendant CITY.

75. Defendant Officers intentionally used deadly force against and killed Decedents without there being an immediate threat of death or serious bodily injury, thereby using excessive and unreasonable force against Decedents. Upon information and belief, at all relevant times no person was about to be struck or harmed by the vehicle Decedents occupied, the FPD Officers were not responding to a serious or violent crime, had no information that a crime was in progress by Decedents' when the FPD Officers arrived, Decedents did not verbally threaten any person or officer, and did not harm any person or officer.

76. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, acted pursuant to an expressly adopted or fiscal policy or longstanding practice or custom of the Defendant CITY, and DOES 9-10, inclusive.

77. According to information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, were not disciplined, reprimanded, retrained, provided additional training, suspended, or otherwise penalized in connection with the deprivation of Plaintiffs' or Decedents' rights.

78. Defendants CITY, and DOES 9-10, inclusive, together with other CITY policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a) Using excessive and objectively unreasonable force, including deadly force on unarmed persons who do not pose a risk of immediate death or serious bodily injury to others.

(b) Providing inadequate training regarding the use of force, including the use of less-lethal force, and deadly force.

(c) Employing and retaining as Officers, individuals such as Defendant, who upon information and belief, Defendant CITY, and DOES 9-10, inclusive, at all times material herein, knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force.

(d) Inadequately supervising, training, controlling, assigning, and disciplining CITY law enforcement Officers, and other personnel, including Defendant, who CITY knew or in the exercise of reasonable care should have known, had the aforementioned propensities or character traits.

(e) Maintaining inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by law enforcement Officers of the CITY.

(f) Announcing that unjustified uses of force are "within policy."

(g) Even where uses of force are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the Officers involved.

(h) Failing to adequately discipline CITY law enforcement Officers for the above-mentioned categories of misconduct, including inadequate discipline and "slaps on the wrist," discipline that is so slight as to be out of proportion with the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct.

(i) Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or

simply "code of silence," pursuant to which Officers do not report other Officers' errors, misconduct, or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other officer's wrongdoing.

(j) Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of law enforcement use of deadly force, including failing to discipline, retrain, investigate, terminate, and recommend Officers for criminal prosecution who participate in deadly force encounters.

79. On information and belief, the CITY has deficient policies and failed to train it Officers with respect to unreasonable seizures of persons, unreasonable use of vehicle intervention techniques, and unreasonable and unjustifiable use of deadly force against individuals who do not pose an immediate threat of death or serious bodily injury to anyone person. As a result of these deficient polices and training, the Officer Defendants used deadly force against Decedents while Decedents were in vehicle, while no Officer or person was about to be struck or run over by the vehicle, and while Decedents were not an immediate threat of death or serious bodily injury, resulting in the injuries claimed in this lawsuit.

80. Defendants CITY and DOES 9-10, inclusive, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged herein. Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiffs and other individuals similarly situated.

81. By perpetuating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants CITY and DOES 9-10, inclusive, acted with intentional, reckless, and callous disregard for the Plaintiff's constitutional rights. Furthermore, the policies, practices, and customs implemented, maintained, and tolerated by Defendants CITY and DOES 9-10, inclusive, were affirmatively linked to and were a significantly influential force behind Plaintiff's' and Decedents' injuries.

82. The acts of each of Defendant DOES 9-10, inclusive, were willful, wanton, oppressive, malicious, and extremely offensive and unconscionable to any person of normal sensibilities, and therefore warrants imposition of exemplary and punitive damages as to DOES 9-10, inclusive.

83. By reason of the aforementioned acts and omissions, and as a direct and proximate result of the aforementioned unconstitutional policies and customs, Decedents endured substantial pain and suffering, loss of enjoyment of life, and loss of life, and Plaintiffs have suffered the loss of their sons, and will continue to be deprived for the remainder of their natural lives.

84. The acts of each of Defendants DOES 9-10, inclusive, were willful, wanton, oppressive, malicious, and extremely offensive and unconscionable to any person of normal sensibilities, and therefore warrants imposition of exemplary and punitive damages as to Defendant DOES 9-10, inclusive.

85. Accordingly, Defendants CITY and DOES 9-10, inclusive, each are liable for compensatory damages under 42 U.S.C. §1983.

86. Plaintiffs bring this claim individually and as successor-in-interest to Decedents and seeks both survival and wrongful death damages. Plaintiffs also seek reasonable attorneys' fees and costs under this claim.

/ / /

Case 5:25-cv-00207-JGB-SHK Document 1 Filed 01/24/25 Page 23 of 36 Page ID #:23

## FOURTH CLAIM FOR RELIEF

**Municipal Liability—Failure to Train (42 U.S.C. §1983)**

(By Plaintiffs against Defendant CITY and DOES 9-10, inclusive)

87. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 86 of this Complaint with the same force and effect as if fully set forth herein.

88. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive acted under the color of state law and within the course and scope of their employment with Defendant CITY.

89. The acts of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, as described herein, deprived Decedents and Plaintiffs of their particular rights under the United States Constitution, including when they unreasonably seized Decedents, and used unreasonable force against Decedents without justification, causing his death.

90. On information and belief, Defendant CITY failed to properly and adequately train FPD Officers, including Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, to handle the usual and recurring situations with which they must deal, including with regard to the use of force and deadly force generally, use of force against a person in a vehicle, unreasonable stop of a vehicle without reasonable suspicion or probable cause, de-escalation techniques, tactical communication, and tactical positions. The training policies of Defendants CITY and DOES 9-10, inclusive, were not adequate to train its Officers to handle the usual and recurring situations with which they must deal.

91. On information and belief, the Defendant CITY failed to train its Officers not to use deadly force against a person who is not an immediate threat of death or serious bodily injury and failed to train their Officers in the appropriate tactics prior to and in an effort to eliminate the use of force. As a

result of this deficient policy and deficient training, the Officer Defendants used deadly force against Decedents, resulting in the injuries claimed in this lawsuit.

92. Defendant CITY and DOES 9-10, inclusive, were deliberately indifferent to the obvious consequences of its failure to train its Officers adequately as described herein.

93. The failure of Defendant CITY and DOES 9-10, inclusive, to provide adequate training caused the deprivation of Plaintiffs' and Decedents' rights by Defendant DOES 1-8, inclusive; that is, Defendants' failure to train is so closely related to the deprivation of Plaintiffs' and Decedents' rights as to be the moving force that caused the ultimate injury.

94. As a direct and proximate result of the aforementioned conduct, Decedents endured severe pain and suffering, loss of enjoyment of life, and loss of life. Further, as a direct and proximate result of the aforementioned conduct, Plaintiffs endured the loss of her son, including being deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedents, and will continue to be so deprived for the remainder of their natural lives.

95. Accordingly, Defendant CITY and DOES 9-10, inclusive, are liable to Plaintiffs for compensatory damages under 42 U.S.C. §1983.

96. Plaintiffs bring this claim individually and as successor-in-interest to Decedents and seeks both survival and wrongful death damages. Plaintiffs also seek reasonable attorneys' fees and costs under this claim.

/ / /

/ / /

**FIFTH CLAIM FOR RELIEF**

**Municipal Liability – Ratification (42 U.S.C. § 1983)**

(By Plaintiffs against Defendant CITY and DOES 9-10, inclusive)

97. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 96 of this Complaint with the same force and effect as if fully set forth herein.

98. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive acted under the color of state law and within the course and scope of their employment with Defendant CITY.

99. The acts of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, as described herein, deprived Decedents and Plaintiffs of their particular rights under the United States Constitution, including when they intentionally used deadly force against Decedents without justification, causing his death, deprived Plaintiffs of their familial relationship with their respective son, and unreasonably seized Decedents in his vehicle.

100. Upon information and belief, a final policymaker, acting under color of law, has a history of ratifying the unconstitutional and unreasonable uses of force, including deadly force.

101. Upon information and belief, a final policymaker for the Defendant CITY, acting under color of law, who had final policymaking authority concerning the acts of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, and the bases for them, ratified the acts and omissions of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, and the bases for them. Upon information and belief, the final policymaker knew of and specifically approved of Defendants' acts, specifically approving the FPD Officers'

unlawful and excessive and unreasonable use of deadly force Decedents when they were not an immediate threat of death or serious bodily injury.

102. On information and belief, the official policies with respect to the incident are that FPD Officers are not to use deadly force against an individual unless the individual poses an immediate risk of death or serious bodily injury to the Officers or others. The FPD Officers' actions deviated from these official policies because Decedents did not pose an immediate threat of death or serious bodily injury to the involved Officers or anyone else.

103. Upon information and belief, a final policymaker(s) has determined (or will determine) that the acts of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, were "within policy."

104. By reason of the aforementioned acts and omissions, Defendants CITY and DOES 9-10, inclusive, are liable to Plaintiffs for compensatory damages under 42 U.S.C. §1983.

105. Plaintiffs bring this claim individually and as successor-in-interest to Decedents and seek both survival and wrongful death damages. Plaintiffs also seek reasonable attorneys' fees and costs under this claim.

## SIXTH CLAIM FOR RELIEF

**Battery (Cal. Govt. Code §§815, 820 and California Common Law)**

(Survival/Wrongful Death)

(By Plaintiffs against Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, directly; and CITY and DOES 9-10 vicariously)

106. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 105 of this Complaint with the same force and effect as if fully set forth herein.

107. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive acted under the color of state law and within the course and scope of their employment with Defendant CITY.

108. When Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, were detaining Decedents, Decedents were not threatening any person, and Decedents never verbally threatened any Defendant Officers.

109. Upon information and belief, Decedents were not attempting, willing, or intending to inflict harm on anyone. Defendants were not responding to a serious or violent crime, Defendants did not witness a serious or violent crime in progress upon arrival, Defendants had no information that anyone had been hurt or injured or that Decedents had hurt or injured someone. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers used force against Decedents without justification, and used unreasonable vehicle intervention techniques.

110. The use of force, including deadly force, was excessive and objectively unreasonable, especially because throughout the incident, Decedents presented no immediate threat to the safety of the Officers or others, including not an immediate threat of death or serious bodily injury to any Officer or other person. Further, Defendants' use of deadly force, and use of force violated their training, standard law enforcement training, and generally accepted law enforcement standards.

111. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers had no legal justification for using force against Decedents, and the use of force was unreasonable and non-privileged. Moreover, Decedents did not knowingly or voluntarily consent to the use of force against them.

112. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers caused various injuries as mentioned herein and are liable either

because they directly harmed Decedents or by integrally participating or failing to intervene in the incident, and by engaging in other acts and/or omissions around the time of the incident. Defendants' acts and omissions resulted in harmful and offensive touching of Decedents.

113. As a direct and proximate result of the aforesaid acts and omissions of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, Decedents suffered great physical and mental injury, as well as fear and emotional distress related to their physical injuries, pain and suffering, humiliation, anguish, and death.

114. The conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Decedents, entitling Plaintiffs to an award of exemplary and punitive damages, which Plaintiffs seek under this claim.

115. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers are directly liable for their actions and inactions pursuant to Cal. Govt. Code §820(a).

116. The Defendant CITY is vicariously liable for the wrongful acts and omissions of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

117. Plaintiffs seek compensatory damages and brings this wrongful death claim as successor-in-interest to Decedents against Defendants and seek survival and wrongful death damages under this claim. Plaintiffs also seek reasonable costs and funeral and burial expenses on this claim.

## SEVENTH CLAIM FOR RELIEF

**Negligence (Cal. Govt. Code §§815, 820 and California Common Law)**

(Survival/Wrongful Death)

(By Plaintiffs against Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, directly; and CITY and DOES 9-10 vicariously)

118. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 117 of this Complaint with the same force and effect as if fully set forth herein.

119. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers acted under the color of state law and within the course and scope of their employment with Defendant CITY.

120. Peace officers, including Defendants, have a duty to use reasonable care to prevent harm or injury to others. This duty includes but is not limited to the following: using appropriate tactics, giving appropriate commands, giving warnings, allowing time for the subject to understand and comply with appropriate commands and warnings, not using any force unless necessary, using less-intrusive options, acting objectively reasonable when using deadly force, and only using deadly force as a last resort. Defendants breached this duty of care.

121. The actions and inactions of Defendants were negligent and reckless, including but not limited to:

a) Defendants' failure to constitutionally respond to Decedents.

b) Defendants' failure to properly and adequately assess the need to stop Decedents.

c) Defendants' failure to properly and adequately assess the need to use vehicle intervention techniques against Decedents.

d) Defendants' failure to properly and adequately assess the need to use force against Decedents.

e) Defendants' negligent tactics and handling of the situation with Decedents, including the failure to de-escalate the situation.

f) Defendants' negligent use of force against Decedents.

g) Negligent tactics and handling of the situation with Decedents, including pre-force negligence and the failure to give appropriate commands and warnings.

h) Defendants' failure to properly train and supervise employees.

i) Defendants' failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of Decedents.

j) Defendants' failure to properly report the incident.

k) Defendants' failure to de-escalate the situation and use proper communication and commands.

122. As a result of their misconduct, Defendants are liable for Plaintiffs' and Decedents' injuries on this claim, either because they were integral participants in the aforementioned conduct, or because they failed to intervene to prevent these violations.

123. As a direct and proximate result of Defendants' conduct as alleged above, and other undiscovered negligent conduct, Decedents sustained injuries and died from those injuries. Also, as a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedents, and will continue to be so deprived for the remainder of their natural lives.

124. Pursuant to Cal. Gov't Code §820(a), "a public employee is liable for injury caused by his act or omission to the same extent as a private person."

125. A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his

employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code §815.2(a). Defendant CITY is vicariously liable under California law and the doctrine of *respondeat superior*.

126. Pursuant to Cal. Code. of Civ. Pro. §§377.20, 377.30, 377.34, Plaintiffs brings this survival action for compensation of Decedents' pre-death pain and suffering, and disfigurement, and for punitive damages.

127. Pursuant to Cal. Code. of Civ. Pro. §§377.60, 377.61, Plaintiffs brings this wrongful death action for compensation of her past and future loss of Decedents' love, companionship, comfort, care, assistance, attention, protection, affection, society, moral support, instruction, training, advice, guidance, gifts or benefits, funeral and burial expenses, household services, and future financial support.

128. Plaintiffs seeks attorneys' fees under this claim pursuant to Cal. Code of Civ. Pro. §1021.5 for enforcement of the important rights effecting the public interest that Plaintiffs, Decedents, and those similarly situated have to a right to familial relationship without unreasonable interference, the right of privacy of their own home and prevention of government entry without a warrant, and the right to be free from intimidation and physical assault.

129. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers are directly liable for their actions and inactions pursuant to Cal. Govt. Code §820(a).

130. Plaintiffs seek compensatory damages and brings this wrongful death claim as successor-in-interest to Decedents against Defendants and seeks survival and wrongful death damages under this claim. Plaintiffs also seek reasonable costs and funeral and burial expenses on this claim.

/ / /

**EIGHTH CLAIM FOR RELIEF**

**Violation of the Bane Act (Cal. Civil Code § 52.1)**

(By Plaintiffs against Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, directly; and CITY and DOES 9-10 vicariously)

131. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 130 of this Complaint with the same force and effect as if fully set forth herein.

132. At all relevant times Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers acted under the color of state law and within the course and scope of their employment with Defendant CITY.

133. California Civil Code, Section 52.1, prohibits any person, including a police officer and/or Police Officer, from interfering with another person's exercise or enjoyment of his constitutional rights by threats, intimidation, or coercion, including using unconstitutionally excessive force. Conduct that violates the Fourth Amendment, including the use of excessive force, violates the Bane Act when performed with specific intent to deprive others of their civil rights, which can be inferred by a reckless disregard for the person's civil rights.

134. Upon information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers while working for the Defendant CITY and acting within the course and scope of their duties as Officers and under color of law, intentionally committed, and attempted to commit acts of violence against Decedents, including by intentionally used force against Decedents and otherwise using unreasonable force against Decedents. This use of deadly force was excessive and objectively unreasonable and especially reckless because Decedents was not armed with a firearm, was not attempting to harm any person, was not being assaultive or resistive, and Decedents did not pose an immediate threat of death or serious bodily injury to any person.

Further, the Defendants' use of force violated basic law enforcement training, and generally accepted law enforcement standards. Defendants used deadly force against and killed Decedents without any legal justification.

135. When Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers used deadly force against Decedents while Decedents were not an immediate threat of death or serious bodily injury, they interfered with Decedents' constitutional right to be free from unreasonable searches and seizures to equal protection of the laws, to be free from state actions that shock the conscience, and to life, liberty, and property.

136. On information and belief, Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers intentionally, and spitefully committed the above acts to discourage or prevent Decedents from exercising their civil rights, or from enjoying such rights, which they were and are fully entitled to enjoy. Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers intentionally interfered with the above constitutional rights of Decedents, and as alleged herein, which can be demonstrated by Defendants' reckless disregard for Decedents' constitutional rights.

137. On information and belief, Decedents reasonably believed and understood that the violent acts committed by Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers were intended to discourage them from exercising the above civil rights, to retaliate against them for invoking such rights, or to prevent them from exercising such rights.

138. The conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers was a substantial factor in causing Decedents' harm, loss, injury, damages, and death.

139. The Defendant CITY is vicariously liable for the wrongful acts of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers pursuant to section 815.2(a) of the California Government Code, which

provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

140. Defendants CITY and DOES 9-10 are vicariously liable under California law and the doctrine of *respondeat superior*.

141. The conduct of Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers was malicious, wanton, oppressive, and accomplished with a conscious disregard for Decedents' rights, justifying an award of exemplary and punitive damages as to Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers.

142. Plaintiffs seek compensatory damages for the violations of Decedents' rights, including for his pre-death pain and suffering, loss of enjoyment of life, and loss of life. Plaintiffs also seek punitive damages, costs, and attorney's fees under California Civil Code section 52 *et seq.* as to this claim.

/ / /

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs DIANA RIAS, individually and as successor-in-interest to ROBERT RIAS; TATANISHA PITTS, individually and as successor-in-interest to OMARI PITTS; and DOMINIC ADAMS Sr., and BRITTANY MASON both individually and as successors-in-interest to DOMINIC ADAMS Jr. request entry of judgment in their favor against Defendants CITY OF FONTANA; Defendants BAUTISTA; GARCIA; PRECIE; ZOZAYA; and DOE Officers, inclusive, as follows:

1. For general and special compensatory damages, according to proof at trial, under Federal and State law.

2. For punitive and exemplary damages against the individual Defendants in an amount to be proven at trial.

3. For statutory damages and civil penalties.

4. For reasonable attorneys' fees including litigation expenses and treble damages under Federal and State law.

5. For costs of suit and interest incurred herein.

6. For such further relief at law or equity as the Court or jury may deem just and appropriate.

DATED: January 24, 2025

**LAW OFFICES OF DALE K. GALIPO**
**SHOJAI LAW FIRM**

/s/ *Dale K. Galipo*
Dale K. Galipo, Esq.
Marcel F. Sincich, Esq.
Neema Shojai, Esq.
*Attorneys for Plaintiffs*

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby submit this demand that this action be tried in front of a jury.

DATED: January 24, 2025

**LAW OFFICES OF DALE K. GALIPO**
**SHOJAI LAW FIRM**

/s/ *Dale K. Galipo*
Dale K. Galipo, Esq.
Marcel F. Sincich, Esq.
Neema Shojai, Esq.
*Attorneys for Plaintiffs*

# Exhibit B

**Fontana Police Department**
17005 Upland Ave
Fontana, CA 92335
(909) 350-7740

**Confidential Incident Report**
**240001556** Supplement No: **ORIG**
Reported Date/Time: 02/03/2024 22:44:52

**Event**

| Location | Beat | From Date/Time | To Date/Time |
|---|---|---|---|
| VALLEY BL & CATAWBA AV, FON, CA 92335 | 3 | 02/03/2024 22:44:52 | |

**Offense(s)**

| | | | |
|---|---|---|---|
| 1 | COMPLETED | 2800.4 VC - EVADING A PEACE OFFICER:WRONG WAY DRIVER | FELONY |

**Digital**

| | |
|---|---|
| ZOZAYA, BRIAN O 1330 | BWC VIDEO (VISUAL LABS) - BWC VIDEO OF PURSUIT |

**Narrative(s)**

ZOZAYA, BRIAN O 1330

## Assignment:

I am employed as a Police Officer for the City of Fontana, currently assigned to the Patrol Division as a Patrol Officer. I was on duty on Saturday February 3, 2024, assigned as 5P45, wearing full police uniform and driving a marked police vehicle (F-14) with a solid forward facing red light and siren. I function tested my lights and siren prior to the start of my shift to ensure they were in proper working order. Officer D. Precie was my partner for the duration of the shift. The City of Fontana is located in the County of San Bernardino. The following report is a summary of the events and statements which occurred during this incident.

## Details:

At approximately 2244 hours, I was conducting routine patrol in the area of Catawba and Valley. While driving eastbound on Valley approaching Catawba, I observed a white sedan, later identified as a 2022 Nissan CA Lic: 8ZZG454. As I drove behind the vehicle, I observed one of the vehicles occupants hanging out of the rear passenger side window. The subject's complete torso was outside of the vehicle, and it was apparent that the subject was not wearing a seatbelt, in violation of VC27315. As I approached closer to the vehicle, I observed the vehicle make an unsafe turn from the number 1 lane of Valley into the number 2 lane, passing in front of another motorist without using a signal, in violation of VC22108.

Based on the above CVC violations I attempted to conduct a traffic enforcement stop on the vehicle. It shall be noted at this time the road was wet due to rain, and based on the weather, road conditions, and traffic conditions, the unsafe lane change and a passenger without a seatbelt posed a threat to not only the subjects in the vehicle but the public as well.

## Vehicle Pursuit:

**Fontana Police Department**
17005 Upland Ave
Fontana, CA 92335
(909) 350-7740


I was behind the vehicle as we approached a solid red light in the eastbound lanes of Valley at Catawba. Once the light turned green I initiated my overhead emergency lights, which included a forward facing solid red light, flashing white / blue lights and activated my police siren I observed the vehicle quickly accelerated from the number 2 lane into the number 1 lane in front of another motorist, eastbound Valley from Catawba. A vehicle pursuit was initiated at this time. I was the primary officer in the pursuit.

It shall be noted that traffic conditions were moderate throughout the entire pursuit and weather conditions were wet and there was a moderate sprinkle. Additionally, as detailed below, the driver committed numerous vehicle code violations throughout this pursuit that endangered many lives in an attempt to evade officers.

The driver traveled eastbound on Valley from Catawba at speeds in excess of 60 miles per hour. It was apparent based on the driver's driving; he was not going to stop for officers. The driver continued driving eastbound on Valley in the number 1 lane through Citrus at speeds in excess of 80 miles per hour.

The driver continued eastbound on Valley through Citrus and approached Oleander at speeds in excess of 80 miles per hour. At this time, I broadcasted to dispatch that I was in pursuit. The driver continued to pass motorists at high speeds, with the roads wet and the light rain, the driver's actions posed a major threat to the injury of motorists the driver was passing at high speeds.

The driver continued eastbound in the number 1 lane as he approached Cypress. The driver continued through Cypress at speeds in excess of 80 miles per hour. After passing Cypress the driver began veering into westbound lanes of Valley. The driver veered into the westbound lanes of Valley and collided with a responding Fontana Police Vehicle.

The vehicle became disabled following the collision. I immediately broadcasted there had been a traffic collision and called for fire and paramedics. Additional officers began responding to assist with the collision.

**Additional Information:**

Following the conclusion of the pursuit San Bernardino County Sheriff's Department Major Accident Investigation Team responded and assumed the investigation. I was removed from the scene following the collision.

**Observations:**

Based on the totality of the above observations, erratic / dangerous driving, speeds in excess of 80mph, and numerous vehicle code violations conducted by the driver of the vehicle, it was apparent that he was attempting to flee from officers without due regard for

the safety of other drivers on the roadway.

**Additional Information:**

The total mileage of the pursuit (Valley Blvd from Citrus to Cypress) was approximately .65 miles. A CHP187A (Pursuit Form) was completed and attached to this report.

**Evidence:**

The following items were booked as evidence at Fontana Police Property Division and/or uploaded into the Visual Labs system.

1) BWC Video

**Disposition:**

Pending

**OFFICER**

| Involvement | Officer |
|---|---|
| REPORTING | ZOZAYA, BRIAN O 1330 |

# Exhibit C

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

**SHOJAI LAW FIRM**
Neema Shojai, Esq. (SBN 321833)
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
Telephone: (619) 777-0383
Facsimile: (619) 775-1383

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiffs,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

Case No. 5:25-cv-00207-JGB-SHK

[*Honorable Jesus G. Bernal*]
Magistrate Judge Shashi H. Kewalramani

**PLAINTIFF DIANA RIAS RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (Set 1)**

FPTC: Not Set.
Trial: Not Set.

ROPOUNDING PARTY: Defendant, CITY OF FONTANA

PLAINTIFFS: Plaintiff, DIANA RIAS

SET NUMBER: One (1)

## I. PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are made on the basis of information which is presently known by and available to Responding Party. Each answer is subject to all appropriate objections (including, but not limited to, objections to confidentiality, relevancy, and admissibility) which would require the exclusion of any information contained herein if such information was provided by a witness present and testifying in court. All such objections are reserved and may be interposed at the time of trial.

Responding Party has not yet completed their investigation of the facts relating to this action; has not yet interviewed all witnesses in this action; has not yet completed discovery in this action; and has not yet completed their preparation for trial. Consequently, the following responses are given without prejudice to Responding Party's right to amend or supplement these responses at a later date. No admissions of any nature whatsoever are implied or should be inferred. Nothing herein should be construed as an admission or acceptance by Responding Party with respect to the admissibility or relevance of any document or fact, or the relevance, truth, or accuracy of any characterization or statement of any kind.

Responding Party reserves the right to continue investigation and discovery of facts, witnesses, and documents which may reveal additional information about the issues in this case. In addition, Responding Party reserves the right to amend the responses contained herein, and to produce, refer to and offer any additional documents, facts, and evidence at the time of trial which may be ascertained through his continuing discovery and trial preparation, notwithstanding the reference to facts, evidence, documents, and things in this response.

## II. GENERAL OBJECTIONS

1. Responding Party objects to the Interrogatories, as a whole, to the extent that they request information that is protected from disclosure by the attorney-client privilege, attorney work product doctrine and/or any other applicable

privilege or immunity.

2. Responding Party objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information other than that which may be obtained through a reasonably diligent search of their records, or to create a summary or compilation other than as maintained in the regular course of business. Responding Party further objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information not in their possession, custody or control.

3. Responding Party objects to each and every Interrogatory to the extent that such discovery is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Responding Party objects to each and every Interrogatory to the extent that such discovery is overly broad, vague, and ambiguous.

5. Responding Party objects to each and every Interrogatory to the extent that it seeks information already known by, or reasonably accessible to Defendants, or facts that are solely within the knowledge and control of Defendants.

6. Responding Party objects on the grounds that Responding Party has not completed factual investigation. These responses are made in good faith and after diligent inquiry into the facts and information now known to Responding Party as well as their present analysis of the case. However, information that may be responsive may not yet have been discovered. Accordingly, without asserting an obligation to do so, and without waiving the objections asserted herein, Responding Party reserves the right to amend and/or supplement these responses as and when additional information is discovered. Additionally, because Responding Party's responses are based upon information that they recall and have identified to date, they do not preclude Responding Party from relying on facts or documents recalled, discovered or generated pursuant to subsequent investigation and discovery.

## III. PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES

**INTERROGATORY NO. 1:**

State, in specific detail, all facts known to You regarding the Incident that You contend support Your claim that the County, or any law enforcement officer or other person employed by the County, violated any of Decedent's constitutional, civil, statutory, or other legal rights during any part of the Incident – including but not limited to all of Your contentions as to how Decedent had Excessive Force used upon him, and/or otherwise was subject to any unlawful seizures or other violations of Decedent's constitutional or legal rights.

**RESPONSE to INTERROGATORY No. 1:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. Vague and unintelligible as phrased as Responding Party is not aware of any "County" defendant. Further, vague and ambiguous as to the differentiation between "constitutional" and "civil" and well as "statutory" and "other legal rights" as phrased, as Responding Party does not know what Requesting Party is referring to specifically or generally in context in order to respond. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." These interrogatories request several subparts and will be viewed as such, including (1) all facts related to "County" violation of "constitutional" or "civil rights," or how Decedent had Excessive Force used upon him by "County," and any "other violations of Decedent's constitutional or legal rights" assuming Requesting Party views these as the same; (2) all facts related to "County" violation of "statutory" or "other legal rights"; (3) how

Decedent was otherwise subject to any unlawful seizure; (4)-(6) same with the substitution of Officer Edward Bautista for "County"; (7)-(9) same with the substitution of Officer Jesus Garcia; (10)-(12) same with the substitution of Officer Daniel Pricie, and (13)-(15) same with the substitution of Officer Brian Zozaya. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. *Aldapa v. Fowler Packing Co., Inc*., 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); *In re Convergent Techs. Sec. Litig*., 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); *see also id.* at 339 (the "filing of sets of contention

interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); *Tubbs v. Sacramento Cnty. Jail*, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); *Mach Sols. Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 2:**

Identify all Witnesses known to You whom You contend can testify from Personal Knowledge about any of the acts, omissions, circumstances, or events that You contend occurred during any part of the Incident.

///

following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 6:**

State, in specific detail, all facts known to You that You contend support Your claim that the City (as opposed to any individual City employee or peace officer) is directly liable (as opposed to vicariously liable) to You in this action – including but not limited to stating all facts known to You supporting Your allegations of municipal and/or *Monell*-type liability.

**RESPONSE to INTERROGATORY No. 6:**

Objections: Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Plaintiff objects on the grounds that responses to this interrogatory given all of the multiple discrete subparts improperly introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it; thus, each subpart is considered a separate interrogatory for purposes of numerical limitation on interrogatories, no matter how it is designated. These Interrogatory requests: (1) City liability for unconstitutional customs, policies or practices; (2) City liability for failure to train; and (3) City liability for ratification. Responding Party objections on the ground that this Interrogatory is overly broad, oppressive, harassing, and unduly burdensome as it is asking Responding Party to respond in interrogatory to "state, in specific detail, all facts known" related to three different "Monell-type" claims. Further, this interrogatory is too vague and ambiguous to enable Responding Party to determine the scope of the interrogatory, and thus is improper. The plain language of a request generally speaking and literally translated, includes nearly the entire universe of information in this case. Accordingly, as phrased, the request is also overbroad and

unduly burdensome. Literally interpreted, the request also seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Pursuant to FRCP 26(b)(1), this request not relevant to any party's claim or defense and is not proportional to the needs of the case. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 7:**

State all facts known to You Identifying each and every employment that Decedent has had for any length of time for the period beginning five (5) years prior to date of the Incident, including specifying the Address of each employer Identified, the telephone number of each employer Identified, the dates of such employment by each employer Identified, and the job/duties that such person performed for each employer Identified.

**RESPONSE to INTERROGATORY No. 7:**

Objections: Pursuant to FRCP 26(b)(1), this request not relevant to any party's claim or defense and is not proportional to the needs of the case. Responding Party further objects on the grounds that this Request is not reasonably calculated to

**RESPONSE to INTERROGATORY No. 19:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, assumes facts, calls for narrative, and vague and overbroad as phrased. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." This interrogatory obviously exceeds that number. Responding Party further objects on the grounds that this Request is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects that this Interrogatory to the extent that it calls for an invasion of privacy, privilege, and is overbroad.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows to the best of the Responding Party's information and recollection and understanding:

We Facetimed on Friday night before I went to bed. We were texting Saturday, but he hadn't called yet because he wasn't home from Dave & Busters. June was the last time I was able to hug my son and put him on a plane when he flew first class to stay with his grandmother while I was in concussion therapy.

**INTERROGATORY NO. 20:**

State in specific detail all facts known to YOU about the vehicle collision that resulted in Decedent's death.

**RESPONSE to INTERROGATORY No. 20**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more

than 25 written interrogatories, including all discrete subparts." Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. *Aldapa v. Fowler Packing Co., Inc*., 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); *In re Convergent Techs. Sec. Litig*., 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); *see also id.* at 339 (the "filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); *Tubbs v. Sacramento Cnty. Jail*, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to

present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); *Mach Sols. Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

DATED: July 28, 2025

**LAW OFFICES OF DALE K. GALIPO**

By: ______________________________

Dale K. Galipo
Marcel F. Sincich
*Attorneys for Plaintiffs*

PROOF OF SERVICE

STATE OF CALIFORNIA, CITY OF LOS ANGELES

I, Stefany Anderson, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On July 28, 2025, I served the foregoing document described as: **PLAINTIFF DIANA RIAS RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (SET 1)** on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

METHOD OF SERVICE

☒ (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☒ I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐ (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 28, 2025, at Woodland Hills, California.

/s/*Stefany Anderson*

Stefany Anderson

SERVICE LIST

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
Eugene P. Ramirez (State Bar No. 134865)
Kayleigh Andersen (State Bar No. 306442)
Eugene Hanrahan (State Bar No. 185826)
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
E-mail:
*eugene.ramirez@manningkass.com*
*kayleigh.andersen@manningkass.com*
*eugene.hanrahan@manningkass.com*
*athena.reddersen@manningkass.com*
*delia.flores@manningkass.com*
*yury.kolesnikov@manningkass.com*
*candice.raub@manningkass.com*
*sandra.alarcon@manningkass.com*

Attorneys for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA

# VERIFICATION

Case Name: Rias; Pitts & Adams v. City of Fontana
Case No.: 5:25-cv-002077-JGB-SHKx

I, the undersigned, declare:

I am one of the plaintiffs in the foregoing matter and I am making this verification for that reason. I have read **PLAINTIFF DIANA RIAS RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES, SET ONE** and know their content, and the same is true to my knowledge, or on my information and belief and on that ground allege that the matters stated in those discovery responses are true.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and that this declaration is executed on 7/28/2025, at Rialto, California.




Diana Rias

# Exhibit D

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

**SHOJAI LAW FIRM**
Neema Shojai, Esq. (SBN 321833)
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
Telephone: (619) 777-0383
Facsimile: (619) 775-1383

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DIANA RIAS; TA-TANESHA GALBURTH; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiffs,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

Case No. 5:25-cv-00207-JGB-SHK

[*Honorable Jesus G. Bernal*]
Magistrate Judge Shashi H. Kewalramani

**PLAINTIFF TA-TANESHA GALBURTH'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (Set 1)**

FPTC: Not Set.
Trial: Not Set.

PROPOUNDING PARTY: Defendant, CITY OF FONTANA

PLAINTIFFS: Plaintiff, TA-TANESHA GALBURTH

SET NUMBER: One (1)

## I. PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are made on the basis of information which is presently known by and available to Responding Party. Each answer is subject to all appropriate objections (including, but not limited to, objections to confidentiality, relevancy, and admissibility) which would require the exclusion of any information contained herein if such information was provided by a witness present and testifying in court. All such objections are reserved and may be interposed at the time of trial.

Responding Party has not yet completed their investigation of the facts relating to this action; has not yet interviewed all witnesses in this action; has not yet completed discovery in this action; and has not yet completed their preparation for trial. Consequently, the following responses are given without prejudice to Responding Party's right to amend or supplement these responses at a later date. No admissions of any nature whatsoever are implied or should be inferred. Nothing herein should be construed as an admission or acceptance by Responding Party with respect to the admissibility or relevance of any document or fact, or the relevance, truth, or accuracy of any characterization or statement of any kind.

Responding Party reserves the right to continue investigation and discovery of facts, witnesses, and documents which may reveal additional information about the issues in this case. In addition, Responding Party reserves the right to amend the responses contained herein, and to produce, refer to and offer any additional documents, facts, and evidence at the time of trial which may be ascertained through his continuing discovery and trial preparation, notwithstanding the reference to facts, evidence, documents, and things in this response.

## II. GENERAL OBJECTIONS

1. Responding Party objects to the Interrogatories, as a whole, to the extent that they request information that is protected from disclosure by the attorney-client privilege, attorney work product doctrine and/or any other applicable

privilege or immunity.

2. Responding Party objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information other than that which may be obtained through a reasonably diligent search of their records, or to create a summary or compilation other than as maintained in the regular course of business. Responding Party further objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information not in their possession, custody or control.

3. Responding Party objects to each and every Interrogatory to the extent that such discovery is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Responding Party objects to each and every Interrogatory to the extent that such discovery is overly broad, vague, and ambiguous.

5. Responding Party objects to each and every Interrogatory to the extent that it seeks information already known by, or reasonably accessible to Defendants, or facts that are solely within the knowledge and control of Defendants.

6. Responding Party objects on the grounds that Responding Party has not completed factual investigation. These responses are made in good faith and after diligent inquiry into the facts and information now known to Responding Party as well as their present analysis of the case. However, information that may be responsive may not yet have been discovered. Accordingly, without asserting an obligation to do so, and without waiving the objections asserted herein, Responding Party reserves the right to amend and/or supplement these responses as and when additional information is discovered. Additionally, because Responding Party's responses are based upon information that they recall and have identified to date, they do not preclude Responding Party from relying on facts or documents recalled, discovered or generated pursuant to subsequent investigation and discovery.

## III. PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES

**INTERROGATORY NO. 1:**

State, in specific detail, all facts known to You regarding the Incident that You contend support Your claim that the County, or any law enforcement officer or other person employed by the County, violated any of Decedent's constitutional, civil, statutory, or other legal rights during any part of the Incident – including but not limited to all of Your contentions as to how Decedent had Excessive Force used upon him, and/or otherwise was subject to any unlawful seizures or other violations of Decedent's constitutional or legal rights.

**RESPONSE to INTERROGATORY No. 1:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. Vague and unintelligible as phrased as Responding Party is not aware of any "County" defendant. Further, vague and ambiguous as to the differentiation between "constitutional" and "civil" and well as "statutory" and "other legal rights" as phrased, as Responding Party does not know what Requesting Party is referring to specifically or generally in context in order to respond. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." These interrogatories request several subparts and will be viewed as such, including (1) all facts related to "County" violation of "constitutional" or "civil rights," or how Decedent had Excessive Force used upon him by "County," and any "other violations of Decedent's constitutional or legal rights" assuming Requesting Party views these as the same; (2) all facts related to "County" violation of "statutory" or "other legal rights"; (3) how

Decedent was otherwise subject to any unlawful seizure; (4)-(6) same with the substitution of Officer Edward Bautista for "County"; (7)-(9) same with the substitution of Officer Jesus Garcia; (10)-(12) same with the substitution of Officer Daniel Pricie, and (13)-(15) same with the substitution of Officer Brian Zozaya. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. *Aldapa v. Fowler Packing Co., Inc*., 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); *In re Convergent Techs. Sec. Litig*., 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); *see also id.* at 339 (the "filing of sets of contention

interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); *Tubbs v. Sacramento Cnty. Jail*, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); *Mach Sols. Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 2:**

Identify all Witnesses known to You whom You contend can testify from Personal Knowledge about any of the acts, omissions, circumstances, or events that You contend occurred during any part of the Incident.

///

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to this Interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 6:**

State, in specific detail, all facts known to You that You contend support Your claim that the City (as opposed to any individual City employee or peace officer) is directly liable (as opposed to vicariously liable) to You in this action – including but not limited to stating all facts known to You supporting Your allegations of municipal and/or *Monell*-type liability.

**RESPONSE to INTERROGATORY No. 6:**

Objections: Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Plaintiff objects on the grounds that responses to this interrogatory given all of the multiple discrete subparts improperly introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it; thus, each subpart is considered a separate interrogatory for purposes of numerical limitation on interrogatories, no matter how it is designated. These Interrogatory requests: (1) City liability for unconstitutional customs, policies or practices; (2) City liability for failure to train; and (3) City liability for ratification. Responding Party objections on the ground that this Interrogatory is overly broad, oppressive, harassing, and unduly burdensome as it is

asking Responding Party to respond in interrogatory to "state, in specific detail, all facts known" related to three different "*Monell*-type" claims. Further, this interrogatory is too vague and ambiguous to enable Responding Party to determine the scope of the interrogatory, and thus is improper. The plain language of a request generally speaking and literally translated, includes nearly the entire universe of information in this case. Accordingly, as phrased, the request is also overbroad and unduly burdensome. Literally interpreted, the request also seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Pursuant to FRCP 26(b)(1), this request not relevant to any party's claim or defense and is not proportional to the needs of the case. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 7:**

State all facts known to You Identifying each and every employment that Decedent has had for any length of time for the period beginning five (5) years prior to date of the Incident, including specifying the Address of each employer Identified, the telephone number of each employer Identified, the dates of such

Without waiving and subject to the aforementioned objections, Responding Party responds as follows to the best of Responding Party's information and recollection:

On the day Omari left the house, I was sitting downstairs with a friend. Omari came down to talk with us. He was excited and shared that he wanted to join the football team at Carter High School. I told him how proud I was of him for bringing his grades up, and I was also sharing that pride with my friend. She complimented Omari, telling him how big and handsome he had gotten, which made all of us laugh because she was cracking jokes.

Omari then got a text message and told us he was going to hang out with friends and attend a party that night. He went upstairs to get dressed. When he came back down, he wanted us to see his outfit. We told him he looked really handsome. My friend joked again, saying, "Omari, you've gotten so big! I remember when you were a baby and you used to holler all the time—I used to call you 'Hollering Jack.'" We all laughed again.

Shortly after that, he received another text saying his friends were outside. I told him to be safe, and he told me he would. I also reminded him not to come back too late.

That was the last time I spoke with my son.

**INTERROGATORY NO. 20:**

State in specific detail all facts known to YOU about the vehicle collision that resulted in Decedent's death.

**RESPONSE to INTERROGATORY No. 20**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil

Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. *Aldapa v. Fowler Packing Co., Inc*., 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); *In re Convergent Techs. Sec. Litig*., 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); *see also id.* at 339 (the "filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); *Tubbs v. Sacramento Cnty. Jail*,

2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); *Mach Sols. Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

DATED: July 28, 2025

**LAW OFFICES OF DALE K. GALIPO**

By: ______________________________

Dale K. Galipo
Marcel F. Sincich
*Attorneys for Plaintiffs*

PROOF OF SERVICE

STATE OF CALIFORNIA, CITY OF LOS ANGELES

I, Alejandro Monguia, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On July 28, 2025, I served the foregoing document described as: **PLAINTIFF TA-TANESHA GALBURTH'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (SET 1)** on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

METHOD OF SERVICE

☒ (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☒ I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐ (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 28, 2025, at Woodland Hills, California.

*/s/ Alejandro Monguia*
Alejandro Monguia

SERVICE LIST

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
Eugene P. Ramirez (State Bar No. 134865)
Kayleigh Andersen (State Bar No. 306442)
Eugene Hanrahan (State Bar No. 185826)
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
E-mail:
*eugene.ramirez@manningkass.com*
*kayleigh.andersen@manningkass.com*
*eugene.hanrahan@manningkass.com*
*athena.reddersen@manningkass.com*
*delia.flores@manningkass.com*
*yury.kolesnikov@manningkass.com*
*candice.raub@manningkass.com*
*sandra.alarcon@manningkass.com*

Attorneys for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA

# VERIFICATION

Case Name: Rias; Pitts & Adams v. City of Fontana
Case No.: 5:25-cv-002077-JGB-SHKx

I, the undersigned, declare:

I am one of the plaintiffs in the foregoing matter and I am making this verification for that reason. I have read **PLAINTIFF TA-TANESHA GALBURTH'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES, SET ONE** and know their content, and the same is true to my knowledge, or on my information and belief and on that ground allege that the matters stated in those discovery responses are true.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and that this declaration is executed on 7/28/2025, at Rialto, California.

DocuSigned by:
39C0502686B4406

Ta-Tanesha Galburth

# Exhibit E

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

**SHOJAI LAW FIRM**
Neema Shojai, Esq. (SBN 321833)
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
Telephone: (619) 777-0383
Facsimile: (619) 775-1383

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiffs,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

Case No. 5:25-cv-00207-JGB-SHK

[*Honorable Jesus G. Bernal*]
Magistrate Judge Shashi H. Kewalramani

**PLAINTIFF DOMINIC ADAMS, SR. RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (SET 1)**

FPTC: Not Set.
Trial: Not Set.

PROPOUNDING PARTY: Defendant, CITY OF FONTANA

PLAINTIFFS: Plaintiff, DOMINIC ADAMS, SR.

SET NUMBER: One (1)

## I. PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are made on the basis of information which is presently known by and available to Responding Party. Each answer is subject to all appropriate objections (including, but not limited to, objections to confidentiality, relevancy, and admissibility) which would require the exclusion of any information contained herein if such information was provided by a witness present and testifying in court. All such objections are reserved and may be interposed at the time of trial.

Responding Party has not yet completed their investigation of the facts relating to this action; has not yet interviewed all witnesses in this action; has not yet completed discovery in this action; and has not yet completed their preparation for trial. Consequently, the following responses are given without prejudice to Responding Party's right to amend or supplement these responses at a later date. No admissions of any nature whatsoever are implied or should be inferred. Nothing herein should be construed as an admission or acceptance by Responding Party with respect to the admissibility or relevance of any document or fact, or the relevance, truth, or accuracy of any characterization or statement of any kind.

Responding Party reserves the right to continue investigation and discovery of facts, witnesses, and documents which may reveal additional information about the issues in this case. In addition, Responding Party reserves the right to amend the responses contained herein, and to produce, refer to and offer any additional documents, facts, and evidence at the time of trial which may be ascertained through his continuing discovery and trial preparation, notwithstanding the reference to facts, evidence, documents, and things in this response.

## II. GENERAL OBJECTIONS

1. Responding Party objects to the Interrogatories, as a whole, to the extent that they request information that is protected from disclosure by the attorney-client privilege, attorney work product doctrine and/or any other applicable

privilege or immunity.

2. Responding Party objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information other than that which may be obtained through a reasonably diligent search of their records, or to create a summary or compilation other than as maintained in the regular course of business. Responding Party further objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information not in their possession, custody or control.

3. Responding Party objects to each and every Interrogatory to the extent that such discovery is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Responding Party objects to each and every Interrogatory to the extent that such discovery is overly broad, vague, and ambiguous.

5. Responding Party objects to each and every Interrogatory to the extent that it seeks information already known by, or reasonably accessible to Defendants, or facts that are solely within the knowledge and control of Defendants.

6. Responding Party objects on the grounds that Responding Party has not completed factual investigation. These responses are made in good faith and after diligent inquiry into the facts and information now known to Responding Party as well as their present analysis of the case. However, information that may be responsive may not yet have been discovered. Accordingly, without asserting an obligation to do so, and without waiving the objections asserted herein, Responding Party reserves the right to amend and/or supplement these responses as and when additional information is discovered. Additionally, because Responding Party's responses are based upon information that they recall and have identified to date, they do not preclude Responding Party from relying on facts or documents recalled, discovered or generated pursuant to subsequent investigation and discovery.

## III. PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES

**INTERROGATORY NO. 1:**

State, in specific detail, all facts known to You regarding the Incident that You contend support Your claim that the County, or any law enforcement officer or other person employed by the County, violated any of Decedent's constitutional, civil, statutory, or other legal rights during any part of the Incident – including but not limited to all of Your contentions as to how Decedent had Excessive Force used upon him, and/or otherwise was subject to any unlawful seizures or other violations of Decedent's constitutional or legal rights.

**RESPONSE to INTERROGATORY No. 1:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. Vague and unintelligible as phrased as Responding Party is not aware of any "County" defendant. Further, vague and ambiguous as to the differentiation between "constitutional" and "civil" and well as "statutory" and "other legal rights" as phrased, as Responding Party does not know what Requesting Party is referring to specifically or generally in context in order to respond. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." These interrogatories request several subparts and will be viewed as such, including (1) all facts related to "County" violation of "constitutional" or "civil rights," or how Decedent had Excessive Force used upon him by "County," and any "other violations of Decedent's constitutional or legal rights" assuming Requesting Party views these as the same; (2) all facts related to "County" violation of "statutory" or "other legal rights"; (3) how

Decedent was otherwise subject to any unlawful seizure; (4)-(6) same with the substitution of Officer Edward Bautista for "County"; (7)-(9) same with the substitution of Officer Jesus Garcia; (10)-(12) same with the substitution of Officer Daniel Pricie, and (13)-(15) same with the substitution of Officer Brian Zozaya. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. Aldapa v. Fowler Packing Co., Inc., 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); see also id. at 339 (the "filing of sets of contention

interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); Tubbs v. Sacramento Cnty. Jail, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); Aldapa, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); Mach Sols. Inc. v. Doosan Infracore Am. Corp., 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting Moses v. Halstead, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 2:**

Identify all Witnesses known to You whom You contend can testify from Personal Knowledge about any of the acts, omissions, circumstances, or events that You contend occurred during any part of the Incident.

///

San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 6:**

State, in specific detail, all facts known to You that You contend support Your claim that the City (as opposed to any individual City employee or peace officer) is directly liable (as opposed to vicariously liable) to You in this action – including but not limited to stating all facts known to You supporting Your allegations of municipal and/or *Monell*-type liability.

**RESPONSE to INTERROGATORY No. 6:**

Objections: Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Plaintiff objects on the grounds that responses to this interrogatory given all of the multiple discrete subparts improperly introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it; thus, each subpart is considered a separate interrogatory for purposes of numerical limitation on interrogatories, no matter how it is designated. These Interrogatory requests: (1) City liability for unconstitutional customs, policies or practices; (2) City liability for failure to train; and (3) City liability for ratification. Responding Party objections on the ground that this Interrogatory is overly broad, oppressive, harassing, and unduly burdensome as it is asking Responding Party to respond in interrogatory to "state, in specific detail, all facts known" related to three different "Monell-type" claims. Further, this interrogatory is too vague and ambiguous to enable Responding Party to determine the scope of the interrogatory, and thus is improper. The plain language of a request generally speaking and literally translated, includes nearly the entire universe of information in this case. Accordingly, as phrased, the request is also overbroad and unduly burdensome. Literally interpreted, the request also seeks information protected from disclosure by the attorney-client privilege and the attorney work

product doctrine. Pursuant to FRCP 26(b)(1), this request not relevant to any party's claim or defense and is not proportional to the needs of the case. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 7:**

State all facts known to You Identifying each and every employment that Decedent has had for any length of time for the period beginning five (5) years prior to date of the Incident, including specifying the Address of each employer Identified, the telephone number of each employer Identified, the dates of such employment by each employer Identified, and the job/duties that such person performed for each employer Identified.

**RESPONSE to INTERROGATORY No. 7:**

Objections: Pursuant to FRCP 26(b)(1), this request not relevant to any party's claim or defense and is not proportional to the needs of the case. Responding Party further objects on the grounds that this Request is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to this request on the basis that it seeks information protected from disclosure by the right

respectful young man.

**INTERROGATORY NO. 19:**

State in specific detail the last interaction YOU had with the Decedent, including but not limited to the substance of the contact, the date/time of the contact, and location of the contact.

**RESPONSE to INTERROGATORY No. 19:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, assumes facts, calls for narrative, and vague and overbroad as phrased. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." This interrogatory obviously exceeds that number. Responding Party further objects on the grounds that this Request is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects that this Interrogatory to the extent that it calls for an invasion of privacy, privilege, and is overbroad.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows to the best of Responding Party's information and recollection:

I saw my son two days before he passed. I picked him up to come over. He wanted to go visit his cousin, I dropped him off for a couple of hours and I picked him back up. We went to a movie, and I dropped him back home to his mom afterward.

**INTERROGATORY NO. 20:**

State in specific detail all facts known to YOU about the vehicle collision that resulted in Decedent's death.

**RESPONSE to INTERROGATORY No. 20**

Objections: Responding Party objects on the grounds that this Interrogatory

calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. *Aldapa v. Fowler Packing Co., Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of

questions...is sufficiently likely to be productive to justify the burden that responding can entail"); *see also id.* at 339 (the "filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); *Tubbs v. Sacramento Cnty. Jail*, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); *Mach Sols. Inc. v. Doosan Infracore Am. Corp*., 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

///

DATED: July 28, 2025

**LAW OFFICES OF DALE K. GALIPO**
**SHOJAI LAW FIRM**

By: ______________________________

Dale K. Galipo
Marcel F. Sincich
Neema Shojai
*Attorneys for Plaintiffs*

# PROOF OF SERVICE

STATE OF CALIFORNIA, CITY OF LOS ANGELES

I, Stefany Anderson, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On July 28, 2025, I served the foregoing document described as: **PLAINTIFF DOMINIC ADAMS, SR. RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (SET 1)** on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

METHOD OF SERVICE

☒ (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☒ I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐ (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 28, 2025, at Woodland Hills, California.

*/x/Stefany Anderson*
Stefany Anderson

SERVICE LIST

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
Eugene P. Ramirez (State Bar No. 134865)
Kayleigh Andersen (State Bar No. 306442)
Eugene Hanrahan (State Bar No. 185826)
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
E-mail:
*eugene.ramirez@manningkass.com*
*kayleigh.andersen@manningkass.com*
*eugene.hanrahan@manningkass.com*
*athena.reddersen@manningkass.com*
*delia.flores@manningkass.com*
*yury.kolesnikov@manningkass.com*
*candice.raub@manningkass.com*
*sandra.alarcon@manningkass.com*

Attorneys for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA

# VERIFICATION

Case Name: Rias; Pitts & Adams v. City of Fontana
Case No.: 5:25-cv-002077-JGB-SHKx

I, the undersigned, declare:

I am one of the plaintiffs in the foregoing matter and I am making this verification for that reason. I have read **PLAINTIFF DOMINIC ADAMS, SR. RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES, SET ONE** and know their content, and the same is true to my knowledge, or on my information and belief and on that ground allege that the matters stated in those discovery responses are true.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and that this declaration is executed on 7/28/2025, at 4655 Minnier Ave #37a Riverside Ca 92505, California.

Signed by:
Dominic Adams Sr.
9BE4F8FC16*045D

Dominic Adams, Sr.

# Exhibit F

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

**SHOJAI LAW FIRM**
Neema Shojai, Esq. (SBN 321833)
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
Telephone: (619) 777-0383
Facsimile: (619) 775-1383

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 5:25-cv-00207-JGB-SHK<br><br>[*Honorable Jesus G. Bernal*]<br>Magistrate Judge Shashi H. Kewalramani<br><br>**PLAINTIFF BRITTANY MASON RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (Set 1)**<br><br>FPTC: Not Set.<br>Trial: Not Set. |

PROPOUNDING PARTY: Defendant, CITY OF FONTANA

PLAINTIFFS: Plaintiff, BRITTANY MASON

SET NUMBER: One (1)

## I. PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are made on the basis of information which is presently known by and available to Responding Party. Each answer is subject to all appropriate objections (including, but not limited to, objections to confidentiality, relevancy, and admissibility) which would require the exclusion of any information contained herein if such information was provided by a witness present and testifying in court. All such objections are reserved and may be interposed at the time of trial.

Responding Party has not yet completed their investigation of the facts relating to this action; has not yet interviewed all witnesses in this action; has not yet completed discovery in this action; and has not yet completed their preparation for trial. Consequently, the following responses are given without prejudice to Responding Party's right to amend or supplement these responses at a later date. No admissions of any nature whatsoever are implied or should be inferred. Nothing herein should be construed as an admission or acceptance by Responding Party with respect to the admissibility or relevance of any document or fact, or the relevance, truth, or accuracy of any characterization or statement of any kind.

Responding Party reserves the right to continue investigation and discovery of facts, witnesses, and documents which may reveal additional information about the issues in this case. In addition, Responding Party reserves the right to amend the responses contained herein, and to produce, refer to and offer any additional documents, facts, and evidence at the time of trial which may be ascertained through his continuing discovery and trial preparation, notwithstanding the reference to facts, evidence, documents, and things in this response.

## II. GENERAL OBJECTIONS

1. Responding Party objects to the Interrogatories, as a whole, to the extent that they request information that is protected from disclosure by the attorney-client privilege, attorney work product doctrine and/or any other applicable

privilege or immunity.

2. Responding Party objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information other than that which may be obtained through a reasonably diligent search of their records, or to create a summary or compilation other than as maintained in the regular course of business. Responding Party further objects to each Interrogatory to the extent that it seeks to require Responding Party to provide information not in their possession, custody or control.

3. Responding Party objects to each and every Interrogatory to the extent that such discovery is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Responding Party objects to each and every Interrogatory to the extent that such discovery is overly broad, vague, and ambiguous.

5. Responding Party objects to each and every Interrogatory to the extent that it seeks information already known by, or reasonably accessible to Defendants, or facts that are solely within the knowledge and control of Defendants.

6. Responding Party objects on the grounds that Responding Party has not completed factual investigation. These responses are made in good faith and after diligent inquiry into the facts and information now known to Responding Party as well as their present analysis of the case. However, information that may be responsive may not yet have been discovered. Accordingly, without asserting an obligation to do so, and without waiving the objections asserted herein, Responding Party reserves the right to amend and/or supplement these responses as and when additional information is discovered. Additionally, because Responding Party's responses are based upon information that they recall and have identified to date, they do not preclude Responding Party from relying on facts or documents recalled, discovered or generated pursuant to subsequent investigation and discovery.

## III. PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES

**INTERROGATORY NO. 1:**

State, in specific detail, all facts known to You regarding the Incident that You contend support Your claim that the County, or any law enforcement officer or other person employed by the County, violated any of Decedent's constitutional, civil, statutory, or other legal rights during any part of the Incident – including but not limited to all of Your contentions as to how Decedent had Excessive Force used upon him, and/or otherwise was subject to any unlawful seizures or other violations of Decedent's constitutional or legal rights.

**RESPONSE to INTERROGATORY No. 1:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. Vague and unintelligible as phrased as Responding Party is not aware of any "County" defendant. Further, vague and ambiguous as to the differentiation between "constitutional" and "civil" and well as "statutory" and "other legal rights" as phrased, as Responding Party does not know what Requesting Party is referring to specifically or generally in context in order to respond. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." These interrogatories request several subparts and will be viewed as such, including (1) all facts related to "County" violation of "constitutional" or "civil rights," or how Decedent had Excessive Force used upon him by "County," and any "other violations of Decedent's constitutional or legal rights" assuming Requesting Party views these as the same; (2) all facts related to "County" violation of "statutory" or "other legal rights"; (3) how

Decedent was otherwise subject to any unlawful seizure; (4)-(6) same with the substitution of Officer Edward Bautista for "County"; (7)-(9) same with the substitution of Officer Jesus Garcia; (10)-(12) same with the substitution of Officer Daniel Pricie, and (13)-(15) same with the substitution of Officer Brian Zozaya. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. Aldapa v. Fowler Packing Co., Inc., 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); see also id. at 339 (the "filing of sets of contention

interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); Tubbs v. Sacramento Cnty. Jail, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); Aldapa, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); Mach Sols. Inc. v. Doosan Infracore Am. Corp., 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting Moses v. Halstead, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 2:**

Identify all Witnesses known to You whom You contend can testify from Personal Knowledge about any of the acts, omissions, circumstances, or events that You contend occurred during any part of the Incident.

///

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to this Interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 6:**

State, in specific detail, all facts known to You that You contend support Your claim that the City (as opposed to any individual City employee or peace officer) is directly liable (as opposed to vicariously liable) to You in this action – including but not limited to stating all facts known to You supporting Your allegations of municipal and/or *Monell*-type liability.

**RESPONSE to INTERROGATORY No. 6:**

Objections: Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Plaintiff objects on the grounds that responses to this interrogatory given all of the multiple discrete subparts improperly introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it; thus, each subpart is considered a separate interrogatory for purposes of numerical limitation on interrogatories, no matter how it is designated. These Interrogatory requests: (1) City liability for unconstitutional customs, policies or practices; (2) City liability for failure to train; and (3) City liability for ratification. Responding Party objections on the ground that this Interrogatory is overly broad, oppressive, harassing, and unduly burdensome as it is

asking Responding Party to respond in interrogatory to "state, in specific detail, all facts known" related to three different "Monell-type" claims. Further, this interrogatory is too vague and ambiguous to enable Responding Party to determine the scope of the interrogatory, and thus is improper. The plain language of a request generally speaking and literally translated, includes nearly the entire universe of information in this case. Accordingly, as phrased, the request is also overbroad and unduly burdensome. Literally interpreted, the request also seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Pursuant to FRCP 26(b)(1), this request not relevant to any party's claim or defense and is not proportional to the needs of the case. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

**INTERROGATORY NO. 7:**

State all facts known to You Identifying each and every employment that Decedent has had for any length of time for the period beginning five (5) years prior to date of the Incident, including specifying the Address of each employer Identified, the telephone number of each employer Identified, the dates of such

the other boys or their parents.

**INTERROGATORY NO. 19:**

State in specific detail the last interaction YOU had with the Decedent, including but not limited to the substance of the contact, the date/time of the contact, and location of the contact.

**RESPONSE to INTERROGATORY No. 19:**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, assumes facts, calls for narrative, and vague and overbroad as phrased. Pursuant to FRCP 26, this request is not proportional to the needs of the case. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." This interrogatory obviously exceeds that number. Responding Party further objects on the grounds that this Request is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects that this Interrogatory to the extent that it calls for an invasion of privacy, privilege, and is overbroad.

Without waiving and subject to the aforementioned objections, Responding Party responds as follows to the best of Responding Party's information and recollection:

The last interaction I had with Domonic was across the street at our neighbor's house. He came across about an hour after me and his brother did. He hung out for a bit, ate some pizza, and headed back home. I followed shortly after. Before I went to bed, he texted me asking what's for dinner. I was surprised he was still hungry, but I told him there were leftovers in the fridge or he could make himself noodles.

**INTERROGATORY NO. 20:**

State in specific detail all facts known to YOU about the vehicle collision that resulted in Decedent's death.

**RESPONSE to INTERROGATORY No. 20**

Objections: Responding Party objects on the grounds that this Interrogatory calls for speculation, compound, assumes facts, calls for narrative, and vague and overbroad as phrased. This request requires considerable research and investigation in order to respond and is too vague or ambiguous to enable the Responding Party to determine the scope of interrogatory in order to respond. Federal Rules of Civil Procedure, Rule 33 provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Pursuant to FRCP 26, this request is not proportional to the needs of the case. Responding Party objects that this Interrogatory is calls for an invasion of privacy, privilege, and is overbroad, harassing and oppressive. Responding Party further objects that this request calls for an expert opinion and/or premature disclosure of expert witness discovery prior to the date for expert exchange set by the Fed. R. Civ. Pro. and/or the Scheduling Order in this case. Responding Party further objects that these interrogatories call for speculation, lacks foundation, calls for the entire universe of facts – some of which is outside of Responding Party's personal knowledge at this time and some of which Requesting Party has greater access to. Responding Party objects that responsive information to this Request is equally available to Defendants as to Responding Party or are in Defendants' possession, custody, and/or control; or to which Defendants have superior access and documents which were requested by Responding Party and to which Defendants have failed to produce. This contention interrogatory is unduly burdensome and oppressive on its face. *Aldapa v. Fowler Packing Co., Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings and that ask for each and every fact and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome."); *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("at least in cases where

defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of questions...is sufficiently likely to be productive to justify the burden that responding can entail"); *see also id.* at 339 (the "filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"); *Tubbs v. Sacramento Cnty. Jail*, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses. 'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case…."); *Mach Sols. Inc. v. Doosan Infracore Am. Corp*., 323 F.R.D. 522, 528 (D.S.C. 2018) (Contention interrogatories "are overly broad and unduly burdensome on their face if they seek 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case…") (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006))).

Without waiving and subject to the aforementioned objections, the Responding Party responds as follows:

The answer to these Interrogatories may be determined by examining, auditing, compiling, abstracting, or summarizing records (including electronically stored information), and the burden of deriving or ascertaining the answer will be substantially the same for either party. Thus, Responding Party specifies the following records for Requesting Parties review which are in Requesting Parties custody and control: Defendants' Disclosures and Discovery Responses; County of San Bernardino investigatory records; California Highway Patrol investigatory records; statements of Defendant Officers.

DATED: July 28, 2025

**LAW OFFICES OF DALE K. GALIPO**

By: ______________________________

Dale K. Galipo
Marcel F. Sincich
*Attorneys for Plaintiffs*

PROOF OF SERVICE

STATE OF CALIFORNIA, CITY OF LOS ANGELES

I, Alejandro Monguia, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On July 28, 2025, I served the foregoing document described as: **PLAINTIFF BRITTANY MASON RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES (SET 1)** on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

METHOD OF SERVICE

☒ (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☒ I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐ (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 28, 2025, at Woodland Hills, California.

/s/ *Alejandro Monguia*
Alejandro Monguia

SERVICE LIST

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
Eugene P. Ramirez (State Bar No. 134865)
Kayleigh Andersen (State Bar No. 306442)
Eugene Hanrahan (State Bar No. 185826)
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
E-mail:
*eugene.ramirez@manningkass.com*
*kayleigh.andersen@manningkass.com*
*eugene.hanrahan@manningkass.com*
*athena.reddersen@manningkass.com*
*delia.flores@manningkass.com*
*yury.kolesnikov@manningkass.com*
*candice.raub@manningkass.com*
*sandra.alarcon@manningkass.com*

Attorneys for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA

# VERIFICATION

Case Name: Rias; Pitts & Adams v. City of Fontana
Case No.: 5:25-cv-002077-JGB-SHKx

I, the undersigned, declare:

I am one of the plaintiffs in the foregoing matter and I am making this verification for that reason. I have read **PLAINTIFF BRITTANY MASON RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF FONTANA'S INTERROGATORIES, SET ONE** and know their content, and the same is true to my knowledge, or on my information and belief and on that ground allege that the matters stated in those discovery responses are true.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and that this declaration is executed on 7/28/2025, at Fontana, California.




Brittany Mason

# EXHIBIT G

# EXHIBIT H

# Exhibit I

# SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

## *MAJOR ACCIDENT INVESTIGATION TEAM*

***ACCIDENT INVESTIGATION REPORT***
***City of Occurrence***
**Fontana**

***Supervisor***
Sgt. B. Motley

***Investigator***
Deputy Darrell Holland
Deputy Garrett Wolff
Deputy Henry Reyes

***Case Number***
192400847

***Date/Time/Location***
02/03/2024, 2244 hours, at Valley Boulevard and Cypress Avenue, Fontana, CA

***Subpoenas for investigating personnel should be directed to:***
***San Bernardino County Sheriff's Department:***
***Civil Liabilities Division***

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH REPORT

CHP 555 Page 1 (Rev. 3-20) OPI 060

Page 1 of

| SPECIAL CONDITIONS | NUMBER INJURED | HIT & RUN FELONY | CITY | JUDICIAL DISTRICT | LOCAL REPORT NUMBER |
|---|---|---|---|---|---|
| Fatal<br>On-Duty Emergency Vehicle | 3 | ☐ | Fontana | Rancho Superior | 192400847 |
| | NUMBER KILLED: 3 | HIT & RUN MISDEMEANOR: ☐ | COUNTY: San Bernardino | REPORTING DISTRICT: H26G1; BEAT: Fon1 | DAY OF WEEK: Saturday; TOW AWAY: ☒ YES ☐ NO |

## LOCATION

| | | | |
|---|---|---|---|
| CRASH OCCURRED ON: Valley Boulevard | MO. DAY YEAR: 02/03/2024 | TIME (2400): 2244 | NCIC #: 3600; OFFICER ID: B9547 |
| MILEPOST INFORMATION: ☐ FEET ☐ MILES OF | GPS COORDINATES: LATITUDE LONGITUDE | | PHOTOGRAPHS BY: ☐ NONE<br>H. Reyes, C9389 |
| ☐ AT INTERSECTION WITH<br>☒ OR: 418 ☒ FEET ☐ MILES East OF Cypress Avenue | | STATE HWY REL: ☐ YES ☒ NO | |

## PARTY 1

| Field | Value |
|---|---|
| Party type | ☒ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR |
| DRIVER'S LICENSE NUMBER | None |
| STATE | CA |
| CLASS | U |
| AIR BAG | L |
| SAFETY EQUIP. | H |
| NAME (FIRST, MIDDLE, LAST) | Giovanni, NMN, Bonilla |
| STREET ADDRESS | 4605 N. Acapulco Street |
| CITY/STATE/ZIP | San Bernardino/CA/92407 |
| SEX | M |
| HAIR | Brn |
| EYES | Brn |
| HEIGHT | 511 |
| WEIGHT | 120 |
| BIRTHDATE | 03/30/2007 |
| RACE | H |
| HOME PHONE | (951) 384-5898 |
| BUSINESS PHONE | ( ) |
| INSURANCE CARRIER | None |
| POLICY NUMBER | |
| DIR OF TRAVEL | E |
| ON STREET OR HIGHWAY | Valley Boulevard |
| LANE | Lt Trn |
| THRU LANES | 2 |
| TOTAL LANES | 3 |
| SPEED LIMIT | 45 |
| VEH. YEAR | 2022 |
| MAKE/MODEL/COLOR | Nissan/Sentra/White |
| LICENSE NUMBER | 8ZZG454 |
| STATE | CA |
| OWNER'S NAME | ☐ SAME AS DRIVER — Carlos Arandacortez |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER — 1650 N Sierra Way, San Bernardino, CA 92405 |
| DISPOSITION OF VEHICLE ON ORDERS OF | ☒ OFFICER ☐ DRIVER ☐ OTHER — Armada Towing, (909) 428-1115 |
| PRIOR MECHANICAL DEFECTS | ☒ NONE APPARENT ☐ REFER TO NARRATIVE |
| VEHICLE IDENTIFICATION NUMBER | |
| VEHICLE TYPE | 01 |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☒ MAJOR ☐ ROLL-OVER |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

## PARTY 2

| Field | Value |
|---|---|
| Party type | ☒ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR |
| DRIVER'S LICENSE NUMBER | F5431708 |
| STATE | CA |
| CLASS | C |
| AIR BAG | L |
| SAFETY EQUIP. | H |
| NAME (FIRST, MIDDLE, LAST) | Jesus, Mauricio, Garcia (On-Duty Emergency Vehicle) |
| STREET ADDRESS | 17005 Upland Avenue |
| CITY/STATE/ZIP | Fontana/CA/92335 |
| SEX | M |
| HAIR | Brn |
| EYES | Brn |
| HEIGHT | 600 |
| WEIGHT | 225 |
| BIRTHDATE | 04/27/1995 |
| RACE | H |
| HOME PHONE | (909) 350-7740 |
| BUSINESS PHONE | ( ) |
| INSURANCE CARRIER | City of Fontana |
| POLICY NUMBER | Self |
| DIR OF TRAVEL | N |
| ON STREET OR HIGHWAY | Valley Boulevard |
| LANE | Lt Trn |
| THRU LANES | 2 |
| TOTAL LANES | 3 |
| SPEED LIMIT | 45 |
| VEH. YEAR | 2020 |
| MAKE/MODEL/COLOR | Ford/Explorer/Black |
| LICENSE NUMBER | 1603691 |
| STATE | CA |
| OWNER'S NAME | ☐ SAME AS DRIVER — City of Fontana |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER — 8353 Sierra Avenue, Fontana, CA 92335 |
| DISPOSITION OF VEHICLE ON ORDERS OF | ☒ OFFICER ☐ DRIVER ☐ OTHER — Armada Towing, (909) 428-1115 |
| PRIOR MECHANICAL DEFECTS | ☒ NONE APPARENT ☐ REFER TO NARRATIVE |
| VEHICLE IDENTIFICATION NUMBER | |
| VEHICLE TYPE | 48 |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☒ MAJOR ☐ ROLL-OVER |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

## PARTY 3

| Field | Value |
|---|---|
| Party type | ☐ DRIVER ☐ PEDESTRIAN ☒ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR |
| DRIVER'S LICENSE NUMBER | |
| STATE | |
| CLASS | |
| AIR BAG | P |
| SAFETY EQUIP. | P |
| NAME (FIRST, MIDDLE, LAST) | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE / RACE | |
| HOME PHONE | ( ) |
| BUSINESS PHONE | |
| INSURANCE CARRIER | N/A |
| POLICY NUMBER | N/A |
| DIR OF TRAVEL | W |
| ON STREET OR HIGHWAY | Valley Boulevard |
| LANE | 2 |
| THRU LANES | 2 |
| TOTAL LANES | 3 |
| SPEED LIMIT | 45 |
| VEH. YEAR | 2018 |
| MAKE/MODEL/COLOR | Toyota/Corolla/Silver |
| LICENSE NUMBER | 8MQB233 |
| STATE | CA |
| OWNER'S NAME | ☐ SAME AS DRIVER — Alyssa Gutierrez |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER — 4406 N Aspan Avenue, Covina, CA 91722 |
| DISPOSITION OF VEHICLE ON ORDERS OF | ☐ OFFICER ☐ DRIVER ☒ OTHER — Released to owner |
| PRIOR MECHANICAL DEFECTS | ☒ NONE APPARENT ☐ REFER TO NARRATIVE |
| VEHICLE IDENTIFICATION NUMBER | |
| VEHICLE TYPE | 01 |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☒ MAJOR ☐ ROLL-OVER |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| Darrell Holland | ☒ YES ☐ NO ☐ N/A | B. [signature] | 5/23/24 |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH REPORT

CHP 555 Page 1 (Rev. 3-20) OPI 060

Page 2 of

| | | | |
|---|---|---|---|
| SPECIAL CONDITIONS: Fatal, On-Duty Emergency Vehicle | NUMBER INJURED: 3 | HIT & RUN FELONY: ☐ | CITY: Fontana |
| | NUMBER KILLED: 3 | HIT & RUN MISDEMEANOR: ☐ | COUNTY: San Bernardino |
| JUDICIAL DISTRICT: Rancho Superior | LOCAL REPORT NUMBER: 192400847 | | |
| REPORTING DISTRICT: H26G1 | BEAT: Fon1 | DAY OF WEEK: Saturday | TOW AWAY: ☒ YES ☐ NO |

**LOCATION**

| | |
|---|---|
| CRASH OCCURRED ON | Valley Boulevard |
| MO. DAY YEAR | 02/03/2024 |
| TIME (2400) | 2244 |
| NCIC # | 3600 |
| OFFICER ID | B9547 |
| MILEPOST INFORMATION | ☐ FEET ☐ MILES OF |
| GPS COORDINATES | LATITUDE LONGITUDE |
| PHOTOGRAPHS BY: | ☐ NONE — H. Reyes, C9389 |
| ☐ AT INTERSECTION WITH | |
| ☒ OR: | 418 ☒ FEET ☐ MILES East OF Cypress Avenue |
| STATE HWY REL | ☐ YES ☒ NO |

**PARTY 4** — ☐ DRIVER ☐ PEDESTRIAN ☒ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| | |
|---|---|
| DRIVER'S LICENSE NUMBER | |
| STATE | |
| CLASS | |
| AIR BAG | P |
| SAFETY EQUIP. | P |
| VEH. YEAR | 2022 |
| MAKE/MODEL/COLOR | Chevrolet/Silverado/Black |
| LICENSE NUMBER | 91589L3 |
| STATE | CA |
| NAME (FIRST, MIDDLE, LAST) | |
| OWNER'S NAME | ☐ SAME AS DRIVER — Odon Licea |
| STREET ADDRESS | |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER — 10050 Juniper Avenue #98, Fontana, CA 92335 |
| CITY/STATE/ZIP | |
| DISPOSITION OF VEHICLE ON ORDERS OF: | ☐ OFFICER ☐ DRIVER ☒ OTHER — Released to owner |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE (Mo. Day Year) / RACE | |
| PRIOR MECHANICAL DEFECTS: | ☒ NONE APPARENT ☐ REFER TO NARRATIVE |
| HOME PHONE | ( ) |
| BUSINESS PHONE | ( ) |
| VEHICLE IDENTIFICATION NUMBER: | |
| INSURANCE CARRIER | N/A |
| POLICY NUMBER | N/A |
| VEHICLE TYPE | 22 |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☒ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER |
| SHADE IN DAMAGED AREA | |
| DIR OF TRAVEL | W |
| ON STREET OR HIGHWAY | Valley Boulevard |
| LANE | 2 |
| THRU LANES | 3 |
| TOTAL LANES | 3 |
| SPEED LIMIT | 45 |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

**PARTY 5** — ☐ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| | |
|---|---|
| DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP. | |
| VEH. YEAR / MAKE/MODEL/COLOR / LICENSE NUMBER / STATE | |
| NAME (FIRST, MIDDLE, LAST) | |
| OWNER'S NAME | ☐ SAME AS DRIVER |
| STREET ADDRESS | |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER |
| CITY/STATE/ZIP | |
| DISPOSITION OF VEHICLE ON ORDERS OF: | ☐ OFFICER ☐ DRIVER ☐ OTHER |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE (Mo. Day Year) / RACE | |
| PRIOR MECHANICAL DEFECTS: | ☐ NONE APPARENT ☐ REFER TO NARRATIVE |
| HOME PHONE | ( ) |
| BUSINESS PHONE | ( ) |
| VEHICLE IDENTIFICATION NUMBER: | |
| INSURANCE CARRIER / POLICY NUMBER | |
| VEHICLE TYPE | |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER |
| SHADE IN DAMAGED AREA | |
| DIR OF TRAVEL / ON STREET OR HIGHWAY / LANE / THRU LANES / TOTAL LANES / SPEED LIMIT | |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

**PARTY 6** — ☐ DRIVER ☐ PEDESTRIAN ☐ PARKED VEHICLE ☐ BICYCLIST ☐ OTHER ☐ OPERATOR

| | |
|---|---|
| DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP. | |
| VEH. YEAR / MAKE/MODEL/COLOR / LICENSE NUMBER / STATE | |
| NAME (FIRST, MIDDLE, LAST) | |
| OWNER'S NAME | ☐ SAME AS DRIVER |
| STREET ADDRESS | |
| OWNER'S ADDRESS | ☐ SAME AS DRIVER |
| CITY/STATE/ZIP | |
| DISPOSITION OF VEHICLE ON ORDERS OF: | ☐ OFFICER ☐ DRIVER ☐ OTHER |
| SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE (Mo. Day Year) / RACE | |
| PRIOR MECHANICAL DEFECTS: | ☐ NONE APPARENT ☐ REFER TO NARRATIVE |
| HOME PHONE | ( ) |
| BUSINESS PHONE | |
| VEHICLE IDENTIFICATION NUMBER: | |
| INSURANCE CARRIER / POLICY NUMBER | |
| VEHICLE TYPE | |
| DESCRIBE VEHICLE DAMAGE | ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER |
| SHADE IN DAMAGED AREA | |
| DIR OF TRAVEL / ON STREET OR HIGHWAY / LANE / THRU LANES / TOTAL LANES / SPEED LIMIT | |
| CA / DOT / CAL-T / TCP/PSC / MC/MX | |

| | |
|---|---|
| PREPARER'S NAME | Darrell Holland |
| DISPATCH NOTIFIED | ☒ YES ☐ NO ☐ N/A |
| REVIEWER'S NAME | [signature] |
| DATE REVIEWED | |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH CODING

CHP 555 Page 2 (Rev. 9-19) OPI 060

Page 3 of

| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| PROPERTY DAMAGE | OWNER'S NAME: Southern California Edison | OWNER'S ADDRESS: 7951 Redwood Avenue, Fontana, CA, 92336 |
|---|---|---|

| PERSON NOTIFIED | ☐ SAME AS OWNER | TELEPHONE NUMBER | METHOD OF NOTIFICATION (MARK ALL THAT APPLY) | LOG / INCIDENT NUMBER |
|---|---|---|---|---|
| | | (909) 357-6116 | ☐ IN PERSON ☐ PHONE ☒ DISPATCH ☐ CHP 422 | |

DESCRIPTION OF DAMAGE
Damaged conical electrical box.

## SEATING POSITION

1 TO 9 - STANDARD SEATING POSITION
10 - REAR OCC. TRK, VAN, STATION WAGON, ETC.*
11 - POSITION UNKNOWN*
0 - OTHER*

(Diagram: 1 2 3 / 4 5 6 / 7 8 9 / 10)

## SAFETY EQUIPMENT

**OCCUPANTS**
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP / SHOULDER HARNESS USED
H - LAP / SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED
P - NOT REQUIRED

**CHILD RESTRAINT**
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

**MC / BICYCLE HELMET**
DRIVER: V - NO, W - YES
PASSENGER: X - NO, Y - YES

## AIR BAG

B - UNKNOWN
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

## EJECTED FROM VEHICLE

0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

## INATTENTION CODES

A - CELL PHONE HANDHELD
B - CELL PHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
I - PERSONAL HYGIENE
J - READING
K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

### PRIMARY CRASH FACTOR — LIST NUMBER (#) OF PARTY AT FAULT

| # | Code | |
|---|---|---|
| 1 | A | CVC SECTION VIOLATED: CVC 22350 — CITED ☐ YES ☒ NO |
| | B | OTHER IMPROPER DRIVING*: |
| | C | OTHER THAN DRIVER* |
| | D | UNKNOWN* |

### WEATHER (MARK 1 TO 2 ITEMS)

| Mark | Code | |
|---|---|---|
| | A | CLEAR |
| X | B | CLOUDY |
| | C | RAINING |
| | D | SNOWING |
| | E | FOG / VISIBILITY ___ FT. |
| | F | OTHER*: |
| | G | WIND |

### LIGHTING

| Mark | Code | |
|---|---|---|
| | A | DAYLIGHT |
| | B | DUSK - DAWN |
| X | C | DARK - STREET LIGHTS |
| | D | DARK - NO STREET LIGHTS |
| | E | DARK - STREET LIGHTS NOT FUNCTIONING* |

### ROADWAY SURFACE

| Mark | Code | |
|---|---|---|
| | A | DRY |
| X | B | WET |
| | C | SNOWY - ICY |
| | D | SLIPPERY (MUDDY, OILY, ETC.) |

### ROADWAY CONDITIONS (MARK 1 TO 2 ITEMS)

| Mark | Code | |
|---|---|---|
| | A | HOLES, DEEP RUT* |
| | B | LOOSE MATERIAL ON ROADWAY* |
| | C | OBSTRUCTION ON ROADWAY* |
| | D | CONSTRUCTION - REPAIR ZONE |
| | E | REDUCED ROADWAY WIDTH |
| | F | FLOODED* |
| | G | OTHER*: |
| X | H | NO UNUSUAL CONDITIONS |

### TRAFFIC CONTROL DEVICES

| Mark | Code | |
|---|---|---|
| | A | CONTROLS FUNCTIONING |
| | B | CONTROLS NOT FUNCTIONING* |
| | C | CONTROLS OBSCURED |
| X | D | NO CONTROLS PRESENT / FACTOR* |

### TYPE OF CRASH

| Mark | Code | |
|---|---|---|
| | A | HEAD - ON |
| | B | SIDE SWIPE |
| | C | REAR END |
| X | D | BROADSIDE |
| | E | HIT OBJECT |
| | F | OVERTURNED |
| | G | VEHICLE / PEDESTRIAN |
| | H | OTHER*: |

### MOTOR VEHICLE INVOLVED WITH (MARK 1 TO 2 ITEMS)

| Mark | Code | |
|---|---|---|
| | A | NONCOLLISION |
| | B | PEDESTRIAN |
| X | C | OTHER MOTOR VEHICLE |
| | D | MOTOR VEHICLE ON OTHER ROADWAY |
| X | E | PARKED MOTOR VEHICLE |
| | F | TRAIN |
| | G | BICYCLE |
| | H | ANIMAL: |
| | I | FIXED OBJECT: |
| | J | OTHER OBJECT: |
| | K | ADDITIONAL OBJECT(S) STRUCK |

### PEDESTRIAN'S ACTIONS

| Mark | Code | |
|---|---|---|
| X | A | NO PEDESTRIANS INVOLVED |
| | B | CROSSING IN CROSSWALK - AT INTERSECTION |
| | C | CROSSING IN CROSSWALK - NOT AT INTERSECTION |
| | D | CROSSING - NOT IN CROSSWALK |
| | E | IN ROAD - INCLUDES SHOULDER |
| | F | NOT IN ROAD |
| | G | APPROACHING / LEAVING SCHOOL BUS |

### VEHICLE AUTOMATION LEVEL

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| X | X | | A | SAE LEVEL - 0 |
| | | | B | SAE LEVEL - 1 |
| | | | C | SAE LEVEL - 2 |
| | | | D | SAE LEVEL - 3 |
| | | | E | SAE LEVEL - 4 |
| | | | F | SAE LEVEL - 5 |
| | | | G | UNKNOWN* |

### VEHICLE AUTOMATION ENGAGED

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| X | X | | A | NO AUTOMATION |
| | | | B | DRIVER ASSISTANCE |
| | | | C | PARTIAL AUTOMATION |
| | | | D | CONDITIONAL AUTOMATION |
| | | | E | HIGH AUTOMATION |
| | | | F | FULL AUTOMATION |
| | | | G | UNKNOWN* |

### OTHER ASSOCIATED FACTOR(S) (MARK 1 TO 2 ITEMS)

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| X | | | A | CVC SECTION VIOLATION: CVC 22107 — CITED ☐ YES ☒ NO |
| | | | B | CVC SECTION VIOLATION: — CITED ☐ YES ☐ NO |
| | | | C | CVC SECTION VIOLATION: — CITED ☐ YES ☐ NO |
| | | | D | |
| | | | E | VISION OBSCUREMENT: |
| | | | F | INATTENTION*: |
| | | | G | STOP & GO TRAFFIC |
| | | | H | ENTERING / LEAVING RAMP |
| | | | I | PREVIOUS CRASH |
| | | | J | UNFAMILIAR WITH ROAD |
| X | | | K | DEFECTIVE VEH. EQUIP.: Tire deficiency — CITED ☐ YES ☒ NO |
| | | | L | UNINVOLVED VEHICLE |
| | | | M | OTHER*: |
| | X | | N | NONE APPARENT |
| | | | O | RUNAWAY VEHICLE |

### MOVEMENT PRECEDING CRASH

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| | | | A | STOPPED |
| | | | B | PROCEEDING STRAIGHT |
| | | | C | RAN OFF ROAD |
| | | | D | MAKING RIGHT TURN |
| | X | | E | MAKING LEFT TURN |
| | | | F | MAKING U TURN |
| | | | G | BACKING |
| | | | H | SLOWING / STOPPING |
| | | | I | PASSING OTHER VEHICLE |
| | | | J | CHANGING LANES |
| | | | K | PARKING MANEUVER |
| | | | L | ENTERING TRAFFIC |
| X | | | M | OTHER UNSAFE TURNING |
| | | | N | XING INTO OPPOSING LANE |
| | | X | O | PARKED |
| | | | P | MERGING |
| | | | Q | TRAVELING WRONG WAY |
| | | | R | OTHER*: |
| | | | S | LANE SPLITTING |

### SOBRIETY - DRUG - PHYSICAL (MARK ALL THAT APPLY)

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| X | X | | A | HAD NOT BEEN DRINKING |
| | | | B | HBD - UNDER THE INFLUENCE |
| | | | C | HBD - NOT UNDER INFLUENCE* |
| | | | D | HBD - IMPAIRMENT UNKNOWN* |
| | | | E | UNDER DRUG INFLUENCE* |
| | | | | DRE EXAM. CONDUCTED |
| | | | | STIMULANT |
| | | | | HALLUCINOGEN |
| | | | | DISSOCIATIVE ANESTHETICS |
| | | | | NARCOTIC ANALGESIC |
| | | | | INHALANT |
| | | | | CANNABIS |
| | | | | DEPRESSANT |
| | | | F | IMPAIRMENT - PHYSICAL* |
| | | | G | IMPAIRMENT NOT KNOWN |
| | | X | H | NOT APPLICABLE |
| | | | I | SLEEPY / FATIGUED* |

### SKETCH

INDICATE NORTH

### MISCELLANEOUS

Please see the attached factual diagram and sketch.

### SPECIAL INFORMATION

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| | | | A | HAZARDOUS MATERIAL |
| | | | B | CELL PHONE HANDHELD IN USE |
| | | | C | CELL PHONE HANDSFREE IN USE |
| | | | D | CELL PHONE NOT IN USE |
| X | X | X | E | CELL PHONE USE UNKNOWN |
| | | | F | SCHOOL BUS RELATED |

### BIKEWAY FACILITY

| 1 | 2 | 3 | Code | |
|---|---|---|---|---|
| | | | A | SHARED ROADWAY |
| | | | B | CLASS I - BIKE PATH* |
| | | | C | CLASS II - BIKE LANE* |
| | | | D | CLASS III - BIKE ROUTE* |
| | | | E | CLASS IV - SEPARATED BIKEWAY* |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# TRAFFIC CRASH CODING

CHP 555 Page 2 (Rev. 9-19) OPI 060



| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| PROPERTY DAMAGE | OWNER'S NAME | OWNER'S ADDRESS |
|---|---|---|
| | Southern California Edison | 7951 Redwood Avenue, Fontana, CA, 92336 |

| PERSON NOTIFIED | ☐ SAME AS OWNER | TELEPHONE NUMBER | METHOD OF NOTIFICATION (MARK ALL THAT APPLY) | LOG / INCIDENT NUMBER |
|---|---|---|---|---|
| | | (909) 357-6116 | ☐ IN PERSON ☐ PHONE ☒ DISPATCH ☐ CHP 422 | |

DESCRIPTION OF DAMAGE
Damaged conical electrical box.

## SEATING POSITION

1 TO 9 - STANDARD SEATING POSITION
10 - REAR OCC. TRK, VAN, STATION WAGON, ETC.*
11 - POSITION UNKNOWN*
0 - OTHER*

1 2 3 / 4 5 6 / 7 8 9 / 10

## SAFETY EQUIPMENT

**OCCUPANTS**
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP / SHOULDER HARNESS USED
H - LAP / SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED
P - NOT REQUIRED

**CHILD RESTRAINT**
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

**MC / BICYCLE HELMET**
DRIVER: V - NO, W - YES
PASSENGER: X - NO, Y - YES

## AIR BAG

B - UNKNOWN
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

## EJECTED FROM VEHICLE

0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

## INATTENTION CODES

A - CELL PHONE HANDHELD
B - CELL PHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
I - PERSONAL HYGIENE
J - READING
K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

### PRIMARY CRASH FACTOR — LIST NUMBER (#) OF PARTY AT FAULT

| # | | |
|---|---|---|
| 1 | A | CVC SECTION VIOLATED: CVC 22350 — CITED: ☐ YES ☒ NO |
| | B | OTHER IMPROPER DRIVING*: |
| | C | OTHER THAN DRIVER* |
| | D | UNKNOWN* |

### WEATHER (MARK 1 TO 2 ITEMS)

| | | |
|---|---|---|
| | A | CLEAR |
| X | B | CLOUDY |
| | C | RAINING |
| | D | SNOWING |
| | E | FOG / VISIBILITY ___ FT. |
| | F | OTHER*: |
| | G | WIND |

### LIGHTING

| | | |
|---|---|---|
| | A | DAYLIGHT |
| | B | DUSK - DAWN |
| X | C | DARK - STREET LIGHTS |
| | D | DARK - NO STREET LIGHTS |
| | E | DARK - STREET LIGHTS NOT FUNCTIONING* |

### ROADWAY SURFACE

| | | |
|---|---|---|
| | A | DRY |
| X | B | WET |
| | C | SNOWY - ICY |
| | D | SLIPPERY (MUDDY, OILY, ETC.) |

### ROADWAY CONDITIONS (MARK 1 TO 2 ITEMS)

| | | |
|---|---|---|
| | A | HOLES, DEEP RUT* |
| | B | LOOSE MATERIAL ON ROADWAY* |
| | C | OBSTRUCTION ON ROADWAY* |
| | D | CONSTRUCTION - REPAIR ZONE |
| | E | REDUCED ROADWAY WIDTH |
| | F | FLOODED* |
| | G | OTHER*: |
| X | H | NO UNUSUAL CONDITIONS |

### TRAFFIC CONTROL DEVICES

| | | |
|---|---|---|
| | A | CONTROLS FUNCTIONING |
| | B | CONTROLS NOT FUNCTIONING* |
| | C | CONTROLS OBSCURED |
| X | D | NO CONTROLS PRESENT / FACTOR* |

### TYPE OF CRASH

| | | |
|---|---|---|
| | A | HEAD - ON |
| | B | SIDE SWIPE |
| | C | REAR END |
| X | D | BROADSIDE |
| | E | HIT OBJECT |
| | F | OVERTURNED |
| | G | VEHICLE / PEDESTRIAN |
| | H | OTHER*: |

### MOTOR VEHICLE INVOLVED WITH (MARK 1 TO 2 ITEMS)

| | | |
|---|---|---|
| | A | NONCOLLISION |
| | B | PEDESTRIAN |
| X | C | OTHER MOTOR VEHICLE |
| | D | MOTOR VEHICLE ON OTHER ROADWAY |
| X | E | PARKED MOTOR VEHICLE |
| | F | TRAIN |
| | G | BICYCLE |
| | H | ANIMAL: |
| | I | FIXED OBJECT: |
| | J | OTHER OBJECT: |
| | K | ADDITIONAL OBJECT(S) STRUCK |

### PEDESTRIAN'S ACTIONS

| | | |
|---|---|---|
| X | A | NO PEDESTRIANS INVOLVED |
| | B | CROSSING IN CROSSWALK - AT INTERSECTION |
| | C | CROSSING IN CROSSWALK - NOT AT INTERSECTION |
| | D | CROSSING - NOT IN CROSSWALK |
| | E | IN ROAD - INCLUDES SHOULDER |
| | F | NOT IN ROAD |
| | G | APPROACHING / LEAVING SCHOOL BUS |

### VEHICLE AUTOMATION LEVEL

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | SAE LEVEL - 0 |
| | | | B | SAE LEVEL - 1 |
| | | | C | SAE LEVEL - 2 |
| | | | D | SAE LEVEL - 3 |
| | | | E | SAE LEVEL - 4 |
| | | | F | SAE LEVEL - 5 |
| | | | G | UNKNOWN* |

### VEHICLE AUTOMATION ENGAGED

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | NO AUTOMATION |
| | | | B | DRIVER ASSISTANCE |
| | | | C | PARTIAL AUTOMATION |
| | | | D | CONDITIONAL AUTOMATION |
| | | | E | HIGH AUTOMATION |
| | | | F | FULL AUTOMATION |
| | | | G | UNKNOWN* |

### OTHER ASSOCIATED FACTOR(S) (MARK 1 TO 2 ITEMS)

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | CVC SECTION VIOLATION — CITED ☐ YES ☐ NO |
| | | | B | CVC SECTION VIOLATION — CITED ☐ YES ☐ NO |
| | | | C | CVC SECTION VIOLATION — CITED ☐ YES ☐ NO |
| | | | D | |
| | | | E | VISION OBSCUREMENT: |
| | | | F | INATTENTION*: |
| | | | G | STOP & GO TRAFFIC |
| | | | H | ENTERING / LEAVING RAMP |
| | | | I | PREVIOUS CRASH |
| | | | J | UNFAMILIAR WITH ROAD |
| | | | K | DEFECTIVE VEH. EQUIP.: CITED ☐ YES ☐ NO |
| | | | L | UNINVOLVED VEHICLE |
| | | | M | OTHER*: |
| X | | | N | NONE APPARENT |
| | | | O | RUNAWAY VEHICLE |

### MOVEMENT PRECEDING CRASH

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | STOPPED |
| | | | B | PROCEEDING STRAIGHT |
| | | | C | RAN OFF ROAD |
| | | | D | MAKING RIGHT TURN |
| | | | E | MAKING LEFT TURN |
| | | | F | MAKING U TURN |
| | | | G | BACKING |
| | | | H | SLOWING / STOPPING |
| | | | I | PASSING OTHER VEHICLE |
| | | | J | CHANGING LANES |
| | | | K | PARKING MANEUVER |
| | | | L | ENTERING TRAFFIC |
| | | | M | OTHER UNSAFE TURNING |
| | | | N | XING INTO OPPOSING LANE |
| X | | | O | PARKED |
| | | | P | MERGING |
| | | | Q | TRAVELING WRONG WAY |
| | | | R | OTHER*: |
| | | | S | LANE SPLITTING |

### SOBRIETY - DRUG - PHYSICAL (MARK ALL THAT APPLY)

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | HAD NOT BEEN DRINKING |
| | | | B | HBD - UNDER THE INFLUENCE |
| | | | C | HBD - NOT UNDER INFLUENCE* |
| | | | D | HBD - IMPAIRMENT UNKNOWN* |
| | | | E | UNDER DRUG INFLUENCE* |
| | | | | DRE EXAM. CONDUCTED |
| | | | | STIMULANT |
| | | | | HALLUCINOGEN |
| | | | | DISSOCIATIVE ANESTHETICS |
| | | | | NARCOTIC ANALGESIC |
| | | | | INHALANT |
| | | | | CANNABIS |
| | | | | DEPRESSANT |
| | | | F | IMPAIRMENT - PHYSICAL* |
| | | | G | IMPAIRMENT NOT KNOWN |
| X | | | H | NOT APPLICABLE |
| | | | I | SLEEPY / FATIGUED* |

### SKETCH

INDICATE NORTH

### MISCELLANEOUS

Please see the attached factual diagram and sketch.

### SPECIAL INFORMATION

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | HAZARDOUS MATERIAL |
| | | | B | CELL PHONE HANDHELD IN USE |
| | | | C | CELL PHONE HANDSFREE IN USE |
| | | | D | CELL PHONE NOT IN USE |
| X | | | E | CELL PHONE USE UNKNOWN |
| | | | F | SCHOOL BUS RELATED |

### BIKEWAY FACILITY

| 4 | 5 | 6 | | |
|---|---|---|---|---|
| | | | A | SHARED ROADWAY |
| | | | B | CLASS I - BIKE PATH* |
| | | | C | CLASS II - BIKE LANE* |
| | | | D | CLASS III - BIKE ROUTE* |
| | | | E | CLASS IV - SEPARATED BIKEWAY* |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# INJURED / WITNESS / PASSENGERS

CHP 555 Page 3 (Rev. 9-19) OPI 060

Page 5 of

| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ("X" ONE): FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | INJURED WAS ("X" ONE): DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 37 | M | ☐ | ☒ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 2 | 3 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Bradley Aaron Terwilliger / 01-23-1987 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Arrowhead Regional Medical Center
DESCRIBE INJURIES: Broken left femur, top of head laceration, concussion, back pain, right elbow pain, abdominal hernia.
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 28 | M | ☐ | ☒ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | 2 | 1 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Party #2 / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Arrowhead Regional Medical Center
DESCRIBE INJURIES: Back pain, concussion.
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 16 | M | ☐ | ☒ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | 1 | 1 | L | H | 1 |

NAME / D.O.B. / ADDRESS: Party #1 / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Arrowhead Regional Medical Center
DESCRIBE INJURIES: Broken right femur, broken ribs, brain bleeding.
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 15 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 1 | 3 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Robert Rias / 11-16-2008 / 2257 N. Spruce Ave, Rialto, CA 92377
TELEPHONE: (208) 917-0519
(INJURED ONLY) TRANSPORTED BY: San Bernardino County Coroner
EMS RUN NUMBER:
TAKEN TO: San Bernardino County Coroner
DESCRIBE INJURIES: Left leg shin laceration, left thigh bruise, bruising to abdomen, puncture to upper right thigh, compound broken right tibia, right side rib fractures, skull fractures, pelvis fracture, aortic tear. TOD pronounced by San Bernardino County Fire on 02/03/24 at 2311 hours.
TOD pronounced by San Bernardino County Fire on 02/03/24 at 2311 hours.
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 15 | M | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 1 | 4 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Omari Pitts / 11-01-2008 / 937 W. Clover Ave, Rialto, CA 92376
TELEPHONE: (323) 943-7093
(INJURED ONLY) TRANSPORTED BY: AMR
EMS RUN NUMBER:
TAKEN TO: Loma Linda University
DESCRIBE INJURIES: Hematoma to the head, subdural hematoma on right side of head, transection of celiac artery and a laceration to the right lung.
TOD pronounced by Loma Linda University Medical Center on 02/03/24 at 0735 hours.
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 14 | M | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | 1 | 6 | L | H | 0 |

NAME / D.O.B. / ADDRESS: Domonic Adams / 04-28-2009 / 1700 Red Trail Lane, Fontana, CA 92336
TELEPHONE: (951) 539-8375
(INJURED ONLY) TRANSPORTED BY: San Bernardino County Coroner
EMS RUN NUMBER:
TAKEN TO: San Bernardino County Coroner
DESCRIBE INJURIES: Right pubic fracture, skull separation from spine, transection of spine, fractured sternum, fractured right ribs, brain hemorrhage, brain/brainstem separation, pulpified right lung, pulpified liver, transection of aorta, laceration above right eye, laceration to right cheek, missing teeth, laceration to inner left thigh, laceration to left foot, deformed left thigh. TOD pronounced by San Bernardino County Fire on 02/03/24 at 2311 hours.
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| Darrell Holland | B9547 | 02/03/2024 | | |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# INJURED / WITNESS / PASSENGERS

CHP 555 Page 3 (Rev. 9-19) OPI 060

Page 6 of

| DATE OF CRASH (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | B9547 | 192400847 |

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ("X" ONE): FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | INJURED WAS ("X" ONE): DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ # 1 | ☐ | 23 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: Brian Zozaya / 04-26-2000 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ # 2 | ☐ | 23 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: Daniel Precie / 03-27-2000 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ # 3 | ☐ | 30 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: Edward Bautista / 02-19-1994 / 17005 Upland Avenue, Fontana, CA 92335
TELEPHONE: (909) 350-7740
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D.O.B. / ADDRESS: / /
TELEPHONE: ( )
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| Darrell Holland | B9547 | 02/03/2024 | B. [signature] | |

*An Internationally Accredited Agency* Destroy Previous Editions Chp555_0919.pdf


Sketch
DR# 192400847
H. Reyes
0'
50
100
N
Valley Blvd
AOI # 1
AOI # 2
AOI # 3
Vehicle #1
Vehicle #2
Edison Pole #4845670E


Factual
DR# 192400847
H. Reyes
0'
50
100
N
Valley Blvd
SIGNAL SIGNAL
AHEAD AHEAD
Edison pole # 4845670E




CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER






CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER




COF 000022

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| Legend | | Case Name | Courtesy |
|---|---|---|---|
| | | Case Number | 192400847 |
| Drawn By | H Reyes | Incident Date | 02-03-2024 |
| Drawn Date | H. Reyes | Location | Valley Blvd / Cypress Ave |

| # | X | Y | Z | Description |
|---|---|---|---|---|
| 1 | 0.00 | 0.00 | 0.00 | Edison Pole # 4845670E |
| 2 | 9.26 | 63.37 | 0.00 | Patrol unit light bar |
| 3 | 33.94 | 47.27 | 0.00 | Debris Field |
| 4 | 55.02 | 63.97 | 0.00 | Vehicle 2 at rest |
| 5 | 62.25 | 111.84 | 0.00 | Vehicle 3 at rest |
| 6 | 79.21 | 110.42 | 0.00 | Vehicle 1's rear right passenger door |
| 7 | 100.98 | 108.72 | 0.00 | Vehicle 1 at rest |
| 8 | 117.37 | 107.02 | 0.00 | Vehicle 4 at rest |
| 9 | 109.40 | 99.37 | 0.00 | tire to vehicle 1 |
| 10 | 133.06 | 99.12 | 0.00 | Vehicle 1 plastic bumper |




COF 000024
CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**FACTS:**

**NOTIFICATION:**

On 02/03/2024, I was assigned to the San Bernardino County Sheriff's Department M.A.I.T. team. At approximately 2320 hours, I was dispatched to assist with a unit involved fatal injury traffic collision in the City of Fontana. Responding from Main Street and Ninth Avenue in the city of Hesperia, I arrived on scene on 02/04/2024 at 0143 hours. All times, speeds, and measurements found in this report are approximate. All measurements were made with the FARO scan system.

**INITIAL OBSERVATIONS:**

When I arrived on scene, I observed a white sedan (Vehicle #1 – V-1) on all four wheels facing southwest along the north curb of Valley Boulevard, east of the intersection with Cypress Avenue. The vehicle had heavy damage throughout the exterior, and it appeared the roof of the vehicle was removed by fire personnel for extrication of subjects inside V-1. V-1 came to rest against the north curb of Valley Boulevard and a black pickup truck (Vehicle #4 – V-4) that was parked along the north roadway curb line of Valley Boulevard. There were two deceased subjects located inside V-1 in the #3 (Robert Rias) and #6 (Domonic Adams) seats. There were numerous pieces of plastic, metal and glass debris around V-1.

I observed a black and white Fontana Police patrol vehicle (SUV) with extensive damage to the front of the vehicle, facing northeast. The vehicle came to rest in the center turn lane of Valley Boulevard, east of the intersection with Cypress Avenue. There were numerous pieces of plastic, metal and glass debris around V-2. The light bar of V-2 came to rest in the center turn lane on the west side of V-2.

I observed a silver sedan with major damage to the driver side along the north curb of Valley Boulevard. The vehicle came to rest facing southwest and appeared to be a parked vehicle along the north curb line of Valley Boulevard that was struck by V-1 during the collision.

All other subjects were transported by American Medical Response (AMR) to local hospitals for treatment of injuries. Prior to my arrival, and directly following the collision, Fontana Police officers

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

located Party #1 (P-1, Bonilla) on the north sidewalk of Valley Boulevard, outside the #3 passenger door, where he was ejected from V-1. P-1 sustained serious injuries and was transported by medical personnel to Arrowhead Regional Medical Center. Pitts was located by Fontana Police officers in the #4 passenger seat of V-1 and was later extricated by fire personnel and transported to Loma Linda University Medical Center for treatment of injuries.

**STATEMENTS:**

*STATEMENTS ARE NOT VERBATIM AND WERE WRITTEN IN SUMMARY FORM.*

**Witness #1 (Zozaya)** On 03/18/2024, at approximately 1510 hours, I spoke with Zozaya in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Zozaya was assigned to patrol with Fontana Police and was in his patrol vehicle conducting routine patrol in the area of Valley Boulevard and Catawba Avenue. Zozaya was the driver of the patrol vehicle and was assisted by his partner (Precie), who sat in the #3 seat. Zozaya traveled east on Valley Boulevard and observed a white sedan (V-1) in front of his patrol vehicle in the #1 lane on Valley Boulevard. It appeared a passenger in the #6 seat of V-1 was leaning out the window, not wearing a seatbelt, holding a cell phone. V-1 made a lane change from the #1 to the #2 lane, failing to signal the lane change. Based on the two vehicle code violations observed, Zozaya conducted a traffic enforcement stop on V-1 by activating his overhead solid red light and siren. V-1 accelerated through a green light at the intersection with Catawba Avenue, and made an unsafe lane change back into the #1 lane, cutting off another vehicle that occupied the #1 lane. V-1 accelerated quickly, east on Valley Boulevard from Catawba Avenue. Zozaya broadcast the failure to yield to Fontana dispatch center.

V-1 continued accelerating from 60 to approximately 80 mph in the #1 eastbound lane of Valley Boulevard through the intersection with Citrus Avenue, failing to yield to the light and siren displayed by Zozaya. Traffic was moderate in the intersection, with wet roadways due to continuous rain conditions. Zozaya broadcast the pursuit to Fontana dispatch as V-1 continued at approximately 80 mph on Valley Boulevard through the intersection with Cypress Avenue. As Zozaya got close to Cypress Avenue, he observed a Fontana patrol vehicle with overhead lights on, facing west on Valley Boulevard. Zozaya then observed a second patrol vehicle travel west on Valley Boulevard toward his

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

vehicle. V-1 merged from the eastbound #1 lane of Valley Boulevard into opposing lanes and collided with a Fontana patrol vehicle at an estimated speed of 80-90 mph. Zozaya broadcast the collision to Fontana dispatch and requested medical personnel to the scene.

Zozaya observed V-1 come to rest along the north curb of Valley Boulevard, facing west. Zozaya exited his patrol vehicle and ran to V-1 to assist with medical attention for any involved parties. As Zozaya approached the driver door of V-1, he observed there was nobody in the #1 driver seat. Zozaya ran around to the sidewalk near the passenger side of V-1 and observed a subject laying on the sidewalk (later identified as P-1). Zozaya observed passengers in the #3 and #6 seats of V-1 and began rendering aid to all subjects he observed in and outside the vehicle. Zozaya did not want to move any subjects until medical personnel arrived, due to the potential for spinal injuries. Shortly after broadcasting all related information, medical personnel, along with Fontana Police supervisors, arrived and secured the scene.

**Witness #2 (Precie)** On 03/18/2024, at approximately 1514 hours, I spoke with Precie in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Precie was assigned to patrol with Fontana Police, and was in his patrol vehicle, along with Officer Zozaya, conducting routine patrol in the area of Valley Boulevard and Catawba Avenue. Precie observed V-1 in front of his patrol vehicle with a passenger hanging out of the #6 seat window, holding a cell phone. Precie observed the rear passenger was not wearing a seatbelt. V-1 made an unsafe lane change from the #2 to the #1 lane on Valley Boulevard. V-1 cut off another vehicle in the #1 lane, while failing to signal the lane change. Zozaya activated his overhead solid red light and siren, and attempted an enforcement stop on V-1. V-1 fled the location at approximately 80 mph, east on Valley Boulevard. V-1 continued for approximately 20 seconds to elude Precie's patrol vehicle through several intersections, eastbound on Valley Boulevard. As V-1 cleared the intersection with Cypress Avenue, an assisting patrol vehicle exited a business parking lot on the south side of Valley Boulevard by turning left to travel west on Valley Boulevard. As the patrol vehicle exited onto Valley Boulevard, V-1 veered from the #1 eastbound lane into the center median of Valley Boulevard and collided with the patrol vehicle. Precie estimated V-1's speed at approximately 80-90 mph in wet drizzling conditions at the time of the collision. During the pursuit, V-1 ran a minimum of one red light on Valley Boulevard through an unknown intersection. Precie did not recall seeing brake lights illuminated on V-1 prior to impact.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**Witness #3 (Bautista)** On 03/18/2024, at approximately 1523 hours, I spoke with Bautista in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Bautista was assigned to Fontana Police patrol as a K-9 handler. Bautista was in his patrol vehicle, stationary on the southeast corner of the intersection of Valley Boulevard and Cypress Avenue, in the parking lot of a business (Deseret Industries). Bautista heard Zozaya broadcast a pursuit, so Bautista exited the parking lot by driving north onto Valley Boulevard. Bautista turned left and traveled west in the #1 lane of Valley Boulevard. Bautista could see the pursuing patrol vehicle's overhead lights from a distance (minimum of 1500 feet), plenty of distance to pull out onto Valley Boulevard, and ascertained the suspect vehicle was in front of the pursuing patrol vehicle. Bautista was in the #1 westbound lane of Valley Boulevard traveling slow for several seconds when he observed V-1 go past his patrol vehicle at a high rate of speed (approximately 80-90 mph). As V-1 passed Bautista's location, he observed sparks in his driver's side view mirror. Bautista did not see brake lights or driver steering input from V-1 prior to the collision.

**V-1 Passenger (Terwilliger)** On 03/18/2024, at approximately 1532 hours, I spoke with Terwilliger in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Terwilliger was assigned to patrol with Fontana Police and was in his patrol vehicle with his partner Garcia, stationary on the southwest corner of Valley Boulevard and Cypress Avenue in a parking lot. Terwilliger heard one of his partners broadcast they were in pursuit of a vehicle, eastbound on Valley Boulevard from Citrus Avenue. Garcia was the driver of their patrol vehicle, and exited the parking lot by driving north onto Valley Boulevard. As Garcia drove towards the driveway of the parking lot that exited north onto Valley Boulevard, Terwilliger heard the pursuing unit broadcast that V-1 was eastbound Valley Boulevard through Oleander Avenue at speeds exceeding 100 mph. As Garcia was near Valley Boulevard, Terwilliger looked left (out the driver's window) and saw V-1 coming at them (approximately 20-30 feet away) with no headlights on. Terwilliger could not recall any other details regarding the collision and could not recall where Garcia was when the collision occurred.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**Party #2 (P-2, Garcia)** On 03/18/2024, at approximately 1546 hours, I spoke with Garcia in the administrative conference room at the Fontana Police station. On 02/03/2024, at approximately 2244 hours, Garcia was assigned to patrol with Fontana Police and was in his patrol vehicle with his partner Terwilliger, stationary on the southwest corner of Valley Boulevard and Cypress Avenue in a parking lot. Garcia was parked in the parking lot of Deseret Industries when he heard one of his partners broadcast they were in pursuit of a vehicle. Garcia drove north out of the parking lot towards Valley Boulevard. Garcia looked left and right and saw no vehicles coming, so he made a left turn to travel west on Valley Boulevard. Garcia completed his turn in the #1 westbound lane of Valley Boulevard when he observed V-1 coming at him (eastbound on Valley Boulevard). Garcia did not recall the collision, but remembered the conditions on the road were wet and slippery.

**Party #1 (P-1, Bonilla)** On 02/06/24, at approximately 1030 hours, I attempted to set up an interview with P-1. I was advised by P-1's mother (Maria Ramirez), the family retained an attorney and P-1 would set up a time at a later date to provide a statement. P-1, his family or an attorney representing the family never returned my call for an interview to set up a time. On 04/22/24, I placed a follow-up call to Maria to determine if P-1 would be providing a statement with an attorney. Maria could not provide an answer if P-1 would be providing a statement at a future time.

**OPINIONS AND CONCLUSIONS:**

**SUMMARY:**

P-1 traveled east in the #1 lane of Valley Boulevard through the intersection with Cypress Avenue at a minimum average speed of 105 mph. P-2 traveled north and made a left turn from the private parking lot of Deseret Industries Thrift Store at 16593 Valley Boulevard, which was located on the south side of Valley Boulevard. P-1 traveled at 105 mph, turned V-1 to the left, and lost control of V-1. The rear of V-1 slid to the right, causing the passenger side of V-1 to collide with the front of V-2 in a broadside collision. The momentum of the collision caused V-1 to continue north where the rear of V-1 collided with the driver side of V-3, which was parked along the north curb of Valley Boulevard. The remaining momentum from the second collision caused V-1 to roll backwards, where the rear of V-1 collided with the front of V-4, which was parked along the north curb of Valley Boulevard.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**CAUSE:**

**Primary Collision Factor**

P-1 caused this collision by being in violation of the following vehicle code section: CVC 22350 –"No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property."

**Associated Collision Factor**

P-1 was in violation of the following vehicle code section: CVC 22107 – "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

P-1 was found to have operated the vehicle with defective equipment (right rear and left rear tire). At the time of the collision, the spare tire was being operated on the right rear axle of V-1. The left rear tire was mounted improperly with the tread direction reversed. The reversed tread direction contributed to the tire's inability channel water property, thus reducing traction with the roadway surface. The width of the right rear tire (spare) was less than the standard tire width. The narrow width of the right rear tire provided less contact with the roadway surface, thus reducing traction.

**Electronic Data Recovery**

The Airbag Control Modules (ACM) for V-1 and V-2 were obtained during the vehicle inspection of both vehicles. Data recovery was performed, and speeds were obtained for both vehicles prior to impact at the time of the collision.

Using vehicle data acquired from the event data recorder (EDR), Detective LaFond performed mathematical calculations to determine the distance range V-1 was from V-2 when V-2 entered onto Valley Boulevard. LaFond calculated V-1 traveled with a wheel speed range of 83.3 to 108.7 mph and was approximately 537 to 609 feet west of V-2 when V-2 entered Valley Boulevard, near the area of impact.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

Based on the distance between V-1 and V-2, wet roadway conditions, video footage, vehicle data and the average speed of V-1, I determined V-1 was in violation of the above listed vehicle codes for Primary and Associated Collision factors. P-2 entered Valley Boulevard with the expectation that V-1 was far enough away (537-609 feet) that P-2 would be able to complete his turn and enter the roadway, without obstructing the right of way of P-1.

The above violations are based on the statements of the parties involved, witnesses, location of the vehicles upon my arrival on scene, the physical evidence of the scene (including damage to all vehicles), data recovery for involved vehicles and the weather conditions at the time of the collision.

**INJURIES:**

**P-1** sustained a broken right femur, broken ribs and brain bleeding. All injuries were sustained as a result of the collision.
**P-2** sustained back pain and a concussion. All injuries were sustained as a result of the collision.
**Terwilliger (Passenger, V-2, seat #3)** sustained a broken left femur, top of head laceration, concussion, back pain, right elbow pain and an abdominal hernia. All injuries were sustained as a result of the collision.
**Rias (Passenger, V-1, seat #3)** sustained internal/external fatal injuries that included left leg shin laceration, left thigh bruise, bruising to abdomen, puncture to upper right thigh and compound broken right tibia, right side rib fractures, internal skull fractures, right side pelvis fracture and aortic tear. All injuries were sustained as a result of the collision.
**Pitts (Passenger, V-1, seat #4)** sustained internal fatal injuries that included hematoma to the head, subdural hematoma on right side of head, transection of celiac artery and a laceration to the right lung. All injuries were sustained as a result of the collision.
**Adams (Passenger, V-1, seat #6)** sustained internal/external fatal injuries that included right pubic fracture, skull separation from spine, transection of spine and spinal cord, fractured sternum, fractured ribs, brain hemorrhage, brain separation from brainstem, pulpified right lung, pulpified liver and transection of aorta, laceration to skin above right eye, laceration to right cheek, teeth dislodged from gums, laceration to inner left thigh, laceration to inner left foot and deformity to left thigh. All injuries were sustained as a result of the collision.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

**INTOXICATION:**

A search warrant was authorized for the medical records of P-1, which contained toxicology screening results upon his admittance to Arrowhead Regional Medical Center. The toxicology results did not appear to show significant levels of drugs or alcohol in P-1's blood near the time of the collision.

**CORONER'S REPORT:**

For details on the Coroner's report please refer to the attached San Bernardino County Coroner's reports #702401067 (Rias), #702401068 (Adams), and #702401073 (Pitts).

**RECOMMENDATIONS:**

I recommend a copy of this report be forwarded to Fontana Police Department for prosecution of P-1 (Bonilla).

**EVIDENCE:**

Photographs of the scene and vehicle inspection were taken, and later uploaded to Motorola Command Central Vault at the Hesperia Police station.

A copy of the medical record for P-1 was placed into evidence at the Hesperia Police station.

DNA swabs were taken throughout the driver compartment of V-1 during the vehicle inspection. The swabs were placed into evidence at the Hesperia Police station.

Fontana Police obtained video surveillance from intersection cameras at Valley Boulevard/Citrus Avenue and Valley Boulevard/Cypress Avenue. The videos were uploaded to Motorola Command Central Vault at the Hesperia Police station.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | B9547 | 192400847 |

Body Worn Camera (BWC) footage was obtained from all Fontana Police officers involved at the scene. The videos were uploaded to Motorola Command Central Vault at the Hesperia Police station.

Cell phones located at the scene and during the vehicle inspection were placed into evidence initially at the Victorville Police station, but later transferred to the Hesperia Police station. The cell phones were later transferred to the Fontana Police station for additional processing related to the collision.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |

**FACTS:**

**NOTIFICATION:**

On 02/03/2024, I was assigned to San Bernardino County Sheriff's Department Major Accident Investigation Team (M.A.I.T). At 2330 hours, I was notified from Fontana police Lieutenant Dill in reference to a fatal collision that occurred near Valley Boulevard and Cypress Avenue. I arrived to the scene at 0120 hours and my call sign was 14W1. As I arrived to the scene, I contacted Sergeant Motley and later contacted Deputies Holland and Wolff. I was tasked with conducting the scene investigation and processing the scene.

The scene measurements were obtained using the following:

- a FARO Laser Scanner S/N LLS081811621.
- Google maps website
- Lidar laser

**SCENE:**

The scene was near the intersection of Valley Boulevard and Cypress Avenue. The collision occurred on Valley Boulevard, east of Cypress Avenue. Valley Boulevard is an asphalt-paved, traveled roadway, with two lanes traveling east, two lanes traveling west, with a center turn lane. Cypress Avenue is an asphalt-paved, traveled roadway, with one lane traveling north, and two lanes traveling south, with right and left turn lanes.



STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |




The collision occurred approximately 455 feet east of east Cypress Avenue curb line, on Valley Boulevard, just north of the north exterior driveway to the business of 16593 Valley Boulevard, Fontana.

To measure the scene with the FARO, I used Edison light pole (ELP) # 4845670E as a reference point. The ELP was located on the south sidewalk of Valley Boulevard, approximately 422 feet east of the east curb line prolongation of Cypress Avenue.

There was a driveway on the south side of Valley Boulevard, approximately 28 feet east of the ELP.

**OFFICER OBSERVATIONS:**

As I arrived on scene, Vehicle 2 (Ford) was at rest, facing east in the center turn lane of Valley Boulevard. Vehicle 1 (Nissan) was at rest, on the north curb of Valley Boulevard. Vehicle 3 (Toyota) was at rest on the north curb of Valley Boulevard. Vehicle 4 (Chevy) was at rest, parked facing west near the north curb of Valley Boulevard.

STATE OF CALIFORNIA

**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**

CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |



Vehicle 1(Nissan) had extensive damage to the front and right side. The roof was removed and rested in front of the vehicle. Passengers #3 and #6 were pronounced deceased prior to my arrival. A yellow-colored blanket was placed on the passengers by medical personnel. There was a black pop-up canopy tent placed over Vehicle 1 by Fontana police personnel.

STATE OF CALIFORNIA

**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**

CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |




Vehicle 2 (Ford) had extensive front-end damage to the front end. The driver and passenger airbags were deployed and both doors were damaged.

STATE OF CALIFORNIA

**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**

CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |



Vehicle 3 (Toyota) was an unoccupied parked vehicle. The vehicle was at rest on the north curb of Valley Blvd.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |



Vehicle 4 (Chevy) was an unoccupied vehicle parked near the north curb of Valley Blvd. Vehicle 1 was at rest in front of vehicle 4.

**WEATHER CONDITIONS:**

While at the scene the weather was raining and wet.
I attached the weather conditions for this day from https://www.wunderground.com/ to this report.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |

**ROADWAY CONDITIONS:**

The roads were wet and it was raining at the time of the collision. After I arrived on scene, it stopped raining and the roads were wet. There were no unusual conditions or construction on the roadway. Valley Boulevard was closed off by Fontana police department personnel. They closed Valley Boulevard at the intersections of Cypress Avenue and Juniper Avenue.

**POSTED SPEED LIMIT:**

The posted speed limit on Valley Boulevard was 45 MPH.

**PHYSICAL EVIDENCE:**

I walked around the scene to look for any vehicle tire marks or gouges on the roadway related to the vehicles involved. Due to the collision occurring while it was raining, and the road was wet, there was no visible tire marks or gouges.

**OPINIONS AND CONCLUSIONS:**

**AREA OF IMPACT:**

Deputy Wolff and I measured the areas of impact using a Lidar laser. Area of impact #1 was estimated using plastic pieces of debris seen west of vehicle 2 at rest.

- Area of impact #1 (V-1 vs. V-2) was 67 feet north of ELP #4845670E and 2 feet west of ELP.
- Area of impact #2 (V-1 vs. V-3) was 101 feet north of ELP and 63 feet east of ELP.
- Area of impact #3 (V-1 vs. V-4) was 108 north of ELP and 110 feet east of ELP.

Please see the attached diagram for more information.

**PHOTOGRAPHS:**

I took digital photographs of the scene, and they were uploaded into the Vault system at the Yucaipa station.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | C9389 | 192400847 |

**EVIDENCE:**

I placed the scene photographs, and FARO Raw Data on a Blu-ray disc. I packaged the disc and placed it in evidence at the Yucaipa Police Station.

**FACTUAL DIAGRAM:**

I documented the scene using a FARO Laser Scanner, Serial#LLS081811621. I completed 29 scans of the scene and processed them using the FARO SCENE software.

I used the Edison light pole (ELP) #4845670E as a reference point to measure the scene.

I prepared the following diagrams using FARO Reality Diagraming Software:

- Factual Diagram
- Roadway Details
- Evidence with Legend
- Area of impact
- Sketch

Please see the attached factual diagram.

Our Apps (/download)

About Us (/about/our-company)

Contact (/about/contact-us)

Careers (https://www.weathercompany.com/careers)

PWS Network (/pws/overview)

WunderMap (/wundermap)

Feedback & Support (https://www.wunderground.com/feedback)

Terms of Use (/company/legal)

Privacy Policy (/company/privacy-policy)

Accessibility Statement (/accessibility-statement)

Data Vendors (/data-vendors)

(https://www.essentialaccessibility.com/the-weather-channel?
utm_source=theweatherchannelhomepage&utm_medium=iconlarge&utm_term=eachannelpage&utm_content=header&utm_

We recognize our responsibility to use data and technology for good. We may use or share your data with our data vendors. Take control of your data.

| Review All Privacy and Ad Settings (/privacy-settings) | Do Not Sell or Share My Personal Information You opted in (/privacy-settings#do-not-sell) | Data Rights (/data-rights) |
|---|---|---|

© Copyright TWC Product and Technology LLC 2014, 2024

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## AUTOPSY REPORT:

### ASSIGNMENT:

| | | |
|---|---|---|
| Date / Time: | February 6, 2024, 1138 Hours | |
| Coroner Case #: | 702401073 | |
| Autopsy #: | A0301-24 | |
| Toe tag #: | 03808 | |
| Body bag lock #: | 7690323 | Lock broken @ 1147 Hours |

### PERSONNEL PRESENT:

| | |
|---|---|
| Doctor: | Scott Luzi, Coroner's Division |
| Autopsy Assistant: | Josie Rivera, Coroner's Division |
| Deputy: | Garrett Wolff, Major Accident Investigation Team |
| Deputy: | Darrell Holland, Major Accident Investigation Team |

### VICTIM:

| | |
|---|---|
| Name: | Omari Pitts |
| Race: | Black |
| Age: | 15 |
| Date of Birth: | 11/01/2008 |
| Date of Death: | 02/04/2024 |
| Height: | 70 |
| Weight: | 120 |
| Hair: | Black |
| Eyes: | Brown |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**EXTERNAL EXAMINATION:**

On Tuesday, February 6, 2024, at about 1138 hours, an autopsy was conducted on the body of Omari Pitts at the San Bernardino County Coroner's Office. The body laid on a coroner's gurney inside a yellow body bag.

At about 1147 hours, I saw Autopsy Assistant Josie Rivera cut the bag lock. The body bag was opened by Rivera to reveal a second, white body bag, containing the body of Pitts. Rivera opened the white bag to reveal Pitts, who laid in a supine position. Pitt's arms laid down by his sides and his hands rested in front of his lower abdomen. Pitts was a black male juvenile with black hair and brown eyes. Toe Tag #03808 was attached to his right great toe.

A medical device was affixed to Pitt's left thigh and appeared to penetrate his skin. A bandage was affixed to the right side of his upper torso below the nipple line. Beneath the bandage was a cut, which was closed with surgical staples. A cut extended down the center of Pitt's abdomen, which was closed with surgical staples. There was also a cut on the top right side of Pitt's head, which was closed with surgical staples.

**TATTOOS:**

Pitt's right arm was tattooed with the text, "Tatanesha."

**EXTERNAL INJURIES:**

I did not observe any external injuries, beside the aforementioned areas which were surgically stapled and appeared to be associated with a medical procedure conducted at Loma Linda University Medical Center.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**INTERNAL EXAMINATION:**

Doctor Scott Luzi located and determined the following internal injuries were a result of the traffic crash.

- Hematoma to right head
- Subdural hematoma on the right side of the head
- Transection of celiac artery
- Laceration to right lung

**CAUSE OF DEATH:**

Doctor Scott Luzi said the cause of death was blunt force traumatic injuries and death was within minutes.

The manner of death was accident.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## AUTOPSY REPORT:

### ASSIGNMENT:

Date / Time: February 6, 2024, 1025 Hours
Coroner Case #: 702401068
Autopsy #: A0298-24
Toe tag #: 09878
Body bag lock #: 7689622 Lock broken @ 1027 Hours

### PERSONNEL PRESENT:

Doctor: Scott Luzi, Coroner's Division
Autopsy Assistant: Josie Rivera, Coroner's Division
Deputy: Garrett Wolff, Major Accident Investigation Team
Deputy: Darrell Holland, Major Accident Investigation Team

### VICTIM:

Name: Domonic Adams
Race: Black
Age: 14
Date of Birth: 04/28/2009
Date of Death: 02/03/2024
Height: 61"
Weight: 123 pounds
Hair: Black
Eyes: Brown

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**EXTERNAL EXAMINATION:**

On Tuesday, February 6, 2024, at about 1025 hours, an autopsy was conducted on the body of Domonic Adams at the San Bernardino County Coroner's Office. The body laid on a coroner's gurney inside a yellow body bag.

At about 1027 hours, I saw Autopsy Assistant Josie Rivera cut the bag lock. The body bag was opened by Rivera to reveal Adams lying supine, inside the bag. Adam's arms laid down by his sides and his hands rested in front of his lower abdomen. Adams wore green and brown camouflage boxer briefs. A gray sweater, socks, shoes, and other clothing laid in the bag around Adams' legs. Adams was a black male juvenile with black hair and brown eyes. Toe Tag #09878 was attached to his right great toe. Two EKG pads were affixed to Adams' body; one to his left abdomen and one to his right chest.

**EXTERNAL INJURIES:**

I observed the following external injuries on Adams' body.

- Laceration/trauma to the skin above his right eye
- Laceration to right cheek
- Teeth visibly dislodged from gums and held in place by dental braces.
- Laceration to inner left thigh
- Laceration to inner left foot
- Visible deformity to left thigh

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**INTERNAL EXAMINATION:**

Doctor Scott Luzi located and determined the following internal injuries were a result of the traffic crash.

- Right pubic fracture
- Skull internally separated from spine
- Transection of spine and spinal cord at vertebra T4
- Fractured sternum
- Fractured right ribs three, four, and five
- Hemorrhage in brain
- Brain separated from brainstem
- Pulpified right lung
- Pulpified liver
- Transection of aorta

**CAUSE OF DEATH:**

Doctor Scott Luzi said the cause of death was blunt force traumatic injury and death was instantaneous.

The manner of death was accident.

# San Bernardino County Sheriff - Coroner Division

## *Report Of Death Worksheet*

| | | | | |
|---|---|---|---|---|
| **1** | MODE **Traffic** | CASE # **702401067** | **Master File** | |
| | STATUS **Post** | DECEDENT **Robert Rias** | | |

## CASE INFO

| REPORTED BY | AGENCY | DATE | TIME | Call Back Phone |
|---|---|---|---|---|
| Deputy G. Wolff | San Bernardino Co. Sheriff's Dept. (SBCSD) | 02/04/2024 | 0403 | (760) 947-1500 |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | # OF PHOTOS | MEDIUM | SPECIAL CIRCUMSTANCES |
|---|---|---|---|---|---|
| Yes | Yes | Yes | | | Officer Involved |

## DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| **Robert** | **Andrew** | **Rias** |

| AKA | DOE TYPE/NUMBER | PHONE |
|---|---|---|
| | | |

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 2257 N. Spruce Ave. | Rialto | CA | 92377 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | Hispanic | 11/16/2008 | 15 yrs | Yes |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 7689664 | 09879 | 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 | 67.0 in | 128.0 lbs | Black | Brown |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED |
|---|---|---|
| | | Circumstantial ID approved (M. Leyva) |

## LEGAL NEXT OF KIN

| NAME | RELATIONSHIP | DOB/AGE | DATE/TIME NOTIFIED | NOTIFIED BY |
|---|---|---|---|---|
| Diana Rias | Mother | 03/13/1986 37 yrs | 02/04/2024 0703 | DCI A. Acevedo |

| ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 303 W. Pennwood St. APT B103 | Meridian | ID | 83642 |

| PHONE | ALTERNATE PHONE # |
|---|---|
| (208) 917-0519(Cell) | |

## PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|
| 02/04/2024 | 2311 | Sunday | San Bernardino County Fire Department Paramedic A. Anderson pronounced. |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Roadway | | Other |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| Valley Blvd. approximately 525 feet east of Cypress Avenue | Fontana |

## INVESTIGATIVE SUMMARY

ADDITIONAL NARRATIVE ATTACHED [x] YES [ ] NO

On Sunday, 02/04/2024 at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentifiec male, later identified as 15-year-old Robert Rias who was involved in a traffic collision near Valley Blvd. and Cypress Ave. in Fontana. According to Deputy Wolff, the Fontana Police Department attempted to initiate a traffic stop with a white Nissan Sentra west of Valley Blvd. The vehicle failed to yield and at 2244 hours Officers wi Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high-rated speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there was a total of 4 juveniles inside of the vehicle. The driver and passenger on the rear driver's side were transported to Arrowhead Regional Medical Center and Loma Linda University Medical Center. The passenger (Robert Rias) and the individual in the rear passenger (John Doe 27-24) were pronounced at the scene. According to Officers with Fontana PD they stated that befor the collision occurred two juveniles were hanging out the back windows of the vehicle and were unrestrained.
There was no alcohol, tobacco, or illicit drugs located inside the vehicle.

*NOTE TO PATHOLOGY*

Officer involved pursuit. MAIT team wants to attend autopsy they are going vehicular homicide.

# San Bernardino County Sheriff - Coroner Division

***Report Of Death Worksheet***

**2**

MODE **Traffic** CASE # **702401067** **Master File**

STATUS **Post** DECEDENT **Robert Rias**

## MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | M/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| N/A | N/A | | | No | | Not Available |

## CAUSE OF DEATH

| 107 CAUSE | TIME INTERVAL | |
|---|---|---|
| (A) MULTIPLE BLUNT FORCE INJURIES | Seconds | 109 BIOPSY PERFORMED? ☐ YES ☒ NO |
| DUE TO (B) | | 110 AUTOPSY PERFORMED? ☒ YES ☐ NO |
| (C) | | AUTOPSY # A0300-24 SL EXAM # |
| (D) | | INDIGENT # |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107

NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF "YES" LIST TYPE OF OPERATION & DATE.

No

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| N/A | | | Scott Luzi |
| 115 PHYSICIAN TO SIGN D.C. Coroner | ADDRESS | PHONE | DATE 02/06/2024 TIME 0000 |

## INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Accident | Roadway | No | 02/03/2024 | 22:45 |

125 LOCATION (include Zip Code)

Valley Blvd. approximately 525 feet east of Cypress Ave. Fontana 91764

DESCRIBE HOW INJURY OCCURRED

Head on vehicle collision, airbags deployed, passenger not ejected, not seat belted.

## PROPERTY

| PROPERTY? | PROP RLS'D? |
|---|---|
| ☐ YES ☒ NO | ☐ YES ☒ NO |

## LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| San Bernardino Co. Sheriff's Dept. (SBCSD) | Deputy Sheriff G. Wolff | 192400847 |

## AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| AA | 02/04/2024 | 02-06-2024 | 03/08/2024 | Dep. Darrell Holland (MAIT team) (760) 881-9780 |

## DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY |
|---|---|---|
| RELEASE | | N/A |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| 92M | Ana Acevedo | 02/04/2024 | 0446 | 0525 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| Family Funeral Chapel & Cremation | (909) 875-9000 |

6 REVIEWED BY Leyva

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| 3 | *MODE* **Traffic** | *CASE #* **702401067** | **Master File** |
|---|---|---|---|
| | *STATUS* **Post** | *DECEDENT* **Robert Rias** | |

# Coroner Investigation

**02/05/2024**

## ASSIGNMENT:

On Sunday, 02/04/2024, at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 15-year-old Robert Rias, who was involved in a traffic collision near Valley Boulevard and Cypress Avenue in Fontana. I was assigned incident number CO240350005 at 0430 hours.

## INTERVIEW - DEPUTY SHERIFF G. WOLFF (SBCSD):

At 0437 hours I spoke with Deputy G. Wolff via telephone. The following is a summary of that statement.

According to Deputy Wolff, the Fontana Police Department (FPD) attempted to initiate a traffic stop on a white Nissan Sentra west of Valley Boulevard. The vehicle failed to yield and at 2244 hours, officers with Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high rate of speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there were a total of four juveniles inside the vehicle. The driver and the passenger on the rear driver's side were transported to Arrowhead Regional Medical Center (ARMC) and Loma Linda University Medical Center (LLUMC). The passenger Robert Rias and the individual in the rear passenger Domonic Adams were pronounced at the scene. The area of impact was 67.4 feet north, 2.0 feet west of the Edison pole.

According to officers with the Fontana PD, they stated that before the collision occurred, two juveniles were hanging out of the back windows of the vehicle and were unrestrained.

## REVIEW OF PARAMEDIC RUN SHEET:

At 2245 hours, the San Bernardino County Sheriff's Department received a call for service. ME 77 arrived at the scene at 2252 hours. When fire personnel arrived at the scene, they found a two-car traffic collision with major damage to both vehicles. Vehicle 1 was a Fontana Police Department patrol vehicle with two occupants. The second vehicle was a white four-door sedan with four individuals with major damage to the vehicle including the roof collapsed onto the passenger space compartment. The first individual was found on the passenger side of the vehicle. The second individual was found near the rear window entrapped by the roof at the neckline. John Doe #1 was the front right-seat passenger of the white sedan. Fire personnel were unable to access the individual initially due to the damage to the roof of the car. The male was visibly apneic. The upper torso was located between the front two seats with the head towards the driver-side rear door while the lower body remained in the front passenger seat. The male was repositioned to make access to the other viable males inside the passenger space compartment. Fire personnel made contact with the male and found him pulseless, apneic, and asystole. The death was pronounced at 2311 hours by Paramedic A. Anderson.

## RESPONSE TO SCENE:

At 0454 hours, I responded from the City of Ontario to the scene located on Cypress Avenue and Valley Boulevard in Fontana and arrived at 0509 hours.

## SCENE ASSESSMENT:

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 4 | *MODE* **Traffic** | *CASE #* **702401067** | **Master File** | | |
| | *STATUS* **Post** | *DECEDENT* **Robert Rias** | | | |

At 0542 hours I began the scene assessment.

The location was on Valley Blvd. approximately 525 feet east of Cypress Avenue in Fontana. Valley Blvd. was designated as an east-and-west roadway with two lanes of traffic going east and west. There were two left turn lanes located on the westbound lanes of traffic. The east and westbound lanes were separated by a solid yellow line. On the north side of the westbound lanes of traffic was an apartment complex with the address 10050 Juniper Ave. in Fontana. On the south side of the eastbound lanes of traffic was an empty lot/field. A patrol unit was located near the middle of the roadway on the left turn lane with major damage to the front end of the vehicle facing northeast. A white Nissan Sentra with License plate number 8ZZ6454 came to rest at GPS coordinates 37.07053 N, and -117.44253 W with the back of the vehicle slightly up a curb in between two parked vehicles. A gray Toyota Corolla with damage to the left driver-side door was located in front of the Nissan Sentra and A Black Chevrolet Silverado was found in the back of the Nissan Sentra. The roof of the Nissan Sentra was missing. Glass, debris, and various car parts were located along the east and westbound lanes of traffic. The windshields were shattered from both vehicles. The airbags were deployed. There were two bodies located inside the white Nissan Sentra. Rias was located on the front passenger seat and Adams was located on the rear passenger seat. The two individuals were not seat belted. The weather was cool, and the ambient temperature was approximately 50 degrees Fahrenheit.

**BODY EXAMINATION:**

At 0553 hours I began the body examination at the scene.

The body was that of a juvenile male, approximately 15 years of age. The complexion was medium. The hair on the head was brown and medium in length. The eyes were brown. There were natural teeth located on the upper and lower gums. The body was approximately 5 feet 5 inches tall and weighed approximately 150 pounds.

Body Position:

The body was found seated in the passenger seat with the head tilted to the left. The feet were resting on the floorboard. The arms were extended by the torso with the hands resting on the lap.

Clothing:

The body was clothed in a black sweatshirt with blue and silver rhinestones, tan T-shirt, purple underwear, black socks, and black sweatpants.

Therapeutic Devices:

There were electrocardiogram pads located on the anterior lower right forearm and lower right and left abdomen.

Observations:

The sclerae were clear. The pupils were fixed and dilated. There was blood exuding from the nose. There was shattered glass present on the upper and lower extremities. There was blood present in the mouth. Blood was present on the right and left hands.

Trauma:

The following trauma was observed on the body:

· A broken tooth in the lower front gums

· Dicing injuries on the right side of the face

· Contusions on the right temporal area

· Contusions on the lower abdomen

· Abrasions on the upper anterior right leg

· Contusions and abrasions along the inner left leg

· An open compound fracture with bone exposed to the lower right leg

· An abrasion on the lower anterior right leg

· An abrasion on the outer left leg near the knee

· A puncture wound on the lower inner left leg.

Tattoos:

There were no tattoos observed on the body.

Postmortem Changes:

I palpated the chest, abdomen, upper and lower back, and all extremities and they felt cool to the touch consistent with the ambient temperature. Blanching lividity was present on the posterior side of the body consistent with the seated position in the vehicle. Rigor mortis was present on the extremities and was manipulated with ease.

Conclusion:

At 0649 hours I concluded the body examination. I took 61 digital photographs of the body and scene. 92M Transportation team affixed toe tag number 09879 to the big right toe, placed the body in a yellow body bag, and secured it with pouch lock 7690396. The body was transported by the 92M Transportation team to the San Bernardino County Sheriff's Coroner Morgue at my request.

**PROPERTY:**

Two red bracelets, a yellow metal chain, a white metal chain, a white rubber bracelet, and two clear stone earrings were given to Don Rias with the authorization of the legal next of kin, Diana Rias.

**NEXT OF KIN NOTIFICATION:**

At 0703 hours I spoke with Diana Rias via telephone. The following is a summary of that statement.

Rias was 15 years of age, making Diana Rias the legal next of kin. Rias was staying with his grandma due to her living in Idaho and according to Rias' mother, Rias went out with friends the night the collision occurred.

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 6 | *MODE* | Traffic | *CASE #* | 702401067 | Master File |
| | *STATUS* | Post | *DECEDENT* | Robert Rias | |

Diana provided me with a description of Rias' clothing the last time he was seen and confirmed that Robert Rias was her son with the date of birth of 11/16/2008.

**IDENTIFICATION:**

At 0730 hours I responded to 2257 Spruce Avenue in Rialto and presented Don Rias (uncle) with a photo of Robert Rias who confirmed the identification of Robert Rias with the date of birth of 11/16/2008. A coroner identification form was filled out and signed by Don Rias and provided me a copy of his California Driver License.

**INTERVIEW WITH LUPE RIAS (GRANDMOTHER):**

At 0740 hours I spoke with Lupe Rias at her residence. The following is a summary of that interview. Rias was out with friends on 02/03/2024 at approximately 1900 hours. Lupe stated to Rias that he needed to return home by 2200 hours. She continuously checked his location and observed that he was first at the Dave and Busters located in Ontario Mills, then rechecked his location and found him near Cherry Avenue and Valley Boulevard in Fontana. She continuously tried to reach him via text message and was not able to get a hold of him. Lupe received a call from Diana Rias (mother) stating that an investigator had gotten hold of Rias' telephone, stating that he was possibly a decedent involved in a traffic collision.

**DISPOSITION:**

The case was referred to Pathology for autopsy.

**Created by Ana Acevedo. Approved by**

# San Bernardino County Sheriff - Coroner Division

## *Report Of Death Worksheet*

| | | | | |
|---|---|---|---|---|
| 1 | *MODE* **Traffic** | *CASE #* **702401068** | **Sub File To** 702401067 | |
| | *STATUS* **Post** | *DECEDENT* **Domonic Adams** | | |

## CASE INFO

| REPORTED BY | AGENCY | DATE | TIME | Call Back Phone |
|---|---|---|---|---|
| Deputy G. Wolff | San Bernardino Co. Sheriff's Dept. (SBCSD) | 02/04/2024 | 0403 | (760) 947-1500 |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | # OF PHOTOS | MEDIUM | SPECIAL CIRCUMSTANCES |
|---|---|---|---|---|---|
| Yes | Yes | Yes | | | Officer Involved |

## DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| **Domonic** | **Odell** | **Adams Jr** |

| AKA | DOE TYPE/NUMBER | PHONE |
|---|---|---|
| John Doe 27-24 | John 27-24 | |

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 1700 Red Tail Lane | Fontana | CA | 92336 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | Black | 04/28/2009 | 14 yrs | Yes |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 7689665 | 09878 | | 61.0 in | 123.0 lbs | Black | Brown |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED |
|---|---|---|
| | | Circumstantial ID approved (M. Leyva) |

## LEGAL NEXT OF KIN

| NAME | RELATIONSHIP | DOB/AGE | DATE/TIME NOTIFIED | NOTIFIED BY |
|---|---|---|---|---|
| Brittany Mason | Mother | 11/01/1985 38 yrs | 02/04/2024 1545 | A. Valentin |

| ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 1700 Red tail Ln | Fontana | CA | 923636 |

| PHONE | ALTERNATE PHONE # |
|---|---|
| (909) 261-8830(Cell) | |

## PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|
| 02/03/2024 | 2311 | Saturday | San Bernardino County Fire Department Paramedic A. Anderson pronounced |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Roadway | | Other |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| Valley Blvd. approximately 525 feet east of Cypress Avenue | Fontana |

## INVESTIGATIVE SUMMARY

*ADDITIONAL NARRATIVE ATTACHED* [x] YES [ ] NO

On Sunday, 02/04/2024 at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentifier black male appearing to be 15-16 years of age who was involved in a traffic collision near Valley Blvd. and Cypress Ave. in Fontana. According to Deputy Wolff, the Fontana Police Department attempted to initiate a traffic stop with a white Nissan Sentra west of Valley Blvd. The vehicle failed to yield and at 2244 hours Officers wi Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high-rated speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there was a total of 4 juveniles inside of the vehicle. The driver and passenger on the rear driver's side were transported to Arrowhead Regional Medical Center and Loma Linda University Medical Center. The passenger (Robert Rias) and the individual in the rear passenger (John Doe 27-24) were pronounced at the scene. According to Officers with Fontana PD they stated that befor the collision occurred two juveniles were hanging out the back windows of the vehicle and were unrestrained. There was no alcohol, tobacco, or illicit drugs located in the vehicle.

The unidentified male was wearing white American Eagle Jeans size 28x32, white, red and navy-blue Jordan shoes size 10.5, a white t shirt size with an image of a buddha in the front, a gray hoodie with the phrase "Diggin Detroit" on the front of the upper left side of the sweater and on the back.

*NOTE TO PATHOLOGY*

Officer involved pursuit. MAIT team wants to attend autopsy they are going vehicular homicide.

# San Bernardino County Sheriff - Coroner Division

***Report Of Death Worksheet***

**2**

MODE **Traffic** CASE # **702401068** **Sub File To 702401067**

STATUS **Post** DECEDENT **Domonic Adams**

## MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | M/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| N/A | N/A | | | No | | Not Available |

## CAUSE OF DEATH

| 107 CAUSE | TIME INTERVAL | |
|---|---|---|
| (A) MULTIPLE BLUNT FORCE INJURIES | Immediate | 109 BIOPSY PERFORMED? [ ] YES [x] NO |
| DUE TO (B) | | 110 AUTOPSY PERFORMED? [x] YES [ ] NO |
| (C) | | AUTOPSY # A0298-24 SL EXAM # |
| (D) | | INDIGENT # |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107

NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF "YES" LIST TYPE OF OPERATION & DATE.

No

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| N/A | | | Scott Luzi |
| **115 PHYSICIAN TO SIGN D.C.** | **ADDRESS** | **PHONE** | |
| Coroner | | | DATE 02/06/2024 TIME 1145 |

## INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Accident | Roadway | No | 02/03/2024 | 22:45 |

125 LOCATION (Include Zip Code)

Valley Blvd. approximately 525 feet east of Cypress Ave. Fontana 92335

DESCRIBE HOW INJURY OCCURRED

Head on vehicle collision, airbags deployed, passenger not ejected, not seat belted.

## PROPERTY

PROPERTY? [ ] YES [x] NO PROP RLS'D? [ ] YES [x] NO

## LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| San Bernardino Co. Sheriff's Dept. (SBCSD) | Deputy G. Wolff | 192400849 |

## AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| AA | 02/04/2024 | 02-06-2024 | 03/08/2024 | Dep. Darrell Holland (MAIT team) (760) 881-9780 |

## DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY |
|---|---|---|
| RELEASE | | |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| 92M | Ana Acevedo | 02/04/2024 | 0446 | 0525 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| McKays Family Mortuary Fontana | (909)-822-9595 |

[5] REVIEWED BY Leyva

San Bernardino County Sheriff - Coroner Division

*Report Of Death Worksheet*

| | | | | |
|---|---|---|---|---|
| 3 | *MODE* Traffic | *CASE #* 702401068 | Sub File To 702401067 | |
| | *STATUS* Post | *DECEDENT* Domonic Adams | | |

# Coroner Investigation

02/06/2024

**ASSIGNMENT:**

On Sunday, 02/04/2024, at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 14-year-old Domonic Adams, who was involved in a traffic collision near Valley Boulevard and Cypress Avenue in Fontana. I was assigned incident number CO240350005 at 0430 hours.

**INTERVIEW - DEPUTY SHERIFF G. WOLFF (SBCSD):**

At 0437 hours I spoke with Deputy G. Wolff via telephone. The following is a summary of that statement.

According to Deputy Wolff, the Fontana Police Department (FPD) attempted to initiate a traffic stop on a white Nissan Sentra west of Valley Boulevard. The vehicle failed to yield and at 2244 hours, officers with Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high rate of speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there were a total of four juveniles inside the vehicle. The driver and the passenger on the rear driver's side were transported to Arrowhead Regional Medical Center (ARMC) and Loma Linda University Medical Center (LLUMC). The passenger Robert Rias and the individual in the rear passenger Domonic Adams were pronounced at the scene. According to officers with the Fontana PD, they stated that before the collision occurred, two juveniles were hanging out of the back windows of the vehicle and were unrestrained.

**REVIEW OF PARAMEDIC RUNS HEET:**

At 2245 hours, the San Bernardino County Fire Department received a call for service. ME 77 arrived at the scene at 2252 hours. When fire personnel arrived at the scene, they observed a male located in the rear right seat passenger of a white sedan with fire personnel unable to access the male due to damage to the roof of the car. The male was seated upright in the rear right seat with significant facial trauma to his right orbital area. Access was made to the male after extraction of the roof and the male appeared to be pulseless, apneic, and asystole. The death was pronounced at 2311 hours by Paramedic A. Anderson.

**RESPONSE TO SCENE:**

At 0454 hours, I responded from the City of Ontario to the scene located on Cypress Avenue and Valley Boulevard in Fontana and arrived at 0509 hours.

**SCENE ASSESSMENT:**

At 0542 hours I began the scene assessment.

The location was on Valley Blvd. approximately 525 feet east of Cypress Avenue in Fontana. Valley Blvd. was designated as an east-and-west roadway with two lanes of traffic going east and west. There were two left turn lanes located on the westbound lanes of traffic. The east and westbound lanes were separated by a solid yellow line. On the north side of the westbound lanes of traffic was an apartment complex with the address 10050 Juniper Ave. in Fontana. On the south side of the eastbound lanes of

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | |
|---|---|---|---|---|
| 4 | *MODE* **Traffic** | *CASE #* **702401068** | **Sub File To** 702401067 | |
| | *STATUS* **Post** | *DECEDENT* **Domonic Adams** | | |

lane with major damage to the front end of the vehicle facing northeast. A white Nissan Sentra with License plate number 8ZZ6454 came to rest at GPS coordinates 37.07053 N, and -117.44253 W with the back of the vehicle slightly up a curb in between two parked vehicles. A gray Toyota Corolla with damage to the left driver-side door was located in front of the Nissan Sentra and A Black Chevrolet Silverado was found in the back of the Nissan Sentra. The roof of the Nissan Sentra was missing. Glass, debris, and various car parts were located along the east and westbound lanes of traffic. The windshields were shattered from both vehicles. The airbags were deployed. There were two bodies located inside the white Nissan Sentra. Rias was located in the front passenger seat and Adams was located in the rear passenger seat. The two individuals were not seat belted. The weather was cool, and the ambient temperature was approximately 50 degrees Fahrenheit.

**BODY EXAMINATION:**

At 0622 hours I began the body examination at the scene.

Physical Characteristics:

The body was that of a juvenile male approximately 14 years of age. The complexion was dark. The hair on the head was black and medium in length. The eyes were brown. There were braces present in the mouth and natural teeth present on the upper and lower gums. The body was approximately 5 feet 10 inches tall and weighed approximately 160 pounds.

Body Position:

The body was found seated on the rear passenger seat with the feet resting on the floorboard. The arms were resting beside the torso and the head was tilted to the right.

Clothing:

The body was clothed in white jeans, a pair of Jordan shoes, a white T-shirt, a gray sweater, and a black ski mask.

Therapeutic Devices:

There were no therapeutic devices observed on the body.

Observations:

The sclerae were clear. The pupils were fixed and dilated. There was shattered glass located on the upper and lower extremities. There was blood exuding from the nose. There was blood present in the mouth and on the face.

Tattoos:

There were no tattoos observed on the body.

Trauma:

The following trauma was observed on the body.

- A laceration on the upper right orbital area exposed the skull

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | |
|---|---|---|---|---|
| 5 | *MODE* **Traffic** | *CASE #* **702401068** | **Sub File To** **702401067** | |
| | *STATUS* **Post** | *DECEDENT* **Domonic Adams** | | |

· The teeth were broken.

· Abrasion on the right side of the face

· Dicing injuries on the chin

· An abrasion on the left cheek

· Neck and rib fractures palpated.

· I palpated fractures on the sternum.

· I palpated fractures on the upper left leg.

· An abrasion on upper inner left leg

· I palpated a fracture on the tailbone.

· An abrasion near the tailbone.

Postmortem Changes:

I palpated the chest, abdomen, upper and lower back, and all extremities and felt cold to the touch. Blanching lividity was present on the posterior side of the body consistent with the seated position in the rear passenger seat. Rigor mortis was present on the extremities that was manipulated with ease.

Conclusion:

At 0649 hours, I concluded the body examination. I took 64 digital photographs of the body and scene. 92M Transportation team affixed toe tag number 09878 to the big right toe, placed the body into a yellow body bag and secured it with pouch number 7691366. The body was transported by the 92M Transportation team to the San Bernardino County Sheriff's Coroner Morgue on my request.

**PROPERTY:**

There was no property collected from the body or scene.

**IDENTIFICATION:**

See supplemental report provided by DCI A. Valentin.

**NEXT OF KIN NOTIFICATION:**

See supplemental report provided by DCI A. Valentin.

**DISPOSITION:**

The case was referred to Pathology for autopsy.

**Created by Ana Acevedo. Approved by**

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| 6 | *MODE* **Traffic** | *CASE #* **702401068** | **Sub File To** 702401067 | | |
| | *STATUS* **Post** | *DECEDENT* **Domonic Adams** | | | |

## Coroner Supplement Report

**02/06/2024**

DEPUTY CORONER INVESTIGATOR A. VALENTIN

**CIRCUMSTANIAL IDENTIFICATION:**

On February 4, 2024, at 1545 hours, Brittany Mason and Domonic Adams, Domonic's parents, came to the coroner's lobby to conduct a visual ID from a photo.

I spoke with them in the lobby and showed them a photo and they identified it as their son Domonic Adams Jr.

Brittany filled out and signed the coroner's identification form which I witnessed. I uploaded this form into CCMS images.

**DISPOSITION:**

Attach to original report.

**Created by Alondra Valentin. Approved by**

# San Bernardino County Sheriff - Coroner Division

## *Report Of Death Worksheet*

| | | | |
|---|---|---|---|
| 1 | MODE **Traffic** | CASE # **702401073** | Sub File To 702401067 |
| | STATUS **Post** | DECEDENT **Omari Pitts** | |

## CASE INFO

| REPORTED BY | AGENCY | DATE | TIME | Call Back Phone |
|---|---|---|---|---|
| Unit Coordinator A. Alnajjar | Loma Linda University Children's Hospital | 02/04/2024 | 0755 | |

| NEWS RELEASE | NAME RELEASABLE | ROLL-OUT? | # OF PHOTOS | MEDIUM | SPECIAL CIRCUMSTANCES |
|---|---|---|---|---|---|
| Yes | No | Yes | 33 | Digital | Officer Involved |

## DECEDENT INFO

| 1 NAME (FIRST) | 2 (MIDDLE) | 3 (LAST) |
|---|---|---|
| **Omari** | **Malik** | **Pitts** |

| AKA | DOE TYPE/NUMBER | PHONE |
|---|---|---|
| John Doe 28-24, Doe Sugarland | John 28-24 | |

| 20 ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 937 W. Clover Ave. | Rialto | CA | 92376 |

| 6 SEX | 14 RACE | 4 DOB | 5 AGE | RELATED CASE NUMBERS |
|---|---|---|---|---|
| Male | Black | 11/01/2008 | 15 yrs | Yes |

| BODY BAG # | TOE TAG | 10 SS # | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|
| 7689666 | 03808 | | 70.0 in | 120.0 lbs | Black | Brown |

| DRIVER'S LIC # | STATE | HOW IDENTIFIED |
|---|---|---|
| | | Circumstantial ID approved. Biological mother, Tatanesha Galburth identified her son as Omari Pitts, DOB 11/01/2008 via tattoo and digital photograph. DM |

## LEGAL NEXT OF KIN

| NAME | RELATIONSHIP | DOB/AGE | DATE/TIME NOTIFIED | NOTIFIED BY |
|---|---|---|---|---|
| Tatanesha Galburth | Mother | | 02/04/2024 1430 | DCI A. Valentin |

| ADDRESS | 21 CITY | 25 STATE | 23 ZIP |
|---|---|---|---|
| 937 W. Clover Ave. | Rialto | CA | 92376 |

| PHONE | ALTERNATE PHONE # |
|---|---|
| (323) 943-7093(Cell) | |

## PLACE/DEATH OCCURRED

| 7 DATE | 8 TIME | DAY OF DEATH | PRONOUNCED BY |
|---|---|---|---|
| 02/04/2024 | 0735 | Sunday | Dr. Sonea Qureshi |

| 101 PLACE OF DEATH | 102 IP-ER/OP-DOA | FAC OTHER THAN HOSPITAL |
|---|---|---|
| Loma Linda University Children's Hospital | In Patient | |

| 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|
| 11234 Anderson Street | Loma Linda |

## INVESTIGATIVE SUMMARY

ADDITIONAL NARRATIVE ATTACHED ☒ YES ☐ NO

On 02/04/2024, John Doe 28-24 was a passenger of a White Honda Civic who collided with a Fontana Police Department vehicle. John Doe 28-24 was transported via American Medical Response ambulance to Loma Linda University Medical Center- Children's Hospital for medical care.

John Doe 28-24 was taken to surgery for exploratory laparotomy. He had internal damage to his organ.

John Doe 28-24 was a juvenile black male approximately 15-17 years old. He was approximately 5'7-6' tall and weighed approximately 169 pounds. He had a tattoo "TATANESHA" with a crown on the right forearm. He had two eyebrow slits on the left eyebrow.

He had no clothing at the time of body examination. LLUMC tossed the clothing. Per AMR the male had an unknown colored/brand jacket and a pair of white shoes tha was given to RN Joelle at arrival. Per LLUMC he was wearing a black puff jacket, Unk pants and black Nike Airforce 1 shoes.

Mother Tatanesha called in asking for information on the Doe. She circumstantially identified Omari Pitts as John Doe 28 via the tattoo on the left arm and the jacket description.

*NOTE TO PATHOLOGY*

Officer involved pursuit. MAIT team wants to attend autopsy they are going vehicular homicide.

# San Bernardino County Sheriff - Coroner Division

***Report Of Death Worksheet***

**2**

| | | | |
|---|---|---|---|
| MODE | **Traffic** | CASE # | **702401073** |
| STATUS | **Post** | DECEDENT | **Omari Pitts** |

**Sub File To**
**702401067**

## MEDICAL

| TRANSPORTED FROM | ADMITTED TO? | DATE | TIME | M/R ORDERED | MED REC # | BLOOD ORDERED |
|---|---|---|---|---|---|---|
| Fontana | LLUMC | 02/04/2024 | 1527 | No | 9900679 | |

## CAUSE OF DEATH

| 107 CAUSE | | TIME INTERVAL | |
|---|---|---|---|
| (A) | MULTIPLE BLUNT FORCE INJURIES | hours | 109 BIOPSY PERFORMED? ☐ YES ☒ NO |
| DUE TO (B) | | | 110 AUTOPSY PERFORMED? ☒ YES ☐ NO |
| (C) | | | AUTOPSY # A0301-24 SL EXAM # |
| (D) | | | INDIGENT # |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107

NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF "YES" LIST TYPE OF OPERATION & DATE.

No

| ATTENDING PHYSICIAN | PHONE | DATE LAST ATTENDED | CAUSE GIVEN BY |
|---|---|---|---|
| Dr. Sonea Qureshi | (909) 558-4000 | 02/04/2024 | Scott Luzi |
| 115 PHYSICIAN TO SIGN D.C. | ADDRESS | PHONE | DATE 02/06/2024 TIME 1313 |
| Coroner Cert | | | |

## INJURY

| 119 SPECIFY MODE | 123 PLACE OF INJURY | 120 AT WK? | 121 DATE | 122 HOUR |
|---|---|---|---|---|
| Accident | City Street | No | 02/03/2024 | 22:45 |

125 LOCATION (include Zip Code)

34.07053 N, -117.44253 W Fontana 92335

DESCRIBE HOW INJURY OCCURRED

Head on vehicle collision, airbags deployed, (Pending seat belt info and where he was in vehicle)

## PROPERTY

| PROPERTY? | PROP RLS'D? |
|---|---|
| ☐ YES ☒ NO | ☐ YES ☒ NO |

## LAW ENFORCEMENT

| AGENCY | AGENT | REPORT NUMBER |
|---|---|---|
| San Bernardino Co. Sheriff's Dept. (SBCSD) | Deputy Sheriff G. Wolff | 192400847 |

## AUTOPSY

| ORDERED BY | DATE | TOX ORDERED | TOX RECEIVED | AGENT(S) TO ATTEND |
|---|---|---|---|---|
| | | 02-06-2024 | 03/28/2024 | Dep. Darrell Holland (MAIT team) (760) 881-9780 |

## DISPO OF REMAINS

| PRESENT LOCATION | MORGUE STATUS | VEHICLE TOWED BY |
|---|---|---|
| RELEASE | | N/A |

| TRANSPORTED BY | NOTIFIED BY | DATE | TIME | ARRIVED |
|---|---|---|---|---|
| 92M | Ana Acevedo | 02/05/2024 | 1204 | 1258 |

| 44 MORTUARY | PHONE OF MORTUARY |
|---|---|
| Funeral Preciado | (909)-383-1108 |

5 REVIEWED BY Leyva

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| **3** | *MODE* **Traffic** | *CASE #* | **702401073** | **Sub File To** 702401067 | |
| | *STATUS* **Post** | *DECEDENT* | **Omari Pitts** | | |

# Coroner Investigation

**02/05/2024**

**ASSIGNMENT:**

OnSunday, 02/04/2024 at 0755 hours, Unit Secretary Ammar Alnajjar called to report the death of a juvenile male John Doe #28-24, later identified as 15-year-old Omari Pitts, who was involved in a traffic collision in the city of Fontana on 02/03/2024. At 0805 hours, I was assigned Coroner Call #CO240350012.

**STATEMENT- REGISTERED NURSE M. ZARATE (LLUMC):**

At 0810 hours, I spoke with Registered Nurse M. Zarate via telephone. The following is a summary of her statement.

The john doe was a black juvenile male appearing to be between 14-16 years old. He arrived at the hospital via ambulance at 2327 hours on 02/03/2024. The juvenile male was involved in a traffic collision. He was not awake or oriented.

The male arrived at the hospital and was taken to the operating room. Doctors performed an exploratory laparotomy. The male had internal trauma.

From the operating room, he was taken to the pediatric intensive care unit due to not oxygenating after the surgery.

The male became unresponsive. Medical staff began advance cardiac life support. He was pronounced deceased at 0737 hours by Dr. Sonea Qureshi.

Registered Nurse Zarate advised she had started her shift and did not know further information about clothing or other trauma. She refused to provide medical records at hospital response.

It was unknown where the clothing was located.

**HOSPITAL RESPONSE:**

At 0829 hours, I responded from the San Bernardino Coroner Division and arrived at the hospital at 0838 hours.

**BODY DESCRIPTION:**

At 0847 hours, I began the body examination.

Physical Description:

The body was that of a black juvenile male appearing to be the age of 15-17 years old. The complexion was dark. There was short hair on the head. The eyes were brown. There was no facial hair. The body was approximately between 5 feet 10 inches to 6 feet tall and weighed approximately 169 pounds.

Body Position:

The body was supine on a hospital gurney. Both arms and legs were extended out straight parallel to

each other.

Clothing:

There was no clothing on the body. There was no clothing in the room. Hospital staff did not know where the clothing was that he was wearing when he arrived at the hospital.

Therapeutic Devices:

The following therapeutic devices were on the body:

· Intracranial Sophysa Bolt

· An endotracheal tube

· Neck brace

· Intraosseous line on the left shoulder

· Surgical bandage on the abdomen

· Intravenous line on the left arm

· Intraosseous line on the left thigh

· Pelvis brace

· Leg brace on the left leg

Observations:

Both eyes were clear. Top and bottom frenulum are intact. Fingernails were intact. There were no defensive wounds on the hands or arms. Natural teeth were present on the upper and lower gums.

Tattoo(s):

The following tattoos were most identifiable:

“Tatanesha” with a crown on top of it on the right arm

Trauma:

The following trauma was observed and palpated on the body:

- Left leg fracture

Postmortem Changes:

I palpated the chest, abdomen, and all extremities felt warm. Rigor mortis was not present. Lividity was not present.

Conclusion:

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| **5** | *MODE* **Traffic** | *CASE #* **702401073** | **Sub File To** **702401067** | | |
| | *STATUS* **Post** | *DECEDENT* **Omari Pitts** | | | |

The body was released to the hospital morgue. I confirmed with Senio Deputy Coroner Investigator D. McCarthy that the body was releasable to the morgue.

**NEXT OF KIN NOTIFICATION:**

At 1418 hours, Carnaisa Galloway called San Bernardino County Coroner's office looking for her brother, Omari Pitts. At 1430 hours, I spoke to Carnaisa and their mother, Tatanesha Galburth over the phone.

**INTERVIEW - TATANESHA GALBURTH (MOTHER) AND CARNAISA GALLOWAY (SISTER):**

I spoke with Tatanesha and Carnaisa via telephone. The following was a summary of their interview.

Omari was out with his friends on Friday 02/03/2024. He was with two Hispanic juvenile males and his friend Domonic Adams. Omari and Domonic had not arrived home that night of.

Tatanesha and Domonic's parents were looking for them. They saw on the news about a traffic collision that occurred in Fontana.

Omari was wearing a black jacket and blue jeans. He had a tattoo on the right lower arm with the name "Tatanesha."

**IDENTIFICATION**

They circumstantially identified the body as Omari Pitts, based on the tattoo on the right forearm with the name of "Tatanesha" by his mother Tatanesha Galburth.

See Deputy Coroner Investigator S. Morgan report for further.

**MEDICAL RECORDS:**

Medical records were requested from LLUMC.

**SCENE RESPONSE/ DESCRIPTION**

See Deputy Coroner Investigator A. Acevedo report.

**STATEMENTS**

See Deputy Coroner Investigator A. Acevedo report.

**DISPOSITION:**

This case was submitted to pathology for review.

**Created by Alondra Valentin. Approved by**

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| **6** | *MODE* **Traffic** | *CASE #* **702401073** | **Sub File To** **702401067** |
| | *STATUS* **Post** | *DECEDENT* **Omari Pitts** | |

# Coroner Supplement Report

**02/05/2024**

**Investigator: S. Morgan**

## CIRCUMSTANIAL IDENTIFICATION:

On February 5, 2024, at 1139 hours, Tatanesha Galburth came to the coroner's lobby to conduct a visual ID from a photo. At 1151 hours, I spoke with Tatanesha Galburth in the lobby and showed her a photo and she identified it as her son Omari Pitts.

She filled out and signed the coroner's identification form which I witnessed. I uploaded this form into CCMS images.

## DISPOSITION:

Attach to original report.

**Created by Shawn Morgan. Approved by**

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| | | | | | |
|---|---|---|---|---|---|
| **7** | *MODE* **Traffic** | *CASE #* **702401073** | **Sub File To** **702401067** | | |
| | *STATUS* **Post** | *DECEDENT* **Omari Pitts** | | | |

# Coroner Supplement Report

**02/06/2024**

**INVESTIGATOR A.ACEVEDO**

## ASSIGNMENT:

On Sunday, 02/04/2024, at 0403 hours, Sergeant B. Motley with the San Bernardino County Sheriff's Department (SBCSD) called to report the death of an unidentified male, later identified as 15-year-old Robert Rias, who was involved in a traffic collision near Valley Boulevard and Cypress Avenue in Fontana. I was assigned incident number CO240350005 at 0430 hours.

## INTERVIEW - DEPUTY SHERIFF G. WOLFF (SBCSD):

At 0437 hours I spoke with Deputy G. Wolff via telephone. The following is a summary of that statement.

According to Deputy Wolff, the Fontana Police Department (FPD) attempted to initiate a traffic stop on a white Nissan Sentra west of Valley Boulevard. The vehicle failed to yield and at 2244 hours, officers with Fontana PD radio trafficked that they were involved in a pursuit. The driver of the vehicle was driving at a high rate of speed and was facing west when the driver lost control, did a lateral spin, and collided with the front of the patrol unit at 2245 hours. At the time of the collision, there were a total of four juveniles inside the vehicle. The driver and the passenger on the rear driver's side were transported to Arrowhead Regional Medical Center (ARMC) and Loma Linda University Medical Center (LLUMC). The passenger Robert Rias and the individual in the rear passenger Domonic Adams were pronounced at the scene. According to officers with the Fontana PD, they stated that before the collision occurred, two juveniles were hanging out of the back windows of the vehicle and were unrestrained.

## RESPONSE TO SCENE:

At 0454 hours, I responded from the City of Ontario to the scene located on Cypress Avenue and Valley Boulevard in Fontana and arrived at 0509 hours.

## SCENE ASSESSMENT:

At 0542 hours I began the scene assessment.

The location was on Valley Blvd. approximately 525 feet east of Cypress Avenue in Fontana. Valley Blvd. was designated as an east-and-west roadway with two lanes of traffic going east and west. There were two left turn lanes located on the westbound lanes of traffic. The east and westbound lanes were separated by a solid yellow line. On the north side of the westbound lanes of traffic was an apartment complex with the address 10050 Juniper Ave. in Fontana. On the south side of the eastbound lanes of traffic was an empty lot/field. A patrol unit was located near the middle of the roadway on the left turn lane with major damage to the front end of the vehicle facing northeast. A white Nissan Sentra with License plate number 8ZZ6454 came to rest at GPS coordinates 37.07053 N, and -117.44253 W with the back of the vehicle slightly up a curb in between two parked vehicles. A gray Toyota Corolla with damage to the left driver-side door was located in front of the Nissan Sentra and A Black Chevrolet Silverado was found in the back of the Nissan Sentra. The roof of the Nissan Sentra was missing. Glass, debris, and various car parts were located along the east and westbound lanes of traffic. The windshields were shattered from both vehicles. The airbags were deployed. There were two bodies located inside the white

**San Bernardino County Sheriff - Coroner Division**

***Report Of Death Worksheet***

| 8 | *MODE* Traffic | *CASE #* 702401073 | Sub File To 702401067 |
|---|---|---|---|
| | *STATUS* Post | *DECEDENT* Omari Pitts | |

Nissan Sentra. Rias was located on the front passenger seat and Adams was located on the rear passenger seat. The two individuals were not seat belted. The weather was cool, and the ambient temperature was approximately 50 degrees Fahrenheit.

**DISPOSITION:**

Refer to the original report.

**Created by Ana Acevedo. Approved by**

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

The following supplemental investigation was conducted by the San Bernardino County Sheriff's Department.

Personnel involved:

Deputy D. Holland, Hesperia Station
Deputy G. Wolff, Victorville Station
San Bernardino County Deputy District Attorney Rodney Tamparong

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**VEHICLE #1:**

**TIRES AND WHEELS:**

This vehicle was equipped with three different size tires of four different makes and models. The tires were mounted on three different types of wheels. Notably, the right rear tire was a spare tire, designated for temporary use.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**TIRES AND WHEELS:**

The **Left Front** tire was a Delinte DH2 all season passenger tire. The tire size was 205/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on a 16" diameter Nissan alloy wheel.

The DOT number on the tire was TBPVAP5C2121. The tire was inflated to 36.1 PSI at the time of examination. The maximum PSI rating was 44 PSI.

The tread depths were as follows:

Inner tread: 3/32"
Center tread: 6/32"
Outer tread: 3/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Right Front** tire was a Kumho Ecsta 4X II all season passenger tire. The tire size was 205/60 R16. The tire was recovered on scene, dismounted from the wheel, after the wheel suffered catastrophic failure during the crash. Debris from the wheel was located inside the tire. A portion of the wheel remained bolted to the right front wheel hub. The sidewalls of the tires were punctured in multiple locations. The tire size and physical evidence indicated it was mounted on a 16" diameter Nissan alloy wheel.

The DOT number on the tire was 1Y0TPYC9W1621. The tire pressure was 0 PSI at the time of examination. The maximum PSI rating was 50 PSI.

The tread depths were as follows:

Inner tread: 6/32"
Center tread: 6/32"
Outer tread: 5/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Left Rear** tire was an Achilles ATR Sport DH2 performance tire. The tire size was 215/45 R18. The tire had no abnormal signatures. The tire tread was unidirectional and installed backwards, with the intended direction for forward rotation directed rearward. Mounted in such fashion, the tread pattern was reversed and would draw water to the center of the tire, rather than draw it out as designed, compromising hydroplaning resistance. The tire was mounted on an 18" diameter Nissan alloy wheel.

The DOT number on the tire was 5KQSWA. The tire was inflated to 20.2 PSI at the time of examination. The maximum PSI rating was 50 PSI.

The tread depths were as follows:

Inner tread: 7/32"
Center tread: 8/32"
Outer tread: 7/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

### TIRES AND WHEELS:

The **Right Rear** tire was a Maxxis compact spare tire. The tire size was 125/70 R16. The tire had no abnormal signatures. The tire was mounted on a 16" diameter Nissan steel wheel. The wheel displayed indentations to the outer edge and abrasion to the front face.

The DOT number on the tire was 77FXQM002. The tire was inflated to 24.7 PSI at the time of examination. The maximum PSI rating was 60 PSI.

The exterior surface of the tire read, "TEMPORARY USE ONLY," "SPARE TIRE," and, "inflate to 420KpA (60 PSI)."

A warning label was affixed to the wheel, which read the following:

WARNING
1. SPARE TIRE FOR TEMPORARY EMERGENCY USE ONLY
2. REPLACE WITH REGULAR TIRE AS SOON AS POSSIBLE, TO AVOID POSSIBLE ACCIDENT AND SERIOUS [*Illegible due to damage*]
3. DO NOT EXCEED 50 MPH (80KM/H)
4. SEE OWNERS MANUAL BEFORE USING SPARE TIRE.

The tread depths were as follows:

Inner tread: 2/32"
Outer tread: 3/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**STEERING SYSTEM:**

This vehicle was equipped with a dual pinion rack electric power steering system. Unless otherwise indicated, all components were intact, secure and properly mounted with no indication of impairment.

The steering wheel contained a mounted Supplemental Restraint System (SRS) air bag module which was deployed. The steering column was still attached to its dashboard and bulkhead mounts. The steering shaft extended downward from within the adjustable steering column and extended through the bulkhead. The steering shaft was joined to the steering gear input shaft.

The steering assembly consisted of an electronically controlled dual pinion and rack; tie rod ends and steering knuckles. A threaded adjustable shaft and tie rod ends were attached to each end of the steering rack, and the other end of the tie rod ends were attached to the steering knuckle. The passenger side tie rod shaft was broken between the threads and the rack. The driver side tie rod was connected and appeared in working order.

Ball and socket joints were used to join the articulating steering components between the steering gear and steering knuckles. The joints were secured by locking nuts. The ball and socket joints were equipped with rubber dust boots that remained complete and intact. When tested, there was no discernible lateral movement within the ball and socket joints.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**THROTTLE SYSTEM:**

The vehicle was equipped with an electronic fuel injected, 2.0 liter inline-4 cylinder gasoline engine with 149 horsepower. Unless otherwise indicated, all component parts were intact, securely and properly mounted, with no indication of impairment.

The engine throttle was operated by an electronic system commonly referred to as a "Throttle-By-Wire" system. This system employs sensors and electronic components to gain input from the accelerator pedal and apply the positioning to the throttle plate. The accelerator pedal was mounted to the driver side bulkhead.

The throttle body was clean. The throttle body operated smoothly and recoiled to a closed position when released. Upon inspection, a piece of loose black plastic was found on the outside of the butterfly valve. The plastic appeared to have broken off the intake assembly and fell into the throttle body during the crash. The valve prevented the plastic from falling further into the intake manifold which indicated the valve was closed when the debris entered the throttle body. There were no observed irregularities or nonfunctional components in the throttle system.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

The vehicle was equipped with a power-assisted, 4 wheel disc Anti-lock Brake System. Unless otherwise indicated, all component parts were intact, securely, and properly mounted with no indication of impairment. All measurements within this section are approximate.

The brake pedal was suspended from the underside of the driver dashboard. The rubber brake pedal cover was properly positioned on the brake pedal.

The brake system used a power-brake booster to provide assistance during braking. The booster was mounted on the forward side of the bulkhead and connected directly to the brake pedal by a push rod. The diaphragm vacuum booster was self-contained and utilized engine intake manifold vacuum and atmospheric pressure for its power.

The master cylinder was mounted to the front of the power-brake booster. The reservoir no longer mounted on the master cylinder, and fluid leaked from the top. The loose plastic reservoir was located in the engine compartment below the master cylinder.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry, with no indication of fluid loss or contamination. Brake lines to each assembly showed no indication of damage or fluid loss.

The brake pads were composed of a bonded semi-metallic friction material. The Federal Vehicle in Use Inspection Standard is 1/32 inch of friction material, or 0.79 millimeters. All of the pads on the front axle far exceeded this standard. The friction surfaces on the brake pads showed wear but were otherwise normal.

The brake pad measurements were as follows:

| | |
|---|---|
| Left Front Inner: | 5.0 mm |
| Left Front Outer: | 3.5 mm |
| Right Front Inner: | 5.0 mm |
| Right Front Outer | 3.5 mm |

The rotor measurements were as follows:

| | |
|---|---|
| Left Front Rotor: | 23.5 mm |
| Right Front Rotor: | 24.0 mm |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The swept areas (friction surface) on the ventilated brake rotors appeared normal. The wheel bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**REAR AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry, with no indication of fluid loss or contamination. Brake lines to each assembly showed no indication of damage or fluid loss. Emergency brake cables to the rear brake assemblies appeared functional and were not damaged.

The brake pad measurements were as follows:

| | |
|---|---|
| Left Rear Inner: | 5.0 mm |
| Left Rear Outer: | 4.5 mm |
| Right Rear Inner: | 6.0 mm |
| Right Rear Outer | 5.0 mm |

The rotor measurements were as follows:

| | |
|---|---|
| Left Rear Rotor: | 7.5 mm |
| Right Rear Rotor: | 7.5 mm |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #1**

**BRAKE SYSTEM:**

**REAR AXLE:**

The swept areas (friction surface) on the brake rotors appeared normal. The wheel bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly.

**EMERGENCY / PARKING BRAKE:**

The parking brake assembly on this vehicle consisted of a foot pedal located on the driver side footwell.

The parking brake pedal was in the up position, indicating it was not active, during the time of the examination. A test of the parking brake was conducted and appeared to be working correctly.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

**VEHICLE #1**

## NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION:

On February 6, 2024, I contacted the National Highway Traffic Safety Administration (NHTSA), Office of Defects Investigation, Recall and Service Bulletins Database, via their World Wide Web site on the internet. The purpose of the contact was to inquire if there were, or had been, any NHTSA defect investigation, recalls and/or technical service bulletins for the 2022 Nissan Sentra. There were two recalls for the 2022 Nissan Sentra shown on the website, one of which was applicable and reportedly unrepaired this vehicle. The recalls were printed and attached to this report.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## ANALYSIS AND OPINION

## MECHANICAL EXAMINATION

### VEHICLE #1

The mechanical examination of the tires and wheels revealed the improper installation of the unidirectional left rear tire. When installed correctly, the angled tread pattern of unidirectional tires provides more efficient water channeling for improved traction in wet conditions and increased hydroplaning resistance. Installed backwards, the tread would tend to channel water inward and compromise the tire's engineered ability to resist hydroplaning. The tire was inflated to 20.2 PSI at the time of inspection. According to the vehicle's tire and loading information sticker, the recommended tire pressure was 33 PSI. The improper installation of the tire and underinflation could have contributed to the crash. The right rear tire was a spare tire, with a recommended pressure of 60 PSI. The tire pressure at time of inspection was 24.7 PSI. The tire was rated for 50 miles per hour. The improper usage of the tire and underinflation could have contributed to the crash.

The mechanical examination of the steering system revealed a broken tie rod between the rack and right front steering knuckle. NHTSA records indicated an outstanding recall on the vehicle for tie rods. The following are excerpt from NHTSA Safety Recall Report 23V-581:

*Description of the Defect: On affected vehicles, the left and/or right side tie rod's strength may be insufficient under certain operating conditions. If the tie rod experiences a high input force (such as a curb impact) it may deform.*

*Description of the Safety Risk: A bent tie rod may impair the driver's ability to steer the vehicle. Additionally, the steering wheel may be off-center and/or experience vibration. In the worst-case scenario, if the tie rod breaks, it can lead to a partial loss of steering control which may increase the risk of a crash.*

Nissan's Voluntary Recall Campaign Document (Campaign ID R23B3) described the recall service procedure. The service procedure required the technician to examine the tie rods for bending. If bending was observed, an identical replacement part was to be ordered and installed. The document contained photographs which indicated the area of bending and failure were the same point of failure identified on the Nissan's right front tie rod during inspection. NHTSA Safety Recall Report 23V-581 and Nissan's Voluntary Recall Campaign Document were attached to this report.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #1

The condition of the front right tie rod prior to the crash was unknown. There were no indications or reports from NHTSA documents of sudden catastrophic tie rod failure. Additional damage was noted to the right front of the vehicle, including a broken stabilizer linkage and shattered wheel, which indicated the tie rod failure was likely the result of the crash, and did not cause or contribute to the traffic collision.

If additional evidence were discovered indicating the tie rod was damaged prior to the incident, it may have contributed to the crash.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

**VEHICLE #1**

The mechanical examination of the throttle system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the brake system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision. The surfaces on the brake pads and brake rotors were indicative of normal wear.

The mechanical examination of the parking brake did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

**MECHANICAL EXAMINATION VEHICLE #1 END.**

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

VEHICLE #2

INTRODUCTION:

The following information was associated with this examination:

| | |
|---|---|
| DATE OF EXAMINATION | February 7, 2024 |
| REQUESTED BY | San Bernardino County Sheriff's Department |
| EXAMINATION LOCATION | Armada Towing<br>8623 Carob Street<br>Fontana, CA 92335 |
| MANUFACTURED BY | FORD MOTOR COMPANY |
| MAKE | Ford |
| MODEL | Explorer |
| MODEL YEAR | 2020 |
| VIN | 1FM5K8AB4LGC13863 |
| CALIFORNIA VEHICLE LICENSE | 1603691 |
| TYPE OF VEHICLE | Multipurpose Passenger Vehicle |
| COLOR | White/Black |
| EXTENT OF EXAMINATION | Steering, Throttle, Brakes, Tires and Wheels |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

**VEHICLE #2:**

**TIRES AND WHEELS:**

This vehicle was equipped with two types of tires that were mounted on the factory equipped wheels. The vehicle was found to be equipped with two Goodyear Eagle Enforcer all weather passenger tires and two Firestone Firehawk all season performance passenger tires. All four tires were size 255/60 R18.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**TIRES AND WHEELS:**

The **Left Front** tire was a Goodyear Eagle Enforcer all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel. The outer edge of the steel wheel was indented in two places.

The DOT number on the tire was 1MGW4JJ1R2323. The tire was inflated to 42.1 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 8/32"
Center tread: 8/32"
Outer tread: 9/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL EXAMINATION**

**TIRES AND WHEELS:**

The **Right Front** tire was a Firestone Firehawk Pursuit all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel. The outer edge of the steel wheel was indented such that the seal between the wheel and tire was broken. The tire was deflated.

The DOT number on the tire was 1W2W4FKPT5023. The tire was inflated to 0 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 8/32"
Center tread: 8/32"
Outer tread: 8/32"

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

## TIRES AND WHEELS:

The **Left Rear** tire was a Firestone Firehawk Pursuit all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel.

The DOT number on the tire was 1W2W4FKPT4623. The tire was inflated to 43.1 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 7/32"
Center tread: 7/32"
Outer tread: 7/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL EXAMINATION

### TIRES AND WHEELS:

The **Right Rear** tire was a Goodyear Eagle Enforcer all weather performance passenger tire. The tire size was 255/60 R16. The tire had no abnormal signatures and appeared it had functioned as designed. The tire was mounted on an 18" diameter Ford Motor Company original steel wheel.

The DOT number on the tire was 1MGW4JJ1R1823. The tire was inflated to 42.4 PSI at the time of examination. The maximum PSI rating was 51 PSI.

The tread depths were as follows:

Inner tread: 7/32"
Center tread: 7/32"
Outer tread: 7/32"

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**STEERING SYSTEM:**

This vehicle was equipped with a pinion rack electric power steering system. Unless otherwise indicated, all components were intact, secure and properly mounted with no indication of impairment.

The adjustable tilt steering column was in the lowest position. The lever controlling position appeared broken and the steering column tilted up and down freely. The steering wheel mounted Supplemental Restraint System (SRS) air bag module was deployed. The steering column was still attached to its dashboard and bulkhead mounts. The steering shaft extended downward from within the adjustable steering column and extended through the bulkhead. Within the engine compartment, the steering shaft bent and disconnected from steering gear input shaft. The steering gear input shaft and steering assembly were displaced forward and left, along with the engine and transmission.

The steering assembly consisted of a rack; tie rod ends and steering knuckles. A threaded adjustable shaft and tie rod ends were attached to each end of the steering rack, and the other end of the tie rod ends were attached to the steering knuckle. The left tie rod was broken in the threads between the adjustable nut and the rack. The right tie rod was intact, the portion of the right steering knuckle where the tie rod was fastened, along with the lower control arms was fractured off. A portion of the steering knuckle remained mounted to the hub and right strut.

Ball and socket joints were used to join the articulating steering components between the steering gear and steering knuckles. The joints were secured by locking nuts. The ball and socket joints were equipped with rubber dust boots that remained complete and intact. When tested, there was no discernible lateral movement within the ball and socket joints.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**THROTTLE SYSTEM:**

The vehicle was equipped with an electronic fuel injected, 3.3-liter six cylinder gasoline engine with 285 horsepower. Unless otherwise indicated, all component parts were intact, securely and properly mounted, with no indication of impairment.

The engine throttle was operated by an electronic system commonly referred as a "Throttle-By-Wire" system. This system employs sensors and electronic components to gain input from the accelerator pedal and apply the positioning to the throttle plate. The accelerator pedal was mounted to the driver side bulkhead.

The air intake assembly, throttle body, and a portion of the intake plenum were broken off from the engine. I was unable to locate the throttle body or connected components loose within the engine compartment. There we no observed irregularities or nonfunctional components in the throttle system.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## MECHANICAL INSPECTION

### VEHICLE #2

### BRAKE SYSTEM:

The vehicle was equipped with a power-assisted, 4 wheel disc Anti-lock Brake System. Unless otherwise indicated, all component parts were intact, securely and properly mounted with no indication of impairment. All measurements within this section are approximate.

The brake pedal was suspended from the underside of the driver dashboard. The rubber brake pedal cover was properly positioned on the brake pedal.

The brake system used a power-brake booster to provide assistance during braking. The brake booster, master cylinder, and fluid reservoir sustained catastrophic damage as the result of the crash and were displaced from their factory mounted position.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry with no indication of fluid loss or contamination.

The brake pads were composed of a bonded semi-metallic friction material. The Federal Vehicle in Use Inspection Standard is 1/32 inch of friction material. All of the pads on the front axle far exceeded this standard. The friction surfaces on the brake pads were glazed and worn.

The brake pad measurements were as follows:

| | |
|---|---|
| Left Front Inner: | 10.0 mm |
| Left Front Outer: | 10.0 mm |
| Right Front Inner: | 10.3 mm |
| Right Front Outer | 10.0 mm |

The rotor measurements were as follows:

| | |
|---|---|
| Left Front Rotor: | 32.5 mm |
| Right Front Rotor: | 32.0 mm |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**FRONT AXLE:**

The swept areas (friction surface) on the ventilated brake rotors were normal. The wheels bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly. The brake hoses were dry and had no indication of fluid loss.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**REAR AXLE:**

The brake assemblies on this axle each consisted of a brake caliper, brake pads, a brake rotor and related hardware. The single piston calipers were attached to their individual brackets with two bolts. The caliper piston moved freely within their individual bores and their rubber piston dust boots were dry with no indication of fluid loss or contamination.

The brake pads were composed of a bonded semi-metallic friction material. The Federal Vehicle in Use Inspection Standard is 1/32 inch of friction material. All of the pads on the front axle far exceeded this standard. The friction surfaces on the brake pads were glazed and worn.

The brake pad measurements were as follows:

| | |
|---|---|
| Left Rear Inner: | 8.0 mm |
| Left Rear Outer: | 7.5 mm |
| Right Rear Inner: | 8.0 mm |
| Right Rear Outer | 7.0 mm |

The rotor measurements were as follows:

| | |
|---|---|
| Left Rear Rotor: | 24.9 mm |
| Right Rear Rotor: | 25.1 mm |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**MECHANICAL INSPECTION**

**VEHICLE #2**

**BRAKE SYSTEM:**

**REAR AXLE:**

The swept areas (friction surface) on the ventilated brake rotors were slightly irregular. Both rear rotors displayed a rotor edge lip. Measurements of rotor thickness were taken using a digital micrometer to exclude the edge lip. The wheels bearings on the left and right side hub assemblies rotated freely with no discernible lateral movement in either assembly. The brake hoses were dry and had no indication of fluid loss.

**EMERGENCY / PARKING BRAKE:**

The parking brake assembly on this vehicle consisted of an electronic switch in the driver compartment.

The vehicle was unpowered and the parking brake was not activated.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION:**

On February 8, 2024, I contacted the National Highway Traffic Safety Administration (NHTSA), Office of Defects Investigation, Recall and Service Bulletins Database, via their World Wide Web site on the internet. The purpose of the contact was to inquire if there were, or had been, any NHTSA defect investigation, recalls and/or technical service bulletins for the 2020 Ford Explorer. There were zero unrepaired recalls associated with the vehicle.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

## ANALYSIS AND OPINION

## MECHANICAL EXAMINATION

### VEHICLE #2

The mechanical examination of the tires and wheels did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the steering system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the throttle system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

The mechanical examination of the brake system did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision. The irregular and abraded friction surfaces on the brake pads and brake rotors were indicative of normal wear.

The mechanical examination of the parking brake did not reveal any preexisting mechanical deficiencies that could have affected the normal functional ability of the vehicle upon the highway and/or caused or contributed to the traffic collision.

**MECHANICAL EXAMINATION VEHICLE #2 END.**

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02-03-2024 | 2244 | 3600 | I1592 | 192400847 |

**AIRBAG CONTROL MODULES:**

During the inspection, I removed the Airbag Control Modules (ACMs) from the Nissan Sentra and Ford Explorer for off-site examination. While I continued the inspection, San Bernardino County Deputy District Attorney Rodney Tamparong transported the ACMs to the to the San Bernardino County District Attorney's Office at 303 West 3rd Street in San Bernardino, California, for imaging. Tamparong returned the ACMs to me at the inspection location. Tamparong provided me a USB drive containing the ACM image files. Refer to Tamparong's supplemental report for more information.

I provided the ACMs to Holland for booking into evidence.

**County of San Bernardino**

# Office of the District Attorney

JASON ANDERSON, District Attorney

## Bureau of Investigation

Eric Hopley, Chief Investigator

# San Bernardino County District Attorney's Office
# Report #3397

## Supplemental Report

## San Bernardino County Sheriff's Department
## Major Accident Investigation Team
## Case #192400847

SBDA Sr. Investigator Rodney Tamparong

*1-909-382-3686 (Office)*
*E-mail: rtamparong@sbcda.org*

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

## SUPPLEMENTAL REPORT

### Assignment

I am a Senior District Attorney Investigator (Police Officer) for the San Bernardino County District Attorney's Office - Bureau of Investigation. I am assigned to the Office of Traffic Safety - Impaired Driving; Vehicular Manslaughter Unit, working in a plain clothes assignment driving an unmarked police vehicle.

### Prop 115 Certification

I have been a Police Officer for over 23 years, and I am Proposition 115 qualified through a POST Mandated Course.

### Notification

On Tuesday, 2-6-2024, San Bernardino County Sheriff's Department (SBSD) Major Accident Investigation Team (MAIT) Investigator G. Wolff requested my assistance with a fatal traffic collision investigation.

Note: Involved parties' information on this case is noted in the originating agency report, SBSD - MAIT case #192400847. For further information refer to the original report.

### Investigation

On Wednesday, 2-7-2024, I assisted SBSD-MAIT Investigators D. Holland and Investigator G. Wolff with a fatal traffic collision investigation. I was asked to image the Airbag Control Modules (ACM) for two vehicles.

1. 2020 Ford Explorer, VIN 1FM5K8AB4LGC13863
2. 2022 Nissan Sentra, VIN 3N1AB8DV6NY230192

Investigator G. Wolff obtained a search warrant granting access to the vehicles ACM's. The search warrant was signed by the Honorable Judge Cheryl Kersey on, Monday, 2-5-2024, under warrant ID #000135481.

SBSD-MAIT had removed the vehicles ACMs prior to my involvement. I met MAIT Investigator G. Wolff at Armada Towing, located at 8623 Carob Street, Fontana, CA 92335. He then gave me both ACM's.

| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7881 | 2-8-2024 |

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| | |
|---|---|
| CASE NO. | 3397 |
| ASSOCIATED CASES | SBSD – MAIT 192400847 |
| CRIME | PC 191.5 (a) – Vehicle Manslaughter |
| SUSPECT / DEFENDANT | Giovanni Bonilla |

**2020 Ford Explorer**







**ACM 2020 Ford Explorer**






| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |

# NARRATIVE / SUPPLEMENTAL REPORT

BUREAU OF INVESTIGATION
County of San Bernardino, Office of the District Attorney
CA036023A

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

## 2022 Nissan Sentra





## ACM 2022 Nissan Sentra






| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |

| NARRATIVE / SUPPLEMENTAL REPORT<br>BUREAU OF INVESTIGATION<br>County of San Bernardino, Office of the District Attorney<br>CA036023A | CASE NO.<br>3397<br>ASSOCIATED CASES<br>SBSD – MAIT<br>192400847 |
|---|---|
| CRIME<br>PC 191.5 (a) – Vehicle Manslaughter | SUSPECT / DEFENDANT<br>Giovanni Bonilla |

**ACM Imaging**

I then drove to the San Bernardino County District Attorney's Office, located at 303 W. Third Street, San Bernardino.

Senior Investigator J. Rodriguez assisted me with the imaging process. I used the Bosch EDR tool along with the proper combination of cords and cables to successfully image both ACMs.

**Note: The additional notes section on the Bosch generated report did not have enough room for the disclaimer. The disclaimer should read:**

> *Disclaimer:*
>
> *I have accessed and retrieved data from CDR Tool accessible system(s) from or in the vehicle identified by the applied VIN in which potential Event Data Recorder (EDR) may be found. The retrieved data may be related to a crash or other physical event. The successful retrieval of the data and production of this report is an indication that the procedure(s) necessary to properly access and retrieve the data have been followed and the data was properly imaged/downloaded.*
>
> *I will have or will provide the appropriate party(s) a copy of the original, raw data file – the underlying CDR System file - for discovery and/or later re-printing as necessary. This file will be named using the vehicle's Vehicle Identification Number (VIN) and identified by the *.CDRx file extension. This file should only be opened and viewed with the latest version of the Bosch Crash Data Retrieval System Software; improper use of a "text viewer" may corrupt the CDRx file which would prevent it from being opened again in the CDR Tool software and generating a data translation report.*
>
> *The raw data as found in the CDRx file might be compared to a photographic negative and it is a direct image or copy of the data stored on/in the module(s) accessed using the CDR Tool. The CDRx file should be preserved in its native format, unedited, and should be shared in that format where it may be viewed at a later date using a licensed copy of the CDR Tool software or using the "free reader" version of the CDR Tool software in the latest production release of that software. Prior to any analytical use of this data or legal proceeding, the original *.CDRx file should be reopened and the raw data translated in the latest production version of the CDR software to ensure the most recent, complete translation of the data is used as described in the "Important Notice" above.*
>
> *I have indicated to the individual(s) receiving the CDRx file that the report includes a Data Limitations section which follows this disclaimer and that portion of this translation report may describe or suggest conditions or characteristics of the data which may be, on the surface, confusing or require a more complete analysis by other means. I have also informed the*

| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |

# NARRATIVE / SUPPLEMENTAL REPORT

**BUREAU OF INVESTIGATION**
**County of San Bernardino, Office of the District Attorney**
**CA036023A**

| CASE NO. | ASSOCIATED CASES |
|---|---|
| 3397 | SBSD – MAIT 192400847 |

| CRIME | SUSPECT / DEFENDANT |
|---|---|
| PC 191.5 (a) – Vehicle Manslaughter | Giovanni Bonilla |

*individual(s) that the data may be affected by conditions or vehicle characteristics described in the Data Limitations section of the report or in other related reference material including, but not limited to, the CDR Tool software Help File. For these reasons and others, a situationally complete analysis of the crash or event under study should be undertaken to fully evaluate the meaning, usefulness and applicability of the recovered data found in this report.*

I later returned the ACMs and provided the Bosch generated reports and files to MAIT Investigator G. Wolff concluding my investigation. For further refer SBSD-MAIT case # 192400847.

**Recommendations**

Forwarded report to MAIT Investigator D. Holland.

| REPORTED BY | EMPLOYEE NO | DATE | REVIEWED BY | EMPLOYEE NO | DATE |
|---|---|---|---|---|---|
| R. Tamparong | F8771 | 2-8-2024 | J. Vega | F7891 | 2-8-2024 |



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000120

Warrant
No.

Report #: 192400847

The Great Seal

SUPERIOR COURT OF CALIFORNIA
County of San Bernardino

**SEARCH WARRANT**
Probable Cause Warrant to Search
(Penal Code Section 1524)

**SEARCH WARRANT AND AFFIDAVIT**

**AFFIDAVIT**

I, Deputy Darrell Holland, swear under oath that the facts expressed by me in the attached and incorporated **Statement of Probable Cause** are true and that based therein I have probable cause to believe and do believe that the articles, property, and persons described below may be lawfully seized pursuant to Penal Code Section 1524, as indicated below, and is now located at the location(s) set forth below. Wherefore, I request that this Search Warrant be issued.

______________________________,
(Signature of Affiant)

**HOBBS SEALING REQUESTED:** ☐ YES ☒ NO
**NIGHT SEARCH REQUESTED:** ☐ YES ☒ NO

**SEARCH WARRANT**

**THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY SHERIFF, POLICEMAN OR PEACE OFFICER IN THE COUNTY OF SAN BERNARDINO:** proof by affidavit, under penalty of perjury, having been made before me by Deputy Darrell Holland that there is probable cause to believe that the property or person described herein may be found at the location(s) set forth herein and that it is lawfully sizeable pursuant to Penal Code Section 1524 et seq., as indicated below by "☒"(s), in that:

☐ it was stolen or embezzled;

☐ it was used as the means of committing a felony;

☐ it is possessed by a person with the intent to use it as means of committing a public offense or is possessed by another to whom he or she may have delivered it for the purpose of concealing it or preventing its discovery;

☒ it tends to show that a felony has been committed or that a particular person has committed a felony;

☐ it tends to show that sexual exploitation of a child, in violation of Penal Code Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Section 311.11, has occurred or is occurring;

☐ an arrest warrant has been issued for ____________N/A____________________________;

☐ a provider of electronic communication service or remote computing service has records of evidence, as specified in Penal Code Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in possession of any person with intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery;

**YOU ARE THEREFORE COMMANDED TO SEARCH:**

Clinical Laboratory Department – 1st level of Arrowhead Regional Medical Center Main Building.

**PREMISES TO BE SEARCHED:**

Arrowhead Regional Medical Center, Clinical Laboratory – 1st Level, 400 N. Pepper Avenue, Colton, CA 92324.

**FOR THE FOLLOWING PROPERTY:**

Any and all blood samples taken for toxicology screening for Giovanni Bonilla, DOB: 03/30/2007, taken at the time of admittance to Arrowhead Regional Medical Center on or after February 3, 2024, for treatment sustained during the traffic collision on February 3, 2024.

**AND TO SEIZE IT IF FOUND** and bring it before me, or this court, at the courthouse of this court. This Search Warrant and incorporated Affidavit was sworn to and subscribed before me this 9th day of Feb, 2024, at 1000 (a.m.)/p.m. Wherefore, I find probable cause for the issuance of this Search Warrant and do issue it.

______________________________, NIGHT SEARCH APPROVED: ☐ YES ☐ NO

*(Signature of Magistrate)*

**Judge of the San Bernardino Superior Court**

## STATEMENT OF PROBABLE CAUSE

### STATEMENT OF FACTS:

On February 3, 2024, at approximately 2355 hours, I was assigned to Region MAIT (Major Accident Investigation Team) with the San Bernardino County Sheriff's Department, and was dispatched to assist Fontant Police Department with an interagency investigation of a fatal traffic collision. I was dispatched to a two-vehicle head-on fatal traffic collision near the intersection of Valley Boulevard and Cypress Avenue in the City of Fontana, that involved a Fontana PD patrol vehicle (Vehicle #2, V-2) and a 2022 white Nissan Sentra (Vehicle #1, V-1).

V-1 traveled east on Valley Boulevard through the interseciton with Citrus Avenue, when a Fontana PD patrol vehicle attempted to conduct a traffic stop on the vehicle for violation of CVC 27315(e) - passenger not wearing a seatbelt. V-1 was observed with two passengers hanging out of the right and left rear passenger windows, making gestures and using cellular phones to record their activity. A traffic stop was initiated by the patrol vehicle (by activating a solid red light and siren), but V-1 failed to yield and fled at a high rate of speed. V-2 was a second assisting Fontana PD patrol vehicle, that was stationary facing westbound in the center turn lane of Valley Boulevard, approximately 3500 feet east of the attempted traffic stop near Valley Boulevard and Citrus Avenue. V-1 fled eastbound in the #1 lane on Valley Boulevard in excess of 90 mph in a 45 mph zone, in raining conditions on a wet roadway surface. V-1 entered the intersection with Cypress Avenue when the driver (Party #1, P-1, GIOVANNI BONILLA) lost control of V-1, causing V-1 to slide sideways in the wet conditions. The passenger side of V-1 collided with the front of V-2, causing P-1 to be ejected from V-1. Momentum from the collision caused V-1 to slide out of control and collide with a parked vehicle (Vehicle #3, V-3) along the north roadway curb of Valley Boulevard. As a result of the collision, the passengers in the right front, right rear, and left rear seats of V-1 died as a result of injuries sustained during the collision. P-1 was transported to Arrowhead Regional Medical Center for treament of serious injuries sustained in the collision.

A toxicology screen conducted at Arrowhead Regional Medical Center at the time P-1 was admitted, showed a presence of narcotics in his blood. It is believed P-1 operated a motor vehicle while under the influence of drugs at the time of the collision, which contributed to the cause of the collision.

**YOUR AFFIANT DECLARES UNDER PENALTY OF PERJURY**, under the laws of the State of California that this Affidavit is true and correct.

Darrell Holland, Deputy Sheriff

Date: 02/09/24

**WARRANT NOTES**

(No Notes)

---

County of San Bernardino.

The people of the State of California to any peace officer in the County of San Bernardino:

Proof, by affidavit, having been this day made before me by telephone by the officer whose signature is affixed to the affidavit, that there is probable cause for believing that evidence tending to show that a felony (or felonies) has or have been committed, you are therefore commanded to make search on the person and/or property set forth in the description page and/or affidavit, which is incorporated by reference herein; and, in the case of a thing or things or personal property, if you find the same or any part thereof, to bring the thing or things or personal property forthwith before me at the courthouse of this Court.

Given under my hand, and issued at 10:19 on this 9th day of February, 2024

Hobbs Sealing Approved: **NO** Night Service Approved: **NO**

Judge Shahla Sabet

**Warrant ID: 000135947**

**END OF WARRANT**



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000124

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**NOTIFICATION:**

On Tuesday, April 23, 2024, at about 1704 hours, I was assigned to the Hesperia Station as a Detective/Corporal for the Hesperia Station and a supervisor for the San Bernardino County Sheriff's Department Regional Major Accident Investigation Team (M.A.I.T.) Deputy D. Holland, asked me to conduct the Event Data Recorder (EDR) analysis for the 2022 Nissan Sentra (VIN 3N1AB8DV6NY230192) and the 2020 Ford Explorer (VIN 1FM5K8AB4LGC13863) involved in a collision on Saturday, February 3, 2024. The airbag control modules (ACM) from each of the vehicles were removed during the vehicle inspection. On Wednesday, February 7, 2024, the ACM's were imaged by San Bernardino County District Attorney Senior Investigator Rodney Tamparong pursuant to a search warrant.

**EVENT DATA RECORDER:**

An Event Data Recorder (EDR) is a function or device installed in a motor vehicle to record technical vehicle and occupant information for a very brief period before, during, and after a crash solely for the purpose of monitoring and assessing vehicle safety system performance. After a vehicle module's primary functions are complete, and where appropriate thresholds are met, data may be recorded as part of the "Event Data Recorder" (EDR) functionality or capability. An "EDR" is not a standalone device, and the data may not always be recorded.

Event Data Recorders (EDR) and air bag control modules (ACM) are being used synonymously. Each term may be used but refers to the same item. The event data recorder is located inside the vehicle's airbag control module. A common misconception is that they are two different modules or boxes. The EDR Summary data table tells us about the currently recorded events and tells us what else this module has seen over its lifetime.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

## EVENT DATA RECORDER:

EDRs may record:

- information, but only after some physical event like a crash
- vehicle dynamics information and system status for about 5 seconds before a crash
- certain driver inputs for about 5 seconds before a crash
- vehicle crash severity signature
- restraint use and deployment related information
- post-crash data such as the activation of an automatic collision notification (ACN) system

Crash Data Retrieval is a term used by those who use specialized equipment to "retrieve" the vehicle's EDR (event data recorder) data. This EDR data is also referred to as "crash data". CDR technicians and experts connect their EDR tool to an automobile allowing them to communicate with the vehicle and retrieve the EDR data file. Specialized software is then used to translate the EDR data file to a readable format for review and analysis.

CDR is also used in the name of the Bosch CDR Tool and the Bosch CDR Software. These specialized tools are made up of hardware and software which provides the ability to “image”, “download”, or “retrieve” EDR data that may be stored in the control modules. The software component is a single, standalone program designed to run in a Windows environment. The hardware part of the EDR Tool is a collection of components including interface modules (VCI), cables and adapters which, with proper training and minimal difficulty, are used to “retrieve” data from supported vehicles.

In the context of EDR Tool technology, the word “image” is used to describe the process of saving a digital copy of the EDR data / crash data which may be recorded in a supported vehicle to the person’s computer. Think of it being like a photographic image. When you take a picture of a vehicle, you are not physically changing or taking anything away from that vehicle, just getting an “image.” That vehicle is in the same condition as it was before the photograph. The EDR Tools simply retrieve an “image” of the crash data which may be in that vehicle and copies that data – as an “image” – to your computer in a secure digital file.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS:**

On Sunday, April 28, 2024, I analyzed the data obtained from the ACM of Vehicle #1.

While reading the comments section from the CDR report, I read the recommended tire size for Vehicle #1 was 215/45/R18. Vehicle #1 was front wheel drive The size mounted on the front of Vehicle #1 at the time of the collision was 205/60/R16. With the tire size smaller than the recommended size, the EDR would overestimate the wheel speed from the actual wheel speed unless the speedometer for Vehicle #1 was calibrated for the new size. If the speedometer was not calibrated for the new size, the speed offset would be 95.55% of the stated wheel speed.

The ACM of Vehicle #1 can record up to two events within its memory. An event is vehicle activity sensed by the ACM and recorded on the module. Event data includes both pre-crash and crash data. There are generally two types of events recorded, deployment and non-deployment events are most common. A deployment event refers to the deployment of the vehicles SRS airbags and a non-deployment event refers to an event that the module detects, however, the module does not deploy the SRS system(s). A non-deployment event is recorded if the change in longitudinal or lateral velocity equals or exceeds 8km/h over a 150ms timeframe or another type of non-reversible deployable restraint device other than a front, side, or side curtain airbag (e.g. seatbelt pretensioner) is commanded to deploy. Except as indicated below, non-deployment events are not locked into memory and can be over-written by subsequent non-deployment or deployment events. A deployment event is recorded if front airbag(s), side airbag(s), or side curtain airbag(s) are commanded to deploy. Deployment events are locked into memory and cannot be over-written.

The ACM for Vehicle #1 records two samples of pre-crash data per second for five seconds before Algorithm Enabled (AE). AE can also be described as time zero on the CDR printout. The main data elements are vehicle wheel speed, steering input, accelerator pedal, service brake activation, and engine RPM's. Other pre-crash data recorded one second before AE includes safety belt status, seat track position switch, airbag warning lamp status, occupant size classification and frontal airbag disable indicator.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

Vehicle #1 had two events recorded on the ACM. From the table below, the ACM records the vehicle's ignition cycle at the time of the event. Using the vehicle's ignition cycles at the time of event, you can see event record 2 is the only recorded event involving this collision. The ignition cycle at the time the module was imaged indicated 5,296. The ignition cycle at the time of the event record 1 indicated 4,033. Event record 2 indicated the event recorded at ignition cycle 5,295. Event record 1 was a non-deployment event and event record 2 was a deployment event. There was no maximum value for ignition cycles at the time of the crash listed in the data limitation.

| SYSTEM STATUS AT EVENT (EVENT RECORD 1) | |
|---|---|
| Ignition Cycle, Download | 5,296 |
| Ignition Cycle, Crash | 4,033 |
| | |
| **SYSTEM STATUS AT EVENT (EVENT RECORD 2)** | |
| Ignition Cycle, Download | 5,296 |
| Ignition Cycle, Crash | 5,295 |

The event data recorded showed the driver was not wearing his seat belt by indicating the safety belt status as OFF or "unfastened." The event data did not indicate the safety belt status of the front right passenger. The data indicated the right front passenger was not a "child" and the frontal air bag suppression switch was "off" indicating the airbag was set to deploy. At the time of the crash, the frontal airbag, side airbag and side curtain were all deployed for the driver and right front passenger.

Based on the information obtained during the investigation, Party #1 was driving Vehicle #1 eastbound on Valley Boulevard at a high rate of speed failing to stop for Fontana Police Department emergency personnel. Party #1 turned Vehicle #1 to the left which caused Vehicle #1 to cross over a divided highway sideways and into the front of Vehicle #2 (on-duty emergency vehicle). The impact with Vehicle #2 subsequently killed three occupants inside of Vehicle #1.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

The posted speed limit in this area of Valley Boulevard is 45 miles per hour. This area of Valley Boulevard had multiple lanes in each direction. The prima facie for Valley Boulevard was 65 miles per hour. The EDR captured Vehicle #1's data five seconds prior to the collision.

| PRE-CRASH DATA -5 TO 0 SEC (EVENT RECORD 2) | | | | | |
|---|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) | Accelerator Pedal, % Full (%) | Engine RPM (rpm) | Service Brake, On/Off | Steering Input (deg) |
| -5 | 105 | 79 | 5,200 | OFF (Brake not activated) | 250.0 (clp) |
| -4.5 | 105.6 | 77 | 5,200 | OFF (Brake not activated) | 250.0 (clp) |
| -4 | 106.3 | 75 | 5,300 | OFF (Brake not activated) | 250.0 (clp) |
| -3.5 | 106.3 | 70 | 5,300 | OFF (Brake not activated) | 250.0 (clp) |
| -3 | 106.3 | 84 | 4,800 | OFF (Brake not activated) | 250.0 (clp) |
| -2.5 | 106.9 | 82 | 5,100 | OFF (Brake not activated) | 250.0 (clp) |
| -2 | 107.5 | 70 | 5,100 | OFF (Brake not activated) | 250.0 (clp) |
| -1.5 | 108.7 | 0 | 5,100 | ON (Brake activated) | 250.0 (clp) |
| -1 | 96.3 | 0 | 3,700 | ON (Brake activated) | 250.0 (clp) |
| -0.5 | 83.3 | 0 | 2,600 | ON (Brake activated) | 242.5 |
| 0 | 83.3 | 0 | 2,500 | ON (Brake activated) | 245 |

From the data collected on the EDR, Vehicle #1 had a wheel speed of 83.3 to 108.7 miles per hour within the five seconds prior to the collision. Based on an EDR accuracy of +/- 4% and a speed offset of 95.55%, Vehicle #1 showed a wheel speed range of 99.7 to 113.0 miles per hour 1.5 seconds prior to the collision braking. From the data obtained, I believe it was at this point Vehicle #1 rotated counter clockwise and began to slide sideways which caused the rapid deceleration of wheel speed. The steering input showed 250 degrees which is the maximum steering input in degrees for the data limitations. The steering input possibly exceeded the 250 degrees during these time intervals.

Since this part of the roadway was undivided and one lane of travel in each direction (prima facie of 65 miles per hour), Party #1 was in violation of CVC Section 22349(a): Exceeding 65 miles per hour. See the table below for speed data.

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

| PRE-CRASH DATA -5 TO 0 SEC (EVENT RECORD 2) | | | | | |
|---|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) | Speed, Vehicle Indicated (mph) 4% Over EDR | Speed, Vehicle Indicated (mph) 4% Under EDR | Speed, Vehicle Indicated (mph) 95.55% Speed Offset Over EDR | Speed, Vehicle Indicated (mph) 95.55% Speed Offset Under EDR |
| -5 | 105 | 109.2 | 101 | 104.3 | 96.3 |
| -4.5 | 105.6 | 109.8 | 101 | 104.9 | 96.9 |
| -4 | 106.3 | 110.6 | 102 | 105.6 | 97.5 |
| -3.5 | 106.3 | 110.6 | 102 | 105.6 | 97.5 |
| -3 | 106.3 | 110.6 | 102 | 105.6 | 97.5 |
| -2.5 | 106.9 | 111.2 | 103 | 106.2 | 98.1 |
| -2 | 107.5 | 111.8 | 103 | 106.8 | 98.6 |
| -1.5 | 108.7 | 113.0 | 104 | 108.0 | 99.7 |
| -1 | 96.3 | 100.2 | 92 | 95.7 | 88.3 |
| -0.5 | 83.3 | 86.6 | 80 | 82.8 | 76.4 |
| 0 | 83.3 | 86.6 | 80 | 82.8 | 76.4 |

I calculated the distance Vehicle #1 traveled during the five seconds prior to AE. I used the minimum speed and the maximum speed from the table above. The distance Vehicle #1 traveled in the five seconds prior to AE was approximately 750 to 851 feet.

| PRE-CRASH DATA -5 TO 0 SEC (EVENT RECORD 2) | | | | |
|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) Minum | Distance Traveled Minimum (feet) | Speed, Vehicle Indicated (mph) Maximum | Distance Traveled Maximum (feet) |
| -5 | 96.3 | 70.6 | 109.2 | 80.1 |
| -4.5 | 96.9 | 71.1 | 109.8 | 80.5 |
| -4 | 97.5 | 71.5 | 110.6 | 81.1 |
| -3.5 | 97.5 | 71.5 | 110.6 | 81.1 |
| -3 | 97.5 | 71.5 | 110.6 | 81.1 |
| -2.5 | 98.1 | 72.0 | 111.2 | 81.6 |
| -2 | 98.6 | 72.3 | 111.8 | 82.0 |
| -1.5 | 99.7 | 73.1 | 113.0 | 82.9 |
| -1 | 88.3 | 64.8 | 100.2 | 73.5 |
| -0.5 | 76.4 | 56.0 | 86.6 | 63.5 |
| 0 | 76.4 | 56.0 | 86.6 | 63.5 |
| Total | | 750.5 | | 851.0 |

**EDR ANALYSIS (CONTINUED):**

The total resultant speed change ($\Delta V_r$) experienced is a factor of the Maximum Delta-V in the Longitudinal direction ($\Delta V_x$) and the Maximum Delta-V in the Lateral direction ($\Delta V_y$). The formula to determine the total speed change of a vehicle is: $\Delta V_r$=Sqrt $\Delta V_x^2 + \Delta V_y^2$

The crash pulse for the longitudinal Delta-V and Acceleration of Vehicle #1 peaked at about 110 msec after the collision at -36.0 miles per hour. The crash pulse for the lateral Delta-V and Acceleration peaked at about 110 msec after the collision at -44.1 miles per hour.

| (EVENT RECORD 2) | | |
|---|---|---|
| Time (msec) | Delta-V, Lateral (mph) | Delta-V, Longitudinal (mph) |
| 0 | 0 | 0 |
| 10 | -3.1 | -1.9 |
| 20 | -9.3 | -5 |
| 30 | -28 | -9.3 |
| 40 | -34.8 | -9.3 |
| 50 | -36 | -18 |
| 60 | -36.7 | -23 |
| 70 | -41 | -28.6 |
| 80 | -41.6 | -32.9 |
| 90 | -42.3 | -35.4 |
| 100 | -43.5 | -35.4 |
| 110 | -44.1 | -36 |

I calculated the combined Delta-V experienced by Party #1 and the occupants to be approximately 56.85 miles per hour (+/- 10%). The Delta-V experienced is consistent with fatal injuries. A copy of the PDF is attached to this report.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000141

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
| --- | --- | --- | --- | --- |
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

On Monday, April 29, 2024, I analyzed the data obtained from the ACM of Vehicle #2.

While reading the comments section from the CDR report, I read the recommended tire size for Vehicle #2 was 255/60/R18. Vehicle #2 was equipped with four tires of the recommended size. There would be no speed offset for Vehicle #2 in this case. The indicated wheel speed on the EDR would be correct besides for the margin of error.

The ACM of Vehicle #2 can record up to two events within its memory. An event is vehicle activity sensed by the ACM and recorded on the module. Event data includes both pre-crash and crash data. There are generally two types of events recorded, deployment and non-deployment events are most common. A deployment event refers to the deployment of the vehicles SRS airbags and a non-deployment event refers to an event that the module detects, however, the module does not deploy the SRS system(s). A non-deployment event is recorded if the change in longitudinal or lateral velocity equals or exceeds 8km/h over a 150ms timeframe or another type of non-reversible deployable restraint device other than a front, side, or side curtain airbag (e.g. seatbelt pretensioner) is commanded to deploy. Except as indicated below, non-deployment events are not locked into memory and can be over-written by subsequent non-deployment or deployment events. A deployment event is recorded if front airbag(s), side airbag(s), or side curtain airbag(s) are commanded to deploy. Deployment events are locked into memory and cannot be over-written.

The ACM for Vehicle #2 records five samples of pre-crash data per second for five seconds before Algorithm Enabled (AE). AE can also be described as time zero on the CDR printout. The main data elements are vehicle wheel speed, accelerator pedal, service brake activation, and engine RPM's. Other pre-crash data recorded one second before AE includes safety belt status, seat track position switch, airbag warning lamp status, occupant size classification and frontal airbag disable indicator.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000142

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

Vehicle #2 had one event recorded on the ACM. From the table below, the ACM records the vehicle's ignition cycle at the time of the event. Using the vehicle's ignition cycles at the time of event, you can see event record 1 is the only recorded event involving this collision. The ignition cycle at the time the module was imaged indicated 3,118. The ignition cycle at the time of the event record 1 indicated 3,117. There was no maximum value for ignition cycles at the time of the crash listed in the data limitation.

| SYSTEM STATUS AT TIME OF RETRIEVAL | |
|---|---|
| VIN As Programmed into RCM at Factory | 1FM5K8AB4LGC13863 |
| Current VIN (From PCM) | 1FM5K8AB4LGC13863 |
| Ignition Cycle, Download (First Record) | 3,118 |
| Ignition cycle, Crash | 3,117 |

The event data recorded showed the driver was not wearing his seat belt by indicating the safety belt status as "unbelted." The event data indicated the safety belt status of the front right passenger was also "unbelted." The event data indicated the safety belt status of the second row driver, middle and passenger side was "unbelted." At the time of the crash, the frontal airbag, side airbag, side curtain and inflatable knee bolster were all deployed for the driver and right front passenger.

Based on the information obtained during the investigation, Party #2 was driving Vehicle #2 was assigned to uniformed patrol with the Fontana Police Station. Vehicle #2 was a marked Fontana Police vehicle equipped with emergency lights and sirens. Party #2 was in a stationary position in a parking lot on the southeast corner of Valley Boulevard and Cypress Avenue. While in the stationary position, there was a broadcast of a pursuit heading towards their location. Party #2 drove Vehicle #2 north through the parking lot to exit onto Valley Boulevard. Party #2 exited the parking lot and turned to head west on Valley Boulevard. After Party #2 completed his left turn, the front of Vehicle #2 was struck by the passenger side of Vehicle #1.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

## EDR ANALYSIS (CONTINUED):

The EDR captured Vehicle #1's data five seconds prior to the collision.

| PRE-CRASH DATA -5 TO 0 SEC [5 SAMPLES/SEC] (FIRST RECORD) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Time (sec) | Stability Control Yaw Rate (deg/sec) | Steering Wheel Angle (deg) | Speed, Vehicle Indicated (mph) | Accelerator Pedal, % Full | Accelerator Pedal, % Full, Quality Factor | Service Brake, On/Off | Engine RPM |
| -5 | 0.51 | 2 | 15.9 | 0 | OK | ON(Driver_Braking) | 1,420 |
| -4.8 | 0.66 | 3 | 14.2 | 0 | OK | ON(Driver_Braking) | 1,260 |
| -4.6 | 0.42 | 5 | 12.3 | 0 | OK | ON(Driver_Braking) | 1,080 |
| -4.4 | 0.42 | 7 | 9.8 | 0 | OK | ON(Driver_Braking) | 880 |
| -4.2 | 0.39 | 7 | 7.6 | 0 | OK | ON(Driver_Braking) | 666 |
| -4 | 0.42 | 13 | 6.1 | 0 | OK | ON(Driver_Braking) | 686 |
| -3.8 | 0.63 | 25 | 5.3 | 0 | OK | OFF(Driver_Not_Braking) | 812 |
| -3.6 | 2.15 | 51 | 5.2 | 100 | OK | OFF(Driver_Not_Braking) | 1,144 |
| -3.4 | 3.85 | 88 | 5.4 | 100 | OK | OFF(Driver_Not_Braking) | 1,470 |
| -3.2 | 8.32 | 132.9 | 6.1 | 100 | OK | OFF(Driver_Not_Braking) | 1,892 |
| -3 | 12.34 | 168 | 7.5 | 99 | OK | OFF(Driver_Not_Braking) | 2,114 |
| -2.8 | 17.76 | 192.9 | 9.1 | 100 | OK | OFF(Driver_Not_Braking) | 2,298 |
| -2.6 | 17.74 | 200 | 10.8 | 100 | OK | OFF(Driver_Not_Braking) | 2,484 |
| -2.4 | 24.27 | 197 | 12.2 | 100 | OK | OFF(Driver_Not_Braking) | 2,844 |
| -2.2 | 20.71 | 184.9 | 13.9 | 100 | OK | OFF(Driver_Not_Braking) | 3,124 |
| -2 | 25.56 | 177.9 | 15.2 | 100 | OK | OFF(Driver_Not_Braking) | 3,362 |
| -1.8 | 25.35 | 174 | 16.5 | 100 | OK | OFF(Driver_Not_Braking) | 3,546 |
| -1.6 | 24.46 | 143 | 17.8 | 100 | OK | OFF(Driver_Not_Braking) | 3,958 |
| -1.4 | 9.2 | 20 | 19 | 100 | OK | OFF(Driver_Not_Braking) | 4,110 |
| -1.2 | -1.38 | -1 | 20.4 | 100 | OK | OFF(Driver_Not_Braking) | 4,396 |
| -1 | 4.23 | 34 | 21.7 | 43 | OK | OFF(Driver_Not_Braking) | 4,668 |
| -0.8 | 5.88 | 22 | 23.1 | 0 | OK | OFF(Driver_Not_Braking) | 4,752 |
| -0.6 | 0.7 | -10 | 23.8 | 0 | OK | OFF(Driver_Not_Braking) | 4,784 |
| -0.4 | 2.55 | 33 | 23.9 | 0 | OK | ON(Driver_Braking) | 4,788 |
| -0.2 | 7.93 | 53.9 | 21.9 | 0 | OK | ON(Driver_Braking) | 4,138 |
| 0 | 8.2 | 64 | 19.4 | 0 | OK | ON(Driver_Braking) | 3,588 |

STATE OF CALIFORNIA
**MAJOR ACCIDENT INVESTIGATION TEAM NARRATIVE/SUPPLEMENTAL**
CHP 558D (Rev 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

## EDR ANALYSIS (CONTINUED):

I calculated Vehicle #2's wheel speed with the +/- 4% taken into consideration. With the speed calculated, I calculated the distance traveled within the five seconds before AE.

| PRE-CRASH DATA -5 TO 0 SEC [5 SAMPLES/SEC] (FIRST RECORD) | | | | | |
|---|---|---|---|---|---|
| Time (sec) | Speed, Vehicle Indicated (mph) | Speed, Vehicle Indicated -4% (mph) | Speed, Vehicle Indicated +4% (mph) | Distance Traveled -4% (feet) | Distance Traveled +4% (feet) |
| -5 | 15.9 | 15.3 | 16.5 | 4.5 | 4.9 |
| -4.8 | 14.2 | 13.6 | 14.8 | 4.0 | 4.3 |
| -4.6 | 12.3 | 11.8 | 12.8 | 3.5 | 3.8 |
| -4.4 | 9.8 | 9.4 | 10.2 | 2.8 | 3.0 |
| -4.2 | 7.6 | 7.3 | 7.9 | 2.1 | 2.3 |
| -4 | 6.1 | 5.9 | 6.3 | 1.7 | 1.9 |
| -3.8 | 5.3 | 5.1 | 5.5 | 1.5 | 1.6 |
| -3.6 | 5.2 | 5.0 | 5.4 | 1.5 | 1.6 |
| -3.4 | 5.4 | 5.2 | 5.6 | 1.5 | 1.6 |
| -3.2 | 6.1 | 5.9 | 6.3 | 1.7 | 1.9 |
| -3 | 7.5 | 7.2 | 7.8 | 2.1 | 2.3 |
| -2.8 | 9.1 | 8.7 | 9.5 | 2.6 | 2.8 |
| -2.6 | 10.8 | 10.4 | 11.2 | 3.0 | 3.3 |
| -2.4 | 12.2 | 11.7 | 12.7 | 3.4 | 3.7 |
| -2.2 | 13.9 | 13.3 | 14.5 | 3.9 | 4.2 |
| -2 | 15.2 | 14.6 | 15.8 | 4.3 | 4.6 |
| -1.8 | 16.5 | 15.8 | 17.2 | 4.6 | 5.0 |
| -1.6 | 17.8 | 17.1 | 18.5 | 5.0 | 5.4 |
| -1.4 | 19 | 18.2 | 19.8 | 5.4 | 5.8 |
| -1.2 | 20.4 | 19.6 | 21.2 | 5.7 | 6.2 |
| -1 | 21.7 | 20.8 | 22.6 | 6.1 | 6.6 |
| -0.8 | 23.1 | 22.2 | 24.0 | 6.5 | 7.0 |
| -0.6 | 23.8 | 22.8 | 24.8 | 6.7 | 7.3 |
| -0.4 | 23.9 | 22.9 | 24.9 | 6.7 | 7.3 |
| -0.2 | 21.9 | 21.0 | 22.8 | 6.2 | 6.7 |
| 0 | 19.4 | 18.6 | 20.2 | 5.5 | 5.9 |
| Total | | | | 102.6 | 111.1 |


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000145

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

From the table, Vehicle #2 had a wheel speed between 22.9 and 24.9 miles per hour. Party #2 was in a stationary position prior to exiting onto Valley Boulevard. From the data collected, it appears that at about four seconds prior to AE, Party #2 released the brake pedal and accelerated to make his turn onto Valley Boulevard. Party #2 completed his turn to westbound Valley Boulevard approximately 2.8 seconds later. Within that time period, Vehicle #2 traveled a distance of approximately 48-52 feet. This put Vehicle #2 entering the divided highway portion of Valley Boulevard. Based on the speed calculations listed above, Vehicle #1 was approximately 537-609 feet away when Vehicle #2 entered onto Valley Boulevard.


~~CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000146~~

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 02/03/2024 | 2244 | 3600 | D4301 | 192400847 |

**EDR ANALYSIS (CONTINUED):**

The total resultant speed change ($\Delta V_r$) experienced is a factor of the Maximum Delta-V in the Longitudinal direction ($\Delta V_x$) and the Maximum Delta-V in the Lateral direction ($\Delta V_y$). The formula to determine the total speed change of a vehicle is: $\Delta V_r = \text{Sqrt } \Delta V_x^2 + \Delta V_y^2$

The crash pulse for the longitudinal Delta-V and Acceleration of Vehicle #1 peaked at about 120 msec after the collision at -32.03 miles per hour. The crash pulse for the lateral Delta-V and Acceleration peaked at about 80 msec after the collision at 27.38 miles per hour.

| CRASH PULSE (FIRST RECORD) | | |
|---|---|---|
| Time (msec) | Delta-V, longitudinal (MPH) | Delta-V, Lateral (MPH) |
| 0 | -1.8 | -0.04 |
| 10 | -4.7 | 1.43 |
| 20 | -7.31 | 2.83 |
| 30 | -10.9 | 5.68 |
| 40 | -15.73 | 10.95 |
| 50 | -19.63 | 15.43 |
| 60 | -24.36 | 23.8 |
| 70 | -26.33 | 26.63 |
| 80 | -28.09 | 27.38 |
| 90 | -29.63 | 27.21 |
| 100 | -30.77 | 26.62 |
| 110 | -31.17 | 25.68 |
| 120 | -32.03 | 25.72 |

I calculated the combined Delta-V experienced by Party #2 and the occupants to be approximately 42.13 miles per hour (+/- 10%). The Delta-V experienced is consistent with serious to life threatening injuries. A copy of the PDF is attached to this report.


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000147

IMPORTANT NOTICE: Robert Bosch LLC and the manufacturers whose vehicles are accessible using the CDR System urge end users to use the latest production release of the Crash Data Retrieval system software when viewing, printing or exporting any retrieved data from within the CDR program. Using the latest version of the CDR software is the best way to ensure that retrieved data has been translated using the most current information provided by the manufacturers of the vehicles supported by this product.

## CDR File Information

| | |
|---|---|
| User Entered VIN | 3N1AB8DV6NY230192 |
| User | Sr. Inv. Rodney Tamparong |
| Case Number | 192400847 |
| EDR Data Imaging Date | 02/07/2024 |
| Crash Date | 02/03/2024 |
| Filename | 3N1AB8DV6NY230192_ACM.CDRX |
| Saved on | Wednesday, February 7 2024 at 16:47:51 |
| Imaged with CDR version | Crash Data Retrieval Tool 23.2 |
| Imaged with Software Licensed to (Company Name) | San Bernardino County District Attorney |
| Reported with CDR version | Crash Data Retrieval Tool 23.2 |
| Reported with Software Licensed to (Company Name) | San Bernardino County District Attorney |
| EDR Device Type | Airbag Control Module |
| Event(s) recovered | Event Record 1,<br>Event Record 2 |

## Comments

VIN: 3N1AB8DV6NY230192, 2022 Nissan Sentra
Inspection location: 303 W. Third Street, SAN BERNARDINO, CA 92415
Individuals present:
Senior Investigator, Rodney Tamparong, San Bernardino County District Attorney's Office. Senior Investigator, Jorge Rodriguez, San Bernardino County District Attorney's Office.
Module was removed by SBSD - MAIT from the vehicle prior to imaging.
Restraint deployment(s): Airbags deployed.
Seatbelts: Unknown.
Imaging conducted pursuant to search warrant (warrant details) (Y/N)? Yes.
Imaging conducted pursuant to owner consent (Y/N)? N/A.
Imaging conducted pursuant to civil discovery (Y/N)? N/A.
Ignition key or fob available and its position at the start of the inspection: No.
Odometer reading/units: Unknown.
Recommended tire size (sticker):
215/45R18 Tire size(s) (actual):
L/F - 205/60R16 - Inflated
L/R - 215/45/R18 - Inflated
R/F - 205-60R16 - Deflated
R/R - 215/45/R18 - Inflated
Other notes: Imaging completed by direct to module benchtop.
Disclaimer: I have accessed and retrieved data from CDR Tool accessible system(s) from or in the vehicle identified by the applied VIN in which potential Event Data Recorder (EDR) may be found. The retrieved data may be related to a crash or other physical event. The successful retrieval of the data and production of this report is an indication that the procedure(s) necessary to properly access and retrieve the data have been followed and the data was properly imaged/downloaded. I will have or will provide the appropriate party(s) a copy of the original, raw data file - the underlying CDR System file - for discovery and/or later re-printing as necessary. This file will be named using the vehicle's Vehicle Identification Number (VIN) and identified by the *.CDRx file extension. This file should only be opened and viewed with the latest version of the Bosch Crash Data Retrieval System Software; improper use of a "text viewer" may corrupt the CDRx file which would prevent it from being opened again in the CDR Tool software and generating a data translation report.The raw data as found in the CDRx file might be compared to a photographic negative and it is a direct image or copy of the data stored on/in the module(s) accessed using the CDR Tool. The CDRx file should be preserved in its native format, unedited, and should be shared in that format where it may be viewed at a later date using a licensed copy of the CDR Tool software or using the "free reader" version of the CDR Tool software in the latest production release of that software. Prior to any analytical use of this data or legal proceeding, the original *.CDRx file should be reopened and the raw data translated in the latest production version of the CDR software to ensure the most recent, complete translation of the data is used as described in the "Important Notice" above. I have indicated to the individual(s) receiving the CDRx file that the report includes a Data Limitations section which follows this disclaimer and that portion of this translation report may describe or suggest conditions or characteristics of the data which ma

## Data Limitations

**General Information:**
Data limitations are intended to assist in reading event data that has been imaged from the vehicle's Air bag Control Unit (ACU). Event data should be considered in conjunction with other available physical evidence from the vehicle and scene.

**Airbag Control Unit (ACU)**
- The Air bag Control Unit (ACU) can store two types of events: Non-Deployment Events and Deployment.



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000148

- A Non-Deployment Event is a crash or other physical occurrence which causes the ACU algorithm to be activated, but in which deployment thresholds are not reached.
- A Deployment Event is a crash or other physical occurrence which causes ACU deployment thresholds to be reached or exceeded. Depending on the vehicle model, one or more of the following may be activated during a Deployment Event: front air bags, seat-mounted side airbags, roof-mounted or door-mounted curtain air bags, pretensioners, or pop-up roll bars.

- The ACU can record up to two events. If additional events occur subsequently, the older of the two events already recorded (i.e. the one which occurred first) is overwritten.
  - A Non-Deployment Event can be overwritten by another Non-Deployment event, or by a Deployment Event.
  - A Deployment Event has higher priority than a Non-Deployment Event, and cannot be interrupted or overwritten by another event.
  - The data pertaining to a Deployment Event is locked after being recorded. However, a second event can still be recorded subsequently in the portion of the event memory which is not locked.

- Event data includes both pre-crash data and crash data.
  - If the power supply to the ACU is lost during an event, all or part of the event data may not be recorded.
  - In addition to the recording of event data, the ACU has the ability to perform diagnostics and record Diagnostic Trouble Codes (DTCs).

**Data Element Sign Convention:**
The following table provides an explanation of the sign convention for data elements in the CDR report.

| Data Element Name | Positive Sign Notation Indicates |
|---|---|
| Longitudinal Acceleration | Forward |
| Delta-V, Longitudinal | Forward |
| Maximum Delta-V, Longitudinal | Forward |
| Lateral Acceleration | Left to Right |
| Delta-V, Lateral | Left to Right |
| Maximum Delta-V, Lateral | Left to Right |
| Vehicle Roll Angle | Left to Right Rotation |
| Steering Input | Left Turn |

- "Life Time Counter (sec)" indicates the elapsed time, in seconds, from the vehicle's first ignition activation until the start of the first recorded event. The counter is incremented whenever the vehicle's ignition is on. The counter is reset to 0 if the ACU is replaced.
- "Complete File Recorded" indicates whether a complete EDR data set has been stored after the event. "Yes" indicates that a complete data set has been recorded. "No" indicates that only a portion of the data set has been recorded, for example due to the power to the ACU being lost during the event.
- "Multi-Event, Number of Events (1, 2)" indicates the number of events which are stored during a given ignition cycle. A Multi-Event occurs whenever the time between Event 2 trigger threshold and Event 1 trigger threshold is less than or equal to 5 seconds during the same ignition cycle, and "2" will be recorded in this case. Otherwise, "1" will be recorded.
- "Air Bag Warning Lamp (On, Off)" indicates whether the ACU was in trouble mode or in normal operation mode at the time of the event. "On" indicates that the air bag warning lamp was illuminated at the time of the event, and the ACU was in trouble mode. "Off" indicates that the air bag warning lamp was not illuminated at the time of the event, and the ACU was in normal operation mode.
- "Frontal Air Bag Suppression Switch Status" indicates whether front passenger air bag deployment was suppressed at the time of the event. "On" indicates that the front passenger air bag was suppressed at the time of the event (deployment inhibited). "Off" indicates that the front passenger air bag was not suppressed at the time of the event (deployment enabled). This data will not be available for all vehicles.
- "Delta-V, Longitudinal" indicates the cumulative change in velocity along the longitudinal direction.
- "Acceleration, Longitudinal" indicates the rate of change of velocity with time along the longitudinal direction.
- "Delta-V, Lateral" indicates the cumulative change in velocity along the lateral direction.
- "Acceleration, Lateral" indicates the rate of change of velocity with time along the lateral direction.
- "Engine Throttle, % full" indicates the position of the accelerator pedal as a percentage of the fully depressed position.
- "Service Brake (On, Off)" indicates whether the service brake is activated ("On") or not activated ("Off").
- "Steering Input (deg)" indicates the angular displacement of the steering wheel measured in degrees. -250 deg indicates a 250 degree turn to the right of the steering wheel, 0 deg indicates the straight-ahead steering wheel position, and 250 deg indicates a 250 degree turn to the left of the steering wheel.
- The notation "CLP" indicates that the measurement captured by a sensor exceeded the design range of the sensor.
- "Seat Track Position Switch, Foremost, Status, Driver (Yes/No)" indicates whether the driver's seat is positioned within a designated threshold value of the most forward adjustment position. "Yes" indicates that the driver's seat is positioned within a designated threshold value of the most forward adjustment position. For all other adjustment positions, "No" is displayed. This data will not be available if the seat track position switch is not installed in the vehicle.
- "Occupant Size Classification, Right Front Passenger, Child (Yes/No)" indicates whether or not the right front passenger is classified as a child (as defined in 49 CFR part 572, subpart N or smaller). This data will not be available for all vehicles.
- "e-pedal ON/OFF Status" indicates whether "e-pedal" is activated (ON), or not activated (OFF). This data will not be available for all vehicles.
- "ABS Warning lamp, on/off" indicates whether "Anti-lock Brake System" was in trouble mode or in normal operation mode at the time of the event. This data will not be available for all vehicles.
- "AEB/FCW switch status ON/OFF (from ADAS)" indicates whether the switch of "Automatic Emergency Braking or Forward Collision Warning controlled by ADAS unit" was ON, or OFF at the time of the event. This data will not be available for all vehicles.
- "AEB Warning lamp (from ADAS)" indicates whether "Automatic Emergency Braking controlled by ADAS unit" was in trouble mode or in normal operation mode at the time of the event. This data will not be available for all vehicles.
- "ABS regulation status" indicates whether "Anti-lock Brake System" was activated (ABS in regulation), or not activated (no ABS regulation). This data will not be available for all vehicles.
- "VDC switch status ON/OFF" indicates whether the switch of "Vehicle Dynamic Control" in ON, or OFF. This data will not be available for all vehicles.
- "VDC status/warning" indicates whether "Vehicle Dynamic Control" was in normal operation mode and not activated (No failure and no control), in trouble mode and not activated (Failure), or in normal mode and activated (In active control). This data will not be available for all vehicles.



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000149

- "Adaptive Cruise Control status" indicates whether "Intelligent Cruise Control status" was activated (ACC activated), waiting (ACC waiting), suspended (ACC suspended), or not activated (No display request). This data will not be available for all vehicles.
- "AEB operating capability" indicates whether "Automatic Emergency Braking" was in trouble mode (Impossible to execute request) or in normal operation mode (Braking fully operational). This data will not be available for all vehicles.
- "AEB Brake request (from ADAS)" indicates whether "Automatic Emergency Braking controlled by ADAS unit" was activated (Brake Torque AEB Maximum), or not activated (No Brake Request). This data will not be available for all vehicles.
- "VIN retrieval from other ECU " indicates VIN data retrieval from other ECU when CDR connect to vehicle by using OBD system if available.
- "VIN retrieval from ACU " indicates VIN data retrieval from ACU. It will not be available for all vehicles.
- "Engine RPM (Gearbox Input Shaft) " indicates RPM of motor used for vehicle drive on electric or hybrid vehicles. In case of ICE vehicles, this indicates input shaft revolution that is input to Gearbox. This data will not be available for all vehicles.
- "Engine RPM (Front Electrical Motor) " indicates RPM of motor used for vehicle drive on electric vehicles. This data will not be available for all vehicles.
- "Engine RPM (Rear Electrical Motor)" indicates RPM of motor used for 4WD vehicle drive on electric vehicles. This data will not be available for all vehicles.
- "Engine RPM" indicates RPM of engine used for vehicle drive on electric vehicles. This data will not be available for all vehicles.
- "Airbag Deployment Time" indicates deployment time of each airbag. This data will not be available for all vehicles.
- "Seat Track Position Switch, Foremost, Status, Passenger" indicates whether the passenger's seat is positioned within a designated threshold value of the most forward adjustment position. "Yes" indicates that the passenger's seat is positioned within a designated threshold value of the most forward adjustment position. For all other adjustment positions, "No" is displayed. This data will not be available if the seat track position switch is not installed in the vehicle.

**Hexadecimal Data:**
All data that has been specified for retrieval is shown in the Hexadecimal Data section of this report. However, the Hexadecimal Data section may contain data that is not translated by the CDR tool.

**Data Sources:**
- Crash data is measured internally in the ACU.
- Pre-crash data is not measured internally in the ACU, but is transmitted from other control units through the Controller Area Network (CAN).
- Pre-crash data and crash data are asynchronous.

0701_Nissan001_r011



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000150

BOSCH CDR CRASH DATA RETRIEVAL

## System Status at Time of Retrieval

| | |
|---|---|
| VIN retrieval from ACU | Not Available |
| VIN retrieval from other ECU | Not Available |



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000151

# Exhibit J

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiff,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

No. 5:25-cv-00207-JGB-SHK

DEPOSITION OF GARRETT WOLFF

PMK for the County of San Bernardino

Taken Remotely Via Zoom Workplace

Thursday, July 2, 2026

Stenographically Reported by:
Monica Schoonover, CSR No. 1022
Job No. 28389

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiff,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

No. 5:25-cv-00207-JGB-SHK

REMOTE DEPOSITION OF GARRETT WOLFF, PMK for the County of San Bernardino, taken on behalf of the Defendants, beginning at 9:01 a.m. and ending at 3:06 p.m., on Thursday, July 2, 2026, via Zoom Workplace before Monica Schoonover, Certified Shorthand Reporter No. 10220.

APPEARANCES:

For Plaintiffs:

LAW OFFICES OF DALE K. GALIPO
BY: MARCEL F. SINCICH, ESQ.
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333

SHOJAI LAW FIRM
BY: NEEMA SHOJAI, ESQ.
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
619.777.0383

For Defendants CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA:

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
BY: EUGENE HANRAHAN, ESQ.
eugene.hanrahan@manningkass.com
801 South Figueroa Street, 15th Floor
Los Angeles, California 90017-3012
213.624.6900

For Plaintiff MINOR CHILD "A" (Case No. CIVSB2500920):

LAW OFFICES OF JAMES H. CESENA
BY: JAMES CESENA, ESQ.
jamescesena711@gmail.com
1748 West Katella Avenue, Suite 105
Orange, California 92867
714.744.3333

INDEX TO EXAMINATION

WITNESS: GARRETT WOLFF


| EXAMINATION | PAGE |
|---|---|
| By Mr. Sincich | 6, 186 |
| By Mr. Hanrahan | 123 |

# INDEX TO EXHIBITS


| DESCRIPTION | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of County of San Bernardino Person(s) Most Knowledgeable Regarding the Incident Investigation Pursuant to FRCP 30(b)(6) | 10 |
| Exhibit 2 | MAIT Report | 19 |
| Exhibit 3 | Whiteboard Diagram | 57 |
| Exhibit 4 | Screenshot of Diagram | 63 |
| Exhibit 5 | Screenshot of Diagram | 63 |
| Exhibit 6 | Screenshot of Diagram | 67 |
| Exhibit 7 | Whiteboard Diagram | 67 |
| Exhibit 8 | Photo COF 000497 | 67 |
| Exhibit 9 | Photo COF 000600 | 88 |
| Exhibit A | Photo | 143 |
| Exhibit B | Photo - Bates 607 | 145 |
| Exhibit C | Photo - Bates 614 | 146 |
| Exhibit D | Photo | 159 |
| Exhibit E | Video | 181 |

THURSDAY, JULY 2, 2026; 9:01 A.M.

THE COURT REPORTER: Good morning. My name is Monica Schoonover. I am a California Certified Shorthand Reporter, License No. 10220.

Mr. Wolff, please raise your right hand.

GARRETT WOLFF,

having been first duly sworn remotely by the reporter, was examined and testified as follows:

EXAMINATION BY MR. SINCICH

BY MR. SINCICH:

Q Good morning. Can you please state and spell your name for the record?

A Yes. My name is Garrett Wolff. That's spelled G-a-r-r-e-t-t W-o-l-f-f.

Q Have you had your deposition taken before?

A No.

Q Have you testified in court before?

A Yes.

Q Approximately how many times?

A I would estimate somewhere between 30 and 50 times.

Q Was at least the majority of those related to

law enforcement?

A Yes.

Q Who do you currently work for?

A The San Bernardino County Sheriff's Department.

Q And what's your current rank?

A Deputy sheriff.

Q Okay. Just like in the other times that you testified in court, do you understand that you are under oath to tell the truth today?

A Yes.

Q And although we are sort of in an informal setting of a Zoom deposition, do you understand that your testimony today has the same force and effect as if given in a court of law?

A Yes.

Q The plan is to go about an hour and take a ten-minute break each hour, but if you need a break at any point in time, would you let me know?

A Sure.

Q If you don't understand a question, would you let me know that as well?

A Yes.

Q If there's a technology issue, you might have to, like, wave your hand to get our attention. Okay?

A No problem.

Q Maybe or maybe not, depending on where you testified previously, there might not have been a court reporter, but do you understand that we have a court reporter here today that's typing down everything that's being said?

A Yes.

Q And because of that, and hopefully to make her job easier, it is important for us to only speak one at a time. Okay?

A Understood.

Q And that includes using audible responses to questions. Do you understand what I mean by that?

A Yes. Like, don't nod your head in response to a question.

Q Right. And it also means -- and it might be difficult for her to even put down even in my explanation, but to say the more formal "yes" or "no" if that's the appropriate response instead of the sounds "uh-huh" or "huh-uh." Do you understand that?

A Yes.

Q That way, there's no ambiguity when reading the transcript later.

Is there any reason why you wouldn't be able to give your best testimony today?

A No.

Q Do you understand that you have been designated by the County of San Bernardino as their person most knowledgeable for this deposition?

A I do.

Q And did you receive a notice of deposition?

A I did.

Q Okay. Did you bring anything with you today?

A I did.

Q What did you bring with you?

A I have a printed-out copy of the report prepared by Deputy Holland, the report prepared by myself, the report prepared by Deputy Reyes, and the report prepared by -- he's now -- I think he was at the time Detective LaFond.

Q Okay. Could you spell LaFond for our court reporter?

A Yes. It's L-a-F-o-n-d.

Q Okay. Are these reports contained within the MAIT report?

A Yes. It is -- it is almost the entirety of the MAIT report that I possess in my hands right now.

Q Okay. And the supervisor was Sergeant Motley?

A Yes.

Q That's M-o-t-l-e-y?

A Correct.

Q Did Sergeant Motley draft any reports, to your knowledge?

A Not to my knowledge.

Q Okay. Did you bring anything else?

A No.

MR. SINCICH: Okay. I am going to mark as Exhibit 1 the notice of deposition.

(Exhibit 1 marked for identification.)

BY MR. SINCICH:

Q Do you understand that you are here to testify about the investigation into the February 3rd, 2024, collision that occurred just east of the Cypress and Valley intersection?

A Yes.

Q And if I reference the word "incident," do you understand that I am referring to that collision incident?

A Yes.

Q Which is the subject of your report; right?

A Correct.

Q And also in the notice, it's stated to include information contained in the MAIT report, M-A-I-T, interviews with involved officers and witnesses, conclusions reached, and the basis for those conclusions. Are you prepared to discuss that information as well?

A Yes.
Q Okay. In the notice of deposition, did you also receive a request for documents?
A I did.
Q Did you produce any documents?
A I did not.
Q Do you possess any of the documents requested?
A I possess this hard copy of the report that is in my hands. That was produced to me by our clerk who has access to -- I can't remember. They changed the name of the software. They have a -- there's a document system that contains these reports.
Q Okay. Other than the reports that you brought with you, did you review anything else in preparation for today?
A I think I looked at the call history which I don't believe is contained in this. It's not really -- for me, I don't need to reference it, so the -- I asked -- I told or asked our clerk when I asked her to print this -- I said that I didn't need the -- the EDR download because it's probably 100 pages long, and I didn't need the call history from the case because I didn't think there was any information in there that wouldn't be contained within this report, so -- but I did look at it because I can access it via computer, and it

has, like, the times and stuff that we arrived, but that information is contained within this report, so I didn't think it was necessary to print it out.

Q Other than the call history, did you review anything else?

A No.

Q Okay. Just a little bit about your background. When did you go to the academy?

A I went to the academy in 2019, January of 2019.

Q Okay. From then until now, can you just take me through briefly your assignments?

A Yes. So I completed the academy in June of 2019. I then worked -- I was assigned to West Valley Detention Center from 2019 until 2021 at which point I was assigned to patrol in Victorville. I believe -- I couldn't tell you the exact date that I was assigned to traffic, but I was kind of pushed into traffic pretty early, and I -- if I had to guess, I would say sometime in 2022, near the end of 2022, I started in the traffic division, and I worked there until March of 2024 when I was involved in a crash and I was out medically for several months, and then when I returned, I was very quickly transferred to the gangs/narcotics division which -- on a temporary assignment, and that was approximately June of 2025, and I have been in the

gangs/narcs division since then.

Q Okay. What was your primary assignment at the time of this incident?

A I was assigned to traffic enforcement and accident investigation in the City of Victorville, and I was also assigned to the Sheriff's Department's Regional Major Accident Investigation Team.

Q Approximately how many times have you had to conduct an investigation with the Major Accident Investigation Team?

A With the regional team or with -- because I was -- I also did major accident investigations for Victorville. This was the only major accident investigation I did for the regional team, but I have done at least -- at least two and then assisted with probably three or four or more at the station level because Victorville had its own Major Accident Investigation Team.

Q Okay. Were any of those prior to this incident?

A They were all prior to this incident, I believe. I don't think -- I can't recall investigating any other MAITs between -- between this and then the time that I was involved in a crash, and just to be clear, what we call a MAIT, a major accident investigation, is not -- does not necessarily include all fatals. Most

fatal crashes are not MAITs. There's a threshold that a crash has to have to become a MAIT which you probably know, and so it is possible that I investigated a fatal crash after this because those happen pretty regularly in Victorville, but I don't believe I investigated any MAITs after this particular case.

Q Okay. And for the record, please explain, what is the threshold for a MAIT investigation?

A Generally, the decision is kind of beyond my pay grade, but what it usually is is if there is a fatal crash or potentially fatal crash or major injury crash that could become a fatal crash where there is likely going to be prosecution of one of the involved drivers for causing the crash and causing someone to die, or if there is a high probability of the accident being litigated and involving litigation against the government.

So like in the case of Victorville, if it were to include not just the police department but if it were to be a fatal accident that involved a city vehicle, for instance, that could be considered a MAIT, but, again, it's not usually my decision. It's -- in those cases, the cases where it involved liability against the city, that's generally a decision that's made by a MAIT supervisor.

company.

Q After joining the sheriff's department, did you get any specific training in accident or collision investigations?

A I did.

Q Take me through the training that you received, please.

A I did the -- and I am -- I will have to give my best guess at the length of these courses because it's been a while. I did the basic accident investigation class which I believe is a 40-hour class. I did the intermediate accident investigation class which I believe is an 80-hour class. I did the advanced traffic investigation class which is, I believe, an 80-hour class. And I did the reconstruction class which is an 80-hour class. And I did the vehicle dynamics class which I believe is a 40-hour class.

Q Were all of these courses in-house or did the county send you somewhere?

A They were in-house. Our county hosts those courses at our academy in the advanced officer training area, and it's attended by -- by officers from throughout the region and even Northern California.

Q Okay. Is it only for law enforcement officers?

A To my knowledge, yes. Actually, I think -- I

think some of our nonsworn do take basic, so I don't know that it's a requirement to be a peace officer to attend all of the classes, but because our -- some of our nonsworn take -- investigate noncriminal crashes, I believe they do take some of the lower level traffic investigation courses.

Q Okay. Were any of these courses taken after this incident?

A No.

Q Okay. Did you take these courses in the order that you described them?

A I did.

Q How long prior to this incident did you graduate from the vehicle dynamics course?

A I couldn't -- I wouldn't want to guess because I really don't know. If I pulled up my POST profile --

Q Sure.

A -- I could tell you exactly, but I wouldn't want to guess.

Q Yeah. And I don't want you to guess. Basically, I just want your best estimate, and it could be a range, if it was a few months or it was two years. I am not looking for an exact number there.

A I would say it was probably between six months and a year.

Q Okay.
A And the main reason for that is it would be longer except the vehicle dynamics course was newly offered and I took the first class that -- the very first time that the sheriff's department offered it to my knowledge, I attended that class.
And it may be worth adding I also assisted in the instruction of all of those classes, including vehicle dynamics, after I had taken the classes.
Q Okay. Are you still part of the MAIT team?
A I am not.
Q Are you still with narcotics?
A I am.
Q Okay. All right. I basically want to go through the report. I will mark as Exhibit 2 what I have as the MAIT report. It is 225 pages, and it's Bates-stamped COF 11 through 235.
(Exhibit 2 marked for identification.)
BY MR. SINCICH:
Q I think this one has all of the EDR data and things like that that you have seen before; right?
A If -- if you are trying to show me a document on screen or something, I can't see it so...
Q I will show you. I just wanted to mark that as Exhibit 2 for now. And then when we get to certain

portions, if you don't have it in front of you or maybe if it's easier, I will share my screen with you. Okay?
A Sure.
Q Okay. So how would you describe the purpose of your investigation into this incident?
A I would describe my purpose as to establish the facts of the incident. As a -- as a nonbiased investigator, my job -- and this is one of the reasons that I love accident investigation is the facts are the facts. They are concrete, and you can't, you know, make them up, and so I have appreciated that about traffic, and my job is just to look at the physical evidence and form an opinion about how the crash occurred.
Q Okay. On my document, it's page 34 just for reference to counsel, but it goes to the notification.
A Is this of my specific report --
Q What I will do --
A -- or is this --
Q I want to ask you that because it looks like it's Reyes' report because his name is on the bottom left-hand corner. Is that an indication of who wrote the report?
A Yes.
Q Okay. So at least on this page, it said that Officer Reyes was contacted and reported to the scene,

Q Okay. Now, the officer vehicle, to your knowledge, was it moved at all from the time of the collision to the time of the scan?

A To my knowledge, no.

Q And did you and your team also take photographs of the scene?

A We did.

Q And to your knowledge, had it been moved at any point in time prior to taking that photograph?

A To my knowledge, no.

Q Okay. So the officer vehicle would be oriented but facing when it came to a stop in a -- in a northeast direction approximately 45 degrees; is that fair?

A Yes.

Q And from your observation on the scene of the subject vehicle, which direction was it facing?

A I would -- I would say predominantly west but a little bit southwest, if that makes sense, and if I had to give you a degree on that, I would say the vehicle's heading was about 260 degrees.

Q Okay. So as we are looking, for instance, on this image COF 20, the left side of the vehicle, that would be the front of the vehicle, and the right side would be the trunk?

A Correct.

Q Do you know who was present?
A To my knowledge, Holland.
Q Do you know if any of the interviews were audio- or video-recorded?
A I do not.
Q Is that something as part of a MAIT investigation that you would typically do is conduct interviews?
A Yes.
Q And typically during a MAIT investigation, are the interviews recorded in some way?
A Yes. I believe our department has a policy that prevents us from recording department members in their interviews, so we generally would not record members of our department in an interview. I would have to refer to policy to determine whether or not we are supposed to record other law enforcement officers in these investigations.
So I am not sure if -- if I say "Dusty," by the way, I am referring to Holland because that's his nickname and I keep having to stop myself. I am not aware if Holland recorded them. I don't know if -- I can't remember if our policy requires us to record other department members -- sorry -- members of other law enforcement agencies for interviews, but generally under

almost every circumstance we would record interviews of nonsworn-involved parties.

Q Okay. For instance, I see from his report, and this is on Bates 29, that Mr. Bonilla was interviewed. Had you ever seen a file during your investigation or in preparation for today that showed any recordings of any interviews?

A I don't recall reading whether or not they were recorded. Obviously, I can -- I can refer to the report which I am doing now to see if he indicated whether or not he recorded, and, yeah, there's no indication whether or not he recorded his attempts to set up an interview so -- and that may be perhaps because he wasn't trying to -- he wasn't trying to directly contact Bonilla. He was trying to get a hold of somebody. Because as I understood it, Bonilla was not capable of providing an interview at that time. So if he -- I would not be surprised if he did not attempt to record his contact with Maria Ramirez as she was not a party involved in the crash, and he was simply communicating with her to attempt to coordinate an interview with Bonilla. There's no indication here that it's recorded, so my guess would be that it was not recorded, but that would be a guess.

Q Okay. Thank you. Do you know if there's any form of long-form notes that are more detailed than the

and so the logical conclusion would be that he passed through the intersection at some point between 5 seconds prior to impact when his speed was 105 and 1.5 seconds prior to impact when the brakes were activated in which case his speed was 108.7, and the vehicle had been either continuing at the same speed or accelerating for the entirety of that time between 5 seconds prior to impact and 1.5 seconds prior to impact, and at all times was the speed greater than 105, and he may have concluded it by that way.

And there's multiple ways to come to that conclusion essentially. I don't know exactly how he came to it, but I would venture to say that, in short, he knows that 5 seconds prior to impact the vehicle had not passed through the intersection and its speed at that time was 105, and 1.5 seconds prior to impact the vehicle was 100 percent -- like, he has absolute confidence that the vehicle was through the intersection 1.5 seconds before impact, and between those two time points at all times the speeds -- the speeds were in excess of 105 miles an hour -- at or greater than 105 miles an hour, and so he was comfortable concluding that the vehicle's minimum average speed as it passed through the intersection was 105 miles an hour.

Q Okay. Thank you. And then just generally

speaking, the officer vehicle traveled north and made a left-hand turn from the private parking lot of the thrift store onto Valley; is that fair?

A Yes.

Q And that thrift store was on the south side of Valley?

A Yes.

Q Then it indicates that the subject vehicle traveled at 105 miles per hour. Is that still an approximate average speed?

A Yes. Everything -- I will just preface this by saying everything is an approximation.

Q Okay. So the subject vehicle traveling 105 miles per hour turned to the left, and then it says that the driver lost control. Do you see that?

A Yeah. The vehicle turned left.

Q So we know the vehicle turned left from the EDR data.

A Okay. I see the -- maybe the point that you are about to make is it says that P-1 turned Vehicle 1 to the left. That appears to be what it's saying is that P-1 traveled 105 miles an hour and turned Vehicle 1 to the left; correct?

Q Right. Let's assume that P-1 intentionally turned the vehicle to the left.

A Well, I am not going to assume that.

Q Okay. Well, we can -- it's fair to say that the EDR data shows that the wheel -- the steering wheel went to the left which moved the tires to the left? Is that fair to say?

A Without looking at the -- without looking at the EDR data -- maybe you have access to that, but the -- I am looking at what LaFond put in and generally -- and this is why I can't assume -- generally, in my experience, a positive number for steering wheel angle indicates a clockwise turn which would be a turn to the right, but every vehicle is different. So I can't -- without that information, without having the EDR data in front of me that will describe its limitations or how to interpret the data, I couldn't conclude whether he was turning right or left, and I am not sure if LaFond defined or provided that information in his report. I didn't notice it anywhere.

Q Okay. Is it fair to say that based off of the diagram that Deputy Reyes put together it would corroborate that the subject vehicle went from the Number 1 lane eastbound and then started to go to the left at some point?

A Yes. I would say from the diagram and in my opinion, the vehicle did -- the vehicle rotated laterally

and moved left. However, I -- without having EDR data, I would not -- I couldn't -- I couldn't say definitively if that was due to a deliberate steering input to the left or if -- or if -- because there's two possibilities. Either there was a steering input to the left that caused the vehicle to go left or the vehicle began an uncontrolled lateral rotation to the left and the driver attempted to countersteer and put a right-hand turn input to try to straighten the vehicle out. So those are two options, and if I had the EDR data which includes that information, then I could form a better opinion about that.

Q Yeah. In a little bit we will go through the EDR data specifically.

So is it fair to say that -- for instance, I have seen the movie Tokyo Drift, right, where they are drifting in the vehicle. Have you seen it?

A Right. I have.

Q So there's instances where the steering wheel and the actual front tires can be turning one direction, but the vehicle because of its momentum is actually turning a different direction --

A Correct.

Q -- because it's drifting? And the EDR data doesn't take into account necessarily what the vehicle

was doing. It's just recording what the steering input was; is that fair?

A Correct.

Q Okay. So what I am wondering here is in this sentence, it's saying that the driver of the subject vehicle lost control of the vehicle. What's the basis for that opinion?

A I would say -- to put it briefly, I would say the totality of the circumstances. The reason that I personally would conclude would be two things. The first is that -- I am getting some echo all of a sudden.

The first would be that based on the physical evidence of the vehicle inspection, we were able to conclusively say that Vehicle 1 was sideways essentially when it impacted the patrol vehicle, and then, two, I would just say that if your vehicle is sideways and -- if your vehicle is not -- if all four wheels have lost traction and your vehicle is in a lateral spin, unless it's something you are deliberately doing, then you have lost control of your vehicle. I would venture to say that if somebody is traveling at this speed and their vehicle is in a lateral spin, then they are not in control of the vehicle unless they are, like, a trained drifter or something.

Q Okay. And what's the second reason?

A Oh, so reason 1 was we concluded that the vehicle was sideways upon impact.
Q Okay.
A And reason 2 is if you are traveling that speed and your vehicle is sideways, then you are not in control of the vehicle.
Q Okay. So when you are determining that the vehicle was sideways at the moment of impact, what are you basing that upon?
A I don't know if you can hop to the pictures because I can show you that in depth, but essentially the --
Q Hop to the what? I am sorry. I couldn't hear you.
A Hop to pictures from the vehicle inspection if you have those, but essentially the driver front tire and wheel which was -- and this is an important detail because the patrol unit had two different tires in the front, two different makes of tire or at least two different models of tire, and the front driver's side of the patrol vehicle's -- that particular tire imprinted into the rear passenger side door of Vehicle 1, and the only way that those two could have possibly met with the amount of force necessary to do that is if Vehicle 1 was sideways upon impact. I know saying "sideways" is kind

wheel and tire of the patrol vehicle.

Q Okay. Thank you for that explanation.

I am saving them as I go so that it's organized, and hopefully that's easier for us later on.

Okay. Based on your review of the angle of the impact, keeping in mind the original direction of the vehicles, subject vehicle going eastbound, officer vehicle turning to the left, would you agree that the subject vehicle appeared to have made some form of evasive maneuver to avoid the impact?

MR. HANRAHAN: Objection. Object to the form. Argumentative. You can answer.

THE WITNESS: Okay. If you don't mind, I will -- let me look at the data from the EDR real quick just so I can kind of more accurately explain my answer which --

MR. SINCICH: Okay.

MR. HANRAHAN: And one more objection. Calls for speculation as to the state of the mind of the driver.

THE WITNESS: Sorry. I am looking for a specific table here in a very large report, and if you wouldn't mind, could you ask your question again just so I can be clear with my answer?

MR. SINCICH: Yes, please. Can I have a

readback?

(Record read.)

THE WITNESS: Can you clarify what you mean by "maneuver"?

BY MR. SINCICH:

Q Does it appear to you based off of your review of the data, physical evidence, forensic evidence, and the EDR data that there's any indication that the subject vehicle intentionally struck the officer's vehicle?

A I do not --

MR. HANRAHAN: Same objection.

THE WITNESS: And I am clear to answer, right, because this is a deposition?

BY MR. SINCICH:

Q Yeah.

A I do not believe that the suspect vehicle intentionally struck the patrol vehicle, or I do not believe that the driver of Vehicle 1 intentionally struck his vehicle into Vehicle 2, if that's what your question was.

Q Correct. Based off of your review of the information, does it appear that from the evidence the driver of Vehicle 1 attempted to avoid the collision by turning hard to the left?

MR. HANRAHAN: Objection. Calls for

speculation. No foundation. You can answer.

THE WITNESS: I -- I would hesitate to make any conclusions about whether his steering input was to avoid the crash. I would say that he made an effort to avoid the collision based on the fact that he took his foot off of the gas and put it on the brake. So I believe that that was an effort to slow the vehicle when -- when essentially they were past the point of no return. There was no avoiding the crash at that point, but I believe that his application of the brake prior to impact was an indication that he was trying to avoid the crash.

As for his steering input, I don't know if the steering input was related to a loss of control of the vehicle or if that was steering input that came as a result of a deliberate input by the driver as a result of seeing -- seeing the patrol vehicle entering the roadway.

BY MR. SINCICH:

Q You referred to "the point of no return" being the moment in time when a driver wouldn't be able to avoid the impact; is that fair?

MR. HANRAHAN: Objection. Calls for speculation. Vague as to the term -- vague as to the terms of -- no foundation. You can answer.

THE WITNESS: I -- I haven't really identified what the point of no return -- like, the actual moment in

time in this particular case that I would consider the point of no return, but in general, yes, when we say "the point of no return," we are referring to the moment at which the circumstances have made it such that no action by either driver could prevent a collision.

BY MR. SINCICH:

Q Because of the direction of movement, is there a scientific term that you are familiar with that essentially shows that the direction of the vehicles after the collision will go into a particular direction because of the direction of the collision? Do you understand what I mean by that?

A Are you referring to, like, approach and departure angles as a result of conservation of momentum? Or I feel like you are looking for a particular topic that you want to talk about and hoping that I am the one that brings it up.

Q No. I think you hit the nail on the head there. Could you describe what conservation of momentum means?

A Yes. And I will try to think of, like, an analogy to make it simple because they tell us that we have got to make it simple for juries and stuff.

So essentially an object in motion stays in motion. So if we were to go into space and I were to throw a golf ball, that golf ball would move and it would

move forever. It would not stop unless another force acted upon it.

Now, if that golf ball were to collide with another golf ball, that would be a force that acts upon -- or let's say the golf ball collides with a tennis ball. When that golf ball collides with a tennis ball, it's going to transfer some of its momentum which is -- momentum is essentially a calculation of how much something weighs and how fast it's moving. It's going to transfer all or some of its momentum to the tennis ball.

Now, depending on the location of that impact between the tennis ball and the golf ball, they will depart the impact in different directions. So the same goes for vehicles. When two vehicles collide -- I can't remember if you asked me conservation of momentum or if you just asked me what momentum is.

Q Conservation.

A Conservation. So there is a total amount of momentum that goes into a crash in a given direction, and after a crash, momentum is conserved. So in this case, a portion -- like in the case of this crash, a portion of the momentum that Vehicle 1 had -- well, so Vehicle 2 had momentum because we know it was moving, and Vehicle 1 had momentum because we know it was moving. They were moving in different directions.

Garrett Wolf

When they collided, Vehicle 1 had significantly more momentum because it was traveling much faster. When Vehicle 1 collided with Vehicle 2, it -- and I don't want to get into vectors, but it completely cancelled out the momentum that Vehicle 2 had in the westerly -- westernly direction and caused Vehicle 2 -- Vehicle 1 and Vehicle 2 both exited that collision traveling in a east or northeasternly direction. Does that make sense?

Q Yes. So is it fair to say that because Vehicle 1 moving faster, its momentum caused Vehicle 2 essentially to move to the east?

A Yes.

Q And because a part of Vehicle 1's movement was also slightly north, would it be fair to say that it also caused Vehicle 2 to move slightly north?

A Yes.

MR. SINCICH: Okay. It's 11:20. Let's take a ten-minute break, and I will see you guys back at 11:30.

THE WITNESS: Okay. Thank you.

(Recess taken.)

MR. SINCICH: Let's go back on the record.

BY MR. SINCICH:

Q In the diagram that Deputy Reyes made, it indicated the area of impact. Do you remember that?

A I do.

Q Do you know how he determined the area of impact?
A I would have to review what he said that he used to come up with that. I don't want to just speculate and say based off the physical evidence, yeah.
Q I understand.
A So I assume I have that in here. Let me see.
Q I am going to share my screen COF 40 as Deputy Reyes' Opinions and Conclusions, and it states "Area of Impact." Can you see my screen there?
A Yes.
Q Okay.
A So he stated that he estimated it using pieces of plastic and -- plastic pieces of debris, and this was one of those that was particularly difficult, I imagine, for him to make this estimation given that we didn't have gouges or skids. So I imagine, kind of like he said, it was an approximation based off of -- based off of the debris field and where the vehicles came to rest with the information that he had and understood at that time that he made that estimation.
Q Would it be fair to say that the area of impact of this primary collision would have been close to that debris field?
A I mean "close" is a vague term. How close?

Q Would it be within a few feet?
A No. In this particular case, I don't think the debris was within a few feet of the vehicles. The area of impact was with -- sorry. I don't believe the area of impact was within a few feet. I think the closest major piece of debris to the area of impact was the light bar, in my opinion.
Q Okay. Let me see. And light bar is Number 2?
A Yes.
Q Okay. So looking at COF 20, the -- and I am going to zoom in. Is it fair to say that the center of the truck is marked -- approximately the center of the truck is marked with a black dot?
A Yes.
Q And is it fair to say that the center of the red circle indicating the area of impact is slightly north of the center of the patrol vehicle?
A Of the frame of the vehicle, yes, I would agree to that, but I will just make a note that the engine and transmission of the vehicle -- I don't know if you can see my cursor -- were up here, so --
Q I don't see your cursor right now.
A Okay. So the engine and transmission of the patrol vehicle were outward. Like, we will have to look at pictures to be exact, but they were more forward

because they were partially ejected from Vehicle 4, and I wouldn't say with 100 percent certainty, but I would say that the majority of the engine and transmission were on or even potentially north of the double yellow lines that run on the north side of Vehicle 2 in this scan.

And the only reason I make that point is if we look at this hunk of metal -- that will be helpful, yeah. Looking at this, treating Vehicle 2 as, you know, one big unit, the engine and transmission represent a significant amount of its mass, and those are more north. So while, yes, the center -- this is, like, the approximate center of the vehicle's, you know, space, and potentially it's near its center of mass when it was a undamaged vehicle. I believe the center of mass of this postcrash vehicle is north of where this dot is, if that make sense, so -- and, again, I am using my cursor and it doesn't show up.

MR. CESENA: I don't see a dot.

THE WITNESS: The dot on Vehicle 2 --

MR. CESENA: Okay.

THE WITNESS: -- that is approximately its center. Like, prior to the crash, that dot is probably relatively close to where its center of mass is. However, in its postcrash state, a large portion of the vehicle's mass, that is, its engine and transmission, were partially ejected north, and so I don't believe that

that dot on Vehicle 2 in its postcrash state are an accurate representation of where its center of mass is. I would say that the center of mass of the vehicle there is probably about as north as the area of impact, if that makes sense.

BY MR. SINCICH:

Q Okay. What data would you use to determine -- data or information would you use to determine that the area of impact is west of the light bar?

A The only -- I believe the only information that I can think of would be two things. One, it would take a significant amount of force to -- or a significant change in velocity for that light bar to shear off the top of the patrol vehicle, and in that process, undoubtedly the light bar would experience -- would most likely -- or would experience acceleration in the easternly direction and would likely have velocity in the eastern direction.

And so, for us, it was -- and I think Reyes agreed, was that the light bar would most likely have ended up east of the area of impact. While it would be possible for it to essentially remain in place, I think that we just kind of concluded based off of our instincts and experience that the force required to do that would be unimaginable and not that the force in this crash wasn't unimaginable, but in our experience, debris from

the vehicles, especially large debris like this, tends to -- tends to depart in the crash in the same direction as the vehicles.

Q So considering that these vehicles were also moving to the north, would it be fair to say that the light bar also traveled slightly north of the impact area?

MR. HANRAHAN: Objection. Calls for speculation.

THE WITNESS: I would -- I couldn't say that with certainty, and the main reason I say that is based off of the damage to Vehicle 2, it seems to me that the -- essentially the front end from the A-pillar forward kind of -- almost stayed in place or -- because you see the vehicle opened; right? From the A-pillar to the rear, from our perspective, experienced a significant, probably, you know, in the area of 90-degree rotation from -- from the northwest direction that we -- you know, the range that we earlier -- that I earlier stated, it was probably facing -- to a postimpact, it's facing northeast.

So from the A-pillar to the rear rotated from the -- from the northwest to the northeast about, you know, 90 degrees, plus or minus 45 probably, right, but the front end of the vehicle, while it remained intact on

the driver's side A-pillar, the vehicle essentially opened up near the passenger side A-pillar, and the engine and transmission experienced a significantly -- significantly less rotation. As the vehicle came to rest, the engine and transmission were essentially predominantly facing the same direction that they were at the impact.

And all that is to say is that the cab of the vehicle experienced rotation upon impact, and depending upon where that light bar was mounted during that -- during that rotation and at what point during that rotation it became detached, I couldn't predict what direction that light bar would travel as far as the north and south go.

Again, I feel that it most likely would -- as far as the east-west vectors go, I would say most likely it would travel in an east direction along with the vehicles, but as far as its north-south movement because of that rotation, it's hard to say, and it truly is hard to say with 100 percent confidence. It's, I would say, probably impossible to say with 100 percent confidence even that it -- we know for sure it moved east after the crash. Just that we know based off of our experience that that's most likely the case.

///

BY MR. SINCICH:

Q Okay. Is it fair to say that it's possible that the area of impact of this collision was slightly south of the light bar?

MR. HANRAHAN: Objection. Calls for speculation. You can answer.

THE WITNESS: I would say that it is -- it is possible, yes. And, again, I will add the caveat of that is a circle, and Reyes' determination was that, you know, if we were to assume that it was -- that the area of impact was within that circle, then that circle does extend south of the light bar. And so if you are suggesting that the center of that circle should be south of the light bar, I don't necessarily agree with that, but I certainly would just reiterate that the circle is an area, it's an approximation, and the border of that circle is not intended to be treated as a concrete definitive line with which the impact occurred inside of. It is designating an area, and that's why we call it an "area" and not a "point."

BY MR. SINCICH:

Q Right. Is there any physical or forensic evidence that you could cite to that would preclude the area of impact circle being such that at 12:00 o'clock it touched the north double yellow lines and at 6:00 o'clock

it touches the bottom double yellow lines?

MR. HANRAHAN: Object to the form.

THE WITNESS: Can you ask that question again? I just have a hard time understanding.

BY MR. SINCICH:

Q And what I will do is I will just draw a circle, for instance. Oops. So there's a circle here just for demonstrative purposes that's sort of in line with this measurement of 67.40 where 12:00 o'clock is about where the double yellow lines on the north is and 6:00 o'clock of the circle is about where the double yellow lines is on the south side.

Is there any information, data that you collected in your investigation that would preclude this area of encompassing the potential estimated area of impact?

MR. HANRAHAN: Calls for speculation. Foundation. You can answer.

THE WITNESS: Let me think to say how to -- so, in other words, you are asking me: Is there any reason why in my opinion the area of impact should not contain the space outlined in your green circle as opposed to the one that was created by Deputy Reyes?

BY MR. SINCICH:

Q That's another way of putting it, yes.

MR. HANRAHAN: Same objection.
BY MR. SINCICH:
Q For instance --
A I will tell you why I don't think that it was -- it's kind of hard for me to just put into words that are digestible because it's not a simple topic, but when you look at the EDR data from the patrol vehicle, particularly the steering input, the driver of the patrol vehicle had stopped turning. They turned the wheel essentially to the maximum of their -- you know, the desired turn radius and then turned the wheel back to center and so -- and, again, because part of this has to do with this -- this circle is supposed to essentially encompass the area where the two vehicles met at impact. It's not meant to encompass the entire area where -- it's not meant to encompass the vehicles; right?
So if you were to say place the vehicles in a proposed direction where they were and what directions they faced at impact, the vehicles would protrude from this area, right, and what -- to me, the way the area of impact works is, you know, there is -- there is clearly a point of impact, and that point of impact should be or to our best estimation within the circle of the area that we define as the area of impact, if that makes sense, or within what he drew here.

You know, there's no defined radius around the point at which is designated the area of impact. Of course, you are given a point and we are saying that's the area, and to my knowledge, there's no definition for the radius of that area.

I don't believe based off of my observations here that the point at which they collided would be -- would be at the southern double yellow lines. Among other things, that would -- that would indicate that the patrol vehicle -- because I strongly believe that the patrol vehicle was faced in a somewhat northwesternly direction, that would indicate that the patrol vehicle essentially was occupying the Number 1 eastbound lane, and I don't believe that to be true, so -- and a portion of my reasoning with that is that the driver of the patrol vehicle had disengaged from the turn.

So the fact that they were disengaged from the turn tells me that they were either entering or about to enter the Number 1 eastbound lane. Whether or not they were faced perfectly -- sorry -- the Number 1 westbound lane. Whether or not they were faced perfectly west, I don't believe they were. I believe their patrol vehicle was perhaps predominantly in the center turn lane. As they disengaged that turn, I believe that it was likely

faced northwest with the intent of continuing into the Number 1 westbound lane and straightening out essentially to a direct western heading.

So that's a lot of words to essentially say I believe that the circle that you have drawn encompasses too much of an area to the south. I believe that the area of impact -- I believe that the front driver's side of that patrol vehicle was most likely in the top half of the center turn lane as we defined earlier, and I believe that because of the fact that the driver had disengaged from turning and then obviously plus the physical locations of the evidence.

Q Do I understand your testimony correctly that based on your review of the information, the majority of the patrol vehicle would have been contained inside the center turn lane?

MR. HANRAHAN: Calls for speculation. No foundation. You can answer.

THE WITNESS: In my opinion, I believe that at least a portion of the patrol vehicle was in the center turn lane, if not the majority of the patrol vehicle.

BY MR. SINCICH:

Q Okay. Based on the data you reviewed, we can preclude, for instance, that the area of impact is in the Number 1 lane going eastbound; is that fair?

Garrett Wolf

A I am sorry. Say that question again.
Q Based on the data that you reviewed in the investigation, is it fair to say that we can preclude the area of impact being in the Number 1 eastbound lane?
A Again, I would struggle to -- I mean, what you are doing is asking me to tighten up the area of impact that's shown here, and, again, just a reminder that the circle is not a -- is not a standardized radius; right?
So this drawing, I don't believe its intent is to indicate that the point at which the two vehicles collided is or is not in the Number 1 eastbound lane. It's simply indicating an approximate area where the vehicles came together.
So you are asking me to say that it wasn't in the area above the double yellow lines, and I don't know -- the problem that I have with that is you are essentially asking me to define a radius for the area of impact from the point at which -- from the point at which our team designated, and I have a hard time doing that because it's an approximation, and it's intended to be an approximation.
I don't -- I don't have any -- it's just -- it's tough for me to say that because there's so many factors, particularly the imposed rotation on the patrol vehicle, the fact that essentially it almost was split into two,

and the two -- you know, the two halves of the vehicle rotated at different -- at different velocities.

If -- if you are asking my -- my opinion about the point of impact because that's essentially what you are narrowing down, I believe that the point of impact was -- in other words, the area where the two vehicles collided is most likely at the very north part of the -- of the center turn lane.

Can I conclusively say that it was -- that's the case? No. I can just say that in my opinion, I believe most likely where the two vehicles came into contact with each other was within those, but I believe it is possible that it was not. Does that make sense?

Q Yes, it does. Thank you.

I am going to mark as Exhibit 9 Bates stamp 600 -- COF 600, and this is a photograph kind of close to sun up, it appears. It's a little bit better quality than the other ones.

(Exhibit 9 marked for identification.)

BY MR. SINCICH:

Q Can you see my screen?

A Yes.

Q Did your team take this photograph?

A Yes, as far as I know. I believe that Reyes took that photograph.

Q And it shows the light bar in the center of the double yellow lines?
A Yes.
Q And the debris field is sort of towards the right-hand side of the screen which would be south?
A Yes.
Q And then obviously the patrol vehicle is in its resting location?
A Yes.
Q Okay. Deputy Holland formed certain opinions about the cause of the collision. Do you recall reviewing those?
A Yeah. I will pull those up. I apologize. These are not in -- it would be nice if I had, like, a book that had a table of contents that I could flip to, you know.
Q I understand. I was doing keyword searches myself to find the stuff.
A Wish they made that for physical paper.
Q I will share my screen here, and it's on page COF 30 from Exhibit 2. Can you see my screen?
A Yes, and I found it right about the same time.
Q Okay. So is it fair to say that essentially what Deputy Holland described as the cause of the collision to be certain Vehicle Code violations?

Q And "AE" is the collision right; right?
A I actually -- I am not sure what he means by AE, but I am concluding that based on the context. It's probably activation event, but I didn't read the part in his report where he explains that.
Algorithm enabled. Okay. So algorithm enabled being what he said was described in this EDR as essentially the activation.
Q Okay. So let me see. We have the vehicle speed here on COF 140 on the top, distance traveled on the bottom, and do you agree with Detective LaFond's calculation for this distance traveled?
A I haven't personally verified it, but, I mean, I can break out a calculator right now and do it. I assume I am not explaining this to you because you don't know how to read it. You know -- you know the calculation he used; correct?
Q Generally, but sometimes it's for the record so that it's easier to explain it to others.
So, I mean, obviously the distance traveled is the sum of the right-hand column from the bottom table; correct?
A The distance there -- the bottom row contains the sum of the -- of each column, yes.
Q Right. And so he has a -- based off of the

different ranges of speed, the distance could be different in each half-second increment; right?

A Yes.

Q Okay. So what calculation is used to determine the distance traveled per half-second increment?

A So what he's doing is he's taking the -- we will focus on the left-hand side first. I am looking at particularly the minus 5 seconds, 96.3 miles per hour. What he did was he converted that into -- well, he could have done it in two orders, but essentially he converted it into feet per second and divided it by 2. That, or he divided it by 2 and then converted it into feet per second. But that essentially says if this was the speed for this -- on or about this particular half second of time, if I know the speed that it was traveling for that half second, then I can tell you how far it traveled in that half second.

Q Okay.

A It's basically approaching -- it's, like, attempting to do calculus if you don't know how to do calculus. He's approaching the derivative, and he's just -- the smallest unit that we can divide it in with the information that we are given is half-second increments.

Q Do you know the distance from the approximate

area of impact to the crosswalk on the east side of the cross street?

A I don't -- I don't recall. I think that was probably something that I had looked at at some point in this, but I don't remember what it was.

Q Is it indicated in any of the reports, to your recollection? You don't have to look for it.

A I know it's been discussed, so I am not 100 percent sure if the distance particularly from the crosswalk to there is mentioned. I don't remember a specific measurement from crosswalk to area of impact. So I am going to say I don't recall seeing that, but I couldn't say with certainty that it's not in the report.

Q Okay. And what we have on -- let me see. Where is the driver input?

Okay. So on COF 139, is this the chart that shows Vehicle 1's speed, brake activation, and steering input?

A Let me see. Yes, this shows Vehicle 1's speed and brake activation and steering input, yes.

Q So, in other words, it says "clp" under steering input. What does that mean, to your knowledge?

A To my knowledge, that's the -- that means that a vehicle is -- the wheel is turned at least 250 degrees. The sensor cannot measure beyond 250 degrees, so the

wheel could, in fact, be much, much further. It could be -- it could be 251 degrees, it could be 250.1 degrees, or it could be, you know, in excess of 360 degrees, but the sensor can only detect up to 250 degrees.

I don't know what "clp" means, but if I had to guess, I would say it means clipped because sometimes in the engineering world signals get clipped if they exceed a range.

Q And can you tell from your review of the report if a positive number in the steering input of Vehicle Number 1 indicates a clockwise or counterclockwise turn?

A I -- I am sure he mentioned it. I don't see mention of it specifically whether it's positive -- positive is clockwise or counterclockwise. So if it's somewhere that you are aware of or if it's in the EDR data --

Q I am not aware of it. In fact, I am trying to -- well, what I am curious about is: How is it possible that there is a 250-plus-degree steering output 5 seconds prior to the collision at all whether it's left or right? You saw the video; right?

A I did, yeah.

Q And the potential steering to the left of Vehicle Number 1 from the video, is it fair to say that it has to be within 2 seconds before the collision?

MR. HANRAHAN: I am going to object. Calls for speculation. Improper hypothetical. No foundation. You can answer.

THE WITNESS: Yeah, I don't believe that the vehicle's wheels were turned at 5 seconds prior to the crash to kind of jump to the point of what you are saying.

BY MR. SINCICH:

Q Right. So is the steering input -- is it just incorrect for Vehicle 1?

A Yeah, I --

MR. HANRAHAN: Same -- hold on. Hold on. Mr. Wolff, if you could give me a pause so I can get my objections in before you answer. Same objections.

THE WITNESS: I apologize. I am sorry. Can you ask the question again?

BY MR. SINCICH:

Q Isn't it fair to say that he couldn't possibly have been turning 250 degrees left or right even 4 seconds prior to the impact based off of your review of the video?

MR. HANRAHAN: Same objections.

THE WITNESS: I would say it is highly unlikely, and I don't see how he could possibly have been -- had the wheels turned at that stage of -- yeah. I don't

believe it's possible, and I would say that a possibility that I do see would either be a severe misalignment -- again, it depends on the location of the sensor that is measuring the steering input on that particular vehicle, but I do not believe that the wheels -- the wheels were turned the way that they would be on a properly -- a properly configured vehicle at 250 degrees. I don't believe that the wheels of Vehicle 1 were turned in accordance with a 250-degree steering input 5 seconds prior to the crash.

BY MR. SINCICH:

Q Okay. I am going to go to Vehicle Number 2, and it looks like Vehicle Number 2 has -- instead of every half-second calculation, it's every two-tenths of a second?

A Yes.

Q Okay. Now, do you know from your review of the data whether or not the steering input positive is clockwise or counterclockwise knowing that he turned left at some point prior to the impact?

A I can tell you --

MR. HANRAHAN: Objection. Hold on. Hold on. Objection. No foundation. Calls for speculation. You can answer.

THE WITNESS: My conclusion would be that a

Garrett Wolf

positive number is indicative of a counterclockwise steering input.

BY MR. SINCICH:

Q Okay. So somewhere around the 3.2 seconds prior to the impact to 1.6 prior to the impact, that's where the steering input is over 100 degrees turning left? Is that fair to say?

A That is how it appears.

Q Is that from reading the data indicating when he was turning left?

A I would clarify that. He begins increasing his left-hand turn much sooner, so what you have highlighted is the peak of the turn essentially.

Q So, I mean, essentially if the throttle is at zero at 3.8 seconds, does that indicate approximately -- somewhere between 3.8 to 4 seconds prior to the collision, is that a good indication of where Officer Garcia was on the apron of the driveway?

MR. HANRAHAN: Objection. Calls for speculation. Foundation.

THE WITNESS: I believe that that in conjunction with his foot being on the brake in conjunction with the video is an indicator of when he was on the apron, yeah.

BY MR. SINCICH:

Q So at approximately 3.8 seconds prior to the

collision, that's generally where Officer Garcia accelerated from the apron and began his left turn steering input; is that fair?

MR. HANRAHAN: Objection. Calls for speculation. Foundation.

THE WITNESS: I would say at some point -- at some point prior to the, you know, T minus 3.8 seconds when his foot was removed from the brake, at some point prior to that is the moment that he in his brain said, okay, I am going to make this -- I am going to exit the driveway and make the turn.

MR. SINCICH: Okay.

MR. HANRAHAN: Objection. Move to strike as speculation just for the record.

BY MR. SINCICH:

Q And then between 1.6 to 1.4 seconds before the collision, there's a drastic turn from 143 degrees left to 20 degrees left. Is that fair to say?

MR. HANRAHAN: Objection. Same objections as before.

THE WITNESS: Steering input does change from 143 to 20 degrees between those two measurements, yes.

BY MR. SINCICH:

Q And that's a straightening of the tire?

A Yes.

Q So the tire would be on its way to turning right?

A It would be returning to center.

Q Correct. And then when it gets to negative 1 at minus 1.2 seconds, that would be pretty much straight; is that fair?

A Pretty much straight, overshot center by a degree.

Q And then at some point -- well, not at some point, but at 1 second prior to the collision, from the EDR data, the steering input begins to turn slightly to the left again; right?

A Right.

Q And then within two-tenths of a second, it appears as though the steering wheel was jerked to the right for two-tenths of a second and then jerked back to the left. Is that what that reads from .8 to .4 seconds?

MR. HANRAHAN: Calls for speculation. Foundation.

THE WITNESS: Yes. The steering input does go from left to right to left.

BY MR. SINCICH:

Q And it appears that the officer at .8 seconds removes his foot from the accelerator?

results of the autopsy; correct?
A Correct.
Q And your role -- and that's of two of decedents in this case; is that true?
A True.
Q And that had really nothing to do with the cause of the crash, correct, what happened in the autopsy; is that true?
A That is true, I believe.
Q And you did the vehicle inspections of both the patrol vehicle and the white Nissan; is that true?
A Yes.
Q And you conducted the vehicle inspections on a cursory level the morning after the crash; is that true?
A I don't remember if it was the exact morning after the crash, so I would have to confirm that. Let me check.
No. We conducted the vehicle inspections on February 7th.
Q Okay. So several days after the crash; is that true?
A Yes.
Q I meant to say, you went out to the scene of the crash the morning after it happened; is that true?
A Yes.

Garrett Wolf

Q So that's what I was getting at. You went out and did -- you, at least, saw the condition of the patrol vehicle and the white Nissan at that time; is that true?
A Yes.
Q And then you did a more thorough inspection at an impound lot of the patrol vehicle and the Nissan; is that true?
A Yes.
Q And at that location, you looked at the damage to the rear passenger side door of the Nissan; true?
A True.
Q And you said you noticed damage that appeared to be inflicted there by the -- one of the front tires of the patrol vehicle; is that true?
A Yes, specifically the driver's side tire.
Q Did you actually take the driver's side front tire and place it alongside the white Nissan?
A Yes.
Q And to you, that was, you know, approximately a match; is that accurate?
A I would say it was -- it was absolutely a match. It was -- there was no other possibility other than the two of those items met during that crash and, again, not just because of the unique tire situation but also because of that visible -- there was a visible substrate

under -- I say "substrate" as a generic term. There was a material that had protruded from it within the door panel of the -- of the Nissan, and it left a mark and some remnants behind on the rim in the exact spot where they collided. So it was the only wheel of the police vehicle which could have left that mark.

Q Okay. So your conclusion was that the patrol vehicle's front left tire hit the passenger side rear door of the Nissan; is that true?

A Yes.

Q And you concluded based on Officer Reyes' analysis and your review of the EDR that the patrol vehicle when it pulled out of the apron of the parking lot that it had completed the left turn heading westbound on Valley; is that true?

MR. SINCICH: Misstates facts. Lacks foundation. Argumentative.

THE WITNESS: I cannot conclusively say that it had completed the turn and was headed directly westbound. In fact, I don't believe that's the case.

BY MR. HANRAHAN:

Q Well, did you testify earlier that the EDR evidence showed that the patrol vehicle had taken a left turn from a motionless position; is that true?

A Yes. I think that's kind of a semantic issue.

So I know that he did turn left and returned the wheel to center, so I believe that he completed the turn in the direction -- or to turn his vehicle to whatever direction he intended to continue.

What I can't conclusively say is that he turned 90 degrees. I would say he had not turned 90 degrees at the time that his wheel returned to center.

Q Okay. Well, let me just do one question at a time and just try to answer just what I am asking, Mr. Wolff.

Did the tires, according to the -- of the patrol vehicle, according to the EDR data, did they return to center -- or sorry. Did the wheels return to center position after making the left turn?

A Yes.

MR. SINCICH: Overbroad.

BY MR. HANRAHAN:

Q Okay. And is there an indication that the wheels turned back to just about -- the steering wheel turned back to neutral after completing the left turn?

MR. SINCICH: Overbroad. Assumes facts.

THE WITNESS: There is a indication that the steering wheel returned to center after turning left.

BY MR. HANRAHAN:

Q And did you testify earlier that the patrol

vehicle -- another way of putting that is it disengaged from its turn to the left?

MR. SINCICH: Vague as to time.

THE WITNESS: Yes. I would say the vehicle -- it initiated a left-hand turn and then disengaged the left-hand turn or terminated the left-hand turn and returned to, even if it was only briefly, a straight path of travel.

BY MR. HANRAHAN:

Q So when the patrol vehicle is turning back to a straight path of travel, that means that the wheels are facing basically straight? They are not canted one angle or the other; is that true?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: Yes.

BY MR. HANRAHAN:

Q And when the steering input has stopped, that means the steering wheel is not turning one way or the other. It's basically just neutral, not turned in either direction; is that true?

A Just to clarify, you said that if -- like, essentially what you are saying is if it shows zero that the wheel is not turning, and I just want to clarify that what it tells us is it shows that the wheel is -- the steering wheel at that particular time is centered, but

Garrett Wolfe

it doesn't tell us if the driver is actively turning the wheel, if that makes sense. So do you understand?
Q Well, when the EDR says the steering wheel position is at zero, it means the steering wheel is centered; true?
A Yes.
Q And "centered" means the steering wheel is not turning to the left or the right; true?
A It means that it's not currently turned. I just want to indicate that the wheel could be in the process -- like, it could be -- the wheel could have angular velocity. It could have -- you could be turning a wheel really fast and the moment that the snapshot is taken, it shows zero.
All I am getting at is I don't know if the wheel was stationary or not, but I do know that it was centered. Hopefully, that clarifies it.
Q Okay. All I am trying to say is that when a steering wheel is at zero, it's, okay, centered. I think you answered the question.
And there's no way to tell from your analysis or Deputy Reyes' analysis precisely where the Area of Impact 1 was; is that correct?
A Again, I would just say that precision is hard to define. It's hard to precisely say as in to narrow it

down to a very small area. In this particular case, it's quite difficult.

Q And is that partly because of the high velocity of the Nissan before and during the collision?

A Yes, it is partly because of that.

Q Is that because also the patrol vehicle was moving immediately before the collision?

A Yes. That also makes it more difficult.

Q Would you characterize this as a dynamic crash scene?

MR. CESENA: Objection. Vague.

THE WITNESS: Yeah. I mean, yes, but I kind of feel like that's kind of how most crashes could be described as, like, a dynamic instant, you know. So if you have, like, a more specific question, maybe I could answer it.

BY MR. HANRAHAN:

Q Well, what I am getting at is, because the vehicles were both moving and one vehicle was going extremely fast, does that create a very violent impact when those two vehicles collide?

MR. SINCICH: Argumentative. Overbroad.

THE WITNESS: Yes.

BY MR. HANRAHAN:

Q And the more violent the impact and the higher

Garrett Wolf

rates of speed, is it that much harder in your analysis or in Deputy Reyes' analysis to determine the approximate area of impact?

MR. SINCICH: Overbroad. Calls for speculation. Argumentative.

THE WITNESS: I would say that higher speed crashes can certainly be -- it certainly can be more challenging to ascertain the area of impact. It isn't necessarily always the case, but in this case in particular, there was a very large discrepancy of speed between the two vehicles, and they -- they moved significantly postimpact, and then that, of course, combined with the ground being more slick and having no tire impressions made it extremely difficult.

BY MR. HANRAHAN:

Q Back to your inspection of the vehicles, the front end of the patrol vehicle was almost entirely sheared off; is that correct?

MR. SINCICH: Overbroad. Misstates facts.

THE WITNESS: I would say that it was -- it was -- I don't know about -- I wouldn't use the term "shear" because that is a -- that is a specific thing. I would say that the front portion of the vehicle from the A-pillar forward was almost -- almost completely separated from the A-pillar to the rear.

A Correct.
Q The damage to the patrol vehicle was so extensive, it basically knocked the engine and transmission loose from the vehicle; is that true?
A Yes.
Q And the damage in the patrol vehicle went all the way from the very front of the vehicle all the way to the passenger compartment behind the windshield area; is that true? Or up to the windshield area; is that true?
A Of the patrol vehicle?
Q Yes.
A There was damage beyond that. There was -- there was damage inside of the -- inside of the vehicle, but visibly from the outside, yes, the damage was mostly from the A-pillar forward.
Q Okay. And for the sake of your analysis, that's what you are looking at to determine the cause of this crash and what happened during this crash; correct?
A In particular, the way the vehicle -- the patrol vehicle was damaged and the way that the engine separated I think was important in determining the -- basically the principal direction of force of the Nissan into the patrol vehicle.
Q Okay. Some part of the patrol vehicle had a violent collision with the front passenger door and

passenger compartment of the Nissan as well -- just start with that. Restate it. Let me restate it.

Some part of the patrol vehicle collided violently with the front passenger side door of the Nissan; correct?

A Correct.

Q And caused it to knock the door right off its hinges; correct?

MR. SINCICH: Misstates testimony. Assumes facts. Lacks foundation.

BY MR. HANRAHAN:

Q Correct?

A Can you ask it again? I am sorry.

Q The patrol vehicle collided with the passenger side front door of the Nissan; correct?

A Yes.

Q The front of the patrol vehicle collided with the passenger side door of the Nissan; correct?

A The front, yes.

Q And the front collided so violently with the front passenger side of the Nissan that it killed the right front passenger and ejected the driver onto the sidewalk; correct?

A I think that's outside of my expertise.

Q Okay. Well, you know that -- you believe that

the passenger compartment of -- the front passenger compartment of the Nissan at the front driver's seat -- at the front passenger seat was basically collapsed; is that true?
A Yes.
Q Is that what happened in this crash?
A There was intrusion into the passenger compartment on the passenger side.
Q Okay. And so this was a collision that was as you say -- you were talking about momentum and tennis balls hitting one another. This is -- is this an inelastic collision or elastic collision?
A This is an inelastic collision.
Q And it's an inelastic collision how come?
A Because in an elastic collision, you don't lose momentum to things like, you know, the crushing metal deformation, the sound and heat that come from it. So an inelastic collision is more like two pieces of Play-Doh colliding where they each change shape, and that absorbs some of the energy, and so that's what this crash is, is the damage absorbed some of the energy whereas two tennis balls colliding, they may change shape momentarily but in separation they return to their shape. And so, again, in theory, that would be an elastic collision, but car crashes are not elastic.

Garrett Wolfe

Q Okay. Well, in this collision, the Nissan and the patrol vehicle collided, and then the Nissan shot off and hit two other vehicles parked along the curb; correct?

A Correct.

Q And the patrol vehicle bounced back several feet at least; is that true?

A Correct.

Q So this wasn't a case of two pieces of Play-Doh coming together and sticking together. This was a case where there was an impact and each vehicle shot off in different directions like pool balls; is that correct?

A No. Pool balls would be a better example of a near elastic collision.

Q Okay. Well, skip the pool ball simile. This was a case where the patrol vehicle smashed into the side of the Nissan and the Nissan shot off northbound and the patrol vehicle shot back eastbound down Valley; is that true?

MR. CESENA: I would object. That mischaracterizes all of the prior testimony. No one has ever mentioned "shot back."

THE WITNESS: Yeah. I would say the Nissan departed in a northeasternly direction, and the patrol vehicle departed in a predominantly eastern but most

likely a slightly northeastern direction.

BY MR. HANRAHAN:

Q Okay. And the damage to the Nissan, that was caused due to the high rates of speed of the Nissan; true?

MR. SINCICH: Calls for speculation. Lacks foundation. Improper opinion.

THE WITNESS: I would say the speed was a factor.

BY MR. HANRAHAN:

Q Well, in your analysis, is the fact that the Nissan was described as going approximately 105 miles per hour immediately before the crash -- is that a primary factor to this crash?

A Yes.

MR. SINCICH: Calls for speculation.

BY MR. HANRAHAN:

Q Did you also analyze whether there were latent problems with the tires on the Nissan?

A I did.

Q Did you analyze whether there was also latent problems with the steering rack and pinions on the Nissan?

A I am sorry. Could you ask that question one more time?

Q Did you determine that there was also latent damage to the steering of the Nissan?

A Postcrash, correct.

Q Well, did you conclude that there was a broken tie rod on the steering system between the rack and the right front steering knuckle?

A Yes.

Q And did you do some research about whether there was a National Highway Traffic and Safety recall for that defect?

A I did.

Q So were you able to determine whether the broken tie rod on the steering system existed before or after the collision?

A No.

Q Would the car still be drivable if it had this defect between the rack and the right front steering knuckle?

A No.

Q Okay. And was the -- did the recall have to do with that under strain oversteering, for example, that this-- this tie rod might break under stress?

A Yes.

Q And what effect would that have on the ability to steer the vehicle if that were to happen, say, if

Garrett Wolf

someone were driving a vehicle at excess speeds on a wet road surface?

A I would expect most likely a complete loss of control.

Q Now, let's talk about for a minute your analysis of the tires to the vehicle. Did you evaluate -- and the vehicle I am talking about -- and just let me also clarify, the problem with the broken tie rod, was that on the Nissan?

A Yes.

Q And did you also analyze the condition of the tires on the Nissan?

A Yes.

Q On the left front tire, did you analyze whether that was a safe tire with appropriate tire pressure?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: I did.

BY MR. HANRAHAN:

Q What was your conclusion?

A The tire was in good condition but was underinflated.

Q Is it inherently dangerous for a left front tire on a Nissan such as this to be underinflated to 36.1 PSI instead of the max 44 PSI?

MR. SINCICH: Vague.

THE WITNESS: Not necessarily. I would need to -- I don't know if I put that information in here. I need to see what the -- what the vehicle -- what the manufacturer's suggested tire pressure is.

BY MR. HANRAHAN:

Q Okay. For the right front tire in your analysis, you determined that that tire sustained a catastrophic failure as a result of the crash?

A The left front?

Q No. The right front.

A The right front, yes.

Q And now I am going to ask you about the left rear tire. Did you determine whether that was installed in the correct direction?

A I did.

Q What was your determination?

A That it was installed backwards.

Q What does it mean when a tire is installed backwards?

A If it is a directional tire like this particular tire, the channels that are designed to push water out from the center of the tire and to improve traction would, in fact, be channeling water into the tire.

Q What effect would that have when one is driving on wet roads?

Garrett Wolf

MR. SINCICH: Calls for speculation.

THE WITNESS: It could potentially reduce traction to be -- yeah, it would reduce traction. It could reduce traction.

BY MR. HANRAHAN:

Q Is that because instead of channeling the water away from the tire, the tire would channel water underneath the tire?

A That's correct.

Q Would that make the tire more susceptible to hydroplaning and losing control underneath that tire?

MR. SINCICH: Vague.

THE WITNESS: Yes.

BY MR. HANRAHAN:

Q Did you analyze whether that left rear tire on the Nissan was underinflated?

A Yes.

Q Was it inflated to 20.2 PSI?

A Yes.

Q Was the recommended tire pressure on that tire 33 PSI?

A Again, I am looking for where I have -- if I have -- I apologize if I didn't put that in there the recommended tire pressures. It's probably in a photograph of the car. So I can't -- I don't have that

information in front of me, so I can't testify to what the recommended tire pressure was for the tires, but in my experience, just based off my training and experience, 20 is generally far below a typical specification for a vehicle like this.

Q Let me see if I can find -- oh, do you know whether the cell phones were analyzed of the occupants of the vehicle as part of your analysis?

A I do not believe they were.

Q Do you know one way or the other?

A I am near confident that they were not and that they were provided to Fontana Police Department for their investigation.

Q Okay. So, in other words, MAIT didn't analyze them as far as you know?

A Correct.

Q Okay. I will look for -- I am trying to find your -- anyway, I will keep looking for your report, but as to the right rear tire of the Nissan, did you analyze that one when you inspected that vehicle?

A I did.

Q Was that a regular tire or a spare tire?

A That was a spare tire.

Q What's a spare tire?

A I am sorry. What is a spare tire?

Q Yeah. What is a spare tire?

A A spare tire is a -- generally a smaller tire that's intended for temporary use in the event of a flat and is carried usually in the trunk of a vehicle or underneath the vehicle.

Q Is it safe to leave a spare tire on a vehicle and just keep driving with it mile after mile?

MR. SINCICH: Incomplete hypothetical.

THE WITNESS: In my opinion, no.

BY MR. HANRAHAN:

Q Why is that?

A Because they are designed for a temporary use. They are not engineered to be driven on for extended periods of time or at highway speeds, or they are not engineered to provide the same traction and control that a regular street tire would have, and so for those reasons generally you shouldn't drive for extended periods of time on those tires.

Q Do the surface of the tires say printed on its sidewall "Temporary use only, spare tire, and inflate to 60 PSI"?

A Yes.

Q Was that spare tire underinflated to 24.7 PSI instead?

A Yes.

Q Was there another warning label on the spare tire?
A Yes.
Q Did the warning label say, "Warning: Spare tire for temporary emergency use only"?
A Yes.
Q Did the warning also say, "Replace with regular tire as soon as possible to avoid possible accident and serious" and then an illegible word after that because of a smudge?
A Yes.
Q Did the warning also say, "Do not exceed 50" or any miles per hour -- or "50 miles per hour," I believe?
A Yes. It said, "Do not exceed 50 miles per hour," and then it had 80 kilometers an hour.
Q Okay. Did the warning also say, "See owner's manual before using spare tire"?
A Yes.
Q Did you see another car in the white Nissan other than these four we have discussed so far?
MR. SINCICH: You said "car," Counsel.
MR. HANRAHAN: Sorry. What did I say?
MR. SINCICH: You said "car in the car."
MR. HANRAHAN: Oh, sorry. Yeah, it's getting to be 2:30. That's what usually happens. Let me try and

rephrase that.

BY MR. HANRAHAN:

Q Sir, did you see another tire in the Nissan other than the four tires we have talked about so far?

A Yes. Well, I believe it was not in the car at the time that I located it, but there was another wheel and tire at the scene which was a match for one of the -- or at least the style of wheel that the nonspares were for the Nissan, and we have concluded that that -- that that tire was associated with that vehicle because there were no other -- there were no other vehicles that didn't have all of their wheels accounted for, and given its proximity to the Nissan and the fact that appeared to match the wheels on the Nissan and the fact that the Nissan was on a spare, we concluded that that came from the Nissan.

Q Did you do any analysis on that tire that was not actually on the Nissan?

A I don't believe so, no, besides just photographing it.

Q Okay. Did you run an accident or crash report for the Nissan?

A Did I run a crash report?

Q Yes.

A Can you clarify what you mean?

Q You know when you buy a used car, you can get a crash report done by CARFAX and they can tell you that your new car that you thought was really great but actually has been totally retrofitted?

A I see. Like a vehicle history report. No, I did not run --

Q Yes.

A -- a vehicle history report for the Nissan.

Q And in terms of primary causes, Deputy Reyes concluded that -- let me back up a little bit.

Deputy Reyes' job in this case was to serve as the case deputy or case investigator; is that correct?

A Reyes -- I think the term you are looking for that we would use would be case agent.

Q Okay.

A And I believe Holland was designated as the case agent which is why his name is listed first. Typically, the case agents are the ones that will do the summary and cause.

Q Okay. So it was Holland's job to ultimately issue the opinion of the MAIT team as to the cause of this collision; correct?

A Correct.

Q And Deputy Holland's opinions are a collaborative effort of all of the MAIT investigators to

offer an opinion as to what caused this collision; correct?

A Correct.

Q And is there an opportunity for a MAIT investigator to write a dissenting opinion if he or she disagrees with Deputy Holland's conclusions?

A Well, I haven't heard of that. That would certainly be acceptable. It's certainly doable.

Q Okay. Well, you said that you had some disagreement with one of the authors of the report about the -- I call it the black box but the EDR data about whether the speed of the vehicle would be actually 95.55 percent slower than the stated wheel speed. Do you remember that?

A I do.

Q And you disagreed with that. You thought that actually the EDR report would be 100 percent of the stated wheel speed, that the smaller tire would have no impact on the stated wheel speed; is that true?

A I didn't -- LaFond and I didn't have any communication about it, and I didn't review his section of the report prior to the entire thing being submitted with Holland's overall opinion.

So I was -- honestly, I hadn't -- I hadn't noticed that until -- until reading it which I didn't

read it before -- before this was all brought to my attention. So, like, before this deposition came about, I hadn't read his section.

Obviously, I communicated with him, but I believe that communication was essentially limited to, you know, his calculation for the distance, and I don't believe there was any discussion about that 95 percent -- approximately 95 percent speed discrepancy.

Q Okay. Well, all I am really getting at is that in this report, that's the only discrepancy that you can point to is that .45 percent difference as to the wheel speed of the Nissan before the collision; is that true?

A That is true.

Q And -- oh, another thing is that since you can't tell, and correct me if I am wrong, the precise direction that the Nissan was facing immediately before the collision and you can't tell the exact direction that the patrol vehicle was facing immediately before the collision, you can't tell precisely how each of those vehicles was oriented to one another before the collision; is that true?

MR. CESENA: Objection. That's compound.

THE WITNESS: I would actually say no.

BY MR. HANRAHAN:

Q Okay. Well, you say that -- is it clear to you

that the front of the patrol vehicle collided with the side of the -- passenger side of the Nissan?

A Do I have to answer these in yes or no as well or can I just say --

Q Well, if anybody has a follow-up, they can follow up. The point is you don't have to explain everything. You can say yes or no and then we can take your answer or ask for follow-up, but just -- and if you don't know, that's fine, too, but just -- or you don't remember, that's a fine answer too. I am not trying to trick you or anything, but just is what I said accurate or not?

A I just -- I guess the problem that I have being a crash guy is when you say "front," you know, there's a front and there's front side and there's front side and there's back and there's backside. So, like, if we are referring to the portion of the vehicle -- the front of the vehicle as being both the front and the front sides, I just want to distinguish between the front and the front sides, if that makes sense, you know.

Q Okay. Well, I understand. When I say "the front," I mean the bumper area, like the bumper area, headlights, like the front-facing part of the vehicle, not like the whole front hood, tires, engine. Just the front of that part of the vehicle, the front of the

patrol vehicle, you know, the headlights, the bumpers, all that equipment.

A The front front?

Q Yeah, the front front. That struck the Nissan? Is that true, in your opinion?

A Yes.

Q Okay. And the part of the Nissan that that struck was the passenger side; correct?

A Yes.

Q And it struck the passenger side with such violence that it basically collapsed the passenger side compartment on the two passengers who sat in there; correct?

A I believe the intrusion came from the front, mostly from the front side of -- the front driver's side of the vehicle, not so much the front bumper area, but -- so more or less yes, but I just want to clarify.

Q Okay. And in terms of determining the area of impact, in the absence of skid marks or an eyewitness or surveillance videos showing precisely where the impact happened, the analysis of the area of impact is based on circumstantial evidence like the aftermath of the crash; correct?

A Correct.

Q And the aftermath of the crash includes various

items of debris that are scattered around the crash scene; correct?

A Correct.

Q And the location of the vehicles themselves doesn't tell you very much about where the crash occurred; correct?

A Well, that depends.

Q Well, in this situation.

A I would say that the location where the vehicles came to rest tends to indicate an area where the crash happened. It doesn't provide a precise location.

Q Right. And no item that was found at the scene, like plastic, glass, the light bar, can tell you with any precision about what the area of impact is; is that true?

A True.

Q And the EDR data, that can't tell you with any precision about where each vehicle was at the time of impact; is that true?

MR. SINCICH: Outside the scope. Calls for speculation.

THE WITNESS: I think the EDR can provide valuable information that can assist in making that determination, but by itself with no other information, the EDR data would be insufficient to precisely determine an area of impact.

BY MR. HANRAHAN:

Q Well, and the EDR data gives you a variance of, you know, up to 10 miles per hour that the vehicles were traveling, so that could translate into over 20 feet in terms of their location from beginning to end of this incident; is that correct?

A Yes.

MR. SINCICH: Lacks foundation.

BY MR. HANRAHAN:

Q When you are looking at the video of this incident, are you able to tell whether the front tires of the Nissan are heading straight or whether they are turned to one side or the other?

MR. SINCICH: Vague. Ambiguous.

THE WITNESS: From my recollection, I didn't notice whether the wheels were straight or turned, and -- but I would just add that I don't know if the reason I don't recall that is because it's not really visible or if -- if it's because they were straight.

Based off my recollection, nothing stood out to me that the wheels were turned, but I can't recall how -- how visible the wheels were. I would certainly -- I guess unfortunately at no point did I -- when looking at that video did I -- did I notice anything unusual about the wheels and -- oh, well, there you go.

BY MR. HANRAHAN:
Q Okay. I am going to mark as Exhibit E, and you tell me if you can tell from looking at this video whether you can tell whether the front tires of the white Nissan are turned in one direction or another or pointed straight or you can't tell. You just tell me what you can tell from looking at this.
(Exhibit E marked for identification.)
MR. HANRAHAN: And for the record, I am playing it from the beginning.
(Video played.)
BY MR. HANRAHAN:
Q Sorry. I have it on playing slow. Sorry.
A Okay.
Q Let me back up. I am at 39. I am going to back up five seconds so we can get right to.
A You can leave it in slow motion if you want.
Q Well, let's just watch it at real speed and then we can play with it if you want.
A Okay.
(Video played.)
THE WITNESS: Yeah, I wouldn't be able to make any judgment as to wheel position based off of that.
BY MR. HANRAHAN:
Q Okay. Do you want me to -- we will go back, and

do you want me to slow -- do you think slowing it down would have any impact on whether you could change your opinion?

A I think it's unlikely to definitively say anything. Just, I mean, even looking at this here still shot, you can't -- of the police cruiser, you can't really discern. I mean, we can assume that its wheels are facing forward, but I can't -- I can't really visually confirm that. So I don't think slowing it down will have much of an effect, but if you would like to, we can look at it for the sake of being thorough.

Q Unfortunately, it's not what I want that matters around here. It's what you think would make an impact. If you think it would make an impact, then we will do it. If you don't think it would change your opinion, then we don't need to take the time to do it.

A I say let's do it.

Q Okay. Did I hear, "Let's do it"? You were kind of muffled.

A Yes.

Q Okay. So I am going back to 30 seconds and I am going to speed it to half a second or half speed.

(Video played.)

THE WITNESS: No. I can't definitively say if wheels are facing any particular direction.

BY MR. HANRAHAN:

Q So is the only information from which you could determine the direction of the Nissan's tires before the collision would be from the black box or EDR data?

A That's the only -- I would say that's the only tool that we have at our disposal in this particular case to try to estimate the wheel position.

Q Okay. And do you know whether there was any evidence -- any effort to try to download any other electronic data from the Nissan such as its NissanConnect feature?

A To my knowledge, no.

Q Do you know whether that was possible with this vehicle?

A I don't recall being aware of it or researching it. So, no, I didn't -- I was not familiar with the -- it's essentially, what, kind of like an entertainment center or infotainment device, I assume?

Q I can represent that, yes, it is. It's like -- for example, in my car, it's like Apple Access, I think. It will link to your cell phone and link your cell phone to your car.

Do you know whether there was any effort to download that information from the Nissan by any member of your team?

A To my knowledge, no.
Q Do you know whether there was any effort to download any other kind of location information from the Nissan such as GPS data or any kind of mapping data?
A To my knowledge, no.
Q Would this have been something that you were responsible for or someone else who was a member of your team?
A It would have been most likely Rodney because he was kind of the resident expert on -- on doing those downloads, so I imagine that he is probably familiar with that. I can't speak to whether or not he was familiar with it at the time, but that would have been his -- his portion.
Q Could you tell me Rodney's last name?
A Yeah. I will spell it for you. Let me pull up his supplemental here. All right. It is Tampa like Tampa Bay and then r-o-n-g, Tamparong.
Q So in the way that you're the math expert on the team, he's the circuitry software downloading expert at the sheriff's department MAIT unit?
A He works for the -- he was a district attorney investigator.
Q Okay. So he's part of that -- when these regional investigators get together, he comes from the

Garrett Wolf

DA's office, you know, and other officers come from other agencies. That's how it works?

A Right. I believe he's -- like, his whole position is funded by the Office of Traffic Safety, I believe. Don't quote me on that. I guess it's too late; huh? I think that his -- his position is funded by the Office of Traffic Safety, and in a case-by-case basis he will assist with certain investigations.

Q So when I want someone to go back into this vehicle and pull out the Nissan access data, Rodney is the person to talk to?

A Yeah. I would think that he's probably the most qualified.

Q Okay. Let me just go through my notes. I think I am almost done.

One more question. Just backing up about the FARO scans, who took them in this case? Was that --

A Reyes.

Q -- Deputy Reyes? Okay. So Deputy Reyes should be the one. Is he also still in MAIT now?

A I do not know.

Q Do you know, does he work for the sheriff's department?

A As far as I know he does.

MR. HANRAHAN: Okay. All right. I think that's

all I have.

MR. SINCICH: I just have a little bit of follow-up. Do you need a quick break?

MR. CESENA: Yes.

MR. SINCICH: I don't want to be longer than, like, five minutes, ten minutes maybe.

MR. CESENA: Okay. Five minutes.

MR. SINCICH: I will be quick.

MR. CESENA: Five minutes.

MR. SINCICH: I will try to be super quick.

FURTHER EXAMINATION BY MR. SINCICH

BY MR. SINCICH:

Q Deputy Wolff, isn't it also true that the patrol vehicle's tires were underinflated upon examination?

A Again, I don't have the recommended pressures for the vehicles in front of me. So 42, 43, 42.

Q When you report a maximum PSI rating, are you stating maximum as recommended or what does that mean?

A No. The maximum PSI is simply the maximum pressure that the tire is engineered to operate with. The pressure that the tire should have is designated by the vehicle manufacturer.

Q Okay. Given that at the time of testing the inflation of the Nissan tires it was after a serious

Garrett Wolfe

collision, is it fair to say we don't know exactly what the pressure was at the time of the collision?

A Yes and no. I do believe it is possible in a crash for tires to -- to -- obviously to catastrophically deflate or deflate entirely. We know that that's possible.

I do believe it is possible that a tire could potentially lose some of its pressure at impact. The likelihood that -- because that would essentially require the bead of the tire to separate from the rim to allow air to escape. The likelihood that that would happen without catastrophic failure, I think, is really low.

Q Okay.

A So in my opinion, most likely if we have an intact tire -- wheel and tire assembly, the pressure that we measure generally I am of the opinion that that's accurate to what the tire was inflated to at the time, but if the tire is obviously completely deflated, then -- generally speaking absent some other circumstances, then I can presume that that's a result of the crash.

Q Okay. Is it possible that the front end bumper of the patrol vehicle came in contact with the right side of the Nissan towards the front door, and then as the Nissan moved forward which would have been east-northeast and as the patrol vehicle rotated clockwise, that during

that movement the front left tire of the patrol vehicle made the imprint into the back right door of the Nissan?

MR. HANRAHAN: Objection. Calls for speculation. Improper hypothetical. You can answer.

THE WITNESS: I personally don't believe that this crash happened that way.

BY MR. SINCICH:

Q Is it possible that's how it occurred?

MR. HANRAHAN: Same objections.

THE WITNESS: In my opinion, no.

BY MR. SINCICH:

Q Okay. Let me just go through this video really quickly here. Can you see my screen?

A It's black right there. There it is. I see it.

Q Okay. This is the surveillance video, and I am using Exhibit 2 which was previously marked during the officers' depositions. I am not going to mark it for today. Just for reference.

Do you see the black truck that's in the Number 1 lane eastbound on Valley?

A I can't tell if that's the Number 1 lane or the Number 2 lane. To me, it looks like the Number 2 lane.

Q Well, we know there's only two lanes on eastbound Valley; right?

A Yes, but I believe, unless my perspective is

wrong here, that that's the Number 2 lane and the lane -- the dividing line to the driver's side of that vehicle on the other side of that line is the Number 1 lane.

Q Let me do it this way. We have already determined that at least after crossing the crosswalk the Nissan was in the Number 1 lane; right?

A Yes, I believe so.

Q Okay. Just going forward to --

A Right.

Q Okay. Let me see. I am going forward to 35 seconds, and this is approximately the time frame that the Nissan crosses the crosswalk on the east side?

A Yes.

Q Okay. I am just going to go frame by frame as we go through it, and we are still at 35 seconds, and I stopped at 37 seconds it now reads at the bottom left. Can you see the black and white patrol vehicle?

A I do.

Q And is that the driver's side of the black and white patrol vehicle?

A I believe so.

Q It's oriented generally north?

A Yes.

Q And as I continue to click, do you see just

below the e-y of Valley at 37 seconds the red taillights of the Nissan?

A I do.

Q So we know generally speaking the Nissan is oriented to the east still?

A Yes.

Q And as I continue to click forward at 38 seconds, we can still see the white part of the driver's side door of the patrol vehicle?

MR. HANRAHAN: Objection. It speaks for itself. Argumentative.

BY MR. SINCICH:

Q You can answer, if you know.

A Yes.

Q And we can still see the rear lights of the Nissan?

A Yes.

Q As I click forward, it's still 38 seconds. Just to the left of the V in Valley, can we still see the rear red lights of the Nissan?

A Yes.

Q And so if we can still see the red lights, is it fair to say that the Nissan is still facing generally eastbound?

A Generally, yeah.

Q And as I click forward, it's still at 38 seconds. Up to the point that the Nissan went out of screen, we could still see the red lights of the Nissan; is that fair?
A I can -- yeah, I can see the lights until they went off screen, yep.
Q Okay. And the impact -- the collision occurred at some point in time after this moment; right?
A Yes.
Q Is it fair to say it was within maybe a second or two after this?
A Yes.
MR. HANRAHAN: Okay. I have no further questions.
MR. SINCICH: I have no further question.
MR. CESENA: I have no questions now. Thank you.
MR. SINCICH: Is there any orders you need to get on the record before we go off?
THE COURT REPORTER: Mr. Cesena, would you like to order a copy of the transcript?
MR. CESENA: Oh, I'm sorry. Yes. I was just looking at something else.
THE COURT REPORTER: No problem. Thank you.
And, Eugene, would you like to order a copy of

the transcript?

MR. HANRAHAN: Yes, please.

(The deposition concluded at 3:06 p.m.)

REPORTER'S CERTIFICATION

I, MONICA SCHOONOVER, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of Certificate No. 10220, which is in full force and effect and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

That the foregoing 192 pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

That prior to the completion of the foregoing deposition, review of the transcript was requested.

I further certify that I am not a relative or

employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 15th day of July, 2026.

MONICA SCHOONOVER, CSR No. 10220

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ____ day of __________________, 2026.

______________________________________
GARRETT WOLFF

# DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

________________________________________________________

SIGNATURE______________________________DATE:______________
GARRETT WOLFF

# DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____________________

_________________________________________________________

Reason for change:______________________________________

_________________________________________________________

Page No._____Line No._____Change to:_____________________

_________________________________________________________

Reason for change:______________________________________

_________________________________________________________

Page No._____Line No._____Change to:_____________________

_________________________________________________________

Reason for change:______________________________________

_________________________________________________________

Page No._____Line No._____Change to:_____________________

_________________________________________________________

Reason for change:______________________________________

_________________________________________________________

Page No._____Line No._____Change to:_____________________

_________________________________________________________

Reason for change:______________________________________

_________________________________________________________

SIGNATURE_____________________________DATE:______________
GARRETT WOLFF

Focus Litigation Solutions
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone (916) 228-4593
Production@FocusLitigationSolutions.com

July 17, 2026

Garrett Wolff
gWolfff@sbcsd.org

Re: Diana Rias v. City of Fontana
Date of Deposition: July 2, 2026

The transcript of your deposition taken in the above-entitled matter has been transcribed. The original transcript will be held for 30 days from the date of this letter before it is sealed and forwarded to the noticing attorney.

You have the right to review, sign and make corrections to your transcript within the 30-day period. Please call the above number, or e-mail to make an appointment for your review. It is our policy not to release the original transcript and complimentary copies are not provided.

If you are represented by an attorney, we advise that you contact your attorney to discuss this matter. If you are an independent witness and have questions, please contact the attorney who requested you to testify or this office for further instructions.

If you wish to waive signature, please sign and date below and return this letter to the above address. In the event you have not read, corrected, and signed your deposition within (30) days of receipt of this letter, it may be used with the full force and effect as though it had been read, corrected, and signed.

Cc: All counsel

______________________ ______________________
DATE Garrett Wolff

# Exhibit K

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

DIANA RIAS; TATANISHA PITTS;
DOMINIC ADAMS Sr.; and
BRITTANY MASON,

Plaintiffs,

v. Case No. 5:25-cv-00207-JGB-SHK

CITY OF FONTANA; EDWARD
BAUTISTA; JESUS GARCIA;
DANIEL PRECIE; BRIAN
ZOZAYA; and DOES 1-10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF

JESUS GARCIA

WEDNESDAY, JUNE 3, 2026

Reported Stenographically by:
KIMBERLY D'URSO, CSR 11372, RPR
Job No. 27646

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: MARCEL SINCICH, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
msincich@galipolaw.com

SHOJAI LAW FIRM
BY: NEEMA SHOJAI, ESQ.
8880 Rio San Diego, Suite 800
San Diego, California 92108
619.777.0383
neema@shojaifirm.com

FOR THE DEFENDANTS CITY OF FONTANA, EDWARD BAUTISTA, JESUS GARCIA, DANIEL PRECIE, BRIAN ZOZAYA:

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
BY: EUGENE P. RAMIREZ, ESQ.
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
213.624.6900
eugene.ramirez@manningkass.com

FOR MINOR A:

LAW OFFICES OF JAMES H. CESENA
BY: JAMES H. CESENA, ESQ.
1748 W. Katella Av., #105
Orange, CA 92867
714.744.3333
jamescesena711@gmail.com

--oOo--

INDEX OF EXAMINATION

WITNESS: JESUS GARCIA


EXAMINATION BY PAGE

MR. SINCICH..............................4

MR. CESENA.............................102


EXHIBITS FOR REFERENCE


EXHIBIT DESCRIPTION PAGE

Ex 1 - Clip of radio communication...............82

Ex 2 - 50-second clip of the surveillance video on Valley and Cypress.....................87

Ex 3 - Copies of three photographs...............96

Ex 4 - Copy of Google Maps photo.................99


--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 3rd day of June, 2026, commencing at the hour of 9:13 a.m., thereof, JESUS GARCIA, appeared remotely in Los Angeles, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

EXAMINATION

BY MR. SINCICH:

Q. Good morning, Mr. Garcia. How are you?
A. Good morning, sir. I'm okay. How are you?
Q. All right. Thank you for asking. I'm doing well.
Have you had your deposition taken before?
A. Yes.
Q. How many times?
A. Once.
Q. Was it related to your responsibilities as a

were inside the white sedan?
A. Yes, sir.
Q. Is it fair to say you didn't know what they were thinking at the time?
A. Yes, sir.
Q. Up to the time of the collision, had you received any information that they had physically injured any person?
A. Not that I recall.
Q. Any information that they had verbally threatened any person?
A. Not that I recall.
Q. Prior to your collision, had you received any information as to whether they were fleeing from a particular place?
A. I'm sorry. Could you repeat the question, sir?
Q. Yeah. Do you know if they were fleeing from a particular place?
A. I know that they were fleeing from law enforcement, not a particular place.
Q. Okay. So you didn't know, like, where they were coming from when they first got engaged with law enforcement?
A. No, sir. All I know is what was put out over the radio.

Q. Okay. Did you know why law enforcement began the engagement with that vehicle?
A. I recall having heard -- I'm not sure exactly at what point -- that it was for Vehicle Code violations.
Q. Do you know what Vehicle Code violations they were?
A. No, sir.
Q. As far as you knew at the time, they could have been, like, a minor violation. Is that fair to say?
MR. RAMIREZ: May call for speculation.
But you may respond what you knew.
THE WITNESS: Vehicle Code violations range from minor to a severe. So, yes.
BY MR. SINCICH:
Q. Okay. And prior to the collision between your vehicle and the white car, did you see any collision between the white car and any other vehicle?
A. Not that I recall.
Q. Did you hear anybody state over the radio that there was a, like, different vehicle collision at all, during the pursuit?
A. I'm sorry. Say it again, sir?
Q. Did you hear any information over the radio that there was another collision during the pursuit?

A. I don't --

Q. I'm sorry. Say it again?

A. I don't remember.

Q. Okay. Do you know if anybody requested air support?

A. I don't recall.

Q. To your knowledge, was air support available for things like vehicle pursuits, at the time of the incident?

MR. RAMIREZ: May call for speculation.

But you may respond, if you know.

THE WITNESS: At the time, I don't recall if -- if they were in the air or if we had the -- the helicopter up or not.

Q. Was there a helicopter that was available to Fontana P.D. at the time?

A. We -- we had a helicopter, yes. I'm not sure if they were working that night or not, is what I'm saying.

Q. Okay. Thank you.

Did you hear anyone request backup for the pursuit?

A. Not specifically, no, sir.

Q. What do you mean by, "Not specifically"?

A. Typically, in police work, when a vehicle is

engaged in a pursuit, for officer safety, we -- we -- we try to go assist within our policy's limits.

Q. Okay. And was that what your intention was, was to try to go and assist the pursuit?

A. To respond, yes, sir.

Q. Okay. Did you hear anyone over the radio state that the white car had ran any red lights?

A. I don't recall, sir.

Q. Okay. What were the road conditions like at the time?

A. I remember that night was a -- a mix of light rain to mild rain, so the road would have been wet or -- or damp.

Q. Okay. Now, the vehicle that you were driving, was that a Fontana Police Department patrol vehicle?

A. Yes, sir.

Q. What kind was it?

A. I believe it was a Ford Explorer.

Q. That's an SUV?

A. Yes, sir.

Q. Do you know if that SUV had ballistic panels?

A. I'm not sure, sir.

Q. Okay. Do you know if it was -- any modifications to that vehicle, besides being painted black or white?

MR. RAMIREZ: It's vague and ambiguous.
But you can respond, if you know the modifications.
THE WITNESS: No. I'm sorry. I'm not sure what the -- what's done to the vehicles before we use them.
BY MR. SINCICH:
Q. Okay. Did that vehicle have a grill guard?
A. I'm sorry.
Q. Did your vehicle have a grill guard?
A. "A grill guard"?
Q. A grill guard.
A. We have what's -- what I know of as to be a push bar.
Q. Okay. And I take it it had the overhead lights and sirens?
A. Yes.
Q. Okay. Did your vehicle have a dash camera?
A. Not that I know of.
Q. Do you know of any vehicles in Fontana P.D., did they have dash cameras at the time?
A. Not that I know of.
Q. Okay. Were you wearing a body-worn camera at the time?
A. Yes, sir.

Q. Did you ever activate your body-worn camera?
A. Not that I recall.
Q. Did you inspect the vehicle at the start of the shift?
A. We conduct a basic inspection of the vehicles before the shift, yes.
Q. When you say "we," are you referring to you and your partner?
A. Referring to our department.
Q. Okay. Did you personally inspect the vehicle?
A. Yes.
Q. Did you ensure that the radio was functioning correctly?
A. Not specifically conducting a radio check, but I did confirm that the radio worked.
Q. Okay. Did you confirm that all the lights were functioning correctly?
A. I confirmed that our overhead lights worked and that our siren worked.
Q. Okay. Do you know if the other vehicle -- I believe it was a Nissan Sentra. Is that your recollection?
A. I don't remem- -- I don't recall make and model. I remember it was a white sedan.
Q. Okay. Based on your recollection, did your SUV

hit the sedan, or the did the sedan hit your SUV?
A. I don't remember the collision itself.
Q. Okay. Do you recall seeing damage to your SUV?
A. I recall what I have seen in photos and videos. Again, I don't remember much of the accident itself.
Q. Okay. What's the general location of the damage to your SUV?
A. Again, based off of what I've seen in photos and videos, it looks like the front end.
Q. And do you know where the general damage was to the white sedan?
A. Not specifically. No, sir.
Q. Okay. Did you review photographs of the white sedan at all?
A. Yes, sir.
Q. Okay. Was your SUV moving at the time of the collision?
A. Yes, sir.
Q. How fast were you going?
A. I don't believe it was more than, maybe, 20 to 25 miles an hour.
Q. Do you know if you were braking or accelerating at the time?
A. I don't recall.
Q. Do you recall if you were turning left or right

or going straight at the time of the collision?
A. Again, I don't remember at the time of the collision. Prior to the collision, I remember being in the Number 1 lane of westbound traffic on Valley.
Q. Okay. Do you know what lane you were in at the time of the collision?
A. Again, sir, I don't remember the collision itself.
Q. Okay. After you recall being in the Number 1 lane, do you recall turning at all?
A. Prior to the -- prior to being in the Number 1 lane, I -- I did turn out of a driveway.
Q. Right. What about immediately prior to the collision, did you try to turn at all?
A. I don't recall.
Q. Do you recall if you did anything to try to avoid the collision?
A. Not that I recall.
Q. For instance, did you try to honk your horn?
A. Not that I recall.
Q. Did you try to hit the brakes, or anything like that?
A. Not that I recall, specifically.
Q. Okay. Was the white car moving at the time of the collision?

A. I'm not sure, sir.
Q. Okay. Did you see the white car prior to the collision?
A. I saw headlights. I -- I -- I'm not sure -- to describe a vehicle, I wouldn't be able to tell you that I recall, without having looked at some of the footage and -- and photographs.
Q. Okay. When you say that you "saw headlights," are you referring to the white sedan?
A. Again, sir, I don't -- specifically, based off my memory, leading up to remembering and seeing headlights, I don't know what color the car was or what it looked like. I just remember having seen headlights.
Q. Right. Were those headlights the vehicle that ended up being involved in the collision with your vehicle?
A. After having seen photos, I believe so, yes.
Q. Okay. Approximately how long prior to the collision did you first see the headlights?
A. To give you a specific time frame, I'm not sure, sir.
Q. Could you give me your best estimate, a range, perhaps?
A. Maybe a couple seconds or a second.
Q. Okay. Were you able to judge how fast you

believed that vehicle was going in?
A. No, sir.
Q. Did you see any of the occupants inside the vehicle?
A. Could you specify the question?
Q. Right. So before the collision occurred, did you see any occupants inside the white sedan?
A. Not that I recall.
Q. Did you see any movement inside the white sedan, prior to the collision?
A. Not that I recall.
Q. Did you see the white sedan turning at all, prior to the collision?
A. I don't recall, sir.
Q. Okay. Could you describe your best recollection of what you do recall on how the collision occurred, for instance, the moment of impact?
A. Again, I don't remember the collision itself. And I'm sorry I keep repeating that, but I don't remember the collision itself. And all I recall prior to is turning out from a driveway, being in the Number 1 lane, and then seeing headlights.
Q. And when you saw those headlights, what lane did you believe those headlights were coming from?
A. Based on radio traffic and the general, like,

recollection, and from what I recall, I believe they were coming from -- they were from the -- from the west, coming east, on Valley.

Q. And what lane do you recall them being in when you first saw the headlights?

A. It all happened so fast. I -- I think right in front of us, pretty much, in the Number 1 lane of westbound traffic.

Q. Okay. So from your recollection, the white sedan was coming straight on to your vehicle, going eastbound, but in the Number 1 westbound lane?

A. Again, my -- my memory is a little foggy on that, but I believe so, based off the things that I pieced together from what I can remember.

Q. Okay. And I appreciate that. Thank you.

Did you see the white sedan do any kind of maneuvers to try to avoid the crash, like braking or swerving?

A. I'm not sure, sir.

Q. Did you hear any noise immediately prior to the crash?

A. I don't remember.

Q. Like, for instance, did you hear a horn honking?

A. I don't remember, sir. I'm sorry.

Q. Okay. And sometimes I'll ask the questions because it might jog your memory just by hearing the question. So, that's why -- that's why I continue to ask. I don't mean to bother you with it, because I understand.

MR. RAMIREZ: We don't think you're being argumentative at all, Marcel. We get it.

MR. SINCICH: I appreciate it.

MR. RAMIREZ: I know when you are argumentative, but this isn't it.

MR. SINCICH: Yeah, I don't think this one's it.

BY MR. SINCICH:

Q. If you didn't hear a horn, for instance, did you hear, like, tires squealing or screeching from braking?

A. Again, sir, I apologize, but I don't remember.

Q. Okay. After the incident, did you see any skid marks on the road?

A. I don't recall.

Q. Is it your understanding, as you sit here today, that the white sedan is the vehicle that was subject to the vehicle pursuit?

A. Could you clarify the question?

Q. Yeah. Was the white sedan that you were in a

collision with, that was the subject of the vehicle pursuit; right?

A. To my understanding, yes, sir.

Q. Okay. Do you know how many patrol vehicles were involved in the pursuit?

A. To my recollection, I believe just the one.

Q. And who was that vehicle?

A. I believe -- I believe it would have been Officer Zozaya and Officer Precie in one unit.

Q. And it was Officer Zozaya that was driving?

A. I believe so. Yes, sir.

MR. SINCICH: Okay. And can you spell Precie for our court reporter?

THE WITNESS: I'm not sure of the exact spelling of his name. I'm sorry.

MR. RAMIREZ: I think it's P-R-E-C-I-E. I think that's it.

MR. CESENA: That's correct. That's it.

MR. SINCICH: Okay.

BY MR. SINCICH:

Q. Okay. I think you said earlier that, really, the only information you knew was what was transmitted over the radio. Is that what you said?

A. At the time, yes, sir.

Q. Do you know who was making the radio

transmissions between those two officers?
A. I believe it was Officer Zozaya, but I don't recall exactly.
Q. Okay. And I think you said that you were -- you were responding to the pursuit earlier?
A. Yes, sir.
Q. Can you describe that? What do you mean by that?
A. Specifically, what is it you're asking?
Q. Just to add some clarification to what you mean by you were "responding to the pursuit"?
A. I was trying to go assist my partner in the pursuit for officer safety, so I was leaving the area where I was, to go to respond to the area of either where they were going, or the traffic -- the radio traffic that was being put out.
Q. Okay. So you were intending to join the vehicle pursuit?
A. To assist, yes, sir.
Q. And when you say "assist," that would have meant that you would be part of the vehicles that were following the white sedan until it eventually pulled over?
A. Ideally, yes, sir.
Q. Okay. So when you pulled out of the parking

lot, I think you said that your intent was to join the vehicle pursuit; right?
A. Again, my intent was to respond to assist my partner in the pursuit.
Q. And I think you said that you were trying to go to where the direction they were going in. Something like that. Do you recall that?
A. I was attempting to respond to the pursuit, yes.
Q. Okay. Did you have an understanding that the pursuit was going eastbound on Valley?
A. Yes, sir.
Q. Why did you turn westbound on Valley?
A. I -- again, I was trying to respond to the pursuit, so I would have had to have left the area that I was in, and there's only --
Q. Okay.
A. I'm not sure if there's only one way to leave that parking area, but it was the closest one to me.
Q. Okay. Was it an option to wait in the parking lot to see which direction the pursuit went before leaving the parking lot?
A. Yes, sir.
Q. And I know you described some of your injuries as it relates to the collision. I think you said you

had back pain?
A. Yes, sir.
Q. Were you transported to the hospital after the incident?
A. Yes, sir.
Q. Did you stay in the hospital for some period of time?
A. Yes, sir.
Q. Approximately how long?
A. I don't know exactly. I know that by the next day, I was home.
Q. Okay. Were you transported by ambulance?
A. No, sir.
Q. How did you get to the hospital?
A. I was -- I was transported by one of our units, one of our officers.
Q. How long after the incident did you go to the hospital?
A. I don't recall exactly.
Q. Was it within an hour?
A. All that stuff's kind of a very harsh blur to me, sir. I don't -- I don't remember exactly.
Q. Okay. After the collision, I understand that at some point you were outside of your vehicle; is that fair?

A. Again, I don't recall exactly. I've -- I've seen footage of -- I think it's me outside of my vehicle, yes.
Q. Were you walking around?
A. I don't recall.
Q. What were your injuries on the day of the incident?
A. I don't -- I'm not -- don't remember exactly what they wrote on my medical report, so I -- I -- couldn't tell you exactly.
Q. Could you just describe what your injuries are, then?
A. From what I remember, I had -- I'd hit my head, so I had a cut on my head. I had cuts, bruising, and swelling, and all kinds of stuff all over my arms. I had hit my -- my elbow.
MR. RAMIREZ: Which elbow?
THE WITNESS: My right elbow. I had really bad -- really bad back pain. A really bad headache.
That I can remember, that was -- those are the majority. Again, that entire area is kind of a blur, so I don't remember exactly, but I think that's a good summary.
BY MR. SINCICH:
Q. Okay. Any broken bones?

A. Not that I recall.
Q. Did you drive home from the hospital the next day?
A. No, sir.
Q. How long after the incident did you feel comfortable driving again?
A. I don't remember.
Q. Did you feel like your injuries prevented you from driving?
A. I mean, I think so. Yeah.
Q. Are you driving now?
A. Yes, sir.
Q. When you were discharged from the hospital, were you able to walk?
A. I believe so.
Q. Okay. Do you know if any other officers were injured as a result of the incident?
A. Yes, sir.
Q. Who was that?
A. My partner, Officer Terwilliger.
Q. Can you spell that, please?
A. No, sir, I can't. I'm sorry.
MR. SINCICH: It's T-E-R-W-I-L-L-I-G-E-R, for the court reporter.
MR. RAMIREZ: That sounds about right.

THE WITNESS: I -- I think so.

MR. SINCICH: I hope I'll pronounce it correctly this afternoon.

THE CERTIFIED STENOGRAPHER: Thank you for the spelling.

MR. SINCICH: That's a tough one.

BY MR. SINCICH:

Q. Do you recall what his injuries are or were at the time?

MR. RAMIREZ: May call for speculation. May call for a medical conclusion. May involve HIPAA issues.

But you can answer what you know.

THE WITNESS: I remember he had a cut on his head, and was having trouble walking and getting around. I think he was on the floor at one point, based off, like, video I've seen and stuff. I don't recall exactly what his exact injuries were.

BY MR. SINCICH:

Q. Were you wearing a seatbelt during the incident?

A. I don't recall.

Q. Do you know if Officer Terwilliger was wearing a seatbelt during the incident?

A. I -- I don't remember.

Q. My understanding is that you were parked in a

parking lot on the southeast corner of Cypress and Valley; is that right?
A. I believe so, yes.
Q. And is that a particular business or something?
A. We were parked at the parking lot of Deseret Industries, I belive is the name of it. I'm not sure if that's still the name of the location.
Q. That is like a thrift store?
A. I've never been in there, sir, so I'm not sure what it is.
Q. Okay. And were you there with another patrol vehicle, as well?
A. Yes, sir.
Q. Was that a one-man or two-man unit?
A. That would have been a canine unit, so one man and his canine, I belive. I'm not sure if he had it that night or not.
Q. And which officer was that?
A. Officer Bautista.
MR. SINCICH: And can you spell that for the court reporter, please?
MR. RAMIREZ: I think it's B-A-U-T-I-S-T-A, is my best --
MR. SINCICH: Yeah.
THE WITNESS: Sorry.

MR. RAMIREZ: Best attempt, but I think that's it.

MR. SINCICH: I always try to ask the deponent first, and then we can clear it up afterwards, but we can give it a shot.

BY MR. SINCICH:

Q. So why were you guys in that parking lot?

A. I was assigned, I believe, to that beat area, and it was a good spot for us to park. And I believe I was typing a report at the time; so, yeah.

Q. Okay. So you were kind of just waiting there until you received the next call for service?

A. Yes, sir.

Q. Okay.

MR. SINCICH: All right. I see that it's 10:10. Why don't we take a ten-minute break, since we've been going about an hour, and then we'll come back on.

MR. RAMIREZ: Sounds good. Thank you.

(Break taken.)

BY MR. SINCICH:

Q. Okay. We just left off, Mr. Garcia, talking about how you were in the parking lot. Do you recall that?

A. I believe so. Yes, sir.

Q. Okay. And so at some point in the parking lot, as you were writing the report, you got some information that a vehicle pursuit had occurred?
A. Yes, sir. It was broadcast over the radio.
Q. All right. And what information did you have from that initial broadcast?
A. I don't recall, myself, having heard it, based off my memory, but I remember in the recordings the pursuit was in the area of either Citrus and Valley or Catawba and Valley. That area.
(Reporter clarification.)
MR. SINCICH: I think it's C-A-T-A-W-B-A.
THE WITNESS: Yes, sir.
MR. RAMIREZ: Very good.
MR. SINCICH: I wasn't good in spelling.
BY MR. SINCICH:
Q. From your knowledge of the City of Fontana, which street was further from your location, Citrus or Catawba?
A. I believe Citrus was further --
Q. Okay.
A. -- from my location at the time.
Q. Right. In the parking lot; right?
A. Yes, sir.
Q. And approximately, what is that distance

between the parking lot where you were at and the intersection of Valley and Citrus?

A. I don't -- I don't know of even an approximate distance, but several streets over.

Q. Is it something like miles away? Do you know?

A. I don't think so.

Q. Do you think it's less than a mile?

A. Probably right around a mile, maybe.

Q. And then what is the approximate distance, to your knowledge, from that parking lot you were in to the cross street of Valley and Cypress -- or excuse me -- Valley and Catawba?

A. Could you re-ask the question, please? Sorry.

Q. Yes. What is the approximate distance between the parking lot that you were in and the cross street of Valley and Catawba?

A. So if since Citrus and Valley is right around a mile, it would be less than that.

Q. Would it be half the distance or closer to the one-mile mark?

A. I'm not sure, sir.

Q. Okay. How long after receiving that call did you wrap up what you were doing and begin to move your vehicle?

A. I think as soon as the -- as soon as the radio

traffic came over, we -- both me and Officer Bautista tried to respond to assist.

Q. Okay. Approximately how long after receiving that initial radio call did you begin to move your vehicle?

A. Maybe a few seconds.

Q. Was your -- was your SUV already on?

A. Yes, sir.

Q. What other information did you receive prior to turning on to Valley Boulevard?

A. I don't recall.

Q. Do you recall if the pursuing officer -- is that the "primary vehicle"? Is that what it's called?

A. I'm sorry?

Q. Is it the primary vehicle that was giving the information about the pursuit?

A. Officer Zozaya and Officer Precie would have been the vehicle pursuing, I believe.

Q. Okay. But you're not sure which individual officer was on the radio?

A. Yeah. Again, not that I recall.

Q. Okay. For the sake of clarity, could we call that the "primary pursuing vehicle"?

A. Yes, sir.

Q. Okay. Did you hear communication from the

primary vehicle about the speed of the pursuit?
A. Not that I recall.
Q. Did you hear any updates from the primary pursuing vehicle about the location of the pursuit?
A. Again, sir, I'm sorry. I don't remember.
Q. Okay. Did you hear from the radio the primary vehicle indicating that the pursuit was initiated, passing Catawba?
MR. RAMIREZ: It's vague and ambiguous.
But you may respond, if you understand.
THE WITNESS: Could you repeat or rephrase the question, sir?
BY MR. SINCICH:
Q. Did you hear the primary vehicle broadcast over the radio that the pursuit was initiated passing Catawba?
A. Again, sir, I -- I don't specifically remember exactly, but I believe I do remember having heard the -- the street Catawba at one point.
Q. Okay. And was that before you started to respond?
A. I don't remember, sir. I'm sorry.
Q. Okay. Did you hear the primary vehicle stating that the pursuit was high speed?
A. I don't recall.

Q. Did you hear the primary vehicle broadcast that the pursuit was passing Oleander?
A. I don't recall, sir.
Q. Did you hear the primary vehicle in the pursuit broadcast that the pursuit was approaching Cypress?
A. Not that I remember, sir. I don't remember. Sorry.
Q. Okay. When you left the parking lot, the driveway to leave the parking lot would have been going north; right?
A. Yes, sir.
Q. And then, when you turned to west, you would have turned left?
A. Yes, sir.
Q. And at that time, you knew that the vehicle pursuit was going eastbound on Valley Boulevard?
A. Yes, sir.
Q. When you first got to -- well, strike that.
From my recollection of the video, it would have been Officer Bautista that was in front of you; right?
A. Yes, sir.
Q. Between the time that you first received that radio broadcast about a pursuit, to the time of the collision, did you have any communication with a

A. I'm not sure, sir.
Q. Did you speak with your partner in between that time frame?
A. It's possible. I don't remember.
Q. Okay. When you got to the end of the driveway -- sometimes I've heard it referred to as the "curtain of the driveway." Is that what you've heard it as, as well?
A. I've -- we call it an "apron," I believe.
Q. The "apron." Okay.
When you get to the apron of the driveway, did you stop before turning?
A. I don't recall exactly having stopped. I -- I believe I cleared the intersection.
Q. And what do you mean by "cleared the intersection"?
A. Checked to see if there's any cars immediately preventing me from turning out.
Q. Is there a procedure, for instance, that you went through in clearing the intersection?
A. Not specifically, no.
Q. Did you look to your left, to the west?
A. Yes, sir.
Q. Did you see any vehicles coming in your direction from the west?

A. Not that I could see, sir.
Q. Did you look to your right, to the east?
A. Yes, sir. I -- I believe so.
Q. Did you see any vehicles coming in your direction from the east?
A. Not that I recall.
Q. Did you hear Officer Bautista put out any radio communication?
A. Not that I recall, sir.
Q. Did you see any update on your computer that would inform officers that Officer Bautista was responding to the pursuit?
A. I don't remember.
Q. When you looked to the west, did you see any vehicles near the intersection of Cypress and Valley?
A. I don't remember. To be honest with you, I don't remember.
Q. Okay. Before you turned, were you able to see Officer Bautista's vehicle?
A. Yes.
Q. And where did he go?
A. He made a -- a westbound turn out of the apron.
Q. Okay. And do you recall what lane he was in?
A. Could you rephrase the question?
Q. Do you know what lane Officer Bautista turned

into, on Valley Boulevard?
A. Not exactly. I believe it's Lane 1 of westbound, on Valley. But I wasn't in his car, so I don't specifically remember.
Q. Okay. But he turned left, to the west?
A. Yes, sir.
Q. Okay. Is it your recollection that you had completed your left-hand turn prior to the collision?
A. Yes, sir.
Q. Okay. And what I mean by that is, you weren't still in the process of making the left-hand turn?
A. Yes, sir.
Q. When you made the decision to join the pursuit, why didn't you turn your body-worn camera on?
A. Everything happened so fast that I don't believe I had time, but I don't remember exactly specifically why I made that decision.
Q. How do you turn the body-worn camera on that you had at the time?
A. You -- there's a button you press to activate it.
Q. Was it in the center of your chest?
A. Around the area, yes.
Q. And I mean the camera itself?
A. Around the area of the chest, yes.

Q. And then the button is on the camera?
A. Yes, sir.
Q. Okay. Do you just have to press it once, or is it one that you have to press twice?
A. I don't remember.
Q. Do you know if in your vehicle, it's situated to where if you turned on your sirens, it would also turn on your body-worn camera video?
A. Not that I know of, sir.
Q. Okay. Between getting the call and the collision, did you have your sirens on at all?
A. Not that I recall. I don't remember.
Q. Did your vehicle, in that time frame, have its emergency red and blue lights on at all?
A. Again, sir, I'm sorry, but I don't remember.
Q. Based on your review of the video, could you see if you had your red and blue emergency lights on?
A. Not -- not that I recall, and not based off what I remember seeing in the video.
Q. Okay. The video that you saw of the pursuit, did that have any audio?
A. I don't think so.
Q. Okay. Did you have your headlights turned on when you were turning left on to Valley?
A. I don't remember, sir. I'm sorry.

Q. From your review of the video, were you able to see if the headlights to your vehicle were on at that time?

A. Based off what I remember, having seen of the video, I don't think so.

Q. Do you know why your headlights would have been off?

A. When we park, again, for safety -- I'm sorry -- for safety, we -- we blackout our vehicles.

Q. Okay. When you're joining a pursuit, is there any policy that you're aware of as to whether or not you're supposed to turn on your lights and sirens?

A. I'm not sure what the verbiage on the policy is exactly, sir. It's possible it's in there.

Q. What's your understanding of the policy with regard to lights and sirens, when joining a pursuit?

A. That I recall, I believe when you're actively engaged in the pursuit, you're to have your lights and sirens on.

Q. And what do you mean by "actively engaged"?

A. As in you're involved with the pursuing officer.

Q. Is there any differences in the policy for what you're supposed to do when you're actively engaged in a pursuit, as opposed to responding to the pursuit?

A. Not that I recall. Again, I don't remember the exact verbiage. It's been some time.

Q. You reviewed the pursuit policy in preparation for today, though; right?

A. Yes, sir.

Q. When was the last time you reviewed it?

A. I don't remember the exact time, but it was sometime yesterday.

Q. Okay. And when you're driving at night, generally are you supposed to use your headlights?

A. Yes, sir.

Q. And why is that?

A. Visibility.

Q. What do you mean by that, "Visibility"?

A. Visibility of the road, visibility of other vehicles.

Q. The headlights assist the driver of the vehicle to see other vehicles or obstacles in the road. Is that what you're describing?

A. Potentially, yes, sir.

Q. Do the headlights also make it easier for other drivers to see your vehicle?

MR. RAMIREZ: May call for speculation.

But you can answer.

THE WITNESS: Generally, it could, yes.

Q. Approximately how many of the 30 did you not use lights and sirens?

A. I'm not sure, to give you an exact or even approximate number. Policing is -- and particularly in pursuits, it's rapidly evolving circumstances where I could have turned them on and then turned them off, or just not had them on, and maybe turned them on at one point later in a different pursuit.

I'm not sure if that answers your question. I'm sorry.

Q. Okay. During this incident, were you trying to be inconspicuous at all?

A. While I was typing my report, leading up, yes.

Q. Right. What about between the time of when you started to respond to the pursuit to the time of the collision?

A. What was the question? Sorry.

Q. From the time that you start to respond to the time of the collision, were you attempting to be inconspicuous at all?

A. Again, I was parked inconspicuously, typing my report, and then responded. And that's kind of like a flow of events, if that makes sense?

Q. So were you still kind of in the mode of being inconspicuous?

A. At the time I was typing my report, leading up to when the call came out, yes.

Q. Okay. And what about after the call came out up to the time of the collision, were you trying to be inconspicuous at all?

A. Not that I recall.

Q. Okay. Were there any tactical reasons between receiving the call to the time of the collision, where you wouldn't want to use your headlights?

A. Sorry. Say it again.

Q. Were there any tactical reasons that you considered between receiving the call and the time of the collision, that you considered to not use your headlights?

A. Again, while I was typing, I was trying to be inconspicuous, for safety reasons and tactical reasons. And I received the call maybe a few seconds after. And again, that sequence of events is all kind of connected, to my recollection.

So not specifically for the pursuit, but I was trying to be inconspicuous while typing my report, for tactical reasons, for safety reasons, and the things we've discussed.

Q. Okay. And so that all kind of flowed into the time frame all the way up to the collision?

A. To the best of my recollection, yes, sir.
Q. Approximately how long was it from the time that you first started to respond to the time of the collision?
A. I'm not sure, sir. I don't remember.
Q. Could you give me an approximate time frame?
A. My best guess would be a few seconds, but I'm not sure.
Q. Okay. Do you recall if you used your blinker when turning left on to Valley?
A. I don't remember, sir.
Q. Do you recall, if you had turned into the Number 1 westbound lane, would you have had to pass a double-yellow line?
A. I don't remember the exact layout of the lines on Valley.
Q. Do you know if there was a center lane, or if it was a painted median?
A. And forgive me if the terminology's off, but I believe there is some sort of turning lane in the middle of eastbound and westbound lanes on Valley. I'm not sure what the exact term for that area or that lane is.
Q. Okay. And when you say a "turning lane," what does that look like, in terms of the paintings on the road?

Cypress" on the left-hand corner.

Q. Okay. Now, does this look like a type of video that you reviewed in preparation for today?

A. I believe so.

Q. Okay. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. And I'm stopping at 3 seconds.

Did you see the white car that went from eastbound Valley, turning north on to Cypress?

A. I'm not sure what the orientation of the cameras are. I did see a white car turn left.

Q. And then there appears to be another car that's stopped in the road, on the left-hand side?

A. Yes, sir. I see headlights.

Q. Okay. I'm going to press play.

(Video is being played.)

BY MR. SINCICH:

Q. All right. There's been a few other cars around 19 seconds, that are traveling. Is that fair to say?

A. Yes, sir.

Q. All right. I stopped it at 24 seconds.

If you look at the top left-hand corner of the screen, does it appear to be a patrol vehicle right

above the "Y" of "Valley"?

A. I believe so. I see what looks like a black and white car.

Q. Okay. And is this the parking lot on the top of the screen that was the Deseret Industries Thrift Store?

A. I believe so, yes.

Q. Okay. And from your review of the video and recollection of the incident, would this be Officer Bautista's car that's at the apron of the driveway, right now at 24 seconds?

A. Based off the video and what little I remember, it does seem to be that that would be Officer Bautista.

Q. Okay. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. And I stopped it at 32 seconds.

Is it fair to say that Officer Bautista turned left on to Valley, going westbound?

A. Yes, sir.

Q. And then, on the top left-hand corner of the screen at 32 seconds, just above the "P" and "R" in the word Cypress, did you see another patrol vehicle up there?

A. Yes. It looks like some sort of white vehicle.

Q. Okay. Is that your patrol vehicle?
A. Based off the video and from what I -- from what little I remember, I think so, yes.
Q. Okay. I'm going to press play.
(Video being played.)
BY MR. SINCICH:
Q. All right. I stopped it at 35 seconds.
Is this about the time that you paused for a second the apron of the driveway?
A. I don't remember, sir, exactly what I was doing at that exact time.
Q. Is that what you see in the video, your vehicle pausing for a second on the apron of the driveway?
A. It's very low visibility. I can't tell exactly what's happening. It looks like there's some sort of light there, but I can't tell exactly what it is.
Q. Right. I'm going to back up a little bit to 32 seconds, and I'm able to go frame by frame on this VLC player.
Have you ever used VLC player before?
A. I think so.
Q. Okay. I'm clicking the frame by frame. Do you see your vehicle moving on the top left-hand corner?
A. Yes, sir.
(Video being played.)

BY MR. SINCICH:

Q. And you see how the time is adjusting?

A. Yes, sir.

Q. Okay. And does it appear -- and I'm still at 34 seconds as I click, and I stopped it at 35 seconds.

Does it appear that your vehicle was around the area of the apron of the driveway when I stopped at 35 seconds?

A. Again, sir, it's very low visibility. It looks like that vehicle's in that general area. I can't tell exactly where it's at.

Q. Okay. In the general area of the apron; is that fair?

A. Yes, sir.

Q. And is it Officer Bautista's vehicle that looks like it's in approximately the Number 1 lane, westbound Valley?

MR. RAMIREZ: That may call for speculation.

But you can respond, if you can.

THE WITNESS: It looks like he's on Valley. Yes, sir. I'm not sure exactly what lane.

BY MR. SINCICH:

Q. Okay. And at this time, does it appear that the white sedan is entering the intersection of Valley and Cypress?

line be considered a painted median?
A. I'm not -- I'm not sure what that terminology, if that's accurate.
Q. Is it fair to say that it's not a turning lane?
MR. RAMIREZ: May call for speculation.
But you can respond, if you can.
THE WITNESS: Again, I -- I don't know.
BY MR. SINCICH:
Q. Do you know where, based off of -- well, you see the debris spread out along the road from the vehicles?
A. Yes, sir.
Q. Based on your recollection and reviewing the video and the photographs, do you know where your vehicle was, approximately, at the moment of impact?
A. Based off my recollection and from what I recall having seen and what I've reviewed, I believe in the Number 1 lane.
Q. And when you say "the Number 1 lane," are you talking about where these words that say "Signal ahead" are?
A. Assuming that that's Valley, westbound, near Deseret Industries, yes.
Q. Okay. So you were -- is it your recollection that you were on the south side or the north side of the

(Reporter clarification.)
BY MR. CESENA:
Q. -- entry into a pursuit?
A. It's possible, sir.
Q. However, you indicated you did not recall ever telling anyone that you were entering the pursuit; correct?
A. Not that I recall, but I wasn't in the pursuit.
Q. Well, you were not attempting -- as Mr. Garcia indicated, you were not attempting to do any of the PIT techniques, the pursuit intervention techniques?
MR. RAMIREZ: This is Mr. Garcia.
MR. CESENA: I'm sorry.
BY MR. CESENA:
Q. Mr. Cesena just asked the questions regarding the PIT. Were you attempting to do any of those items that are listed in pursuit policies?
A. I'm sorry. I got confused with the question and the interjectory. Repeat it one more time. Sorry.
Q. Sure. Vehicle Pursuit Policy 314, lists an item called "pursuit intervention techniques." You recall those questions?
A. Do I recall what questions?
Q. Mr. Sincich asked you questions regarding pursuit intervention and pursuit techniques. Do you

recall that?
A. Yes. I remember having answered questions from Mr. --
(Simultaneous speakers.)
(Reporter clarification.)
THE WITNESS: -- Sincich had answered -- had asked. I'm sorry.
BY MR. CESENA:
Q. And in any of these questions that you were asked, you indicated that you were not attempting to -- excuse me -- did you state you were not attempting to conduct a pursuit intervention?
A. I don't remember having said that I was conducting a pursuit intervention technique.
Q. Were you intending to do so?
A. Not that I recall.
Q. You were not intending to do anything -- any other tactic; correct?
A. I'm sorry. I don't understand the question.
Q. Sure. There are several tactics listed that are defined, such as blocking or boxing in, pursuit intervention, the PIT, ramming, road blocks, tire deflation. Were you attempting to do any of those items?
A. Not that I recall, sir. I was just responding

to the pursuit.

Q. And in responding to the pursuit, do you know whether or not you had been requested to do so?

A. It's -- I'm not sure this answers your question, but in general, based of training and experience, whether an officer puts out a pursuit and there's a single unit involved, it's an officer safety thing to respond to the pursuit to assist.

I'm not sure if that answers the question.

Q. Well, isn't it required, under your pursuit policy for the Fontana Police Department, that you are to immediately notify dispatch of your enter into the pursuit?

A. Yes, sir, but I wasn't in the pursuit.

Q. Well, what was your objective of entering the roadway?

A. Again, I'm not sure if this answers the question, sir, but I was responding to assist in the pursuit.

Q. But you were not specifically requested to do so, nor did you notify dispatch?

A. Correct. Again, I'm not sure if this answers your question, sir, but in general, it's an officer safety thing. When there's a single officer involved in a pursuit, it's a safety thing to respond to assist the

Q. Sure. You were asked regarding -- regarding for safety of others on the roadway when you are entering?

A. I don't remember if I was asked that or not. I think so.

Q. Okay. And in reviewing the video that you saw just a few moments ago, showing your car was in the median area; correct?

MR. RAMIREZ: May call for speculation. Vague and ambiguous as to time.

But you may respond.

THE WITNESS: If -- if what you're asking is if in the video I can see myself in that -- what I refer to as the "turning lane" --

BY MR. CESENA:

Q. It was a photograph. I'm sorry. But in the photograph.

A. I'm sorry. Which photograph and what was the question?

Q. You were shown some photographs, a series of photographs, Exhibit 3, with three photos. It shows your vehicle in the median area. That was, in fact, your vehicle; correct?

A. If it's referring to the photos that I hadn't seen before, I -- I believe so.

Q. Have you seen any -- any photo showing your vehicle in any westbound lane on Valley?
A. I'm not sure. I don't think so.
Q. Pardon?
A. I said: I'm not sure exactly. I believe the photos I have seen have shown the vehicle after it's come to rest, and it looks like it's in between the Number 1 lane for westbound and the area that I referred to as a turning lane.
Q. Well, at any point, were you ever informed where the point of impact was?
A. It's possible, sir. I don't remember.
Q. I just may have one or two questions left. Give me a moment.
(Pause.)
BY MR. CESENA:
Q. And when you say you were responding to assist, what were you trying to assist in doing? I understand you were going to join the pursuit, but what specifically were you hoping to accomplish?
MR. RAMIREZ: May call for speculation. Lacks foundation.
But you may respond.
THE WITNESS: Was the question what I was doing when I was responding to the pursuit?

BY MR. CESENA:

Q. What were you hoping to accomplish when you were responding?

A. It was -- it was my attempt at trying to assist my partner for his safety.

Q. Well, earlier you indicated the only thing you were aware of was that there was a Vehicle Code violation; correct?

MR. RAMIREZ: May misstate his testimony.

But you may respond.

THE WITNESS: Repeat the question? Sorry.

BY MR. CESENA:

Q. Sure. Let me rephrase it.

Earlier you testified that what you had heard was there were some Vehicle Code violations; correct?

A. I believe so. Again, my memory is not great for the incident. I -- I thought I remember hearing Vehicle Code violations.

Q. Did you ever hear anything about any weapons involved?

A. Not that I recall.

Q. Did you ever hear about any actions by the white Nissan, directed towards any person, vehicle, or structure?

A. Not that I recall.

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 9th day of June, 2026.



KIMBERLY D'URSO, CSR NO. 11372, RPR

ERRATA SHEET

PAGE/LINE CHANGE REASON

____________________________________________

DECLARATION OF DEPONENT

I, ____________________, say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of ______________, 2026, at _______________________, California.

______________________________

JESUS GARCIA

# Exhibit L

**Court Access Portal**
Superior Court of California, County of San Bernardino
*Registered*

HOME SEARCH CALENDARS CASE PAYMENT FAQ/INSTRUCTIONAL VIDEOS EUGENE HANRAHAN LOGOFF

# 24IN-028155

The People of the State of California vs. GIOVANNI BONILLA

Print

CASE INFO PARTIES EVENTS HEARINGS CHARGES/DISPO. FINANCIALS

## CHARGES, DISPOSITIONS & PLEAS

| COUNT | RESULT | DATE | DETAILS | Citation# | JURISDICTION |
|---|---|---|---|---|---|
| 001 | CHARGE | 3/10/2024 | Infraction - VC22356(B)-I: Exceeding 70 MPH | 7NH000038 | San Bernardino |
| | DISPOSITION | 4/20/2024 | Traffic School - Ordered | | |
| | DISPOSITION | 6/14/2024 | Traffic School - Completed | | |

Go Back

# Exhibit M

**POST PROFILE NAME:**

ZOZAYA, BRIAN OSCAR

CALIFORNIA COMMISSION ON **POST**

**Certification Status: Active**

**AKA:** N/A

**DATE:** 03/24/2025



## PERSONAL IDENTIFICATION

| POST I.D. | Agency | Birth Date | Gender | Race/Ethnicity |
|---|---|---|---|---|
| C90-P34 | FONTANA PD | [redacted] | Male | [redacted] |

## CERTIFICATES AWARDED

| Cert No. | Type | Awarded | Education | T | T+ | Comments |
|---|---|---|---|---|---|---|
| 213962 | B | 06/17/2024 | | 48.00 | 5.20 | |

**Total Number of Certificates:** 1

## PROOF OF ELIGIBILITY

| POE | Agency Name | Agency | Issued | Status |
|---|---|---|---|---|
| P0007579 | FONTANA PD | 36040 | 12/15/2022 | Expired |

**Total Number of Proof of Eligibility:** 1

## EMPLOYMENT

| Hired From | To | R* | Rank | Rank Date | Agency | Agency Name | F/P | P/U | Seas |
|---|---|---|---|---|---|---|---|---|---|
| 04/23/2022 | 12/15/2022 | 6 | TRN | 04/23/2022 | 36040 | FONTANA PD | F | P | |
| 12/15/2022 | | | PO | 12/15/2022 | 36040 | FONTANA PD | F | P | |

***Reason for Separation: 6 = Other**

## POST CERTIFIED TRAINING

| Comp Date | Cat | CCN | Hrs | Rmb | Cmp | Agency | School | * | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 12/15/2022 | A | 2330-00100-22-001 | 960 | R | Y | 36040 | S BRNDO SD | | BASIC COURSE-INTENSIVE |
| 04/13/2023 | K | 1346-31809-22-001 | 8 | X | Y | 36040 | SDLLC | | FIREARMS SEMI-AUTO PISTOL 1911 |
| 05/12/2023 | K | 2330-21165-22-039 | 4 | R | Y | 36040 | S BRNDO SD | | DRIVER TRNG (EVOC) UPD (PIT) |
| 06/22/2023 | K | 7530-32075-22-002 | 36 | R | Y | 36040 | FONTANA | | FIREARMS/TACTICAL RIFLE |
| 07/10/2023 | K | 7530-29000-23-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 09/06/2023 | K | 7530-32076-23-001 | 24 | X | Y | 36040 | FONTANA | | FIREARMS/TACTICAL RIFLE-ADV |
| 11/07/2023 | K | 7530-29502-23-002 | 8 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 01/18/2024 | K | 7530-29501-23-004 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 02/16/2024 | K | 7530-20290-23-001 | 16 | R | Y | 36040 | FONTANA | | DUI DETECTION-FIELD SOBRIETY |
| 10/16/2024 | K | 7530-29503-24-009 | 7 | | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 11/14/2024 | K | 7530-29580-24-007 | 4 | X | Y | 36040 | FONTANA | * | USE OF FORCE (PSP) |
| 11/14/2024 | K | 7530-29540-24-007 | 2 | X | Y | 36040 | FONTANA | * | STRATEGIC COMMUNICATIONS (PSP) |
| 11/14/2024 | K | 7530-29000-24-284 | 2 | X | Y | 36040 | FONTANA | | STRATEGIC COMMUNICATIONS |
| 11/15/2024 | K | 7530-32343-24-007 | 2 | X | Y | 36040 | FONTANA | | DOMESTIC VIOLENCE UPDATE |
| 02/24/2025 | K | 7530-29000-24-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |

***Meets Perishable Skills**

## FOOTNOTES

NO FOOTNOTE ON FILE.

**PLEASE REFER TO THE ENCLOSED EXPLANATION SHEET FOR ADDITIONAL INFORMATION.**

**The Profile Report contains confidential information.**

# EXPLANATION SHEET

## PERSONAL IDENTIFICATION: Subject's personal information as indicated in POST database (EDI system)

| | |
|---|---|
| **POST ID:** | Unique identification number assigned to subject by POST. |
| **Agency:** | Indicates the agency (or one of the agencies) where subject is currently employed.<br>An "*" indicates that the subject is employed in more than one position within the same agency. |
| **Birth Date/Gender:** | Self-explanatory. |
| **Race/Ethnicity:** | **A** = Asian **B** = African American (Black) **N** = Native American **S** = Spanish/Hispanic **W** = White **O** = Other |

## CERTIFICATES AWARDED

| | |
|---|---|
| **Cert:** | Certificate serial number. |
| **Type:** | **B** = Basic **I** = Intermediate **A** = Advanced **S** = Supervisory **M** = Management **E** = Executive<br>**R** = Reserve **D** = Public Safety Dispatcher **SX**= Specialized X (example: SA = Specialized Advanced) |
| **Awarded:** | Date certificate was issued. |
| **Education:** | Educational points or degree used for earning a certificate. |
| **T:** | Training points used for awarding the certificate. |
| **T+:** | Additional training points. |
| **Comments:** | Comments regarding training or institute(s) where subject received education. |
| **Total Number of Certificates:** | Number of certificates awarded to subject as indicated in POST database. |

## EMPLOYMENT: Subject's employment history as indicated in POST database

| | |
|---|---|
| **Hired From:** | Date subject was hired or sworn into the agency. |
| **To:** | Date subject left agency (if applicable). |
| **R*:** | Reason for separation as indicated by number in the Report description. |
| **Rank / Rank Date:** | Indicates rank as translated by POST database and date subject made rank. |
| **Agency / Agency Name:** | Agency code number and name where subject is currently working or previously worked. |
| **F/P:** | Time base: **F** = Full time **P** = Part time |
| **P/U:** | Wage status: **P** = Paid **U** = Unpaid |
| **Seas:** | Provisional or seasonal employment. |

## POST TRAINING: Courses attended or completed as indicated in POST database

| | |
|---|---|
| **Comp Date:** | Date course ended. |
| **Cat:** | General course category (for POST use only). |
| **CCN:** | Course Control Number. |
| **Hrs:** | Hours completed in course. |
| **Rmb:** | Reimbursement indicator: **R** = Reimbursed *(before FY 83/84 reimbursable agency not necessarily reimbursed)*<br>**J** = Job specific ***** = Job specific, SALARY NOT PAID **Blank** = None or no data available |
| **Cmp:** | Completion indicator: **Blank or Y** = Course completed **N** = Course not completed **?** = Prior to 1979 |
| **Agency:** | Agency where subject was employed at time of course enrollment. |
| **School:** | Training institute offering the course. |
| **Course Name:** | Course name as shown in POST database. |

## NON-CERTIFIED COURSES

This section will only appear if applicable.

## FOOTNOTES

This section reserved for additional information.

Revised 11/2014

Fontana Police Department

# Individual Training Activity

03/24/2025 

**Person:** **Zozaya, Brian**

## Personal

**Agency:** Fontana Police Department
**ID #:** C90-P34

## Employment

| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Active | 11/13/2018 | / / |
| Duty Status: | | / / | / / |
| Time Status: | Part Time | / / | / / |
| Rank: | Cadet | 11/13/2018 | / / |
| Work Unit: | | / / | / / |
| Station: | | / / | / / |
| Division: | | / / | / / |

**Scheduled Training In: 2025**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-3266 | 03/06/2025 | IVS Training After Action Report | *** None *** | ✓ | P | | 10:00 |
| - 1-3254 | 02/27/2025 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-3252 | 02/27/2025 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-3253 | 02/27/2025 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-3169 | 01/17/2025 | Performance Pistol/Rifle | *** None *** | ✓ | P | | 16:00 |
| **Totals For Training Completed in: 2025** | | Completed 5 of 5 Modules | | | | | 34:00 |

**Scheduled Training In: 2024**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-3121 | 11/15/2024 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-3156 | 11/14/2024 | Use of Force (PSP) | *** None *** | ✓ | P | | 04:00 |
| - 1-3154 | 11/14/2024 | Domestic Violence Update (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-3155 | 11/14/2024 | Strategic Communications (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-3152 | 11/14/2024 | High Risk Traffic Stops | *** None *** | ✓ | P | | 00:30 |
| - 1-3106 | 10/16/2024 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-2983 | 08/01/2024 | Hidden Compartment Training | *** None *** | ✓ | P | | 08:00 |
| - 1-2927 | 05/01/2024 | Informants Class/Street Level Drug Interdiction | *** None *** | ✓ | P | | 16:00 |
| - 1-2932 | 04/28/2024 | Automated Criminal History System - RAPS | *** None *** | ✓ | P | | 00:15 |
| - 1-2931 | 04/18/2024 | 5150 With Guns | *** None *** | ✓ | P | | 01:00 |
| - 1-2902 | 03/21/2024 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - 1-2768 | 02/16/2024 | SFST - Field Sobriety | *** None *** | ✓ | P | | 16:00 |
| - 1-2894 | 02/12/2024 | Assembly Bill (AB) 360 | *** None *** | ✓ | P | | 01:00 |
| - 1-2804 | 01/18/2024 | Firearms (PSP) | *** None *** | ✓ | P | | 08:00 |
| **Totals For Training Completed in: 2024** | | Completed 14 of 14 Modules | | | | | 77:45 |

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Zozaya, Brian** (Continued)

**Scheduled Training In: 2023**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2700 | 11/07/2023 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-2691 | 11/07/2023 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-2637 | 09/15/2023 | Taser Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2638 | 09/15/2023 | Tactical Negotiation Team Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2597 | 09/06/2023 | Advanced Rifle Course | *** None *** | ✓ | P | | 20:00 |
| - 1-2545 | 07/14/2023 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-2546 | 07/14/2023 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-2547 | 07/14/2023 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-2548 | 07/14/2023 | SB 2 - Reporting Requirements & Decertification Process | *** None *** | ✓ | P | | 00:30 |
| - 1-2477 | 06/22/2023 | Patrol Rifle | *** None *** | ✓ | P | | 36:00 |
| - 1-2526 | 06/01/2023 | Automated Criminal History Systems (RAPS) | *** None *** | ✓ | P | | 00:15 |
| - 1-2470 | 05/12/2023 | Pit Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2425 | 03/14/2023 | CPR/First Aid/AED | *** None *** | ✓ | P | | 08:00 |
| - 1-2426 | 03/14/2023 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| - 1-2427 | 03/14/2023 | Sudden Custody Death Syndrome | *** None *** | ✓ | P | | 01:00 |

**Totals For Training Completed in: 2023** Completed 15 of 15 Modules 95:45

**Scheduled Training In: 2022**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2336 | 12/31/2022 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1973 | 01/10/2022 | Tactical Care | *** None *** | ✓ | P | | 05:00 |
| - 1-1972 | 01/10/2022 | Narcan | *** None *** | ✓ | P | | 02:00 |
| - 1-1974 | 01/10/2022 | Officer Wellness | *** None *** | | P | | 02:00 |

**Totals For Training Completed in: 2022** Completed 3 of 4 Modules 10:00

**Scheduled Training In: 2021**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1722 | 05/19/2021 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-1710 | 05/19/2021 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-1716 | 05/19/2021 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-1557 | 01/22/2021 | CPR/First Aid/AED | *** None *** | ✓ | P | | 08:00 |
| - 1-1566 | 01/22/2021 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |

**Totals For Training Completed in: 2021** Completed 5 of 5 Modules 17:00

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Zozaya, Brian** (Continued)

**Scheduled Training In: 2020**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1428 | 09/18/2020 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - 1-1442 | 09/15/2020 | Carotid Hold | *** None *** | ✓ | P | | 01:00 |
| - 1-1394 | 09/01/2020 | Automated Criminal History System - RAPS | *** None *** | ✓ | P | | 00:16 |
| - 1-1337 | 07/23/2020 | Firearms (PSP) | *** None *** | ✓ | P | | 06:00 |
| - 1-1343 | 07/23/2020 | Taser Training | *** None *** | ✓ | P | | 03:00 |
| - 1-1331 | 07/23/2020 | Tactical Communication (PSP) | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2020** | | Completed 6 of 6 Modules | | | | | 19:16 |

**Scheduled Training In: 2019**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1091 | 10/08/2019 | Mental Health & De-escalation | *** None *** | ✓ | P | | 05:00 |
| - 1-1092 | 10/08/2019 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-1093 | 10/08/2019 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-1085 | 10/08/2019 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1022 | 05/30/2019 | Automated Criminal History Systems (RAPS) | *** None *** | ✓ | P | | 00:15 |
| - 1-0905 | 03/28/2019 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| **Totals For Training Completed in: 2019** | | Completed 6 of 6 Modules | | | | | 20:15 |

**Scheduled Training In: 2018**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-0782 | 12/14/2018 | Cal Gangs | *** None *** | ✓ | P | | 16:00 |
| **Totals For Training Completed in: 2018** | | Completed 1 of 1 Modules | | | | | 16:00 |
| **Totals For: Zozaya, Brian** | | Completed 55 of 56 Modules | | | | | 290:01 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| ZOZAYA | BRIAN | OSCAR |

| ID # | Assignment |
|---|---|
| 1330 | PATROL (TRAINEE) |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| BZOZAYA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 12/22/22 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| P. BELTRAN | 1211 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature
[signature]

| Print Name | Date |
|---|---|
| BRIAN ZOZAYA | 12/22/22 |

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| ZOZAYA | BRFAIN | OSCAR |

| ID # | Date |
|---|---|
| 1330 | 11-7-23 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| GOOSELAW | 1128 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature [signature]

| Print Name & ID Number | Date |
|---|---|
| B. ZOZAYA 1330 | 11-7-23 |

5

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| ZOZAYA | BRIAN | O |

| ID # | Assignment |
|---|---|
| 1330 | PATROL TS |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| BZOZAYA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 11/1/24 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| SGT R. JANUSZ | 700 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature

| Print Name | Date |
|---|---|
| B. ZOZAYA | 11-1-24 |

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| ZOZAYA | BRIAN | OSCAR |

| ID # | Date |
|---|---|
| 1330 | 11-7-23 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| GOOSELAW | 1128 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature [signature]

| Print Name & ID Number | Date |
|---|---|
| B. ZOZAYA 1330 | 11-7-23 |

5

# Exhibit N

**POST PROFILE NAME:**

PRECIE, DANIEL LAWRENCE

CALIFORNIA COMMISSION ON **POST**

**Certification Status: Active**

**AKA:** N/A

**DATE:** 03/24/2025



## PERSONAL IDENTIFICATION

| POST I.D. | Agency | Birth Date | Gender | Race/Ethnicity |
|---|---|---|---|---|
| C90-T38 | FONTANA PD | [redacted] | Male | [redacted] |

## CERTIFICATES AWARDED

| Cert No. | Type | Awarded | Education | T | T+ | Comments |
|---|---|---|---|---|---|---|
| 216026 | B | 12/18/2024 | | 48.00 | 0.00 | |

**Total Number of Certificates:** 1

## PROOF OF ELIGIBILITY

| POE | Agency Name | Agency | Issued | Status |
|---|---|---|---|---|
| P0016630 | FONTANA PD | 36040 | 06/15/2023 | Expired |

**Total Number of Proof of Eligibility:** 1

## EMPLOYMENT

| Hired From | To | R* | Rank | Rank Date | Agency | Agency Name | F/P | P/U | Seas |
|---|---|---|---|---|---|---|---|---|---|
| 05/07/2022 | 06/15/2023 | 10 | TRN | 05/07/2022 | 36040 | FONTANA PD | F | P | |
| 06/15/2023 | | | PO | 06/15/2023 | 36040 | FONTANA PD | F | P | |

***Reason for Separation: 10 = Status Change**

## POST CERTIFIED TRAINING

| Comp Date | Cat | CCN | Hrs | Rmb | Cmp | Agency | School | * | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 12/15/2022 | A | 2330-00100-22-001 | 132 | R | N | 36040 | S BRNDO SD | | BASIC COURSE-INTENSIVE |
| 06/15/2023 | A | 2330-00100-22-005 | 960 | R | Y | 36040 | S BRNDO SD | | BASIC COURSE-INTENSIVE |
| 07/10/2023 | K | 7530-29000-23-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 11/14/2023 | K | 7530-29502-23-007 | 8 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 01/19/2024 | K | 7530-29501-23-005 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 04/25/2024 | K | 7530-32075-23-001 | 36 | R | Y | 36040 | FONTANA | | FIREARMS/TACTICAL RIFLE |
| 08/14/2024 | K | 7530-29503-24-006 | 7 | | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 11/14/2024 | K | 7530-29580-24-007 | 4 | X | Y | 36040 | FONTANA | * | USE OF FORCE (PSP) |
| 11/14/2024 | K | 7530-29540-24-007 | 2 | X | Y | 36040 | FONTANA | * | STRATEGIC COMMUNICATIONS (PSP) |
| 11/14/2024 | K | 7530-29000-24-284 | 2 | X | Y | 36040 | FONTANA | | STRATEGIC COMMUNICATIONS |
| 11/15/2024 | K | 7530-32343-24-007 | 2 | X | Y | 36040 | FONTANA | | DOMESTIC VIOLENCE UPDATE |
| 11/22/2024 | K | 7530-20290-24-001 | 16 | | Y | 36040 | FONTANA | | DUI DETECTION-FIELD SOBRIETY |
| 02/18/2025 | K | 1270-20272-24-042 | 16 | | Y | 36040 | CHP | | ADVANCED ROADSIDE IMPAIRED DRIVER ENFORCEMENT |
| 02/26/2025 | K | 7530-29000-24-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 03/06/2025 | K | 2330-33590-24-005 | 40 | | Y | 36040 | S BRNDO SD | | TRAFFIC COLLISION INV |

***Meets Perishable Skills**

## FOOTNOTES

NO FOOTNOTE ON FILE.

**PLEASE REFER TO THE ENCLOSED EXPLANATION SHEET FOR ADDITIONAL INFORMATION.**

**The Profile Report contains confidential information.**

# EXPLANATION SHEET

| PERSONAL IDENTIFICATION: Subject's personal information as indicated in POST database (EDI system) | |
|---|---|
| **POST ID:** | Unique identification number assigned to subject by POST. |
| **Agency:** | Indicates the agency (or one of the agencies) where subject is currently employed.<br>An "*" indicates that the subject is employed in more than one position within the same agency. |
| **Birth Date/Gender:** | Self-explanatory. |
| **Race/Ethnicity:** | **A** = Asian **B** = African American (Black) **N** = Native American **S** = Spanish/Hispanic **W** = White **O** = Other |

| CERTIFICATES AWARDED | |
|---|---|
| **Cert:** | Certificate serial number. |
| **Type:** | **B** = Basic **I** = Intermediate **A** = Advanced **S** = Supervisory **M** = Management **E** = Executive<br>**R** = Reserve **D** = Public Safety Dispatcher **SX**= Specialized X (example: SA = Specialized Advanced) |
| **Awarded:** | Date certificate was issued. |
| **Education:** | Educational points or degree used for earning a certificate. |
| **T:** | Training points used for awarding the certificate. |
| **T+:** | Additional training points. |
| **Comments:** | Comments regarding training or institute(s) where subject received education. |
| **Total Number of Certificates:** | Number of certificates awarded to subject as indicated in POST database. |

| EMPLOYMENT: Subject's employment history as indicated in POST database | |
|---|---|
| **Hired From:** | Date subject was hired or sworn into the agency. |
| **To:** | Date subject left agency (if applicable). |
| **R*:** | Reason for separation as indicated by number in the Report description. |
| **Rank / Rank Date:** | Indicates rank as translated by POST database and date subject made rank. |
| **Agency / Agency Name:** | Agency code number and name where subject is currently working or previously worked. |
| **F/P:** | Time base: **F** = Full time **P** = Part time |
| **P/U:** | Wage status: **P** = Paid **U** = Unpaid |
| **Seas:** | Provisional or seasonal employment. |

| POST TRAINING: Courses attended or completed as indicated in POST database | |
|---|---|
| **Comp Date:** | Date course ended. |
| **Cat:** | General course category (for POST use only). |
| **CCN:** | Course Control Number. |
| **Hrs:** | Hours completed in course. |
| **Rmb:** | Reimbursement indicator: **R** = Reimbursed *(before FY 83/84 reimbursable agency not necessarily reimbursed)*<br>**J** = Job specific ***** = Job specific, SALARY NOT PAID **Blank** = None or no data available |
| **Cmp:** | Completion indicator: **Blank or Y** = Course completed **N** = Course not completed **?** = Prior to 1979 |
| **Agency:** | Agency where subject was employed at time of course enrollment. |
| **School:** | Training institute offering the course. |
| **Course Name:** | Course name as shown in POST database. |

**NON-CERTIFIED COURSES**

This section will only appear if applicable.

**FOOTNOTES**

This section reserved for additional information.

Revised 11/2014

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Precie, Daniel**

## Personal

**Agency:**
**ID #:**

## Employment

| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Inactive | | |
| Duty Status: | | | |
| Time Status: | | | |
| Rank: | | | |
| Work Unit: | | | |
| Station: | | | |
| Division: | | | |

**Scheduled Training In: 2025**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-3227 | 03/06/2025 | Traffic Collision Basic | *** None *** | ✓ | P | | 40:00 |
| - 1-3218 | 02/28/2025 | 2-day Search warrant workshop | *** None *** | ✓ | P | | 16:00 |
| - 1-3251 | 02/26/2025 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-3249 | 02/26/2025 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-3250 | 02/26/2025 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-3191 | 02/18/2025 | ARIDE | *** None *** | ✓ | P | | 16:00 |
| **Totals For Training Completed in: 2025** | | Completed 6 of 6 Modules | | | | | 80:00 |

**Scheduled Training In: 2024**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-3105 | 11/22/2024 | SFST - Field Sobriety | *** None *** | ✓ | P | | 16:00 |
| - 1-3175 | 11/22/2024 | Intoximeters Intox EC/IR II | *** None *** | ✓ | P | | 04:00 |
| - 1-3121 | 11/15/2024 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-3156 | 11/14/2024 | Use of Force (PSP) | *** None *** | ✓ | P | | 04:00 |
| - 1-3154 | 11/14/2024 | Domestic Violence Update (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-3155 | 11/14/2024 | Strategic Communications (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-3152 | 11/14/2024 | High Risk Traffic Stops | *** None *** | ✓ | P | | 00:30 |
| - 1-3047 | 08/14/2024 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - 1-2932 | 04/28/2024 | Automated Criminal History System - RAPS | *** None *** | ✓ | P | | 00:15 |
| - 1-2868 | 04/25/2024 | Patrol Rifle | *** None *** | ✓ | P | | 36:00 |
| - 1-2931 | 04/18/2024 | 5150 With Guns | *** None *** | ✓ | P | | 01:00 |
| - 1-2902 | 03/21/2024 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - 1-2894 | 02/12/2024 | Assembly Bill (AB) 360 | *** None *** | ✓ | P | | 01:00 |
| - 1-2803 | 01/19/2024 | Firearms (PSP) | *** None *** | ✓ | P | | 08:00 |
| **Totals For Training Completed in: 2024** | | Completed 14 of 14 Modules | | | | | 92:45 |

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Precie, Daniel** (Continued)

**Scheduled Training In: 2023**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2705 | 11/14/2023 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-2696 | 11/14/2023 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-2618 | 09/12/2023 | Tactical Negotiation Team Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2620 | 09/12/2023 | Taser Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2536 | 07/12/2023 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-2537 | 07/12/2023 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-2538 | 07/12/2023 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-2540 | 07/12/2023 | SB 2 - Reporting Requirements & Decertification Process | *** None *** | ✓ | P | | 02:00 |
| - 1-2519 | 06/22/2023 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| **Totals For Training Completed in: 2023** | | Completed 9 of 9 Modules | | | | | 28:00 |

**Scheduled Training In: 2022**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1979 | 01/12/2022 | Tactical Care | *** None *** | ✓ | P | | 05:00 |
| - 1-1978 | 01/12/2022 | Narcan | *** None *** | ✓ | P | | 02:00 |
| - 1-1980 | 01/12/2022 | Officer Wellness | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2022** | | Completed 3 of 3 Modules | | | | | 09:00 |

**Scheduled Training In: 2021**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1903 | 11/01/2021 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-1723 | 05/20/2021 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-1711 | 05/20/2021 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-1717 | 05/20/2021 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2021** | | Completed 4 of 4 Modules | | | | | 16:00 |
| **Totals For: Precie, Daniel** | | Completed 36 of 36 Modules | | | | | 225:45 |

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| PRECIE | DANIEL | LAWRENCE |

| ID # | Date |
|---|---|
| 1396 | 11-14-23 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| P. BELTRAN | 1211 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

[signature]

| Print Name & ID Number | Date |
|---|---|
| DANIEL PRECIE 1396 | 11-14-23 |

25

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

### Officer Identification

| Last | First | Middle |
|---|---|---|
| PRECIE | DANIEL | LAWRENCE |

| ID # | Assignment |
|---|---|
| 1396 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| DPRECIE @fontana.org | |

### Training Specifications

| Training Date | Location |
|---|---|
| 06-22-23 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| T. POPE | 1155 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

### Attestation

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

| Print Name | Date |
|---|---|
| DANIEL PRECIE | 06-22-23 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

### Officer Identification

| Last | First | Middle |
|---|---|---|
| PRECIE | DANIEL | LAWRENCE |

| ID # | Assignment |
|---|---|
| 1396 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| DPRECIE @fontana.org | |

### Training Specifications

| Training Date | Location |
|---|---|
| 11-03-24 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| JANUSZ | 700 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

### Attestation

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature [signature]

| Print Name | Date |
|---|---|
| DANIEL PRECIE | 11-03-24 |

32

# Exhibit O

**POST PROFILE NAME:**

BAUTISTA, EDWARD ANDRE

CALIFORNIA COMMISSION ON POST

**Certification Status: Active**

**AKA:** N/A

**DATE:** 03/24/2025



## PERSONAL IDENTIFICATION

| POST I.D. | Agency | Birth Date | Gender | Race/Ethnicity |
|---|---|---|---|---|
| C50-P11 | FONTANA PD | [redacted] | Male | [redacted] |

## CERTIFICATES AWARDED

| Cert No. | Type | Awarded | Education | T | T+ | Comments |
|---|---|---|---|---|---|---|
| 185660 | B | 01/17/2017 | | 46.00 | 0.00 | |
| 140138 | I | 03/26/2019 | 62.00 | 46.00 | 5.35 | THE UNIVERSITY OF LA VERNE |
| 133441 | A | 03/18/2024 | 62.00 | 46.00 | 12.60 | THE UNIVERSITY OF LA VERNE |

**Total Number of Certificates:** 3

## EMPLOYMENT

| Hired From | To | R* | Rank | Rank Date | Agency | Agency Name | F/P | P/U | Seas |
|---|---|---|---|---|---|---|---|---|---|
| 09/08/2014 | 03/12/2015 | 6 | TRN | 09/08/2014 | 36040 | FONTANA PD | F | P | |
| 03/12/2015 | | | PO | 03/12/2015 | 36040 | FONTANA PD | F | P | |

***Reason for Separation: 6 = Other**

## POST CERTIFIED TRAINING

| Comp Date | Cat | CCN | Hrs | Rmb | Cmp | Agency | School | * | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 03/12/2015 | A | 2330-00100-14-002 | 920 | | Y | 36040 | S BRNDO SD | | BASIC COURSE-INTENSIVE |
| 08/18/2015 | K | 7530-29000-15-260 | 2 | X | Y | 36040 | FONTANA | | BIAS BASED POLICING: REMAINING FAIR & IMPARTIAL |
| 08/18/2015 | K | 9180-25559-15-049 | 12 | X | Y | 36040 | POST | | FIRST AID/CPR (WEB) |
| 09/07/2015 | K | 7530-29503-15-001 | 7 | | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 09/08/2016 | K | 7530-29502-16-003 | 5 | X | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 10/12/2016 | K | 9180-25583-16-104 | 2 | X | Y | 36040 | POST | | DOMESTIC VIOLENCE RESPONSE (WEB) |
| 11/16/2016 | K | 7530-29501-16-007 | 5 | X | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 11/28/2016 | K | 9180-25554-16-151 | 2 | X | Y | 36040 | POST | * | COMMUNICATION: KEEPING YOUR EDGE (WEB) |
| 01/11/2017 | K | 7530-20290-16-001 | 16 | | Y | 36040 | FONTANA | | DUI DETECTION-FIELD SOBRIETY |
| 03/15/2017 | K | 9180-25559-16-258 | 12 | X | Y | 36040 | POST | | FIRST AID/CPR (WEB) |
| 03/15/2017 | K | 7530-29000-16-260 | 2 | X | Y | 36040 | FONTANA | | BIAS BASED POLICING: REMAINING FAIR & IMPARTIAL |
| 04/18/2017 | K | 9180-25557-16-292 | 2 | X | Y | 36040 | POST | | BEST PRACTICES OF GOOD TRAINING (WEB) |
| 09/12/2017 | K | 7530-29503-17-006 | 7 | | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 05/22/2018 | K | 5890-30252-17-008 | 4 | X | Y | 36040 | OPD | | VEHICLE RACING/MOD.VEH.ENFORC |
| 06/01/2018 | K | 9180-25554-17-336 | 2 | X | Y | 36040 | POST | * | COMMUNICATION: KEEPING YOUR EDGE (WEB) |
| 07/04/2018 | K | 7530-29501-18-004 | 6 | X | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 09/20/2018 | K | 7530-29502-18-004 | 5 | X | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 10/31/2018 | K | 1270-20272-18-046 | 16 | X | Y | 36040 | CHP | | ADVANCED ROADSIDE IMPAIRED DRIVER ENFORCEMENT |
| 10/11/2019 | K | 7530-29000-19-260 | 2 | X | Y | 36040 | FONTANA | | BIAS BASED POLICING: REMAINING FAIR & IMPARTIAL |
| 01/15/2020 | K | 8730-28000-19-001 | 24 | X | Y | 36040 | IPCA | | TRAINING CONFERENCE |
| 02/07/2020 | K | 7530-29502-19-008 | 5 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 07/18/2020 | K | 9180-25589-20-018 | 2 | X | Y | 36040 | POST | | DV RESPONSE & LETHALITY ASSESSMENT (WEB) |
| 07/22/2020 | K | 7530-29501-20-004 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 07/22/2020 | K | 7530-29000-20-161 | 2 | X | Y | 36040 | FONTANA | * | TACTICAL COMMUNICATIONS |

**POST PROFILE NAME:**

BAUTISTA, EDWARD ANDRE

CALIFORNIA COMMISSION ON **POST**

**Certification Status: Active**

**AKA:** N/A

**DATE:** 03/24/2025



**POST CERTIFIED TRAINING** *continued*

| Comp Date | Cat | CCN | Hrs | Rmb | Cmp | Agency | School | * | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 09/18/2020 | K | 7530-33888-20-005 | 2 | R | Y | 36040 | FONTANA | | AB 392 USE OF FORCE UPDATE |
| 09/18/2020 | K | 7530-29503-20-005 | 7 | R | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 05/18/2021 | K | 7530-29000-20-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 11/04/2021 | K | 7530-29502-21-007 | 8 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 08/10/2022 | K | 7530-29501-22-001 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 08/10/2022 | K | 7530-29580-22-001 | 4 | X | Y | 36040 | FONTANA | * | USE OF FORCE (PSP) |
| 08/25/2022 | K | 7530-32343-22-007 | 2 | X | Y | 36040 | FONTANA | | DOMESTIC VIOLENCE UPDATE |
| 08/25/2022 | K | 7530-29540-22-007 | 2 | X | Y | 36040 | FONTANA | * | STRATEGIC COMMUNICATIONS (PSP) |
| 08/25/2022 | K | 7530-29503-22-007 | 7 | R | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 07/10/2023 | K | 7530-29000-23-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 09/06/2023 | K | 7530-32076-23-001 | 24 | X | Y | 36040 | FONTANA | | FIREARMS/TACTICAL RIFLE-ADV |
| 11/07/2023 | K | 7530-29502-23-002 | 8 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 01/17/2024 | K | 7530-29501-23-003 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 01/24/2024 | K | 8730-28001-23-001 | 24 | X | Y | 36040 | IPCA | | TRAINING CONFERENCE |
| 10/16/2024 | K | 7530-29503-24-009 | 7 | | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 11/14/2024 | K | 7530-32343-24-008 | 2 | X | Y | 36040 | FONTANA | | DOMESTIC VIOLENCE UPDATE |
| 11/15/2024 | K | 7530-29580-24-008 | 4 | X | Y | 36040 | FONTANA | * | USE OF FORCE (PSP) |
| 11/15/2024 | K | 7530-29540-24-008 | 2 | X | Y | 36040 | FONTANA | * | STRATEGIC COMMUNICATIONS (PSP) |
| 11/15/2024 | K | 7530-29000-24-284 | 2 | X | Y | 36040 | FONTANA | | STRATEGIC COMMUNICATIONS |
| 01/29/2025 | K | 8730-28001-24-001 | 24 | X | Y | 36040 | IPCA | | TRAINING CONFERENCE |
| 02/28/2025 | K | 7530-29000-24-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |

***Meets Perishable Skills**

**FOOTNOTES**

NO FOOTNOTE ON FILE.

**PLEASE REFER TO THE ENCLOSED EXPLANATION SHEET FOR ADDITIONAL INFORMATION.**

**The Profile Report contains confidential information.**

# EXPLANATION SHEET

| PERSONAL IDENTIFICATION: Subject's personal information as indicated in POST database (EDI system) | |
|---|---|
| **POST ID:** | Unique identification number assigned to subject by POST. |
| **Agency:** | Indicates the agency (or one of the agencies) where subject is currently employed.<br>An "*" indicates that the subject is employed in more than one position within the same agency. |
| **Birth Date/Gender:** | Self-explanatory. |
| **Race/Ethnicity:** | **A** = Asian **B** = African American (Black) **N** = Native American **S** = Spanish/Hispanic **W** = White **O** = Other |

| CERTIFICATES AWARDED | |
|---|---|
| **Cert:** | Certificate serial number. |
| **Type:** | **B** = Basic **I** = Intermediate **A** = Advanced **S** = Supervisory **M** = Management **E** = Executive<br>**R** = Reserve **D** = Public Safety Dispatcher **SX**= Specialized X (example: SA = Specialized Advanced) |
| **Awarded:** | Date certificate was issued. |
| **Education:** | Educational points or degree used for earning a certificate. |
| **T:** | Training points used for awarding the certificate. |
| **T+:** | Additional training points. |
| **Comments:** | Comments regarding training or institute(s) where subject received education. |
| **Total Number of Certificates:** | Number of certificates awarded to subject as indicated in POST database. |

| EMPLOYMENT: Subject's employment history as indicated in POST database | |
|---|---|
| **Hired From:** | Date subject was hired or sworn into the agency. |
| **To:** | Date subject left agency (if applicable). |
| **R*:** | Reason for separation as indicated by number in the Report description. |
| **Rank / Rank Date:** | Indicates rank as translated by POST database and date subject made rank. |
| **Agency / Agency Name:** | Agency code number and name where subject is currently working or previously worked. |
| **F/P:** | Time base: **F** = Full time **P** = Part time |
| **P/U:** | Wage status: **P** = Paid **U** = Unpaid |
| **Seas:** | Provisional or seasonal employment. |

| POST TRAINING: Courses attended or completed as indicated in POST database | |
|---|---|
| **Comp Date:** | Date course ended. |
| **Cat:** | General course category (for POST use only). |
| **CCN:** | Course Control Number. |
| **Hrs:** | Hours completed in course. |
| **Rmb:** | Reimbursement indicator: **R** = Reimbursed *(before FY 83/84 reimbursable agency not necessarily reimbursed)*<br>**J** = Job specific ***** = Job specific, SALARY NOT PAID **Blank** = None or no data available |
| **Cmp:** | Completion indicator: **Blank or Y** = Course completed **N** = Course not completed **?** = Prior to 1979 |
| **Agency:** | Agency where subject was employed at time of course enrollment. |
| **School:** | Training institute offering the course. |
| **Course Name:** | Course name as shown in POST database. |

**NON-CERTIFIED COURSES**

This section will only appear if applicable.

**FOOTNOTES**

This section reserved for additional information.

Revised 11/2014

**Fontana Police Department**

# Individual Training Activity



**Person:** **Bautista, Edward**

## Personal

| | |
|---|---|
| **Agency:** | Fontana Police Department |
| **ID #:** | C50-P11 |

## Employment

| Property | Value | From | Through |
|---|---|---|---|
| **Active Status:** | Active | 09/11/2013 | / / |
| **Duty Status:** | | / / | / / |
| **Time Status:** | | / / | / / |
| **Rank:** | Police Officer | 03/12/2015 | / / |
| **Work Unit:** | | / / | / / |
| **Station:** | | / / | / / |
| **Division:** | | / / | / / |

**Scheduled Training In: 2025**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-3257 | 02/28/2025 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-3255 | 02/28/2025 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-3256 | 02/28/2025 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-3249 | 02/26/2025 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-3181 | 01/29/2025 | Canine Narcotic Conference | *** None *** | ✓ | P | | 24:00 |

**Totals For Training Completed in: 2025** Completed 5 of 5 Modules 34:00

**Scheduled Training In: 2024**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-3160 | 11/15/2024 | Use of Force (PSP) | *** None *** | ✓ | P | | 04:00 |
| - 1-3158 | 11/15/2024 | Domestic Violence Update (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-3121 | 11/15/2024 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-3157 | 11/15/2024 | High Risk Traffic Stops | *** None *** | ✓ | P | | 00:30 |
| - 1-3106 | 10/16/2024 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-3008 | 08/29/2024 | HITS K9 Conference | *** None *** | ✓ | P | | 32:00 |
| - 1-2932 | 04/28/2024 | Automated Criminal History System - RAPS | *** None *** | ✓ | P | | 00:15 |
| - 1-2931 | 04/18/2024 | 5150 With Guns | *** None *** | ✓ | P | | 01:00 |
| - 1-2901 | 03/20/2024 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - 1-2894 | 02/12/2024 | Assembly Bill (AB) 360 | *** None *** | ✓ | P | | 01:00 |
| - 1-2749 | 01/24/2024 | Canine Narcotic Conference | *** None *** | ✓ | P | | 24:00 |
| - 1-2805 | 01/17/2024 | Firearms (PSP) | *** None *** | ✓ | P | | 08:00 |

**Totals For Training Completed in: 2024** Completed 12 of 12 Modules 91:45

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Bautista, Edward** (Continued)

**Scheduled Training In: 2023**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2700 | 11/07/2023 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-2691 | 11/07/2023 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-2622 | 09/13/2023 | Taser Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2624 | 09/13/2023 | Tactical Negotiation Team Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2597 | 09/06/2023 | Advanced Rifle Course | *** None *** | ✓ | P | | 20:00 |
| - 1-2556 | 08/18/2023 | HITS K9 Conference | *** None *** | ✓ | P | | 32:00 |
| - 1-2536 | 07/12/2023 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-2537 | 07/12/2023 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-2538 | 07/12/2023 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-2540 | 07/12/2023 | SB 2 - Reporting Requirements & Decertification Process | *** None *** | ✓ | P | | 02:00 |
| - 1-2526 | 06/01/2023 | Automated Criminal History Systems (RAPS) | *** None *** | ✓ | P | | 00:15 |
| - 1-2468 | 05/11/2023 | Pit Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2425 | 03/14/2023 | CPR/First Aid/AED | *** None *** | ✓ | P | | 08:00 |
| - 1-2426 | 03/14/2023 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| - 1-2427 | 03/14/2023 | Sudden Custody Death Syndrome | *** None *** | ✓ | P | | 01:00 |

**Totals For Training Completed in: 2023** Completed 15 of 15 Modules 93:15

**Scheduled Training In: 2022**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2336 | 12/31/2022 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-2294 | 11/15/2022 | Advanced Rifle Course | *** None *** | ✓ | P | | 24:00 |
| - 1-2280 | 10/04/2022 | Red Dot Transition Course | *** None *** | ✓ | P | | 20:00 |
| - 1-2193 | 09/15/2022 | K9 Conference | *** None *** | ✓ | P | | 24:00 |
| - 1-2299 | 09/12/2022 | AB 490 | *** None *** | ✓ | P | | 00:30 |
| - 1-2259 | 08/25/2022 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - 1-2251 | 08/25/2022 | Strategic Communications (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-2252 | 08/25/2022 | Domestic Violence Update (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-2222 | 08/10/2022 | Firearms (PSP) | *** None *** | ✓ | P | | 05:00 |
| - 1-2224 | 08/10/2022 | Use of Force (PSP) | *** None *** | ✓ | P | | 04:00 |
| - 1-2024 | 02/03/2022 | Tactical Negotiation Team #2 Training | *** None *** | ✓ | P | | 00:30 |
| - 1-1982 | 01/13/2022 | Tactical Care | *** None *** | ✓ | P | | 05:00 |
| - 1-1981 | 01/13/2022 | Narcan | *** None *** | ✓ | P | | 02:00 |
| - 1-1983 | 01/13/2022 | Officer Wellness | *** None *** | ✓ | P | | 02:00 |

**Totals For Training Completed in: 2022** Completed 14 of 14 Modules 99:00

**Fontana Police Department**

# Individual Training Activity

03/24/2025 

**Person:** **Bautista, Edward** (Continued)

**Scheduled Training In: 2021**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1917 | 11/06/2021 | Tactical Negotiation Team | *** None *** | ✓ | P | | 01:00 |
| - 1-1908 | 11/04/2021 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-1909 | 11/04/2021 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1763 | 09/16/2021 | K9 Conference | *** None *** | ✓ | P | | 24:00 |
| - 1-1918 | 09/13/2021 | Social Host and Unruly Gathering Ordinance | *** None *** | ✓ | P | | 00:30 |
| - 1-1822 | 08/31/2021 | Taser Training | *** None *** | ✓ | P | | 05:00 |
| - 1-1834 | 08/31/2021 | Racial and Identity Profiling Act (RIPA) | *** None *** | ✓ | P | | 02:00 |
| - 1-1824 | 08/31/2021 | Officer Involved Shooting (OIS) | *** None *** | ✓ | P | | 01:00 |
| - 1-1841 | 08/31/2021 | Senate Bill 439 | *** None *** | ✓ | P | | 00:30 |
| - 1-1777 | 07/08/2021 | Strategic Communications | *** None *** | ✓ | P | | 00:30 |
| - 1-1721 | 05/18/2021 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-1709 | 05/18/2021 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-1715 | 05/18/2021 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-1764 | 05/08/2021 | Hate Crime Identification & Investigation | *** None *** | ✓ | P | | 01:00 |
| - 1-1765 | 05/06/2021 | Common Executime Errors | *** None *** | ✓ | P | | 01:00 |
| - 1-1687 | 04/07/2021 | Policing Mental Illness | *** None *** | ✓ | P | | 01:30 |
| - 1-1661 | 03/17/2021 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1644 | 02/28/2021 | Homelessness and Policing | *** None *** | ✓ | P | | 01:00 |
| - 1-1554 | 01/19/2021 | CPR/First Aid/AED | *** None *** | ✓ | P | | 08:00 |
| - 1-1563 | 01/19/2021 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| - 1-1595 | 01/14/2021 | Wellness | *** None *** | ✓ | P | | 01:00 |

**Totals For Training Completed in: 2021** Completed 21 of 21 Modules 67:00

**Scheduled Training In: 2020**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1540 | 12/16/2020 | Driving | *** None *** | ✓ | P | | 00:45 |
| - 1-1513 | 11/25/2020 | Patrol Based Tracking Course | *** None *** | ✓ | P | | 120:00 |
| - 1-1527 | 11/20/2020 | SoCalGas Emergency Responder Topics | *** None *** | ✓ | P | | 00:15 |
| - 1-1428 | 09/18/2020 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - 1-1447 | 09/18/2020 | AB 392 POST Video | *** None *** | ✓ | P | | 02:00 |
| - 1-1448 | 09/18/2020 | Carotid Hold | *** None *** | ✓ | P | | 01:00 |
| - 1-1394 | 09/01/2020 | Automated Criminal History System - RAPS | *** None *** | ✓ | P | | 00:16 |
| - 1-1336 | 07/22/2020 | Firearms (PSP) | *** None *** | ✓ | P | | 06:00 |
| - 1-1342 | 07/22/2020 | Taser Training | *** None *** | ✓ | P | | 03:00 |

**Fontana Police Department**

# Individual Training Activity



**Person:** **Bautista, Edward** (Continued)

**Scheduled Training In: 2020** (Continued)

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1330 | 07/22/2020 | Tactical Communication (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-1299 | 07/20/2020 | Domestic Violence Response & Lethality Assessment | *** None *** | ✓ | P | | 02:00 |
| - 1-1274 | 04/20/2020 | ABC Trace Web App | *** None *** | ✓ | P | | 00:15 |
| - 1-1263 | 03/20/2020 | Laws for Teens and Alcohol | *** None *** | ✓ | P | | 00:15 |
| - 1-1259 | 03/05/2020 | Criminal Interdiction | *** None *** | ✓ | P | | 24:00 |
| - 1-1230 | 02/07/2020 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 05:00 |
| - 1-1247 | 02/07/2020 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1134 | 01/15/2020 | Canine Narcotic Conference | *** None *** | ✓ | P | | 24:00 |
| - 1-1190 | 01/08/2020 | AB 392 and Peace Officer Use of Force Standards | *** None *** | ✓ | P | | 00:15 |

**Totals For Training Completed in: 2020** Completed 18 of 18 Modules 199:01

**Scheduled Training In: 2019**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1188 | 10/14/2019 | Tobacco licensed locations and inspections | *** None *** | ✓ | P | | 00:15 |
| - 1-1100 | 10/11/2019 | Mental Health & De-escalation | *** None *** | ✓ | P | | 05:00 |
| - 1-1101 | 10/11/2019 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-1102 | 10/11/2019 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-1085 | 10/08/2019 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1185 | 09/29/2019 | ABC Licensed locations and inspections | *** None *** | ✓ | P | | 00:15 |
| - 1-1020 | 07/30/2019 | Common Alcohol-Related Violations | *** None *** | ✓ | P | | 00:15 |
| - 1-1159 | 06/19/2019 | CPR / First Aid | *** None *** | ✓ | P | | 06:00 |
| - 1-1170 | 06/19/2019 | Sudden Custody Death Syndrome | *** None *** | ✓ | P | | 02:00 |
| - 1-1164 | 06/19/2019 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| - 1-1176 | 06/19/2019 | Immigration Violations | *** None *** | ✓ | P | | 00:15 |
| - 1-1019 | 05/30/2019 | Commerical Cannabis & Alcoholic Beverages | *** None *** | ✓ | P | | 00:15 |
| - 1-1022 | 05/30/2019 | Automated Criminal History Systems (RAPS) | *** None *** | ✓ | P | | 00:15 |
| - 1-1063 | 05/16/2019 | Gun Violence Restaining Order | *** None *** | ✓ | P | | 00:30 |
| - 1-0898 | 04/30/2019 | Social Host & Unruly Gathering Ordinance Policy | *** None *** | ✓ | P | | 00:15 |
| - 1-0880 | 04/18/2019 | TRACE Program | *** None *** | ✓ | P | | 00:15 |
| - 1-0901 | 03/20/2019 | Active Shooter | *** None *** | ✓ | P | | 10:00 |

**Totals For Training Completed in: 2019** Completed 17 of 17 Modules 31:30

**Fontana Police Department**

# Individual Training Activity



**Person:** **Bautista, Edward** (Continued)

**Scheduled Training In: 2018**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-0721 | 10/31/2018 | ARIDE | *** None *** | ✓ | P | | 16:00 |
| - 1-0713 | 09/20/2018 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 05:00 |
| - 1-0727 | 09/04/2018 | Vehicles in the Park After-Hours | *** None *** | ✓ | P | | 00:15 |
| - 1-0642 | 07/25/2018 | Alcohol Trends | *** None *** | ✓ | P | | 00:30 |
| - 1-0643 | 07/25/2018 | Commercial Cannabis & Alcohol Beverages | *** None *** | ✓ | P | | 00:30 |
| - 1-0620 | 07/12/2018 | SEMS/ICS/NIMS | *** None *** | ✓ | P | | 04:00 |
| - 1-0640 | 06/27/2018 | 451 Body Worn Computers | *** None *** | ✓ | P | | 00:30 |
| - 1-0644 | 06/27/2018 | Code Three Response | *** None *** | ✓ | P | | 00:30 |
| - 1-0586 | 06/21/2018 | Patrol Tactics | *** None *** | ✓ | P | | 05:00 |
| - 1-0603 | 06/21/2018 | Firearms (PSP) | *** None *** | ✓ | P | | 05:00 |
| - 1-0584 | 06/21/2018 | Tactical Communication | *** None *** | ✓ | P | | 01:00 |
| - 1-0538 | 05/22/2018 | Street Racing Enforcement | *** None *** | ✓ | P | | 04:00 |
| - 1-0579 | 05/22/2018 | Immigration Violation Update | *** None *** | ✓ | P | | 00:15 |
| - 1-0545 | 05/10/2018 | Basic Decoy Course | *** None *** | ✓ | P | | 08:00 |
| - 1-0591 | 05/01/2018 | Communication: Keeping Your Edge | *** None *** | ✓ | P | | 02:00 |

**Totals For Training Completed in: 2018** Completed 15 of 15 Modules 52:30

**Scheduled Training In: 2017**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-0341 | 11/14/2017 | Cartels, Narco & Violence: Death from the South | *** None *** | ✓ | P | | 08:00 |
| - 1-0363 | 10/24/2017 | Certified Gang Enforcement Officer | *** None *** | ✓ | P | | 24:00 |
| - 1-0336 | 09/12/2017 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - 1-0202 | 06/14/2017 | Mental Health & De-escalation | *** None *** | ✓ | P | | 05:00 |
| - 1-0199 | 06/14/2017 | Taser Training | *** None *** | ✓ | P | | 04:00 |
| - 1-0095 | 03/15/2017 | CPR/First Aid/AED | *** None *** | ✓ | P | | 12:00 |
| - 1-0099 | 03/15/2017 | Annual Trng. - Bias Free Policing | *** None *** | ✓ | P | | 02:00 |
| - 1-0097 | 03/15/2017 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-0100 | 03/15/2017 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| - -9978 | 01/11/2017 | SFST - Field Sobriety | *** None *** | ✓ | P | | 16:00 |

**Totals For Training Completed in: 2017** Completed 10 of 10 Modules 80:00

**Scheduled Training In: 2016**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-0014 | 12/05/2016 | Tactical Communication (PSP) | *** None *** | ✓ | P | | 04:00 |
| - 1-0006 | 11/19/2016 | Firearms | *** None *** | ✓ | P | | 05:00 |
| - 1-0007 | 11/19/2016 | Patrol Tactics | *** None *** | ✓ | P | | 05:00 |

**Fontana Police Department**

# Individual Training Activity



**Person:** **Bautista, Edward** (Continued)

**Scheduled Training In: 2016** (Continued)

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-0009 | 11/01/2016 | Domestic Violence | *** None *** | ✓ | P | | 02:00 |
| - -9925 | 09/15/2016 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 05:00 |
| - -9926 | 09/15/2016 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - -9848 | 07/06/2016 | COPLINK | *** None *** | ✓ | P | | 08:00 |
| - -9865 | 06/30/2016 | End of Life Option Act | *** None *** | ✓ | P | | 00:15 |
| - -9869 | 06/30/2016 | 326 Elder & Dependant Adult Abuse Policy Review | *** None *** | ✓ | P | | 00:15 |
| - -9854 | 06/14/2016 | Active Shooter | *** None *** | ✓ | P | | 08:00 |
| - -9719 | 02/25/2016 | Patrol Rifle | *** None *** | ✓ | P | | 40:00 |
| - -9975 | 01/11/2016 | SFST - Field Sobriety | *** None *** | ✓ | P | | 16:00 |

**Totals For Training Completed in: 2016** Completed 12 of 12 Modules 94:30

**Scheduled Training In: 2015**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -9580 | 09/30/2015 | 40mm Policy Change | *** None *** | ✓ | P | | 01:00 |
| - -9582 | 09/28/2015 | 328 Discriminatory Harassment Policy Review | *** None *** | ✓ | P | | 00:30 |
| - -9573 | 09/07/2015 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - -9572 | 09/07/2015 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - -9550 | 08/18/2015 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| - -9541 | 08/18/2015 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - -9539 | 08/18/2015 | CPR / First Aid | *** None *** | ✓ | P | | 12:00 |
| - -9557 | 08/18/2015 | 40mm Less Lethal Transition Course | *** None *** | ✓ | P | | 04:00 |
| - -9451 | 08/10/2015 | Portable Audio/Video Recorders | *** None *** | ✓ | P | | 01:00 |
| - -9352 | 04/01/2015 | Rap Sheets | *** None *** | ✓ | P | | 00:15 |
| - -9335 | 03/18/2015 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - -9321 | 03/16/2015 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - -9320 | 03/12/2015 | Basic Academy | CA-POST - -14 | ✓ | P | | 920:00 |
| - -9323 | 01/30/2015 | Basic Driver Training | CA-POST - -14 | ✓ | P | | 40:00 |

**Totals For Training Completed in: 2015** Completed 14 of 14 Modules 1,000:45

**Totals For: Bautista, Edward** Completed 153 of 153 Modules 1,843:16

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | ANDRE |

| ID # | Date |
|---|---|
| 1125 | 09/07/15 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| SGT KRAUT | 842 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

[signature]

| Print Name & ID Number | Date |
|---|---|
| EDWARD BAUTISTA 1125 | 09/07/15 |

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | ANDRE |

| ID # | Date |
|---|---|
| 1125 | 09/08/16 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| B. GUITH | 660 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

[signature]

| Print Name & ID Number | Date |
|---|---|
| EDWARD BAUTISTA | 09/08/16 |

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | ANDRE |

| ID # | Date |
|---|---|
| 1125 | 03/15/17 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| CPL ROTH | 752 |

**Attestation**

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature

[signature]

| Print Name & ID Number | Date |
|---|---|
| EDWARD BAUTISTA | 03/15/17 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | ANDRE |

| ID # | Assignment |
|---|---|
| 1125 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| EBAUTISTA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 9/20/18 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| TOMICIC | 718 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature

[signature]

| Print Name | Date |
|---|---|
| EDWARD BAUTISTA | 9/20/18 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | |

| ID # | Assignment | |
|---|---|---|
| 1125 | PATROL | |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| EBAUTISTA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 10/11/19 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| OFC DAVIS | 1091 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature

[signature]

| Print Name | Date |
|---|---|
| EDWARD BAUTISTA | 10/11/19 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

*INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST*

### Officer Identification

| | | |
|---|---|---|
| Last: BAUTISTA | First: EDWARD | Middle: ANDRE |
| ID #: C50-P11 / 1125 | Assignment: OFFICER | |
| Station: Fontana Police Department | Telephone: (909) 350-7700 | Fax: (909) 356-7111 |
| Email: EBAUTISTA @fontana.org | Other: | |

### Training Specifications

| | | |
|---|---|---|
| Training Date: 02/07/20 | Location: Fontana Police Department | |
| Instructor: LOCEY | Instructor ID#: 473 | |
| Course Name: Pursuit Policy | Course #: NA | Hours: 1 |
| Other/Notes: | | |

### Attestation

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature: [signature]

Print Name: EDWARD BAUTISTA

Date: 2/7/20

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | |

| ID # | Assignment |
|---|---|
| 1125 | PATROL K9 |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| EBAUTISTA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 3/7/21 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| | |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature



| Print Name | Date |
|---|---|
| EDWARD BAUTISTA | 3/7/21 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | A |

| ID # | Assignment |
|---|---|
| 1125 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| EBAUTISTA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 11/4/21 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| STEWART | 906 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

[signature]

| Print Name | Date |
|---|---|
| EDWARD BAUTISTA | 11/4/21 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY -- DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDDIE | |

| ID # | Assignment | |
|---|---|---|
| 1125 | PATROL OFFICER | |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| ebautista@fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 12/24/22 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| SGT. VREESKE | 946 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

[signature]

| Print Name | Date |
|---|---|
| EDDIE BAUTISTA | 12/24/22 |

13

Name: EDDIE BAUTISTA

ID#: 1125

Date: 12-24-22

**Fontana Police Department**

**Pursuit Policy Test**

| **True/False** | |
|---|---|
| 1 T | The primary purpose of policy 314 is to provide officers with guidance in balancing the safety of the public and themselves against law enforcement's duty to apprehend violators of the law. |
| 2 T | A vehicle pursuit is an event involving one or more law enforcement officers attempting to apprehend a suspect who is attempting to avoid arrest while operating a motor vehicle by using high speed driving or other evasive tactics such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop. |
| 3 T | In recognizing the potential risk to public safety created by vehicle pursuits, no officer or supervisor shall be criticized or disciplined for deciding not to engage in a vehicle pursuit because of the risk involved. |
| 4 T | The initial pursuing unit will be designated as the primary unit and will be responsible for the conduct of the pursuit unless it is unable to remain reasonably close enough to the violator's vehicle. The primary responsibility of the officer initiating the pursuit is the apprehension of the suspect(s) without unreasonable danger to themselves or other persons. |
| 5 F | A pursuit can be continued even if the fleeing vehicle is no longer in sight, but the pursuing officer knows the area of the fleeing vehicle. |
| 6 F | Officers may never discharge a firearm from a moving vehicle at a fleeing vehicle. |
| 7 T | The speed of a pursuit is not a factor that should be evaluated on a continual basis by the officer and supervisor. |

14

REV 08/2014

| Multiple Choice | |
|---|---|
| 8<br>E | Which of the following should the officer consider when initiating the pursuit?<br>A - Seriousness of the known violation(s)<br>B - Safety of the public in the area of the pursuit<br>C - Safety of the pursuing officer<br>D - Weather and road conditions<br>E - All of the above |
| 9<br>B | A pursuit should not be undertaken when;<br>A - Carrying an Explorer<br>B - Carrying a Prisoner<br>C - Carrying a citizen ride-a-long<br>D - A and B<br>E - All of the Above |
| 10<br>E | Which of the following units are permitted in a pursuit?<br>A - Primary / Initiating Unit<br>B - Secondary / Back-up Unit<br>C - Supervisor Unit (Optional)<br>D - Additional units approved by the supervisor<br>E - All of the above |
| 11<br>E | Which of the following is not considered a pursuit intervention?<br>A - Boxing-in or Roadblocks.<br>B - Ramming.<br>C - Spikes or Tack Strips.<br>D - Pursuit Intervention Technique (PIT).<br>E – Commandeering the pursued vehicle. |
| 12<br>C | The use of a pursuit intervention should only be employed after;<br>A – All other means of stopping the fleeing vehicle have failed.<br>B – It has been established that the occupants of the fleeing vehicle committed a Felony.<br>C – Approval of a supervisor.<br>D – All of the above. |
| 13<br>E | Which of the following guidelines should be followed prior to using the PIT maneuver on a pursued vehicle?<br>A – Obtaining approval from a supervisor.<br>B – Officer attempting the maneuver has been trained in the use of the PIT.<br>C – Consideration of the circumstances and conditions present at the time.<br>D – A and B.<br>E – All of the above. |

15

| | | |
|---|---|---|
| 14 | D | The use of firearms to disable a pursued vehicle<br>A - Is not generally an effective tactic.<br>B – Should only be used when it appears reasonably necessary to protect life.<br>C – Shall not be used per policy 314.<br>D – A and B<br>E – A and C |
| 15 | A | What should be communicated to an allied agency when it appears that a pursuit is likely to enter their jurisdiction?<br>A - Specific indication whether their assistance is needed<br>B - The number of units involved<br>C - Whether the pursuit is televised |
| 16 | E | Units from this department should not join another agency's pursuit unless;<br>A - The pursued vehicle is wanted for a Felony<br>B - The initiating agency specifically requests our assistance<br>C - A single unit from the initiating agency is in pursuit<br>D - A and B<br>E - B and C |
| 17 | C | When a pursuit is turned over to the CHP, what should the relinquishing agency do?<br>A - Remain in the pursuit to assist the CHP<br>B - Take over as secondary unit and follow the CHP<br>C - Relinquish the pursuit to the CHP<br>D - A and C |
| 18 | C | Pursuant to VC 14602.1(b), who shall complete CHP form 187A (Allied Agency Vehicle Pursuit Form)?<br>A - Any officer involved in the pursuit<br>B - Any supervisor involved in the pursuit<br>C - The primary officer<br>D - The secondary officer |
| 19 | B | When should a pursuit be discontinued?<br>A – If it is determined that the wanted violation is an infraction<br>B – Whenever the risk to the officers and public outweighs the risks from the suspect(s) escape<br>C – If the pursued vehicle is driving safely and following the rules of the road |
| 20 | A | Units not directly involved in the pursuit should;<br>A – Monitor the pursuit and remain alert to its progress and whether assistance is needed<br>B – Follow the pursuit to termination<br>C – A and B<br>D – None of the Above |

16

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | ANDRE |

| ID # | Date |
|---|---|
| 1125 | 11/7/23 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| GOOSELAW | 1128 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

| Print Name & ID Number | Date |
|---|---|
| EDWARD BAUTISTA | 11/7/23 |

9

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| BAUTISTA | EDWARD | |

| ID # | Assignment |
|---|---|
| 1125 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| EBAUTISTA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 10/21/24 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| HEAVISIDE | 565 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.

Signature

[signature]

| Print Name | Date |
|---|---|
| EDWARD BAUTISTA | 10/21/24 |

# Exhibit P

**POST PROFILE NAME:**

GARCIA, JESUS MAURICIO

CALIFORNIA COMMISSION ON **POST**

**Certification Status: Active**

**AKA:** N/A

**DATE:** 06/02/2025



## PERSONAL IDENTIFICATION

| POST I.D. | Agency | Birth Date | Gender | Race/Ethnicity |
|---|---|---|---|---|
| C81-E19 | | [redacted] | Male | [redacted] |

## CERTIFICATES AWARDED

| Cert No. | Type | Awarded | Education | T | T+ | Comments |
|---|---|---|---|---|---|---|
| 207086 | B | 06/20/2022 | | 46.65 | 2.60 | |

**Total Number of Certificates:** 1

## EMPLOYMENT

| Hired From | To | R* | Rank | Rank Date | Agency | Agency Name | F/P | P/U | Seas |
|---|---|---|---|---|---|---|---|---|---|
| 05/26/2020 | 12/17/2020 | 6 | TRN | 05/26/2020 | 36040 | FONTANA PD | F | P | |
| 12/17/2020 | 02/08/2025 | 3 | PO | 12/17/2020 | 36040 | FONTANA PD | F | P | |

***Reason for Separation: 3 = Retired, 6 = Other**

## POST CERTIFIED TRAINING

| Comp Date | Cat | CCN | Hrs | Rmb | Cmp | Agency | School | * | Course Name |
|---|---|---|---|---|---|---|---|---|---|
| 10/13/2020 | K | 2330-32075-20-005 | 16 | | Y | 36040 | S BRNDO SD | | FIREARMS/TACTICAL RIFLE |
| 12/17/2020 | A | 2330-00100-20-001 | 933 | R | Y | 36040 | S BRNDO SD | | BASIC COURSE-INTENSIVE |
| 05/21/2021 | K | 7530-29000-20-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 10/26/2021 | K | 7530-29502-21-002 | 8 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 03/30/2022 | K | 7530-29580-21-003 | 4 | X | Y | 36040 | FONTANA | * | USE OF FORCE (PSP) |
| 03/30/2022 | K | 7530-29501-21-002 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |
| 04/15/2022 | K | 7530-20290-21-001 | 16 | R | Y | 36040 | FONTANA | | DUI DETECTION-FIELD SOBRIETY |
| 05/24/2022 | K | 8790-22500-21-002 | 8 | | Y | 36040 | CNOA | | INFORMANT DEVELOPMENT & MAINTENANCE |
| 07/28/2022 | K | 7530-32075-22-001 | 36 | R | Y | 36040 | FONTANA | | FIREARMS/TACTICAL RIFLE |
| 08/25/2022 | K | 7530-32343-22-007 | 2 | X | Y | 36040 | FONTANA | | DOMESTIC VIOLENCE UPDATE |
| 08/25/2022 | K | 7530-29540-22-007 | 2 | X | Y | 36040 | FONTANA | * | STRATEGIC COMMUNICATIONS (PSP) |
| 08/25/2022 | K | 7530-29503-22-007 | 7 | R | Y | 36040 | FONTANA | * | ARSTCTL(PSP) |
| 02/21/2023 | K | 7530-32076-22-002 | 24 | X | Y | 36040 | FONTANA | | FIREARMS/TACTICAL RIFLE-ADV |
| 05/12/2023 | K | 2330-21165-22-039 | 4 | R | Y | 36040 | S BRNDO SD | | DRIVER TRNG (EVOC) UPD (PIT) |
| 07/10/2023 | K | 7530-29000-23-288 | 2 | X | Y | 36040 | FONTANA | | BIAS AND RACIAL PROFILING |
| 11/08/2023 | K | 7530-29502-23-003 | 8 | R | Y | 36040 | FONTANA | * | DRIVING(PSP) |
| 01/17/2024 | K | 7530-29501-23-003 | 6 | R | Y | 36040 | FONTANA | * | FIREARM(PSP) |

***Meets Perishable Skills**

## FOOTNOTES

NO FOOTNOTE ON FILE.

**PLEASE REFER TO THE ENCLOSED EXPLANATION SHEET FOR ADDITIONAL INFORMATION.**

The Profile Report contains confidential information.

# EXPLANATION SHEET

## PERSONAL IDENTIFICATION: Subject's personal information as indicated in POST database (EDI system)

| | |
|---|---|
| **POST ID:** | Unique identification number assigned to subject by POST. |
| **Agency:** | Indicates the agency (or one of the agencies) where subject is currently employed.<br>An "*" indicates that the subject is employed in more than one position within the same agency. |
| **Birth Date/Gender:** | Self-explanatory. |
| **Race/Ethnicity:** | **A** = Asian **B** = African American (Black) **N** = Native American **S** = Spanish/Hispanic **W** = White **O** = Other |

## CERTIFICATES AWARDED

| | |
|---|---|
| **Cert:** | Certificate serial number. |
| **Type:** | **B** = Basic **I** = Intermediate **A** = Advanced **S** = Supervisory **M** = Management **E** = Executive<br>**R** = Reserve **D** = Public Safety Dispatcher **SX**= Specialized X (example: SA = Specialized Advanced) |
| **Awarded:** | Date certificate was issued. |
| **Education:** | Educational points or degree used for earning a certificate. |
| **T:** | Training points used for awarding the certificate. |
| **T+:** | Additional training points. |
| **Comments:** | Comments regarding training or institute(s) where subject received education. |
| **Total Number of Certificates:** | Number of certificates awarded to subject as indicated in POST database. |

## EMPLOYMENT: Subject's employment history as indicated in POST database

| | |
|---|---|
| **Hired From:** | Date subject was hired or sworn into the agency. |
| **To:** | Date subject left agency (if applicable). |
| **R*:** | Reason for separation as indicated by number in the Report description. |
| **Rank / Rank Date:** | Indicates rank as translated by POST database and date subject made rank. |
| **Agency / Agency Name:** | Agency code number and name where subject is currently working or previously worked. |
| **F/P:** | Time base: **F** = Full time **P** = Part time |
| **P/U:** | Wage status: **P** = Paid **U** = Unpaid |
| **Seas:** | Provisional or seasonal employment. |

## POST TRAINING: Courses attended or completed as indicated in POST database

| | |
|---|---|
| **Comp Date:** | Date course ended. |
| **Cat:** | General course category (for POST use only). |
| **CCN:** | Course Control Number. |
| **Hrs:** | Hours completed in course. |
| **Rmb:** | Reimbursement indicator: **R** = Reimbursed *(before FY 83/84 reimbursable agency not necessarily reimbursed)*<br>**J** = Job specific ***** = Job specific, SALARY NOT PAID **Blank** = None or no data available |
| **Cmp:** | Completion indicator: **Blank or Y** = Course completed **N** = Course not completed **?** = Prior to 1979 |
| **Agency:** | Agency where subject was employed at time of course enrollment. |
| **School:** | Training institute offering the course. |
| **Course Name:** | Course name as shown in POST database. |

## NON-CERTIFIED COURSES

This section will only appear if applicable.

## FOOTNOTES

This section reserved for additional information.

Revised 11/2014

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Garcia, Jesus**

## Personal

**Agency:** Fontana Police Department
**ID #:** C81-E19

## Employment

| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Inactive | | |
| Duty Status: | | | |
| Time Status: | | | |
| Rank: | | | |
| Work Unit: | | | |
| Station: | | | |
| Division: | | | |

**Scheduled Training In: 2024**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2932 | 04/28/2024 | Automated Criminal History System - RAPS | *** None *** | ✓ | P | | 00:15 |
| - 1-2931 | 04/18/2024 | 5150 With Guns | *** None *** | ✓ | P | | 01:00 |
| - 1-2824 | 02/27/2024 | Red Dot Transition Course | *** None *** | ✓ | P | | 20:00 |
| - 1-2894 | 02/12/2024 | Assembly Bill (AB) 360 | *** None *** | ✓ | P | | 01:00 |
| - 1-2805 | 01/17/2024 | Firearms (PSP) | *** None *** | ✓ | P | | 08:00 |

**Totals For Training Completed in: 2024** Completed 5 of 5 Modules 30:15

**Scheduled Training In: 2023**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2701 | 11/08/2023 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |
| - 1-2692 | 11/08/2023 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-2622 | 09/13/2023 | Taser Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2624 | 09/13/2023 | Tactical Negotiation Team Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2536 | 07/12/2023 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-2537 | 07/12/2023 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-2538 | 07/12/2023 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-2540 | 07/12/2023 | SB 2 - Reporting Requirements & Decertification Process | *** None *** | ✓ | P | | 02:00 |
| - 1-2526 | 06/01/2023 | Automated Criminal History Systems (RAPS) | *** None *** | ✓ | P | | 00:15 |
| - 1-2468 | 05/11/2023 | Pit Training | *** None *** | ✓ | P | | 04:00 |
| - 1-2385 | 04/04/2023 | Two-Day Gang & Narcotics Symposium | *** None *** | ✓ | P | | 16:00 |
| - 1-2433 | 03/16/2023 | CPR/First Aid/AED | *** None *** | ✓ | P | | 08:00 |
| - 1-2434 | 03/16/2023 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |

**Fontana Police Department**

# Individual Training Activity



**Person:** **Garcia, Jesus** (Continued)

**Scheduled Training In: 2023** (Continued)

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2435 | 03/16/2023 | Sudden Custody Death Syndrome | *** None *** | ✓ | P | | 01:00 |
| - 1-2377 | 02/21/2023 | Advanced Rifle Course | *** None *** | ✓ | P | | 20:00 |
| - 1-2367 | 02/10/2023 | Certified Gang Enforcement Officer | *** None *** | ✓ | P | | 16:00 |

**Totals For Training Completed in: 2023** Completed 16 of 16 Modules 93:15

**Scheduled Training In: 2022**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-2336 | 12/31/2022 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-2274 | 11/08/2022 | 2-day Search warrant workshop | *** None *** | ✓ | P | | 16:00 |
| - 1-2304 | 10/28/2022 | Informant Cultivation & Development | *** None *** | ✓ | P | | 08:00 |
| - 1-2299 | 09/12/2022 | AB 490 | *** None *** | ✓ | P | | 00:30 |
| - 1-2259 | 08/25/2022 | Arrest & Control (PSP) | *** None *** | ✓ | P | | 07:00 |
| - 1-2251 | 08/25/2022 | Strategic Communications (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-2252 | 08/25/2022 | Domestic Violence Update (PSP) | *** None *** | ✓ | P | | 02:00 |
| - 1-2174 | 08/23/2022 | Investigative Tactics and Updates for Narco Cases | *** None *** | ✓ | P | | 08:00 |
| - 1-2184 | 07/28/2022 | Patrol Rifle | *** None *** | ✓ | P | | 36:00 |
| - 1-2101 | 05/24/2022 | Informant Development and Management | *** None *** | ✓ | P | | 08:00 |
| - 1-2411 | 05/04/2022 | Interview and Interrogation | *** None *** | ✓ | P | | 01:30 |
| - 1-2130 | 05/01/2022 | Automated Criminal History Systems (RAPS) | *** None *** | ✓ | P | | 00:15 |
| - 1-2058 | 04/15/2022 | SFST - Field Sobriety | *** None *** | ✓ | P | | 16:00 |
| - 1-2059 | 04/06/2022 | Good Faith & The 4th Amendment | *** None *** | ✓ | P | | 01:30 |
| - 1-2050 | 03/31/2022 | Plain View & Plain Feel | *** None *** | ✓ | P | | 01:30 |
| - 1-2065 | 03/30/2022 | Use of Force (PSP) | *** None *** | ✓ | P | | 04:00 |
| - 1-2052 | 03/29/2022 | Responding to an Unexplained Child Death | *** None *** | ✓ | P | | 06:00 |
| - 1-2024 | 02/03/2022 | Tactical Negotiation Team #2 Training | *** None *** | ✓ | P | | 00:30 |
| - 1-1979 | 01/12/2022 | Tactical Care | *** None *** | ✓ | P | | 05:00 |
| - 1-1978 | 01/12/2022 | Narcan | *** None *** | ✓ | P | | 02:00 |
| - 1-1980 | 01/12/2022 | Officer Wellness | *** None *** | ✓ | P | | 02:00 |

**Totals For Training Completed in: 2022** Completed 21 of 21 Modules 128:45

**Scheduled Training In: 2021**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1895 | 10/26/2021 | Driver Awareness (PSP) | *** None *** | ✓ | P | | 08:00 |

**Fontana Police Department**

# Individual Training Activity

03/24/2025



**Person:** **Garcia, Jesus** (Continued)

**Scheduled Training In: 2021** (Continued)

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1896 | 10/26/2021 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1841 | 08/31/2021 | Senate Bill 439 | *** None *** | ✓ | P | | 00:30 |
| - 1-1777 | 07/08/2021 | Strategic Communications | *** None *** | ✓ | P | | 00:30 |
| - 1-1724 | 05/21/2021 | Mental Health & De-escalation | *** None *** | ✓ | P | | 04:00 |
| - 1-1712 | 05/21/2021 | Bias Based Policing: Remaining Fair & Impartial | *** None *** | ✓ | P | | 02:00 |
| - 1-1718 | 05/21/2021 | Principled Policing- Annual Training | *** None *** | ✓ | P | | 02:00 |
| - 1-1764 | 05/08/2021 | Hate Crime Identification & Investigation | *** None *** | ✓ | P | | 01:00 |
| - 1-1765 | 05/06/2021 | Common Executime Errors | *** None *** | ✓ | P | | 01:00 |
| - 1-1687 | 04/07/2021 | Policing Mental Illness | *** None *** | ✓ | P | | 01:30 |
| - 1-1661 | 03/17/2021 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| - 1-1594 | 02/06/2021 | Autism Recognition and Response | *** None *** | ✓ | P | | 01:00 |
| - 1-1555 | 01/20/2021 | CPR/First Aid/AED | *** None *** | ✓ | P | | 08:00 |
| - 1-1564 | 01/20/2021 | Bloodborne Pathogens | *** None *** | ✓ | P | | 01:00 |
| **Totals For Training Completed in: 2021** | | Completed 14 of 14 Modules | | | | | 32:30 |

**Scheduled Training In: 2020**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - 1-1541 | 12/28/2020 | Pursuit Policy | *** None *** | ✓ | P | | 01:00 |
| **Totals For Training Completed in: 2020** | | Completed 1 of 1 Modules | | | | | 01:00 |

**Totals For: Garcia, Jesus** — Completed 57 of 57 Modules — 285:45

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| GARCIA | JESUS | M |

| ID # | Assignment |
|---|---|
| 1375 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| JMGARCIA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 12-28-2020 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| D. LOCEY | 473 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

[signature]

| Print Name | Date |
|---|---|
| JESUS M. GARCIA | 12-28-20 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| GARCIA | JESUS | M |

| ID # | Assignment |
|---|---|
| 1375 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| JMGARCIA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 03-08-21 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| CPL. T. BORDEN | 828 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

| Print Name | Date |
|---|---|
| J. GARCIA | 03-08-21 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

### Officer Identification

| Last | First | Middle |
|---|---|---|
| GARCIA | JESUS | M |

| ID # | Assignment | |
|---|---|---|
| 1375 | PATROL | |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| JMGARCIA @fontana.org | |

### Training Specifications

| Training Date | Location |
|---|---|
| 10-26-21 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| E. STEWART | 906 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

### Attestation

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

| Print Name | Date |
|---|---|
| JESUS M GARCIA | 10-26-21 |

# Fontana Police Department
# #7530

## SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| GARCIA | JESUS | M |

| ID # | Assignment |
|---|---|
| 1375 / 5210 | PATROL |

| Station | Telephone | Fax |
|---|---|---|
| Fontana Police Department | (909) 350-7700 | (909) 356-7111 |

| Email | Other |
|---|---|
| JMGARCIA @fontana.org | |

**Training Specifications**

| Training Date | Location |
|---|---|
| 12-24-22 | Fontana Police Department |

| Instructor | Instructor ID# |
|---|---|
| S. WEISKE | 946 |

| Course Name | Course # | Hours |
|---|---|---|
| Pursuit Policy | NA | 1 |

Other/Notes

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature
[signature] #1375

9

| Print Name | Date |
|---|---|
| J. GARCIA | 12-24-22 |

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
|---|---|---|
| GARCIA | JESUS | M. |

| ID # | Date |
|---|---|
| 1375 | 11-08-23 |

**Training Specifications**

| Instructor | Instructor ID# |
|---|---|
| TOMICIC | 728 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

J. GARCIA

| Print Name & ID Number | Date |
|---|---|
| J. GARCIA #1375 | 11-08-23 |

9

# FONTANA POLICE

## SB 719 Pursuit Policy Training Attestation

**Officer Identification**

| Last | First | Middle |
| --- | --- | --- |
| GARCIA | JESUS | M |

| ID # | Date |
| --- | --- |
| 1375 | 11-08-23 |

**Training Specifications**

| Instructor | Instructor ID# |
| --- | --- |
| TOMTCTC | 728 |

**Attestation**

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

Signature

J. GARCIA

| Print Name & ID Number | Date |
| --- | --- |
| J. GARCIA #1375 | 11-08-23 |

9

# EXHIBIT Q

# Exhibit R

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

DIANA RIAS; TATANISHA PITTS;
DOMINIC ADAMS Sr.; and
BRITTANY MASON,

Plaintiffs,

v. Case No. 5:25-cv-00207-JGB-SHK

CITY OF FONTANA; EDWARD
BAUTISTA; JESUS GARCIA;
DANIEL PRECIE; BRIAN
ZOZAYA; and DOES 1-10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF

DANIEL PRECIE

THURSDAY, JUNE 4, 2026

Reported Stenographically by:
KIMBERLY D'URSO, CSR 11372, RPR
Job No. 27647

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: MARCEL SINCICH, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
msincich@galipolaw.com

SHOJAI LAW FIRM
BY: NEEMA SHOJAI, ESQ.
8880 Rio San Diego Drive, Suite 800
San Diego, California 92108
619.777.0383
neema@shojaifirm.com

FOR THE DEFENDANTS CITY OF FONTANA, EDWARD BAUTISTA, JESUS GARCIA, DANIEL PRECIE, BRIAN ZOZAYA:

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
BY: EUGENE P. RAMIREZ, ESQ.
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
213.624.6900
eugene.ramirez@manningkass.com

FOR MINOR A:

LAW OFFICES OF JAMES H. CESENA
BY: JAMES H. CESENA, ESQ.
1748 W. Katella Av., Suite 105
Orange, CA 92867
714.744.3333
jamescesena711@gmail.com

--oOo--

INDEX OF EXAMINATION

WITNESS: DANIEL PRECIE

EXAMINATION BY PAGE

MR. SINCICH..................................4

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

Ex 7 - Video from the Chevron gas station, on Valley and Cherry..................................66

Ex 8 - Video of Valley and Poplar...................69

Ex 9 - Video of Valley and Catawba..................71

Ex 10- Video of Valley and Catawba..................73

Ex 11- Video of Citrus gas station and Valley.......74

Ex 12- Video of Citrus gas station..................75

Ex 13- Video of Citrus intersection and Valley......76

--oOo--

--oOo--

BE IT REMEMBERED, that set on Thursday, the 4th day of June, 2026, commencing at the hour of 10:06 a.m., thereof, DANIEL PRECIE, appeared remotely in Los Angeles, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

EXAMINATION

BY MR. SINCICH:

Q. Good morning, Officer Precie. Can you please state and spell your name for the record?

A. Yes. My name is Daniel Precie. D-A-N-I-E-L; last name Precie, P-R-E-C-I-E.

Q. Okay. Have you had your deposition taken before?

A. I have, yes.

Q. How many times?

A. Once.

Q. Was that work-related in law enforcement?

A. It was, yes.

collision; but was the video that you reviewed depicting things that occurred after the collision?

A. Yes.

Q. Okay. Did you review any video of the pursuit prior to the collision?

A. No.

Q. And which audio did you review?

A. I reviewed my Dispatch audio.

Q. When you say your "Dispatch audio," are you referring to transmissions that you made to Dispatch?

A. That includes that, correct. Yes.

Q. You were in a vehicle with Officer Zozaya; correct?

A. Correct.

Q. Were you the one making the radio communication during the pursuit?

A. No, I was not.

Q. Did you review any other audio?

A. Not to my knowledge.

Q. And you reviewed the MAIT report; right?

A. Correct.

Q. Okay. How long have you been a law enforcement officer with Fontana Police Department?

A. Approximately three years.

Q. At the time of the incident, how long had you

served as a law enforcement officer?

A. Six months.

Q. Were you still on probation at the time?

A. Correct.

Q. Was Officer Zozaya your field training officer?

A. He was not, no.

Q. At that time frame, did you require a field training officer?

A. No.

Q. All right. Was that your first assignment after the academy, was patrol?

A. Yes.

Q. Did you have any law enforcement experience prior to being hired with Fontana Police Department?

A. No.

Q. Any military experience?

A. No.

Q. Prior to this incident, had you been on any vehicle pursuits?

A. Yes.

Q. How many, prior to this incident?

A. Approximately four.

Q. Did some of those pursuits get up to high speeds?

MR. RAMIREZ: Vague and ambiguous as to the

term "high speed."

But you may respond.

THE WITNESS: Yes.

BY MR. SINCICH:

Q. Were they exceeding the speed limit, essentially?

A. Yes.

Q. Were any of those pursuits at night?

A. Yes.

Q. And were any of those pursuits during conditions where the road was wet?

A. Not -- not from what I remember.

Q. Okay. What about since the incident occurred, have you been involved in any vehicle pursuits?

MR. RAMIREZ: I'm going to object as irrelevant.

But you may respond "yes" or "no."

THE WITNESS: I'm sorry. Could you ask that question one more time?

BY MR. SINCICH:

Q. Yes. Have you been in any vehicle pursuits since the incident?

MR. RAMIREZ: Same objection.

But you may respond.

THE WITNESS: Yes.

MR. RAMIREZ: I would object under the Federal Right to Privacy, Penal Code Sections 832.7, 832.8; Peace Officer's Bill of Rights pursuit to Government Code Section 3300 et seq; Evidence Code Sections 1040, 1043, 1045.

However, you may respond "yes" or "no," if you're aware.

THE WITNESS: No.

BY MR. SINCICH:

Q. What was the location that you first saw the subject vehicle?

A. On Valley, as we were approaching Catawba.

Q. Which direction was your vehicle moving when you first saw the vehicle?

A. Eastbound, on Valley.

Q. And which direction was the subject vehicle facing?

A. Eastbound.

Q. And you said that was Valley and Catawba?

A. Correct.

Q. Was the subject vehicle moving when you first saw it?

A. Correct.

Q. Was it -- where was it in relation to that intersection when you first saw it?

A. It -- it was, I would say, approximately, maybe 50 feet from -- from the intersection from Catawba. We were very close approaching the intersection.
Q. So 50 feet to the west of it?
A. Correct.
Q. And were you directly behind the subject vehicle?
A. Yes.
Q. Approximately, what was your distance between your vehicle and the subject vehicle at that time?
A. Approximately, four car lengths.
Q. When you first saw the subject vehicle, did you see anything that would indicate a violation of the Vehicle Code or Penal Code?
A. Yes.
Q. What did you see when you first saw the subject vehicle?
A. I saw the rear right passenger, his body was -- he was hanging out of the window and, obviously, he didn't have his seatbelt on.
Q. How much of his body could you see?
A. Up to his torso.
Q. And when you say "torso," how much of that could you see?
A. I would say about almost -- almost to his

waistline.

Q. Do you know what color shirt he was wearing?

A. No.

Q. Is it possible that he extended the seatbelt out in order to be in that position?

MR. RAMIREZ: May call for speculation.

But you may respond.

THE WITNESS: It could be possible, but he would have to put the seat -- the seatbelt behind him.

BY MR. SINCICH:

Q. Describe the person that you saw hanging out of the window.

A. He looked like a juvenile, early -- early teenager, male. I don't recall what he was wearing. But that's all I remember right now.

Q. Did you ever put out any of that information on the radio or computer?

A. No.

Q. Were you able to identify what you believed his race to be?

A. No.

Q. Were you just too far to be able to see that detail?

A. Yes.

Q. Did you see anybody else in the vehicle at that

time?

A. No.

Q. Were you ever able to see the driver?

A. No.

Q. Were you able to tell that there was anyone else in the vehicle, except for the driver and the person that you saw hanging out of the window?

A. No.

Q. Besides that time that you saw him hanging out of the window, did you ever see him hanging out of the window any other time?

A. No.

Q. What was he doing when he was hanging out of the window?

A. He was looking at us and looking in our direction, and had his phone pointed at us, looking like he was trying to record us.

Q. Okay. How fast was the subject vehicle going at that time?

A. He was within -- within the speed limit at that time.

Q. And what was the speed limit on Valley?

A. 45.

Q. Do you recall what lane he was in?

A. Initially, he was in the Number 1 lane, and he

switched into the Number 2 lane.

Q. How long was the juvenile in the back right seat hanging out of the window?

A. I -- I don't recall exactly how long.

Q. Could use give me an estimate, please?

A. Around, maybe, 20 seconds.

Q. In that 20 seconds' time frame, did the vehicle continue going eastbound on Valley?

A. Correct.

Q. Approximately, how far down Valley did it go? Did it reach another street?

A. No.

Q. Did you or Officer Zozaya turn on the lights and sirens to initiate the pursuit?

A. Could -- could you ask that -- rephrase that question?

Q. Yeah. I'm wondering which person in your vehicle turned on the lights and sirens when you initiated the pursuit?

A. Officer Zozaya.

Q. Did Officer Zozaya turn on the lights and sirens while the young juvenile was hanging out of the window?

A. Yes.

Q. And then you said that, at some point, there

was a lane change from Number 1 to Number 2?
A. Correct.
Q. Was that also while the juvenile was hanging out of the window for that approximate 20 seconds?
A. I -- I don't recall if -- if he was hanging out of the window during the lane change, or if it was after.
Q. Okay. So is it fair to say that the lane change occurred after you recall the lights and sirens being turned on?
A. The initial lane change from the Number 1 and Number 2, that occurred before we turned our lights and sirens on.
Q. Okay. So, just so I understand the timing, the young man is hanging out of the window, and they're in the Number 1 lane; right?
A. They -- they started in the Number 1 lane.
Q. Okay.
A. So he was not hanging out the window yet.
Q. Okay. Describe to me the timeline of when he was hanging out of the window, from when you first saw him, to him hanging out the window, to him changing lanes, and when the lights and sirens first came on. If you could just describe that, so I understand the timing correctly.

A. Okay. So he started in the Number 1 lane, traveling eastbound on Valley. And he made the lane change into the Number 2 lane, with -- without his turn signal on, approaching Catawba.

And at some point the juvenile hung his body out the window, recording us, while we were approaching Catawba.

Q. And then where were you in relation to that intersection when the lights and sirens came on?

A. The lights and sirens came on just as -- before we were proceeding through Catawba.

Q. Okay. So within that 50 feet or so?

A. Correct.

Q. So how long had you seen the subject vehicle before the lights and sirens came on?

A. I don't -- I don't recall exactly how long I -- I saw the car.

Q. Could you give me an estimate, please?

A. About within a minute.

Q. Could you give me an approximate distance that you were following the subject vehicle before the lights and sirens came on?

A. We were maybe about half a block.

Q. Were you ever going westbound on Valley and passed the subject vehicle?

MR. RAMIREZ: Vague and ambiguous as to time.
But you may respond, if you ever did that.
THE WITNESS: I -- I don't recall if -- if we were going westbound prior to that.
BY MR. SINCICH:
Q. Before you were behind the subject vehicle, just west of Catawba and Valley, were you going westbound on Valley?
A. I only remember us going eastbound.
Q. Did you have any communication with Officer Zozaya between the time that you first saw the subject vehicle and the time that the lights and sirens came on?
A. Yes.
Q. What did you say to him?
A. We were just talking about how that rear passenger -- excuse me -- was hanging out of the window, recording us, and we both agreed that he was not wearing a seatbelt, and he was going to hurt himself, because it looked like he was going to probably fall out of the car.
Q. Was there any other communication?
A. Besides agreeing that we're going to make a traffic stop on the vehicle, no.
Q. Okay. How long after the lights and sirens came -- well, strike that.

When, in relation to the lights and sirens coming on, did Officer Zozaya put out on the radio that a pursuit was being initiated?
A. It was within -- within seconds.
Q. Was it seconds before or after the lights came on?
A. After.
Q. Okay. Were you still around the intersection of Catawba and Valley when that occurred?
A. Correct.
Q. Did you see any other movement that stood out to you, by the subject vehicle, after the lights and sirens came on?
A. No.
Q. At some point did the vehicle pick up speed?
A. Yes.
Q. How long after the lights and sirens came on did the vehicle start to pick up speed?
A. It was immediately.
Q. And approximately how fast was the subject vehicle going after it started to speed up?
A. It continued to pick up speeds upwards of 80 miles an hour.
Q. Did you see the collision between Officer Garcia's vehicle and the subject vehicle?

A. No.
Q. Were you still pursuing the subject vehicle at the time?
A. Yes.
Q. Were you focused on the subject vehicle during the pursuit?
MR. RAMIREZ: It's vague and ambiguous, "focused on the suspect's vehicle."
But you may respond, if you understand.
THE WITNESS: To the -- to the best of my ability, yeah.
BY MR. SINCICH:
Q. Were you looking somewhere else, besides the subject vehicle, at the moment of the impact?
A. Well, everything -- everything happened so quickly, so we were prepared to get out of the vehicle, so, obviously, I took my seatbelt off. And so, during that time, I was trying to put my seatbelt back on.
And right after that, I looked up, and I saw the vehicle veer into the center median lane; and as I drove up, the collision occurred.
Q. When did you take your seatbelt off?
A. Just as we were turning our lights and sirens on.
Q. And you said that your intent was because you

were hoping to be able to jump out of the vehicle quickly?

A. Correct.

Q. But then, by the time you got to the intersection of Cypress and Valley, you were putting it back on?

A. Correct.

Q. And why were you putting your seatbelt on?

A. For safety purposes, and it's within our policy.

Q. What does the policy state about wearing a seatbelt?

A. That we should wear our seatbelt.

Q. Do you recall anything else from the policy?

A. As in -- can you rephrase that question?

Q. Are officers required to wear their seatbelt in a moving vehicle, while on duty?

A. Correct.

Q. And it would be a Vehicle Code violation to not wear the seatbelt; correct?

A. Correct.

Q. And I think you said that the driver of the subject vehicle didn't use a turn signal?

A. Correct.

Q. Would turning or changing lanes without a turn

signal be a Vehicle Code violation, as well?
A. Correct.
Q. Generally speaking, are officers required to follow the Vehicle Code, unless they're responding to an emergency situation?
A. Correct.
Q. And in order for those exceptions to apply, is it true that the officers have to have their lights and sirens on?
A. Correct.
Q. How long was the subject vehicle in the Number 2 lane before it changed into a different lane?
A. It -- it was within seconds.
Q. And which lane did it go into, from the Number 2 lane?
A. The Number 1 lane.
Q. Was there light traffic on the road?
A. Yes.
Q. During the pursuit, other than that final collision, did you see any other collisions occur?
A. No.
Q. Did you see the subject vehicle run any stop signs?
A. No.
Q. Did you see the subject vehicle run any

stoplights?

A. I -- I don't recall if -- if he ran any red lights, at the moment.

Q. Okay. What kind of ticket or citation would you give for what you initially saw, the hanging from the window, and the not using a signal when changing lanes?

A. I would give out the violation for not wearing a seatbelt and unsafe lane change.

Q. Are those "infractions"? Is that what it's called?

A. Yes.

Q. Are those arrestable offenses?

A. No.

Q. Would they be considered fairly minor offenses, then?

A. Yes.

Q. Does your vehicle have a license plate reader on it?

A. Not all vehicles are equipped with it, so I don't -- I don't remember if our vehicle at the time had a license plate reader.

Q. Okay. Some of the vehicles, at the time of the incident, in Fontana Police Department, had one of those?

A. Yes.
Q. And how do those typically work?
A. You'd have to log into the system. And as you drive by, it will -- it will read any vehicles, whether they're parked or driving, as long as it's able to get a clear view.
Q. From your distance behind the subject vehicle, being approximately four car lengths when you first saw it, if there was a license plate reader on the vehicle, would it have a picked up that license plate, to your knowledge?
MR. RAMIREZ: May call for speculation. Lacks foundation.
But you may respond, if you know.
THE WITNESS: If it read it clearly, yes.
BY MR. SINCICH:
Q. Okay. Were the you able to see the license plate when you first saw the vehicle?
A. I don't remember seeing the license plate. So I don't -- yeah, I don't recall.
Q. As the passenger, is that one of your responsibilities, to gather that information?
A. It's -- it's not required, but that's -- it's something that you can have a discussion with your partner, what each of our responsibilities are.

Q. Is it fair to say you didn't know anything about the histories of the individuals inside the subject vehicle?

A. Correct.

Q. Were you able to run the license plate at all to get any information about the vehicle or the owner?

A. No.

Q. Did you ever request air support during the pursuit?

A. We -- we did not, because after we stated the vehicle was fleeing, our helicopter, Eagle 1, said that he was en route.

Q. Okay. Did either you or your partner call for backup?

A. No. Multiple officers put themselves en route to us.

Q. What officers put themselves en route to you?

A. There were -- there were various officers and Sergeant -- I know Sergeant Janusz, he put himself en route to it, as well.

Q. Do you know any other officers who put themselves en route?

A. Yes.

Q. Which officers?

A. Officer Terwilliger and Officer Garcia.

Q. Did Officer Bautista put himself en route?
A. Correct.
Q. According to the policy, is there a certain number of vehicles that are typically allowed to pursue in a vehicle pursuit?
A. Yes.
Q. And what's that number?
A. The primary unit, secondary unit, and a supervisor.
Q. Do you know how far your sergeant was from the incident location when he put himself en route?
A. No.
Q. Where were you in the pursuit when you knew that the sergeant was en route?
MR. RAMIREZ: It's vague and ambiguous.
But you may respond, if you understand.
THE WITNESS: I didn't -- not until after the fact, after everything was done, did we know that he was en route, because he -- you can manually put yourself on the call from the computer. So he never put out that he was en route to us.
BY MR. SINCICH:
Q. Okay. So during the pursuit itself, you didn't know that the sergeant was en route?
A. No.

Q. During the pursuit, did you know that Officer Bautista was en route?
A. No.
Q. During the pursuit, did you know that Officers Garcia and Terwilliger were en route?
A. No.
Q. Did you hear any radio communication from any other officers, requesting to join the pursuit?
A. No.
Q. According to the policy and training at the time, if officers are en route to join a pursuit, when they're responding, do they respond with lights and sirens on?
MR. RAMIREZ: May call for speculation. Lacks foundation.
But you may respond, if you know.
THE WITNESS: It depends.
BY MR. SINCICH:
Q. What does it depend on?
A. The severity of the crime.
Q. How are the officers responding supposed to learn of the severity of the crime? Where would they get that from?
A. It could be the primary officer saying what the rea- -- what the reason for the stop is.

Q. Did either you or your partner put out the reason for the stop?

A. No, not at the time. It wasn't -- everything happened so quickly, so we didn't have enough reasonable time.

Q. Approximately how long was it from the time that the lights and sirens came on, to the time of that collision?

A. It was within around 30 seconds.

Q. And that was generally on Valley, from Catawba, to just past Cypress?

A. Correct.

Q. Do you know the approximate distance between those two streets?

A. I don't know what the approximate distance is. It's under a mile.

Q. Okay. Do you recall Officer Zozaya putting out over the radio, I think it was 89.7?

A. Yes.

Q. And what was that reference to, if you know?

A. Yes. He put that out because it makes it easier in the conclusion of a pursuit, because on the CHP form, pursuit form, you have to list how -- how long that pursuit was in miles -- in miles.

Q. So the 89.7 was his odometer reading at the

time?

A. Yes, the last -- the last digits on his odometer.

Q. Do you recall what the final odometer reading was?

A. No.

Q. Did you draft any reports related to this incident?

A. No.

Q. Other than the interview with the county two months after the incident, did you have any other interviews related to this incident, other than your attorneys?

A. No.

Q. Were you injured at all in the incident?

A. No.

Q. Did you see the subject vehicle just before it reached the intersection of Cypress and Valley?

A. Yes.

Q. What lane was it in at that time?

A. The Number 1 lane.

Q. And did it stay on course in the Number 1 lane as it passed through the intersection?

A. No.

Q. Did you see it veer off what the Number 1 lane

would be, while it was inside the intersection?
MR. RAMIREZ: It's vague and ambiguous.
But if you understand, you may respond.
THE WITNESS: No. Could you rephrase -- rephrase that question?
BY MR. SINCICH:
Q. Sure. I'll ask it a different way.
After the subject vehicle got past Cypress and was on Valley, on the east side of Cypress, what lane was it in?
A. It was starting to -- to veer into the -- the center -- the center median lane.
Q. How far past the east sidewalk did you see it start to veer into the center median lane?
A. I -- I don't remember the -- the approximate distance.
Q. What would you say is the approximate distance between the sidewalk, on the east side of Cypress, and the collision location?
A. Which sidewalk?
Q. The east side, sidewalk.
A. On the north or south side of Valley?
Q. Sorry. I'm referring to like the white lines indicating -- oh, I'm sorry. I said it backwards.
MR. RAMIREZ: That changes everything.

MR. SINCICH: There it is. I see now the error in my ways. I'm saying sidewalk, but I'm thinking the crosswalk.

MR. RAMIREZ: Okay. That makes a big difference. I was wondering what you were talking about, as well, so --

BY MR. SINCICH:

Q. Okay. That makes sense.

What's the approximate distance from the east side crosswalk to the collision location?

A. I would say, about 200 feet.

Q. Okay. In that approximate 200 feet, did you see the subject vehicle in lane 1 at all?

A. Just east of -- east of Catawba -- or I'm sorry, east of Cypress, no. I only saw it when it was in that -- veering into the center median lane.

Q. Okay. Did you ever see it go into the westbound traffic lanes, before the collision?

A. No.

Q. I understand that the vehicle ended up on the north side of the road, which would be on the westbound side; is that right?

A. Correct.

Q. Did you ever see the subject vehicle braking before the collision?

A. I did not see brake lights.
Q. Did you see the subject vehicle swerve before the collision?
A. Other than veering into the center -- the center median, no.
Q. And when you say "veering into," was that like a gradual, almost like a lane change?
A. Correct.
Q. Did you ever see the subject vehicle slide at all, before the collision?
A. No.
Q. Did you ever see it, for instance, almost sideways, but sliding forward, towards the officer vehicle?
A. No.
Q. Did you ever hear anybody honk a horn prior to the collision?
A. No.
Q. Did you see Officer Bautista's vehicle prior to the collision?
A. Yes.
Q. And where was he located?
A. He was -- I don't remember exactly which -- I remember seeing his vehicle. I don't remember if he was in the center median or the Number 1, westbound lane,

but he did have his lights and sirens on.
Q. Did you ever see Officer Bautista's vehicle before he had his lights and sirens on?
A. No.
Q. Did you ever see Officer Garcia's vehicle prior to the collision?
A. I'm sorry. You said "Officer Bautista"?
Q. Excuse me. Did you ever see Officer Garcia's vehicle prior to the collision?
A. No.
Q. When you saw the subject vehicle, as you described veering to its left, did it appear to you like the driver was trying to avoid a collision?
MR. RAMIREZ: May call for speculation. Lacks foundation. Assumes facts not in evidence.
But you may respond, if you can.
THE WITNESS: No. I -- I couldn't tell.
BY MR. SINCICH:
Q. Okay. Did you and your partner put out over the radio that the pursuit was going high speed?
A. Yes.
Q. And is that a common vernacular for officers to communicate something to their partners?
A. Can you rephrase that question?
Q. Right. So I'm wondering if when you put out

"high speed," is that a common radio term that you would use?

A. You would -- you just need to put out the conditions, which involve what the speeds are.

Q. When you put out "high speed," what would that generally mean, based off of the training, to an officer hearing that?

A. Over the speed limit.

Q. Okay. And did you or your partner put out that the pursuit was passing Oleander?

A. I don't -- I don't recall that exact radio transmission.

Q. It was Officer Zozaya that was making all the radio transmissions?

A. Correct.

Q. Did you hear Officer Zozaya put out that the pursuit was approaching Cypress?

A. I heard that -- I heard "Cypress." I couldn't re- -- I can't recall if it was approaching or if we were through Cypress.

Q. Okay. If Officer Zozaya put out that the pursuit was approaching Cypress, would it be fair to say that that communication would be while you were still on the west side of the intersection?

A. Correct.

Q. I understand that Officers Garcia and Terwilliger were injured during the incident?

A. Correct.

Q. Was Officer Zozaya injured at all, to your knowledge?

A. Officer Zozaya?

Q. Zozaya.

A. No.

Q. Was Officer Bautista injured related to this incident?

A. No.

Q. And I understand -- and don't want to be insensitive, but I understand that he's no longer with us, Officer Bautista?

A. That's correct.

Q. Do you know the circumstances of his death?

MR. RAMIREZ: I'll object as to privacy.

But you can answer generally, if you know.

THE WITNESS: Yes.

BY MR. SINCICH:

Q. Could you explain to me what those circumstances are?

A. I only know that he took his own life.

Q. Did you ever communicate with Officer Bautista after the incident?

A. Yes.

Q. What did he tell you about the incident?

MR. RAMIREZ: Calls for hearsay.

But you may answer.

THE WITNESS: It's been so long ago. I don't recall -- I don't recall exactly what we had talked about.

BY MR. SINCICH:

Q. What, generally, do you recall him communicating to you?

A. Just -- just how crazy everything was with our officers getting injured, and just the overall, "How come?"

Q. Do you know how long after the incident he took his life?

A. It -- it's been maybe around a year now. So a year -- so it was over a year after the incident.

Q. Okay. Did you receive any information that it was related to this incident?

MR. RAMIREZ: The death of Officer Bautista; correct?

MR. SINCICH: Yes.

MR. RAMIREZ: Relevance.

But you may respond, if you know.

THE WITNESS: No, I don't know.

MR. SINCICH: Okay. Is now a good time to take a break? Let's take ten minutes. I appreciate you bearing with me on that last set.

We're off the record.

(Break taken.)

BY MR. SINCICH:

Q. Could you describe the pursuit, just generally speaking? How would you describe the pursuit, before the collision?

MR. RAMIREZ: Vague and ambiguous.

But you may respond, if you understand.

THE WITNESS: Very -- very, very short.

BY MR. SINCICH:

Q. Did you believe that it was a dangerous pursuit?

A. No.

Q. Is that because the speeds weren't that extremely high?

A. We -- we'll take everything into consideration. And at the time, there was very little traffic, and the visibility was good.

Q. Okay. Because Valley is a pretty flat and straight road; right?

A. Correct.

Q. Is it pretty easy to see kind of in a long

A. I -- I couldn't give an exact number. I just skimmed most of the report.

Q. Did you review something like 10 pages; or was it more like a hundred pages; or what is an estimate that you recall?

A. I reviewed all the pages that seemed important to me, such as my statement I made.

Q. When you reviewed the statement that you made, was it a summary of the statement?

A. Correct.

Q. Did you see any inaccuracies when you reviewed that?

A. Yes.

Q. What inaccuracies did you see?

A. I had said that the vehicle made the lane change initially from the Number 2 to the Number 1, but now realizing -- I realize now that it was from the Number 1 to the Number 2. So that was my error at the time.

Q. And you're referring to when you first saw the subject vehicle; right?

A. Correct.

Q. Were there any other inaccuracies in the statement that you gave to the investigators?

A. No.

Q. Do you recall telling the investigators that the patrol vehicle exited onto Valley?

A. No.

Q. Do you recall telling the investigators --

(Reporter clarification.)

BY MR. SINCICH:

Q. -- that an assisting patrol vehicle exited a business parking lot on the south side of Valley Boulevard, by turning left to travel west on Valley Boulevard?

A. Okay. Yes. The -- the first -- the first vehicle, the first responding.

Q. So are you referring to Officer Bautista's vehicle in that statement?

A. Correct.

Q. So you saw Officer Bautista's vehicle turning left?

A. Correct; when he -- he pulled out on to Valley.

Q. Did he have his lights and sirens on at that time?

A. Initially, I don't remember if he had his lights and sirens on, but he -- he did have his headlights on.

Q. Do you recall telling the investigator that as the patrol vehicle exited onto Valley Boulevard, vehicle

1 veered from the Number 1 eastbound lane into the center median of Valley Boulevard?

A. Yes.

Q. And so you're referring -- the vehicle 1 is referencing the subject vehicle; right?

A. Correct.

Q. And what you're saying to the investigators there is that, the veering into the center median lane was, as the patrol vehicle was exiting, making that left-hand turn?

A. That's correct.

Q. Are you still referencing Officer Bautista's vehicle exiting, when you're talking about the time frame when the subject vehicle veered into the center median?

A. No. I guess it was the secondary vehicle pulling out.

Q. So is it fair to say that you saw Officer Garcia's vehicle pulling out of the parking lot and turning left?

A. At the time, I -- I might have, but right now, I don't recall if I saw them pull out or not.

Q. Okay. But what were you describing to the investigators, two months after the incident, was that you did see Officer Garcia's vehicle pulling out of the

parking lot and turning left?
A. At the time, I -- I guess I did see it, yes.
Q. And is that what you were describing to the investigators?
A. Correct.
Q. And that it was at the time that Officer Garcia's vehicle was exiting the parking lot onto Valley, that's when the subject vehicle began to veer to the left, into the center median lane?
A. Yes.
Q. Would it be fair to say that, from a vehicle going eastbound on Valley, Officer Garcia's vehicle exiting the parking lot would be on the right-hand side?
A. Yes.
Q. And so as that vehicle was going eastbound on Valley, and Officer Garcia -- from the right-hand side, would he be pulling up in front of the subject vehicle?
MR. RAMIREZ: May call for speculation. Lacks foundation. Assumes facts not in evidence.
But you may respond.
THE WITNESS: Yes.
BY MR. SINCICH:
Q. And it was at that time that you saw the subject vehicle start to go to the left?
A. Correct.

Q. Would that be, from what it appeared to you, moving away from where the officer's vehicle was?

MR. RAMIREZ: Calls for speculation. Lacks foundation. Assumes facts not in evidence.

But you may respond, if you can.

THE WITNESS: Like -- like I said earlier, I don't recall -- recall seeing the collision occur, so I don't -- I couldn't say if he was trying to veer out of the officer's way, or if he was just pulling into the center median on his own.

BY MR. SINCICH:

Q. But from what you were describing, is it fair to say that him pulling -- veering to the left is moving in the opposite direction of where Officer Garcia's vehicle was coming from?

A. He was veering towards the -- the patrol vehicle, as they had already exited out of the -- the parking lot. They -- they pulled into that center median, and the suspect vehicle followed into the center median.

Q. Did you ever tell the investigator that Officer Garcia's vehicle got to the center median?

A. I don't recall.

Q. In the summary, it says: "As the patrol vehicle exited on to Valley."

That would be referencing before it got to the center median; is that fair?

A. It can.

Q. Well, when you said: "As it exited onto Valley," are you talking about as it exited the parking lot?

MR. RAMIREZ: I'm going to object as to say "he said." This is a summary. I don't see any quotes.

But you can respond the best you can, as to what you recall saying.

THE WITNESS: Yeah. I -- I don't remember exactly what I had said. It would have been nice to hear my audio. But like I said, it's just a summary of my statement.

So, I -- I don't remember if he was veering out of the way right as he was pulling on to Valley, or if he was already pulling into the center median from -- from the parking lot.

BY MR. SINCICH:

Q. Okay. And I thought you said earlier that you weren't able to see Officer Garcia's vehicle?

A. Right. Right from -- at this time now, two years later, I don't -- I don't remember seeing the vehicle. At the time two years ago, from making that statement to the MAIT investigator, I may have

remembered seeing something. But as it sits now, I don't remember seeing the vehicle pulling out.

Q. Okay. Do you recall whether or not you saw that Officer Garcia's vehicle had lights and sirens on at the time?

A. I don't -- I don't recall if he did or not.

Q. Okay. Do you recall whether or not you saw if Officer Garcia's vehicle had his headlights on at the time?

A. No.

Q. In the statement summary of the statement, that I believe you testified was a correct summary of the statement, it said that: "The subject vehicle veered into the center median and collided with the patrol vehicle."

Do you remember reading that?

A. Yes.

Q. And so that would be referencing colliding with Officer Garcia's vehicle; right?

A. Correct.

Q. At the time that you gave your statement to the investigators, do you think you recalled seeing the collision?

A. I don't -- I don't remember if I had seen it or if I was referencing what had occurred.

Q. Okay.
A. After once I -- because it was obvious, once I approached, that he collided into the patrol unit.
Q. Right. After the collision, what did you do?
A. We both -- me and Officer Zozaya, we both got out of our vehicle. I initially was going to check on the officers involved in the collision, while my partner goes to check on the -- the occupants in the suspect vehicle.
But I had seen a responding unit was already there, so they were going towards the -- our officers that were involved, so -- so I assisted Officer Zozaya with the suspect vehicle.
Q. And what did you see when you first went up to the suspect vehicle?
A. We -- we both could see that there was no driver seated in the driver's seat, so we had thought initially -- or I had thought initially maybe the -- the driver had foot bailed and fled the scene. But walking around the vehicle, I saw the -- the suspected driver was -- had got ejected.
Q. Could you tell, based off of the -- either the windshield or the window if he was ejected in either through the windshield or the driver's window?
A. No, I -- I -- I couldn't. I think -- I don't

remember which windows were broken and which one he got ejected out of.

Q. Were all of the doors closed at the time?

MR. RAMIREZ: Vague and ambiguous as to the term "closed."

But you can respond.

THE WITNESS: I mean, most of them were damaged, but it -- it -- it looked as though they were closed.

BY MR. SINCICH:

Q. On the driver's side, did it appear like the doors were closed?

A. Correct.

Q. Is this a four-door car?

A. Correct.

Q. And when you first walked up, did you see the other three passengers?

A. No. We -- after going to the passenger side, I could see that there were at least two people trapped in the vehicle.

Q. On the passenger side?

A. From the passenger side, I could -- I could see in clearly, for a better -- better visual than from the driver's side.

Q. Did you ever see the individual that was seated

behind the driver?

A. I only remember that there were two individuals in the vehicle, but I -- I don't remember exactly where their placement was.

Q. Did you see anybody attempt to render medical aid to any of the kids?

A. No.

Q. Did you see anybody attempt to check their pulse or anything like that?

A. From inside the -- we couldn't -- we couldn't get into the vehicle due to them being trapped in there, but as for the subject that was on -- on the ground that had got ejected, we were -- we were monitoring him, and we could hear that he was breathing.

Q. He was breathing; but did he appeared injured, though?

A. Correct.

Q. Is it fair to say that the only medical aid that was rendered was once the fire department and ambulance arrived?

MR. RAMIREZ: May call for speculation.

But you can respond, if you know.

THE WITNESS: That's correct. My -- my partner, he -- he -- he called for Fire to expedite to get there as quickly as possible. And they were there

within minutes.

BY MR. SINCICH:

Q. Okay. I'm going to show you what was previously marked as Exhibit 4.

Let me know when you can see my screen.

A. I can see it.

Q. Does this appear to be the location of where the collision occurred?

A. Correct.

Q. And I just want to get oriented to the traffic lines and things of that nature.

Do you see the driveway on the right-hand side of the screen?

A. Correct.

Q. Is that the driveway, in the apron that you saw the vehicles exiting the parking lot from, when they turned on to Valley?

A. Like I said, as of right now, I don't remember seeing them pull out, but that -- that was the -- the spot they had -- they did pull out of, yes.

Q. I'm just going to make it a little bit bigger, so we can see.

And then, it appears where the crosswalk is, do you see how there's a double-yellow line?

A. Correct.

Q. And then, just south of the double-yellow line, eastbound would be the Number 1 lane?
A. Correct.
Q. And then south of that would be the Number 2 lane?
A. Correct.
Q. And would this be considered a Number 3 lane, south of that; or is that just a turning lane?
A. Yes, that's considered the -- the Number 3 lane, but it's merging into the Number 2 lane.
Q. Okay. Okay. And then, on the north side going westbound, it appears that there's two left-hand turn lanes; is that fair?
A. Yes, two -- two dedicated left-turn lanes.
Q. What would be the first lane north of the double-yellow line called? What would that be called?
A. The -- the -- the one that you're hovering over, that's the Number 1 dedicate left-turn lane.
Q. And then, north of that, what would that be?
A. The Number 2 dedicated left-turn lane.
Q. And then north of that, what would that be considered?
A. Number 1 westbound lane.
Q. Okay. So the numbers kind of start over?
A. Correct.

Q. Okay. And when you say that, "He veered into the center median," could you tell by looking at this map, approximately where he started to veer into the center median, the subject vehicle?

A. Look -- looking at the map, I -- I couldn't -- I don't remember if it was -- if he had started veering over where it was partially the Number 1 dedicated left-turn lane, or if it was just past that where the center median opens up.

Q. Okay. So, there's -- there's four green markings that have the number 10 in there. Do you see that?

A. Correct.

Q. And where, in between or around, approximately, would you estimate would be the location where the subject vehicle started to veer into the center median lane?

MR. RAMIREZ: And if we start with the left hand, should we count that as number 1, Counsel, for example, then go to the right, or whatever makes it easier?

MR. SINCICH: Sure. Left to right would be easy.

THE WITNESS: I would say between the number -- the second number 10, closer to that one, in between the

second and third.

BY MR. SINCICH:

Q. Okay. So around where the first Valley Boulevard indication is?

A. Correct.

Q. Okay. And then, from looking at this map, what's your best estimate of where the collision occurred, not where the vehicles ended up, but where the collision occurred, best estimate?

A. Around the -- the fourth number 10.

Q. Okay. And as I zoomed out, I just saw that there's more number 10s.

MR. RAMIREZ: Okay.

BY MR. SINCICH:

Q. So when you were indicating the fourth number 10, once the map was zoomed out, it's actually the fifth number 10; is that fair?

A. Correct. I would -- I'd say right there, if not just -- just east of.

Q. Okay. And then, earlier when you said it was the second number 10, it would actually be the third number 10?

A. Correct.

Q. And so it would still be an indication of the first time that Valley Boulevard is labeled, reading

left to right?
A. Correct.
Q. Okay. Thank you for that clarification.
And did you see where Officer Bautista's vehicle was at the time that you saw the subject vehicle veer?
A. Yes. He was -- he was either in the -- the Number 1 or Number 2 dedicated left-turn lane, from what I can remember.
Q. So did it appear that when the subject vehicle veered, it sort of rode behind the same lane that Officer Bautista was in?
A. Correct.
Q. Okay. And I want to show you what has been previously marked as Exhibit 2.
Can you see my screen?
A. Yes.
Q. Did you see this video?
A. I have, yes.
Q. And this it is a surveillance camera showing the intersection of Valley and Cypress?
A. Correct.
Q. All right. It's 50 seconds. I'm going to press play.
(Video being played.)

BY MR. SINCICH:

Q. And when you were watching it, did you focus on the top left-hand corner to see where the other officers' vehicles were coming from?

A. Correct.

(Video is being played.)

BY MR. SINCICH:

Q. Okay. Stopping at 23 seconds.

Did you see the first patrol vehicle coming up to the apron of the driveway?

A. Yes.

Q. And that would be Officer Bautista?

A. Yes.

Q. Okay. And he's stopped on the apron; right?

A. Correct.

Q. And I'm going to press play.

(Video is being played.)

BY MR. SINCICH:

Q. At 33 seconds, I pressed pause.

Is it fair to say that Officer Bautista turned left?

A. Yes.

Q. And can you see Officer Garcia pulling up to the apron?

A. Yes.

Daniel Pecic

Q. And does it appear that Officer Bautista has his lights and sirens on at the time?
A. No, not at the time of pulling out.
Q. Does it appear that Officer Garcia has his lights and sirens on?
A. No.
Q. Does it appear that his headlights are on?
A. No.
Q. I'm going to click forward. This is frame by frame.
Do you see how I'm clicking forward?
A. Yes.
(Video being played.)
BY MR. SINCICH:
Q. And I stopped at 35 seconds.
Is that when Officer Bautista turned on his emergency lights?
A. Yes.
Q. And do you see this blur on the right-hand side of the screen?
A. Yes.
Q. Is that pretty much when the subject vehicle was entering the intersection?
A. Correct.
Q. And Officer Garcia's vehicle was still at the

apron of the driveway?

A. Correct.

Q. Okay. I'm going to click forward.

(Video being played.)

BY MR. SINCICH:

Q. And I stopped at 36 seconds.

Could you tell, after looking at the map and now looking at the video, what lane the subject vehicle was in?

A. Looks like the Number 2. Number 2, eastbound lane.

Q. What we saw on the map was that there was three eastbound lanes; is that fair?

A. Correct.

Q. And so there was the right-hand turning lane that merged into Number 2?

A. Right.

Q. That would be the third lane; right?

A. Correct.

Q. And then to the left of that, north of that, would be the Number 2 lane?

A. Yes.

Q. And then north of that would be the Number 1 lane; right?

A. Yes.

Q. Okay. As I click forward a little bit more, and the subject vehicle just passed the crosswalk, is it fair to say that it's in the Number 1 eastbound lane?

(Video being played.)

THE WITNESS: Yes.

BY MR. SINCICH:

Q. And then, Officer Bautista's vehicle would be approximately in the Number 2 dedicated left-turn lane; is that fair?

A. Yes.

Q. Okay. As I click forward --

(Video being played.)

BY MR. SINCICH:

Q. If you could focus on the top left-hand corner of where Officer Garcia's vehicle was.

(Video being played.)

BY MR. SINCICH:

Q. Did you see it exiting the apron at all?

A. No, I -- not in -- not in that frame.

Q. Okay. As I click forward just a little bit, more to 37 seconds, is it fair to say that the subject vehicle is just about passing Officer Bautista's vehicle?

A. Yes.

(Video being played.)

BY MR. SINCICH:

Q. And it's still in the Number 1 eastbound lane?

A. Yes.

Q. And that's approximately parallel to where it almost seems like the sidewalk curves into a parking area; is that fair?

A. Yeah.

Q. Do you see that?

A. Yes.

Q. Is that -- at that time, he's still in the Number 1 lane?

A. Yes.

Q. I'm just going click forward a little bit more.

(Video being played.)

BY MR. SINCICH:

Q. It's still at 37 seconds.

Are you able to tell from the trajectory of the vehicle moving if, at 37 seconds, he's still in the Number 1 lane?

A. No, I can't tell.

Q. And this is your vehicle that just entered the intersection at 37 seconds?

A. Yes.

Q. Okay. Do you see the black and white, almost checkered image, on the top left-hand corner above the

V, at 37 seconds?
A. Yes.
Q. Would that be the black and white unit of Officer Garcia's vehicle?
A. Yes.
Q. And what part of the vehicle was white?
A. It would be the -- could either be the roof or the -- the driver's side.
Q. Would the engine compartment, that area be white or black?
A. That part is black.
Q. So, if we're able to see, at 37 seconds, that white portion, are we looking at the left side of Officer Garcia's vehicle?
A. I -- in that frame, I can't tell if that's the roof or the driver's side.
Q. Okay. If it's the driver's side, would it be fair to say that the vehicle would still be oriented, at 37 seconds, generally north?
A. If it -- if that is the driver's side, yes.
Q. Okay. I want to show what I'm going to mark as Exhibit 7.
(Exhibit Number 7 was marked.)
BY MR. SINCICH:
Q. A video from the Chevron gas station, on Valley

and Cherry.

Did you see that video from Valley and Cherry?

A. I don't think I did.

Q. Okay. At the beginning of the video, do you see a white vehicle that appears to be in the Number 1 lane, around the crosswalk?

A. Yes.

Q. And the way that this is oriented is that this vehicle would be on Valley, facing eastbound?

A. Yes.

Q. Are you familiar with that Chevron across from the ARCO?

A. I am.

Q. Does that look like the subject vehicle, as you see it right now?

A. Yeah, it does.

Q. All right. I'm going to press play --

(Video being played.)

BY MR. SINCICH:

Q. -- and stop at 9 seconds.

Did you see the vehicle that was going westbound in a light -- it looks like a spotlight went off?

MR. RAMIREZ: Can you replay that, please?

MR. SINCICH: Yes. From 2 seconds, pressing

play.

(Video being placed.)

MR. RAMIREZ: Move up closer if you need to.

BY MR. SINCICH:

Q. Stopping at 10 seconds.

After the white car went east, past Cherry, on Valley, it appears to pass a patrol vehicle. Do you see that?

A. Yes.

Q. Is that your patrol vehicle, with your partner?

A. I'm honestly not sure.

Q. Do you recall if you or your partner used a spotlight to light up a vehicle at some point, while you were going westbound on Valley, at the intersection of Cherry?

A. No, I don't remember.

Q. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. The patrol vehicle is stopped at the light right now; is that fair?

A. Yes.

Q. And then, I stopped at about 24 seconds.

Do you see the patrol vehicle beginning to make a U-turn?

A. Yes.
Q. I'll press play.
(Video being played.)
BY MR. SINCICH:
Q. And it appears, stopping at 33 seconds, that the patrol vehicle, after making the U-turn, sped forward. Did you see that?
A. Yeah. I saw -- I saw it make a U-turn to continue eastbound.
Q. Did you and your partner see the white vehicle going in the opposite direction of you, and then make a U-turn to catch up with the subject vehicle?
A. I don't recall.
Q. Okay. At least in that video, did you see the person hanging out of the window in the back left seat?
A. No.
Q. I wanted to mark as Exhibit 8, a video of Valley and Poplar.
(Exhibit Number 8 was marked.)
BY MR. SINCICH:
Q. Can you see my screen?
A. Yes.
Q. On Valley, are there some businesses that have truck parking lots that you're familiar with?
A. Yes.

Q. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. And I stopped at 2 seconds.

Do you see the white car, going eastbound on Valley?

A. Yes.

Q. And I'm just going to click slowly forward, frame by frame, and stop at 2 seconds still, where the white car is towards the right side of the screen.

Do you see anybody hanging out of the back window at this time?

A. No.

Q. And clicking forward.

(Video being played.)

BY MR. SINCICH:

Q. Behind the white car, stopping at 4 seconds, there's an SUV patrol vehicle?

A. Yes.

Q. Is that your vehicle?

A. I don't -- I don't -- I don't recall, but it could be.

Q. Were you and your partner following the subject vehicle since Poplar?

A. I don't remember us following him. I think we

were just traveling eastbound on Valley, and we noticed the vehicle, especially once we saw the passenger starting to hang their body out the window.

Q. Okay. I'm going to mark as Exhibit 9, a video of Valley and Catawba.

(Exhibit Number 9 was marked.)

BY MR. SINCICH:

Q. Can you see my screen?

A. Yes.

Q. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. Okay. Stopping at 13 seconds.

From this angle, can you see from right to left, the white vehicle and then the patrol vehicle following?

A. Yes.

Q. And then I'm just going to back up to about 3 seconds, and press play.

(Video being played.)

BY MR. SINCICH:

Q. Does that depict the approximate location and time that the -- that your vehicle began to turn on its lights and sirens?

MR. RAMIREZ: If you can enlarge that screen,

we have a green box that says: "You are viewing Marcel F. Sincich's" -- attorney for Plaintiff -- "screen," and it's blocking the upper portion of that video.

MR. SINCICH: Sometimes there's a panel of options on Zoom that you can actually drag and move it out of the way.

MR. RAMIREZ: If you can grab that there, Daniel, and see if you can get that out of the way.

THE WITNESS: Yeah, there you go.

MR. RAMIREZ: You can move it up or out of the way, or move it all the way down.

THE WITNESS: It's not -- it isn't letting me move it.

MR. RAMIREZ: Is that enough?

THE WITNESS: It only goes side to side.

MR. RAMIREZ: It only goes side to side.

MR. SINCICH: Okay. Well, this is -- this is as large as I can make the screen on mine, and I'll play it, again.

MR. RAMIREZ: Let's see if we can pick it up here.

(Video being played.)

BY MR. SINCICH:

Q. Right at the 11-second mark, the lights come on. Did you see that?

A. Yes.
Q. Okay. And I'm going to mark as Exhibit 10, another view of Valley and Catawba.
(Exhibit Number 10 was marked.)
BY MR. SINCICH:
Q. And I'm going to press play on this 8-second video.
(Video being played.)
BY MR. SINCICH:
Q. And stopped it at 6 seconds.
Did you see the patrol vehicle following the white vehicle?
A. Yes.
Q. And then, the patrol vehicle turned on its emergency lights?
A. Yes.
Q. Okay. Just backing up to 4 seconds, and then I'm clicking forward frame by frame.
This is depicting the driver's side of the vehicles; is that fair?
A. Yeah.
(Video being played.)
BY MR. SINCICH:
Q. And so this is showing the approximate time, at about 4 seconds, when the emergency lights come on?

A. Right.
Q. Now, after passing Catawba, did you eventually get to Citrus?
A. Yes.
Q. By that time, was the subject in the back left seat, still hanging out of the window?
A. I don't recall if he was still hanging out the window at that point.
Q. Is Catawba to Citrus, is that the next street over?
A. Yes, Citrus is the next major intersection.
Q. And what's the approximate distance between Catawba and Citrus?
A. Maybe, like, 0.1 or 0.2 miles.
Q. Okay.
MR. SINCICH: Did I already say I was going to mark this as 11? I'm sorry.
THE CERTIFIED STENOGRAPHER: No, you haven't.
BY MR. SINCICH:
Q. Okay. Let me mark as Exhibit 11, this video, that is a Citrus gas station and Valley.
(Exhibit Number 11 was marked.)
BY MR. SINCICH:
Q. And I'm going to press play.
(Video being played.)

BY MR. SINCICH:

Q. And on my end it kind of glitches, the video does that. Did you see that, as well?

A. Yes.

Q. But as it plays -- and I'm just clicking forward now, still at 0 seconds. But as you see the white car moving, at least by Citrus, is it fair to say that there's no one hanging out of the back left window?

A. Correct.

(Video playing.)

BY MR. SINCICH:

Q. And then, clicking forward to approximately 2 seconds, your vehicle was following, with its emergency lights on?

A. Correct.

Q. And I'm going to mark as Exhibit 12, another video of Citrus gas station.

(Exhibit Number 12 was marked.)

BY MR. SINCICH:

Q. Can you see my screen?

A. Yes.

Q. Okay. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. And it stopped at 7 seconds.

On Citrus, did you see the white vehicle followed by your vehicle?

A. Yes.

Q. And at least right here, the light was green; correct?

A. Correct.

Q. And there is one more video of Citrus intersection and Valley, I'll mark as Exhibit 13.

(Exhibit Number 13 was marked.)

BY MR. SINCICH:

Q. Can you see my screen?

A. Yes.

Q. Okay. I'm going to press play.

(Video being played.)

BY MR. SINCICH:

Q. At 6 seconds, the light turns green on Valley, passing Citrus; is that fair?

A. Yes.

Q. All right. I'm going to press play, and I stopped it at 9 seconds.

(Video being played.)

BY MR. SINCICH:

Q. At this time, on Valley, passing Citrus, the subject vehicle is still in the Number 1 lane; is that fair to say?

A. Yes.
Q. And I'll just finish this video.
(Video being played.)
BY MR. SINCICH:
Q. And is that when you were following, you said, approximately four lengths behind?
A. Correct.
Q. Okay.
MR. SINCICH: Okay. Thank you, Officer Precie. I don't have any further questions at this time.
I don't know if we need a break, or if anybody else has follow-up?
MR. RAMIREZ: I don't have any.
MR. CESENA: I'm fine. No, it's good.
THE CERTIFIED STENOGRAPHER: And, Mr. Ramirez, you're good; right?
MR. RAMIREZ: I need a copy, and I'm not going to be asking any questions.
THE CERTIFIED STENOGRAPHER: Mr. Cesena, are you ordering a copy?
MR. CESENA: Yes.
MR. RAMIREZ: And I'd like a rough draft.
THE CERTIFIED STENOGRAPHER: Okay.
(12:13 p.m., deposition concluded.)
--oOo--

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 20th day of June, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# ERRATA SHEET

PAGE/LINE CHANGE REASON

DECLARATION OF DEPONENT

I, ____________________, say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of ______________, 2026, at ________________________, California.

______________________________

DANIEL PRECIE

Focus Litigation Solutions
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone (916) 228-4593
Production@FocusLitigationSolutions.com

June 24, 2026

Daniel Precie
c/o Eugene P. Ramirez, Esq.
eugene.ramirez@manningkass.com

Re: Diana Rias v. City of Fontana
Date of Deposition: June 4, 2026

The transcript of your deposition taken in the above-entitled matter has been transcribed. The original transcript will be held for 30 days from the date of this letter before it is sealed and forwarded to the noticing attorney.

You have the right to review, sign and make corrections to your transcript within the 30-day period. Please call the above number, or e-mail to make an appointment for your review. It is our policy not to release the original transcript and complimentary copies are not provided.

If you are represented by an attorney, we advise that you contact your attorney to discuss this matter. If you are an independent witness and have questions, please contact the attorney who requested you to testify or this office for further instructions.

If you wish to waive signature, please sign and date below and return this letter to the above address. In the event you have not read, corrected, and signed your deposition within (30) days of receipt of this letter, it may be used with the full force and effect as though it had been read, corrected, and signed.

Cc: All counsel

______________________ ________________________
DATE Daniel Precie

# Exhibit S

**CHIEF'S PREFACE**

The Fontana Police Department has a solid reputation for providing a level of service to its diverse community that is considered second to none. This service could not be achieved without the dedicated employees that make up the Fontana Police Department. The general orders contained in this manual will not only serve our employees as a resource guide, but will guarantee the service we provide is delivered in a fair and consistent manner. It is important for employees of the Fontana Police Department to take an active role in the evolution of the general orders contained in this manual. As the role of the police department evolves, so to must this manual. This manual must be viewed as an instrument to assist our employees in providing a level of service that our community has come to enjoy. It is our responsibility to maintain the public safety of the community and preserve the quality of life our citizens deserve. This is a responsibility the Fontana Police Department firmly recognizes and makes a priority on a daily basis. One of the most important aspects of this manual is to ensure the safety of our employees and residents. Adhering to the tenets of this manual will provide the best opportunity to provide this level of service in a safe and impartial manner.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000613

**LAW ENFORCEMENT CODE OF ETHICS**

As a law enforcement officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice.

I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession . . . law enforcement.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000614

## MISSION, VISION STATEMENT AND CORE VALUES

### MISSION STATEMENT

- The Fontana Police Department is committed to protecting the community by providing quality "Service with Integrity." As an organization, we will continue to build diverse community based partnerships. These partnerships will be guided by innovation and perseverance to ensure Fontana's future as a well-developed, dignified, and respected community in the Inland Empire.

### VISION

- Dedicated to excellence and professionalism, we are committed to working with the people of Fontana to enhance the safety and security of our diverse community.

### CORE VALUES

- **Tradition**: We are a tradition rich organization, respectful of past accomplishments, optimistic about current challenges, and inspirationally leading the way for Fontana's future.
- **Excellence**: We strive for excellence in all we do. We work to identify our organizational vulnerabilities and are committed to improvement via training, communication, and initiative.
- **Accountability**: We hold ourselves accountable for our deeds. We are aware of the impact our actions have and are dedicated to providing service with integrity.
- **Mindful**: We are mindful of the trust and confidence placed in us by the community. We honor this responsibility and strive for validation each and every day.

**"TEAM" Fontana Police Department**

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000615

# Table of Contents

**Chief's Preface.** . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Law Enforcement Code of Ethics.** . . . . . . . . . . . . . . . . . . . . **2**

**Mission, Vision Statement and Core Values.** . . . . . . . . . . . . . . . . **3**

**Chapter 1 - Law Enforcement Role and Authority.** . . . . . . . . . . . . . **9**
100 - Law Enforcement Authority. . . . . . . . . . . . . . . . . . . . 10
102 - Chief Executive Officer. . . . . . . . . . . . . . . . . . . . . 14
104 - Oath of Office. . . . . . . . . . . . . . . . . . . . . . . . 15
106 - Policy Manual. . . . . . . . . . . . . . . . . . . . . . . . 16

**Chapter 2 - Organization and Administration.** . . . . . . . . . . . . . . **19**
200 - Organizational Structure and Responsibility. . . . . . . . . . . . . . 20
204 - Special Order. . . . . . . . . . . . . . . . . . . . . . . . 22
206 - Emergency Operations Plan. . . . . . . . . . . . . . . . . . . 23
208 - Training. . . . . . . . . . . . . . . . . . . . . . . . . . 24
212 - Electronic Mail. . . . . . . . . . . . . . . . . . . . . . . 27
214 - Administrative Communications. . . . . . . . . . . . . . . . . . 29
216 - Staffing Levels. . . . . . . . . . . . . . . . . . . . . . . 30
218 - License to Carry a Firearm. . . . . . . . . . . . . . . . . . . 31
220 - Retiree Concealed Firearms. . . . . . . . . . . . . . . . . . . 37

**Chapter 3 - General Operations.** . . . . . . . . . . . . . . . . . . . **42**
300 - Use of Force. . . . . . . . . . . . . . . . . . . . . . . . 43
306 - Handcuffing and Restraints. . . . . . . . . . . . . . . . . . . 54
308 - Control Devices and Techniques. . . . . . . . . . . . . . . . . 58
309 - Conducted Energy Device. . . . . . . . . . . . . . . . . . . . 63
310 - Officer-Involved Shootings and Deaths. . . . . . . . . . . . . . . 69
312 - Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . 78
314 - Vehicle Pursuits. . . . . . . . . . . . . . . . . . . . . . . 90
316 - Officer Response to Calls. . . . . . . . . . . . . . . . . . . 102
318 - Canines. . . . . . . . . . . . . . . . . . . . . . . . . . 105
320 - Domestic Violence. . . . . . . . . . . . . . . . . . . . . . 117
322 - Search and Seizure. . . . . . . . . . . . . . . . . . . . . . 133
324 - Temporary Custody of Juveniles. . . . . . . . . . . . . . . . . 136
326 - Senior and Disability Victimization. . . . . . . . . . . . . . . . 149
328 - Discriminatory Harassment. . . . . . . . . . . . . . . . . . . 164
330 - Child Abuse. . . . . . . . . . . . . . . . . . . . . . . . 170
332 - Missing Persons. . . . . . . . . . . . . . . . . . . . . . . 178
334 - Public Alerts. . . . . . . . . . . . . . . . . . . . . . . . 185
335 - Code Red Notification System. . . . . . . . . . . . . . . . . . 191
336 - Victim and Witness Assistance. . . . . . . . . . . . . . . . . . 196
338 - Hate Crimes. . . . . . . . . . . . . . . . . . . . . . . . 200

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000616

340 - Standards of Conduct. . . . 205
344 - Report Preparation. . . . 213
345 - Online Reporting. . . . 220
346 - Media Relations. . . . 222
348 - Subpoenas and Court Appearances. . . . 226
350 - Reserve Officers. . . . 230
351 - Technical Reserves. . . . 236
352 - Mutual Aid and Outside Agency Assistance. . . . 237
356 - Registered Offender Information. . . . 238
358 - Major Incident Notification. . . . 242
360 - Death Investigation. . . . 244
362 - Identity Theft. . . . 248
364 - Private Persons Arrests. . . . 249
365 - Noise Ordinance. . . . 251
368 - Limited English Proficiency Services. . . . 254
370 - Communications with Persons with Disabilities. . . . 262
372 - Mandatory Employer Notification. . . . 270
374 - Biological Samples. . . . 272
375 - DNA Processing. . . . 276
376 - Chaplains. . . . 280
380 - Child and Dependent Adult Safety. . . . 286
382 - Service Animals. . . . 289
386 - Off-Duty Law Enforcement Actions. . . . 292
389 - Department Use of Social Media. . . . 294
390 - Gun Violence Restraining Orders. . . . 297

**Chapter 4 - Patrol Operations. . . . 303**

400 - Patrol Function. . . . 304
402 - Bias-Based Policing. . . . 306
404 - Briefing Training. . . . 310
406 - Crime and Disaster Scene Integrity. . . . 311
408 - Inland Valley SWAT. . . . 313
410 - Ride-Along Policy. . . . 323
412 - Hazardous Material Response. . . . 332
414 - Hostage and Barricade Incidents. . . . 334
415 - BARRICADED SUBJECTS. . . . 340
416 - Response to Bomb Calls. . . . 346
418 - Mental Illness Commitments. . . . 351
420 - Cite and Release Policy. . . . 357
422 - Foreign Diplomatic and Consular Representatives. . . . 361
424 - Rapid Response and Deployment. . . . 365
428 - Immigration Violations. . . . 367
430 - Emergency Utility Service. . . . 373
433 - Aircraft Accidents. . . . 374
434 - Use of Narcan (Naloxone). . . . 378
435 - Field Training Officer Program. . . . 380
437 - Obtaining Air Support. . . . 383

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000617

439 - Contacts and Temporary Detentions. . . . . 384
441 - Criminal Organizations. . . . . 388
447 - Mobile Data Computer Use. . . . . 393
449 - Body Worn Computer. . . . . 396
450 - Medical Marijuana. . . . . 408
452 - Bicycle Patrol Unit. . . . . 413
460 - Automated License Plate Readers (ALPRs). . . . . 416
463 - Public Recording of Law Enforcement Activity. . . . . 419
464 - Medical Aid and Response. . . . . 422
465 - Suspicious Activity Reporting. . . . . 426
466 - Crisis Intervention Incidents. . . . . 428
467 - Civil Disputes. . . . . 433
468 - Policy Title. . . . . 435
469 - First Amendment Assemblies. . . . . 436
470 - Verified Alarm. . . . . 443
471 - Facial Recognition. . . . . 445

**Chapter 5 - Traffic Operations. . . . . 450**

500 - Traffic Function and Responsibility. . . . . 451
502 - Traffic Collision Reporting. . . . . 454
510 - Vehicle Towing and Release. . . . . 456
512 - Vehicle Impound Hearings. . . . . 460
514 - Impaired Driving. . . . . 462
516 - Traffic Citations. . . . . 467
520 - Disabled Vehicles. . . . . 470
524 - 72-Hour Parking Violations. . . . . 471
527 - Motorcycle Assigned to Traffic Enforcement. . . . . 473

**Chapter 6 - Investigation Operations. . . . . 475**

600 - Investigation and Prosecution. . . . . 476
602 - Sexual Assault Investigations. . . . . 483
603 - Informants. . . . . 489
606 - Asset Forfeiture. . . . . 496
609 - Cellular Site Simulator Usage and Privacy. . . . . 502
612 - Brady Material Disclosure. . . . . 505
613 - Unmanned Aerial System (UAS) Operations. . . . . 507

**Chapter 7 - Equipment. . . . . 510**

700 - Department Owned and Personal Property. . . . . 511
702 - Personal Communication Devices. . . . . 514
704 - Vehicle Maintenance. . . . . 517
706 - Vehicle Use. . . . . 519
707 - Cash Handling, Security and Management. . . . . 524
708 - Long Range Acoustical Device (LRAD). . . . . 526
709 - Military Equipment. . . . . 528

**Chapter 8 - Support Services. . . . . 531**

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000618

800 - Crime Analysis. . . . . 532
802 - The Dispatch Center. . . . . 533
804 - Property and Evidence. . . . . 538
806 - Records Bureau. . . . . 554
808 - Restoration of Firearm Serial Numbers. . . . . 556
810 - Records Maintenance and Release. . . . . 558
812 - Protected Information. . . . . 568
814 - Computers and Digital Evidence. . . . . 572
820 - Animal Control. . . . . 576
821 - Handling Wildlife Calls. . . . . 581
822 - Guidelines for using pharmaceuticals by authorized employees. . . . . 583

**Chapter 9 - Custody. . . . . 585**

900 - Temporary Custody of Adults. . . . . 586
902 - Custodial Searches. . . . . 608
904 - Prison Rape Elimination. . . . . 613

**Chapter 10 - Personnel. . . . . 623**

1000 - Recruitment and Selection. . . . . 624
1004 - Promotional and Transfer Policy. . . . . 631
1010 - Reporting of Employee Convictions. . . . . 636
1011 - Peer Support Program. . . . . 638
1012 - Drug- and Alcohol-Free Workplace. . . . . 645
1014 - Communicable Diseases. . . . . 648
1015 - Unscheduled Leave Policy. . . . . 653
1018 - Smoking and Tobacco Use. . . . . 655
1020 - Personnel Complaints. . . . . 656
1022 - Seat Belts. . . . . 668
1024 - Body Armor. . . . . 670
1026 - Personnel Records. . . . . 671
1028 - Request for Change of Assignment. . . . . 680
1030 - Commendations and Awards. . . . . 682
1032 - Fitness for Duty. . . . . 683
1034 - Meal Periods and Breaks. . . . . 687
1035 - Lactation Break Policy. . . . . 689
1036 - Payroll Record Procedures. . . . . 691
1038 - Overtime Compensation Requests. . . . . 692
1039 - Vacation, Earned Compensation and Shift Trade Requests. . . . . 694
1040 - Outside Employment. . . . . 695
1042 - Occupational Disease and Work-Related Injury Reporting. . . . . 700
1044 - Personal Appearance Standards. . . . . 702
1046 - Uniform Regulations. . . . . 706
1048 - Police Cadets. . . . . 714
1050 - Nepotism and Conflicting Relationships. . . . . 716
1051 - Facility Security and Identification. . . . . 719
1052 - Department Badges. . . . . 722
1054 - Transitional (Light) Duty Assignments. . . . . 724

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000619

1056 - Employee Speech, Expression and Social Networking. . . . . . . . . . 729

**Attachments. . . . . . . . . . . . . . . . . . . . . . . . . . . 733**
COUNTY PURSUIT MOU.pdf. . . . . . . . . . . . . . . . . . . . . . . 734
Uniform Equipt Specs Maunal 10-13-21 FINAL.pdf. . . . . . . . . . . . . . 735
FONTANA POLICE MILITARY EQUIPMENT INVENTORY.pdf. . . . . . . . . 736
Uniform Equipt Specs Maunal 02-13-23 FINAL.pdf. . . . . . . . . . . . . . 737
Hate Crime Checklist.pdf. . . . . . . . . . . . . . . . . . . . . . . . 738
Statutes and Legal Requirements.pdf. . . . . . . . . . . . . . . . . . . 739
Commission on Peace Officer Standards and Training Hate Crimes Model Policy 2019.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . 740
Uniform Equipment Specs.pdf. . . . . . . . . . . . . . . . . . . . . . 741
Uniform Equipt Specs Maunal 03-14-18 FINAL.pdf. . . . . . . . . . . . . . 742
Supplemental Hate Crime Report.pdf. . . . . . . . . . . . . . . . . . . 743

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000620

# Chapter 1 - Law Enforcement Role and Authority

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000621

# Chapter 3 - General Operations

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000654

# Use of Force

## 300.1 PURPOSE AND SCOPE

This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial, and reasonable manner (Government Code § 7286).

In addition to those methods, techniques, and tools set forth below, the guidelines for the reasonable application of force contained in this policy shall apply to all policies addressing the potential use of force, including but not limited to the Control Devices and Techniques and Conducted Energy Device policies.

Retaliation prohibitions for reporting suspected violations are addressed in the Anti-Retaliation Policy.

### 300.1.1 DEFINITIONS

Definitions related to this policy include:

**Deadly force** - Any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to the discharge of a firearm (Penal Code § 835a).

**Feasible** - Reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person (Government Code § 7286(a)).

**Force** - The application of physical techniques or tactics, chemical agents, or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained.

**Serious bodily injury** - A serious impairment of physical condition, including but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement (Penal Code § 243(f)(4)).

**Totality of the circumstances** - All facts known to the officer at the time, including the conduct of the officer and the subject leading up to the use of force (Penal Code § 835a).

## 300.2 POLICY

The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000655

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

### 300.2.1 DUTY TO INTERCEDE

Any officer present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, shall, when in a position to do so, intercede (as defined by Government Code § 7286) to prevent the use of unreasonable force.

When observing force used by a law enforcement officer, each officer should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject (Government Code § 7286(b)).

### 300.2.2 FAIR AND UNBIASED USE OF FORCE

Officer are expected to carry out their duties, including the use of force, in a manner that is fair and unbiased (Government Code § 7286(b)). See the Bias-Based Policing Policy for additional guidance.

### 300.2.3 DUTY TO REPORT EXCESSIVE FORCE

Any officer who observes a law enforcement officer or an employee use force that potentially exceeds what the officer reasonably believes to be necessary shall immediately report these observations to a supervisor (Government Code § 7286(b)).

As used in this subsection, "immediately" means as soon as it is safe and feasible to do so.

### 300.2.4 FAILURE TO INTERCEDE

An officer who has received the required training on the duty to intercede and then fails to act to intercede when required by law, may be disciplined in the same manner as the officer who used force beyond that which is necessary (Government Code § 7286(b)).

## 300.3 USE OF FORCE

Officers shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose (Penal Code § 835a).

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. Officers may only use a level of force that they reasonably believe is proportional to

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000656

the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance (Government Code § 7286(b)).

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the approved or authorized tools, weapons, or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1 USE OF FORCE TO EFFECT AN ARREST

Any peace officer may use objectively reasonable force to effect an arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance. Retreat does not mean tactical repositioning or other de-escalation techniques (Penal Code § 835a).

### 300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE

When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit (Government Code § 7286(b)). These factors include but are not limited to:

(a) The apparent immediacy and severity of the threat to officers or others (Penal Code § 835a).

(b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time (Penal Code § 835a).

(c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d) The conduct of the involved officer leading up to the use of force (Penal Code § 835a).

(e) The effects of suspected drugs or alcohol.

(f) The individual's apparent mental state or capacity (Penal Code § 835a).

(g) The individual’s apparent ability to understand and comply with officer commands (Penal Code § 835a).

(h) Proximity of weapons or dangerous improvised devices.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000657

(i) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(j) The availability of other reasonable and feasible options and their possible effectiveness (Penal Code § 835a).

(k) Seriousness of the suspected offense or reason for contact with the individual.

(l) Training and experience of the officer.

(m) Potential for injury to officers, suspects, bystanders, and others.

(n) Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the officer.

(o) The risk and reasonably foreseeable consequences of escape.

(p) The apparent need for immediate control of the subject or a prompt resolution of the situation.

(q) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(r) Prior contacts with the subject or awareness of any propensity for violence.

(s) Any other exigent circumstances.

### 300.3.3 PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a) The degree to which the application of the technique may be controlled given the level of resistance.

(b) Whether the person can comply with the direction or orders of the officer.

(c) Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4 ALTERNATIVE TACTICS - DE-ESCALATION

As time and circumstances reasonably permit, and when community and officer safety would not be compromised, officers should consider actions that may increase officer safety and may decrease the need for using force:

(a) Summoning additional resources that are able to respond in a reasonably timely manner.

(b) Formulating a plan with responding officers before entering an unstable situation that does not reasonably appear to require immediate intervention.

(c) Employing other tactics that do not unreasonably increase officer jeopardy.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000658

In addition, when reasonable, officers should evaluate the totality of circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)).

### 300.3.5 RESTRICTIONS ON THE USE OF A CHOKE HOLD

Officers of this department are not authorized to use a choke hold. A choke hold means any defensive tactic or force option in which direct pressure is applied to a person's trachea or windpipe (Government Code § 7286.5).

### 300.3.6 ADDITIONAL RESTRICTIONS

Terms such as "positional asphyxia," "restraint asphyxia," and "excited delirium" continue to remain the subject of debate among experts and medical professionals, are not universally recognized medical conditions, and frequently involve other collateral or controlling factors such as narcotics or alcohol influence or pre-existing medical conditions. While it is impractical to restrict an officer's use of reasonable control methods when attempting to restrain a combative individual, officers are not authorized to use any restraint or transportation method which might unreasonably impair an individual's breathing or respiratory capacity for a period beyond the point when the individual has been adequately and safely controlled. Once the individual is safely secured, officers should promptly check and continuously monitor the individual's condition for signs of medical distress (Government Code § 7286.5).

## 300.4 CAROTID CONTROL HOLD

The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, the use of the carotid control hold is subject to the following:

(a) The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b) The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application is in accordance with section 300.5 Deadly Force.

(c) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(d) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(e) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000659

Fontana PD Policy Manual



(f) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

## 300.5 DEADLY FORCE APPLICATIONS

Where feasible, the officer shall, prior to the use of deadly force, make reasonable efforts to identify him/herself as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts (Penal Code 835a).

If an objectively reasonable officer would consider it safe and feasible to do so under the totality of the circumstances, officers shall evaluate and use other reasonably available resources and techniques when determining whether to use deadly force. To the extent that it is reasonably practical, officers should consider their surroundings and any potential risks to bystanders prior to discharging a firearm (Government Code § 7286(b)).

The use of deadly force is only justified when the officer reasonably believes it is necessary in the following circumstances (Penal Code § 835a):

(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury to the officer or another person.

(b) An officer may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

Officers shall not use deadly force against a person based on the danger that person poses to him/herself, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or to another person (Penal Code § 835a).

An “imminent” threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable Officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the Officer or another person. An officer’s subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention (Penal Code § 835a).

### 300.5.1 SHOOTING AT OR FROM MOVING VEHICLES

When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others (Government Code § 7286(b)).

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000660

300.5.2 WARNING SHOTS

Generally, warning shots fired for the purpose of summoning aid are discouraged and may not be discharged unless the officer reasonably believes that they appear necessary, effective and reasonably safe.

300.5.3 DISPLAYING OF FIREARMS

Given that individuals might perceive the display of a firearm as a potential application of force, officers should carefully evaluate each tactical situation and use sound discretion when drawing a firearm in public by considering the following guidelines (Government Code § 7286(b)):

(a) If the officer does not initially perceive a threat but reasonably believes that the potential for such threat exists, firearms should generally be kept in the low-ready or other position not directed toward an individual.

(b) If the officer reasonably believes that a threat exists based on the totality of circumstances presented at the time (e.g., high-risk stop, tactical entry, armed encounter), firearms may be directed toward such threat until the officer no longer perceives such threat.

Once it is reasonably safe to do so, officers should carefully secure all firearms. Any intentional pointing of a firearm at an individual by an officer should be verbally reported to a supervisor or documented in applicable report.

**300.6 REPORTING THE USE OF FORCE**

Any use of force by a member of this department shall be documented promptly, completely, and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances.

300.6.1 NOTIFICATION TO SUPERVISORS

Any use of force by an officer shall be reported immediately to a supervisor, including but not limited to the following circumstances (Penal Code § 832.13):

(a) The application caused a visible injury.

(b) The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c) The individual subjected to the force complained of injury or continuing pain.

(d) The individual indicates intent to pursue litigation.

(e) Any application of a conducted energy device or control device.

(f) Any application of a restraint device other than handcuffs, shackles, or belly chains.

(g) The individual subjected to the force was rendered unconscious.

(h) An individual was struck or kicked.

(i) An individual alleges unreasonable force was used or that any of the above has occurred.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000661

Fontana PD Policy Manual



As used in this subsection, "immediately" means as soon as it is safe and feasible to do so.

### 300.6.2 REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE

Statistical data regarding all officer-involved shootings and incidents involving use of force resulting in serious bodily injury is to be reported to the California Department of Justice as required by Government Code § 12525.2. See the Records Bureau Policy.

### 300.6.3 REPORT RESTRICTIONS

Officers shall not use the term "excited delirium" to describe an individual in an incident report. Officers may describe the characteristics of an individual's conduct, but shall not generally describe the individual's demeanor, conduct, or physical and mental condition at issue as "excited delirium" (Health and Safety Code § 24402).

## 300.7 MEDICAL CONSIDERATION

Once it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident (Government Code § 7286(b)).

Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer’s initial assessment of the nature and extent of the subject’s injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff, or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called “excited delirium”), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000662

See the Medical Aid and Response Policy for additional guidelines.

### 300.8 SUPERVISOR RESPONSIBILITY

A supervisor should respond to any reported use of force, if reasonably available. The responding supervisor is expected to (Government Code § 7286(b)):

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated.

(c) When possible, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her *Miranda* rights, the following shall apply:

1. The content of the interview should not be summarized or included in any related criminal charges.
2. The fact that a recorded interview was conducted should be documented in a property or other report.
3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

(d) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(e) Identify any witnesses not already included in related reports.

(f) Review and approve all related reports.

(g) Determine if there is any indication that the subject may pursue civil litigation.

1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(h) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.9 BODY WORN CAMERA REQUIREMENT
### ACTIVATION OF A BODY WORN CAMERA (BWC)

An employee should activate the BWC to record uses of force. Pursuant to The Body Worn Camera Policy 451, employees should activate the BWC prior to required contacts, or as soon as safely possible to do so.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000663

Fontana PD Policy Manual



The safety of employees and members of the public is the highest priority, and the department acknowledges there may be situations in which operation of the device is impractical or may be an impediment to public or employee safety.

**REVIEW OF USE OF FORCE BWC DIGITAL FILES**

The BWC policy allows for the review of BWC digital files. An employee may review his or her own BWC recording and an employee may share a BWC recording with other employees as outlined in the BWC policy.

The BWC policy allows for an administrative review of an employee's BWC digital files for limited administrative purposed as outlined in the BWC policy.More specifically, an administrative review of BWC digital files is allowed on an incident involving a use of force by an employee, including canines, which results in injury or death.

## 300.10 USE OF FORCE COMPLAINTS

The receipt, processing, and investigation of civilian complaints involving use of force incidents should be handled in accordance with the Personnel Complaints Policy (Government Code § 7286(b)).

## 300.11 USE OF FORCE ANALYSIS

The Fontana Police Department requires all use of force incidents to be analyzed by two supervisors, holding the rank of sergeant or above. This process provides supervisors the ability to provide involved officers with immediate feedback on performance and reinforce department policy. The analysis should include all available written, photographed, and video evidence related to the incident.

Any potential policy violations should be detailed in a memorandum addressed to the commander of the division the involved employee is primarily assigned to.

Additionally, instances of employees demonstrating meritorious conduct during a use of force incident should be documented into the Guardian Tracking system.

In addition to routine reporting and dialog, the Field Services and Special Operations Division Commanders will meet regularly with the Sergeants and Lieutenants assigned to their command to address the following:

(a) The identification of any trends in use of force by members

(b) Training needs and recommendations

(c) Equipment needs recommendations

(d) Policy revision recommendations

Identified trends and training needs should be reported to the Administrative Services Division Commander for incorporation into the annual training plan.

Identified trends and training needs should be reported to the Administrative Services Division Commander for incorporation into the annual training plan.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

Fontana PD Policy Manual



## 300.12 POLICY REVIEW

The Chief of Police or the authorized designee should regularly review and update this policy to reflect developing practices and procedures (Government Code § 7286(b)).

## 300.13 POLICY AVAILABILITY

The Chief of Police or the authorized designee should ensure this policy is accessible to the public (Government Code § 7286(c)).

## 300.14 PUBLIC RECORDS REQUESTS

Requests for public records involving an officers's personnel records shall be processed in accordance with Penal Code § 832.7 and the Personnel Records and Records Maintenance and Release policies (Government Code § 7286(b)).

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000665

# Control Devices and Techniques

## 308.1 PURPOSE AND SCOPE
This policy provides guidelines for the use and maintenance of control devices that are described in this policy.

## 308.2 POLICY
In order to control subjects who are violent or who demonstrate the intent to be violent, the Fontana Police Department authorizes officers to use control devices in accordance with the guidelines in this policy and the Use of Force Policy.

## 308.3 ISSUING, CARRYING AND USING CONTROL DEVICES
Control devices described in this policy may be carried and used by members of this department only if the device has been issued by the Department or approved by the Chief of Police or the authorized designee.

Only officers who have successfully completed department-approved training in the use of any control device are authorized to carry and use the device.

Control devices may be used when a decision has been made to control, restrain or arrest a subject who is violent or who demonstrates the intent to be violent, and the use of the device appears reasonable under the circumstances. When reasonable, a verbal warning and opportunity to comply should precede the use of these devices.

When using control devices, officers should carefully consider potential impact areas in order to minimize injuries and unintentional targets.

## 308.4 RESPONSIBILITIES

### 308.4.1 WATCH COMMANDER RESPONSIBILITIES
The Watch Commander may authorize the use of a control device by selected personnel or members of specialized units who have successfully completed the required training.

### 308.4.2 USER RESPONSIBILITIES
All normal maintenance, charging or cleaning shall remain the responsibility of personnel using the various devices.

Any damaged, inoperative, outdated or expended control devices or munitions, along with documentation explaining the cause of the damage, shall be returned to the Rangemaster for disposition. Damage to City property forms shall also be prepared and forwarded through the chain of command, when appropriate, explaining the cause of damage.

## 308.5 BATON GUIDELINES
The need to immediately control a suspect must be weighed against the risk of causing serious injury. The head, neck, throat, spine, heart, kidneys and groin should not be intentionally targeted

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000670

except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

When carrying a baton, uniformed personnel shall carry the baton in its authorized holder on the equipment belt. Plainclothes and non-field personnel may carry the baton as authorized and in accordance with the needs of their assignment or at the direction of their supervisor.

### 308.6 TEAR GAS GUIDELINES

Tear gas may be used for crowd control, crowd dispersal or against barricaded suspects based on the circumstances. Only the Watch Commander, Incident Commander or Crisis Response Unit Commander may authorize the delivery and use of tear gas, and only after evaluating all conditions known at the time and determining that such force reasonably appears justified and necessary.

When practicable, fire personnel should be alerted or summoned to the scene prior to the deployment of tear gas to control any fires and to assist in providing medical aid or gas evacuation if needed.

### 308.7 OLEORESIN CAPSICUM (OC) GUIDELINES

As with other control devices, oleoresin capsicum (OC) spray and pepper projectiles may be considered for use to bring under control an individual or groups of individuals who are engaging in, or are about to engage in violent behavior. Pepper projectiles and OC spray should not, however, be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public.

#### 308.7.1 OC SPRAY

Uniformed personnel carrying OC spray shall carry the device in its holster on the equipment belt. Plainclothes and non-field personnel may carry OC spray as authorized, in accordance with the needs of their assignment or at the direction of their supervisor.

#### 308.7.2 PEPPER PROJECTILE SYSTEMS

Pepper projectiles are plastic spheres that are filled with a derivative of OC powder. Because the compressed gas launcher delivers the projectiles with enough force to burst the projectiles on impact and release the OC powder, the potential exists for the projectiles to inflict injury if they strike the head, neck, spine or groin. Therefore, personnel using a pepper projectile system should not intentionally target those areas, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

Officers encountering a situation that warrants the use of a pepper projectile system shall notify a supervisor as soon as practicable. A supervisor shall respond to all pepper projectile system incidents where the suspect has been hit or exposed to the chemical agent. The supervisor shall ensure that all notifications and reports are completed as required by the Use of Force Policy.

Each deployment of a pepper projectile system shall be documented. Unintentional discharges shall be promptly reported to a supervisor. Only non-incident use of a pepper projectile system, such as training and product demonstrations, is exempt from the reporting requirement.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000671

308.7.3 TREATMENT FOR OC SPRAY EXPOSURE
Persons who have been sprayed with or otherwise affected by the use of OC should be promptly provided with clean water to cleanse the affected areas. Those persons who complain of further severe effects shall be examined by appropriate medical personnel.

## 308.8 POST-APPLICATION NOTICE
Whenever tear gas or OC has been introduced into a residence, building interior, vehicle or other enclosed area, officers should provide the owners or available occupants with notice of the possible presence of residue that could result in irritation or injury if the area is not properly cleaned. Such notice should include advisement that clean up will be at the owner's expense. Information regarding the method of notice and the individuals notified should be included in related reports.

## 308.9 KINETIC ENERGY PROJECTILE GUIDELINES
This department is committed to reducing the potential for violent confrontations. Kinetic energy projectiles, when used properly, are less likely to result in death or serious physical injury and can be used in an attempt to de-escalate a potentially deadly situation.

308.9.1 DEPLOYMENT AND USE
Only department-approved kinetic energy munitions shall be carried and deployed. Approved munitions may be used to compel an individual to cease his/her actions when such munitions present a reasonable option.

Officers are not required or compelled to use approved munitions in lieu of other reasonable tactics if the involved officer determines that deployment of these munitions cannot be done safely. The safety of hostages, innocent persons and officers takes priority over the safety of subjects engaged in criminal or suicidal behavior.

Circumstances appropriate for deployment include, but are not limited to, situations in which:

(a) The suspect is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.

(b) The suspect has made credible threats to harm him/herself or others.

(c) The suspect is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or officers.

(d) There is probable cause to believe that the suspect has already committed a crime of violence and is refusing to comply with lawful orders.

308.9.2 DEPLOYMENT CONSIDERATIONS
Before discharging projectiles, the officer should consider such factors as:

(a) Distance and angle to target.

(b) Type of munitions employed.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000672

(c) Type and thickness of subject's clothing.

(d) The subject's proximity to others.

(e) The location of the subject.

(f) Whether the subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

A verbal warning of the intended use of the device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other officers and individuals that the device is being deployed.

Officers should keep in mind the manufacturer's recommendations and their training regarding effective distances and target areas. However, officers are not restricted solely to use according to manufacturer recommendations. Each situation must be evaluated on the totality of circumstances at the time of deployment.

The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death. The head, neck, chest, spine, and groin should not be intentionally targeted, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

### 308.9.3 SAFETY PROCEDURES

Launchers specifically designated for use with kinetic energy projectiles will be specially marked in a manner that makes them readily identifiable as such.

Officers will inspect the launcher and projectiles at the beginning of each shift to ensure that the launcher is in proper working order and the projectiles are of the approved type and appear to be free from defects.

When it is not deployed, the launcher will be unloaded and properly and securely stored in the vehicle. When deploying the kinetic energy projectile launcher, the officer shall visually inspect the kinetic energy projectiles to ensure that an unauthorized munition is not being loaded into the launcher.

Due to the fact that the lower receiver of the kinetic energy projectile launcher is similar to the lower receiver of the patrol rifle, no officer shall deploy and/or sling both the kinetic energy projectile launcher and the patrol rifle simultaneously.

## 308.10 TRAINING FOR CONTROL DEVICES

The Training Sergeant shall ensure that all personnel who are authorized to carry a control device have been properly trained and certified to carry the specific control device and are retrained or recertified as necessary.

(a) Proficiency training shall be monitored and documented by a certified, control-device weapons or tactics instructor.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000673

Fontana PD Policy Manual



(b) All training and proficiency for control devices will be documented in the officer's training file.

(c) Officers who fail to demonstrate proficiency with the control device or knowledge of this agency's Use of Force Policy will be provided remedial training. If an officer cannot demonstrate proficiency with a control device or knowledge of this agency's Use of Force Policy after remedial training, the officer will be restricted from carrying the control device and may be subject to discipline.

**308.11 REPORTING USE OF CONTROL DEVICES AND TECHNIQUES**

Any application of a control device or technique listed in this policy shall be documented in the related incident report and reported pursuant to the Use of Force Policy.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000674

# Vehicle Pursuits

## 314.1 PURPOSE AND SCOPE

This policy provides guidelines for vehicle pursuits in order to protect the safety of involved officers, the public, and fleeing suspects.

### 314.1.1 DEFINITIONS

**Blocking** - A low-speed tactic where one or more authorized police department emergency vehicles intentionally restrict the movement of a suspect vehicle, with the goal of containment or preventing a pursuit. Blocking is not boxing in or a roadblock.

**Boxing-in** - A tactic designed to stop a suspect's moving vehicle by surrounding it with law enforcement vehicles and then slowing all vehicles to a stop.

**Pursuit Intervention** - An attempt to stop the suspect's ability to continue to flee in a vehicle through tactical application of technology, tire deflation devices, blocking or vehicle intercept, boxing-in, the PIT (known as Pursuit Intervention Technique or Precision Immobilization Technique), ramming, or roadblock procedures.

**Pursuit Intervention Technique (PIT)** - A low-speed tactic intentionally applied to cause the suspect vehicle to spin out and terminate the pursuit.

**Ramming** - The deliberate act of impacting a suspect's vehicle with another vehicle to functionally damage or otherwise force the suspect's vehicle to stop.

**Roadblocks** - A tactic designed to stop a suspect's vehicle by intentionally placing an emergency vehicle or other immovable object in the path of the suspect's vehicle.

**Tire deflation device** - A device that extends across the roadway designed to puncture the tires of the pursued vehicle, sometimes referred to as spike strips.

**Terminate** - To discontinue a pursuit or stop chasing fleeing vehicles.

**Trail** - Following the path of the pursuit at a safe speed while obeying all traffic laws and without activating emergency equipment. If the pursuit is at a slow rate of speed, the trailing vehicle will maintain sufficient distance from the pursuit vehicles so as to clearly indicate an absence of participation in the pursuit

**Vehicle Pursuit** - An event involving one or more law enforcement officers attempting to apprehend a suspect, who is attempting to avoid arrest while operating a motor vehicle by using high-speed driving or other evasive tactics, such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop.

## 314.2 OFFICER RESPONSIBILITIES

Vehicle pursuits shall only be conducted using authorized police department emergency vehicles that are equipped with and displaying emergency lighting and sirens as required by Vehicle Code

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000702

Fontana PD Policy Manual



§ 21055. Officers are responsible for continuously driving with due regard and caution for the safety of all persons and property (Vehicle Code § 21056).

### 314.2.1 WHEN TO INITIATE A PURSUIT

Officers are authorized to initiate a pursuit when the officer reasonably believes that a suspect, who has been given appropriate signal to stop by a law enforcement officer, is attempting to evade arrest or detention by fleeing in a vehicle.

Factors that should be considered in deciding whether to initiate a pursuit include:

(a) The seriousness of the known or reasonably suspected crime and its relationship to community safety.

(b) The importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to officers, innocent motorists, and others.

(c) The safety of the public in the area of the pursuit, including the type of area, time of day, the amount of vehicular and pedestrian traffic (e.g., school zones), and the speed of the pursuit relative to these factors.

(d) The pursuing officers familiarity with the area of the pursuit, the quality of radio communications between the pursuing units and the dispatcher, and the driving capabilities of the pursuing officers under the conditions of the pursuit.

(e) Whether weather, traffic, and road conditions unreasonably increase the danger of the pursuit when weighed against the risk of the suspect's escape.

(f) Whether the identity of the suspect has been verified and whether there is comparatively minimal risk in allowing the suspect to be apprehended at a later time.

(g) The performance capabilities of the vehicles used in the pursuit in relation to the speeds and other conditions of the pursuit.

(h) Emergency lighting and siren limitations on unmarked police department vehicles that may reduce visibility of the vehicle, such as visor or dash-mounted lights, concealable or temporary emergency lighting equipment, and concealed or obstructed siren positioning.

(i) Suspect and officer vehicle speeds.

(j) Other persons in or on the pursued vehicle (e.g., passengers, co-offenders, hostages).

(k) Availability of other resources such as air support or vehicle locator or deactivation technology.

### 314.2.2 WHEN TO TERMINATE A PURSUIT

Pursuits should be terminated whenever the totality of objective circumstances known or which reasonably ought to be known to the officer or supervisor during the pursuit indicates that the present risks of continuing the pursuit reasonably appear to outweigh the risks resulting from the suspect’s escape.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000703

The factors listed in this policy on when to initiate a pursuit will apply equally to the decision to terminate a pursuit. Officers and supervisors must objectively and continuously weigh the seriousness of the offense against the potential danger to innocent motorists, themselves, and the public when electing to continue a pursuit.

In addition to the factors that govern when to initiate a pursuit, other factors should be considered in deciding whether to terminate a pursuit, including:

(a) The distance between the pursuing vehicle and the fleeing vehicle is so great that further pursuit would be futile or require the pursuit to continue for an unreasonable time and/or distance.

(b) The pursued vehicle's location is no longer definitely known.

(c) The pursuing vehicle sustains damage or a mechanical failure that renders it unsafe to drive.

(d) The pursuing vehicle's emergency lighting equipment or siren becomes partially or completely inoperable.

(e) Hazards to uninvolved bystanders or motorists.

(f) The danger that the continued pursuit poses to the public, the officers, or the suspect, balanced against the risk of allowing the suspect to remain at large.

(g) The identity of the suspect is known and it does not reasonably appear that the need for immediate capture outweighs the risks associated with continuing the pursuit.

(h) Extended pursuits of violators for misdemeanors not involving violence, risk of serious harm, or weapons (independent of the pursuit) are generally discouraged.

### 314.2.3 SPEED LIMITS

The speed of a pursuit is a factor that should be evaluated on a continuing basis by the officer and supervisor. Evaluation of vehicle speeds should take into consideration public safety, officer safety, and the safety of the occupants of the fleeing vehicle.

Should high vehicle speeds be reached during a pursuit, officers and supervisors should also consider these factors when determining the reasonableness of the speed of the pursuit:

(a) Pursuit speeds have become unreasonably unsafe for the surrounding conditions.

(b) Pursuit speeds have exceeded the driving ability of the officer.

(c) Pursuit speeds are beyond the capabilities of the pursuit vehicle thus making its operation unsafe.

## 314.3 PURSUIT UNITS

When involved in a pursuit, unmarked police department emergency vehicles should be replaced by marked emergency vehicles whenever practicable.

Vehicle pursuits should be limited to three vehicles (two units and a supervisor); however, the number of units involved may vary with the circumstances.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000704

An officer or supervisor may request additional units to join a pursuit if, after assessing the factors outlined above, it reasonably appears that the number of officers involved may be insufficient to safely arrest the suspects. All other officers should stay out of the pursuit, but should remain alert to its progress and location. Any officer who drops out of a pursuit may then, if necessary, proceed to the termination point at legal speeds, following the appropriate rules of the road.

### 314.3.1 MOTORCYCLE OFFICERS

When involved in a pursuit, police department motorcycles should be replaced by marked four-wheel emergency vehicles as soon as practicable.

### 314.3.2 UNMARKED POLICE VEHICLES

Unmarked police vehicles, with emergency equipment, are generally prohibited from initiating or joining in any pursuit. Officers in such vehicles, however, may become involved in emergency activities involving known or suspected felony crimes. Those officers should terminate their involvement in any pursuit immediately upon arrival of a sufficient number of marked police emergency vehicles or any helicopter. The exemptions provided by Vehicle Code § 21055 do not apply to officers using vehicles without emergency equipment. Any unmarked police vehicles without emergency equipment shall not be involved in any pursuits.

### 314.3.3 PRIMARY UNIT RESPONSIBILITIES

The initial pursuing unit will be designated as the primary pursuit unit and will be responsible for the conduct of the pursuit unless the officer is unable to remain reasonably close to the suspect’s vehicle. The primary responsibility of the officer initiating the pursuit is the apprehension of the suspects without unreasonable danger to any person.

The primary unit should notify the dispatcher commencing with a request for priority radio traffic, that a vehicle pursuit has been initiated, and as soon as practicable provide information including but not limited to:

(a) The location, direction of travel, and estimated speed of the suspect's vehicle.

(b) The description of the suspect's vehicle including license plate number, if known.

(c) The reason for the pursuit.

(d) Known or suspected weapons. Threat of force, violence, injuries, hostages, or other unusual hazards.

(e) The suspected number of occupants and identity or description.

(f) The weather, road, and traffic conditions.

(g) The need for any additional resources or equipment.

(h) The identity of other law enforcement agencies involved in the pursuit.

Until relieved by a supervisor or secondary unit, the officer in the primary unit is responsible for the broadcasting of the progress of the pursuit. Unless circumstances reasonably indicate otherwise, the primary pursuing officer should, as soon as practicable, relinquish the responsibility of broadcasting the progress of the pursuit to a secondary unit or air support joining the pursuit

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000705

to minimize distractions and allow the primary pursuing officer to concentrate foremost on safe pursuit tactics.

### 314.3.4 SECONDARY UNIT RESPONSIBILITIES

The second officer in the pursuit will be designated as the secondary unit and is responsible for:

(a) Immediately notifying the dispatcher of entry into the pursuit.

(b) Remaining a safe distance behind the primary unit unless directed to assume the role of primary pursuit vehicle or if the primary pursuit vehicle is unable to continue the pursuit.

(c) Broadcasting the progress, updating known or critical information, and providing changes in the pursuit, unless the situation indicates otherwise.

(d) Identifying the need for additional resources or equipment as appropriate.

(e) Serving as backup to the primary pursuing officer once the suspect has been stopped.

### 314.3.5 PURSUIT DRIVING

The decision to use specific driving tactics requires the same assessment of the factors the officer considered when determining whether to initiate and/or terminate a pursuit. The following are tactics for units involved in the pursuit:

(a) Officers, considering their driving skills and vehicle performance capabilities, will space themselves from other involved vehicles such that they are able to see and avoid hazards or react safely to maneuvers by the fleeing vehicle.

(b) Because intersections can present increased risks, the following tactics should be considered:

  1. Available units not directly involved in the pursuit may proceed safely to controlled intersections ahead of the pursuit in an effort to warn cross traffic.

  2. Pursuing units should exercise due regard and caution when proceeding through controlled intersections.

(c) As a general rule, officers should not pursue a vehicle driving left of center (wrong way) against traffic. In the event that the pursued vehicle does so, the following tactics should be considered:

  1. Requesting assistance from available air support.

  2. Maintain visual contact with the pursued vehicle by paralleling it on the correct side of the roadway.

  3. Request other units to observe exits available to the suspects.

(d) Notify the California Highway Patrol (CHP) and/or other law enforcement agency if it appears that the pursuit may enter its jurisdiction.

(e) Officers involved in a pursuit should not attempt to pass other units unless the situation indicates otherwise or they are requested to do so by the primary unit and with a clear understanding of the maneuver process between the involved units.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000706

### 314.3.6 PURSUIT TRAILING

In the event the initiating unit from this agency either relinquishes control of the pursuit to another unit or jurisdiction, that initiating unit may, with permission of a supervisor, trail the pursuit to the termination point in order to provide necessary information and assistance for the arrest of the suspects.

The term trail means to follow the path of the pursuit at a safe speed while obeying all traffic laws and without activating emergency equipment. If the pursuit is at a slow rate of speed, the trailing unit will maintain sufficient distance from the pursuit units so as to clearly indicate an absence of participation in the pursuit.

### 314.3.7 AIR SUPPORT ASSISTANCE

When available, air support assistance should be requested. Once the air unit has established visual contact with the pursued vehicle, the unit should assume control over the pursuit. The primary and secondary ground units, or involved supervisor, will maintain operational control but should consider whether the participation of air support warrants the continued close proximity and/or involvement of ground units in the pursuit.

The air unit should coordinate the activities of resources on the ground, report progress of the pursuit and provide officers and supervisors with details of upcoming traffic congestion, road hazards, or other pertinent information to evaluate whether to continue the pursuit. If ground units are not within visual contact of the pursued vehicle and the air support unit determines that it is unsafe to continue the pursuit, the air support unit should recommend terminating the pursuit.

### 314.3.8 UNITS NOT INVOLVED IN THE PURSUIT

There should be no paralleling of the pursuit route. Officers are authorized to use emergency equipment at intersections along the pursuit path to clear intersections of vehicular and pedestrian traffic to protect the public. Officers should remain in their assigned area and should not become involved with the pursuit unless directed otherwise by a supervisor.

The primary and secondary units should be the only units operating under emergency conditions (red light and siren) unless other units are assigned to the pursuit.

### 314.3.9 OPTIONAL PURSUIT MODES

The following modes are intended to enhance safety to the public and officers involved in a vehicle pursuit by encouraging a fleeing suspect to operate his/her vehicle in a safe manner and/or self-terminate the pursuit. Exigent circumstances may preclude the use of these tactics.

(a) Tracking Mode- When an air unit is participating in a vehicle pursuit, a supervisor can authorize a transition to tracking mode. While in tracking mode, the air unit will continue to broadcast the pursuit and may gain altitude and divert or discontinue the use of the spot light.

> (1) Ground units should disengage from direct pursuit of the suspect and attempt to remain out of sight of the suspect, but maintain close proximity to the suspect's vehicle if safe to do so. Ground units can continue code three operation pursuant to CVC 21055/21056.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000707

If the use of tracking mode does not appear to change the suspect's driving behavior, the supervisor may choose to have ground units reengage in the pursuit, transition to surveillance mode or terminate the pursuit.

(b) Surveillance Mode- When an air unit is participating in a vehicle pursuit, a supervisor can authorize the transition to surveillance mode. While in surveillance mode ground units will shut down code three operation and discontinue involvement in the pursuit.

(1) The air unit will continue broadcasting the suspect's location as usual; updating speed, location, traffic conditions etc. The air unit may gain altitude and divert or discontinue use of the spotlight. The air unit will continue until the suspect vehicle stops or some exigency occurs. At that point a supervisor can order ground units to apprehend the suspect(s), initiate a perimeter or reengage in the pursuit.

## 314.4 SUPERVISORY CONTROL AND RESPONSIBILITIES

Available supervisory and management control will be exercised over all vehicle pursuits involving officers from this department.

The field supervisor of the officer initiating the pursuit, or if unavailable, the nearest field supervisor will be responsible for:

(a) Immediately notifying involved unit and the dispatcher of supervisory presence and ascertaining all reasonably available information to continuously assess the situation and risk factors associated with the pursuit.

(b) Engaging in the pursuit, when appropriate, to provide on-scene supervision.

(c) Exercising management and control of the pursuit even if not engaged in it.

(d) Ensuring that no more than the required number of units are involved in the pursuit under the guidelines set forth in this policy.

(e) Directing that the pursuit be terminated if, in the supervisor's judgment, it is unreasonable to continue the pursuit under the guidelines of this policy.

(f) Ensuring that assistance from air support, canines, or additional resources is requested, if available and appropriate.

(g) Ensuring that the proper radio channel is being used.

(h) Ensuring that the Watch Commander is notified of the pursuit as soon as practicable.

(i) Ensuring the notification and/or coordination of outside agencies if the pursuit either leaves or is likely to leave the jurisdiction of this department.

(j) Controlling and managing Fontana Police Department units when a pursuit enters another jurisdiction.

### 314.4.1 WATCH COMMANDER RESPONSIBILITIES

Upon becoming aware that a pursuit has been initiated, the Watch Commander should monitor and continually assess the situation and ensure the pursuit is conducted within the guidelines and

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000708

Fontana PD Policy Manual



requirements of this policy. Once notified, the Watch Commander has the final responsibility for the coordination, control, and termination of a vehicle pursuit and shall be in overall command.

The Watch Commander shall review all pertinent reports..

## 314.5 DISPATCH CENTER

If the pursuit is confined within the City limits, radio communications will be conducted on the primary channel unless instructed otherwise by a supervisor or dispatcher. If the pursuit leaves the jurisdiction of this department or such is imminent, involved units may, whenever necessary, switch radio communications to a tactical or emergency channel.

### 314.5.1 DISPATCHER RESPONSIBILITIES

Upon notification or becoming aware that a pursuit has been initiated, the dispatcher is responsible for:

(a) Clearing the radio channel of non-emergency traffic.

(b) Coordinating pursuit communications of the involved units and personnel.

(c) Broadcasting pursuit updates as well as other pertinent information as necessary.

(d) Ensuring that a field supervisor is notified of the pursuit.

(e) Notifying and coordinating with other involved or affected agencies as practicable.

(f) Notify the Watch Commander as soon as practicable.

(g) Documenting pursuit activities.

### 314.5.2 LOSS OF PURSUED VEHICLE

When the pursued vehicle is lost, the primary unit should broadcast pertinent information to assist other units in locating suspects. The primary unit or supervisor will be responsible for coordinating any further search for either the pursued vehicle or suspects fleeing on foot.

## 314.6 INTER-JURISDICTIONAL CONSIDERATIONS

When a pursuit enters another agency's jurisdiction, the primary officer or supervisor, taking into consideration distance traveled, unfamiliarity with the area and other pertinent facts, should determine whether to request the other agency to assume the pursuit. Unless entry into another jurisdiction is expected to be brief, it is generally recommended that the primary officer or supervisor ensure that notification is provided to each outside jurisdiction into which the pursuit is reasonably expected to enter, regardless of whether such jurisdiction is expected to assist.

### 314.6.1 ASSUMPTION OF PURSUIT BY ANOTHER AGENCY

Officers will relinquish control of the pursuit when another agency has assumed the pursuit, unless the continued assistance of the Fontana Police Department is requested by the agency assuming the pursuit. Upon relinquishing control of the pursuit, the involved officers may proceed, with supervisory approval, to the termination point of the pursuit to assist in the investigation. The supervisor should coordinate such assistance with the assuming agency and obtain any information that is necessary for any reports. Notification of a pursuit in progress should not be

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000709

Fontana PD Policy Manual



construed as a request to join the pursuit. Requests to or from another agency to assume a pursuit should be specific.

### 314.6.2 PURSUITS EXTENDING INTO THIS JURISDICTION

The agency that initiates a pursuit is responsible for conducting the pursuit. Units from this department should not join a pursuit unless specifically requested to do so by the pursuing agency and with approval from a supervisor. The exception to this is when a single unit from the initiating agency is in pursuit. Under this circumstance, a supervisor may authorize units from this department to join the pursuit until sufficient units from the initiating agency join the pursuit or until additional information is provided allowing withdrawal of the pursuit.

When a request is made for this department to assist or take over a pursuit that has entered the jurisdiction of Fontana Police Department, the supervisor should consider:

(a) The public's safety within this jurisdiction.

(b) The safety of the pursuing officers.

(c) Whether the circumstances are serious enough to continue the pursuit.

(d) Whether there is adequate staffing to continue the pursuit.

(e) The ability to maintain the pursuit.

As soon as practicable, a supervisor or the Watch Commander should review a request for assistance from another agency. The Watch Commander or supervisor, after considering the above factors, may decline to assist in, or assume the other agency’s pursuit.

Assistance to a pursuing allied agency by officers of this department will terminate at the City limits provided that the pursuing officers have sufficient assistance from other sources. Ongoing participation from this department may continue only until sufficient assistance is present.

In the event that a pursuit from another agency terminates within this jurisdiction, officers should provide appropriate assistance to officers from the allied agency including but not limited to scene control, coordination and completion of supplemental reports, and any other reasonable assistance requested or needed.

## 314.7 WHEN PURSUIT INTERVENTION IS AUTHORIZED

Whenever practicable, an officer shall seek approval from a supervisor before employing any intervention to stop the pursued vehicle. In deciding whether to use intervention tactics, officers/ supervisors should balance the risks of allowing the pursuit to continue with the potential hazards to the public arising from the use of each tactic, the officers, and persons in or on the pursued vehicle to determine which, if any, intervention tactic may be reasonable.

### 314.7.1 USE OF FIREARMS

An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000710

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle (see the Use of Force Policy).

### 314.7.2 INTERVENTION STANDARDS

Any intervention tactic, depending upon the conditions and circumstances under which it is used, may present dangers to the officers, the public, or anyone in or on the vehicle being pursued. Certain applications of intervention tactics may be construed to be a use of force, including deadly force, and subject to the policies guiding such use. Officers should consider these facts and requirements prior to deciding how, when, where, and if an intervention tactic should be employed.

(a) Blocking should only be used after giving consideration to the following:

1. The technique should only be used by officers who have received training in the technique.
2. Supervisory approval should be obtained before using this technique.
3. The need to immediately stop the suspect vehicle or prevent it from leaving reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will contain or prevent the pursuit.

(b) The PIT should only be used after giving consideration to the following:

1. The technique should only be used by officers who have received training in the technique, including speed restrictions.
2. Supervisory approval should be obtained before using the technique.
3. The need to immediately stop the suspect vehicle reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will terminate or prevent the pursuit.

(c) Ramming a fleeing vehicle should only be done after giving consideration to the following:

1. Supervisory approval should be obtained before using the technique.
2. The need to immediately stop the suspect vehicle reasonably appears to substantially outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
3. It reasonably appears the technique will terminate or prevent the pursuit.
4. Ramming may be used only under circumstances when deadly force would be authorized.
5. Ramming may be used when all other reasonable alternatives have been exhausted or reasonably appear ineffective.

(d) Before attempting to box a suspect vehicle during a pursuit the following should be considered:

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000711

1. The technique should only be used by officers who have received training in the technique.
2. Supervisory approval should be obtained before using the technique.
3. The need to immediately stop the suspect vehicle reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will terminate or prevent the pursuit.

(e) Tire deflation devices should only be used after considering the following:

1. Tire deflation devices should only be used by officers who have received training in their use.
2. Supervisory approval should be obtained before using tire deflation devices.
3. The need to immediately stop the suspect vehicle reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the use will terminate or prevent the pursuit.
5. Tire deflation devices should not be used when the pursued vehicle is a motorcycle, a vehicle transporting hazardous materials, or a school bus transporting children, except in extraordinary circumstances.
6. Due to the increased risk to officers deploying tire deflation devices, such deployment should be communicated to all involved personnel.

(f) Roadblocks should only be used after considering the following:

1. Roadblocks should only be used by officers who have received training in their use.
2. Supervisory approval should be obtained before using the technique.
3. The need to immediately stop the suspect vehicle reasonably appears to substantially outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will terminate or prevent the pursuit. Roadblocks may be used only under circumstances when deadly force would be authorized.
5. Roadblocks may be used when all other reasonable alternatives have been exhausted or reasonably appear ineffective.

### 314.7.3 CAPTURE OF SUSPECTS

Proper self-discipline and sound professional judgment are the keys to a successful conclusion of a pursuit and apprehension of evading suspects. Officers shall use only that amount of force, which reasonably appears necessary under the circumstances, to accomplish a legitimate law enforcement purpose.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000712

Unless relieved by a supervisor, the primary pursuing officer should coordinate efforts to apprehend the suspects following the pursuit. Officers should consider safety of the public and the involved officers when formulating plans for setting up perimeters or for containing and capturing the suspects.

## 314.8 REPORTING REQUIREMENTS

All appropriate reports should be completed to comply with applicable laws, policies, and procedures.

(a) The primary officer should complete appropriate crime/arrest reports.

(b) The Allied Agency Vehicle Pursuit Report (form CHP 187A) shall be filed with the CHP no later than 30 days following the pursuit (Vehicle Code § 14602.1). The primary officer should complete as much of the required information on the form as is known and forward the report to the Watch Commander for review and distribution.

(c) Any use of force by a member of this department shall be documented (See the Use of Force Policy)

(d) Injuries, medical treatment, damaged property should be documented inthe crime/ arrest report.

### 314.8.1 REGULAR AND PERIODIC PURSUIT TRAINING

The Training Sergeant shall make available to all officers initial and supplementary Police Officer Standard Training (POST) training on pursuits required by Penal Code § 13519.8, and no less than annual training addressing:

(a) This policy.

(b) The importance of vehicle safety and protecting the public.

(c) The need to balance the known offense and the need for immediate capture against the risks to officers and others (Vehicle Code § 17004.7(d)).

### 314.8.2 POLICY REVIEW

Officers of this department shall certify in writing that they have received, read, and understand this policy initially, upon any amendments, and whenever training on this policy is provided. The POST attestation form, or an equivalent form, may be used to document the compliance and should be retained in the member’s training file.

## 314.9 APPLICATION OF VEHICLE PURSUIT POLICY

This policy is expressly written and adopted pursuant to the provisions of Vehicle Code § 17004.7, with additional input from the POST Vehicle Pursuit Guidelines.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000713

# Officer Response to Calls

## 316.1 PURPOSE AND SCOPE

This policy provides for the safe and appropriate response to emergency and non-emergency situations whether dispatched or self-initiated.

## 316.2 RESPONSE TO CALLS

Officers dispatched "Code-3" shall consider the call an emergency response and proceed immediately. Officers responding Code-3 shall continuously operate emergency lighting equipment, including at minimum a steady forward facing red light, and shall sound the siren as reasonably necessary pursuant to Vehicle Code § 21055.

Responding with emergency light(s) and siren does not relieve the officer of the duty to continue to drive with due regard for the safety of all persons. The use of any other warning equipment without a red light and siren does not provide any exemption from the Vehicle Code. (VC 21056)

Officers should only respond Code-3 when so dispatched or when circumstances reasonably indicate an emergency response is required. Officers not authorized to respond Code-3 shall observe all traffic laws and proceed without the use of emergency lights and siren.

### 316.2.1 EMERGENCY RESPONSE - GUIDELINES

The following is a list of common calls that will be considered authorized for emergency response unless directed otherwise: 1. Assist an endangered officer 2. Injury or unknown injury traffic accidents 3. In progress calls where bodily harm has been committed or is likely to occur 4. Any type of call where a human life is seriously threatened and an urgent response to the scene by a police officer is imperative

### 316.2.2 NUMBER OF UNITS ASSIGNED

Normally, only one unit should respond to an emergency call Code-3 unless the Watch Commander or the field supervisor authorizes an additional unit(s).

## 316.3 REQUESTING EMERGENCY ASSISTANCE

Requests for emergency assistance should be limited to those situations where the involved personnel reasonably believe that there is an immediate threat to the safety of officers, or assistance is needed to prevent imminent serious harm to a citizen. In any event, where a situation has stabilized and emergency response is not required, the requesting officer shall immediately notify the Dispatch Center.

If circumstances permit, the requesting officer should give the following information:

- The unit number
- The location
- The reason for the request and type of emergency
- The number of units required

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000714

### 316.4 INITIATING CODE 3 RESPONSE

If an officer resonably believes that a Code-3 response to any call is appropriate, the officer shall notify the Dispatch Center as soon as it is practicable to do so. Generally, only one unit should respond Code-3 to any situation. Should another officer believe a Code-3 response is appropriate, the Dispatch Center shall be notified and the Watch Commander or field supervisor will make a determination as to whether one or more officers driving Code-3 is appropriate.

### 316.5 RESPONSIBILITIES OF RESPONDING OFFICERS

Officers shall exercise sound judgment and care with due regard for life and property when responding to an emergency call. Officers shall reduce speed at intersections where they do not have the right away to such a degree that they have complete control of the vehicle.

The decision to continue a Code-3 response is at the discretion of the officer. If, in the officer's judgment, the roadway conditions or traffic congestion does not permit such a response without unreasonable risk, the officer may elect to respond to the call without the use of red lights and siren at the legal speed limit. In such an event, the officer should immediately notify the Dispatch Center. An officer shall also discontinue the Code-3 response when directed by a supervisor.

Upon receiving authorization or determining a Code-3 response is appropriate, an officer shall immediately give the location from which he/she is responding.

### 316.6 COMMUNICATIONS RESPONSIBILITIES

A dispatcher shall assign a Code-3 response when an officer requests emergency assistance or available information reasonably indicates that the public is threatened with serious injury or death and immediate police response is needed. In all other circumstances, the dispatcher shall obtain authorization from the Watch Commander or a field supervisor prior to assigning units Code-3 . The dispatcher shall:

(a) Attempt to assign the closest available unit to the location requiring assistance

(b) Immediately notify the Watch Commander

(c) Confirm the location from which the unit is responding

(d) Notify and coordinate allied emergency services (e.g., fire and ambulance)

(e) Continue to obtain and broadcast information as necessary concerning the response and monitor the situation until it is stabilized or terminated

(f) Control all radio communications during the emergency and coordinate assistance under the direction of the Watch Commander or field supervisor

### 316.7 SUPERVISORY RESPONSIBILITIES

Upon being notified that a Code-3 response has been initiated, the Watch Commander or the field supervisor shall verify the following:

(a) The proper response has been initiated

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000715

(b) No more than those units reasonably necessary under the circumstances are involved in the response

(c) Affected outside jurisdictions are being notified as practical

The field supervisor shall monitor the response until it has been stabilized or terminated and assert control by directing units into or out of the response if necessary. If, in the supervisor's judgment, the circumstances require additional units to be assigned a Code-3 response, the supervisor may do so.

It is the supervisor's responsibility to terminate a Code-3 response that, in his/her judgment is inappropriate due to the circumstances.

When making the decision to authorize a Code-3 response, the Watch Commander or the field supervisor should consider the following:

- The type of call
- The necessity of a timely response
- Traffic and roadway conditions
- The location of the responding units

## 316.8 FAILURE OF EMERGENCY EQUIPMENT

If the emergency equipment on the vehicle should fail to operate, the officer must terminate the Code-3 response and respond accordingly. In all cases, the officer shall notify the Watch Commander, field supervisor, or the Dispatch Center of the equipment failure so that another unit may be assigned to the emergency response.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000716

# Report Preparation

## 344.1 PURPOSE AND SCOPE

Report preparation is a major part of each officer's job. The purpose of reports is to document sufficient information to refresh the officer's memory and to provide sufficient information for follow-up investigation and successful prosecution. Report writing is the subject of substantial formalized training and on-the-job training.

### 344.1.1 REPORT PREPARATION

Employees should ensure that reports are sufficiently detailed for their purpose and free from errors prior to submission. It is the responsibility of the assigned employee to complete and submit all reports taken during the shift before going off-duty unless permission to hold the report has been approved by a supervisor. Generally, reports requiring prompt follow-up action on active leads, or arrest reports where the suspect remains in custody should not be held.

Handwritten reports must be prepared legibly. If the report is not legible, the submitting employee will be required by the reviewing supervisor to promptly make corrections and resubmit the report. Employees who dictate reports shall use appropriate grammar, as content is not the responsibility of the typist. Employees who generate reports on computers are subject to all requirements of this policy.

All reports shall accurately reflect the identity of the persons involved, all pertinent information seen, heard or assimilated by any other sense, and any actions taken. Employees shall not suppress, conceal or distort the facts of any reported incident, nor shall any employee make a false report orally or in writing. Generally, the reporting employee's opinions should not be included in reports unless specifically identified as such.

## 344.2 REQUIRED REPORTING

Written reports are required in all of the following situations on the appropriate department approved form unless otherwise approved by a supervisor.

### 344.2.1 CRIMINAL ACTIVITY

When a member responds to a call for service, or as a result of self-initiated activity becomes aware of any activity where a crime has occurred, the member shall document the incident regardless of whether a victim desires prosecution. Activity to be documented in a written report includes:

(a) All arrests

(b) All felony crimes

(c) Non-Felony incidents involving threats or stalking behavior

(d) Situations covered by separate policy. These include:

1. Use of Force Policy

2. Domestic Violence Policy

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000825

3. Child Abuse Policy
4. Senior and Disability Victimization Policy
5. Hate Crimes Policy
6. Suspicious Activity Reporting Policy

(e) All misdemeanor crimes where the victim desires a report

Misdemeanor crimes where the victim does not desire a report shall be documented using the department-approved alternative reporting method (e.g., dispatch log).

### 344.2.2 NON-CRIMINAL ACTIVITY
The following incidents shall be documented using the appropriate approved report:

(a) Any use of force against any person by a member of this department (see the Use of Force Policy)

(b) Any firearm discharge (see the Firearms Policy)

(c) Anytime a person is reported missing, regardless of jurisdiction (see the Missing Persons Policy)

(d) Any found property or found evidence

(e) Any traffic collisions above the minimum reporting level (see Traffic Collision Reporting Policy)

(f) Suspicious incidents that may indicate a potential for crimes against children or that a child's safety is in jeopardy

(g) All protective custody detentions

(h) Suspicious incidents that may place the public or others at risk

(i) Whenever the employee believes the circumstances should be documented or at the direction of a supervisor

### 344.2.3 DEATH CASES
Death investigations require specific investigation methods depending on circumstances and should be handled in accordance with the Death Investigations Policy. The handling officer should notify and apprise a supervisor of the circumstances surrounding the incident to determine how to proceed. The following cases shall be appropriately investigated and documented using the approved report:

(a) Sudden or accidental deaths.

(b) Suicides.

(c) Homicide or suspected homicide.

(d) Unattended deaths (No physician or qualified hospice care in the 20 days preceding death).

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000826

(e) Found dead bodies or body parts.

### 344.2.4 INJURY OR DAMAGE BY CITY PERSONNEL

Reports shall be taken if an injury occurs that is a result of an act by a City employee. Additionally, reports shall be taken involving damage to City property or City equipment. The watch commander or other supervisor will determine whether an administrative report, standard report with case number, or both is necessary.

### 344.2.5 MISCELLANEOUS INJURIES

Any injury that is reported to this department shall require a report when:

(a) Attempted suicide

(b) The injury is major/serious, whereas death could result

(c) The circumstances surrounding the incident are suspicious in nature and it is desirable to record the event

The above reporting requirements are not intended to be all-inclusive. A supervisor may direct an employee to document any incident he/she deems necessary.

### 344.2.6 MANDATORY REPORTING OF JUVENILE GUNSHOT INJURIES

A report shall be taken when any incident in which a child 18 years or younger suffered an unintentional or self-inflicted gunshot wound. Records Unit personnel shall notify the California Department of Public Health (CDPH) of the incident as required by CDPH (Penal Code § 23685).

### 344.2.7 USE OF CAD SEQUENCE NUMBERS

(a) CAD Sequence Numbers / Incident Numbers will be used in place of officer generated reports when there is no workable suspect information for the following types of cases:

1. Misdemeanor thefts: PC 488 / PC 490.5.
2. Misdemeanor vandalism: PC 594(a)(1) with less than $1000 damage with the exception of cases involving graffiti.
3. Grand theft: PC 487.1 total loss less than $1500.
4. Trespass and unlawful entry: PC 602 / PC 603.
5. Prowling: PC 647(i).
6. Obscene or annoying phone calls: PC 653m
7. Bomb threats: PC 148.1
8. Vehicle burglaries.
9. Theft of mail.

(b) For purposes of this policy, no workable suspect information means the victim and/or witnesses involved in the case are unable to supply information that would allow an officer to identify a suspect through follow-up investigation. For purposes of this policy, a valid California license plate number is considered workable suspect information.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000827

(c) Officers will take case numbers and not use Sequence Numbers in any of the following situations:

1. All felonies with the exception of those felonies already indicated.

2. Any crime of violence.

3. Any crime with workable suspect information

4. Any property crime where one or more of the items taken has serial numbers that can be entered into the Department's NCIC computer system.

5. Any domestic violence situation.

6. Any 594 PC involving graffiti.

7. Any reports of lost items that are serialized or that has a unique inscription which can be entered into the Department of Justice Automated property System (PC 11108)

(d) When dispatch receives a report of a call not in-progress, the dispatcher should ask the victim whether they want to talk to an officer or would like a phone report.

1. If the victim advises that a phone report is satisfactory, the dispatcher should obtain the necessary information from the victim and issue them a Sequence Number / Incident Number.

2. If the victim has suffered some type of property loss, for example, a theft or vandalism loss, the dispatcher should include the victim's estimate of loss and what was stolen or damaged in the CAD report.

3. It is not necessary for the dispatcher to obtain any additional information from the victim that is not presently required before dispatching an officer.

(e) If a victim reports that a crime is in-progress or requests that an officer respond, the dispatcher should dispatch the call per existing policy.

1. When the officer clears the call, instead of receiving a case number, the officer should ask Dispatch for the CAD Sequence Number and provide the number to the victim instead of a report number.

2. In a situation where the victim suffered a property loss, either through theft or vandalism, the officer shall advise Dispatch the amount of loss and what was stolen or damaged, and that information shall be placed into the CAD report.

(f) Any employee issuing a Sequence Number shall advise the victim/subject that they need to maintain the Sequence Number / Incident Number and the date of the occurrence in order to obtain a CAD print out of the incident at a later date.

(g) Employees shall not use CAD Sequence Numbers / Incident Numbers in place of criminal reports for any crime other than those specifically authorized by this policy.

### 344.2.8 ALTERNATE REPORTING FOR VICTIMS

Reports that may be submitted by the public via online or other self-completed reporting processes include:

(a) Lost property.

(b) Misdemeanor thefts of property, other than firearms or materials that threaten public safety, when there is no suspect information, serial number or ability to trace the item.

1. Misdemeanor thefts of cellular telephones may be reported even though they have a serial number.

(c) Misdemeanor vandalism with no suspect information and no hate crime implications.

(d) Vehicle burglaries with no suspect information or evidence.

(e) Stolen vehicle attempts with no suspect information or evidence.

(f) Annoying telephone calls with no suspect information.

(g) Identity theft without an identifiable suspect.

(h) Online or email fraud solicitations without an identifiable suspect and if the financial loss classifies the crime as a misdemeanor.

(i) Hit-and-run vehicle collisions with no suspect or suspect vehicle.

(j) Supplemental property lists.

Members at the scene of one of the above incidents should not refer the reporting party to an alternate means of reporting without authorization from a supervisor. Members may refer victims to online victim assistance programs (e.g., Federal Communications Commission (FCC) website for identity theft, Internet Crime Complaint Center (IC3) website for computer crimes).

## 344.3 GENERAL POLICY OF EXPEDITIOUS REPORTING

In general, all officers and supervisors shall act with promptness and efficiency in the preparation and processing of all reports. An incomplete report, unorganized reports or reports delayed without supervisory approval are not acceptable. Reports shall be processed according to established priorities or according to special priority necessary under exceptional circumstances.

### 344.3.1 GENERAL POLICY OF HANDWRITTEN, TYPED, AND DICTATED REPORTS

Some incidents and report forms lend themselves to block print rather than typing. In general, the narrative portion of reports should be typed and included in the ARS system.

Felony in-custody reports may be dictated. Other lengthy reports may be dictated with a supervisors approval. Supervisors may also approve dictation of a report for training purposes.

Supervisors may require, with the foregoing general policy in mind, block printing or typing of reports of any nature for departmental consistency.

### 344.3.2 GENERAL USE OF OTHER HANDWRITTEN FORMS

County, state and federal agency forms may be block printed as appropriate. In general, the form itself may make the requirement for typing apparent.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000829

**344.4 REPORT CORRECTIONS**

Supervisors shall review reports for content and accuracy. If a correction is necessary, the reviewing supervisor should complete the report correction process as per established ARS procedures. The original report and the correction form should be returned to the reporting employee for correction as soon as practical. It shall be the responsibility of the originating officer to ensure that any report returned for correction is processed in a timely manner.

**344.5 REPORT CHANGES OR ALTERATIONS**

Reports that have been approved by a supervisor and submitted to the records unit for filing and distribution shall not be modified or altered except by way of a supplemental report. Reviewed reports that have not yet been submitted to the records unit may be corrected or modified by the authoring officer only with the knowledge and authorization of the reviewing supervisor.

**344.6 CRIME REPORTS AND COMMUNITY SERVICE OFFICERS**

Community service officers are normally authorized to take the following types of reports:

- PC 488 and PC 487
- PC 653m
- PC 594
- Found Property
- Runaway Juveniles (RAJ's)
- Missing persons (non-critical)
- Abandoned Vehicles
- CVC 10851 (GTA) and 10851 recoveries
- Lost/stolen license plates
- Parking violations
- Non-injury Traffic Collision's (TC's)
- PC 476 and PC 470
- PC 530.5
- PC 459 vehicles and residential
- Other reports as directed by a supervisor
- Supplemental reports to all previously mentioned report types

In addition, CSO's may take reports that include suspect information in those cases in which there will be no immediate follow up by the CSO that will place them in any danger whatsoever of coming into contact with a suspect.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000830

If a suspect resides in Fontana or one of our neighboring jurisdictions, a CSO should not be dispatched to take a report with suspect information. Due to the fact that a patrol officer would be able to continue on with a follow up investigation and possibly contact and arrest the suspect, the report should be assigned to a patrol officer or other sworn member of the department in these cases.

The safety of the CSO in these cases is our primary concern and if information develops that indicates it is unsafe for the CSO to gather and report the suspect information, the CSO should immediately bring that to the attention of a supervisor and the report should be reassigned to a patrol officer or other sworn member of the department most suited to handle the report.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000831

# Patrol Function

## 400.1 PURPOSE AND SCOPE
The purpose of this policy is to define the patrol function and address intraorganizational cooperation and information sharing.

## 400.2 INFORMATION SHARING
To the extent feasible, all information relevant to the mission of the Department should be shared among all divisions and specialized units on a timely basis. Members should be provided with opportunities on a regular basis to share information during the daily briefings and to attend briefings of other divisions or specialized units.

Additionally, information should be shared with outside agencies and the public in conformance with department policies and applicable laws. Members are encouraged to share information with other units and divisions.

## 400.3 CROWDS, EVENTS AND GATHERINGS
Officers may encounter gatherings of people, including but not limited to, civil demonstrations, civic, social and business events, public displays, parades and sporting events. Officers should monitor such events as time permits in an effort to keep the peace and protect the safety and rights of those present. A patrol supervisor should be notified when it becomes reasonably foreseeable that such an event may require increased monitoring, contact or intervention.

Officers responding to an event or gathering that warrants law enforcement involvement should carefully balance the speech and association rights of those present with applicable public safety concerns before taking enforcement action.

Generally, officers should consider seeking compliance through advisements and warnings for minor violations and should reserve greater enforcement options for more serious violations or when voluntary compliance with the law is not achieved.

Officers are encouraged to contact organizers or responsible persons to seek voluntary compliance that may address relevant public safety/order concerns.

Officers should consider enforcement of applicable state and local laws, such as Penal Code 602.1 (obstructing or intimidating business operators), when the activity blocks the entrance or egress of a facility or location and when voluntary compliance with the law is not achieved.

## 400.4 POLICY
The Fontana Police Department provides patrol services 24 hours a day, seven days a week and will prioritize responses to requests for emergency services using available resources to enhance the safety of the public and department members.

## 400.5 FUNCTION
Patrol will generally be conducted by uniformed officers in clearly marked law enforcement vehicles in assigned jurisdictional areas of Fontana. The function of patrol is to respond to calls

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000916

Fontana PD Policy Manual



for assistance and reports of criminal activity, act as a deterrent to crime, enforce state and local laws, identify community needs, provide support and assistance to the community and respond to emergencies.

Patrol services include, but are not limited to:

(a) Responding to emergency calls for service.

(b) Apprehending criminal offenders.

(c) Providing mutual aid and assistance to other agencies for emergency and law enforcement-related activities.

(d) Preventing criminal acts, traffic violations and collisions, maintaining public order and discovering hazardous situations or conditions.

(e) Responding to reports of criminal and non-criminal acts.

(f) Responding to routine calls for service, such as public assistance or public safety.

(g) Carrying out crime prevention activities such as residential inspections, business inspections and community presentations.

(h) Carrying out community oriented policing and problem-solving activities including the application of resources to improve or resolve specific problems or situations and contacting or assisting members of the public in a positive way.

(i) Directing and controlling traffic.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000917

# Briefing Training

## 404.1 PURPOSE AND SCOPE

Briefing training is generally conducted at the beginning of the officer's assigned shift. Briefing provides an opportunity for important exchange between employees and supervisors. A supervisor generally will conduct Briefing; however officers may conduct Briefing for training purposes with supervisor approval.

Briefing should accomplish, at a minimum, the following basic tasks:

(a) Briefing officers with information regarding daily patrol activity, with particular attention given to unusual situations and changes in the status of wanted persons, stolen vehicles, and major investigations

(b) Notifying officers of changes in schedules and assignments

(c) Notifying officers of new Special Orders or changes in Special Orders

(d) Reviewing recent incidents for training purposes

(e) Providing training on a variety of subjects

## 404.2 PREPARATION OF MATERIALS

The supervisor conducting Briefing is responsible for preparation of the materials necessary for a constructive briefing. Supervisors may delegate this responsibility to a subordinate officer in his or her absence or for training purposes.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000922

# Obtaining Air Support

## 437.1 PURPOSE AND SCOPE
The use of a police helicopter can be invaluable in certain situations. This policy specifies potential situations where the use of a helicopter may be requested and the responsibilities for making a request.

## 437.2 REQUEST FOR HELICOPTER ASSISTANCE
If a supervisor or officer in charge of an incident determines that the use of a helicopter would be beneficial, a request to obtain helicopter assistance may be made.

### 437.2.1 REQUEST FOR ASSISTANCE FROM ANOTHER AGENCY
After consideration and approval of the request for a helicopter, the Watch Commander, or his/her designee, will call the closest agency having helicopter support available. The Watch Commander on duty will apprise that agency of the specific details of the incident prompting the request.

### 437.2.2 CIRCUMSTANCES UNDER WHICH AID MAY BE REQUESTED
Police helicopters may be requested under any of the following conditions:

(a) When the helicopter is activated under existing mutual aid agreements

(b) Whenever the safety of law enforcement personnel is in jeopardy and the presence of the helicopters may reduce such hazard

(c) When the use of the helicopters will aid in the capture of a suspected fleeing felon whose continued freedom represents an ongoing threat to the community

(d) When a helicopter is needed to locate a person who has strayed or is lost and whose continued absence constitutes a serious health or safety hazard

(e) Vehicle pursuits

While it is recognized that the availability of helicopter support will generally provide valuable assistance to ground personnel, the presence of a helicopter will rarely replace the need for officers on the ground.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 000995

# Traffic Function and Responsibility

## 500.1 PURPOSE AND SCOPE

The ultimate goal of traffic law enforcement is to reduce traffic collisions. This may be achieved through the application of such techniques as geographic/temporal assignment of personnel and equipment and the establishment of preventive patrols to deal with specific categories of unlawful driving behavior. Traffic enforcement techniques are based on accident data, enforcement activity records, traffic volume, and traffic conditions. This department provides enforcement efforts toward violations, not only in proportion to the frequency of their occurrence in accident situations, but also in terms of traffic-related needs.

## 500.2 TRAFFIC OFFICER DEPLOYMENT

Several factors are considered in the development of deployment schedules for officers of the Fontana Police Department. Information provided by the California Statewide Integrated Traffic Reporting System (SWITRS) is a valuable resource for traffic accident occurrences and therefore officer deployment. Some of the factors for analysis include:

- Location
- Time
- Day
- Violation factors

All officers assigned to patrol or traffic enforcement functions will emphasize enforcement of accident causing violations during high accident hours and at locations of occurrence. All officers will take directed enforcement action on request, and random enforcement action when appropriate against violators as a matter of routine. All officers shall maintain high visibility while working general enforcement, especially at high accident locations.

Other factors to be considered for deployment are citizen requests, construction zones or special events.

## 500.3 ENFORCEMENT

Enforcement actions are commensurate with applicable laws and take into account the degree and severity of the violation committed. This department does not establish ticket quotas and the number of arrests or citations issued by any officer shall not be used as the sole criterion for evaluating officer overall performance (Vehicle Code § 41603). The visibility and quality of an officer's work effort will be commensurate with the philosophy of this policy. Several methods are effective in the reduction of collisions:

### 500.3.1 WARNINGS

Warnings or other non-punitive enforcement actions should be considered in each situation and substituted for arrests or citations when circumstances warrant, especially in the case of inadvertent violations.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

500.3.2 CITATIONS
Citations may be issued when an officer believes it is appropriate. It is essential that officers fully explain the rights and requirements imposed on motorists upon issuance of a citation for a traffic violation. Officers should provide the following information at a minimum:

(a) Explanation of the violation or charge

(b) Court appearance procedure

500.3.3 PHYSICAL ARREST
Physical arrest can be made on a number of criminal traffic offenses outlined in the Vehicle Code or Penal Code. These physical arrest cases usually deal with, but are not limited to:

(a) Vehicular manslaughter

(b) Felony and misdemeanor driving under the influence of alcohol/drugs

(c) Felony or misdemeanor hit-and-run

(d) Refusal to sign notice to appear

(e) Any other misdemeanor at the discretion of the officer, such as reckless driving with extenuating circumstances

## 500.4 SUSPENDED OR REVOKED DRIVERS LICENSES
If an officer contacts a traffic violator for driving on a suspended or revoked license, the officer may issue a traffic citation pursuant to Vehicle Code § 14601.

If a computer check of a traffic violator's license status reveals a suspended or revoked driver license and the traffic violator still has his or her license in possession, the license shall be seized by the officer. The officer shall verbally advise the traffic violator of the suspension or revocation and issue the citation. The officer will be responsible for filling out the Verbal Notice form (DMV form DL-310) and causing that form and license to be forwarded to the Department of Motor Vehicles.

## 500.5 HIGH-VISIBILITY VESTS
The Department has provided American National Standards Institute (ANSI) Class II high-visibility vests to increase the visibility of department members who may be exposed to hazards presented by passing traffic, maneuvering or operating vehicles, machinery and equipment (23 CFR 655.601; 8 CCR 1598).

Although intended primarily for use while performing traffic related assignments, high-visibility vests should be worn at any time increased visibility would improve the safety or efficiency of the member.

500.5.1 CARE AND STORAGE OF HIGH-VISIBILITY VESTS
High-visibility vests will be issued to all employees that could be exposed to incidents that would require use of the vest per Policy Manual §500.5.1. Each vest should be stored inside

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

Fontana PD Policy Manual



the re-sealable plastic bag provided to protect and maintain the vest in a serviceable condition. Before going into service each employee shall ensure a serviceable high-visibility vest is in their possession.

A supply of high-visibility vests will be maintained in the equipment room for replacement of damaged or unserviceable vests. The Training Sergeant should be promptly notified whenever the supply of vests in the equipment room needs replenishing.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001065

# Traffic Collision Reporting

## 502.1 PURPOSE AND SCOPE

The Fontana Police Department prepares traffic collision reports in compliance with the California Highway Patrol Collision Investigation Manual (CIM) and as a public service makes traffic collision reports available to the community with some exceptions.

## 502.2 RESPONSIBILITY

The Traffic Sergeant will be responsible for distribution of the Collision Investigation Manual. The Traffic Sergeant will receive all changes in the state manual and ensure conformity with this policy. The traffic sergeant may delegate responsibility for distribution of and updating the collision investigation manual.

## 502.3 TRAFFIC COLLISION REPORTING

All traffic collision reports taken by members of this department shall be forwarded to the Traffic Bureau for approval and data entry into the Records Management System.

## 502.4 REPORTING SITUATIONS

### 502.4.1 TRAFFIC COLLISIONS INVOLVING CITY VEHICLES

Traffic collision investigation reports (CHP 555) shall be taken when a City-owned vehicle is involved in a traffic collision upon a roadway or highway wherein any damage or injury results.

Whenever a traffic collision occurs involving only minor property damage and City owned property a traffic investigation report (CHP 555) is not required. whenever there is damage to a City vehicle, an Administrative Memorandum and SCAR report shall be completed by a supervisor and forwarded to the appropriate Division Commander. Photographs of the collision scene and vehicle damage shall be taken at the scene to document all property damage, injuries and the collision scene.

The responding supervisor shall be responsible for completing all necessary documentation along with a Fontana Police Department Employee Involved Traffic Collision Routing Checklist (FPD 336). These forms will then be forwarded as indicated on the routing checklist.

### 502.4.2 TRAFFIC COLLISIONS WITH POLICE DEPARTMENT EMPLOYEES

When an employee of this department, either on-duty or off-duty, is involved in a traffic collision within the jurisdiction of the Fontana Police Department resulting in a serious injury, fatality, or any injury that might cause a liabilty concern for the City a supervisor shall notify the on-call MAIT investigators and a MAIT supervisor to respond to the scene. The supervisor shall then notify the on-duty watch commander or on-call staff lieutenant, if outside normal business hours, who will approve an AOD request to contact the San Bernardino County Sheriff's Department (SBSO) Major Accident Investigation Team (M.A.I.T.) in handling the collision investigation.

The term serious injury is defined as any injury that may result in a fatality.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001066

Fontana PD Policy Manual



502.4.3 TRAFFIC COLLISIONS WITH OTHER CITY EMPLOYEES OR OFFICIALS

When any City employee or City official, either on-duty or off-duty, is involved in a traffic collision within the jurisdiction of the Fontana Police Department resulting in a serious injury, fatality, or any injury that might cause a liability concern for the City a supervisor shall notify the on-call MAIT investigators and a MAIT supervisor to respond to the scene. The MAIT supervisor shall then notify the on-duty watch commander or on-call staff lieutenant, if outside normal business hours, to determine the need, if any, to request the assistance of the San Bernardino County Sheriff's Department (SBSO) Major Accident Investigation Team (M.A.I.T.).

The term serious injury is defined as any injury that may result in a fatality.

502.4.4 TRAFFIC COLLISIONS ON PRIVATE PROPERTY

In compliance with the Collision Investigation Manual, traffic collision reports shall not be taken for traffic collisions occurring on private property, unless there is a death or injury to any person involved, a hit and run violation, or Vehicle Code violation. A collision report may be taken at the discretion of any supervisor.

502.4.5 TRAFFIC COLLISIONS ON ROADWAYS OR HIGHWAYS

Traffic collision reports shall be taken when they occur on a roadway or highway within the jurisdiction of this department under any of the following circumstances:

(a) When there is a death or injury to any persons involved in the collision

(b) When a report is requested by any involved driver

## 502.5 NOTIFICATION OF TRAFFIC BUREAU SUPERVISION

In the event of a serious injury or death related traffic collision, the Watch Commander shall notify the Traffic Sergeant or M.A.I.T. Supervisor to relate the circumstances of the traffic collision and seek assistance from the Major Accident Investigation Team as appropriate. In the absence of a Traffic Sergeant, the Watch Commander or any supervisor may assign an accident investigator or motor officer to investigate the traffic collision.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001067

# Traffic Citations

## 516.1 PURPOSE AND SCOPE

This policy outlines the responsibility for traffic citations, the procedure for dismissal, correction, and voiding of traffic citations.

## 516.2 RESPONSIBILITIES

The Traffic Sergeant shall be responsible for the development and design of all Department traffic citations in compliance with state law and the Judicial Council.

The Records Unit shall be responsible for the supply and accounting of all traffic citation books issued to employees of this department.

## 516.3 DISMISSAL OF TRAFFIC CITATIONS

Employees of this department do not have the authority to dismiss a citation once it has been issued. Only the court has the authority to dismiss a citation that has been issued (Vehicle Code § 40500(d)). Any request from a recipient to dismiss a citation shall be referred to the Traffic Sergeant. Upon a review of the circumstances involving the issuance of the traffic citation, the Traffic Sergeant may request the Field Services Division Commander to recommend dismissal of the traffic citation. If approved, the citation will be forwarded to the appropriate court with a request for dismissal. All recipients of traffic citations whose request for the dismissal of a traffic citation has been denied shall be referred to the appropriate court.

Should an officer determine during a court proceeding that a traffic citation should be dismissed in the interest of justice or where prosecution is deemed inappropriate the officer may request the court to dismiss the citation in the interest of justice. The officer must have a valid and articulable reason in order to make such a request of the court.

## 516.4 VOIDING TRAFFIC CITATIONS

Voiding a traffic citation may occur when a traffic citation has not been completed or where it is completed, but not issued. All copies of the citation shall be kept in the appropriate citation book with the word "VOID" written clearly across the citation.

## 516.5 CORRECTION OF TRAFFIC CITATIONS

When a traffic citation is issued and in need of correction, the officer issuing the citation shall be responsible for completing a Notice of Correction and Proof of Service (FPD 121) in accordance with Vehicle Code 40505. The proper copy shall be forwarded to the appropriate court. Another copy shall be attached to the corresponding citation copy in the officer's citation book. The final copy shall be mailed to the defendant.

## 516.6 DISPOSITION OF TRAFFIC CITATIONS

The court and file copies of all traffic citations issued by members of this department shall be forwarded to a supervisor for review. The citation copies shall then be filed with the Records Unit.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001079

Upon separation from employment with the this department, all employees issued traffic citations books shall return any unused citations to the Records Unit.

## 516.7 NOTICE OF PARKING VIOLATION APPEAL PROCEDURE

Disposition of notice of parking violation appeals is conducted pursuant to Vehicle Code § 40215.

### 516.7.1 APPEAL STAGES

Appeals may be pursued sequentially at three different levels:

(a) Administrative reviews are conducted by the Processing Agency who will review written/documentary data. These requests are informal written statements outlining why the notice of parking violation should be dismissed. Copies of documentation relating to the notice of parking violation and the request for dismissal must be mailed to the current mailing address of the processing agency.

(b) If the appellant wishes to pursue the matter beyond administrative review, an administrative hearing may be conducted in person or by written application, at the election of the appellant. Independent referees review the existent administrative file, amendments, and/or testimonial material provided by the appellant and may conduct further investigation or follow-up on their own.

(c) If the appellant wishes to pursue the matter beyond an administrative hearing, a Superior Court review may be presented in person by the appellant after an application for review and designated filing fees have been paid to The Superior Court of California.

### 516.7.2 TIME REQUIREMENTS

Administrative review or appearance before a hearing examiner will not be provided if the mandated time limits are not adhered to by the violator.

(a) Requests for an administrative review must be postmarked within 21 calendar days of issuance of the notice of parking violation, or within 14 calendar days of the mailing of the Notice of Delinquent Parking (Violation Vehicle Code § 40215(a)).

(b) Requests for administrative hearings must be made no later than 21 calendar days following the notification mailing of the results of the administrative review (Vehicle Code § 40215(b)).

(c) An administrative hearing shall be held within 90 calendar days following the receipt of a request for an administrative hearing, excluding time tolled pursuant to Vehicle Code § 40200 - 40225. The person requesting the hearing may request one continuance, not to exceed 21 calendar days (Vehicle Code § 40215).

(d) Registered owners of vehicles may transfer responsibility for the violation via timely affidavit of non-liability when the vehicle has been transferred, rented or under certain other circumstances (Vehicle Code § 40209 and Vehicle Code § 40210).

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001080

516.7.3 COSTS

(a) There is no cost for an administrative review.

(b) Appellants must deposit the full amount due for the citation before receiving an administrative hearing, unless the person is indigent, as defined in Vehicle Code § 40220, and provides satisfactory proof of inability to pay (Vehicle Code § 40215).

(c) An appeal through Superior Court requires prior payment of filing costs, including applicable court charges and fees. These costs will be reimbursed to the appellant in addition to any previously paid fines if appellant's liability is overruled by the Superior Court.

**516.8 JUVENILE CITATIONS**

Completion of traffic citation forms for juveniles may vary slightly from the procedure for adults. The juvenile's age, place of residency, and the type of offense should be considered before issuing the juvenile a citation.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001081

# Vehicle Maintenance

## 704.1 PURPOSE AND SCOPE

Employees are responsible for assisting in maintaining Department vehicles so that they are properly equipped, properly maintained, properly refueled and present a clean appearance.

## 704.2 DEFECTIVE VEHICLES

When a department vehicle becomes inoperative or in need of repair that affects the safety of the vehicle, that vehicle shall be removed from service for repair. Proper documentation shall be promptly completed by the employee who first becomes aware of the defective condition, describing the correction needed. The paperwork shall be promptly forwarded to vehicle maintenance for repair.

### 704.2.1 SEVERE USE

Vehicles operated under severe-use conditions, which include operations for which the vehicle is not designed or that exceed the manufacturer’s parameters, should be removed from service and subjected to a safety inspection as soon as practicable. Such conditions may include rough roadway or off-road driving, hard or extended braking, pursuits or prolonged high-speed operation.

### 704.2.2 DAMAGE OR POOR PERFORMANCE

Vehicles that may have been damaged, or perform poorly shall be removed from service for inspections and repairs as soon as practicable.

### 704.2.3 REMOVAL OF WEAPONS

All firearms, weapons and control devices shall be removed from a vehicle and properly secured in the department armory prior to the vehicle being released for maintenance, service or repair.

## 704.3 VEHICLE EQUIPMENT

Certain items shall be maintained in all department vehicles for emergency purposes and to perform routine duties.

### 704.3.1 PATROL VEHICLES

Officers shall inspect the patrol vehicle at the beginning of the shift and ensure that the following equipment, at a minimum, is present in the vehicle:

- Emergency road flares
- Fire Extinguisher
- Riot Baton
- Hand Sanitizer
- Trauma Kit
- AMBU bag

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001129

- Yellow crayon or chalk
- Crime Scene Barricade Tape
- First aid kit, CPR mask
- Blanket
- Spit Mask
- Protective gloves
- Hazardous Materials Emergency Response Handbook

### 704.4 VEHICLE REFUELING

Absent emergency conditions or supervisor approval, officers driving patrol vehicles shall not place a vehicle in service that has less than one-quarter tank of fuel. Vehicles shall only be refueled at the authorized location.

### 704.5 WASHING OF VEHICLES

All units shall be kept clean at all times and weather conditions permitting, shall be washed as necessary to enhance their appearance.

Officers in patrol shall obtain clearance from the dispatcher before responding to the car wash. Only one marked unit should be at the car wash at the same time unless otherwise approved by a supervisor.

Employees using a vehicle shall remove any trash or debris at the end of their shift. Confidential material should be placed in a designated receptacle provided for the shredding of this matter.

### 704.6 NON-SWORN EMPLOYEE USE

Non-sworn employees using marked vehicles shall ensure all weapons are removed from vehicles before going into service. Non-sworn employees shall also prominently display the "out of service" placards or lightbar covers at all times. Non-sworn employees shall not operate the emergency lights or siren of any vehicle unless expressly authorized by a supervisor.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001130

# Vehicle Use

## 706.1 PURPOSE & SCOPE

The Department utilizes city owned motor vehicles in a variety of applications operated by department personnel. In order to maintain a system of accountability and ensure City owned vehicles are used appropriately, regulations relating to the use of these vehicles have been established. The term "City owned" as used in this section also refers to any vehicle leased or rented by the City.

## 706.2 AUTHORIZED USE OF VEHICLES

Employees shall not take department vehicles home after their tour of duty or other assignment (such as training) is finished except as authorized by the Chief of Police or his/her designee.

The Chief of Police may restrict an employee, listed in Section 706.3 of this General Order, from taking a vehicle home if it is determined that the needs of the department will not be served. Considerations for such a restriction may include, but is not limited to: excessive mileage, liability concerns, and/or the changing needs of the department. Such decisions will be made on a case-by-case basis.

In those cases where an employee has received authorization to drive a department vehicle home, the vehicle shall be used for official purposes only. All other General Orders pertaining to use and operation of department vehicles and equipment shall remain in full force and effect while said vehicle is in the control of the authorized employee.

### 706.2.1 SHIFT ASSIGNED VEHICLES

Personnel assigned to routine scheduled field duties shall log onto the in-car computer inputting the required information when going on duty. If the vehicle is not equipped with a working in-car computer, they shall notify the Dispatch Center for entry of the vehicle number on the shift roster. If the employee exchanges vehicles during the shift, the new vehicle number shall be entered.

Employees shall be responsible for inspecting the interior and exterior of any assigned vehicle before taking the vehicle into service and at the conclusion of their shift. Any previously unreported damage, mechanical problems, unauthorized contents or other problems with the vehicle shall be promptly reported to a supervisor and documented as appropriate.

### 706.2.2 UNSCHEDULED USE OF VEHICLES

Personnel utilizing a vehicle for any purpose other than their normally assigned duties shall first notify the Watch Commander of the reasons for use. This section does not apply to personnel permanently assigned an individual vehicle (e.g., command staff, detectives), or to Property and Evidence Unit personnel assigned transportation duties to and from the maintenance yard, etc.

### 706.2.3 UNDERCOVER VEHICLES

Unmarked units, if not assigned to an individual employee, shall not be used without first obtaining approval from the respective unit supervisor.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001131

706.2.4 DETECTIVE BUREAU VEHICLES
Investigation Division vehicle use is restricted to detective personnel Monday through Friday from 7:00 AM to 5:00 PM unless approved by a detective supervisor. After hour use of Investigation vehicles by personnel not assigned to Investigations shall be recorded with the Watch Commander on the shift roster.

706.2.5 AUTHORIZED PASSENGERS
Personnel operating department owned vehicles shall not permit persons other than City employees or persons required to be conveyed in the performance of duty or as otherwise authorized to ride as a passenger in their vehicle.

706.2.6 PARKING
City owned vehicles should be parked in their assigned stalls. Employees shall not park privately owned vehicles in any stall assigned to a City owned vehicle or in other areas of the parking lot not designated as a parking space unless authorized by a supervisor. Privately owned motorcycles shall be parked in designated areas.

706.2.7 INSPECTIONS
The interior of any vehicle that has been used to transport any person other than an employee should be inspected prior to placing another person in the vehicle and again after the person is removed. This is to ensure that unauthorized items have not been left in the vehicle.

**706.3 EMPLOYEES AUTHORIZED TO TAKE DEPARTMENT VEHICLES HOME**
The following personnel are authorized to drive department vehicles home at the end of their assigned shift or other assignments:

- Chief of Police and Deputy Chief, subject to the guidelines set by City Council, City Administration, or contract
- Captains-Subject to contractual guidelines
- Lieutenants-Subject to contractual guidelines
- Canine officers
- Emergency Services Coordinator
- Sworn members of the Investigation's Unit
- Narcotic Unit Personnel
- Motor Officers (includes Unit Supervisors)
- Others, as determined by the Chief of Police

706.3.1 VEHICLES SUBJECT TO INSPECTION
All City owned vehicles are subject to inspection and or search at any time by a supervisor and no employee assigned to or operating such vehicle shall be entitled to any expectation of privacy with respect to the vehicle or its contents.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001132

### 706.4 GUIDELINES FOR VEHICLES DRIVEN HOME

(a) Vehicles shall be parked off the street, on the property at which the employee resides. They shall be legally parked, in a manner consistent with the zoning codes and other statutes applicable in the jurisdiction in which the vehicle is parked. It is not required that the vehicle be garaged, unless required by that local jurisdiction.

(b) Motors shall be parked in a secured enclosed garage or other similar structure.

(c) Motor Officers are not restricted from taking home their assigned motors, however, during inclement weather they will be restricted from traveling through the Cajon Pass (defined as any portion of Interstate 15, north of the Kenwood off-ramp). Inclement weather can be defined as high winds, rain, ice, snow or any combination thereof. If inclement weather develops after a motor is secured at an officer's residence then an alternative mode of transportation should be utilized to return to work.

(d) Employees involved in any police action while in transit with the vehicle shall report their involvement to dispatch as soon as possible, and to the Watch Commander as soon as practical. But in no case later than 24 hours after the incident.

(e) Employees whose route of transit takes them outside of the department's radio frequencies shall take all necessary steps to insure, as much as possible, that they are able to contact a law enforcement agency by radio from any point in their transit route.

(f) Employees shall immediately report any damage to their vehicle or any complaints by neighbors residing near their home. Employees shall report these facts directly to their division commander.

(g) When on leave for a week or longer, employees who are assigned a take home vehicle shall leave their vehicle at the station.

(h) Employees assigned a take home vehicle may participate in the City's Ride Share Program.

(i) Employees assigned a take home vehicle may make incidental stops on their way to and from work. These stops may include, but are not limited to, stopping at a store, dropping off or picking up a child at school or school attendance during a time period that immediately proceeds or follows the employee's work schedule.

(j) If department needs require the use of unmarked vehicles for a police operation the cars assigned to unit members in Investigations may be utilized for the duration of the operation. This will, therefore, impact the member's ability to take their unit home. Advanced notice will be provided if this should occur. This provision does not apply to Investigations Unit personnel who are on call.

#### 706.4.1 KEYS

All uniformed field personnel approved to operate marked patrol vehicles shall be issued their own personal unit key as part of their initial equipment distribution upon hiring. Personnel assigned a

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001133

permanent vehicle shall be issued keys for their respective vehicle. The loss of any assigned key shall be promptly reported in writing through the employee's chain of command.

## 706.5 ENFORCEMENT ACTIONS

When driving an assigned vehicle to and from work outside of the jurisdiction of the Fontana Police Department, an officer shall not become involved in enforcement actions except in those circumstances where a potential threat to life or serious property damage exists.

Officers driving marked vehicles shall be armed at all times.

Officers may render public assistance, e.g. to a stranded motorist, when deemed prudent.

## 706.6 MAINTENANCE

(a) Each employee is responsible for the cleanliness (exterior and interior) and overall maintenance of their assigned vehicle.

(b) Employees shall make daily inspections of their assigned vehicle for service/ maintenance requirements and damage.

(c) Supervisors shall make, at a minimum, monthly inspections of vehicles assigned to employees under their command to ensure the vehicles are being maintained in accordance with policy.

(d) Routine maintenance and oil changes shall be done in accordance with the maintenance schedule. The vehicles will normally be serviced at the City maintenance shop.

    1. Employees should contact the vehicle maintenance coordinator to schedule routine as well as unscheduled maintenance of the vehicle.

### 706.6.1 ACCESSORIES AND/OR MODIFICATIONS

No modifications, additions or deletions of any equipment or accessories shall be made to the vehicle without written permission from their Division Commander.

## 706.7 COLLISION DAMAGE, ABUSE AND MISUSE

When a City-owned or leased vehicle is involved in a traffic collision, the involved employee shall promptly notify a supervisor. A traffic collision report shall be filed with the agency having jurisdiction.

When a collision involves a department vehicle or when a member of this department is an involved driver in a collision that occurs in this jurisdiction, and the collision results in serious injury or death, the California Highway Patrol should be summoned to handle the investigation.

Collisions involving a private passenger vehicle operated by an employee, when the vehicle use is at the request or direction of a supervisor and is in the performance of the employee's duties, shall be a liability of the Fontana Police Department, not the vehicle owner. Consideration should be given to an outside agency handling the collision investigation report (Insurance Code § 488.5).

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001134

Fontana PD Policy Manual

*Vehicle Use*

The employee involved in the collision shall complete the City's vehicle collision form. If the employee is incapable, the supervisor shall complete the form.

Any damage to a vehicle that was not caused by a traffic collision shall be immediately reported during the shift in which the damage was discovered, documented in memorandum format and forwarded to the shift sergeant.

An administrative investigation will be conducted to determine if there is any vehicle abuse or misuse. If it is determined that misuse or abuse was a result of negligent conduct or operation, appropriate disciplinary action may result.

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001135

# Attachments

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001345

# COUNTY PURSUIT MOU.pdf

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001346

# SAN BERNARDINO COUNTY
# MEMORANDUM OF UNDERSTANDING
# for
# INTER-AGENCY VEHICLE PURSUITS

## I. PURPOSE

This memorandum of understanding is intended to facilitate the effective management of multiple jurisdictional vehicle pursuits.

## II. OBJECTIVES

To reduce the danger of pursuits while still reasonably assuring that fleeing suspects are apprehended.

## III. AGREEMENT

### A. Initiating, Continuing, Supervising and Terminating Pursuits

1. Pursuits should be initiated, continued, supervised or terminated in accordance with individual agency policies.

### B. Pursuits into Allied Agency Jurisdictions

1. When a pursuit extends into an allied agency's jurisdiction, the pursuing agency's supervisor-in-charge should ensure that the allied agency is notified and determine if the other agency should be requested to become involved in, or assume supervision of, the pursuit. The following should be considered:

   a. The type or extent of assistance required;
   b. The pursuing agency's policy regarding pursuits into other jurisdictions.

2. When the allied agency becomes involved in a pursuit, the allied agency should clearly communicate that it is becoming involved in the pursuit, and it should clearly communicate the extent to which it has become involved in the pursuit. This information should be communicated to the units who have been involved in the pursuit, as well as their supervisor.

   a. Units from the agency relinquishing the pursuit will terminate their active involvement when:

1. They are required to do so by their agency's policy; or

2. Sufficient units from the assuming agency join the pursuit; or

3. They are requested to do so by the agency assuming the pursuit.

b. It is recognized that allied agency personnel may be assigned to a pursuit-related activity that does not involve becoming directly involved in the pursuit itself. Examples may be the controlling of an intersection while a pursuit passes through or the blocking of freeway on-ramps or exits. These are limited assignments generally undertaken for the protection of innocent persons and are not intended to authorize personnel to become further involved in pursuit-related activities. Once such a limited assignment has been performed, the involvement of the personnel performing that assignment is terminated unless there is an emergency situation requiring further action.

C. **Responsibilities of Initiating Agency After Relinquishing Pursuit**

1. The officer initiating the pursuit should, if practical, proceed to the termination point at a reduced and legal speed so as to provide information which may be required for the arrest.

2. The agency having or witnessing the most serious crime should take or retain custody of the violator and coordinate all prosecution.

3. Once transfer of pursuit activities or supervision has occurred, the previous agency should not re-enter a pursuit unless a request to do so has been made by the agency then-in-charge, or an emergency condition so dictates.

D. **Joining Pursuits by Allied Agencies**

1. The mere notification by another agency of a pursuit in-progress shall not be construed as a request to assist in the pursuit.

2. Units of allied agencies should not join a pursuit unless specifically requested by the agency whose officers are in pursuit and they have been assigned to become involved by their own

supervisor. However, this does not necessarily mean that supervision of the pursuit itself has been shifted. There should be a separately communicated request and acceptance to transfer supervision of the pursuit itself.

3. Requests for assistance should be reviewed and approved by a supervising officer from the agency from whom assistance is sought, if available. The decision to assist will be made in accordance with that agency's own pursuit policy.

E. Supervisory Responsibilities

1. When it is likely that a pursuit will cross jurisdictional boundaries, the supervisor-in-charge of the pursuit should ensure that notification is made to the appropriate allied agency.

2. A supervisor from the agency who is in charge of the pursuit when it terminates should proceed to the termination point, if at all practical, to provide supervision and on-the-scene coordination with allied agency personnel who may be present.

3. A supervisor or officer from the agency in whose jurisdiction the pursuit originates should proceed to the termination point, if at all practical.

4. The supervisor from the agency in charge of the pursuit when it terminates should determine each agency's responsibility for transporting, booking, and prosecution of the suspect in accordance with this memorandum of understanding. The supervisor should attempt to obtain relevant information from appropriate personnel from allied agencies.

F. Communications During a Pursuit

1. Communications personnel from the agency initiating a pursuit should notify allied agencies of any pursuit which appears likely to enter other jurisdictions and should specify if assistance is or is not requested by the pursuing units and/or supervisor.

2. Radio Channels

a. At the beginning of a multi-jurisdictional pursuit, the initiating agency's communications personnel should notify the San Bernardino County Sheriff's Department (SBSD) communications center of the pursuit and request

that they assume communications responsibility for the pursuit once it leaves the initiating agency's jurisdiction.

b. Once SBSD communications personnel have assumed radio responsibility for the pursuit, they should maintain such responsibility until the end of the pursuit, regardless of whether the pursued vehicle re-enters the initiating agency's jurisdiction or another jurisdiction.

c. Whenever a pursuit becomes a multi-jurisdictional pursuit, the officers involved in the pursuit should switch to one of the county-wide pursuit channels listed in the below table:

| Area of Coverage | Old Talk Group | New Talk Group |
|---|---|---|
| Victor Valley | 1-ATAC-1 | 1CHASE |
| Barstow | 2-ATAC-1 | 2CHASE |
| Lucerne Valley (mid-desert) | 3-ATAC-1 | 3CHASE |
| Morongo Basin | 4-ATAC-1 | 4CHASE |
| Colorado River | 5-ATAC-1 | 5CHASE |
| West Valley (Fontana west) | 6-ATAC-1 | 6CHASE |
| East Valley (Rialto east) | 7-ATAC-1 | 7CHASE |
| Colton | 8-ATAC-1 | 8CHASE |
| Mountains | 8-ATAC-1 | 8CHASE |

ATAC-2 (1-8) have been designated as secondary pursuit talk groups and will be used for multiple pursuits occurring simultaneously.

d. Should additional mutual aid frequencies be required, the SBSD's Valley Control Center Supervisor or the San Bernardino County 800 Project Coordinator may designate an alternative pursuit frequency.

e. It is recognized that, in most areas of the County, the California Highway Patrol (CHP) will not have the ability to switch to the frequencies set forth in this subsection. Therefore, communications will necessarily have to take place and be coordinated by the communications centers who are involved in pursuit activities. Supervisors and officers involved in pursuit activities should recognize that this may create a delay in communications.

f. If SBSD communications personnel are unable to assume dispatch responsibilities for the pursuit, the initiating agency's dispatch personnel should maintain control of the pursuit until its conclusion.

g. Should a pursuit leave the Valley broadcast area and enter the "High Desert" (i.e. Victorville, Apple Valley, etc.), SBSD valley Communications should coordinate radio responsibilities with SBSD High Desert Communications personnel. The opposite will occur when a pursuit leaves the "High Desert" and enters the "Valley" area.

h. In the event of radio failures, radios should be switched to "CLEMARS DIRECT." This will ensure inter-agency and car-to-car communications.

i. Officers involved in multi-jurisdictional pursuits should attempt to use "clear text" in their radio transmissions, as opposed to agency-specific codes or jargon, to avoid miscommunications between officers, supervisors, and communications personnel from different agencies.

G. Use of Law Enforcement Aircraft

1. When available, a helicopter or fixed wing airplane should be used to minimize the hazards inherent in pursuits. The aircraft should assist pursuing ground units by advising of the pursued vehicle's direction of travel, potential traffic hazards, possible cut-off routes, and/or other logistical information. It is recognized that some agencies have policies governing the use of aircraft in pursuits, and it is anticipated that such aircraft will act in accordance with its own governing policy.

2. Sole coordination and/or supervision of the pursuit should not be relinquished to aircraft personnel unless the primary pursuit unit, or a supervisor, directs that this action be taken. In these instances, the decision to do so should be made with section IIIG3 of this policy in mind.

3. Aircraft assisting in a pursuit cannot be designated as the "primary pursuit vehicle" because it is not defined as a "vehicle" under the California Vehicle Code. Therefore, the exemptions outlined under CVC 17004.7(c) (4) may not apply if the aircraft were designated as the "primary unit."

H. **Pursuit Termination Tactics**

1. It is recognized that agencies may have different definitions for tactics that may be used to terminate a pursuit. It is also recognized that not all agency policies will authorize all such tactics.

2. Use of Pursuit Termination Tactics in Multi-jurisdictional Pursuits

   a. When officers from the agency-in-charge of the pursuit intend to employ pursuit termination tactics as defined by that agency's policies, in a multi-jurisdictional pursuit, they should inform the other then-involved agencies of their intentions to do so. When communicating such an intent, it is best to indicate what tactic will be used, as well as when, where, how and who will use the tactic.

I. **Duties and Responsibilities at the Conclusion of a Pursuit**

1. When the pursued suspect vehicle stops, or is stopped, officers should attempt to utilize accepted "high risk vehicle stop" procedures in taking the suspect into custody. When officers from different agencies are involved in the arrest, they should make every effort to communicate their intentions to each other during the stop in order to avoid placing themselves in unsafe positions.

2. At the conclusion of the pursuit, the supervisor-in-charge should proceed to its termination point to provide guidance and supervision consistent with that agency's policies.

3. Officers involved in a pursuit that terminates in another jurisdiction should remain at the scene until released by the on-scene supervisor from the agency in charge of the pursuit when it terminates.

J. **Post-Pursuit Procedures**

1. At the conclusion of a multi-jurisdictional pursuit, the supervisor-in-charge of the pursuit at the time of termination should attempt to organize an assessment of the pursuit, in cooperation with the supervisor(s)-in-charge of the pursuit from the other involved agencies. This assessment should include an evaluation of the following factors:

Case 5:25-cv-00207-JGB-ACCV Document 40-1 Filed 09/15/26 Page 587 of 599
Page ID #:1816

a. Adherence to the *San Bernardino County Memorandum of Understanding for Inter-Agency Vehicle Pursuits;*
b. Employment of sound tactics;
c. Identification of training needs; and
d. Modifications and/or changes to the *Memorandum of Understanding for Inter-Agency Vehicle Pursuits.*

2. Multi-jurisdictional pursuit assessments should only address the need for amendments or changes to the "memorandum of understanding for inter-agency vehicle pursuits" and should not serve as a basis to critique the judgments and/or actions of personnel from another agency or the policy(ies) of another agency.

3. To avoid jeopardizing prosecution of pursuit-related crimes, there should be an agreement between supervisors from the involved agencies on which agency shall handle media advisals and/or inquiries and the nature and extent of the information to be released.

K. **Freeway Pursuits**

1. Whenever a pursuit enters onto one of the freeways located within the County, and it appears that the suspect is likely to remain on the freeway for an extended period of time, the agency then-in-charge of the pursuit may request the assistance of the California Highway Patrol (CHP) in assuming control of the pursuit. When CHP units assume control of the pursuit, the local agency then-in-charge of the pursuit shall relinquish control to the CHP.

## IV. Deviation from Departmental Policy

In those instances where a conflict arises between a department's pursuit policy and the memorandum of understanding for vehicle pursuits, the department's policy will take precedence.

## V. Review of the County-wide Memorandum of Understanding

The standing committee on the inter-agency pursuit MOU of the *San Bernardino County Law Enforcement Administrators' Association* shall periodically review the MOU and make recommendations concerning updating or changes as necessary to association members. This memorandum of understanding shall be reviewed at least once annually.

Signed and placed into effect on October 9, 1997 by the following San Bernardino County Law Enforcement Agency Representatives:

Marshall Keith Bushey
San Bernardino County Marshall's Department

Chief Lee Dean
San Bernardino Police

Chief Roland Dell
California Highway Patrol

Chief Guy Eisenbrey
Montclair Police Department

Chief Dee Hawes
Barstow Police Department

Chief Jim Kuntz
Adelanto Police Department

Chief Bernie Lunsford
Colton Police Department

Acting Chief Thomas Mathison
Chino Police Department

Chief Lewis Nelson
Redlands Police Department

Sheriff Gary Penrod
San Bernardino County Sheriff's Department

Chief Lloyd Scharf
Ontario Police Department

Chief Samuel Scott
Fontana Police Department

Signed and placed into effect on October 9, 1997 by the following
San Bernardino County Law Enforcement Agency Representatives (cont):

Chief Lowell Stark
Rialto Police Department

District Attorney Dennis Stout
San Bernardino County District
Attorney's Office

Chief Martin Thouvenell

Upland Police Department

Chief Probation Officer
Ray Wingerd
San Bernardino County
Probation Department

# Statutes and Legal Requirements.pdf

Copyright Lexipol, LLC 2024/01/02, All Rights Reserved.
Published with permission by Fontana Police Department

## Statutes and Legal Requirements

Items listed in this section include sections from the California Penal Code (CPC), Welfare and Institutions Code (WI) and Government Code (GC).

### *Definitions*

**CPC 422.55** - Provides general definition of hate crimes in California.

**CPC 422.56**- Provides definitions of terms included in hate crimes statutes.

**GC 12926**- Disability-related definitions applicable to some hate crime statutes.

## Felonies

### *Hate Crimes*

**CPC 422.7** - Commission of a crime for the purpose of interfering with another's exercise of civil rights.

### *Related Crimes*

**CPC 190.2(a)(16)** - Homicide penalties related to certain hate crime related acts.

**CPC 190.03(a)** - Homicide penalties related to certain hate crime related acts.

**CPC 288(b)(2)** - Sexual assault of dependent person by caretaker

**CPC 368(b)** - Dependent adult abuse generally - may apply as disability-related hate crime.

CPC 594.3 - Vandalism of places of worship.

**CPC 11412** - Causing or attempting to cause other to refrain from exercising religion by threat.

**CPC 11413** - Arson or destructive device at place of worship.

## Misdemeanors

### *Hate Crimes*

**CPC 422.6** - Use of force, threats, or destruction of property to interfere with another's exercise of civil rights.

**CPC 422.77** - Violation of civil order (Bane Act) protecting the exercise of civil rights

### *Related Crimes*

**CPC 302** - Disorderly conduct during an assemblage of people gathered for religious worship at a tax-exempt place of worship.

**CPC 538(c)** - Unauthorized insertion of advertisements in newspapers and redistribution to the public.

**CPC 640.2** - Placing handbill, notice of advertisement on a consumer product or product packaged without authorization.

**CPC 11411** - Terrorism of owner or occupant of real property. Placement or display of sign, symbol, or other physical impression without authorization, engagement in pattern of conduct, or burning or desecration of religious symbols.



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001425

## Enhancements

**CPC 190.2(a)(16)** - Special circumstances imposing the Death Penalty or Life Without Possibility of Parole, if the victim was intentionally killed because of sexual orientation, gender, or disability.

**CPC 190.3** - Special circumstances imposing LWOP if the victim was intentionally killed because of sexual orientation, gender, or disability.

**CPC 422.75** - Penalty for felony committed because of victim's race, color, religion, nationality, country or origin, ancestry, disability, or sexual orientation shall be enhanced one, two, or three years in prison, if the person acts alone; and two, three, or four years if the person commits the act with another.

**CPC 1170.8** - Enhancement for robbery or assault at a place of worship.

**CPC 1170.85(b)** - Felony assault or battery enhancement due to age or disability.

## Reporting

**CPC 13023**- Requirement for law enforcement agencies to report hate crime data to DOJ.

**WI 15630 –** Elder and Dependent Adult Abuse Mandated Reporting (may apply in disability-related hate crimes).

## Training and Policy Requirements

**CPC 422.87** - Hate crimes policy adoption and update requirements (AB 1985, Effective January 1, 2019).

**CPC 13519.6** - Defines hate crime training requirements for peace officers.

**CPC 13519.41** - Training requirements on sexual orientation and gender identity-related hate crimes for peace officers and dispatchers (AB 2504, Effective January 1, 2019).

## Miscellaneous Provisions

**CPC 422.78** - Responsibility for prosecution of stay away order violations.

**CPC 422.86** - Public policy regarding hate crimes.

**CPC 422.89** - Legislative intent regarding violations of civil rights and hate crimes

**CPC 422.92** - Hate crimes victims brochure requirement for law enforcement agencies.

**CPC 422.93** - Protection of victims and witnesses from being reported to immigration authorities.

**GC 6254** - Victim confidentiality.



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001426

# Vehicle Pursuits

## 314.1 PURPOSE AND SCOPE
This policy provides guidelines for vehicle pursuits in order to protect the safety of involved officers, the public, and fleeing suspects.

### 314.1.1 DEFINITIONS
**Blocking** - A low-speed tactic where one or more authorized police department emergency vehicles intentionally restrict the movement of a suspect vehicle, with the goal of containment or preventing a pursuit. Blocking is not boxing in or a roadblock.

**Boxing-in** - A tactic designed to stop a suspect's moving vehicle by surrounding it with law enforcement vehicles and then slowing all vehicles to a stop.

**Pursuit Intervention** - An attempt to stop the suspect's ability to continue to flee in a vehicle through tactical application of technology, tire deflation devices, blocking or vehicle intercept, boxing-in, the PIT (known as Pursuit Intervention Technique or Precision Immobilization Technique), ramming, or roadblock procedures.

**Pursuit Intervention Technique (PIT)** - A low-speed tactic intentionally applied to cause the suspect vehicle to spin out and terminate the pursuit.

**Ramming** - The deliberate act of impacting a suspect's vehicle with another vehicle to functionally damage or otherwise force the suspect's vehicle to stop.

**Roadblocks** - A tactic designed to stop a suspect's vehicle by intentionally placing an emergency vehicle or other immovable object in the path of the suspect's vehicle.

**Tire deflation device** - A device that extends across the roadway designed to puncture the tires of the pursued vehicle, sometimes referred to as spike strips.

**Terminate** - To discontinue a pursuit or stop chasing fleeing vehicles.

**Trail** - Following the path of the pursuit at a safe speed while obeying all traffic laws and without activating emergency equipment. If the pursuit is at a slow rate of speed, the trailing vehicle will maintain sufficient distance from the pursuit vehicles so as to clearly indicate an absence of participation in the pursuit

**Vehicle Pursuit** - An event involving one or more law enforcement officers attempting to apprehend a suspect, who is attempting to avoid arrest while operating a motor vehicle by using high-speed driving or other evasive tactics, such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop.

## 314.2 OFFICER RESPONSIBILITIES
Vehicle pursuits shall only be conducted using authorized police department emergency vehicles that are equipped with and displaying emergency lighting and sirens as required by Vehicle Code

Copyright Lexipol, LLC 2023/07/19, All Rights Reserved.
Published with permission by Fontana Police Department

§ 21055. Officers are responsible for continuously driving with due regard and caution for the safety of all persons and property (Vehicle Code § 21056).

### 314.2.1 WHEN TO INITIATE A PURSUIT

Officers are authorized to initiate a pursuit when the officer reasonably believes that a suspect, who has been given appropriate signal to stop by a law enforcement officer, is attempting to evade arrest or detention by fleeing in a vehicle.

Factors that should be considered in deciding whether to initiate a pursuit include:

(a) The seriousness of the known or reasonably suspected crime and its relationship to community safety.

(b) The importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to officers, innocent motorists, and others.

(c) The safety of the public in the area of the pursuit, including the type of area, time of day, the amount of vehicular and pedestrian traffic (e.g., school zones), and the speed of the pursuit relative to these factors.

(d) The pursuing officers familiarity with the area of the pursuit, the quality of radio communications between the pursuing units and the dispatcher, and the driving capabilities of the pursuing officers under the conditions of the pursuit.

(e) Whether weather, traffic, and road conditions unreasonably increase the danger of the pursuit when weighed against the risk of the suspect's escape.

(f) Whether the identity of the suspect has been verified and whether there is comparatively minimal risk in allowing the suspect to be apprehended at a later time.

(g) The performance capabilities of the vehicles used in the pursuit in relation to the speeds and other conditions of the pursuit.

(h) Emergency lighting and siren limitations on unmarked police department vehicles that may reduce visibility of the vehicle, such as visor or dash-mounted lights, concealable or temporary emergency lighting equipment, and concealed or obstructed siren positioning.

(i) Suspect and officer vehicle speeds.

(j) Other persons in or on the pursued vehicle (e.g., passengers, co-offenders, hostages).

(k) Availability of other resources such as air support or vehicle locator or deactivation technology.

### 314.2.2 WHEN TO TERMINATE A PURSUIT

Pursuits should be terminated whenever the totality of objective circumstances known or which reasonably ought to be known to the officer or supervisor during the pursuit indicates that the present risks of continuing the pursuit reasonably appear to outweigh the risks resulting from the suspect's escape.

Copyright Lexipol, LLC 2023/07/19, All Rights Reserved.
Published with permission by Fontana Police Department

The factors listed in this policy on when to initiate a pursuit will apply equally to the decision to terminate a pursuit. Officers and supervisors must objectively and continuously weigh the seriousness of the offense against the potential danger to innocent motorists, themselves, and the public when electing to continue a pursuit.

In addition to the factors that govern when to initiate a pursuit, other factors should be considered in deciding whether to terminate a pursuit, including:

(a) The distance between the pursuing vehicle and the fleeing vehicle is so great that further pursuit would be futile or require the pursuit to continue for an unreasonable time and/or distance.

(b) The pursued vehicle's location is no longer definitely known.

(c) The pursuing vehicle sustains damage or a mechanical failure that renders it unsafe to drive.

(d) The pursuing vehicle's emergency lighting equipment or siren becomes partially or completely inoperable.

(e) Hazards to uninvolved bystanders or motorists.

(f) The danger that the continued pursuit poses to the public, the officers, or the suspect, balanced against the risk of allowing the suspect to remain at large.

(g) The identity of the suspect is known and it does not reasonably appear that the need for immediate capture outweighs the risks associated with continuing the pursuit.

(h) Extended pursuits of violators for misdemeanors not involving violence, risk of serious harm, or weapons (independent of the pursuit) are generally discouraged.

### 314.2.3 SPEED LIMITS

The speed of a pursuit is a factor that should be evaluated on a continuing basis by the officer and supervisor. Evaluation of vehicle speeds should take into consideration public safety, officer safety, and the safety of the occupants of the fleeing vehicle.

Should high vehicle speeds be reached during a pursuit, officers and supervisors should also consider these factors when determining the reasonableness of the speed of the pursuit:

(a) Pursuit speeds have become unreasonably unsafe for the surrounding conditions.

(b) Pursuit speeds have exceeded the driving ability of the officer.

(c) Pursuit speeds are beyond the capabilities of the pursuit vehicle thus making its operation unsafe.

## 314.3 PURSUIT UNITS

When involved in a pursuit, unmarked police department emergency vehicles should be replaced by marked emergency vehicles whenever practicable.

Vehicle pursuits should be limited to three vehicles (two units and a supervisor); however, the number of units involved may vary with the circumstances.

Copyright Lexipol, LLC 2023/07/19, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001515

An officer or supervisor may request additional units to join a pursuit if, after assessing the factors outlined above, it reasonably appears that the number of officers involved may be insufficient to safely arrest the suspects. All other officers should stay out of the pursuit, but should remain alert to its progress and location. Any officer who drops out of a pursuit may then, if necessary, proceed to the termination point at legal speeds, following the appropriate rules of the road.

### 314.3.1 MOTORCYCLE OFFICERS

When involved in a pursuit, police department motorcycles should be replaced by marked four-wheel emergency vehicles as soon as practicable.

### 314.3.2 UNMARKED POLICE VEHICLES

Unmarked police vehicles, with emergency equipment, are generally prohibited from initiating or joining in any pursuit. Officers in such vehicles, however, may become involved in emergency activities involving known or suspected felony crimes. Those officers should terminate their involvement in any pursuit immediately upon arrival of a sufficient number of marked police emergency vehicles or any helicopter. The exemptions provided by Vehicle Code § 21055 do not apply to officers using vehicles without emergency equipment. Any unmarked police vehicles without emergency equipment shall not be involved in any pursuits.

### 314.3.3 PRIMARY UNIT RESPONSIBILITIES

The initial pursuing unit will be designated as the primary pursuit unit and will be responsible for the conduct of the pursuit unless the officer is unable to remain reasonably close to the suspect's vehicle. The primary responsibility of the officer initiating the pursuit is the apprehension of the suspects without unreasonable danger to any person.

The primary unit should notify the dispatcher commencing with a request for priority radio traffic, that a vehicle pursuit has been initiated, and as soon as practicable provide information including but not limited to:

(a) The location, direction of travel, and estimated speed of the suspect's vehicle.

(b) The description of the suspect's vehicle including license plate number, if known.

(c) The reason for the pursuit.

(d) Known or suspected weapons. Threat of force, violence, injuries, hostages, or other unusual hazards.

(e) The suspected number of occupants and identity or description.

(f) The weather, road, and traffic conditions.

(g) The need for any additional resources or equipment.

(h) The identity of other law enforcement agencies involved in the pursuit.

Until relieved by a supervisor or secondary unit, the officer in the primary unit is responsible for the broadcasting of the progress of the pursuit. Unless circumstances reasonably indicate otherwise, the primary pursuing officer should, as soon as practicable, relinquish the responsibility of broadcasting the progress of the pursuit to a secondary unit or air support joining the pursuit

Copyright Lexipol, LLC 2023/07/19, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001516

to minimize distractions and allow the primary pursuing officer to concentrate foremost on safe pursuit tactics.

### 314.3.4 SECONDARY UNIT RESPONSIBILITIES

The second officer in the pursuit will be designated as the secondary unit and is responsible for:

(a) Immediately notifying the dispatcher of entry into the pursuit.

(b) Remaining a safe distance behind the primary unit unless directed to assume the role of primary pursuit vehicle or if the primary pursuit vehicle is unable to continue the pursuit.

(c) Broadcasting the progress, updating known or critical information, and providing changes in the pursuit, unless the situation indicates otherwise.

(d) Identifying the need for additional resources or equipment as appropriate.

(e) Serving as backup to the primary pursuing officer once the suspect has been stopped.

### 314.3.5 PURSUIT DRIVING

The decision to use specific driving tactics requires the same assessment of the factors the officer considered when determining whether to initiate and/or terminate a pursuit. The following are tactics for units involved in the pursuit:

(a) Officers, considering their driving skills and vehicle performance capabilities, will space themselves from other involved vehicles such that they are able to see and avoid hazards or react safely to maneuvers by the fleeing vehicle.

(b) Because intersections can present increased risks, the following tactics should be considered:

1. Available units not directly involved in the pursuit may proceed safely to controlled intersections ahead of the pursuit in an effort to warn cross traffic.

2. Pursuing units should exercise due regard and caution when proceeding through controlled intersections.

(c) As a general rule, officers should not pursue a vehicle driving left of center (wrong way) against traffic. In the event that the pursued vehicle does so, the following tactics should be considered:

1. Requesting assistance from available air support.

2. Maintain visual contact with the pursued vehicle by paralleling it on the correct side of the roadway.

3. Request other units to observe exits available to the suspects.

(d) Notify the California Highway Patrol (CHP) and/or other law enforcement agency if it appears that the pursuit may enter its jurisdiction.

(e) Officers involved in a pursuit should not attempt to pass other units unless the situation indicates otherwise or they are requested to do so by the primary unit and with a clear understanding of the maneuver process between the involved units.

Copyright Lexipol, LLC 2023/07/19, All Rights Reserved.
Published with permission by Fontana Police Department



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001517

### 314.3.6 PURSUIT TRAILING

In the event the initiating unit from this agency either relinquishes control of the pursuit to another unit or jurisdiction, that initiating unit may, with permission of a supervisor, trail the pursuit to the termination point in order to provide necessary information and assistance for the arrest of the suspects.

The term trail means to follow the path of the pursuit at a safe speed while obeying all traffic laws and without activating emergency equipment. If the pursuit is at a slow rate of speed, the trailing unit will maintain sufficient distance from the pursuit units so as to clearly indicate an absence of participation in the pursuit.

### 314.3.7 AIR SUPPORT ASSISTANCE

When available, air support assistance should be requested. Once the air unit has established visual contact with the pursued vehicle, the unit should assume control over the pursuit. The primary and secondary ground units, or involved supervisor, will maintain operational control but should consider whether the participation of air support warrants the continued close proximity and/or involvement of ground units in the pursuit.

The air unit should coordinate the activities of resources on the ground, report progress of the pursuit and provide officers and supervisors with details of upcoming traffic congestion, road hazards, or other pertinent information to evaluate whether to continue the pursuit. If ground units are not within visual contact of the pursued vehicle and the air support unit determines that it is unsafe to continue the pursuit, the air support unit should recommend terminating the pursuit.

### 314.3.8 UNITS NOT INVOLVED IN THE PURSUIT

There should be no paralleling of the pursuit route. Officers are authorized to use emergency equipment at intersections along the pursuit path to clear intersections of vehicular and pedestrian traffic to protect the public. Officers should remain in their assigned area and should not become involved with the pursuit unless directed otherwise by a supervisor.

The primary and secondary units should be the only units operating under emergency conditions (red light and siren) unless other units are assigned to the pursuit.

### 314.3.9 OPTIONAL PURSUIT MODES

The following modes are intended to enhance safety to the public and officers involved in a vehicle pursuit by encouraging a fleeing suspect to operate his/her vehicle in a safe manner and/or self-terminate the pursuit. Exigent circumstances may preclude the use of these tactics.

(a) Tracking Mode- When an air unit is participating in a vehicle pursuit, a supervisor can authorize a transition to tracking mode. While in tracking mode, the air unit will continue to broadcast the pursuit and may gain altitude and divert or discontinue the use of the spot light.

(1) Ground units should disengage from direct pursuit of the suspect and attempt to remain out of sight of the suspect, but maintain close proximity to the suspect's vehicle if safe to do so. Ground units can continue code three operation pursuant to CVC 21055/21056. If the use

Copyright Lexipol, LLC 2023/07/19, All Rights Reserved.
Published with permission by Fontana Police Department


CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER COF 001518