**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich, Esq. (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333
Fax: (818) 347-4118

**SHOJAI LAW FIRM**
Neema Shojai, Esq. (SBN 321833)
neema@shojaifirm.com
8880 Rio San Diego, Suite 800
San Diego, California 92108
Telephone: (619) 777-0383
Facsimile: (619) 775-1383

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DIANA RIAS; TA-TANESHA GALBURTH; DOMINIC ADAMS Sr.; and BRITTANY MASON,

Plaintiffs,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants

Case No. 5:25-cv-00207-JGB-ACCV

[*Honorable Jesus G. Bernal*]
Magistrate Judge Angela C. C. Viramontes

**DECLARATION OF ROGER A. CLARK**

## DECLARATION OF ROGER A. CLARK

I, Roger A. Clark, hereby declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

### Qualifications

3. Filed concurrently as "**Exhibit 26**" is a true and correct copy of my Rule 26 Initial Expert Report in this matter, including my exhibit to report which includes my commentary to my analysis in this case, and my qualifications to render opinions, which I incorporate by reference herein. Also filed concurrently as "**Exhibit 27**" is a true and correct copy of my Rule 26 Rebuttal Expert Report in this matter. A summary of my qualifications is also as follows:

a. My opinions are based in part on my training, professional experience and education. I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

b. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted investigation and apprehension methods.

c. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at

our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

d. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

e. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings.

f. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, bullet casings and police administration in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

g. I have consulted and/or testified as an expert in dozens of cases regarding law enforcement shootings and police practices and have been certified as an expert on these areas in both State and Federal Courts.

**Materials Reviewed**

4. I have reviewed the following materials in this case: radio traffic audio; autopsy reports; photographs; involved officer body-worn camera videos; surveillance videos; deposition transcripts; investigative records; training and policy records; reconstructions of the incident; POST Learning Domains; Plaintiffs' Complaint and the Protective Order.

**Methodology**

5. I make this declaration and my opinions based on my review of the above materials and also based on my experience and knowledge of law enforcement training and standards.

6. My general method is to: (1) review all of the relevant available material involved in the case to determine a factual understanding of the circumstances for which I have been asked to consult; (2) review all relevant POST Learning Domains, recent publications, recent case-law on point, pertinent training bulletins, and manuals to ensure that I apply the most modern and accurate law enforcement policies, practices, procedures, and standards to the case at issue; (3) rely on decades of experience, knowledge and training when evaluating and analyzing how the law enforcement training will be applied to real-world scenarios along with the risk involved with them; and (4) apply the discoverable facts to the standards that the law enforcement officers did or should have employed.

**Opinions**

7. Officer Zozaya should not have initiated a vehicle pursuit under these conditions and circumstances. When you declare a pursuit, a reasonable officer understands the foreseeable consequences of a pursuit, including a deadly collision, which is why the balancing test is required prior to initiating a pursuit. The record indicates that the suspected crime was for minor traffic infractions and the Nissan was otherwise driven safely; there were several other options for locating and apprehending the Nissan; the road was wet; it was dark out; speeds quickly increased; alternative pursuit methods were available and appropriate; and officers knew nothing about history of the occupants of the Nissan; and officers suspected a juvenile to be unrestrained in the back seat. Even after the pursuit began, Officer Zozaya should have terminated the pursuit under the same balancing test, which considers the high speeds, low visibility/dark, raining/wet road, unrestrained juvenile in the back seat, and minor traffic violation.

8. I am not critical of Officer Zozaya's decision to conduct a routine pullover for the purpose of issuing citation(s) for the vehicle code violations he observed (as he has reported). However, when the Nissan failed to yield and fled, Officer Zozaya was required in the totality of this circumstance not to declare, or engage in, a vehicle pursuit for such insignificant vehicle code violations. As cited above, three independent policy documents: Item 10, *California Law Enforcement Vehicle Pursuit Guidelines* POST 2022; Item 11, *Vehicular Pursuits. A Guide for Law Enforcement Executives on Managing and Associated Risks*, PERF 2023 and: Item 12, *Vehicular Pursuits*, International Association of Chiefs of Police (IACP) (July 2025), each emphasis that the decision to engage a police pursuit is so dangerous that it must be justified by very serious criminal conduct. The overarching theme in each policy document is that any decision to engage in a pursuit but balanced with the necessity for apprehension versus the risk that will be inflicted on innocent members of the public, the officers involved in the pursuit, passengers in the target vehicle, and even the suspect driving the car. Accordingly, in the training declaring and engaging in a police pursuit for simple vehicle code violations is never justified.

9. Vehicle pursuits should only occur when their risks are clearly outweighed by the risk of not apprehending the suspect. Officer Zozaya's records indicate that he had received training and therefore cannot be excused or forgiven for his decision to declare and engage in pursuit of the Nissan in this set of facts. Declaring and engaging in pursuit per se creates risks and foreseeable consequences. In this set of facts, Officer Zozaya's decision to do so was foreseeably catastrophic. Officer Zozaya's decision set in motion a sequence of events resulting in the of the unnecessary death of juveniles and significant injuries inflected on two police officers who had to retire from service.

10. Even if Officer Zozaya initiated the pursuit, as soon as the speeds increased to near 80 mph, Officer Zozaya could have initiated an alternative pursuit

mode including either “Tracking Mode” or “Surveillance Mode” which encourages self-termination and safe driving.

11. At the time of the collision, Officer Garcia was not in pursuit of the Nissan and should have remained in the parking lot. Pursuit units should be limited to three (according to FPD policy) including two units and a supervisor. Under these facts, Officer Zozaya’s unit was the primary unit (Unit 1), Officer Bautista could have been the secondary unit (Unit 2), and the Sergeant in response would have been the supervisor (Unit 3). Units not involved in the pursuit should not attempt to parallel the pursuit (according to FPD policy) and should remain in their assigned areas and not become involved with the pursuit unless directed otherwise by a supervisor. Officer Garcia was not requested to join the pursuit, did not request to join the pursuit, and did not inform a supervisor, dispatch or the primary unit that he would be joining the pursuit.

