Eugene P. Ramirez (State Bar No. 134865)
*eugene.ramirez@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
*kayleigh.andersen@manningkass.com*
Eugene Hanrahan (State Bar No. 185826)
*Eugene.Hanrahan@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

DIANA BIAS; TATANISHA PITTS; DOMINIC ADAMS Sr., and BRITTANY MASON,

Plaintiffs,

v.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,

Defendants.

Case No. 5:25−cv−00207−JGB−ACCV
District Judge, Jesus G. Bernal
Magistrate Judge, Angela C. C. Viramontes

**[MOTION IN LIMINE NO. 3]**

**ANDERSEN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* NO. 3**

*Filed concurrently with (Proposed) Order*

Date: 11/16/2026
Time: 9 a.m.
Crtrm.: 1 (2nd Floor)

I, Kayleigh A. Andersen, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a Partner with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit A** is a true and accurate copy of Dr. Ryan O'Connor's Expert Report. Attached hereto as **Exhibit B** is a true and accurate copy of relevant excerpts of the deposition of Dr. Ryan O'Connor.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 12th day of October, 2026, at Los Angeles, California.

*/s/ Kayleigh A. Andersen*
Kayleigh A. Andersen

MANNING | KASS

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr., and BRITTANY MASON, | Case No. 5:25-cv-00207-JGB-SHKx |
| Plaintiffs, | |
| v. | |
| CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive, | |
| Defendants. | |

ORAL DEPOSITION OF RYAN O'CONNOR

Wednesday, September 9, 2026

9:03 AM - 10:10 AM PT

Via Zoom Videoconference

Reported by Kornika King, CSR 14823

Magna Legal Services
866-624-6221
www.MagnaLS.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr., and BRITTANY MASON, | Case No. 5:25-cv-00207-JGB-SHKx |
| Plaintiffs, | |
| v. | |
| CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive, | |
| Defendants. | |

The oral deposition of RYAN O'CONNOR, taken on behalf of Defendants, before Kornika King, CSR 14823, for the State of California, commencing at 9:03 AM PT, on Wednesday, September 9, 2026, remotely via Zoom videoconference.

APPEARANCES VIA ZOOM VIDEOCONFERENCE:

FOR PLAINTIFFS:

Neema Shojai, Esquire
SHOJAI LAW FIRM
8880 Rio San Diego, Suite 800
San Diego, California 92108
(619) 777-0383
neema@shojaifirm.com

FOR DEFENDANTS:

Kayleigh Andersen, Esquire
MANNING KASS
801 South Figueroa Street, 15th Floor
Los Angeles, California 90017
(213) 624-6900
kayleigh.andersen@manningkass.com

I N D E X


| DESCRIPTION | PAGE |
|---|---|
| RYAN O'CONNOR | |
| Examination by Attorney Andersen ............... | 6 |
| Errata Sheet ................................ | 46 |
| Reporter's Certificate ........................ | 47 |


E X H I B I T S


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Report, CV, Fee Schedule, and Testimony List ........................ | 8 |


R E Q U E S T S F O R I N F O R M A T I O N

Page 43, Line 15

liability tender.

THE REPORTER: Attorney Neema?

ATTORNEY SHOJAI: My apologies.

THE REPORTER: Attorney Neema, are you able to hear us?

Counsel, we're off the record.

(Off the record, 9:15 AM - 9:16 AM PT.)

THE REPORTER: We're back on the record.

BY ATTORNEY ANDERSEN:

Q. I think -- so you gave an estimate of five times you've testified in federal court in both civil and criminal cases. How many of --

A. Just civil. Excuse me.

Q. Oh, I'm sorry. I'm sorry.

In those five times you've testified in federal court in civil cases, did any of those cases involve a vehicle collision?

A. No.

THE REPORTER: Attorney Andersen, do you want me to read back your last question?

ATTORNEY ANDERSEN: Yeah, I don't even know where I left off. Could you please?

THE REPORTER: Yes.

"And when was the most recent time you testified as an expert?"

That was your last question.

ATTORNEY ANDERSEN: Thank you.

BY ATTORNEY ANDERSEN:

Q. Dr. O'Connor, when was the most recent time you testified as an expert in federal court?

A. The most recent was May 11, 2026. United States District Court for Central District of California, George Gonzalez v. State of California et al.

Q. And was that on behalf of the plaintiffs?

A. Yes.

Q. And in all the cases in which you've testified at trial in a -- in a civil case, have those been on behalf of the plaintiffs?

A. Yes.

Q. And then, I guess, same question for deposition. In all cases in which you've been retained as an expert and testified at deposition in a civil case, have those been on behalf of the plaintiffs?

