Eugene P. Ramirez (State Bar No. 134865)
*eugene.ramirez@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
*kayleigh.andersen@manningkass.com*
Eugene Hanrahan (State Bar No. 185826)
*Eugene.Hanrahan@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

| | |
|---|---|
| DIANA BIAS; TATANISHA PITTS; DOMINIC ADAMS Sr., and BRITTANY MASON,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 5:25−cv−00207−JGB−ACCV<br>District Judge, Jesus G. Bernal<br>Magistrate Judge, Angela C. C. Viramontes<br><br>**ANDERSEN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* NO. 4**<br><br>*Filed concurrently with (Proposed) Order*<br><br>Date: 11/16/2026<br>Time: 9 a.m.<br>Crtrm.: 1 (2nd Floor) |

I, Kayleigh A. Andersen, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a Partner with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants, CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit A** is a true and accurate copy of Dr. Felix

Lee's Expert Report. Attached hereto as **Exhibit B** is a true and accurate copy of relevant excerpts of the deposition of Dr. Felix Lee.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 12th day of October, 2026, at Los Angeles, California.

*/s/ Kayleigh A. Andersen*
Kayleigh A. Andersen

MANNING | KASS

# EXHIBIT A

# "EXHIBIT 2"

July 27, 2026

Marcel Sincich, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Blvd, Suite 310
Woodland Hills, CA 91367

**Case**: **Rias v. City of Fontana *et al.***
**Case No.: 5:25-cv-00207-JGB-SHKx**
**Date of Incident: February 3, 2024**

## Qualifications

I, Felix Lee MS PE, am the Principal Engineer at Collision Reconstruction Consulting. I hold a Master of Science in Mechanical Engineering from the University of California, Los Angeles (UCLA) and am a licensed Professional Engineer in the state of California. I specialize in motor vehicle accident reconstruction and have investigated and reconstructed collisions involving passenger cars, commercial trucks, vans, buses, motorcycles, bicycles, and pedestrians since 2012. In my professional career, I have investigated over 1,200 traffic accidents and conducted engineering assessments of those accidents. In addition, I have qualified in California State Superior Courts and United States Federal Courts as an accident reconstruction expert witness.

## Assignment

I was retained by the Law Offices of Dale K. Galipo to review the supplied materials and to perform an accident reconstruction analysis of a motor vehicle incident that occurred on February 3, 2024 in Fontana, CA. The case materials I received and reviewed as part of my retention include:

- San Bernardino County Sheriff's Department MAIT Accident Investigation Report (225 pages)
- Fontana Police Department Initial Incident Report #240001556
- Supplement Incident Report by Computer Forensics Technician Kurt Wagner
- Surveillance footage from intersection camera – Valley/Cypress
- 122 color photographs taken at-scene by police
- 4 color photographs taken at-scene by Visual Labs
- Bodyworn camera footage from Officer Brian Zozaya
- Bodyworn camera footage from Officer Daniel Precie
- Bodyworn camera footage from Officer Edward Bautista
- Crash Data Retrieval (CDR) data downloaded from a 2020 Ford Explorer Police by SBSD MAIT
- Crash Data Retrieval (CDR) data downloaded from a 2020 Nissan Sentra by SBSD MAIT

## Background

It is my understanding that on February 3, 2024 at around 10:44 pm, City of Fontana police officers were in pursuit of a white 2022 Nissan Sentra SR (VIN: 3N1AB8DV6NY230192) driven by Giovanni Bonilla and transporting Robert Rias, Omari Pitts, and Dominic Adams. Robert Rias was the front passenger in the Nissan. Officer Jesus Mauricio Garcia was driving a black & white 2020 Ford Explorer Police 4x4 (VIN: 1FM5K8AB4LGC13863), a marked City of Fontana police vehicle.

The Nissan Sentra was initially traveling in the #1 lane of eastbound Valley Boulevard. After the Nissan crossed the Cypress Avenue intersection, the Ford Explorer exited the parking lot driveway of 16593 Valley Boulevard and turned left across the path of the Nissan. A broadside collision occurred between the Nissan and Ford. The Nissan then collided with a 2018 Toyota Corolla parked along the north curb of Valley Boulevard, rolled backwards, and collided with a parked Chevy Silverado.

The sequence of events leading up to collision was captured by an overhanging surveillance camera at the intersection of Valley Boulevard and Cypress Avenue. According to the police reports, the weather conditions were wet and there was a moderate sprinkle.

## Accident Reconstruction Analysis

The vehicle damage supports an initial collision between the front of the Ford Explorer and right front of the Nissan Sentra. This offset broadside collision would induce a clockwise rotation of the Ford Explorer and counterclockwise rotation of the Nissan Sentra, resulting in a "secondary slap" between the right rear of the Nissan Sentra and left front of the Ford Explorer. The police photographs depict a distinct wheel impression on the Nissan right rear door panel that matches the shape and form of the Ford Explorer right front wheel (Figure 1). After the Nissan and Ford separated from the "secondary slap" contact, the Ford continued to rotate clockwise to its rest position facing northeast. The Nissan continued to rotate counterclockwise in a northeast direction and struck the parked Toyota Corolla, before rolling backwards into a parked Chevy Silverado.

**Nissan Sentra**





**Ford Explorer Police wheel**

**Figure 1: Matching wheel impression from Ford Explorer (police vehicle) imprinted onto Nissan right rear door panel during secondary contact**

The Event Data Recorders (EDR) from the Ford Explorer and Nissan Sentra were downloaded by SBSD MAIT. I analyzed the EDR data from both vehicles in the context of the subject incident.

EDR data from the Ford Explorer indicates the police vehicle was traveling 16 mph at 5 seconds before impact (with the Nissan). The Ford then decelerated to 5 mph at 3.6 seconds before impact. Thereafter, full acceleration was applied (100% of full capacity) up to impact, where the Ford reached an impact speed of around 19 mph.

EDR data from the Nissan Sentra recorded the indicated vehicle speed, accelerator pedal activity, and braking activity during the 5 seconds leading to impact. The tires installed on the Nissan (P205/60R16) differ from the OEM tire sizes (P215/45R18). Accordingly, the actual vehicle speeds are 0.26% higher than the EDR-reported speeds after adjusting for the differences in the installed tire sizes and associated revolutions per mile (811.93 rev/mile for OEM tires, 809.81 rev/mile for actual tires). At 5 seconds prior to collision (with the police vehicle), the Nissan was traveling 105 mph (after applying the speed adjustment). The Nissan reached a top speed of 109 mph at 1.5 seconds prior to impact. The brakes were applied at around 1.5 to 2 seconds before impact. The Nissan was traveling around 83 to 84 mph during impact according to the EDR. As result of the collision, the Nissan sustained a longitudinal speed change (ΔV) of 36 mph and a lateral speed change (ΔV) of 44 mph over 110 ms.

The police documented the at-scene evidence (i.e. debris field, patrol unit light bar, vehicle rest positions of involved vehicles) using a laser scanner. A scaled scene diagram was prepared to plot the locations of the evidence.

PC-Crash, a validated momentum and vehicle trajectory software, was then used to reconstruct the collision between the Ford Explorer and Nissan Sentra and to simulate their post-impact trajectories considering the form, location, and degree of vehicle damage, roadway evidence, locations of secondary collisions, vehicle rest positions, and EDR data. The best-fit PC-Crash simulation of the collision and post-collision trajectories is depicted in Figure 2 to Figure 7.




**Figure 2: PC-Crash simulation, modeling collision between the Nissan traveling 82 mph and Ford traveling 20 mph**




**Figure 3: PC-Crash simulation, modeling "secondary slap" collision between the Nissan and Ford**




**Figure 4: PC-Crash simulation, modeling post-collision trajectories of the Nissan (CCW rotation) and Ford (CW rotation)**




**Figure 5: PC-Crash simulation, modeling post-collision trajectories of the Nissan (CCW rotation) and Ford (CW rotation)**




**Figure 6: PC-Crash simulation, modeling post-collision trajectory of the Ford (CW rotation)**




**Figure 7: PC-Crash simulation, modeling post-collision trajectory of the Ford (CW rotation), at rest**

The simulation indicates the Nissan was traveling around 82 mph during impact with the Ford Explorer traveling around 20 mph (Figure 2). The reconstructed area of impact was in the left portion of the eastbound #1 lane. The post-collision rotation of the Ford would have deposited debris across the eastbound lane and two-way turn lane, as documented in the scene diagram.

The reconstruction indicates the police-determined area of impact in the two-way turn lane is incorrect. It would not be physically possible for the Ford to slide 60' laterally (eastward) upon impact, since the Ford was in motion facing northwest and the Nissan was in motion facing northeast during impact.

The reconstruction also indicates the police conclusion that the Nissan lost control, slid to the right, and the passenger side of the Nissan collided with the front of the Ford in a broadside collision is inconsistent with the physical evidence. The initial impact, according to the reconstruction, was instead between the front left of Ford and right front of Nissan. There was no evidence of the right side of Nissan sliding into the Ford. The northeast orientation of the Nissan during impact is consistent with a leftward swerve applied just prior to impact with the Ford.

The Ford vehicle positions during the left turn leading up to collision were plotted, by working backwards from the reconstructed impact, and considering the speed and steering input data recorded by the Ford EDR in 0.2 second intervals. Figure 8 depicts the reconstructed path of the Ford during the 5 seconds prior to collision, in 1 second intervals. It indicates the Ford slowed to 5 mph just before reaching the driveway apron, and then accelerated at full throttle while negotiating a left turn across the eastbound lanes. The Ford entered the roadway at around 2 seconds before impact with the Nissan, after the Nissan had crossed the Cypress Avenue intersection.




**Figure 8: Simulated positions of the Ford Explorer (police vehicle) according to the Ford EDR data, working backwards from the reconstructed impact**

**Accident Reconstruction Findings**

Based on my review of the supplied case materials and accident reconstruction analysis utilizing peer-reviewed scientific techniques, the following conclusions were reached to a reasonable degree of engineering certainty:

1. During the pursuit of a Nissan Sentra where Robert Rias was the front passenger, Officer Jesus Mauricio Garcia, driving a Ford Explorer (marked police vehicle), negotiated a left turn out of a parking lot into the path of the Nissan
    a. The police vehicle was traveling around 5 mph before reaching the driveway apron and then applied full throttle while negotiating a left turn during the 3 seconds leading up to impact
    b. The police vehicle departed from the driveway apron and entered the roadway at around 2 seconds before impact
2. A broadside collision occurred between the Nissan and Ford (1st impact)
    a. The front left of the Ford struck the right front of the Nissan
    b. The area of impact was in the left portion of the eastbound #1 lane
    c. The Nissan was traveling around 82 to 84 mph during impact with the Ford Explorer traveling around 19 to 20 mph
    d. The Nissan sustained a longitudinal speed change ($\Delta V$) of 36 mph and a lateral speed change ($\Delta V$) of 44 mph
    e. The impact orientation of the Nissan (facing northeast, straddling the eastbound #1 lane and two-way turn lane) is consistent with a leftward swerve applied just prior to impact with the Ford
3. A "secondary slap" contact occurred between the right rear of the Nissan Sentra and left front wheel of the Ford Explorer (2nd impact), depositing a wheel impression onto the Nissan right rear door panel
4. The Nissan then collided with a Toyota Corolla (3rd impact) parked along the north curb of Valley Boulevard, rolled backwards, and collided with a parked Chevy Silverado (4th impact)

This report was prepared to summarize my findings reached to date based on the case information provided at this time. Should additional evidence be made available to analyze, the current analysis may be updated and a supplemental report may be issued.

Felix Lee

Felix Lee, MS PE
Principal Engineer
Collision Reconstruction Consulting

# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr., and BRITTANY MASON,

Plaintiffs,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA, and DOES 1-10, inclusive,

Defendants.

CASE NO. 5:25-cv-00207-JGB-SHKx

REMOTE DEPOSITION OF FELIX LEE, MS, PE

California

September 4, 2026

REPORTED BY: ASHLEY L. PROXMIRE, CSR
License No. 13664

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

DIANA RIAS; TATANISHA PITTS; DOMINIC ADAMS Sr., and BRITTANY MASON,

Plaintiffs,

vs.

CITY OF FONTANA; EDWARD BAUTISTA; JESUS GARCIA; DANIEL PRECIE; BRIAN ZOZAYA, and DOES 1-10, inclusive,

Defendants.

CASE NO. 5:25-cv-00207-JGB-SHKx

REMOTE DEPOSITION OF FELIX LEE, MS, PE, taken via Zoom videoconference, on Friday, September 4, 2026, at 10:05 a.m., before Ashley L. Proxmire, Certified Shorthand Reporter, License No. 13664, in and for the State of California.

APPEARANCES

FOR THE PLAINTIFFS:
THE LAW OFFICES OF DALE K. GALIPO
By: Marcel F. Sincich, Esq.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
(818)347-3333
msincich@galipolaw.com

FOR THE DEFENDANTS:

MANNING KASS
By: Eugene Hanrahan, Esq.
801 South Figueroa Street, 15th Floor
Los Angeles, California 90017
(213)624-6900
eugene.hanrahan@manningkass.com

ALSO PRESENT:

None

A. In -- earlier this year, I believe. I was first contacted in June. So that was when I was first retained in this case.

Q. In June of '26?

A. Yes.

Q. And on your report, you listed material that you had considered when drafting your Rule 26 report.

Is that true?

A. Yes, I did list material that I received and reviewed.

Q. Okay. And so looking at your report, you listed 11 items that you reviewed to prepare your report. Is that true?

A. For the initial report I prepared, yes, I did.

Q. Okay. Was there -- I have a report dated July 27th, 2026. Have you drafted any other reports other than that?

A. Yes, after that would be the rebuttal report that was prepared in August.

Q. Okay. And the rebuttal report was rebuttal to Dr. Wobrock's report?

A. Yes.

Q. Okay. And did you list items of evidence that you reviewed for that report?

A. The only additional materials I reviewed in

response to that would be the -- the two defense experts' reports. So, yes, I didn't include that.

Q. Okay. So the sum of actual discovery that you reviewed is contained on page 6 of your Rule 26 report.
Is that true?

A. Yes. That in combination with the two expert reports.

Q. Okay. Did you also create some three-dimensional video reenactments of this incident?

A. I did prepare -- yes. This was sent to an animator to create three-dimensional animations depicting the incident.

Q. Okay. And who is the animator?

A. It was a company called Fox AE.

Q. And who was your contact at Fox AE?

A. Nothing comes to my memory, but I know I've worked with him numerous times. I think there was probably a team there, not just a single person.

Q. So you did not prepare the actual 3D animated simulation. Is that true?

A. I've worked with the company so they have the foundation; they have the necessary movements of the vehicles that are consistent with the physics. They take my inputs; so I'm working with them. I take -- they take my inputs and ren -- make the renderings.

Q. And just let me make sure I have it correct. It's Fox, F-O-X, A-E, is the name of the company?
A. Yes.
Q. And where are they based out of?
A. I'm not exactly sure. It might be somewhere in Central U.S. Maybe Missouri, if I recall.
Q. Do you know what city in Missouri?
A. No, I don't.
Q. Do you know how many people were working on this animation?
A. I do not know. I just know I spoke with the project lead.
Q. Do you have any correspondence with that project lead?
A. Not written. We spoke over the phone.
Q. Did you ever communicate by e-mail with the project lead?
A. I don't believe so.
Q. Did you ever pay the animator any money?
A. I did not personally.
Q. Do you know how much the animator charged for their services to create these animations?
A. I don't.
Q. Did you reach out on your own with the animator on your own initiative?