12. There are physical facts, circumstances and admission by Officer Garcia that support the finding that Officer Garcia intentionally and/or deliberately used his vehicle to collide with the Nissan. Officer Garcia knew from the radio traffic that the pursuit was eastbound on Valley Blvd., at high speeds, from Catawba. Officer Garcia knew that within seconds the pursuit was passing Oleander and seconds later that the high-speed pursuit was approaching Cypress, which was the closest cross street to the west of Officer Garcia’s location. Officer Garcia was attempting to remain inconspicuous by keeping his headlights off. Then at the apron of the driveway, Officer Garcia saw the headlights of the Nissan approaching eastbound on Valley Blvd., approximately one to two seconds prior to the collision. Given the speed of the Nissan and distance from the apron, no reasonable officer would believe that it would be safe to turn from the apron onto Valley without risking a collision with the Nissan. Based on Officer Terwilliger’s testimony, at the apron, Officer Garcia saw the Nissan and said, “Fuck, there they are.” Then, the EDR data shows that Officer Garcia removed his foot from the brake, depressed the

accelerator pedal to 100%, and turned the front of his patrol vehicle SUV directly into the side of the Nissan.

13. Intentionally striking the Nissan with the Ford Explorer patrol vehicle would be a use of deadly force. No reasonable officer would conclude that the Nissan was an immediate threat of death or serious bodily injury to any person at the time. In my opinion, considering the officers' testimony and the video evidence, that Officer Garcia could not have reasonably believed that the Nissan was an imminent threat of death of serious bodily injury at the time.

14. At the time, Officer Garcia did not know what the primary pursuit vehicle suspected the Nissan to have violated. Officer Garcia did not know where the Nissan was fleeing from. Officer Garcia did not have any information about the individuals in the subject Nissan. Officer Garcia had no information that the occupants of the Nissan had physically injured any person. Officer Garcia had no information that the occupants of the Nissan had verbally threatened any person. Officer Garcia had no information that the Nissan had been in any prior collision. Further, traffic was light.

15. If Officer Garcia intentionally struck the Nissan, it was inconsistent with basic law enforcement training and violated basic POST standards and the standard of care pursuant to POST and officer training - in other words, was excessive and unreasonable as defined by POST.

16. If Officer Garcia did not intend to strike the Nissan, his conduct was nevertheless reckless, unsafe, without due regard, inconsistent with basic law enforcement training and violated basic POST standards and the standard of care pursuant to POST and officer training. Whether Officer Garcia was intending to create a blocking position or otherwise imped the path of the Nissan, or if he was intending to follow Officer Bautista for any reason, under these facts, Officer Garcia's choice to exit the driveway knowing and seeing a highspeed pursuit moving eastbound on Valley Blvd., without headlights, and without being

situationally aware and yielding the right-of-way, was reckless and a gross departure from the nationally accepted and required tactics as well as the basic Rules of the Road required by any driver.

17. The Officers' failed tactics contributed to the collision and death of the three innocent occupants of the Nissan. During the pursuit, Officers Zozaya did not get the Nissan's license plate and did not instruct Officer Precie to get the license plate. Officer Zozaya and Officer Precie failed to adequately communicate with each other prior to and during the pursuit.

18. Officer Garcia should not have attempted to join the pursuit under these facts. Officer Garcia stated that he knew what was put out over the radio. Officer Garcia did not hear a specific request for backup. Officer Garcia should have known that there was already a primary unit in pursuit (Zozaya), a secondary unit en route to assist (Bautista), and a Sergeant en route.

19. Officer Bautista should not have entered Valley Blvd. The apron of the parking lot driveway was approximately 500 feet from the east crosswalk of the intersection. The Officers knew that the pursuit was eastbound on Valley Blvd. and approaching Cypress at high speeds. Turning left (west) from that position unnecessarily requires that the patrol vehicles pass in front of the known pursuit direction.

20. There was a lack of communication between officers within each vehicle and a lack of communication between officer vehicles. Officer Garcia did not communicate with a supervisor, did not communicate with Officer Zozaya's vehicle, and did not communicate with dispatch that he was responding to the pursuit. Officer Garcia did not activate his body-worn camera video during the incident, which merely required the press of a button to activate. Officer Garcia did not activate emergency lights and sirens, headlights, or signal a turn, and failed to stop at the apron and failed to yield the right-of-way. All of which were violations of the Vehicle Code, violations of the Rules of the Road, violations of policy and basic

officer training, and violation of Officer Garcia's responsibility to drive with due regard.

21. Based on my review of the record, the Officers violated FPD training and policies and violated POST standards, which reflects their lack of adequate training, and a direct reflection of FPD's inadequate supervision, and training policies. The Officers' use of deadly force and poor tactics demonstrates the Defendant Officers' complete lack of situational awareness, lack of control over their emotions and fears, and their inadequate training and understanding of basic use of force and vehicle pursuit principles.

22. Under these circumstances, Fontana Police Department should have investigated the involved officers' conduct. Had they done so, any reasonable law enforcement executive would know that there were several violations of rights, including the inappropriate and unjustifiable use of deadly force, that Officer Garcia caused the collision, and that his conduct was facially intentional from the record. Nevertheless, any reasonable law enforcement executive would find that Officer Garcia violated several policies and Vehicle Codes, all of which were means for disciplinary action.

I declare under penalty of perjury that the foregoing is true and correct. Executed September 16, 2026, at Santee, CA.