A. Yes.

Q. The George Gonzalez case -- is that the one you -- you're referring to, Dr. O'Connor?

A. Yes.

Q. And I believe that was against the City of Hemet and California Highway Patrol personnel. Does

that sound accurate?
A. Yes.
Q. And in that case, did you testify at both a deposition and trial?
A. Yes.
Q. And that case was a case in which you were retained by Mr. Galipo's office, too. Is that correct?
A. That's correct. Yes.
Q. What was the subject of your opinions in that case?
A. That case involved multiple gunshot wounds, and I was retained to try and determine the trajectory of those gunshot wounds.
Q. And then in -- I think there's another case, Barnhill. Does that sound accurate?
A. Yes.
Q. And what was the subject of your testimony in the Barnhill civil case?
A. If you give me a minute to refresh my memory by checking my notes.
This was a police use-of-force incident where the patient sustained significant head trauma. And my purpose was to summarize the extent of injuries and opine on the mechanism of injury for certain aspects of the injuries that he sustained.

Q. And that case did not involve a vehicle collision. Is that correct?

A. Correct.

Q. Okay.

And then there's another case that I saw in your testimony list. I might butcher the pronunciation. D'Son Woods -- D'S-o-n Woods v. CDCR. Do you recall that case?

A. If I can refresh my recollection by looking at my notes. I'm not good with names offhand, but if I can take a look.

Q. Of course.

A. W-o-o-d- -- oh, here we go.

I'm sorry. Just one minute, please.

Q. No problem.

A. Let me try it this way.

ATTORNEY SHOJAI: Kayleigh, there's some construction happening outside my home. Let me know if it is picking up -- if it's disturbing you, I'll keep my microphone muted.

ATTORNEY ANDERSEN: Okay. I can't hear any feedback or anything in your background right now, so.

ATTORNEY SHOJAI: Not at all. Okay. Great.

A. I'm sorry. As you can tell, I don't have good

recollection of this case. I'm just skimming over my report. I'm almost done, and I'll be able to answer your question shortly.

BY ATTORNEY ANDERSEN:

Q. Okay.

A. Okay. I don't have great recollection of this, but I just skimmed through my report. It looks like this one does involve a motor vehicle accident. And I was commenting -- kind of summarizing the very extensive medical records. One of the patients was in the hospital for 18 months with severe burns and had extensive medical intervention. So I was largely kind of summarizing the course of his medical progress over that 18 months until he passed. I make some comments about pain and suffering. There's some calculations that I make regarding blood alcohol concentration, and then there's some comments that I make about -- in another patient -- about head injury and concussion and post-traumatic amnesia.

Q. And so you mentioned vehicle collision.

Did -- as part of your analysis and your opinions for that case, did you opine on anything related to accident reconstruction or biomechanics?

A. Not at all.

Q. No. Okay.

The last one I'll ask you about -- sorry for making you look through old reports -- Solis v. County of Riverside. I believe it was trial testimony you gave.

A. Yes. Again, I'll have to refer to my notes.

Solis -- looks like this was another one related to a gunshot wound injury. Largely, my involvement was, again, summarizing the medical records and describing the course of treatment for the prolonged hospitalization.

Q. Okay. Thank you.

And as a medical expert, do your opinions need to be to a reasonable degree of medical certainty?

A. Yes.

Q. What does that mean in layman's terms?

A. A reasonable degree of certainty, I guess, would correlate with probability as opposed to possibility -- more likely to happen than not. Certainties -- reasonable certainty is probably a little bit higher than just general probability, because probability could be 51 percent. So something that is rather likely to be the case.

Q. And you just mentioned the one case that involved a vehicle collision. I believe it was the Woods case. Have you ever testified as an expert in any

other cases, whether at deposition or trial, regarding injuries from a vehicle collision?

A. In a civil case or any case?

Q. Civil case, yeah.

A. A civil case, not to my knowledge, no.

Q. Okay.

In a criminal case, then, have you testified regarding injuries from a vehicle collision?

A. Probably a fair number, yes. I get a lot of DUI cases, Watson murders, things of that nature, so certainly, yes.

Q. And when you're opining as to injuries in those cases that arise from a vehicle collision in a criminal matter, what type of opinions are you forming? What would be the subject of your opinions?

A. Well, it depends on the case. I do a lot of cases involving great bodily injury, so there could be the potential of whether or not the injury was in fact a great bodily injury or a serious bodily injury. Sometimes in a Watson murder case, there might be intervening factors in the cause of death that would be relevant to how the case is charged, so I do comment on that as well. So as far as injuries to the occupants of vehicles, I would say that those are the main two subject matters.