A. No, I did not.
Q. Did you provide the animators with any information?
A. Yes. About the reconstruction, yes.
Q. Okay. Did you provide them with the EDR data?
A. I don't think I personally provided them that information, but they were probably supplied with the information. And we discussed it.
Q. Okay. Do you know for certain that they were provided the EDR data?
A. I believe they -- they're familiar with it, yes. We did discuss it.
MR. HANRAHAN: I'm going to move to strike as non-responsive.
BY MR. HANRAHAN:
Q. So my question is, first: Did you provide it to them?
A. No, I did not independently send them EDR data.
Q. Do you know whether they had the EDR data to create their animations?
A. I think those are two different things. They may have the EDR data, but they're relying on my inputs about the positioning of the vehicles and the movement.
Q. So is it accurate to say that you don't know one way or the other whether they actually had the EDR

data?

A. Well, I don't know for sure if they had it, but I know that we spoke about it.

Q. Okay. Well, when you spoke to them about it, was this in a phone call?

A. Yes.

Q. Have you ever met with any personnel from Fox AE in person?

A. No, I have not.

Q. How many times have you spoken over the phone with someone from Fox AE?

A. Probably three to five times on this case.

Q. Okay. So for a total of what amount of time did you speak with someone from Fox AE about this case?

A. If I were to provide an estimate, each time would be about a half hour to one hour. So it may be up to five hours.

Q. And when you submitted an invoice for this, did you include line items for your communications with the animators?

A. I did, yes.

Q. Okay. And how much time did you list in terms of -- and that's something that you recently --

MR. HANRAHAN: And Marcel, this is what we just got, basically? The invoice?

MR. SINCICH: There was an invoice that we received for Mr. Lee's services rendered. So if that's what he's referring to, then that would...

MR. HANRAHAN: I'm just trying to figure out what I have versus what I don't have.

BY MR. HANRAHAN:

Q. So, Mr. Lee, do you know whether the animators had at their disposal, when they're creating their animation, the same material that you used to draft your initial Rule 26 report?

A. I can't speak to -- on their behalf, what they received. So I don't know.

Q. Okay. So do you know whether they had the MAIT report that was 225 pages?

A. I don't know what they received.

Q. And have you worked with Fox AE in the past?

A. I have, yes.

Q. On how many occasions?

A. Other cases, maybe five times.

Q. Five times in the last year?

A. I probably first worked with them in -- maybe five years ago. So once in the last five years -- about once a year.

Q. Okay. When they were done with their animations, did they send their completed animations to

you?
A. They did, yes. For my review.
Q. Okay. And so as they were working on their animations, did they send drafts of their animations that -- before the final version?
A. Yes. They showed me their work product, and we had discussions before it was finalized.
Q. How many drafts of their animations did they send you before they sent you a final version?
A. Probably had, maybe, two or three discussions in between before it was finalized.
Q. Okay. But my question isn't how many discussions you had. My question is: How many drafts of the animation did they send you before they sent you the final one for your review?
A. Each time there's about -- two to three each time. There is a draft in the work product; we have a discussion until it was finally finalized.
Q. Well, they did various versions or various perspectives in their animations. Is that true?
A. That's my understanding.
Q. Okay. Well, have you seen all of their videos that they -- that were ultimately produced to the defense?
A. Yes.

Q. Did you sign off and approve all of those videos as accurate and truthful?

A. Yes. The final version is what I agreed is the final version.

Q. Are you trained as an animator?

A. I am not an animator.

Q. I know you are not an animator, but have you ever received any training in creating animations based on hard data, such as EDR data, or police reports, or surveillance video or anything like that?

A. I don't create animations. I make simulations that are physics-based and evidence-based. Animations and simulations are different.

Q. Okay.

A. So to answer your question, I don't -- on the animation side, I don't have training in that; but in the simulation, the physics and engineering, I am.

Q. Okay. And the simulation, your work product results in the diagrams that we have that the police created. Is that true?

MR. SINCICH: Vague, ambiguous.

BY MR. HANRAHAN:

Q. Well, let me clarify that. Your work product is eight -- eight figures in your -- actually, I think it is seven. A total of seven figures, 2 Through 7 -- 2

through 8, rather, in your Rule 26 report showing the path of the vehicles during this collision.
Is that true?
A. It does include that information, yes.
Q. Okay. Are there any other simulations that you created other than these seven figures, 2 through 8?
A. Besides those, those are the only two simulations that were prepared because they model -- they're basically filling in the blanks of what the surveillance video doesn't capture. So the answer is yes.
Q. Okay. Well -- okay. The answer is yes, but this -- this is the sum of your work product, these figures, 2 Through 8, in terms of trying to simulate the collision. Is that true?
A. Yes, between the Nissan and the Ford. Correct.
Q. Right. Now, just back to the animation. Do you know how many hours the animators spent on creating their animations?
A. I don't. I did not ask that question to them.
Q. And in their animations, they created versions under various light conditions. Do you know how they did that?
A. Well, I don't know the exact science behind it, but they -- I'm sure there's something in the program

and the animations that they can do to make that -- adjust that variable.

Q. Okay. Well, do you know what information they used to determine how light or dark the scene was?

A. There's ambient lighting. We know the conditions based on the video, the surveillance video. We know this occurred during hours of darkness. So those are the variables they likely relied on.

Q. Okay. I know what they likely did or not, but do you know exactly how they went about creating in their videos -- or deciding in the creation of their videos how light or dark their videos were going to be?

Do you know that yourself?

A. I don't know exactly, but I know that they're trying to make the best representation according to what they see in the surveillance video, what appears there.

Q. In the first draft of their videos that they created, what was on the first draft of their videos?

MR. SINCICH: I'll object. It is work product. Instruct not to answer.

MR. HANRAHAN: Are you saying that -- okay.

BY MR. HANRAHAN:

Q. Well, let me ask you this. Was -- when you spoke with the creators of the animation, was an attorney present?

A. In the initial conversation between myself and Fox AE, I don't think Mr. Sincich was present.

Q. Okay. Well, I'm just saying any attorney at all. During -- and I'm talking about during the conversations when these drafts were going back and forth. Was an attorney present on the phone call when you were speaking with the animators?

A. Probably just one time out of the three to five conversations I had with Fox AE.

Q. Okay. Was that at the first, second, third -- or which conversation?

A. Probably closer towards the end, when it was close to getting finalized.

Q. Okay. And so was that at the fourth or fifth conversation?

A. I would say somewhere close to that.

Q. Was it at the fifth conversation?

A. Doesn't -- it was not the last. It was not the first. Somewhere in between.

Q. Okay. And -- and I'm not going to ask what was said during that conversation, but was there just one attorney present on that -- during that conversation?

A. Yes.

Q. And what attorney was that?

A. It is plaintiff's counsel appearing today,

here.

Q. Okay. So Mr. Sincich for the record?

A. Correct.

Q. And -- and that conversation lasted how long?

A. Maybe 10, 15 minutes.

Q. Okay. And that was the only time -- and was that -- that was the only time that Mr. Sincich participated in these conversations that you were having with the animators. Is that true?

A. Between the three parties -- the three of us, that's what I recall.

Q. And was that conversation over Zoom, or was that conversation over the phone?

A. Probably Zoom.

Q. When you were communicating with Fox AE other than that time working up this case, were you communicating with them over Zoom or by the phone?

A. It would be a combination of both.

Q. Okay. Well, let's talk about the first time. Was that over the phone or Zoom?

A. Over the phone.

Q. The second time, was that over the phone or Zoom?

A. Likely, it was over Zoom.

Q. Now -- and as you're going over Zoom, are you

looking at the versions of the animations and providing input to the animators?

A. I am, yes.

Q. Okay. And you're telling them -- and -- based on your expertise, how you think the animation should look. Is that true?

A. Yes. Because it has to be consistent with collision dynamics, how the vehicles move. So they're really relying on how I model the crash, and they're just making an animation portion.

Q. Okay. And -- but you don't know the information that they have to start with -- to start their work product. Is that true?

A. Well, I know based on what we discussed that they do have the video. They do have some documents. If they didn't have it, they wouldn't be able to have a conversation with me.

Q. Okay. But I'm just asking that -- you're unaware of, in particular, what precise reports, photographs, discovery they have to begin their work product. Is that true?

A. Right. They didn't send me a list of what they have. So I don't -- I don't know exactly what they had.

Q. And you didn't give them a list of material that they needed to rely on to create an accurate

animation. Is that true?
A. No. I don't supply the materials to them. I only supply the inputs, the information that they need to -- to render these -- these animations.
Q. And is it your opinion that these animations are accurate portrayals of what happened during this incident?
A. Yes. They're based off of physics. They're based off of my reconstruction of the movements of the cars, which -- my reconstruction is then based on the evidence that I reviewed. I would say yes.
Q. Did you ever put in your Rule 26 report that -- any comments about the animations?
A. Any comments about the animations? No, I did not.
Q. Okay. Did you ever represent in your Rule 26 report that the animations are accurate?
A. I did not put in text, that. I included the animation in my file, which is based on the reconstruction.
Q. Okay. And did you interact with more than one person at Fox AE -- Fox AE?
A. No, just -- I was just speaking with one person on the team.
Q. And -- and when you would set up the Zoom call,

did you have an e-mail to which the Zoom call link would go?

A. I don't think I e-mailed. I think I just received a notification through, I guess, the calendar. To participate.

Q. Okay. Have you ever communicated with Fox AE by e-mail?

A. I don't think they corresponded with me, no.

Q. Okay. So you're saying that Fox AE has never corresponded with you over e-mail?

A. I don't recall any times they e-mailed me anything.

Q. And you're saying the -- so how was the timing of the Zoom call set up? You would just, out of the blue, get a calendar notification that there was a Zoom call pending?

A. Well, I think we probably spoke from previous Zoom meetings or phone calls that we agreed to a time, and then they send me a notification.

Q. Do you have Fox AE's phone number of the representative that you --

A. Yes.

Q. Okay. What is that phone number?

A. His phone number -- it is on my phone, so -- it's their company phone number.

Q. Does he have an individual phone number that you call?
A. Like, it's the office number. 573-279-2500.
Q. You don't have a direct line for this person?
A. No, I don't. This is the number that he calls me from.
Q. Okay. And so in the first time -- or I'm sorry. During your second meeting, when you were speaking over Zoom, did you see a draft of the animation?
A. By the time we had our second conversation, I believe he did show what he -- he had, yes.
Q. Did he ever send you an actual file of the animation like I have now?
A. No. Because it was work product; so it was not sent to me. It was just displayed over Zoom, and we just looked over it. I provided comments.
Q. So have you ever actually, yourself, received a file of the final video?
A. Of the final video, yes. Through plaintiff's counsel, yes.
Q. Okay. So -- but you're saying that the animators never sent you directly the files of their work product?
A. Of the work product, correct. Because it's a

draft.

Q. And the only time you saw the drafts and the final version was during the Zoom call. Is that true?

A. Yes.

Q. So -- but have you looked at the final version on the file that was sent to you by plaintiff's counsel?

A. Yes.

Q. And is that any different from the earlier versions of the -- the drafts of the videos that you received?

A. Sure. There were revisions done between, so yes.

Q. Okay. What are some of the revisions?

MR. SINCICH: I'm going to instruct not to answer on the grounds that it's attorney work product.

BY MR. HANRAHAN:

Q. Okay. Well, is the only time that Mr. -- an attorney was involved in your conversations about this video that one time, during the 10-, 15-minute phone call?

A. It was the time that I recall that we all were in a call together.

Q. Okay. And that was the only time, correct?

A. For -- for all three parties, yes.

Q. Okay. Well, the first time you got the version

mean, less than 50.
Q. When you were meeting with this person, you never addressed the person by name?
A. I do.
Q. Okay. And you have no recollection of this person's name at all?
A. I do know who it is.
Q. Okay. But I was asking if you know the name of the person.
A. Yes.
Q. Okay. Could you state what the person's name is?
A. His name was Mark.
Q. Do you know what Mark's last name was?
A. Yes.
Q. Okay. What is Mark's last name?
A. Maletic.
Q. Could you spell that for the record, please?
A. M-A-L-E-T-I-C.
Q. That is M-A-L-E-T-I-C?
A. Yes.
Q. Do you have Mark's cell phone number?
A. I don't.
Q. Do you have Mark's e-mail address?
A. Not offhand. I'd have to look at his website

to see if it's there.
Q. Do you know what Mark's position is with Fox AE?
A. It's probably like a project manager or -- I know he makes animations, but I don't know exactly his title.
Q. Did you interact with any other personnel at Fox AE?
A. I did not.
Q. Now, during the first Zoom call you had with Mark, he showed you an overhead view as well as an animation of the perspective from the Nissan's point of view. Is that true?
A. Yes. That is a work product draft, yes.
Q. Did he show you a bright version of the Nissan's point of view?
MR. SINCICH: Vague and ambiguous.
THE WITNESS: The answer would be no. Because I think when we started from the -- when we started from the beginning, it is to actually remodel the positions of the vehicles first before we put them in the environment. So there is no environment.
BY MR. HANRAHAN:
Q. Okay. Did he show you a dark-version animation from the Nissan's point of view?

MR. SINCICH: Vague and ambiguous.
THE WITNESS: No. At the time, it was a black-and-white type of draft. So, no.
BY MR. HANRAHAN:
Q. Okay. And so are those -- the only two animations that he showed you during that first Zoom call was the overhead and the Nissan's point of view?
A. Yes. At that time it was -- yes. To see what needs to be done and for me to explain how the collision occurred, multiple collisions. So that needs to be accurately modeled first before we put in an environment.
Q. Okay. So initially, the animation is rudimentary. Is that true?
A. Yes. Everything has to start from that stage.
Q. And do you know what software he's using to create the animation?
A. I don't know offhand.
Q. Do you know what trainings he's had in creating these animations?
A. I don't know offhand what his background is or what specific -- what his specific background is, but I do understand he's been creating -- the company has been creating animations for many years.
Q. And so are you basically trying to get him to

create an animation that is consistent with your simulation?

A. That's the idea, yes. To -- to make a rendering from different vantages and perspectives; what's the environment and 3D space that accurately depicts what occurred based on the reconstruction.

Q. Well, based on your reconstruction. Is that true?

A. Right. My reconstruction is based on the evidence, the videos I reviewed, the data I reviewed. And then from that, I determined the path of the vehicles, how the vehicles collided. And then Fox AE took that information to make these renderings.

Q. Did he create these reports with the benefit of having at his disposal your Rule 26 report?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: I don't know exactly what they relied on, if that's what I've mentioned to them about how the vehicle should be modeled. I'm not sure if they received my report, but if they did, it is consistent with what I spoke with them about.

BY MR. HANRAHAN:

Q. Well, when you say "how the vehicles should be modeled," did you provide for them the model of the police vehicle?

A. Yes, the movements of it. Yes. I'm sure they -- they would have seen this report in order to be able to model the positions.

MR. HANRAHAN: Well, I'm going to move to strike as non-responsive.

BY MR. HANRAHAN:

Q. I'm asking you if you personally provided that. I'm not asking you to assume they saw anything. I think you assume that they saw certain things because they gave you some material. I'm just asking you, as to your personal knowledge, of what they had and what they didn't have.

So do you know personally that they had your Rule 26 report? Yes or no?

A. I don't know personally. I didn't send it to them -- I didn't send it to them personally.

Q. Okay. Do you know personally if they had your diagrams that were your reconstruction of the incident? Do you know that personally or not?

A. Yes. I know that they do have the diagrams.

Q. And did they tell you that you -- they had the diagrams?

A. Yes, based on a subsequent meeting that they had modeled it based on the diagrams and the positioning that appears in the diagrams.

Q. Well, so we talked about your first Zoom call where you got the rudimentary versions, the overhead view, and the Nissan's point of view at your meeting that --

Well, let me ask you: During the Zoom call, or during the conversation that you had with Mr. Sincich and the -- and Mark, do you have the date of that Zoom call or conversation?