Q. Okay.
Are you an expert in accident reconstruction?
A. No, ma'am.
Q. Have you ever testified in a criminal or civil matter regarding accident reconstruction?
A. No.
Q. Are you an expert in biomechanics?
A. To some extent. It overlaps with my training and experience in emergency medicine and criminalistics. There are some cases where I've commented on biomechanical issues. For example, what type of mechanism can cause a certain type of fracture versus another. So I do have some expertise in the field, but I wouldn't consider myself strictly an expert biomechanist.
Q. Okay.
Other than the medical experience that we've already gone over, and including your master's, are there any other training you received or certificates you hold related to biomechanics?
A. I've been to a few conferences that have lectures on biomechanics. I believe there was one that was exclusively about biomechanics. There's other emergency medicine conferences that have lectures on the subject because it is relevant to emergency medicine.

Q. You mentioned -- you gave an example of opining regarding a fracture -- biomechanics related to a fracture. Have you ever testified as an expert in biomechanics regarding vehicle collision?
A. I don't believe so, no.
Q. Okay.
And what is biomechanics?
A. Biomechanics is the intersection of physics and anatomy and physiology. It's how external forces affect the human body and the injuries that result under various application of forces.
Q. Are you an expert in seat belt safety?
A. I have knowledge of the subject. I'm not a focused expert on that, but certainly in emergency medicine we see motor vehicle accidents on a daily basis, and it is something that is discussed and taught in my coursework and in conferences and similar.
Q. Are you an expert in seat belt mechanics?
A. No.
Q. Do you recall what type of vehicle the three minor decedents were riding in at the time of the collision?
A. Not offhand, no.
Q. Do you know what type of seat belts are in those vehicles?

A. Other than the typical three-point restraint that's standard in most modern vehicles, I don't know anything beyond that.

Q. What type of impact collision occurred in this case?

A. To my understanding, the major impact was left perpendicular. T-bone would be the common nomenclature.

Q. Okay.

Do you know what -- the best way you can describe it -- which two parts of the vehicle made contact with each other from the suspect vehicle that the minor decedents were in and the patrol car?

A. The passenger side of the decedents' vehicle and the front of the patrol car.

Q. I think you referenced a side-impact collision for purposes of the opinions in your report. Is that -- is that accurate in your understanding?

A. Yes.

Q. On -- I'll direct your attention to page 7 of your report. Towards the top, you put: "I do not have" -- in quotes: "I do not have the specific expertise to address the validity of his calculations. So for purposes of this report, I will assume that his calculations for determining the subject Delta-V are accurate."

Do you see that on your report, page 7?
A. Yes, I do.
Q. And you're referring to the report you reviewed by defense expert Dr. Wobrock. Is that correct?
A. That's correct.
Q. Are you saying that you don't have the expertise to do the calculations that Dr. Wobrock did?
A. Yes.
Q. So you relied on his calculations, then, to form your opinions. Is that -- is that fair?
A. Yes.
Q. Have you ever done this type of Delta-V analysis in a criminal or civil case before?
A. No.
Q. In any prior reports that you've prepared in a civil case, have you referred to or used the MAIS scores?
A. No.
Q. Have you ever been qualified as an expert to run these types of statistics?
A. No.
Q. You note in the report -- I'm trying to find which paragraph -- I believe it's in that first paragraph on page 7 that the "injury statistics do not

that -- is that accurate?
A. Yes.
Q. Have you ever opined in -- whether it's a civil case or a criminal case -- in deposition or at trial regarding cause of death when the occupant is unrestrained in a vehicle collision?
A. There's one case I can think of offhand. Watson murder, criminal case, where the only -- there were four young men in the vehicle. The only one who died was unrestrained and leaning out of the car window at the time of the accident. And I opine that his survival would have been likely if he was inside the vehicle and restrained at the time of the accident.
Q. Do you recall the name of that case?
A. I don't offhand, but if I can do some research, I could find it for you.
Q. That'd be helpful. Maybe we'll take a break in a little bit if you want to look.
A. Sure.
Q. That works. Okay.
And now, I'm -- that was a criminal case. You said Watson murder. Is that correct?
A. Correct. Yes.
Q. And were you retained on behalf of the public defender or the prosecutor?