A. Sometime after that, I think. Probably -- let me see. On -- on the 26th or 27th.

Q. Of July?

A. Yes.

Q. So was that the third conversation that you had on the subject with Fox?

A. That sounds about right.

Q. Okay. So on the -- and that was the one and only time that there was an attorney present during your conversation with a representative from AE.

Is that true?

A. Where the three parties had a meeting together, yes.

Q. Okay. So now let's talk about the next Zoom meeting that you had with -- with Mark from Fox AE. At that time, did you see versions of these 11 animation videos?

A. I would say it's likely yes. I believe that was probably the point where it was the final version.

Q. And so on -- at the fourth meeting, you saw all of the videos that are on Exhibit A. Is that right?

A. Yes. Yes, I did.

Q. Okay. And did you tell him -- him being Mark, to make any changes to those videos?

MR. SINCICH: I'm going to instruct not to answer as attorney work product.

BY MR. HANRAHAN:

Q. Okay. Were there any changes made to the videos from the time that you saw them during this fourth meeting until you received the final version?

MR. SINCICH: Assumes facts. Vague.

THE WITNESS: I'm not aware of any other changes.

BY MR. HANRAHAN:

Q. So to your recollection, the version that you received during the fourth meeting was the final version of -- of the videos. Is that true?

A. From my recollection, that sounds about right. Yes.

Q. So between the second meeting and the fourth meeting, did you personally receive or see any versions between the second and the fourth versions -- I'm sorry.

Let me rephrase that.
Did you personally see, between your second meeting where you saw the rudimentary videos and your fourth meeting, which contains the -- basically, the final versions. Did you see any versions of the animations between those times?
A. Yes.
Q. Did you see them only in a Zoom meeting?
A. Yes, that's the way that was presented to me.
Q. And your conversation during the Zoom -- third meeting, in which Mr. Sincich appeared, that lasted only 10 or 15 minutes. Is that true?
A. From my recollection, yes.
Q. And during that meeting, did you see any of the versions of the animation videos?
A. Yes. A draft was shown, yes.
Q. Did you see a draft of all 11 versions?
A. I don't -- I don't know if there were that many that was presented.
Q. How many were presented?
A. I don't recall offhand exactly how many were.
Q. What point of view was presented during the third meeting to you?
A. I don't recall offhand exactly which ones were shown to me.

Q. As for -- well, now we have been going over -- I should have said this at the beginning, Mr. Lee, but generally, we try to break every hour or so. But that is not a hard-and-fast rule. If you want to take a break, you have to go get some water or something, just raise your hand and just let me know. This isn't meant to be an endurance event.

So why don't we take -- is it okay if we take ten now and come back at 11:20?

A. Sounds good to me.

THE COURT REPORTER: Okay. Off record, Counsel?

MR. HANRAHAN: Yes, thank you.

(Whereupon, a break was taken.)

BY MR. HANRAHAN:

Q. So at any point in time, Mr. Lee, did you advise Mark to make a version of any of the 11 videos darker?

A. No, I don't think that was ever mentioned.

Q. Okay. Did you ever advise Mark to make any of the lighting conditions in any of the videos lighter?

A. No. Not specifically, no.

Q. Did you -- did you ever say so generally?

A. No, I did not talk to him about that.

Q. Did you ever comment to Mark about adding a

point of view?

A. No. I don't think I spoke to him specifically about that.

Q. Did you ever speak to him about adding a right-way version of the video?

A. I did -- I did talk -- have a brief discussion about that scenario, yes.

Q. I'm sorry. Can you repeat your answer? I missed the last sentence.

A. Yes, I did briefly discuss with him about something about that.

Q. Did you instruct him to create a right-way version of the animations?

A. I did not instruct him, no.

Q. Did he volunteer to create a right-way version of the animations?

A. I don't know what -- if it was voluntary or who instructed him to do that. There was not --

Q. You just --

(Cross-talk.)

A. -- myself.

Q. Okay. Did you instruct him to create a combined view of all of the animations into one video?

A. No. I think that's something they do as a standard practice.

Q. Did you give him any instructions about the creation of the animation?

A. Yes, that it should be something that accurately depicts my reconstruction of how the vehicles moved. And here is the -- this is how the vehicles collided, how they moved after the crash. This is how the vehicles proceeded and ended up where they ended up.

Q. Okay. Well, what I'm thinking more is: During your conversations with Mark, did you give him instructions on how to change a version of the animations?

A. Yes, I provided feedback about what details might need to be changed. Yes.

Q. What did you tell him?

MR. SINCICH: I'm going to instruct him not to answer. It's attorney work product.

BY MR. HANRAHAN:

Q. Did you see any errors in any of the animation -- in any of the draft animations that Mark created?

MR. SINCICH: Instruct not to answer. Attorney work product.

BY MR. HANRAHAN:

Q. Well, I'm not asking you what anyone said or did. I'm asking what you saw. Did you see any errors

in earlier drafts of the animations?

MR. SINCICH: Instruct not to answer. Attorney work product.

BY MR. HANRAHAN:

Q. Now, I'm going to go on to your initial report. I'm going to mark this as -- I think we're on Exhibit B. What is today -- Exhibit A? Exhibit A is the --

(Whereupon, the Court Reporter interrupted the proceedings.)

MR. HANRAHAN: Screenshot. Okay. So Exhibit B is Mr. Lee's initial expert report.

(Whereupon, Defendant's Exhibit B was marked for identification.)

BY MR. HANRAHAN:

Q. Oh, let me do it this way. So just so we have it as a point of reference, I'm going to share my screen with you.

Mr. Lee, do you recognize this document? It's Exhibit B. It's a -- 21 pages, and it's your initial Rule 26 report.

A. Yes, this is the Rule 26 report.

Q. And the figures that you created, Figures 2 through 8, are your -- how would you -- what expression would you use? Your exhibits or your simulations that is your work product in this case?

A. Yes. They were screenshots of the simulation that I prepared in this case.

Q. And the method that you used to create these simulations was, you used a software product. Is that true?

MR. SINCICH: I'm sorry. I didn't catch the word. Some product?

MR. HANRAHAN: Software product.

THE WITNESS: It was generated using a computer simulation program.

BY MR. HANRAHAN:

Q. Okay. And according to your report, you used a computer simulation program called PC Crash. Is that right?

A. That's correct.

Q. And PC Crash has the ability to have input, into the software, the EDR data from the vehicles. Is that true?

A. Yes.

Q. And PC Crash has the ability to accept as input the make of the vehicles that are the subject of the crash. Is that true?

A. Yes, for accurate dimensions. Yes.

Q. And the precise model and year of the vehicles. Is that true?

A. Yes, it is.
Q. And it looks like -- that you took, for your simulation, overhead views of FARO scans of the incident. Is that true?
A. Right, yes. That is the foundation for a scene diagram, yes.
Q. Okay. So -- and also, PC Crash has the ability to accept as an input surveillance videos or -- to create the simulation of a crash. Is that true?
A. No, it does not have that capability.
Q. Okay. So the only thing it can accept are data that you manually input. Is that true?
A. Correct. Because it's primarily a computer program that simulates collision and how vehicles respond to it based on principles of physics and momentum.
Q. Right. So did you input the precise make of the vehicles into the software when you created your simulation?
A. I did, yes.
Q. Did you create -- input the exact model of the vehicles when you created your simulation?
A. Yes.
Q. Did you put the exact year of the vehicles when you created your simulation?

A. Of course, yes.
Q. Did you input the EDR data into PC Crash when you created your simulation?
A. I did consider and rely on it, yes, but I did not input that information. In this simulation, it is from impact to rest. So it doesn't have -- you know, I didn't -- I didn't -- so it didn't consider the EDR data.
Q. Well, let's clarify that answer a little bit, if you don't mind. So PC Crash has the ability to, you know, automatically reconstruct the crash using the precise electronic data from the vehicles involved in the crash. Is that true?
MR. SINCICH: Overbroad.
THE WITNESS: You know, not exactly. Because -- I mean, you can input what the EDR data is showing, what the report is showing, but you still need to match the physical evidence independently. So you can run a simulation with just what appears in the EDR report, but --
BY MR. HANRAHAN:
Q. Did you do that?
A. Yes. If you just take the impact speeds of the -- if you're just looking for a simulation from impact to rest, yes, I did start off with that as -- as

part of the draft of the simulation. And the vehicles don't -- don't move in a trajectory that matches the evidence. So there are some other manipulations, adjustments that need to be made in order to match the EDR and also the physical evidence.

Q. So you did do an analysis using the EDR data in PC Crash. Is that true?

MR. SINCICH: Overbroad.

THE WITNESS: Yes, I relied on both. I relied on EDR data along with other pieces of physical evidence.

BY MR. HANRAHAN:

Q. Okay. Did you create any diagrams or screenshots of your work based on the simulations that were spit out when you just relied on the EDR's precise data?

A. No. I didn't save some of the drafts -- you can't -- well, let me just first point out that you can't re --

Q. Was the answer "no" to my question, Mr. Lee? I don't -- I only have so much time. So if --

MR. SINCICH: Argumentative. He's --

(Cross-talk.)

MR. HANRAHAN: -- question.

MR. SINCICH: It is argumentative. He was

answering the question. So allow him to answer the question.

THE WITNESS: Okay. So in order to reconstruct the collision, you need to know where the error of impact is, and EDR does not tell you where the error of impact is. So there's some -- there's some optimization that needs to be done.

And the EDR doesn't also tell you what the impact alignment is. It might tell you what the impact speed is, but there's other variables that you need to make adjustments for and determine, and the simulation helps with that.

BY MR. HANRAHAN:

Q. Okay. So the EDR data -- let's talk about what the EDR data contains. The EDR data contains, really, just basic information about what the vehicles were doing right up to the moment of the crash and a bit afterwards.

Is that correct?

A. Generally true, yes.

Q. And so the information they contain is, importantly, the velocity that the vehicle was going.

Is that true?

MR. SINCICH: Overbroad.

THE WITNESS: It does report of a speed, yes.

Although in certain situations, it might not be accurate. Yes.
BY MR. HANRAHAN:
Q. I understand. There could be variables about how accurate the data is. It could be -- vary based on the size of the tires of the vehicle. Is that true?
A. That is correct, yes. That is one example.
Q. For example, if the tires were smaller than they're supposed to be on a vehicle, the vehicle would actually be going faster than appears on the EDR data.
Is that true?
A. Yes, by certain -- depending on the radius or the diameter, or the exact time.
Q. And you made that calculation in this case, where the EDR data showed that the white Nissan -- showed that it was going a certain speed, and you found that in reality, based on the size of the tires, the Nissan was going even faster than was reported in the EDR data.
Is that true?
A. I -- yes, by .26 percent. Correct.
Q. And you found that -- about 1.5 seconds before the Nissan collided that it was going 109 miles per hour. Is that true?
A. Yes, that's correct.

Q. And let me just clarify. Before the Nissan collided with the patrol vehicle, it was going 109 miles per hour. Is that true?

MR. SINCICH: Misstates facts. Overbroad.

THE WITNESS: At one and a half seconds before impact, yes.

BY MR. HANRAHAN:

Q. Okay. But then the Nissan, according to the EDR data, applied the brakes right before impact with the patrol vehicle. Is that true?

A. The brakes were applied for about one and a half to two seconds before impact and slowed down before impact.

Q. Okay. And the EDR data can show all of that; it can also show whether the vehicle was braking.

Correct?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: During the five seconds leading up to the crash, it does have -- record that brake input, yes or no.

BY MR. HANRAHAN:

Q. I'm sorry. I -- your answer was breaking up. Could you repeat it, please?

A. The EDR does record for five seconds leading up to the crash if the brakes were applied or not.

Q. Okay. It can also tell you whether the accelerator was applied during that period of time. Is that true?
A. Yes, if the throttle was depressed. Yes.
Q. And it can tell you the angle of the steering.
Is that correct?
A. According to what it records from the steering wheel, it may.
Q. Okay. Well -- and it can tell you whether the vehicle was going straight or skidding. Is that correct?
A. It doesn't tell you that.
Q. Well, it can tell you what direction the vehicle is facing, correct?
MR. SINCICH: Objection. Vague.
THE WITNESS: No to that.
(Whereupon, the Court Reporter asked for clarification.)
MR. SINCICH: Vague.
BY MR. HANRAHAN:
Q. It can tell you the direction the tires are facing. Is that correct?
A. Tires are facing? That sounds a bit vague. I mean, it's --
Q. But you understand?

A. -- not the steering, actually. It just tells you about the steering wheel, how far it's turned, based on what the sensor reads.

Q. Yes?

A. It doesn't tell you what's -- what the angle of the tire is.

Q. Okay. And in your simulation here, I'm going to -- I've taken a couple screenshots. I'm going to put Exhibit B -- we will call this Exhibit C. Which is just -- 26 --

(Whereupon, Defendant's Exhibit C was marked for identification.)

BY MR. HANRAHAN:

Q. Exhibit C is just your seven diagrams. So first, let's talk about what you describe in your simulation. And, again, this is just based on an overhead view from the FARO scan that the police took from the scene.

Is that true?

MR. SINCICH: Overbroad. Vague and ambiguous.

THE WITNESS: What you see here is a scene diagram compared from the FARO scans, and it is overlaid with another aerial map of the scene from your maps, and then I also input the vehicles according to how they are lined up during the initial impact, based on my

determination.

BY MR. HANRAHAN:

Q. Okay. Well, let's put in just, like, what you put in and what was there to begin with. So this background that is in color, that is what you added to create this exhibit. Is that true?

A. Yes.

Q. And, again, we're talking about -- we're referring to Figure 2 from Exhibit C. And -- but this black-and-white area with red lettering and green numbers, that was created by the police, correct?

A. Yes. In the black-and-white image, yes, those were primed from the police based on their on-scene measurements.

Q. And you're the one who added in the writing that appears in black on this exhibit. Is that true?

A. Yes. And that's according to the police report. That shows, you know, this is what they labeled as what.

Q. So -- and here, does this report indicate an area -- or does this figure, rather, indicate an area of impact that you added to the exhibit?

A. Yes. That's my reconstruction of it.

Q. Okay. And where did you add -- and so in your opinion, the area of impact was basically right at the

center line of the -- the street. Is that true?
A. Yes, it is.
Q. And you have the Nissan in white on the left and the Explorer on the right. Is that true?
A. True.
Q. And does this diagram show -- I'm looking at this vehicle at the top of the diagram, along the curb. I will put an arrow on that. I think that will make it clear -- clearer.
Do you see that white car that is facing west on the curb?
A. Yes.
Q. Was that white car that the arrow was pointing to part of the original FARO scan that you were using to create your diagram?
A. No, it was not. The answer is no.
Q. Okay. Did you, using your PC Crash software, put that car at that location?
A. Yes.
Q. And is that white car supposed to represent -- it looks -- that looks like the white Nissan Sentra. Is that correct?
A. I'm not sure if it's another Nissan Sentra. It may be a Toyota.
Q. Okay. Well, what vehicle is that supposed to

be?
A. It was a parked vehicle on the curb. I believe it was a Toyota.
Q. Okay. Well, do you see -- so you think that that's the Toyota that the Nissan collided with?
A. Yes. It was the white Toyota that was eventually pushed over a sidewalk, yeah. The Sentra, after being struck by the Ford Explorer, rotated and then struck this parked vehicle and pushed it over the sidewalk and then rolled backwards and hit the pickup truck that was also parked.
Q. So this vehicle -- that's the black vehicle, right above the No. 9 -- what vehicle is that?
A. It's a parked pickup truck. I believe it would have been a Silverado. So -- a Chevy Silverado.
Q. Okay. And this diagram, you put in: "V1 comes to rest." Is that supposed to be where this dot is, just east of the pickup truck?
A. Right. We can see from the scene photos that police took, that's where the Nissan ultimately came to rest. Partially on the road, partially on the sidewalk.
Q. Okay. And the No. 4, that little dot. That's where the patrol vehicle came to rest. Is that true?
A. This right here, where your cursor is? Yes.
Q. So when the Nissan Sentra collided with the

Explorer, what speed was it going according to the EDR data?