A. Public defender.
Q. And then on page 10 -- so the last -- the last part of your entire report, you have two paragraphs that contain opinions. Do you see that?
A. Yes, ma'am.
Q. Are these two opinions to rebut defense expert Dr. Wobrock?
A. Yes.
Q. Okay.
And what was Dr. Wobrock's opinions, or what were Dr. Wobrock's opinions regarding the three decedents?
A. That they likely would have survived if they were wearing their seat belts.
Q. Okay.
And what do you base your opinion on that they probably would not have survived whether they were restrained or not?
A. It's described pretty well in my report. The two decedents that were on the near side of the collision -- the front passenger and the rear passenger -- their wounds were extremely extensive. Multiple fatal wounds, multiple immediately or rapidly fatal wounds. The nature of the accident was such that the vehicle exterior was compressed into the interior

where they were sitting. And so in a situation like that, a seat belt is not going to prevent injury. A seat belt prevents injury by keeping the body in place so it doesn't fly into the interior of the car and have a secondary impact. In this case, the interior of the car is coming to them.

Also, some of the fatal injuries that they suffered, like the aortic dissection, are just from the Delta-V, the sudden deceleration. They're shearing and tearing injuries. So I don't think they would have been survivable whether or not they were wearing seat belts.

Dr. Wobrock's statistics that he cites from that MAIS report support this, because in all cases, there's a 65 percent chance of fatality, which is probable. And that includes all accidents, whether or not occupants are restrained, and accidents that have less severe ramifications like rear-end or front-end. So for those two, it's quite clear to me.

The decedent that was in the far side behind the driver -- his injury pattern was pretty typical for somebody on the far side of a T-bone. Significant head injury. Seat belts are not -- according to my knowledge and experience and research that I've done, as I cited in my report, they're not particularly effective for preventing that sort of injury. A shoulder harness

going across the left side of the shoulder to the right hip is not going to keep the upper body in place when there's impact from the opposite side. So even if the hips are kept in place, the body will rotate, and the head will impact where the collision is coming from. Seat belts are of very limited utility in that sort of mechanism. So that's why I did separate the two of them. The two on the near side of the collision, I don't think at all there's any chance that they would have survived even if they were wearing their seat belts.

Mr. Pitts's on the far side. Statistically, people in the far side have a better chance of survivability. And a seat belt can serve some function by keeping the lower body in place. So there's a -- I believe -- a slight chance of improved survivability. But ultimately, I think it's probable that he would have died as well, even if he was wearing the seat belt.

Q. Did you do any research on crash tests for the type of vehicle that these three decedents were riding in?

A. No.

Q. You mentioned the occupant position in the vehicle. So where was Mr. Adams in the vehicle?

A. Mr. Adams was rear seat, passenger side. So

the near side of the collision.

Q. And then where was Mr. Rias?

A. He was the front seat passenger, near side of the collision.

Q. And then Mr. Pitts -- I think you already mentioned he was on the opposite side of the vehicle in the back. The passenger side -- or the -- sorry -- driver side back, correct?

A. Yes.

Q. Okay.

And then did you -- were you aware at the time you prepared your report that the driver of this vehicle survived the collision?

A. That was reported to me by the plaintiffs' attorneys. I did not review any medical records for him or ambulance reports or anything involving him.

Q. You haven't formed any opinions in connection with the driver of the vehicle. Is that fair?

A. Yes.

Q. In terms of his injuries, I mean, specifically.

A. Yes.

Q. Okay.

You mentioned the term -- in both those paragraphs that we're talking about on page 10, you

mentioned "substantial likelihood." What is substantial likelihood?

A. I think that would go along with probability. It's something that's very much likely to occur to a reasonable degree of certainty.

Q. So in your opinions, these are to a reasonable degree of medical certainty that had they been restrained properly, they still would have died.

A. Yes.

Q. Or a substantial likelihood that they would have died. Is that more accurate?

A. Yes.

Q. Okay.

And then with respect to Mr. Pitts, who's, you mentioned, the far-side collision occupant, he may have had an improved chance of survival. What does that mean?

A. Based on his position being further away from the compartment intrusion and the focus of the force, he gets the benefit of the crumple zone and distribution of the force over time. If he's restrained, he'll be kept at least partially in place in his lower body. Likely other factors, too. If he's flying through the rear seat compartment before he impacts the compartment, he's going to perhaps be cushioned by his friend who's in the

near side in the rear seat. So there's multiple factors that could reduce the amount of trauma that he sustains and therefore increase his likelihood of survival. And I think we see that in the medical records. The two on the near side died essentially instantly or within seconds or minutes. He survived until the next day. So he did receive less trauma than the other two, but ultimately fatal, and likely so, statistically.

Q. In your review of the medical records -- by that I mean, I guess, the autopsy records and the EMS records -- for all three decedents, did they sustain significant head trauma?

A. The head trauma for Mr. Pitts and Mr. Rias -- I'm just referring to my notes because there's three of them. I don't want to get them mixed up.