A. According to the EDR data, if you just take the report as it is, it was going about 80 -- 83 or 84 miles per hour.

Q. But your calculations was that it was going faster than that. Is that true?

MR. SINCICH: Vague as to time.

THE WITNESS: If you're asking based on my reconstruction, it is going about 82 miles an hour.

BY MR. HANRAHAN:

Q. Okay. So after -- you're saying, according to your reconstruction, that the Nissan, once it collided in this way with the Explorer, at this location, it shot up and hit this white vehicle, where the white arrow is.

Is that true?

MR. SINCICH: Vague as to time. It is argumentative and misstates the facts as -- as formed in your question.

THE WITNESS: After the initial impact that we saw -- or that you see in this diagram, there is another impact with the Ford; it's a secondary slap. And the Nissan rotates counterclockwise and, yes, gets redirected in a northeast direction, where it collides with the parked vehicles.

BY MR. HANRAHAN:
Q. So you're saying that there were effectively two collisions between the Nissan and the Explorer. Is that true?
A. Correct.
Q. But you're saying that the Nissan, from this position that we are looking at right now in Figure 2, that struck -- broadside -- this white vehicle, after getting struck at this angle by the Ford Explorer.
Is that true?
MR. SINCICH: Vague. Ambiguous.
THE WITNESS: I'm trying to understand your question. I think if you're asking: "After this collision, there was a secondary collision?" Yes.
Between the right side of the Sentra and the left side of the Ford Explorer, yes.
BY MR. HANRAHAN:
Q. We will get to the secondary collision, but all I'm saying is that -- your testimony is that the Ford Explorer struck the Nissan at the angle depicted in this illustration. Is that true?
A. That's accurate, yes.
Q. And you're saying that at some point after that, the Nissan struck this white vehicle with the red arrow, correct?

A. Yes.

Q. And that at some point after that, it went straight east and landed in the -- facing the opposite direction along the curb where you've indicated D1 coming to rest. Is that true?

A. Yes.

Q. And -- so if a vehicle -- did you calculate in your simulation if the Nissan was just -- strike that.

Let's go to the second one. With respect to -- this is the second illustration, Figure 3. Is this illustration your diagram about what you're calling the "secondary slap"?

A. That's true, yes.

Q. Okay. And have you seen the photographs of the Ford Explorer?

A. I have.

Q. Have you seen the damage to the front of the Ford Explorer?

A. Yes.

Q. Have you seen the -- that the Ford Explorer has -- most of the hood of the Ford Explorer sheared clean off. Would you characterize it that way?

A. Sheared completely off? It was -- it was quite distorted, yes.

Q. Okay. Well, was there a big part of the front

of the Ford Explorer completely missing from the Ford Explorer after the collision?

A. Completely missing? Its front bumper structure was dislodged, and the condenser was dislodged. Multiple parts were off the vehicle.

Q. Okay. Was the engine dislodged from the vehicle?

A. I don't believe it was. I see the engine block was intact.

Q. Okay. And so your position is that this interaction on Figure 3, this is where the front-left tire of the patrol vehicle made contact with the door of the Nissan. Is that true?

A. Yeah, you could see a direct impression, and it was very clear that it was caused by these two parts slapping into each other.

Q. And after they slapped together, you're saying that the Nissan shot north -- or almost due north, but northeast -- and collided broadside with the Toyota. Is that true?

MR. SINCICH: Vague. Ambiguous.

THE WITNESS: That was the secondary -- that's the third impact. Correct.

BY MR. HANRAHAN:

Q. Okay. And that was caused by this secondary

slap. I'm just talking about the path that the Nissan took. Now, let me just try to get an arrow. You are just saying that the path that the Nissan took after this secondary slap, was that the direction --

Is it accurate to say that it took this direction that I've added in red?

A. Depends how you represent it. It didn't go from the tail to the head of the arrow like that. It spun; it rotated counterclockwise into the yaw from A to B.

MR. SINCICH: Real quick. I'm sorry. The -- was -- the arrows on the previous ones, are they marked in the -- in the exhibit?

MR. HANRAHAN: Yeah. The first one added -- this is my exhibit. Exhibit C.

MR. SINCICH: Well -- with the arrows included?

MR. HANRAHAN: Yeah.

MR. SINCICH: Okay. Okay. So that -- I was just wondering if you were needing to describe the arrow, if it was going to be removed from the exhibit.

MR. HANRAHAN: No, I'm going to leave it in.

MR. SINCICH: Okay.

BY MR. HANRAHAN:

Q. So let me just make it a little bit clearer, I guess. I will just leave it. So do you see the

direction -- I will make it going right into the vehicle because it did collide with the vehicle. As it stands now, on --

I've just slightly changed the arrow going directly from the white Nissan to the Toyota. Never mind that it was spinning or yawing or anything like that. Does this red arrow accurately show the precise path of the Nissan colliding with the Corolla?

MR. SINCICH: Vague and ambiguous. Assumes facts.

THE WITNESS: I would say no; it is not a precise path. You drew a straight path. It doesn't move like that. It -- it spun. So it cannot travel in a straight path.

BY MR. HANRAHAN:

Q. Well, even something that is spinning can travel in a straight path, though. Isn't that correct?

A. No. That -- a vehicle that is spinning -- it's radial. It does not travel linearly.

Q. Okay. So are you saying it curved when it -- on the path between this center line of the road to colliding with the Nissan?

A. Yes. It cannot be in a straight -- straight line, yes.

Q. Okay. And -- well, let me ask you -- okay. I

will break it up a little bit.

Is it a curve that went, like -- and I'm going to -- okay. So I'm going to add -- I'm adding a third, another version of Figure 3 to the exhibit, and it shows a slight curve that goes from -- that starts more due north and veers at the last several feet east.

Is that how the curve went between the center line and colliding with the Nissan?

MR. SINCICH: Vague and ambiguous. Overbroad.

THE WITNESS: No, not quite. Because you have to keep in mind the car is rotating counterclockwise. It is not rotating clockwise, like you have it here.

MR. SINCICH: And so you -- for your next question, it appears that you didn't duplicate it before making alterations.

So Slide 2 is a duplicate of Slide 3, or vice versa. And Slide 2 is no longer the one with the singular arrow that you previously drew.

MR. HANRAHAN: Well, I'm going to object to that characterization, but let's just clarify.

BY MR. HANRAHAN:

Q. Mr. Lee, do you see -- I thought I had -- no, you're right. I did -- let me clarify that again.

Figure 2 is the straight one, with the straight line between the Nissan and colliding with the Toyota.

Is that correct?
A. Yes, I see that.
Q. And you're saying that the path that the Nissan took to the Corolla could not have been a straight line because the Nissan was rotating counterclockwise. Is that true?
A. True.
Q. And so then I added a figure -- another version of your diagram that is, right now, Slide No. 3. And you're saying -- I'll ask you whether this represents --
Because I added a curve, the path that the Nissan took to the Corolla, and you said this is inaccurate, too. Is that correct?
A. That is correct.
Q. And it's inaccurate because the vehicle was rotating counterclockwise?
A. Right. This would -- the path that you're proposing here would only occur if the Nissan is rotating clockwise.
Q. So if the Nissan was rotating counterclockwise, the curve would have to start further east and swing in north. Is that correct?
Rather than the direction that I have it here on Slide 3?
A. Yes, that's right. There's some northward

component, and the vehicle-rolling-backwards component, and the vehicle spinning counterclockwise. Yes.

Q. So now I'm going to add a fourth slide. And I'm going to change the direction a bit, of the arrow.

And you tell me: Does this represent an accurate version of the path of the Nissan going from the center line into the Corolla, since it was rotating counterclockwise?

A. It's getting there. It's -- yes. I'll take that.

Q. Okay. So -- so your characterization is that -- that this is an accurate version of the path that the Nissan took before it collided with the Toyota Corolla. True?

MR. SINCICH: Overbroad. Argumentative.

THE WITNESS: Generally, yes. I mean, as long as people understand that it's -- it's not a -- the front of the Nissan that hits the driver side of the Toyota. It's -- it's actually the passenger side of the Nissan that strikes the driver side of the Toyota, but I think the idea is there, here.

BY MR. HANRAHAN:

Q. Okay. So -- and then when the Nissan collided with the Toyota, it collided broadside on the passenger side of the Nissan, colliding with the driver side of

the Toyota. Is that true?
A. Yes.
Q. And when collided -- when the Nissan collided with the Toyota, it collided, like, broadside to broadside. Like -- almost in line with the Toyota. Is that true?
A. It's an oblique angle, but yes. It's between the sides of the vehicles.
Q. Okay. And so by the time, based on the law of physics, when a vehicle such as a Nissan strikes a vehicle broadside like that, all of the momentum from the Nissan would be used up during this collision with the Toyota.
Is that true?
MR. SINCICH: Vague. Ambiguous.
THE WITNESS: No. I mean, from a collision, there's forces transferred; but there's still remaining momentum from -- just from -- to the vehicle, such as the Nissan, after they separate. So it keeps going off. They don't just stop at a dead stop upon a collision.
BY MR. HANRAHAN:
Q. Well, as soon as the Nissan collided with the Toyota -- how fast was it going when it collided with the Toyota, under the law of physics?
MR. SINCICH: Vague as phrased.

THE WITNESS: How fast would it be traveling? I don't think I have an opinion about that.

BY MR. HANRAHAN:

Q. Okay. How fast was it traveling from the time after the collision until it hit the Toyota?

A. I think it's coming out from the initial collision at a certain speed. That, I can give you.

Q. Well, all I'm asking is -- just so I don't confuse myself. Do you have an answer to my question, how fast the Nissan was traveling from the time after this secondary slap until it hit the Toyota?

MR. SINCICH: Assumes facts. Vague and ambiguous.

THE WITNESS: It would be a range of speeds because in between an impact, the vehicle would be --

(Whereupon, the Court Reporter interrupted the proceedings.)

THE WITNESS: Okay. So in between the two impacts that you just referenced, the Nissan is going to be scrubbing off speed due to it being in yaw. So it would be not traveling at a single speed between impacting the Ford and impacting this parked car.

BY MR. HANRAHAN:

Q. Okay. So you're saying that the Nissan, while it's traveling on this red pathway into the Toyota,

would be decelerating from its impact speed. Is that true?

A. Right. It's going to lose speed due to impact with the Ford, and then it's going to be continuously reducing its speed because it's in a counterclockwise yaw.

Q. Okay. So -- but -- and correct me if I'm wrong. Nowhere in your Rule 26 report does it say how fast the Nissan was going during this period of time.

Is that true?

A. Right. I don't -- I didn't concentrate on this portion of the collision sequence. So I did not include that.

Q. Okay. And nowhere in your report does it say the actual velocity that the Nissan was going as it was going between this collision with the patrol vehicle and colliding with the Toyota. True?

A. I did not include that. Correct.

Q. So all you can really say is that -- today, during your deposition, is that the Nissan was going somewhat slower during this period of time from the center line after the collision with the patrol vehicle until it collided with the Toyota -- actually, strike that question.

All you can say is, during this period of

time -- and the red arrows on Slide 4 -- that the Nissan was decelerating from its impact velocity, correct?

A. Yes, that's right.

Q. And you have no opinion as to the speed that it was going beyond that. Is that true?

A. I don't. I don't -- I didn't reconstruct beyond that.

Q. And as far as the impact with the Toyota, are you able to tell precisely where on the Nissan it collided with the Toyota?

A. Based on the damage matching, it would be the passenger side of the Nissan and the driver side -- along the driver side of the Toyota.

Q. Okay. Well, obviously the passenger side of the Nissan was severely damaged with the initial collision with the patrol vehicle. True?

A. Yes. There's some overlapping damage.

Q. Are you -- well, that's my question. Are you able to tell what additional damage was inflicted on the Nissan based on its collision with the Toyota?

A. I mean, there's -- there's just so much damage to the vehicle. I did not break down specific panels, which was caused by which. I do know that the impression -- wheel impression on the Nissan is distinctively from the Ford.

Q. I'm not asking about that one; I'm asking the -- the damage from the Toyota.

A. I don't think there is a way to specifically pick out which components are caused only from the Toyota, based on degree of damage.

Q. But your opinion based on this diagram of Slide 4 was that the Nissan collided directly broadside with the Toyota, as this arrow demonstrates. Is that correct?

MR. SINCICH: Misstates testimony.

THE WITNESS: No. As I mentioned earlier, this was not a T-bone collision as -- as you have the arrow. So that is why I mentioned earlier, too, that this is not the case, that it was more an oblique-angle impact, where the vehicles are -- the parked Toyota and the Nissan are traveling -- or going to the same direction when this side impact occurred.

BY MR. HANRAHAN:

Q. Well, I'm going to make a fifth slide, even, and I'm going to add a little box and -- that I'm going to try and make the same size as the Nissan here, that you have in your diagram.

Would you say that my little blue box in Slide 5 is about the same size as your white-Nissan diagram?

A. Okay.

Q. Is that "yes"?
A. Yes. Same -- yes.
Q. Okay. I'm going to say -- I'm going to rotate it, and we're going to assume this is the white Nissan, and it's colliding on the passenger side with the Toyota. Is that what your opinion is?
A. It -- rotate the Nissan to face southwest. Yes, that's how I have it.
Q. Okay. And so let me add a direction arrow for which direction the Nissan is pointing and -- and make it black so it's not quite as confusing.
So is this -- and why don't we make it white so that it's consistent with the -- well, we'll leave it blue. For now, anyway. I don't want to change it.
So as it appears now, my little box with the arrow pointing. That is the accurate direction that the Nissan was pointing when it collided with the Toyota.
Is that correct? It was facing west?
A. Yes.
Q. And it collided broadside in the way that I've drawn here. Is that true?
A. The path when -- when you say broadside, it always infers a T-bone collision. It's just --
Q. Well, it's --
A. -- I could not agree with that.

Q. I'm not trying to describe -- I mean, this is not a T-bone. A T-bone collision is a T, where it's shaped like a T, where the front of the vehicle collides with the -- the middle of another vehicle. And this is where they collide broadside. This is, like, two -- this is a parallel collision, not a perpendicular collision.

Is that correct?

A. Yeah, where I disagree with you is just the word "broadside." Because that, in our terms, means a T-bone crash. So if you changed "broadside" to "side," then I agree.

Q. Well, how would you characterize it?

A. I'd just call it a side collision. Oblique side collision.

Q. Okay. A side collision. So a side collision, does this accurately illustrate a side collision?

A. Yes, it does.

Q. And is this your opinion as to the collision that the Nissan had with the Toyota?

A. Approximately, yes.

Q. Okay. And so the -- and if I'm correct, if I'm understanding you correctly, you're saying -- and I'm referring to Slide No. 5 from Exhibit C.

The Nissan struck the patrol vehicle and swung

in in a -- first at a northeasterly direction, and then angled north as it was turning until it collided in a side collision with the Toyota.

Is that true?

A. It is.

Q. Okay. And then after it collided with the -- well, let me ask you. Before it collided with the patrol vehicle, did the Nissan skid?