But yes, Mr. Pitts had significant head injury, including intracranial hemorrhage. Mr. Rias had a hinge-type basilar skull fracture. So his skull was essentially split in half. And then Mr. Adams didn't have specific head injury, but he had atlanto-occipital dislocation. That's where the skull separates from the spinal column. This is also known as internal decapitation. It's technically not an injury to the head and skull, but it's quite close to that.

And -- excuse me -- for Mr. Adams as well, he

did have facial trauma. Significant facial trauma. Multiple fractures of the cheekbone, his jawbone.

Q. And were any of the three decedents ejected from the vehicle?

A. No, they were not. They all had to be extricated from the vehicle. There was a prolonged extrication process.

Q. Do you know how long it took for EMS to arrive on scene after the collision?

A. I don't offhand. I know that information is contained in the EMS report, so I can look that up and tell you specifically, but I don't know offhand.

Q. In preparing your report, did you review any of the videos depicting the collision?

A. Yes.

Q. Which ones?

A. Actually, the videos, no. There were photographs of the scene. I didn't see videos of the collision. Excuse me. There were photographs of the scene, and there were photographs of the autopsy process, but I didn't see videos.

Q. Okay.

You mentioned looking at photographs of the scene after the collision, of course. Did you ever visit or conduct an inspection of the vehicles sometime

after the collision?
A. No.
Q. Did you request to conduct an inspection of the vehicles at any time?
A. No.
Q. Now, this is a hypothetical, but I'm wondering if we can see what it would look like. But for Mr. Pitts specifically -- because you mentioned that he may have had an improved chance of survival had he been restrained -- what would that have looked like for him long-term had he survived? If you can opine on that.
A. I mean, it seemed -- clearly a hypothetical. There's so many variables involved here. But one of the major mechanisms of injury in a side-impact collision for the far-side occupant is head trauma, and that is what he significantly sustained that was ultimately fatal to him. So if the injury had been similar but not fatal, there's a good chance that he could have had a significant brain injury, could have been permanently comatose, or otherwise disabled through brain injury. I think that would be the most likely outcome if he had survived.
Q. Do you know what part of the vehicle Mr. Pitts had made contact with during the collision?
A. No.

Q. Okay.
What about for Mr. Rias? Do you know what part of the vehicle he made -- his head made contact with to sustain those injuries or to cause those injuries?
A. Not specifically, no.
Q. Do you know what part of the collision caused -- I think it was Mr. Adams you said -- the internal decapitation? Do you know the mechanism of that injury specifically in this vehicle collision?
A. Specifically, no.
Q. Other than the one case that I'm going to have you check your notes, if you don't mind, when we take a brief break, regarding the restrained versus unrestrained for that individual in the Watson murder case, have you ever testified in criminal or civil cases before regarding restraint versus nonrestraint in terms of seat belt and cause of death in a vehicle collision or cause of injury?
A. I don't believe so, no.
Q. Okay.
In both of these paragraphs, you mentioned statistical and mechanistic factors. What are the statistical factors that you refer to in these paragraphs to determine the substantial likelihood of

dying?

A. Oh, the statistics that are reported by your expert, Dr. Wobrock, and the 65 percent probability of fatality from accident with that Delta-V.

Q. Okay.

And then -- and what about the -- what are the mechanistic factors that you're referring to in those two paragraphs as well, then?

A. Oh, I mean, everything that we've been discussing: the function of seat belts and the mechanism of a side-impact collision with intrusion of the passenger compartment, large Delta-V accidents resulting in more severe injury statistically.

Q. Did you, in the medical records you reviewed -- I'm sorry -- mostly the EMS records is what I'm referring to -- and the EMS records that you reviewed regarding Mr. Pitts, did any -- did you see any notes that he was conscious at any time?

A. Again, I don't want to mix them up, so I'm going to refer to my notes for Mr. Pitts.

No, I don't believe so. On scene, he was not conscious. He was in extremis, and he was intubated pretty rapidly, so there's no indication that he was conscious.

Q. Do you have any opinions that you've formed in

connection with this case regarding, like, the cause of the collision?

A. Oh, no.

Q. Okay.

As an ER doctor, is it part of your responsibility to determine causation in treating patients with -- in a vehicle collision?

A. Not specifically. It can be useful to get some of that information for risk stratification. Certain accident mechanisms have a higher risk factor, but as far as specific causation, it's not part of my function as an ER doctor.

Q. And as an ER doctor, if somebody comes into the ER and they were in a vehicle collision, do you -- before you treat them, do you make any type of finding or determination as to whether they were restrained or unrestrained?