A. Depends how you characterize skid, but, I mean, if you're talking --

Q. How do you characterize skid?

A. Spinning, like, out of control. If that's how you define "skid," yes. It was in yaw in between the two impacts.

Q. Well, I'm talking -- I'm backing up a little more time. I'm not sure if you understood my question because I backed up. Before the Nissan collided with the patrol vehicle --

A. Uh-huh. Okay.

Q. -- was it skidding?

A. I didn't see any evidence of that.

Q. Did you watch the surveillance video?

A. Yes.

Q. Did you see any evidence of the Nissan skidding in that?

A. No.
Q. Did you review all of the EDR data?
A. Yes.
Q. Did you see any evidence of skidding in the EDR data?
A. I did not see evidence of that.
Q. And is it possible in your expert opinion that the damage to the Nissan that was inflicted by the front-left tire of the patrol vehicle could have been inflicted in an initial collision with the Nissan?
A. That's a good question, and the answer is no. I think in that type of scenario, you would have the patrol vehicle and the Nissan basically side swiping each other in a parallel fashion. And that's completely inconsistent with the downstream physical evidence or trying to match the vehicles' rest positions.
Q. Well, so -- and you calculated that this area of impact -- could the Nissan have followed the path from the area of impact to the -- the police identified and hit the Toyota in the same manner?
A. Is your question just stating -- applying the police area of impact, and if we were to apply that, would the Nissan move to hit the Toyota?
Q. Yes. I mean, we know that the Nissan hit the Toyota, right?

A. If you're just isolating that and ignoring other pieces of physical evidence -- you know, I haven't tested that possibility yet. I don't think it would match. I mean, it definitely would not match the rest position of the Ford, I know.

Q. Well, you said you haven't tested -- have you tested, using your software, the police's opinion or the MAIT team's opinion, that the area of impact occurred here, where this red arrow is surrounded by a dot, and that that was the area of impact and that the Nissan proceeded spinning, hitting the Toyota and then came to rest several feet west, facing westbound?

Have you -- have you run that scenario through your program?

A. I have, yes. Early on, that is one of the first simulations I did test, and -- and I just could not get a match even of the -- the Ford. So this -- that was an easily-discarded scenario.

Q. When you --

A. Or -- I knew I had to change the -- or adjust the area of impact in my subsequent simulations.

Q. So when you're doing a simulation, you're working backwards. Is that correct?

A. Somewhat, yes. If -- if, you know, we layout the things that happen at the end, which is the rest

positions, and then we try to work to determine where the impact is. So I would say so.

Q. And --

THE COURT REPORTER: Counsel --

MR. HANRAHAN: In terms -- we have been going for an hour.

Do you need a break?

THE COURT REPORTER: Yeah, sometime soon would be great.

MR. HANRAHAN: Okay.

(Whereupon, a break was taken.)

BY MR. HANRAHAN:

Q. Mr. Lee, we were talking about how you prepared your simulations in general. So is it true that, in general, you start by looking at where the items of evidence such as vehicles wound up and then reverse engineer how they got to be there?

MR. SINCICH: Overbroad.

THE WITNESS: In principle, that is how reconstruction works, yes. Because we come after the fact, and we have where the cars end up. We have evidence of that. So it is a process of determining -- working backwards in time of where impacts happened and what happened to cause the cars to move, to end up where they are.

BY MR. HANRAHAN:

Q. Okay. And your method in this case was to look at where the vehicles ended up based on the FARO scan and the scene photographs. Is that right?

A. That's part of evidence I did consider, yes.

Q. And the evidence in the FARO scan shows that the Toyota Corolla that the Nissan collided with ended up on the curb, about halfway -- just east of where it started beforehand.

Is that right?

A. It did -- it did come to rest, yes. Partially in the road and partially in the sidewalk.

Q. And so did the white Nissan. That also ended up facing in the same direction as the Toyota, but also partly up on the curb and partly on the roadway. Is that true?

A. It appears so, yes.

Q. Okay. Well, and that's shown in the FARO scans that you relied on for your exhibits because you showed the location No. 5; that's where the Toyota Corolla is. This kind of light, shadowy figure that is halfway up on the curb. That's the white Toyota Corolla, where it came to rest, right?

A. Yes.

Q. And this outline, the white-ish gray outline

where there is a dot, right above the word "V1 rests." That is where the Nissan came to rest. Correct?

A. Yes, it is.

Q. And were there any skidmarks at the location?

A. Were any skidmarks documented? I did not see any.

Q. Okay. So you didn't rely on skidmarks for your determination as to the path these vehicles took to arrive at their resting point. Is that true?

A. Right. Because there were none that were documented.

Q. And so the only thing that you really had to rely on was the positioning of the vehicles, where they came to rest, the surveillance video, and the EDR data.

Is that correct?

A. Right. That sounds about right. That is the key piece of evidence that I relied on.

Q. Did you rely on the statements of any of the participants?

A. I did review them, and I considered them, yes. But in terms of coming into my technical conclusion, I don't think they were significant.

Q. Okay. And in your analysis, can you rule out as impossible that the area of impact was this area designated -- and I'm referring to Slide 5 of Exhibit C.

Can you rule out 100 percent that the area of impact was not located in -- within that circle?
MR. SINCICH: We cannot see 5 slide --
MR. HANRAHAN: Oh, I'm sorry.
MR. SINCICH: -- Slide 5.
BY MR. HANRAHAN:
Q. Let me share my screen with you. Can you see Slide 5 from Exhibit C now?
A. Yes.
Q. Now, looking at -- I will try and make it a little bigger. Looking at Slide 5, do you see the area designated as the area of impact?
A. Yes, I do see it.
Q. Okay. Can you rule out the possibility that that was the area of impact?
A. I can, yes.
Q. Okay. And you can rule out 100 percent that the area of impact was in that area, correct?
A. Yes, absolutely. Just based on the impossibility of the Ford moving completely laterally to its final rest position. So that is the basis of it.
Q. So is that the only basis for ruling out that the area of impact was in this circle?
A. Yes. Because we have forward motion of the Ford -- the patrol vehicle at impact. So upon impact,

it's going to rotate clockwise. So it's moving north, and rotating clockwise. There is no way that it can collide at the police area of impact and end up where it is at -- in No. 4 in this diagram.

Q. So you're saying there is no way that the police vehicle could have collided in this area and then wound up at No. 4, where it is indicated on the FARO scan. Is that true?

A. Correct.

Q. And that's because the police vehicle was traveling -- you said laterally?

A. It will require the police vehicle to be moving laterally about 60, 70 feet without any northward components, which would defy the principles of physics. It wouldn't end up where it ends up.

Q. Well, the police vehicle was on wheels, right?

A. Yes.

Q. And a police vehicle could -- and it had -- a vehicle, once it impacts any other object, it could roll to a final resting place. Is that true?

MR. SINCICH: Incomplete hypothetical.

THE WITNESS: "Roll" as in, it could move to its final position --

(Whereupon, the Court Reporter asked for clarification.)

THE WITNESS: "Roll" as in move to its final position, yes. But it's going 20 miles per hour during impact, and it is facing northwest. So if the police area of impact is accurate, then it will come to rest, essentially, in the westbound lane.

BY MR. HANRAHAN:

Q. Okay. So you're saying it's impossible that the patrol vehicle could have collided at the area of impact, and then the collision caused the vehicle to face easterly and roll to its point of rest at No. 4.

You're saying that's impossible?

A. Correct. Impossible.

Q. And that -- that's impossible because they -- the -- the patrol car couldn't have been pushed in a westerly direction by the collision?

A. It -- it couldn't have been pushed southward -- southeast to its final position. It can only move northeast.

Q. Well, you're saying that the -- the impact of the Nissan could not have turned the patrol vehicle towards the west. Is that what you're saying?

A. It can move it towards that direction, but there is also a northward component of the Ford vehicle that would redirect it towards the westbound lane. It just cannot just move completely laterally to this

position here.

Q. Well, there was a difference between the speeds that the Nissan was going compared to the patrol vehicle. Is that true?

A. Yes.

Q. And the momentum of the Nissan would have been much greater than the patrol vehicle, given the much higher velocity of the Nissan. Is that true?

A. It is, but again, the Ford is not stationary. It's moving. So it would move in two directions, not just a single lateral direction.

Q. Well, did you do, like, mathematical calculations to rule out that the area of impact was where it was shown?

A. I did. I did perform the same type of simulations that I did, just moving the area of impact.

Q. So all the -- the work that you did was just changing various scenarios on the software, PC Crash.

Is that true?

MR. SINCICH: Overbroad.

THE WITNESS: To evaluate the question that you just posed, yes. That's what I did.

BY MR. HANRAHAN:

Q. So all you did -- you didn't, like, do any physics calculations on a pen and paper, with a

calculator or anything, to reach your conclusions. Is that correct?

MR. SINCICH: Vague and ambiguous. Overbroad. Argumentative.

THE WITNESS: Not here, no. Because to answer that question, it is best done in a simulation to -- to model how the vehicles would move in response to -- to this area of impact. To see if it can match the rest position.

BY MR. HANRAHAN:

Q. So is the only work that you did in terms of inputting information -- was it putting in the make and model of the vehicle, the -- the vehicles?

Is that the only information that you input into PC Crash?

A. No. You have to input the year, make, and model. You need to enter the specifications of the car, and you need to enter the weights of the occupants and then calculate the inertia, the center of mass of the vehicles.

You have to manipulate the impact configuration to match the vehicle damage, and then you need to input the vehicles' speeds. And -- and once that happens, you can then simulate the response of the cars upon those forces.

Q. What information did you input in terms of vehicle damage?
A. You don't input vehicle damage. You watch -- you try to line up the vehicle damage according to the response of the cars.
Q. Okay. Well, I'm just talking about the basic information that you're inputting into the software when you're doing the work to create this simulation. So you put in all of the information about the vehicles, right?
The make, models, weight, all that stuff?
A. Right. That's what I just mentioned.
Q. All right. And you put in the weight of the occupants?
A. Yes.
Q. And what weight did you give the occupants of the patrol vehicle?
A. There -- there was a driver and a passenger.
Q. I didn't -- I know. I know that there was a driver and a passenger, but what weight did you give them?
A. Let me check.
So for the driver, I input 225 pounds. And for the passenger, I assumed 172 pounds.
Q. And why did you assume that the driver weighed that amount?

A. That's the 50th percentile adult male weight. Because I don't have information about his specific weight.

Q. And the passenger, how did you conclude that he weighed that amount?

A. I'm sorry. The -- what I just mentioned was the passenger. And for the driver, it was taken from the police report.

Q. Okay. And the occupants of the Nissan, did you take that off -- did you take the median, or did you just get that from some actual report?

A. Right. Just based on what's available in the evidence. We have information about the driver, but the passengers, we can only make assumptions about. The 50th percentile.

Q. Okay. So -- and when you're inputting the speed of the Nissan, are you inputting the speed of the Nissan at the time of the collision when you're doing your calculations? Or shortly before the collision?

A. It would be at the time of collision because this program is a momentum simulation program. It's physics-based. So it takes in consideration impact and the response after impact.

Q. So you input the -- that speed from the EDR report. Is that correct?

A. Not necessary from -- directly from the EDR report, but, you know, I'm looking at numbers that are fairly close to that.

Q. What -- well, what speed did you give the Nissan when you were creating your simulation then, at impact?

A. It was a variety of speeds in order to optimize the match of the physical evidence --

Q. Well, Mr. Lee --

A. -- about 82 miles per hour at impact.

Q. So I'm asking: When you created this diagram that we're looking at now, Slide 5 from Exhibit C, what speed did you give the Nissan at impact?

A. Well, this -- the one you have up here is not the initial impact.

Q. Okay. Well, when you created all your -- your series of diagrams, what speed did you give the Nissan at impact?

A. 82 miles per hour.

Q. Okay. Is that different from what the EDR data says?

A. Yes, slightly.

Q. And what did the EDR data say it was?

A. I think it said 83 or 84.

Q. Okay. And you concluded that the Nissan was

actually going faster than the EDR data indicates because of the size of its tires. Is that correct?

A. Yes. There's a 0.26 percent adjustment that needs to be made. Which is --

Q. Okay. So --

A. -- quite negligible.

Q. Okay. So, actually, the EDR said that the vehicle -- the Nissan was going 84 miles per hour. Is that true?

A. In that neighborhood, yes.

Q. Well, it --

(Cross-talk.)

A. -- indicated speed. So that's what it's measuring, yes. From the -- from the wheels.

Q. The data is pretty precise. When it says -- in the EDR data, it says exactly 84 miles per hour. Is that correct?

MR. SINCICH: Assumes facts. Overbroad.

THE WITNESS: It says, "Vehicle speed indicated at impact 83.3," but of course, there are adjustments to be made.

BY MR. HANRAHAN:

Q. Okay. And so the adjustments would be higher than that because of the size of the tires of the Nissan. Is that true?

A. That's one thing to consider, yes. Which is what I told you, .26 percent, which is quite negligible. And then there's some inaccuracies about the speed data, some variance -- that's minus-5 percent -- due to the sensors and the measurements.

Q. Okay. Any other variables when calculating the speed?

A. To my understanding, those are really the only two that -- to consider.

Q. So you input -- to create this simulation, you input the speed at impact for the Nissan to be 82 miles per hour. Is that true?

A. Yes. That is the best -- of all the simulations I performed, this is the best fit of the evidence.

Q. And so you tried multiple versions of this simulation. Is that true?

A. Yes.

Q. How many versions did you try before you got this one?

A. Well, probably -- could be up to 100.

Q. So you came up with -- and when you're trying different versions, are you changing the speed of the Nissan when you're trying different simulations?

A. Precisely, yes.

Q. Are you changing the angle of the impact when you're doing various simulations?

A. Slightly. I'm constrained, roughly, to the one I've come up with based on the damage match. But, you know, plus or minus a few degrees, yes.

Q. Did the PC Crash program suggest to you that there was this secondary slap?

A. No. I don't think it's capable of suggesting to me that, but it's from my own assessment that -- I've seen many types of this type of collision, that this pattern of the secondary slap occurs when you have frontal offset collision, and then you have a secondary impact. So I was aware that this was the situation right at the beginning.

Q. Well, if there wasn't a secondary slap, would the Nissan have continued on in the same direction that you indicated in Slide 5?

A. Probably not. I mean, it completely changes the impact alignment. So you have a left-turning patrol vehicle, and then in order to get that slap as the first impact, you would need the Nissan to be also facing, basically, northwest. And I don't know how you can move northeast after that type of impact. Basically, the Nissan would just go straight north.

Q. So for this area of impact, are you saying that

it was impossible for the Nissan to collide with the patrol vehicle at this area of impact and still come to rest -- or come -- still collide with the Toyota?

A. Depends at what speed. At 80 to 85 miles per hour, I don't see that happening.

Q. Okay. Are you saying that is impossible?

A. Yes. Because primarily, it would just be going straight up here.

Q. You're saying that it's impossible for the Nissan to have hit the patrol vehicle within this area of impact, and spun around, and hit the Toyota at this location?

A. Right. If you just even isolate that, no, it would be highly unlikely.

Q. Well, I'm asking not if it's unlikely, but is it physically impossible? Is it physically impossible for that to happen?

A. Based on my evaluation, yes.

Q. Okay. Is it -- and you're saying it is physically impossible for the patrol vehicle to have collided at the area of impact indicated by the MAIT team and come to rest at Position 4?

A. Right. We talked about that earlier.

Q. Okay. And so with respect to -- now I'm going to go on to the next slide, Slide No. 6 from Exhibit C.

Now, this is -- let's compare it.

This shows the patrol vehicle is moving -- has moved from its position in Slide 5. Now, it was facing -- in Slide 5 -- in a more northeast direction, and in Slide 6, it's facing in a northwest direction.

Is that right?

A. It sounds right, based on this diagram.

Q. Well, I mean --

MR. SINCICH: I'm sorry. Was the question the patrol vehicle or the Nissan?