A. Yeah, that's part of the questioning. Certainly. I want to know that from EMS or from the patient. It helps me with risk stratification as well. We look for physical signs of restraint. There's something called a "seat belt sign" where the presence of a seat belt can cause bruising or abrasions to the skin. And that gives us information as to the fact that someone was restrained, and it also gives indication to

REPORTER'S CERTIFICATE

I, Kornika King, Certified Shorthand Reporter Number 14823 of the State of California, do hereby certify that the foregoing proceedings were taken before me at the time and place herein set forth; that the witness in the foregoing proceedings, RYAN O'CONNOR, prior to testifying, was duly sworn; that a review of the transcript WAS requested; that a record of the proceedings was made by me using shorthand which was thereafter transcribed by me or under my direction; that the foregoing transcript, pages 1 through 46, is a true, accurate, and complete record of the proceedings.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated September 23, 2026.

Kornika King
___________________________
Kornika King, CSR 14823
Certified Shorthand Reporter
State of California

# EXHIBIT B

EXHIBIT

No. 1

exhibitsticker.com


# Ryan O'Connor, M.D.

- - -

Emergency Medical Physician
P.O. Box 86166
Los Angeles, CA 90086


August 17, 2026

Mr. Sincich,

I have reviewed the discovery that you have provided to me regarding Diana Rias, et al. vs. City of Fontana, et al. (Case No. 5:25-cv-00207-JGB-SHK). This includes the following documents:

- San Bernardino County Sheriff's Department Coroner Division Autopsy Protocol for an autopsy performed on Domonic Odell Adams Jr. on 02/06/2024 including NMS toxicology reports, a Coroner Investigation report, and many photographs of the scene of the collision as well as many photographs of the autopsy process

- San Bernardino County Sheriff's Department Coroner Division Autopsy Protocol for an autopsy performed on Robert Andrew Rias on 02/06/2024 including NMS toxicology reports, a Coroner Investigation report, and many photographs of the scene of the collision as well as many photographs of the autopsy process

- San Bernardino County Sheriff's Department Coroner Division Autopsy Protocol for an autopsy performed on Omari Malik Pitts on 02/06/2024 including NMS toxicology reports, a Coroner Investigation report, and many photographs of the scene of the collision as well as many photographs of the decedent in the hospital as well as many photographs of the autopsy process

- San Bernardino County Fire Department Patient Care Report for Domonic Odell Adams Jr dated 02/03/2024

- San Bernardino County Fire Department Patient Care Report for Robert Andrew Rias dated 02/03/2024

- San Bernardino County Fire Department Patient Care Report for Omari Malik Pitts dated 02/03/2024

- A San Bernardino County Sheriff's Department Major Accident Investigation Team Accident Investigation Report for this incident (Case #192400847)

- A report by Gary M. Vilke, M.D. dated 07/22/2026

- A report by Jesse L. Wobrock, Ph.D. dated 07/24/2026

Domonic Odell Adams Jr. (rear seat passenger-side)

EMS arrived on the scene of the collision at 22:52. Their "Primary Impression" of Mr. Adams was "Obvious Death". They were "unable to access [the patient] initially due to damage to roof of car, but [Mr. Adams was] visibly apneic [i.e.: not breathing] upon arrival of me77." After being extricated from the vehicle, the patient was observed to be pulseless and apneic with asystole [i.e.: no heart activity, flatline] observed on the cardiac monitor. It is noted that "resuscitation efforts were not initiated. Considered futile. Determination of death made at 23:11".

On 02/06/2024, an autopsy was performed on Mr. Adams. The coroner observed the following significant injuries:

- Fracture-dislocation of the atlanto-occipital joint with transection of spinal cord

  - This injury (separation of the skull from the spinal column), also known as "internal decapitation", is instantly fatal.
- Fracture-dislocation of the thoracic spine at T3-T4 with transection of the underlying spinal cord
  - This injury would have resulted in permanent and irreversible paralysis of the lower torso and both legs, total sensory loss below the level of the injury, and loss of normal bowel and bladder function.
- Transection of the aorta at the aortic arch
  - This injury is rapidly fatal due to massive internal hemorrhage.
- Right lung pulpifaction (i.e.: destruction of the lung to the point of it becoming a liquefied and pulpy mass)
  - This injury is rapidly fatal due to massive internal hemorrhage.
- Liver pulpifaction (i.e.: destruction of the liver to the point of it becoming a liquefied and pulpy mass)
  - This injury is rapidly fatal due to massive internal hemorrhage.
- Open fracture of the right zygoma (cheek bone)
- Fracture of the maxilla (upper jawbone)
- Fractures of right-sided ribs 4, 5, 6, 7, 8, 9, 10
- Fracture of the sternum at the manubrium
- Rupture of the right side of the diaphragm
- Fracture of the right pubic bone of the pelvis
- Fracture of the left femur (upper leg bone)

The coroner ascribed the cause of death to "multiple blunt force injuries" and described the patient's death as "immediate".