MR. HANRAHAN: The patrol vehicle.

MR. SINCICH: The patrol vehicle on this slide? I think it could be misstating facts.

MR. HANRAHAN: Well, I'm just -- I'm asking. I'm not -- I'm just asking questions.

MR. SINCICH: I just put my objection on. It can carry on.

MR. HANRAHAN: Okay.

BY MR. HANRAHAN:

Q. Well, Mr. Lee, looking at the patrol vehicle. Is it facing -- which direction is it facing? Like, which direction is the front of it facing?

THE WITNESS: It's the black vehicle. So it is southeast.

///

BY MR. HANRAHAN:
Q. Okay. So the vehicle -- the patrol vehicle has spun clockwise from a northeast direction to a southeast direction. Is that true?
A. Yes.
Q. Okay. And it goes from facing this southeast direction, ultimately, to its point of rest at No. 4.
Is that true?
A. Ultimately, it does continue on to do that.
Q. And how many times did the Nissan rotate between its position in Figure 6 until it collided with the Toyota?
A. How many times did it rotate? It made a 180, basically, rotation. 180-degree rotation. So it's then facing west when it hits the Toyota.
Q. And so you're saying as -- from Figure 6 -- it is rotating in a counterclockwise direction, correct?
A. It is.
Q. So it did not make a complete rotation around its axis between where it's positioned on Figure 6 until it collided with the Toyota. Is that true?
A. Right. Didn't make a complete revolution; it just spun 180.
Q. Okay. So the Nissan, you're saying, just slid between its position in Figure 6 -- I'm sorry -- Slide 6

until it collided with the Nissan. Is that true?
A. In between the two impacts it -- yes.
Q. And it slided, and you're saying, again, in this kind of curved angle that swung in from a westerly direction to the north. Is that correct?
A. It moved northeast, but it's facing west.
Q. Well, but -- but here, back to Slide 4, you said that the Nissan swung in at a westerly direction and then, you know, in a curve direction because of its rotation. Isn't that correct?
A. Yes, but it -- it didn't, like, make a loop and them come back around to hit the Toyota. It was -- it was a -- it was, like, in this fashion, where it's rotating counterclockwise but moving northeast.
Q. Well, let me ask you this. In Slide 4, you said this was the correct path that the Nissan took.
Didn't you say that?
A. It's the -- the general direction of travel, yes.
Q. Well, you said it wasn't a straight line between the collision where the Nissan is now and the Toyota, correct?
A. Right. It doesn't move in a straight line, yes.
Q. And you were the one who insisted that I put

this change in direction in there. Is that correct?
MR. SINCICH: Argumentative. Misstates testimony.
THE WITNESS: Right. It's not a linear line. So you need to somehow draw, like, a curved path because the vehicle is rotating, and it would never move linearly.
BY MR. HANRAHAN:
Q. Okay. Well -- and so -- but between on -- we're looking at Slide 6 still. So where the Nissan is now, right at the edge of the -- the more northern double lines, or divider lines.
You're saying that from this position, the Nissan would still swing in -- swing in on a curve to hit the Toyota. Is that true?
A. Yes.
Q. Okay. And it would swing in -- out from the west and up to the north, correct?
A. Yes.
Q. Because of the angle?
A. Yes.
Q. And when it collided with the Toyota, it would collide side to side. Is that true?
A. Right. It's an oblique side impact to the Toyota, yes.

Q. And when they would collide, they would collide as we indicated in Slide 5, with the Nissan facing due west, true?

A. Sure. West and a little bit south, yes.

Q. And the Nissan, when it collided with the Toyota, it was lined up as it appears now. Just -- the cars are roughly the same length, and they were lined up parallel, as they appear in this exhibit -- in Slide 5.

Is that true?

A. Not parallel, like you mentioned. Oblique is not parallel. There's -- there is a slight angle.

Q. Okay. Well, how severe is that angle?

A. It's going to be less than 45, but greater than 0. So in between there.

Q. Okay. So could it be 50 degrees?

A. No, that would be too sharp.

Q. It couldn't be 46 degrees?

A. Again, too sharp, and it would cause too much rotation to not match downstream impact.

Q. Okay. So -- well. And what angle would you call them at -- right now, in Slide 5? What angle is that?

A. You have them parallel. So 0.

Q. Okay. So you're saying that that -- the Nissan could be facing at a 45 -- still west, but angled more

south, at up to a 45-degree angle, when it collided with the Toyota. Is that correct?

A. It can be up to about there, yes. 0 to 45. So an oblique angle.

Q. And do you have an opinion where on the Nissan that it collided with the Toyota, what first made contact with the Toyota?

A. It's somewhere on passenger side of the Nissan, where the --

Q. Do you have -- do you have an opinion whether it was at the front-right headlight of the Nissan that first made contact with the Toyota?

A. No, it's the rear portion.

Q. So somewhere behind the rear passenger door must have first made contact with the Nissan. Is that what you're saying?

A. Yes. This impact is occurring while the Nissan is, essentially, moving rearwards relative to the Toyota. So it is the rear-right region of the Nissan that contacts the -- along the driver side of the parked vehicle.

Q. Could the rear pass -- could the rear-passenger side bumper have collided first with the Toyota?

A. Could that have occurred? I don't think you can rule that out.

Q. So that could have -- the rear-passenger side bumper of the Nissan could have collided with the bumper at what point of the Toyota?

A. Just -- I can only tell you that it's the driver side panels of the parked vehicle, closer towards the rear portion of that. Because that's what causes the rotation necessary to push the Toyota into the sidewalk.

Q. And when the Nissan hit the Toyota, that is the impact that caused the Toyota to jump up on the curb.

Is that correct?

A. Right. That's the only impact that would cause that.

Q. Okay. And when the -- after the Nissan hit the Toyota, did it spin around again?

A. No, it's a parked vehicle. It did not move after contact between the two cars.

Q. Did the Nissan roll between where it appears in Slide 5 to where it came to rest?

A. I didn't see any evidence of rollover damage to the Nissan. So I would have to say no.

Q. When I say "roll," I mean: Did it roll on its wheels between where it appears in Figure 5, in blue, to where it came to rest at V1?

A. Well, sure. Of course, it continued moving.

So the wheels are rotating between impacts.
Q. Did it spin around between those two distances?
A. Very little. It -- there's -- there's not much rotation expected because, essentially, the Nissan is rolling backwards until it hits the parked Chevy Silverado.
Q. How fast was the Nissan going after it collided with the Toyota and then collided into the truck?
A. I didn't analyze that.
Q. Okay. Do you have any estimate as to how fast it was going?
A. No, I don't.
Q. Do you have any idea at all?
A. No. I didn't reconstruct that portion sequence in detail.
Q. Did you do any simulations -- well, doesn't PC Crash tell you the speed it would go during that segment of the incident?
A. No. I don't think that's as well defined as compared to -- the first collision is where we have more evidence. So the answer is no.
Q. Well, but PC Crash will tell you how fast a vehicle is going during a segment. Is that true?
A. It can, if you simulate beyond up to that collision. Yes.

Q. Okay. Did you simulate this speed in PC Crash that the Nissan was going between the time that it collided with the Toyota and the truck?
A. No, that wasn't my focus; so I did not.
Q. Did you simulate the speed that the Nissan was going between the time that it collided with the patrol vehicle and collided with the Toyota?
A. Roughly, yes. It was spinning. That is where the simulation essentially -- and analysis kind of stops, to the stimulation.
Q. Okay. Well, what was the speed then?
A. It is coming out from the parole vehicle crash at about 40 miles per hour. That's what it's depicting.
Q. Does that -- does that appear anywhere in your Rule 26 report?
A. No, I did not include that.
Q. Okay. Is that an important factor to determine the ultimate resting place of the vehicle, the speed that it was going, you know, immediately after it collided with the patrol vehicle?
MR. SINCICH: Assumes facts.
THE WITNESS: I don't think I was asked to analyze what happens after the -- the initial collision with the patrol vehicle.
///

BY MR. HANRAHAN:

Q. Well, you're trying to reverse engineer how a vehicle came to a certain location. Is that true?

A. Yes, which I've done for the patrol vehicle.

Q. Okay. Well, did you reverse eng -- did you do that reverse engineering with the Nissan?

A. Yes, to the best of my ability, for it to reach impact with the Toyota Camry that matches damage. And then the downstream after that is more complicated to model. It is not really the focus of this case.

Q. Okay. Well, just so I'm clear. Did someone -- your analysis, is it accurate to say, kind of concluded after the Nissan hit the Toyota. Is that correct?

A. In terms of -- in terms of quantifying the numbers and the speeds, yes. But in terms of damage matching, we can figure that out easily from -- from what the damage represents in the photos.

Q. Well, I'm just trying to understand what you did and what you didn't do. So you didn't do an analysis -- you're only doing it now. You didn't do an analysis before just now of the speed -- or using PC Crash -- of the speed that the Nissan traveled between the collision with the patrol car and the collision with the Toyota. Is that true or not?

A. I've done it, but yet -- this is the first time

I'm -- I'm telling you that.
Q. Okay. And you've done it, and you have some notes of -- showing what your conclusion was, or it was just your memory, off of the top of your head?
A. Again, this is just the simulation. If you ask me what the speed is and I can tell you, then I can tell you.
Q. When you do the simulation, do you save the simulations?
A. Yes.
Q. Have you saved every simulation you have done in this case?
A. Not every single iteration, no. I only save the final -- I guess, the best fit that is presented.
Q. You said you save them, but do you delete them once you've created them?
A. No, that's not how it works. So you don't save every single iteration. You save -- I only save the final version that fits -- that best fits the evidence, and that is the one that you see in the report.
Q. Well, a second ago you said you did save your simulations. Is that no longer the case?
MR. SINCICH: Misstates testimony. Argumentative.
THE WITNESS: I saved the final version of it.

BY MR. HANRAHAN:
Q. Is that the only version you've ever saved from your work in this case?
A. Yes.
Q. Well, you have to test numerous simulations to get it to simulate in this way that appears in your report. Is that correct?
A. Yes.
Q. And on to Slide 7, which is your Figure 5. Still on Exhibit C. Does this show the -- the path that the Nissan took after the collision and before it hit the Toyota?
A. Yes.
Q. And here, you have the patrol vehicle facing in a southwesterly direction. Is that right?
A. Yes.
Q. And the Nissan, from this position -- about midway across the westerly lanes of that street -- this still has to swing in and curve in to hit the Toyota broadside at this point. Is that true?
A. That's the projected path, yes, from here to the impact with the Toyota.
Q. Okay. So as the Nissan is swinging in west and then colliding broadside, does that exhaust most of its momentum when it knocks the Toyota up on the curb?

A. Apparently not, in this case. Because it -- after it does that it, continues on to hit the stationary Chevy that's parked on -- on the curb behind the Toyota.

Q. And if a vehicle such as the Nissan knocked the -- well, let me ask you this.

When the Nissan was swinging in to hit the Toyota, was it going in a northerly direction?

A. Yes, there's a northerly component as the vehicle is in yaw, moving northeast. Yes. And that's what transfers the force to the Toyota to move in that direction.

Q. It would have taken a great deal of force for the Nissan to strike the Toyota hard enough to knock it up on the curb. Is that true?

MR. SINCICH: Vague and ambiguous.

THE WITNESS: Depends on a variety of factors. Where it was struck on the Toyota, where the parking brakes were applied, et cetera.

BY MR. HANRAHAN:

Q. Well, even if those factors were true, even if the parking brake was on or off and -- it would still take a great deal of force to move a passenger motor vehicle from the roadway up on a curb, that distance.

Is that correct?

MR. SINCICH: Vague and ambiguous.
THE WITNESS: Define a "great deal" of force. If you hit a vehicle in a certain angle, it can rotate it towards the sidewalk. Yes.
BY MR. HANRAHAN:
Q. Okay. Well, it's more force than you could apply using your own hands, correct? You couldn't pick up that car and move it up on the curb like that, I guess, right?
MR. SINCICH: Argumentative.
THE WITNESS: No, I cannot pick the car up and move it like that.
BY MR. HANRAHAN:
Q. Okay. So it would take at least more force than you were able to muster with your own hands to get that vehicle up there. Can we agree on that?
MR. SINCICH: Argumentative. Asked and answered.
THE WITNESS: Sure. I cannot do this manually.
BY MR. HANRAHAN:
Q. Okay. And so in your experience, when you're looking at a traffic collision, it takes -- well, I'll move on. Wasting my time, now.
Now, showing you Figure 6 on Slide 8. This only shows the location of the patrol vehicle. Is that

true?
A. In this frame, yes.
Q. And now it's facing in a northwesterly direction. Is that true?
A. Right, as it's spinning. Yes.
Q. So you're saying: Before it came to rest, it spun about 45 degrees more before it came to rest at Location 4. Is that true?
A. Not quite. It made one full rotation, plus -- plus another 90 degrees. So it had rotated 450 degrees. A 1 -- 1 and 1-quarter rotation.
Q. No, I'm talking about from now, as it appears in Figure 8, until when it came to rest. Are you saying it made a whole -- one more complete rotation until it came to rest at Position 4?
A. No. Based on your prior question, in order to get from here to rest, it would just make a 90-degree rotation, which is one fourth of a rotation.
Q. Okay. And were there any skidmarks underneath the patrol vehicle?
A. None that I could see documented in the MAIT report.
Q. Were there any skidmarks between the area that is designated as the area of impact and where the vehicle came to rest, the patrol vehicle?

A. Again, I don't believe I saw the police had measured or documented that.

Q. Did you see there was a patrol light bar located on the road?

A. They did -- they did photograph that, yes.

Q. Did you factor that into your calculations as to the path the vehicles took?

A. It's not something you can calculate. So, no. But based on the movement of the debris, I don't think anyone can precisely calculate how it lands. But it is a general area where the impact occurred, I can tell you that.

Q. Okay. So to your calculations, the location of the patrol bar was irrelevant. Is that correct?

A. It's the debris that landed, but the trajectory of it from the vehicle to where it landed, I didn't analyze it. But it's in the general area of impact, as opposed -- and if you're talking about debris, the way that the patrol vehicle spins, it does travel over where the debris lands.

Q. Okay. Well, did you -- when you were using PC Crash, is there a way to input the location of this kind of evidence that will assist with your calculations?

A. No. PC Crash doesn't make judgments based on where these physical evidence are located. I did plot

them -- and you see the scene diagram -- just so I could see if the vehicle traveled over certain parts, but PC Crash doesn't utilize that information.

Q. Okay. And Slide 9. This shows you just overlapping the patrol vehicle where it came to rest.

Is that correct?

A. Yes, that's the rest position.

Q. And did you input onto this exhibit an outline of the -- the truck that the Nissan collided with?

A. If I input an outline?

Q. Yes.

A. The outline you see here is from FARO scan. So I didn't input that.

Q. Okay. Do you see an outline of a vehicle on the north curb, right behind where the Nissan came to rest?

A. Yes.

Q. Did you put that in there?

A. No, that's a part of the police scene diagram.

Q. Okay. Let me show you -- and from your exhibit -- okay. Figure 8 -- it just seems to have disappeared on me. Pull that up again.

Okay. I'm going to pull up your report -- which is still Exhibit B -- and get to the Figure 8, share that with you. So what we're looking at here is

your illustration of the path that the patrol vehicle took before the collision.
Is that right?
A. Yes.
Q. Okay. And you based that on the surveillance video?
A. No, that would be based on the EDR data.
Q. So did this have any impact -- did the surveillance video have any impact on this figure?
A. In this particular figure, I don't think the surveillance video was clear enough to be able to create this diagram. So I would say it didn't -- I didn't rely on that to create this diagram.
Q. So the only thing you relied on was the EDR data to create this diagram. Is that true?
A. That sounds about right. And -- and in the scene diagram here. Because this is --
Q. The --
A. -- I guess the foundation of this is --
Q. Okay. You froze up. I think you're frozen, not me?
MR. SINCICH: I can hear you, Counsel.
MR. HANRAHAN: I think he's frozen or not moving.
THE COURT REPORTER: Do you want to go off

record while we wait for him to come back?