Robert Andrew Rias (front seat passenger)

EMS arrived on the scene of the collision at 22:52. Their "Primary Impression" of Mr. Rias was "Obvious Death". They were "unable to access [the patient] initially due to damage to roof of car, but [Mr. Rias was] visibly apneic [i.e.: not breathing] upon arrival of me77." After being extricated from the vehicle, the patient was observed to be pulseless and apneic with asystole observed on the cardiac monitor. It is noted that "resuscitation efforts were not initiated. Considered futile. Determination of death made at 23:11".

On 02/06/2024, an autopsy was performed on Mr. Adams. The coroner observed the following significant injuries:

- Hinge type basilar skull fracture
  - This injury (fracture along the entire base of the skull that effectively splitting the bottom of the skull in half) is likely rapidly fatal and has a high correlation with severe traumatic brain injury if survived
- Transection of the aorta at the aortic arch
  - This injury is rapidly fatal due to massive internal hemorrhage.
- Multiple lacerations to the left and right lungs with hemorrhage of 900ml of blood into both sides of the chest
  - These injuries are potentially fatal due to internal hemorrhage
- Laceration of the right renal artery with bleeding into the abdominal cavity

    - This injury is potentially rapidly fatal due to internal hemorrhage
- Multiple lacerations of the liver with bleeding into the abdominal cavity
    - This injury is potentially rapidly fatal due to internal hemorrhage
- Fractures to right ribs 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11
- Diastatic fracture (both sides of the broken bone pulled apart from each other) of the pubic symphysis and bilateral pubic bone fractures
- Open fracture (with the bone protruding through the skin) of the right tibia and fibula

The coroner ascribed the cause of death to "multiple blunt force injuries" and described the patient's death as having occurred in "seconds".

<u>Omari Malik Pitts (rear seat driver-side)</u>

EMS arrived on the scene of the collision at 22:54. They observed Mr. Pitts to be unresponsive and exhibiting agonal respirations (a distinct reflexive pattern of gasping breathing that is indicative of severe traumatic brain injury or prolonged lack of oxygen to the brain). EMS notes a ten-minute extrication time before the patient could be reached for treatment. His airway was opened, oxygen was administered and his respirations were mechanically assisted. His pulse was noted to be very elevated, ranging from 140 – 170 beats per minute and his blood pressure was significantly elevated (highest reading 170/114). The patient was emergently transported to LLUMC for further treatment, arriving at that facility at 23:26.

The Coroner Investigation report for Omari Pitts describes that, upon arrival to the hospital, Mr. Pitts was taken to the operating room and subsequently transferred to the pediatric ICU where he became unresponsive. After unsuccessful ACLS resuscitation, Mr. Pitts was pronounced dead the following day at 07:37, about eight hours after his arrival to the hospital. The Autopsy Protocol describes the presence of a craniotomy, closed incision of the right chest (thoracotomy), closed midline laparotomy incision, and external fixation of a left femur fracture.

On 02/06/2024, an autopsy was performed on Mr. Adams. The coroner observed the following significant injuries:

- Right parietal scalp Subgaleal hemorrhage with subdural hemorrhage of both cerebral hemispheres
    - This head injury is potentially fatal due to traumatic brain injury
- Laceration of the right lung with hemorrhage into the chest cavity
    - This injury is potentially fatal due to internal hemorrhage
- Laceration of the celiac trunk at the aorta
    - This injury is potentially fatal due to internal hemorrhage
- Fracture of ninth right rib
- Fracture of the left femur

The coroner ascribed the cause of death to “multiple blunt force injuries” and described the patient’s death as having occurred in “hours”.