MR. HANRAHAN: Let's just see if it -- it's a momentary thing. Usually it's a pretty momentary thing, but --

BY MR. HANRAHAN:

Q. There it goes.

A. Oh, did I freeze?

Q. Yeah.

A. Oh. What did I last say? I think I mentioned we're constrained by the point of impact from the prior reconstruction, which appears in this diagram.

Q. Okay. So did you -- the -- in terms of what you used to create this diagram, did you create this diagram through PC Crash independent of your prior analysis on where the crash occurred?

A. No. It would have to rely on the reconstructed area of impact.

Q. Okay. Would you be able, just using the EDR data, to recreate with this illustration the path that the patrol vehicle took?

A. No. Because -- well, I would know a path, but in order to place it in perspective to the roadway, I would not be able to do that without linking or connecting it with the area of impact that I previously determined.

Q. Okay. Well, assuming you -- there was no impact at all, assuming you did not have any information about an impact; all you had was the EDR data and the -- this overhead map or overhead photo of this area.

Assuming you only had that, could you recreate, using PC Crash, the route -- or a diagram such as this, that you created?

A. I mean, you would just -- you would just get the path of the vehicle. This -- this left turn path.

Q. Yeah.

A. But you wouldn't know where it is with respect to the road. You wouldn't know the starting angles of the initial position with respect to the road.

Q. Well, the surveillance video shows that the patrol vehicle came to a virtual stop at the apron of that parking lot. Is that correct?

A. No, it never stopped, according to what I saw.

Q. Well, I said -- well, it slowed to 6 or 7 miles per hour, correct?

A. We only know that from the EDR data, but yes.

Q. Okay. And -- well, we know that it accelerated across the roadway from the surveillance video, don't we?

A. It appears so, yes.

Q. And we know that it accelerated because of the

EDR data, correct?
A. It confirms that.
Q. And we know the angle of the steering wheel from the EDR data when it was turning left, correct?
A. Yes, we do.
Q. And we know the speed that it was going through that entire period of time between the -- was driving shortly before the crash, correct?
A. We -- we know the speeds five seconds leading up to the crash, yes.
Q. Okay. And are -- and you have it going -- is this 16 miles per hour? Is that five seconds before the crash?
A. Yes.
Q. And are these at one-second intervals?
A. That is correct. It --
Q. These --
A. -- yes.
Q. Well, there's -- there's -- unless I'm counting wrong, there's six speeds listed. So are they at fewer than five-second intervals or more than five-second intervals?
A. They're within five seconds.
Q. Okay. And you can tell that this vehicle -- and so you're -- if you were analyzing this just based

on the EDR data, is this the precise angle that the patrol vehicle took off from the end -- from the apron of the parking lot?

A. I determined that based on the EDR data and my reconstruction of the crash.

Q. Okay. Well, I'm not asking about the rest of you -- I'm just asking about the EDR data. Is -- just using the EDR data alone, does it show this precise pathway that the patrol vehicle took from the apron of the parking lot?

A. No, you wouldn't be able to do that because you wouldn't know the starting angle. You need that type of information to -- to be able to model the precise path.

Q. Yeah --

A. And orientation.

Q. Okay. Well, you have the surveillance video, and you have the EDR data. Could that tell you the precise path that the patrol vehicle took after it left the apron of the parking lot?

A. No. Because the surveillance video is so grainy that you cannot see the precise angle of the car in any of these positions prior to the impact.

(Whereupon, the Court Reporter interrupted the proceedings.)

MR. HANRAHAN: Yeah, sure. Do you want to,

say, come back at 2:00?

(Whereupon, a break was taken.)

BY MR. HANRAHAN:

Q. Just a couple more questions about your report as to -- I'm back at Slide 1.

Now, with respect to the collision itself, between the Ford and the Nissan, you show that the Ford collided pretty much with the left half of its front bumper and collided in a T-bone way with -- about at the right real -- rear wheel well of the Nissan.

Is that true?

A. Roughly in that -- yes, in that configuration that you mentioned.

Q. Okay. And is that by some -- is there a physics equation that gets to that degree -- or that positioning of the vehicles when they collide?

A. It's not based on equation. It's based on my assessment of the vehicle damage and lining up the vehicles here with the scanned models.

Q. Okay. So the -- the angle of the impact, that's based on the damage to the vehicles. Is that true?

A. Yes, according to what I can see from the supplied photos.

Q. Okay. Is that the only basis of determining

the angle at which the Explorer collided with the Nissan?

A. Yes. Based on vehicle damage, and I suppose the -- not just the initial damage, but the secondary damage as well.

Q. Okay. And so can you rule out that the -- this initial impact was more of a side-to-side impact than a T-bone impact as it appears in this?

A. Well -- yes. I mean, there's significant lateral force to the right-front of the Nissan, and there's also significant front-left force to the patrol vehicle. That wouldn't be explained by a side-to-side impact between the Nissan and the Ford.

(Whereupon, the Court Reporter interrupted the proceedings.)

MR. HANRAHAN: Sure.

(Brief pause in proceedings.)

BY MR. HANRAHAN:

Q. Okay. And so this -- this damage -- or this illustration, that is based -- actually, let me rephrase that.

You can rule out that this first collision was a side-to-side collision, 100 percent. Is that true?

A. Yes, I can.

Q. And is there any other possibility, other than

this T-bone type of collision, that could have caused the damage to the Nissan?

A. No. This is the only way that you can really sustain the magnitude of damage to the right-front of the Nissan.

Q. Well -- and you showed the Nissan. That is at an angle to the Explorer. Is that correct?

A. In this image, it's at nearly a perpendicular angle with respect to the Ford Explorer.

Q. Okay. Well, what I meant is, it is -- the Nissan is not going straight down the roadway. Is that true?

A. Yes. In this case here, it is at an angle with respect to the roadway. It's angled to the left.

Q. Are you saying that the Nissan was angled traveling along the roadway before the collision?

A. It appeared to be that way, according to a surveillance video. It was traveling within the same direction of the roadway. And then it looks like if we connect -- if we project that path to where it is here in -- at impact, it looks like it makes a leftward swerve to reach the impact here.

Q. Well, did you see a leftward swerve on the surveillance video?

A. No. Because it didn't capture that point.

Q. Are you assuming there was a leftward swerve of the Nissan?
A. Based on the evidence I reviewed, that would -- that would make the most physical sense to match what occurs in this reconstruction.
Q. Okay. And when you're saying -- what you're calling a "swerve," is that a swerve where the driver loses contact with the road on his tires?
A. No. It's a leftward steer, change in direction, towards the left here.
Q. So did the EDR data show a leftward turn of the wheel at the collision?
A. I don't think we can rely on any of the EDR data for steering, for the Nissan.
Q. Okay. But I'm asking: Did the steering data from the -- from the Nissan show a leftward swerve?
A. It does show the steering wheel is turning to the left, yes.
Q. Okay. At what angle?
A. According to the data, it shows 245 degrees.
Q. So you're saying that's unreliable?
A. Yes, definitely.
Q. And you're saying that's unreliable. Why?
A. Well, if you analyze during the five seconds leading up to the crash, the steering wheel is turning

hard to the left --
(Whereupon, the Court Reporter asked for clarification.)
THE WITNESS: The entire -- it's turned hard to the left the entire time, over 250 degrees to the left. So if that's the case, then the vehicle would just be spinning in a circle. It wouldn't be traveling straight on the roadway as we see in the dash -- on the surveillance video.
Q. Unless the vehicle was hydroplaning on the surface, correct?
A. Unless it's hydroplaning. Then you would see the vehicle still spinning --
Q. Well --
A. -- in a circle.
Q. A vehicle can hydroplane still going in a straight direction, with all of its tires facing in the same direction, correct?
A. It wouldn't travel in a straight path, no.
Q. So you're saying it's impossible for a vehicle that is hydroplaning to travel in a straight path on all four tires?
A. Yes, with significant steering involved. Yes.
Q. So you're saying that even if tires aren't making contact with the road --

A. They're not elevated in the air. At least some portion of the tire would be making contact with the road, even if it hydroplanes.

Q. Okay. And it can't do that in a straight direction?

MR. SINCICH: Incomplete hypothetical.

THE WITNESS: It depends on many variables, but given the amount of steering involved, I would say no. It would not be traveling a straight path, and it would not just, all of a sudden, turn left after going straight for a period of time.

BY MR. HANRAHAN:

Q. Well, I'm trying to ask what you can rule out and what you can't rule out. Can you rule out that the Nissan was hydroplaning before the crash?

A. Yes. We don't see any evidence of that in the surveillance video.

Q. Well, do you see the Nissan -- well, can a vehicle be hydroplaning but still traveling in, generally, a straight direction? Is that possible?

MR. SINCICH: Incomplete hypothetical. Vague.

THE WITNESS: It depends on many variables, but I would say: Not for a very long period of time, to travel in a straight path.

///

BY MR. HANRAHAN:

Q. Okay. That's not what I'm asking. So I'm going to move to strike your answer.

I'm just asking, can a vehicle that is hydroplaning generally travel in a straight direction?

MR. SINCICH: Asked and answered. Harassing.

THE WITNESS: I think I told you. It depends on many variables.

BY MR. HANRAHAN:

Q. Are you able to answer --

A. -- I wouldn't be --

Q. Are you -- so are you unable to answer my question?

A. Correct.

MR. SINCICH: Harassing. As phrased.

BY MR. HANRAHAN:

Q. So are you able to answer whether it is possible for a vehicle that -- wheel is turning to the left while it's hydroplaning -- to lose control of that vehicle --

MR. SINCICH: Incomplete hypothetical.

BY MR. HANRAHAN:

Q. -- the driver to lose control of that vehicle?

A. I wouldn't be able to answer that.

Q. Do you have an opinion as to whether the driver

of the Nissan was in control of his vehicle when it collided with the Ford?

MR. SINCICH: Calls for speculation. Incomplete hypothetical.

THE WITNESS: You mean -- at the moment of impact, he swerved to the left. And then impact occurs. So I don't -- I don't know if he's in control at that point.

BY MR. HANRAHAN:

Q. Well -- and you're saying that he swerved, but you're basing that on the surveillance video?

A. Yes, in combination with the orientation of the car during impact. That is -- that's almost a 30- or 45-degree angle with respect to the roadway. So in order for him to have a change in orientation, he had to swerve to the left right before impact.

Q. All right. Well, let me break that down. Does the surveillance video show the presence of a swerve by the Nissan? Yes or no?

A. It does not capture that.

Q. Okay. Does the EDR data show the presence of a swerve?

A. I don't think we can come to that conclusion from the EDR. So, no.

Q. So your answer is no to my question. Is that

correct?

A. Yes.

MR. SINCICH: Misstates --

(Whereupon, the Court Reporter asked for clarification.)

MR. SINCICH: Misstates response.

BY MR. HANRAHAN:

Q. Okay. So -- and so if you didn't see it in the surveillance video, and it doesn't -- and you can't rely on the EDR data for the direction that the wheel was turning on the Nissan, you based your decision that the Nissan was swerving based on the damage to the Nissan and the Ford.

Is that correct?

A. Right. From the reconstruction, the orientation of the Nissan at impact, compared to the orientation we see in the video. So...

Q. So you're saying the Nissan had to be turned at a left -- leftward angle, facing more north, at the time of the collision just based on the damage to the Nissan and the Ford.

Is that what you're saying?

A. I think I just mentioned -- that, in combination with the vehicle position of the Nissan approaching the sites in the No. 1 lane. In order to

connect those two points, you would need to have a rear orientation and a leftward serve.

Q. Well, which two points are you talking about?

A. If you look at the diagram that you're showing in front of you, you can see the Nissan is facing northeast. So if we see from the surveillance video that the Nissan -- the last point we see the Nissan is traveling straight in the No. 1 lane.

How does it move from that orientation to this orientation in this diagram, where it's at an angle with respect to the traffic lane? It has to have a leftward swerve.

Q. How does it go --

A. That's the only way you can reach impact at this orientation.

Q. Is it -- if you put a swerve on it, is that correct?

A. Did I put a swerve on it? That's my -- that's the only way you can reach this orientation after originally traveling straight in the No. 1 lane.

Q. Okay. And so for how long -- when did the swerve begin?

A. It would be just prior to impact occurring to -- in the -- or at an angle like this. Like, within a second, I believe.

Q. Okay. And so you're saying: In a second, if it's going 109 miles per hour, that swerve would have begun further to the west. Is that true?

A. Yes.

Q. And the swerve would have been -- and if a vehicle is traveling 100 miles per hour, how many feet per second is that?

A. 100 -- close to 150.

Q. So if you were to look 150 feet to the west of where this impact occurred on your diagram, that's where you would see the Nissan begin its swerve. Is that true?

A. If it's at one second before impact, yes.

Q. Well, that's what you said, right? That's what you said --

A. I said --

Q. -- happened?

A. Within a second.

Q. Oh, now it's within a second. Okay. So now -- but if it is within a second, if it started within a second, that would mean it started 150 feet west. Is that correct?

A. Based on the math, yes. That's correct.

Q. Okay. And that 150 feet west of this impact that you have described, that's almost -- almost in line

with the Edison pole, that would have been captured by the surveillance video. Is that correct?

A. If it's back at that point, 100 feet, yes. If it's beyond -- way back beyond that, yes. You might be able to see a deviation and -- and see that.

Q. Okay. And you're saying in your review of the surveillance video, you saw no leftward swerve of the Nissan, true?

A. In the area that the video captures the Nissan, I did not see -- I did not see that.

Q. So -- and to get to this level of engagement of the two vehicles, the way they collide like this -- but to get to there, you really -- you reverse engineered from where the vehicle -- the Nissan collided with the Toyota, correct?

A. That's something I'd take into consideration, yes.

Q. Okay. And so you had to determine how the angle at which the vehicle -- the Nissan struck the Toyota, right?

A. As part of the totality of the reconstruction, true.

Q. And you were trying to determine that, and the only way you could determine the angle at which it struck it is to know the location that the collision

happened in the first place, right?

A. That -- that's one of the factors that I'm trying to reconstruct, yes.

Q. And to know that, you have to know the speed that the vehicles are going after they collide, "they" being the Nissan and the Ford. Is that correct?

A. It plays a role, yes.

Q. Okay. You have to know that to know the angle at which the Nissan struck the Toyota, correct?

A. Yes, it does play a role in the movements of the vehicles. Yes.

Q. Okay. And you didn't even know what the speed was that the Nissan was traveling to hit the Toyota until today. Is that true?

A. Well, it is part of the reconstruction. I have that information.

Q. You have that -- where is that information documented?

A. It's within the simulation.

Q. Okay. Well, when the simulation is done, is there a paper report that gets generated?

A. If I ask for one, yes.

Q. Okay. So there is a paper report -- what would be included in that paper report for this final simulation that you did?

A. It prints -- I mean, it depends what variables you're interested in. It can give you the speed; it can tell you, essentially, the different collision dynamics of the model collisions.

Q. Well, I would like to know the information that you put into the system that led to this conclusion that we're looking at.

Is there a report available to you of that simulation?

MR. SINCICH: It is vague and ambiguous.

THE WITNESS: Right. I mean, if -- if you asked for specific numbers or specific things, I can pull that up for you. It just doesn't spit that out in the report. If you're asking me post-impact speeds, I don't think it would give that to you in a default report.