Rebuttal to Dr. Wobrock Opinions

In his report, Dr. Wobrock calculated that "The subject Delta-V was 59.5 mph, which results in approximately 65% probability of fatality in all crashes (more likely than not to be fatal)." I do not have the specific expertise to address the validity of his calculations, so for purposes of this report, I will assume that his calculations for determining the subject Delta-V are accurate. Dr. Wobrock references the MAIS+(05/08) Injury Probability Curves to translate a 59.5 mph Delta-V to a 65% probability of death. However, direct application of this statistic to the subject vehicle in this case is not entirely relevant. The MAIS+(05/08) Injury Probability Curve that he referenced is for "All Crashes" and includes largely frontal and rear-end crashes. The NHTSA report from where this probability curve is obtained describes the base sample sizes as: 5,492,758 for all crashes, 3,934,646 for frontal crashes, and 1,480,759 for rear-end crashed. This leaves only 77,353 cases (or 1.4% of all crashes) for "other crash modes" which presumably includes side impact collisions. Additionally, the MAIS+ injury statistics do not consider specific significant factures such as whether the vehicle occupant was restrained or unrestrained or the position of the occupant within the vehicle.

An additional factor to consider regarding Dr. Wobrock's citing a 65% probability of fatality in all crashes with a Delta-V of 59.5 mph is that the probability of sustaining a MAIS3, MAIS4, MAIS5, or MAIS6 injury (which corresponds to serious, severe, critical, or fatal injury) for that Delta-V is approximately 94%. Accordingly, the likelihood of sustaining a MAIS1 (minor) or MAIS2 (moderate) injury for all crashes is only approximately 6%.

Opinion

Seatbelts protect the occupant of a vehicle by reducing the movement of the body of the individual and limiting impact of the body with the interior of the vehicle. This protective mechanism is significantly compromised in side impact motor vehicle collisions (MCVs) with intrusion, especially for near-side impact occupants. In such a collision, the body of the vehicle intrudes into the passenger space causing injury to the near-side impact occupants regardless of whether they are wearing a seatbelt. Additionally, three-point seat belts have reduced protection for far-side impact occupants as they are prone to their upper body slipping from the shoulder restraint resulting in head injury from impact with the near-side vehicle intrusion. These phenomena are well documented in numerous published scientific articles on the subject. Much of this research is well summarized in Laberge-Nadeau's literature review published in the *Journal of safety research* (2009):

- Lestina (1990) described that "occupants on the struck side are injured more often and more severely than occupants seated on the opposite side and that, regardless of restraint use, the level of injury is higher for occupants on the struck side."
- Monk, et al (1977) observed that "as regards thoracic injuries, seat belts did benefit far-side occupants, but were of no significant benefit to near-side occupants." These researchers also found "that at any given Delta-V, near-side occupants register a much higher Delta-V than do their far-side companions, which means that the former are the most vulnerable in lateral crashes."
- In a study simulating side impacts using cadavers restrained by 3-point seat belts, Shimoda, et al (1989) found that "the restraint system did not offer effective thoracic

protection to near-side occupants. The restraint system was of only slight use in preventing projection of the head and failed to protect the near-side occupant from contact with the vehicle's interior or exterior frame."

- Danner and Langweider (1976) observed that "lateral collisions have a more direct impact on occupants than frontal ones, they cause more violent, varied, and complex injuries."
- Fildes, et al (2000) and Partyka, et al (1983) both "found that, in real-world side impact crashes, the risk of serious or fatal injury to near-side occupants was two times higher than for far-side occupants and that the risk of injury was two times higher with passenger compartment damage (PCD) than without."
- Riley, et al (1976) stated that "the risk of serious injury to a near-side occupant is twice that of a far-side occupant and that PCD also increases the risk of injury to the occupant."
- Danner, et al (1976) found that "Among belt-wearers, near-side occupants ran a four times higher risk of serious injury than did far-side occupants when there was PCD".
- Laberge-Nandeau, et al note that (2009) "traumatic rupture of aorta is twice as likely in lateral impact than frontal ones."
- Additionally, Chipman (2004) observes that "The risk of injury increases greatly when the passenger compartment is compromised (in lateral impact collisions) … Neither seatbelts nor frontal airbags offer much defense against doors collapsing inward, bending roofs, or side pillars."
- Finally, Kemaresan, et al (2006) describes that "the lap/shoulder restraint is not effective in a far-side crash (impact is opposite to the occupant location) since the occupant may slip out of the shoulder harness."

It is my professional medical opinion within a reasonable degree of medical and scientific certainty that, given the statistical and mechanistic factors described above, Mr. Adams and Mr. Rias (both near-side collision occupants) would have had a substantial likelihood of dying in this collision even if they had been wearing seatbelts.

It is further my professional medical opinion within a reasonable degree of medical and scientific certainty that that Mr. Pitts (far-side collision occupant) may have had an improved chance of survival had he been wearing a seatbelt, but given the statistical and mechanistic factors described above, he would still have had a substantial likelihood of sustaining a serious bodily injury or death even if he had been wearing a seatbelt.

Please feel free to contact me with any questions that you may have about this case.

Sincerely,

Ryan O'Connor, M.D.