I can open the simulation and -- and tell you what the numbers are as I'm progressing through the movements of the cars. That is how I'm getting some of the numbers that you're asking about.

BY MR. HANRAHAN:

Q. Do you have the program open up in front of you? Are you looking at this information while we're going through your deposition?

A. Yes. Because you asked me specific questions

about specific scenarios; so I have it open.

Q. Okay. Well, where are you looking at right now?

A. The -- the same thing you have in front of you, but it's the complete simulation instead of screenshots.

Q. Okay. Well -- and so you're looking at, kind of, the work page for the software, correct?

A. I have the program open, yes. It's the physics tool.

Q. Okay. So there -- so the program has various modes that you can go to, correct?

A. There's different windows, yes.

Q. Okay. Different windows. And now you're in -- which window are you using? Which window do you have open?

A. The -- the main simulation file. Exactly what I have in front -- you have in front of you.

Q. Well --

(Cross-talk.)

A. -- diagrams -- from impact.

Q. And -- but -- does your window include other data that you've input into the system to create this simulation?

A. You'd have to access those, yes. I mean, you can. You can go to vehicle settings or things like

that.

Q. Okay. So those are accessible to you currently, right?

A. Sure. Yes.

Q. And that's what you're looking at on your screen -- on your work screen of the window that you have open right now, correct?

A. Right.

MR. SINCICH: Everybody, for the record I -- I don't know if you saw, but my screen went out. I'm not -- probably for the last 30 seconds or so. So I joined on my phone. It doesn't seem to be able to reboot on my computer.

So I'm back with you now. It appears that I missed a line of questioning over the last 30 seconds.

Carry on.

MR. HANRAHAN: Do you want to go back and try and figure out if you had anything -- I don't think there was too many -- if there was something --

Do you want to have us read back a bit so you can see if you want to insert some objections in there?

MR. SINCICH: It is not necessary right now. Thank you. Not -- I know the line of questioning that you were on. So --

MR. HANRAHAN: Okay.

MR. SINCICH: I'm okay. Thank you.

BY MR. HANRAHAN:

Q. So in terms of this angle that the Nissan was traveling and where it impacted the Ford Explorer, was that a product of -- actually, strike that question. Let me move on to another area.

Does PC Crash have the ability to do 3D models?

A. PC Crash can make a 3D model if you add an environment, yes.

Q. Okay. Did you create any 3D models of that?

A. No, I did not make a 3D model. There is an animation being done that was meant to make a 3D rendering.

Q. Is this -- what you created here, these simulations, are these the only simulations that you created as part of your analysis of this case?

A. Are these the only simulations I prepared? Yes. From impact to rest and then the pre-impact of the police vehicle making a left turn. These are the only two I prepared.

Q. And PC Crash can evaluate the speeds and positions of vehicles automatically based on certain inputs you provide. Is that true?

A. Well, if it's a physics tool -- so it relies on inputs, and then it calculates movements of vehicles

based on physics principles.

Q. Okay. And it does that automatically, correct?

A. It's running calculations based on -- yes. Physics.

Q. Okay. And it does it automatically, without you adjusting it, correct?

A. Right. I cannot make an adjustment to a trajectory. I can adjust inputs to see what output I get, but I cannot change the physics equations in the response of the cars.

Q. And you tried -- I believe you said 100 simulations before you obtained the best fit. Is that true?

A. Yes. Numerous. On that order.

Q. Okay. Well, I said 100. Is that an accurate figure?

A. It sounds about right, based on the numerous evidence I'm trying to match.

Q. And you spent most of those hundreds of simulations on trying to get the pathway between the collision and the Toyota. Is that true?

A. I'm trying to match the totality of the evidence, the debris, the rest position of the Ford, the secondary slap between the Ford and the Nissan, and then the secondary impact between the Nissan and the Toyota.

Q. Was it PC Crash that told you that there was a secondary slap?
A. You asked that already; and it is my assessment, my damage assessment that confirms there is a secondary slap.
Q. So just so I'm clear -- and you'll forgive me if I don't remember every question I've asked.
So is the answer "no," to my question that PC Crash did not indicate that there was a secondary slap?
Is that true?
A. I didn't rely on PC Crash to make that determination.
Q. Okay. Well, PC Crash generates a simulated travel of vehicles based on your input, correct?
A. Yes, it does.
Q. When you input the information, did PC Crash create a simulation that included a secondary slap? Yes or no?
A. That was what occurred, yes.
Q. No, I'm not asking whether that occurred. I'm asking whether the program created a simulation that included a secondary slap?
A. PC Crash doesn't create a simulation; it tells you the response. So upon the first collision, what happens is the second collision. Yes. That happened.

Q. Okay. Well, PC Crash, you input information; and then it plays out the scenario, correct?
A. Yes. That, I agree with.
Q. Okay. So you input certain information. And then at any time after you input the information, did PC Crash create a simulation that included a secondary slap?
A. It did, yes. It did result in a secondary contact between two cars that the program detected, and that was the secondary collision. And the vehicles continued on.
Q. Okay. And so PC Crash, based on your input, indicated that the patrol vehicle collided with the Nissan at this precise angle that appears in Figure 2, Slide 1 of Exhibit C?
A. It -- right. Based on my use of PC Crash, or that tool, yes. It did come to this conclusion.
Q. Okay. Well, when you're putting in information, do you do any adjustments to the information to change the various scenarios that PC Crash creates?
A. Sure. I mean, I'm trying -- like I said, I'm trying to match all the pieces of evidence. So the first try of various speeds of the Nissan and the Ford might not result in a secondary slap. It might not

result in the correct spinning of the force to reach the rest position. So I need to try different inputs and adjustments to reach that.

Q. So did you have to try to adjust the inputs so that the program created a scenario in which a secondary slap occurred?

A. Yes. I have to change the speeds, for example. That is why there's numerous iterations involved. I have to adjust the speeds of the vehicle so that the correct locations of the secondary slap also occurs.

Q. So you're saying that the vehicles could not have come to rest in the positions they did unless, unequivocally, a secondary slap occurred?

A. Yes.

Q. And you're saying the vehicles could not have come to rest in the manner that they did unless the vehicles -- the Nissan and the Ford collided in this precise way that you indicated?

A. Right. This is the only way to match the totality of the vehicle damage and where the vehicles come to rest.

Q. And when you got this simulation that you took the screenshots of, was this -- were all these screenshots taken from the same simulation?

A. Yes.

Q. And do you have that entitled in any way as a file or recorded?
A. It's just PC Crash.PRO.
Q. That's how it's named on your computer, as a file?
A. Yes.
Q. Okay. But to get to this simulation that ended up as we see now, you had to change the speed of the Nissan from how it appears in the EPR, correct?
A. Yes.
Q. EDR, sorry. And you had to change the speed of the Nissan from what you calculated that it actually was in reality, based on the size of the tires and the electronic data. Is that true?
A. Yes.
Q. Did you have to change the speed of the Ford from what it was on the electronic data?
A. Yes, there is some minor differences between that.
Q. Okay. And what speed did you give the Ford?
A. At the moment of impact, I had concluded it was traveling 20 miles per hour.
Q. Okay. And the electronic data said that it is traveling how fast?
A. It says 19 miles per hour.

Q. Did you have to change the angle that the Ford's steering wheel said it was at according to the electronic data?

A. Not for the Ford, no.

Q. I'm sorry. I didn't hear your -- understand your --

A. Not for the Ford. The data for -- the Ford's data was reliable.

Q. Okay. But you did change it for the Nissan.

Is that correct?

A. I did not apply any of the EDR data for steering for the Nissan.

Q. Okay. And was there other data -- I don't know -- that -- from the EDR data that differs from inputs that you put in to get the scenario?

A. None that I can think of here. So for the Nissan, we just mentioned it already. For the Ford, there's nothing else.

Q. So does the EDR data show you the yaw of the vehicle?

A. For the patrol vehicle, it does have the yaw rate.

Q. Okay. Does it show that for the Nissan?

A. I will check.

I don't see that information; so it's a no.

Q. You don't see that information in your analysis, or you don't see that from the EDR data for the Nissan?

A. From the EDR data.

Q. Okay. So --

(Cross-talk.)

A. -- to do with that.

Q. Is there any information -- there's -- what other information is available from the EDR data other than the vehicle's velocity, the acceleration or the braking, and the yaw of the vehicle?

What other information is available from the EDR data, from the Nissan?

A. Well, you have acceleration. You have engine RPM. You have cruise control, and then you have, like, seatbelt status. Things like that.

Q. Okay. And so did you use any of that other information to determine -- to create your scenario that we're looking at right now?

A. No, none of them are relevant to creating this.

Q. Okay. So the only ones that you used were the velocity of the Nissan, the velocity of the Ford, the direction of the wheel on the Ford, and the -- that's it -- to create this scenario. Is that true?

A. In terms of my reliance of the data, yes.

Those are the parameters I extracted and relied on.
Q. Okay. And that -- those are the only data points you used to input into PC Crash to create this scenario that we're looking at right now. Is that true?
A. Right. Those are the only parameters I extracted and had utilized in preparing this simulation.
Q. And you didn't use the steering data from the Nissan because you thought that was unreliable, correct?
A. Yes.
Q. And you could rule out any possibility that the steering wheel was actually turned in the direction indicated on the EDR?
A. Right. Based on the magnitude that it's reporting, it wouldn't be consistent with the path of the vehicles.
Q. Okay. And did you see any other data on the Nissan that you also thought was erroneous on the EDR?
A. I didn't see anything else on there that was striking as erroneous.
Q. Is there a way to check, in your expert opinion, whether this data is erroneous based on, I don't know, some troubleshooting on the data or the software?
Or, like, a way to determine whether it is, in fact, erroneous, or just your opinion that it might be?

MR. SINCICH: Vague and ambiguous. Compound.

THE WITNESS: Without inspecting the car mechanically, I wouldn't be able to verify that. So I wouldn't be able to.

BY MR. HANRAHAN:

Q. Do you know how to examine an EDR recorder to see whether its data is accurate or not?

A. Yeah. Depends on which -- which variable. You can do testing --

Q. The speed?

A. It's been done already. It's published. There is federal mandates of how accurate speeds need to be reported.

Q. Do you know how to download the data from an electric data recorder on a vehicle?

A. Yes.

Q. Okay. Do you know how to determine whether it's electronically faulty in some way?

A. Sure. We can download trouble codes or do testing to determine that.

Q. Okay. And is there any reason to believe that there was any kind of electronic issue on this steering wheel data, other than your -- what you've testified to already today?

A. I don't think I have enough information to be

able to answer that without seeing the vehicle or testing or having any additional information.

Q. Okay. And do you have an opinion as to the amount of the momentum that the Nissan had when it struck the Toyota?

A. Do I know how much force? I don't think I quantified that.

Q. Okay. Do you have an opinion as to how much force the Nissan struck the Ford with?

A. The Nissan struck the Ford with. Yes. I mean, that's in terms of, like, the Delta-v. I did do a calculation on that.

Q. Is that contained in your report somewhere?

A. Yes. It says, "Longitudinal speed change: 36 miles per hour. Lateral speed change: 44 miles per hour."

Q. And that's the momentum at impact. Is that what you're saying?

A. Right, from the first impact.

Q. Okay. And do you have the momentum during the period of time that you described as the secondary slap?

A. It's going to produce a Delta-v of about 12 miles per hour to the Nissan, is what I've calculated.

Q. Okay. And so the Delta-v means that that

momentum is quantified in terms of miles per hour?
A. Right, in terms of the force. That is how we typically express the transferring forces.
Q. So are you saying that the Ford transferred 12 miles per hour worth of force onto the Nissan during the secondary slap?
A. No. It experienced a change in velocity of 12 miles per hour during the secondary slap.
Q. The Nissan did?
A. Yes, the Nissan did.
Q. So it was going a certain speed, and then it -- its speed changed 12 miles per hour. Is that correct?
A. In a certain direction, yes.
Q. And 12 miles per hour slower or faster?
A. So in certain directions, faster; in certain directions, slower. So once you have a combination of those two, that results in a speed reduction of about 7 miles per hour.
Q. So you're saying the secondary slap slowed down the Nissan 7 miles per hour?
A. Yes.
Q. And is that contained in your report?
A. No.
Q. But the degree of force was measured in 12 miles per hour, that the Ford inflicted on the

Nissan. Is that true?

A. Yes, for the secondary crash.

Q. Okay. And you're saying that secondary crash of 12 miles per hour, that's what caused the Ford's front tire to make contact with the panel of the Nissan.

Is that true?

A. Right. And left that impression and crushed the door. Yes.

Q. Okay. Let me pull up something else. Hold on. One more thing. This is going to take a sec.

You created a rebuttal report. Is that correct?

A. I did, yes.

Q. And that is based on your review of Dr. Wobrock's report. Is that correct?

A. Yes. It's in response to -- yes, that report.

Q. And actually, you rebutted, also, Mr. Martin's report. Is that correct?

A. I did.

Q. And your opinion about -- well, let's start with Mr. Wobrock. And you disagree with Dr. Wobrock's opinion as to the manner in which the Nissan collided with the patrol vehicle. Is that correct?

A. Right. I believe Dr. Wobrock just simply agreed with what was concluded in the MAIT reports, and

so there's differences with -- between my reconstruction and what the MAIT team had put in.

Q. And you disagree with the MAIT team's report?

A. Yes, about the collision sequence that you brought up earlier.

Q. Okay. And you -- you have an opinion as to Officer Garcia's -- the safety of his driving on the night of the incident?

A. Safety. Well...

Q. Well, as to whether Officer Garcia contributed to the crash?

A. Yes, I can respond to those words. That -- yes, that he initiated a left turn into the path of the Nissan when the Nissan was approaching in close proximity. So he failed to yield the right of way to the Nissan.

He didn't come to a complete stop in the driveway apron before proceeding into the roadway at full throttle. And it looks like he didn't use his headlights or left turn signal leading up to the collision.

Q. Well, do you believe that the driver of the Nissan contributed to this crash?

A. He's driving -- I mean, he's driving on the roadway. So I think there was just nothing he could

have done based on the timing of when the left turn occurred. This incident was not avoidable, based on the timing of the left turn of the Garcia vehicle.

Q. So to your mind, you see no fault by the driver of the Nissan?

A. If we were just isolating it to the moments leading up to the collision, yes.

Q. Okay. Do you see any fault in the driver of the Nissan driving at 109 miles per hour under these conditions?

A. You know, it's over the speed limit. That's all I can tell.

Q. Okay. Do you know what the speed limit is at that location?

A. Not offhand, but I can look it up if you need it.

Q. Sure. Tell me what the speed limit is in that intersection.

A. Probably tells you in the police report.

45.

Q. The police report says 45. Do you have any reason to disagree with that?

A. Unless there is a posted sign that says something else.

Q. Well, usually on a surface street such as this,

you want to order a copy of the transcript?

MR. SINCICH: Can I have your e-mail address, please? Off the record, if you'd like. That way, I can let you know as soon as I talk to the boss.

THE COURT REPORTER: Off record, Counsel?

MR. HANRAHAN: Yes.

(Whereupon, at 4:22 p.m., the matter was concluded.)

---ooOoo---

REPORTER'S CERTIFICATION

I, ASHLEY L. PROXMIRE, do hereby certify:

That I am a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California.

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify under oath.

That the preceding deposition was recorded stenographically by me at the time and place herein mentioned; and that the preceding pages constitute a complete and accurate record of the testimony given by the aforementioned witness.

That I am a neutral party, in no way interested in the outcome of said action, and that I am not related to or otherwise connected with any of the parties involved with this matter or their respective counsel.

Dated: September 23, 2026

*Ashley L. Proxmire*
____________________________________
ASHLEY L. PROXMIRE, CSR No. 13664